# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL SMALL, et al.,, <br> *Plaintiff*, <br> v. <br> UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA , <br> *Defendants.* | NO.  2:13-cv-00298-APG-PAL <br><br> **SPECIAL MASTER DANIEL B. GARRIE E-DISCOVERY SUMMARY AND ORDER** |

## BACKGROUND AND PRIOR PROCEEDINGS

The Special Master was appointed on March 3, 2014. (Dkt. No. 149.) On March 10, 2014, the parties, counsel for all parties, and ESI consultants for all parties, met with Special Master Daniel Garrie and United States Magistrate Judge Peggy Leen in chambers. (Dkt. No. 151.) On March 18, 2014, Special Master Garrie memorialized his directives to the parties in a written order. (Dkt. No. 154.)

On March 18, 2014 Order Special Master Garrie set a hearing schedule, with hearings on April 4, 2014 and April 7, 2014. Present on behalf of Plaintiffs were Counsel Jon Tostrud, Marc Godino, and David O'Mara and ESI consultants Douglas Forrest and Bruce Pixley. Present on behalf of Defendant were Counsel Margaret Foley and Cayla Witty, ESI vendor Joe Edmondson, and Dean Schaibley, Network Security Administrator from the UMC IT Department. In addition, the following UMC IT individuals attended the April 7, 2014 hearing: Jason Clark, Sr. Systems Administrator, Marilyn Susan Kisner, IT Customer Support Manager, and Shane Lattin, Network Engineer. *See* Exhibit A (April 4, 2014 rough hearing transcript); Exhibit B (April 7, 2014, hearing transcript.)

At the April 7, 2014 hearing, Special Master Garrie ordered an additional telephone hearing on April 10, 2014.  *See* Exhibit B at 234:01-236:21 Present at the April 10, 2014 telephonic hearing were Counsel and their respective ESI Consultants and ESI vendor, and no individuals from UMC's IT Department. *See* Exhibit C (April 10, 2014, rough hearing transcript)

The Special Master conducted full day hearings on April 4, 2014 and April 7, 2014 with counsel, the parties' representatives, and consultants regarding UMC's ESI collection and production issues, as well as UMC's efforts to preserve discoverable materials pursuant to the Plaintiffs' litigation hold/preservation letters, and UMC's search of the ESI collected.

These hearings identified multiple potential failures by UMC with respect to the collection, preservation, and search of the ESI by UMC.

## ISSUES WITH UMC COLLECTION EFFORTS

**A.    UMC ESI Collection was Incomplete as of April 10, 2014.**

Among other things.

1.    UMC did not collect the laptops of Doug Spring, Director of Personnel Operations, and John Mumford, Sr. Human Resources Analyst, both potential sources of relevant ESI. *See* Exhibit D, UMC Custodian Interviews (Both John Mumford and Doug Spring stated that they had personal laptops that they used to conduct UMC business, including SEIU labor negotiations in 2009.)

2.    UMC did not include Claudette Myers who is the Executive Assistant to John Espinoza, Chief Human Resources Officer at UMC, in the initial custodian group even though Mr. Espinoza stated in his custodian interview that Ms. Myers maintained electronic filing, regularly accessed both Mr. Espinoza's calendar and e-mail, archived Mr. Espinoza's e-mail and calendars, and sent email and documents on Mr. Espinoza's behalf. *See* Exhibit D, 15 to 17.

3.    UMC never collected ESI from any UMC network file shares. *See* Exhibit B (hearing transcript from 04/07/14) at 116: 2-10 (Mr. Schaibley states that UMC did not collect any of the network file shares.) This means that UMC never collected any information from the UMC payroll network file share. *See* Exhibit D (custodian interviews) at 8, 13, 21, and 22 (Custodian interviews taken of John Mumford, Brian

2

Brannman, John Mumford, and Doug Spring all indicate that they stored documents in UMC network file shares.)

4.   UMC did not collect ESI from the UMC Blackberry server for any of the twenty seven custodians.  *See* Exhibit B (hearing transcript from 04/07/14) at 63 to 67 (Mr. Clark states that he was never instructed to preserve or collect communications or data from the UMC Blackberry server environment.)

5.   UMC failed to review the collection scripts, and, as a result, failed to identify errors that occurred in the collection. *See* Exhibit A (hearing transcript from 04/04/14) at 43:1-5 (Counsel Foley stated that she was never informed of collection errors by UMC or UMC ESI vendor.)

6.   UMC's IT staff did not verify that they had provided to UMC's ESI vendor all the data they had collected. *See* Exhibit B (hearing transcript from 04/07/14) at 138:24-25; 139:1-15 (Mr. Edmonson indicates not all of UMC ESI collection was searched by him in response to the multiple production requests and attempts.) The Special Master notes that, because not all ESI collected by UMC was searched for production, the entire production discussion before the Magistrate Judge Leen was based on a false premise.

B.   **UMC Failed to Perform Custodian Interviews**.

UMC failed to perform custodian interviews and this contributed to many of the above collection issues. *See* Exhibit A (hearing transcript from 04/04/14) at 50:3-25; 51:1-5 (UMC states that no custodian interviews were performed by it on or before the Special Master proceedings.)

**C.     UMC and UMC ESI Vendor Did Not Create Any Chain of Custody Paper Work for any of the ESI that was Collected by the UMC IT Department.**

On March 18, 2014, Special Master Garrie ordered UMC to create Chain-of-Custody paper work before the hearing on April 4, 2014. While UMC did submit a chain-of-custody, it was inadequate for its purpose. *See* Exhibit A (hearing transcript from 04/04/14) from 46 to 48. Specifically, the chain-of-custody failed to record several things, including (i) what sources UMC collected data from for each of the twenty seven (27) custodians, (ii) how they identified the ESI, (iii) how they collected the ESI, (iv) how the ESI was preserved, (v) what criteria were used to identify the ESI that was collected.

## ISSUES WITH UMC PRESERVATION EFFORTS

UMC was informed by Plaintiffs and the Court multiple times of its obligation to preserve information, including on: August 6, 2012, November 6, 2014, March 10, 2014, March 18, 2014 and April 4, 2014. *See e.g.,* Exhibit E (preservation letter sent to UMC); Exhibit F (internal UMC email informing patient service leaders to preserve documents); Exhibit G (deposition testimony of Mr. Espinoza where he states he is aware of his duty to preserve documents).  Despite this it appears that UMC did not take the necessary steps required to ensure preservation of relevant ESI by all custodians. *See* Exhibit B (hearing transcript from 04/07/14) 84:1-15 (Ms. Kisner states she did not receive a preservation notice and yet Ms. Kisner is one of the UMC IT employees responsible for wiping blackberry devices.)

It appears that UMC has not preserved:

1.  Data on the UMC Intranet. *See* Exhibit B (hearing transcript from 04/07/14) at 45:10-18; 46:12-20 (UMC states that did not collect or preserve ESI that existed on its intranet.)

2. UMC network file shares. *See* Exhibit B (hearing transcript from 04/07/14) at 45:10-18; 46:12-20 (UMC states that did not collect or preserve ESI that existed on the network file shares.)

3. UMC e-mail and messages stored on the blackberry server. *See* Exhibit B (hearing transcript from 04/07/14) at 36:3-25; 63:21-25; 64:1-10; 65:1-23; 83:6-18 (Multiple UMC IT stakeholders state that they have not yet preserved the blackberry server data as of April 7, 2014, and only gave the IT individual who could effectuate preservation a notice two weeks ago.)

4. UMC failed to preserve the computers of the twenty seven (27) UMC custodians. *See* Exhibit B (hearing transcript from 04/07/2014) at 112:1-18, 127 - 129;  Exhibit H at 9 (Declaration from Dan Small that includes as an exhibit an e-mail sent to all UMC employees that states many UMC employees store documents on their local computers.)

In addition, UMC is still unable to answer questions as to what data preservation policies have been implemented on their blackberry server and intranet. *See* Exhibit B (hearing transcript from 04/07/2014) at 98-102 (Several UMC IT employees state they do not know the policies implemented on UMC Blackberry server or intranet.)

**ISSUES WITH UMC FIRST, SECOND, AND THIRD PRODUCTION**

The UMC productions suffered from certain technical issues that prevented appropriate search and collection. *See* Exhibit I (UMC ESI vendor findings regarding production) at 3 (states that "[d]espite the manufacturers claims of compatibility the results of these tests show that it is likely that most errors were caused by P2 Commander not processing the source files accurately.")  It appears that the software tool chosen by UMC, while used in the industry, did not work. Special Master Garrie was able to resolve these technical issues.

In addition, UMC failed to identify several encrypted files in production, which were not searched. *See* Exhibit B (transcript of hearing on 04/07/2014) at 26-29 (UMC ESI vendor states there were various encrypted files which included two DMG files for Macintosh, which UMC is unable to explain since none of the custodians supposedly had or used Macintosh devices.)

## POSSIBLE SPOLIATION ISSUES

UMC has yet to accomplish a complete collection of all responsive ESI. This fact, together with the issues identified above, suggests potential spoliation of relevant evidence. Spoliation will be the subject of further attention by Special Master Garrie, and will be one of the topics addressed in his final order.

IT IS HEREBY FURTHER ORDERED THAT Plaintiffs and UMC will have done or do the following:

**Plaintiffs.**

1. Plaintiffs will have provided written questions regarding custodian interviews in advance of the phone hearing on April 10, 2014.

2. Plaintiffs are to be prepared to discuss, at the telephonic hearing on April 15, 2014, the file types to be searched by UMC.

3. Plaintiffs are to provide the Special Master with a letter or affidavit explaining why they believe Lonnie Richardson, Ernie McKinley, and Lawrence Bernard should be added to list of custodians.

4. Plaintiffs will have provided, by April 11, 2014, to Special Master Garrie results of UMC SAP data analysis from 10 opt-in packets.

5. Plaintiffs will file with the Court, by April 17, 2014,   the amended ESI Protocol..

**Defendants**.

1. UMC to start producing data to Plaintiffs' on or before April 22, 2014 at 10:30am PST, starting with custodian John Espinoza.    UMC production is to follow the amended ESI

Protocol.

2.  UMC ESI expert is to provide Special Master Garrie and Plaintiffs with a spreadsheet on or before April 14, 2014. The spreadsheet shall set-forth a count of the total number of emails that were lost in the recovery process.

3.  UMC is to provide the Special Master with the following on or before April 16, 2014, unless noted otherwise:

    - UMC archiving policy for the data stored on the UMC intranet.
    - Name and contact details of the individual(s) in UMC IT department who implement the record/data retention schedules for emails, Blackberry communications, and SAP/Kronos systems.
    - Specific pages of UMC retention and deletion policies/guidelines for the following systems: network file-shares, e-mail, blackberry devices blackberry server, SAP server, Kronos, and any other internal systems used by the custodians.
    - Complete list of all UMC custodians that have smartphones that are either UMC issued or personal that are used to conduct UMC business.
    - Spreadsheet that details the network file share mappings of the initial six custodians by April 15, 2014, and the remaining custodians by April 21, 2014.

4.  UMC is to submit by April 15, 2014, the following documents, unless noted otherwise:

    - Explanation of UMC Blackberry server configuration during the time period in question.
    - Clarification of how UMC Blackberry environment operates with UMC Exchange environment during the time period in question.
    - Explanation of McAfee configuration during the time period in question.
    - Enhanced data map that includes the data repositories at UMC clinics.
    - USB connectivity logs for the initial six custodians by April 18, 2014.
    - Spreadsheet that lists which of the twenty seven (27) UMC custodians are using

7

Windows XP on their desktop today. In addition, the spreadsheet should identify which of these UMC custodians' computers, laptops, or other devices have been updated since 2011. The spreadsheet also should identify any computers or devices these custodians access more than 5 times a month.

- Affidavit or declaration from UMC employee Ms. Kisner that identifies all wiping that occurred with respect to the mobile devices for each of the twenty seven (27) custodians, including personal smartphones, on or before April 18, 2014.  For the sake of clarity, Ms. Kisner should identify if she or anyone on her team has ever configured or been asked to configure a smartphone to access UMC e-mail system for any of the twenty seven (27) custodians, including personal smartphones.

- UMC is to provide on or before April 18, 2014 a spreadsheet that lists all requests made to UMC internal IT support/help desk system to assist with mobile devices or to create backups (e.g., burning CD/DVD) for each of the twenty seven custodians for the time period in question.

- Screen shot or affidavit identifying if UMC OWM configuration sets a flag at the server level not to cache the body of the messages to the web client.

- Spreadsheet of all network file share folders created by UMC employees or consultants in connection with the Department of Labor investigation, and it also should identify which custodians had access to these folders.

- Detailed log files that show when UMC employees accessed UMC systems via the web or VPN during the relevant time period.

- A letter stating the initial date of the Department of Labor investigation.

- An affidavit of declaration by April 17, 2014 that updates the UMC ESI vendor's Scan/Repair findings to reflect the correct number of OST and PST files for the initial custodians, and it is to include an explanation as to why this error occurred.

- UMC is to work with the Special Master to determine if the initial six UMC

8

custodians used personal mobile devices to conduct UMC business, and be prepared to discuss at the April 15, 2014 telephonic hearing.[1]

5. UMC is to provide, on or before April 16, 2014, a letter to Special Master Garrie and Plaintiffs a letter affirming that, on a going forward basis, the following ESI repositories are being preserved using industry best practices:

- All data on e-mail lists,
- Data stored on Blackberry server for the twenty seven (27) custodians
- All network file files shares that contain responsive data, including: Department of Labor investigation folder;
- Doug Spring UMC issued laptop
- James Mumford personal laptop that was used for UMC business
- All UMC computers, laptops, tablets, or other devices used by twenty seven custodians because of UMC email.
- All network files shares, including those identified in the custodian interviews provided to Special Master Garrie.
- UMC IIS servers, lotus notes/domino server, and any other server used by UMC intranet.

6. UMC is to amend the chain of custody forms and submit them to Special Master Garrie and the Plaintiffs by April 14, 2014. The amended chain of custody forms will include the following: details as to what information was collected by UMC for each custodian;

---

[1] UMC circulated proposed additional search terms to be used to search the ESI UMC it collected to date, to ascertain whether the initial six UMC custodians used personal mobile devices to perform UMC related business. *See* Exhibit C (rough hearing transcript from 04/10/2014) at 7:4-22. Plaintiffs provided their comments to the proposed search terms with respect to the mobile devices. Special Master Garrie reviewed the search terms and ordered the parties to search the ESI collection with the following terms: "iPad", "iPhone", "Android", "Blackberry", "Blackberry Curve", "Windows Phone", "Sent from my". UMC is to search the UMC collection for each of the initial custodians with a date range from June 2008 to present.  In addition, UMC will perform the search and provide the results to the Special Master before April 15, 2014 at 12pm. *See* Exhibit C (rough hearing transcript from 04/10/2014) at 77:3-11. UMC will provide the Special Master with remote access to review the search term results on April 15, 2014. *Id.*

identify what ESI sources UMC collected from for each custodian; UMC is to update the chain of custody forms to include details for each mobile device it collected; and MD5 hash values for each evidence container that was collected.

7. UMC is to provide a declaration or affidavit, on or before April 18, 2014, to Special Master Garrie from the original e-discovery provider that addresses, the following: (i) how they failed to properly collect the ESI that UMC initially collected; (ii) why they were unable to collect in a forensically sound manner the ESI gathered by UMC either in April and August. UMC Counsel is to submit a two page letter to Special Master Garrie on or before April 21, 2014, that explains how UMC Security individual, UMC Counsel, UMC current forensic expert, and UMC former forensic expert did not realize the ESI collection being searched was not the entire ESI repository collected by UMC. In addition, UMC ESI expert is to submit an affidavit on or before April 25, 2014, which identifies each and every file that was collected by UMC and not included in UMC's first, second, or third ESI production.

8. UMC is to identify the personal email addresses for the six initial custodians, and run a search for these email addresses and review the results to determine if these custodians were using their personal email address to conduct UMC business. UMC is to notify the Special Master, on or before April 21, 2014, of the results of the search.

9. UMC counsel is to review Plaintiffs' prior request for documents, search the updated UMC ESI collection, and produce any responsive ESI on a rolling basis starting no later than April 24, 2014.

### HEARING DATES

The following dates for hearings are as follows: April 15, April 22, and May 7. All hearings will be held at the Las Vegas court house or telephonically with a court reporter present. The Special Master will coordinate with the court to confirm space is available.  The Special

1    Master Orders the parties to be PREPARED and their ESI and UMC IT EXPERTS TO BE

2    AVAILABLE either by phone or in-person.

3        At the hearing on April 22, 2014, the Special Master has ordered Lawrence (Larry)

4    Barnard, Chief Executive Officer, Ernie McKinley, Chief Information Officer, and John

5    Espinoza, Chief Human Resources Officer to appear at the hearing, their presence being

6    necessary to provide a complete understanding of UMC's discovery related actions and inactions

7    to date.

8        The Special Master Orders the parties to provide all materials to be discussed at the

9    hearing at least 24 hours prior to the hearing.

10

11                              **TIME ESTIMATE**

12       The Special Master at this time is unable to provide a precise estimate as to the amount of

13   time required to perform the work set-forth above.

14

15

16                              **SO ORDERED:**

17

18

19                              Daniel B. Garrie, Esq.
                                Electronic Discovery Special Master
20

21   DATED this 4 day of April, 2014.

22

23

24

25

26

27

28

                                        11

# Exhibit A

```
 1      4-4-14 ROUGH DRAFT OF SPECIAL MASTER'S HEARING

 2

 3           This realtime draft is unedited and

 4      uncertified and may contain untranslated stenographic

 5      symbols, an occasional reporter's note, a misspelled

 6      proper name and/or nonsensical word combinations.

 7           This is an unedited version of the deposition

 8      transcript and should not be used in place of a

 9      certified copy.  This document should not be

10      duplicated or sold to other persons or businesses.

11      This document is not to be relied upon in whole or in

12      part as the official transcript.  This uncertified

13      realtime rough draft version has not been reviewed or

14      edited by the certified shorthand reporter for

15      accuracy.  This unedited transcript is computer

16      generated and random translations by the computer may

17      be erroneous or different than that which will appear

18      on the final certified transcript.

19           Due to the need to correct entries prior to

20      certification, the use of this realtime draft is only

21      for the purpose of augmenting counsel's notes and

22      cannot be used to cite in any court proceeding or be

23      distributed to any other parties.

24           Acceptance of this realtime draft is an

25      automatic final copy order.
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1                  UNITED STATES DISTRICT COURT

 2                     DISTRICT OF NEVADA

 3         BEFORE SPECIAL MASTER PRESIDING, DANIEL GARRIE

 4

 5   DANIEL SMALL, CAROLYN SMALL,  )
     WILLIAM CURTIN, DAVID COHEN,  )
 6   LANETTE LAWRENCE, and LOUISE  )
     COLLARD, Individually, and on )
 7   Behalf of All Other Persons   )   Case No.
     Similarly Situated,           )
 8                                 )   2:13-cv-0298-APG-PAL
             Plaintiff,            )
 9                                 )
     vs.                           )
10                                 )
     UNIVERSITY MEDICAL CENTER OF  )
11   SOUTHERN NEVADA,              )
                                   )
12           Defendant.            )
     _____)

13

14                  *** ROUGH DRAFT ***

15         TRANSCRIPT OF SPECIAL MASTER'S HEARING

16              Taken on Friday, April 4, 2014
                       At 9:07 a.m.
17
                At 333 South Las Vegas Boulevard
18                    Las Vegas, Nevada

19

20

21

22

23
     REPORTED BY:  Janet C. Trimmer, CRR, CCR No. 864
24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    APPEARANCES:

 2
      For the Plaintiffs:
 3
              JON A. TOSTRUD, ESQ.
 4            Tostrud Law Group
              1925 Century Park East
 5            Suite 2125
              Los Angeles, California 90067
 6            (310) 278-2600
              jtostrud@tostrudlaw.com
 7
              MARC L. GODINO, ESQ.
 8            GLANCY BINKOW & GOLDBERG, LLP
              1925 Century Park East
 9            Suite 2100
              Los Angeles, California 90067
10            (310) 201-9105
              mgodino@glancylaw.com
11
              DAVID C. O'MARA, ESQ.
12            The O'Mara Law Firm, P.C.
              311 East Liberty Street
13            Reno, Nevada 89501
              (725) 323-1321
14            david@omaralaw.net

15
      For the Defendant University Medical Center of
16    Southern Nevada:

17            MARGARET G. FOLEY, ESQ.
              CAYLA J. WITTY, ESQ.
18            Lewis Brisbois Bisgaard & Smith, LLP
              6385 South Rainbow Boulevard
19            Suite 600
              Las Vegas, Nevada 89118
20            (702) 893-3383
              cayla.witty@lewisbrisbois.com
21

22    Also Present:

23            DOUGLAS FORREST, ESQ.
              DEAN SCHAIBLEY
24            BRUCE PIXLEY (Via Telephone)

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

```
 1                        I N D E X

 2
                      E X H I B I T S
 3    NUMBER          PAGE   DESCRIPTION
      Exhibit 1          6   "Special Master E-Discovery
 4                           Order"

 5    Exhibit 2          8   "PST Repair and Production Tests
                             For UMC"
 6
      Exhibit 3         24   Chain of custody document
 7
      Exhibit 4         28   UMC's data backup and
 8                           restoration policy

 9    Exhibit 5         56   E-mail from Cindy Dwyer to
                             patient service leaders dated
10                           4-15-03, Bates UMC100004

11    Exhibit 6        120   Letter dated 8-6-12 from David
                             O'Mara to Brian Brannman
12
      Exhibit 7        151   Document titled "Payroll
13                           Correction," Bates UMC100000 to
                             48
14
      Exhibit 8        157   Letter dated 9-26-12 from John
15                           Espinoza to YBelka Hernandez,
                             Bates UMC000006 to 7
16

17

18

19

20

21

22

23

24

25
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    *********************Proceedings**********************

 2

 3         THE SPECIAL MASTER:  I'm going to get started

 4    now.  This is the hearing, just for the record

 5    purposes today, in regards to resolving a series of

 6    e-discovery and collection-based issues.

 7         There was a prior order.  I forget the day it

 8    was issued.  Does anybody have a copy of the prior

 9    order that was issued by the Court?

10         MR. TOSTRUD:  Yes.

11         THE SPECIAL MASTER:  I just want to enter it

12    in so that we have the record, because we are going to

13    use that as sort of a framework for our conference

14    today.

15         MR. TOSTRUD:  Just to be clear, you would

16    like a copy of the order appointing you?

17         THE SPECIAL MASTER:  Not appointing me.  The

18    subsequent one where I issued an order saying we are

19    going to cover --

20         MR. GODINO:  The special master e-discovery

21    order?

22         THE SPECIAL MASTER:  Yes.  Off the record.

23             (OFF RECORD.)

24         THE SPECIAL MASTER:  Back on the record.

25
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1                    (Exhibit 1 was marked
 2               by the Certified Court Reporter.)
 3          THE SPECIAL MASTER:  We're going to use this
 4  order as a framework for parts of the conversations
 5  throughout the day today and we'll touch on certain
 6  things.
 7          I have high hopes that we will make dramatic
 8  progress.  I spent a lot of time reviewing materials
 9  and understanding everything.  I'm going to quickly go
10  off the record.
11                    (OFF RECORD.)
12          THE SPECIAL MASTER:  Back on the record here.
13          So going forward, I had a chance to review
14  all of the materials, which was very extensive and
15  complete, and I also received the chain of custody
16  interview forms, etc.  There will be a discussion
17  about privilege, and we will certainly touch on that.
18          Before we get to that, though, I wanted to
19  check:  The PST repair, can we enter that into
20  evidence?  Is there any objection as privileged by
21  counsel?
22          MS. WITTY:  No.
23          THE SPECIAL MASTER:  So I would like to enter
24  into evidence, provide a copy.  I have three copies
25  printed.  I'm going to go for the easy ones to start,
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   and then we'll progressively deal with the more
 2   challenging issues.  But I want everybody to feel at
 3   least we are making progress to start.
 4         So as they are entered into evidence, I'm
 5   going to turn to our colleague.  Did you enter your
 6   name and your card?
 7         MR. EDMONDSON:  I still don't have a card.
 8   She has my name.
 9         THE REPORTER:  I have his name.
10         THE SPECIAL MASTER:  Do you want me to call
11   you Joe or Joseph?
12         MR. EDMONDSON:  Joe is fine.
13         THE SPECIAL MASTER:  Joe, I'm going to ask
14   you a bunch of questions about this material.  I would
15   like counsel to get a copy of it, and before I get
16   into it, I'm going to explain what it is.
17         MR. GODINO:  We have somebody on the phone.
18         THE SPECIAL MASTER:  Oh, you do?  Are they on
19   the phone?  Have they dialed in?
20         MR. GODINO:  We were told him that the Court
21   would dial him.
22          (Bruce Pixley now present via telephone.)
23         THE SPECIAL MASTER:  Thank you for joining us
24   today.
25         Unfortunately, we don't have wireless
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   Internet so you can't see the exhibits as they are
 2   going in.
 3           MS. WITTY:  We do have wireless.
 4           THE SPECIAL MASTER:  Oh, we do?
 5           MS. WITTY:  Yes.
 6           THE SPECIAL MASTER:  So it might be useful to
 7   provide their ESI expert with a soft copy of the...
 8           So Bruce, this is Daniel.  We are going to
 9   arrange so that when we have exhibits entered, that
10   you will receive soft copy of them when they pertain
11   directly to ESI issues, so that way you can work with
12   your counterparts as necessary.
13           MR. PIXLEY:  Okay.  Thank you.
14           THE SPECIAL MASTER:  Okay, Joe.  Ready?
15           MR. EDMONDSON:  Yes.
16           THE SPECIAL MASTER:  Did the other side get
17   it?
18           MR. TOSTRUD:  Yes, we have a copy.
19           THE SPECIAL MASTER:  And it's Exhibit 2.
20               (Exhibit 2 was marked
21            by the Certified Court Reporter.)
22
23           JOSEPH EDMONDSON - EXAMINATION
24
25   BY THE SPECIAL MASTER:
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1      Q.  So I want to start at the top and go all the
 2  way through, but before I jump into it:  So you, the
 3  PST -- first things first.  It certainly appears that
 4  Paraban does not work?
 5      A.  Yes.
 6      Q.  No?
 7      A.  In this case, that is correct.
 8      Q.  I mean, in this particular case with this
 9  particular situation, based on the table you provided,
10  it's very evident that, contrary to the e-mails and
11  their own direct statements saying that it would work,
12  it didn't work.
13      The good news is -- why don't you walk us
14  through what you did for each of the custodians.  And
15  I particularly want to -- when we are going through
16  them with John Espinoza, I'd particularly love to know
17  where you got the PST and OST files from.  We can
18  table that for downstream.
19      A.  Okay.
20      Q.  The PST/OST file question arises from, the
21  collection script that was run, does not appear to
22  have collected PST or OST files relating to them.  So
23  one of those issues we'll talk about a little
24  downstream.  So I'm a little -- I want to know how you
25  got them.  But we'll get to that in a minute.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1             So why don't you walk me through what you
 2   did, starting with you identify PSTs and OSTs.  How
 3   did you identify them?
 4        A.  I filtered an EnCase by extension.
 5        Q.  And this is total number?
 6        A.  Yes.
 7        Q.  This is total number of the entire case file?
 8        A.  Inside the case file, yes, which was the EO 1
 9   that I had created from the A.
10        Q.  And we'll get to the chain-of-custody piece
11   later.
12             So this is the universe of what you working
13   for OST and PST files?
14        A.  Correct.
15        Q.  What about MBA, like Outlook Express?
16        A.  Outlook Express, there were some files, but I
17   didn't run the -- scan PST on those.
18        Q.  Okay.  You need to run them on that as well.
19        A.  Okay.
20        Q.  Because it would appear -- and we will touch
21   on that -- that as much as people want to tell users
22   to use a certain system, at least it would appear,
23   based on the collection script, that either their
24   children were using or they were using Outlook Express
25   in lieu of Outlook at least, one or two of them, and
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1   we'll touch on that later.  But just please run it on

2   Outlook Express.

3          What were the results -- so you mentioned

4   Jackie Panzeri?

5       A.  Yes.

6       Q.  Walk me through Panzeri.

7       A.  Two of her PSTs failed.

8       Q.  For the record, who is Jackie Panzeri?

9          MS. FOLEY:  Payroll.

10          MS. WITTY:  Jackie Panzeri is payroll manager

11   at UMC.

12   BY THE SPECIAL MASTER:

13       Q.  So keep going.  So she has --

14       A.  Two of her PSTs failed when we were in

15   scanned PSTs, and the error suggested that it was an

16   ANSI format PST that was over 2 gigs.  So it had to be

17   trimmed in order to successfully run the scanned PST.

18       Q.  So we're on the same page, those are the only

19   two you came across with errors?

20       A.  Well, they are the only two that failed.

21       Q.  That failed.

22       A.  Yes.

23       Q.  When they failed, just so we are on the same

24   page, what did you do when they failed?

25       A.  I then ran PST 2 gig to trim off the end of

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    the file.  So I started at 10, to see if it would
 2    actually repair after that.  If it repaired, remove
 3    only 5 from the original, try again.  Till I got the
 4    smallest amount that I could remove and still repair
 5    it successfully.
 6        Q.  You went from 2 gigs to 36 megs?
 7        A.  Yes.
 8        Q.  And then 2 gigs to 512 megs?
 9        A.  Yes.
10        Q.  That's a big haircut, so to speak?
11        A.  Yes, it is.
12            THE SPECIAL MASTER:  We will revisit those
13    two mailboxes or those two PST files.
14            You didn't have -- and we'll get to -- we'll
15    touch on the collections.
16            Thank you to you.  I didn't catch your name.
17            MR. SCHAIBLEY:  Dean Schaibley.
18            THE SPECIAL MASTER:  Thank you, Dean, from
19    UMC, showing up.  I like to have people with feet on
20    the ground, because at the last hearing there was a
21    little -- more in the clouds, we had a
22    much-higher-in-the-air perspective, and so this will
23    be pretty much more useful.
24        Q.  So you trimmed them, but you only found two
25    that failed?
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1        A.  Correct.
 2            THE SPECIAL MASTER:  And you provided me with
 3    those log files, and I started to review them.  But
 4    would you have any objection, Counsel, to the other
 5    side seeing the results of the log files that he
 6    was -- the repair --
 7            MS. WITTY:  From the scan and repair?
 8            THE SPECIAL MASTER:  Yes.
 9            MS. WITTY:  No, there is no issue.
10            THE SPECIAL MASTER:  So I'm going to order
11    you to turn them over to the other side.
12            I would say we would enter them into
13    evidence, but they are way too long, and nobody
14    deserves to have to carry those around.
15            But let the record reflect that I have
16    ordered the parties to turn over the scan repair logs
17    that were provided to me in an e-mail by counsel in a
18    timely fashion, meaning within 24 to 48 hours.
19        Q.  So tell us about the results of the tests
20    here.
21        A.  The results, yes.  What I did was, I then
22    took the repaired PST files, located the --
23        Q.  For those two, or for all of them?
24        A.  For all of them.  So I took --
25        Q.  Were there any other errors on the repairs
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of  Special Master's Hearing    April 4, 2014

1  that you ran, or was this it?

2      A.  Those were the only errors that failed.

3      Q.  But there were other errors?

4      A.  There were other things that were repaired.

5  Within the log files, there were other errors that

6  were repaired in other PST and OST files.

7          THE SPECIAL MASTER:  I believe that almost

8  every one of them at some point had some sort of

9  repair done.  The logs will reflect that and it will

10  allow the other side to see what exactly...

11          Mr. Pixley, can you hear me?

12          MR. TOSTRUD:  Bruce?

13          MR. PIXLEY:  Yes, I've been able to hear.

14          THE SPECIAL MASTER:  So I'm going to let

15  counsel figure out who they want to send them to look

16  at as well I'm looking at them.  We'll have a

17  conversation about what we will do with the errors,

18  but let's first talk about what we found and what we

19  can do going forward, and then we'll deal with the

20  other pieces that remain from that.

21      Q.  So keep going.

22      A.  Okay.  So I took the Bates numbers from the

23  production and the discussion that we had before, and

24  I look --

25      Q.  And that's referring to Mr. Pixley's

Rough Draft of Special Master's Hearing   April 4, 2014

1    declaration where he provided where he identified a

2    series of e-mails?

3        A.  Correct.  And so I located the original

4    source of those e-mails, and then --

5        Q.  In the containers; right?  In the PST/OST

6    files?

7        A.  Yes, which PST or OST they came from, and

8    then I exported using P2 Commander in both EML and MSG

9    format.  I also mounted those PSTs in EnCase 6 and 7

10   and exported the same file in MSG format from both of

11   those.  That way we could compare all four possible

12   production options.

13           THE SPECIAL MASTER:  And what was the end

14   result, at a summary level?  And we'll go through it.

15           Do you guys want to go through each one?

16   They are pretty much the same, but we can if you want.

17           MR. TOSTRUD:  You mean each of the different

18   custodians?

19           THE SPECIAL MASTER:  No, we'll go through

20   that later.  All we're discussing right now is that we

21   ran, scan, and repaired, and then I ordered them to

22   look at -- and in Mr. Pixley's declaration he

23   identifies a series of e-mails that were problematic.

24   I told him to focus on those specific ones and see if

25   the software breaks for Paraban, and if Paraban

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   doesn't work, find me something that works.
 2          He's now talking about EnCase 6 and EnCase 7
 3   and the results of what he found.  And if you will
 4   look at the exhibit, you will see the Bates number
 5   1 --
 6          MR. TOSTRUD:  Uh-huh.
 7          THE SPECIAL MASTER:  It has, just for the
 8   record, it says P2 commander software EML, the native
 9   body view is blank, the native attachment view is a
10   text file, that's mime, eCapture text was a raw mime,
11   and Ipro eCapture was left blank.
12          If you then go to what P2 Commander did with
13   the MSG file, it was even more spectacular.  It
14   couldn't open them in the native body view; it
15   couldn't actually open them in the native attachment
16   view.  But it did appear correct in the eCapture text
17   extract.
18          Then we look at EnCase 6 and EnCase 7 and we
19   see there were no problems, which means that at the
20   end of the day, it appears based on if you look at all
21   the different specific Bates stamp pages, that if you
22   use EnCase 6 or 7 to perform the extraction and that
23   piece of it, it will resolve or remediate at least the
24   sample of e-mails that you provided as a test case, it
25   fixes all of those, which then leads me to believe
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   that the error was with the Paraban software itself.
 2   Does that make sense?  Any questions?
 3        Is that accurate?
 4        MR. SCHAIBLEY:
 5     A.  Yes.
 6        THE SPECIAL MASTER:  Does counsel have any
 7   questions?  We'll talk about the error logs and all of
 8   that a little bit later.  I'm just trying to get
 9   through at the very least we know that we can now
10   process e-mail.
11        MR. TOSTRUD:  I don't think we'll need to go
12   through each one individually.
13        THE SPECIAL MASTER:  Okay.  Good.  You never
14   know.  If I don't ask, I'll never know.  I'm going to
15   go off the record for a second.
16           (OFF RECORD.)
17        THE SPECIAL MASTER:  I'm going to -- Joe --
18   I'm going to request -- or Mr. Edmondson.  My
19   apologies -- that you process everything again through
20   EnCase 7, because -- and assuming that we don't have
21   Chinese character issues, we'll -- and recognizing
22   fully and completely that there is a whole set of
23   other issues that we need to have a conversation
24   about, and counsel for UMC, that you need to be aware
25   of, that the e-mails that were actually -- the PST and
```

1   OST files themselves had errors, and we're not talking

2   for some of these custodians that were identified on

3   the list, particularly Ms. Panzeri, like her PST and

4   OST collection itself; those e-mail containers had

5   substantial issues.

6         So we have to have a conversation about how

7   to deal with that and address that to make sure that

8   the search you are running is actually of the e-mails

9   that you believe to exist there and, if not, how we

10  can address that.

11        But recognizing that, I'd like to suggest:

12  You'll get the scan and repair logs, and I request

13  that you guys, in some sort of timely fashion or by on

14  or before Wednesday of next week, review them.

15        And if you have any -- we'll have a

16  conversation about them, but if you want to raise any

17  issues about them or things that you identify that we

18  do not discuss today or in the hearing on Monday, we

19  will talk about them.

20        I'd like to get it in writing by Wednesday,

21  and so we can then either figure out if we need to

22  have a phone hearing or an in-person hearing

23  accordingly.

24        MS. WITTY:  They should have received an

25  electronic copy of the zip file containing those.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  Did you receive it?
 2            MR. TOSTRUD:  Yes.
 3            MR. GODINO:  Yes.
 4            THE SPECIAL MASTER:  So counsel did receive
 5     it.  Okay.  So that's good news; right?  I mean, there
 6     is a whole lot -- there is a litany of other things to
 7     cover, but at least now I think what I'm going to
 8     suggest -- I'm going to go off the record for one
 9     second.
10                 (OFF RECORD.)
11            THE SPECIAL MASTER:  Let's go back on the
12     record.
13            MR. TOSTRUD:  Plaintiffs are absolutely
14     amenable to rolling production beginning next week or
15     as soon as possible or practicable.  We just want to
16     put on the record that these five custodians and 10 or
17     12 search terms, however we identified them, is an
18     initial ESI --
19            THE SPECIAL MASTER:  100 percent.
20            MR. GODINO:  Also, that this is a production
21     of only e-mails.
22            THE SPECIAL MASTER:  Well, that will be -- it
23     will be a production -- I would request not only --
24     when I said process, I meant process it all.  It will
25     be a process of whatever they collected, and we will
```

```
 1    have a conversation later today about what was
 2    actually collected, but it will be whatever was in the
 3    collection containers for each of these custodians
 4    that was provided by UMC to their initial forensic
 5    expert, then was provided to the next forensic expert,
 6    then was provided to counsel.  So whatever fits within
 7    that realm of what was collected is what you will be
 8    getting in the rolling production.
 9            MR. GODINO:  Understood.
10            THE SPECIAL MASTER:  The only -- if there are
11    additional errors and etc., I would request that you
12    notify me within 24 hours in writing.  You don't have
13    to be specific about it.  Say we have identified a
14    specific error issue, and we will either flag it and
15    address that specific technical issue or, if
16    necessary, we'll slow down the rolling production and
17    address that, if necessary.
18            I'd like, if at all possible, make this
19    production at least start moving somehow forward in
20    some fashion, and I know at the very least e-mail
21    works.
22            So I'm going to keep the bar low and go with
23    just -- I know for a fact that whatever is sitting on
24    this page was mounted and works.  So I can rest
25    assured that you'll receive those.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              Does counsel for UMC have any objection to
 2    that?
 3              MS. WITTY:  Can you clarify what you mean by
 4    the production for next Friday?
 5              THE SPECIAL MASTER:  What I do want by end of
 6    today -- and there will be a lunch break.  I know
 7    that's, exciting as it may be, to not talk about work
 8    at lunch.  I'm going to kindly ask that you look at
 9    your EnCase file and you coordinate with counsel to at
10    least come up with a tentative schedule so that by the
11    end of this hearing, we're walking out of this here
12    saying by this day we will turn over one custodian,
13    two custodian, three custodian, four custodian, five
14    custodian; however it works, for whatever has been
15    collected.  We're not talking about what -- the scope
16    of the collection -- we're not commenting at all on
17    the collection.  It's just what exists now that has
18    been collected.  Is that all right?
19              So I'm not going to order by Friday.  I'm
20    going to wait till the end of day today.  I do request
21    plaintiffs, please remind me need to make sure we
22    cannot leave here until we have that set.
23              MR. TOSTRUD:  Okay.
24              THE SPECIAL MASTER:  I want to be clear.  I
25    fully intend to go home to Seattle today, so we're all
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    on the same page.
 2            So that's good news.  So the good news is
 3    that hopefully we'll have a rolling production going
 4    forward of the five custodians that's pointed out.
 5    There is the initial conversation of 10 or 12 ESI
 6    terms, and hopefully that will be flowing, and there
 7    will be privilege logs created, and you can have a new
 8    sort of interactive dialogue with the Court around
 9    that.
10            Okay.  Any questions around that?
11            I do want to stress, and we do need to, now
12    that we've come up with that, I want to have a
13    conversation about the errors.  It sort of is
14    troubling.  I did look at the error log in some
15    detail.  Dean?
16            MR. SCHAIBLEY:  Dean.
17            THE SPECIAL MASTER:  What's your last name?
18            MR. SCHAIBLEY:  Schaibley.
19            MR. GODINO:  Excuse me.  Bruce's call was
20    dropped.
21            (Bruce Pixley was reconnected via telephone.)
22            THE SPECIAL MASTER:  I want to talk now about
23    the scan repair log issue.  I realize on occasion that
24    nothing is perfect and that you do occasionally have
25    errors.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          It is not often you end up with having to cut
 2   1.95, 1.96 of gigs of the actual e-mail container
 3   itself.  So that leads me to the question of the
 4   evidence that was collected and where it sits and the
 5   hash values.
 6          So I'm going to table this.  I'm going to ask
 7   plaintiffs, because I know you won't let me forget:
 8   Please remind that we have to revisit this and resolve
 9   this today.
10          But before we can actually resolve it, we
11   need to have a broader conversation about the chain of
12   custody and what was down and how it was collected.
13          I do want to commend counsel for UMC for
14   undertaking a mammoth task of getting me the custodian
15   interviews and getting them moving and forward, and I
16   fully recognize that it is a function just as much of
17   your clients as it is you being a lawyer, and so a
18   give-and-take in that process.
19          With regards to the chain of custody, I would
20   like to enter that into evidence.  Is there any
21   objection?
22          MS. WITTY:  No.
23          THE SPECIAL MASTER:  So I'm marking it
24   Exhibit 3.
25
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1                    (Exhibit 3 was marked

 2               by the Certified Court Reporter.)

 3               THE SPECIAL MASTER:  So I want to understand,

 4     Dean -- okay.  So first things first.  I'm going to

 5     need them redone.  I know that sounds like a shocker

 6     and I am being difficult.

 7               But when I gave you my initial order --

 8     right?  And I apologize.  Maybe part of it sits on my

 9     shoulders -- what I was hoping you would do, for each

10     custodian that was collected, you would specify --

11     because the problem that I run into is -- and it's

12     reflected by the -- understanding just for back

13     purposes, if anybody has a bad back, feel free to

14     stand.

15               The issue I have is that, for example, with

16     Jackie or Mrs...

17               MR. TOSTRUD:  Panzeri.

18               THE SPECIAL MASTER:  Yes, Panzeri, the

19     problem we have without having the chain of custody

20     and the collection broken down for each one, we don't

21     actually know what was actually collected and where it

22     was collected from.

23               So what I need you to do, while I have

24     managed to do it, I'm going to bestow upon you the

25     opportunity and honor to say we collected -- I now
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    know you have all of the data, because I have had the

2    opportunity to read it.

3          You need to say, "I ran a script and we

4    collected from these servers" and say, "This server

5    maps to this."  You have given me the files.  I have

6    all of the data myself, but as exciting as that may be

7    for me to do, I'm going to leave it in your trusted

8    hands.

9          I need you to redo the chain of custody form,

10    specify "I collected from these custodians from this

11    server, this computer, this device," etc.

12          The reason why this is so important is that

13    I'd like to start carving out the people we didn't

14    have issue with.  I'd like to start making progress so

15    that we can say we have five, now we only have one

16    person that's perhaps an issue, rather than we have

17    right now all I have is for all five and so that makes

18    the process a little more challenging.

19          So if you would be so kind -- is it clear

20    what I'm expecting?  That I'm expecting the

21    custodian's name, then I'll give you an example.  For

22    HRD Spring, there was a source PDP 001 you collected

23    from that, and then the script you ran has this very

24    nice little text file in it that says how it played

25    out.  I'd like that to be attached.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              I don't need the filenames, I don't need the
 2      data, but I do need the results.  I need to say this
 3      server and this is what we got.  I don't need the
 4      filenames.  I understand there could be issues there.
 5      But we need to know what was actually collected
 6      respectively, because it took a great deal of time.
 7              So that's with regards to chain of custody.
 8      Is there any confusion there with regards to, not the
 9      mobile devices, this is specifically and relating only
10      to the data UMC holds on site.
11              And also, did you collect from the BlackBerry
12      servers?
13              MR. SCHAIBLEY:  No.
14              THE SPECIAL MASTER:  Off the record.
15                   (OFF RECORD.)
16              THE SPECIAL MASTER:  I'd like to know who
17      within the UMC's legal group, be it outside counsel,
18      inside counsel or whoever, was directing you and
19      didn't bother to inform you that, hey, look, we need
20      to include their mobile devices and the BlackBerry
21      servers they use.  I'd like to note who that person
22      is, and I'd like to also understand has it been
23      collected to date from the server.
24              MS. WITTY:  No.
25              THE SPECIAL MASTER:  That needs to happen
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   now.  So when we leave here, UMC needs to go to their
 2   BlackBerry server or their archive of the BlackBerry
 3   server, and I read the whole backup policy.  So I'm
 4   not sure where it might fall within the
 5   classifications of the -- off the record.
 6                   (OFF RECORD.)
 7            THE SPECIAL MASTER:  Going on the record.  I
 8   want to mark for the record the importance, and I'm
 9   ordering UMC counsel and, hopefully, with Dean, who is
10   actually in network security and not the BlackBerry
11   administrator, but hopefully he knows the right
12   individual within UMC or goes to lunch with or somehow
13   can connect counsel with that person.
14            I'm ordering UMC to immediately preserve, for
15   whatever custodians they have represented to the Court
16   are within the ambit of the initial collection, to be
17   completed by no later than this coming Wednesday.
18            There is no excuse in my book for it not
19   being done.  A BlackBerry server you post on site,
20   having administered one myself, having actually had to
21   deal with the -- having to deal with the politics as
22   well as the policies that go with it, it's not that
23   hard.  It's literally like counsel gives them a list
24   of names and they literally log into the BlackBerry
25   server and they check off the boxes and export them.
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              I mean, it's not a -- I'm not asking for a
 2    lot of work to be done.  We're talking about two,
 3    three hours.  I'd like you to fill out separate chain
 4    of custody paperwork for that effort using the forms I
 5    provided and document them.
 6              I'd also like counsel for UMC to work with
 7    whoever within the UMC organization is responsible for
 8    overseeing the backup, and it appears there are
 9    multiple groups that are involved in the backup, which
10    is complete, would be useful to -- can we submit this
11    and -- would counsel have any objection to --
12              MS. WITTY:  The policies?  No.
13              THE SPECIAL MASTER:  -- having the policies
14    put on the record?
15              So I'm going to put to the record UMC's data
16    backup and restoration policy.
17              MR. TOSTRUD:  Yes, Exhibit 4.
18              THE SPECIAL MASTER:  Exhibit 4.
19                   (Exhibit 4 was marked
20                by the Certified Court Reporter.)
21              THE SPECIAL MASTER:  And I also want the
22    record to reflect that I recognize that UMC's counsel,
23    having seen the custodian collection interview form
24    and having recommended what it should say, I fully
25    recognize that UMC itself needs to figure out how to
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    communicate with that individual if they are running a
 2    BlackBerry server, which was represented by -- who is
 3    the guy that was here last time?
 4         MS. WITTY:  Mr. Ernie McKinley.
 5         THE SPECIAL MASTER:  Ernie McKinley
 6    represented that they administer -- is there a phone?
 7         MR. GODINO:  Sounds like a printer.
 8         THE SPECIAL MASTER:  -- represented that such
 9    a server does indeed exist.  The custodian interviews
10    seem to suggest that such thing exist.  So I would
11    like to see that collection immediately done and that
12    preservation to immediately be done.
13         MS. WITTY:  Can I clarify for the record:
14    When you say "preservation," we have taken initiative
15    to maintain all text messages and other information --
16    (inaudible.)
17         THE REPORTER:  I didn't hear the end of that.
18         MS. WITTY:  We have taken the initiative to
19    maintain all of their text messages and data on the
20    BlackBerry server.  I just want to make sure
21    technically what to tell them.
22         THE SPECIAL MASTER:  So technically I'm going
23    to communicate here with my colleague here, Dean.
24         Dean, you know what a BlackBerry server is,
25    right, at a high level?
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          MR. SCHAIBLEY:  Yes, sir.
 2          THE SPECIAL MASTER:  If you look at the
 3  scripts that were run, Dean was not given instructions
 4  to run a script or work with the BlackBerry server
 5  people to collect --
 6          (Telephonic noise.)
 7          THE SPECIAL MASTER:  My phone's off.
 8          Still on the record, a BlackBerry server,
 9  right, is its own repository for e-mailing everything.
10  So the way it works is you have an exchange server and
11  a BlackBerry server, and it depends how they are
12  configured.
13          But based on my understanding of what was run
14  on the collection script, that it seems to me that the
15  BlackBerry server preserves a copy locally on the
16  BlackBerry server as well.
17          I could be wrong.
18          MS. WITTY:  I'll clarify it.
19          THE SPECIAL MASTER:  I don't need it
20  clarified, because I know that whatever is there --
21  the text messages you are preserving of what he has
22  imaged may be very different than what they have
23  sitting on the server.  The BlackBerry server has its
24  own set of policies.  So just because -- it happens a
25  lot in banking, right?  A banker will go out one
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   night -- go off the record.
 2                   (OFF RECORD.)
 3           THE SPECIAL MASTER:  Go back on the record.
 4           MR. TOSTRUD:  On January 31, 2014, defendant,
 5   pursuant to an order from Judge Leen, produced text
 6   messages for, I believe, three people, three
 7   custodians, and represented to plaintiffs' counsel
 8   that those were all the messages that were available
 9   and that that was everything.
10           THE SPECIAL MASTER:  I'll let the record
11   reflect that, and as far as counsel knows, the problem
12   that I've been able to discern is that UMC's counsel,
13   internal in-house people, don't under -- there is a
14   disconnect, because what was asked for makes a lot of
15   sense.
16           You have a BlackBerry server.  I see the
17   script running.  There must be a fundamental
18   disconnect there between what was done and what was
19   delivered, and I'll certainly let the record reflect
20   that.
21           But irrespective of the record, I want it by
22   Wednesday.  Whoever is the BlackBerry administrator,
23   take three hours out of their day and preserve
24   whatever they do have for those 26 people from the
25   BlackBerry server side.
```

Rough Draft of Special Master's Hearing    April 4, 2014

1          I get the fact that we've done the individual

2     devices, and we'll have a whole separate conversation

3     about the individual mobile devices.  Okay?

4          And I want a separate chain of custody form

5     filled out for that effort.  I don't need it for each

6     individual custodian, but I do need to list the

7     custodians that were collected, I need to know their

8     directory password.  I don't need to know the

9     filenames, but I need to know you got the right people

10    with the right custodians in the chain of custody

11    paperwork so that way I don't have to read 1400 pages

12    downstream.

13          Are we crystal-clear here?  Like Dean, you

14    know what I'm asking, right?

15          MR. SCHAIBLEY:  Yes.

16          THE SPECIAL MASTER:  Counsel.

17          MS. WITTY:  Yes.

18          THE SPECIAL MASTER:  He understands.  He

19    should be able to work with the right people within

20    UMC's organization to get me what I'm asking.

21          Now, returning back to the original point of

22    discussion, I want to understand the chain of custody,

23    Joe.  Walk me through this.  I want to make sure I get

24    this.  There were multiple -- are you -- (inaudible).

25          (Reporter requested clarification.)

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  I asked Counsel Foley if
 2    she was just a partner on the case, and she said yes
 3    (to reporter).
 4            The only reason I'm directing that to you
 5    because there have been multiple associates that have
 6    been involved in the chain of custody.  I want to just
 7    trace back -- we're going to redo the chain of
 8    custodies, full stop, and provide the detailed
 9    information that's necessary.
10            But I want to understand just a couple of
11    pieces of the information that were provided by Joe
12    and how Joe got that information.
13            So, Dean, just so I get it, before we get to
14    the mobile phones, how did this work?  Did you get an
15    order or a note or an e-mail, or how did you find out
16    I'm supposed to go and get X, Y and Z people, just
17    generally speaking?
18            MR. SCHAIBLEY:  I received an e-mail stating
19    that we needed to go and collect the e-mail and local
20    and home folders for a list of 26 individuals.
21            THE SPECIAL MASTER:  And you got that e-mail
22    from...
23            MR. SCHAIBLEY:  I received the e-mail back in
24    April 2013 from the initial counsel litigation group.
25            THE SPECIAL MASTER:  Got it.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            Counsel Foley, you guys were not involved at
 2    that time; correct?
 3            MS. FOLEY:  Correct.  We came on in May, I
 4    believe.
 5            THE SPECIAL MASTER:  Okay.  Because it gets
 6    really down to like it's sort of a weird coalescing of
 7    dates and things that all happened.  Doesn't make
 8    anything all right.  I'm just saying that it took me a
 9    while to understand who came when and where and did
10    what.
11            So that, you got initially from a former
12    counsel?
13            MR. SCHAIBLEY:  Correct.
14            THE SPECIAL MASTER:  You then went and ran
15    this Robocopy script.
16            MR. SCHAIBLEY:  Correct.
17            THE SPECIAL MASTER:  Which, generally
18    speaking, when was -- just for my own edification -- I
19    hesitate to submit it to the record because it has all
20    of the filenames in it and all of the details for
21    everything.  So I'm not going to put it on the record.
22    I'm just going to ask questions about it, and I
23    apologize.  We'll talk about privilege.  We can go on
24    or off in just a couple of minutes.  I just want to
25    get my question answered first.  On occasion, when I
```

Rough Draft of  Special Master's Hearing   April 4, 2014

```
 1    look at, for example, HRD Spring -- let's pick a
 2    better one -- off the record.
 3            (OFF RECORD).
 4            THE SPECIAL MASTER:  Back on the record.
 5            A couple of questions about the BlackBerry
 6    server:
 7            I would like counsel to provide me -- do you
 8    have any data policies around how that works?  Like
 9    how long you keep it and other sorts of...
10            MR. SCHAIBLEY:  I don't know off the top of
11    my head what that --
12            THE SPECIAL MASTER:  If you have to say I
13    don't know, just say I don't know.  Totally okay.
14            I would like you to connect counsel from UMC
15    with that person.
16            Counsel, I would like you to provide me with
17    that information, how long do they keep the backups,
18    how do they run, how far back does that information go
19    for the BlackBerry server.
20            MR. O'MARA:  That's on April 9th as well?
21            THE SPECIAL MASTER:  Make it the 10th.
22            Let's talk about Mr. Espinoza.
23            So when I look through the collection for J,
24    there are no PST or OST files in it.  How did PST and
25    OST files end up being collected?  I'll tell you what
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    I did so you understand.  I received the text files, I

2    converted them to Adobe PDF.  I then wrote a script to

3    then go through and pull out every OST and PST file

4    for each one.

5         When I ran it for Mr. Espinoza, unless it

6    didn't work, I wasn't actually able to find any OST or

7    PST files in there, which leads me back to my question

8    of Joe Edmondson, who has two and two logged in his

9    thing.  Just trying to figure out how that ended up

10   there.

11        I can show you.  I have it here if you want

12   to see how I ran it, Counsel, I mean, to explain to

13   you exactly.  I'm pretty sure there aren't any, I

14   mean, unless you found some.

15        MR. SCHAIBLEY:  No, there were no PSTs on his

16   computer pull.  When --

17        THE SPECIAL MASTER:  Or OSTs, either one.

18        MR. SCHAIBLEY:  When I do the collection,

19   when it was requested for local folders, home folders

20   and e-mail, the Robocopy script only goes and pulls

21   their home folder and then it pulls the local profiles

22   from whatever computers they've logged into.

23        As far as the e-mail box, what we do with

24   that is we will go into Microsoft Exchange and, as an

25   investigator, give ourselves back-end access to their

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1    mailbox and then open Outlook as that user on our
 2    desktop.  We'll pull back all the deleted items,
 3    basically restore the entire mailbox, and then export
 4    it into a PST file.  So that's their active current
 5    mailbox.
 6              THE SPECIAL MASTER:  I think I get it.
 7              So we had two PSTs and two OSTs for
 8    Mr. Espinoza?
 9              MR. SCHAIBLEY:  Uh-huh.
10              THE SPECIAL MASTER:  They were -- this is why
11    chain of custody is so important and invaluable, so I
12    will know I collected from this person's server rather
13    than in this session.
14              So that's those four PSTs and OST files?
15              MR. SCHAIBLEY:  Correct.  The first data pull
16    that was done in April would have had his first
17    mailbox, and then when it was requested to rerun it in
18    August, that would be the second PST.
19              THE SPECIAL MASTER:  And that's in addition
20    to all of the other PSTs or OSTs that may or may not
21    have existed, as in some people's cases, within
22    their...
23              MR. SCHAIBLEY:  Their archives that they --
24              THE SPECIAL MASTER -- myself --
25              MR. SCHAIBLEY:  -- themselves.
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  -- everywhere.
 2              And do you use Commvault for any archiving or
 3   just --
 4              MR. SCHAIBLEY:  Yes.
 5              THE SPECIAL MASTER:  You use CommVault
 6   archiving?
 7              MR. SCHAIBLEY:  Yes.
 8              THE SPECIAL MASTER:  For e-mail?
 9              MR. SCHAIBLEY:  Not at this time -- not at
10   that time.
11              THE SPECIAL MASTER:  But today it is?
12              MR. SCHAIBLEY:  It's being prepared to be
13   installed, yes.
14              THE SPECIAL MASTER:  So it's not rolled out
15   yet?
16              MR. SCHAIBLEY:  Correct.
17              THE SPECIAL MASTER:  All right.  Ironically,
18   he had no failures on Mr. Espinoza.
19              However, we can turn to HRJ Mumford, and
20   he -- what I am referring to, just for the record
21   purposes again because of this issue, they ran a
22   script, and that's how the whole entire collection was
23   done for each custodian.  In the process of running
24   the script, I have several questions about that, but
25   there were failures.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              And one thing they needed to make sure, when
 2   you collect everything, is that you -- that, A, when
 3   there is a failure, that counsel is -- how did that
 4   work?  Because if you look at PITRDP20 on, I believe,
 5   page -- had two failures; and then if you look at
 6   WHRDTT12, there's 10 failures; and if you look at
 7   W11090, two failures; PB0R0 -- or it might be OM -- 12
 8   had two failures; UMC-FS01 had six failures.
 9              In your process, did you notify -- when you
10   provided this data and results to counsel, explain to
11   me how it worked.  So you run the script.  If there is
12   a failure, what happens?
13              MR. SCHAIBLEY:  When we run the script, we
14   don't go back and look at the log unless it's
15   requested.  We need to make sure we get that
16   recovered.
17              THE SPECIAL MASTER:  You are not the lawyer.
18   You are just running the tech.  I get it.
19              MR. SCHAIBLEY:  Right.
20              THE SPECIAL MASTER:  You ran it.
21              Is counsel aware of any of these failures in
22   this collection?
23              MS. WITTY:  We were not, until log files were
24   provided from Mr. Edmondson.
25              THE SPECIAL MASTER:  I'm going to order UMC
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   to quickly figure out, A, if any of the files did fail
 2   in the collection, because you -- that you have, and
 3   that they are -- because some of the files that failed
 4   were like .dat files and .htm files that not be as
 5   relevant as the .pst file.
 6          But before we get to determining relevancy, I
 7   would like to know -- I'd like counsel to understand
 8   all of the things that weren't collected in the
 9   process of running that script.
10          I fully get that -- but just so I understand,
11   you ran the script, then you output the result -- who
12   did you give that to you?  You got an e-mail, ran the
13   script?
14          MR. SCHAIBLEY:  Correct.  Once all the data
15   was collected, it was stored on a secure server that
16   only the IT security team has access to.
17          THE SPECIAL MASTER:  And that was, the whole
18   pathway created a unique path?
19          MR. SCHAIBLEY:  Correct.
20          THE SPECIAL MASTER:  And you still have that
21   today?
22          MR. SCHAIBLEY:  Correct.  And then from there
23   the forensic investigator did forensic image.
24          THE SPECIAL MASTER:  He didn't create any
25   hash values -- so when the collection was done, just
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    so I get this, they didn't actually go and collect for

 2    each custodian, creat an evidence container?  They

 3    just took everything?

 4         MR. SCHAIBLEY:  Correct.  And that's just

 5    UMC's process for running investigations, depending on

 6    when --

 7         THE SPECIAL MASTER:  No, I get why you did

 8    it.

 9         (Reporter admonished re overtalk.)

10         THE SPECIAL MASTER:  Repeat that.

11         MR. SCHAIBLEY:  Just UMC's process for

12    investigations when it's requested of investigating an

13    individual, is grab everything.

14         THE SPECIAL MASTER:  I'm going to quickly go

15    off the record.

16              (OFF RECORD.)

17         THE SPECIAL MASTER:  Back on the record.  So

18    I understand, you ran it, you copied the files,

19    preserving the metadata according to the filters you

20    set, the parameters of Robocopy.  You copied that data

21    to a separate server in your organization that only IT

22    people had access to?

23         MR. SCHAIBLEY:  Only IT security.

24         THE SPECIAL MASTER:  At no time did counsel,

25    your prior counsel in April, never asked you were
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    there any, ever, errors?

2            MR. SCHAIBLEY:  No.

3            THE SPECIAL MASTER:  And at that time you

4    hired -- a forensic person was brought in at the

5    direction of prior counsel?

6            MR. SCHAIBLEY:  Correct.

7            THE SPECIAL MASTER:  That person created a

8    set of forensic images?

9            MR. SCHAIBLEY:  Correct.

10           THE SPECIAL MASTER:  Which was the

11   collection, as far as everybody understood it, which

12   is then what was turned over to you?

13           MR. SCHAIBLEY:  Yes.

14           MR. EDMONDSON:  It was turned over to --

15           THE SPECIAL MASTER:  Turned over to counsel.

16           And then you made a copy of it, and who has

17   it today, in the evidence log sheet?

18           MR. EDMONDSON:  I have a copy that I work off

19   of.  She has the original.

20           THE SPECIAL MASTER:  And it's reflected in

21   the log.

22           So sequence again -- but, Counsel Foley, this

23   is my question for you, and this is what I was

24   originally getting at:

25           You were brought in in May, so when you guys

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    received what you thought was these container files,
 2    as you understood it, it was no errors because nobody
 3    told you there were any errors?
 4           MS. FOLEY:  Yes, we didn't know exactly what
 5    it was.
 6           THE SPECIAL MASTER:  All right.  Okay.  When,
 7    Joe, you received it, did you receive the log files
 8    with this?
 9           MR. EDMONDSON:  I believe the logs are inside
10    the container.
11           MR. SCHAIBLEY:  Correct.
12           THE SPECIAL MASTER:  Did you ever look and
13    see the errors?
14           MR. EDMONDSON:  I didn't review the log files
15    until we were asked to provide them.
16           THE SPECIAL MASTER:  So then --
17           MR. EDMONDSON:  They were processed --
18           THE SPECIAL MASTER:  Right, so you process
19    it.  Because that could be another possible
20    contributing source to how we ended up with some
21    issues, some issues with the production as well,
22    because some of the errors look like there were
23    partial copies made, and I couldn't tell -- Dean,
24    maybe you can answer this.
25           If it fails on the copying, does it then just
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1    not make a copy?
 2          MR. SCHAIBLEY:  It attempts to recopy it
 3    three times, and if it fails after the third time, it
 4    moves on.
 5          THE SPECIAL MASTER:  And if it's a partial
 6    copy, it doesn't keep it?
 7          MR. SCHAIBLEY:  I believe that's correct.
 8          THE SPECIAL MASTER:  Can you just verify
 9    that?  Because that's how I read it.  Can you just
10    double-check to make sure?
11          MR. SCHAIBLEY:  Uh-huh.
12          THE SPECIAL MASTER:  Okay.  So then you got
13    it.  You got these evidence containers.
14          MR. SCHAIBLEY:  Yes.
15          THE SPECIAL MASTER:  We're going to redo the
16    chain of custody so we know what was collected for
17    each user.
18          Now, Dean, returning back to my question, I
19    need you to also document on the chain of custody
20    form, for the exact reason I was just discussing with
21    John Espinoza, right, when I look at the scripts,
22    there is no PST, no OST files in there, full stop.
23          So I'm not -- my job is to sort of get to the
24    bottom of this and make sure that everything was
25    properly collected and preserved.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1              Help me understand.  You ran the scripts,

2      then you ran an additional independent process with

3      each one of the 26 custodians, going to their

4      mailboxes?

5              MR. SCHAIBLEY:  Correct.

6              THE SPECIAL MASTER:  Just to be clear, you

7      would go to a mailbox, you would extract -- I don't

8      know what version you had.  Like, were you ExMerging

9      or...

10             MR. SCHAIBLEY:  No, it wasn't ExMerge.  It

11     was literally opening Outlook as the user.  It pulls

12     everything down from the mailbox exchange server into

13     that Outlook session, go in and recover any deleted

14     items in the deleted items folder, recovering deleted

15     items in the inbox, and restore it into the mailbox,

16     and then export as a PST the entire mailbox.

17             THE SPECIAL MASTER:  Okay.  Do you verify the

18     mail once it's done?  Once you finish that process, do

19     you try to load those mail accounts?

20             MR. SCHAIBLEY:  Yes, we do reload the PST to

21     make sure that it will open.

22             THE SPECIAL MASTER:  So then I'm a little --

23     so then returning back to Mrs. Panzeri, if you were

24     able to open it and he had to run a 1 point cutoff 9

25     plus percent of the -- to repair it, either that needs

Rough Draft of Special Master's Hearing April 4, 2014

1    to be redone or recopied?

2          MR. SCHAIBLEY:  I'm not sure which PST is

3    erring out.  For example, I was --

4          THE SPECIAL MASTER:  Why doesn't he provide

5    you the error logs and then you guys work through

6    specifically with Panzeri what the issue is.

7          MR. SCHAIBLEY:  When we reload the PST, we're

8    only reloading the one that we exported, which is the

9    main mailbox.

10          With regard to like Ms. Panzeri, for example,

11    users will archive their own e-mail into a PST file,

12    and we don't go back and reload every single one of

13    the PST files.

14          THE SPECIAL MASTER:  Can we just double-check

15    to work your way through it and make sure it's not

16    connected in at least the work you did?  I need you to

17    add to the chain of custody forms for each of them, "I

18    went to this custodian on these days and this is what

19    I got," because I need to know what the active mail

20    was that you got on that day versus the script

21    running.  And there's still within your script PST and

22    OST files, and I think counsel wants to know the

23    difference as well between what we collected

24    physically on a specific day from these custodians

25    versus what was collected from the server or the

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   scripts, because there is a different value to the --
 2   necessarily just for understanding purposes.  So I
 3   would like you to go back and amend that.
 4           Does plaintiffs have any questions here?
 5           MR. GODINO:  No.
 6           THE SPECIAL MASTER:  Just so I understand,
 7   then, the chain of custody, the MD 5 hash values that
 8   were calculated or not calculated, can someone please
 9   go back and calculate the hash values so that we make
10   sure the evidence items that we're looking at are all
11   the same?
12           MS. WITTY:  When you say the MD 5, you mean
13   information taken from the secure server?
14           THE SPECIAL MASTER:  Yes.
15           MS. WITTY:  We have that, so we can verify
16   that.
17           THE SPECIAL MASTER:  Did you verify it?
18           MR. EDMONDSON:  Yes, it verifies when it
19   opens.
20           THE SPECIAL MASTER:  I'll just point out,
21   there's a -- how long is the hash?  It's typed,
22   though, right?  It's electronic, and this is a Word
23   document.  So copy it and input it in, on the chain of
24   custody.
25           MS. WITTY:  Okay.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1           THE SPECIAL MASTER:  It says -- where is it?

2     Under "identify details."  It says "if item requires

3     the storage device includes the MD 5 for the entire

4     image required ^ EXBT."

5           Okay.  So I'm going to -- now that we have

6     sort of done the easy stuff, we'll get into the other

7     stuff.  I want to talk about verifying -- sorry.

8     Strike that.

9           Counsel Foley, returning back to where I was

10    discussing with you, I want to understand a couple of

11    things for my own edification.

12          MS. FOLEY:  Sure.

13          THE SPECIAL MASTER:  There was another

14    associate assigned to this case prior to this current

15    one.

16          MS. FOLEY:  Two, yes.

17          THE SPECIAL MASTER:  Were custodian

18    interviews ever done at any point in this litigation

19    prior to now?

20          MS. FOLEY:  Custodian interview being what is

21    the inventory --

22          THE SPECIAL MASTER:  Can you give me --

23          (Inaudible due to multiple colloquy.)

24          MS. FOLEY:  I know she did it, but I don't

25    understand what the definition is.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  Can you give me a copy
 2    of the custodian interview?
 3              MS. WITTY:  This includes all six custodians.
 4              THE SPECIAL MASTER:  And you saw my order?
 5              MS. FOLEY:  Yes, I did.
 6              THE SPECIAL MASTER:  In my order I attached a
 7    full custodian interview where it says, at the very
 8    beginning here, to locate and preserve all electronic
 9    and hard copy documents, including e-mail related to
10    whatever action and the devices that are subject to
11    the action.  A more substantive interview may come
12    later.  Step B, explain attorney-client privilege,
13    keep discussion confidential.  Do not discuss case
14    with others except attorneys.  C, explain outline of
15    case.  D, explain preservation duty.  F, explain
16    upcoming preservation and acknowledgment form if that
17    was what you used.
18              I'm talking about those things.
19              MS. FOLEY:  Right.
20              THE SPECIAL MASTER:  Was that ever done?
21              MS. FOLEY:  I do not know.
22              THE SPECIAL MASTER:  When I read over the
23    transcripts of the Court that were provided to me,
24    there was representations to the Court that there had
25    been conversations with their IT individuals within
```

```
 1    UMC.
 2           MS. FOLEY:  Yes.
 3           THE SPECIAL MASTER:  So I was wondering, were
 4    there any -- is there any documentation of what was --
 5    I'm trying to figure out how we ended up with
 6    custodians that -- we ended up with custodian
 7    interviews finally in hand, hearing now, and I want to
 8    make sure that it didn't happen beforehand and it got
 9    lost in the shuffle of old counsel, new counsel,
10    associates, and the like.  So I'm just asking, were
11    they ever done?
12           MS. FOLEY:  I say -- I would have to say I
13    don't think so, but I'm not sure.
14           THE SPECIAL MASTER:  Do me a favor and go
15    back and check, because it's actually fairly important
16    from my perspective.  I was appointed by the Court to
17    make sure that everything is being properly preserved,
18    and before I get into that I want to know if there is
19    any other information I should be reviewing that you
20    might have had through prior custodian interviews or
21    conversations you had with IT, because it's important
22    before I reach any -- or issue any ruling or
23    recommendation that I fully understand what was
24    actually done -- right -- before I reach that point.
25    So if you would be so kind.
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1          MS. WITTY:  In review of prior counsel's
 2   records, there is no indication that specific
 3   custodian interviews were done.
 4          The profiles that were initially requested
 5   for preservation I believe were based upon the list
 6   that came from plaintiff's counsel, and the
 7   discussions, I believe, with regards to scope remain
 8   mainly with the prior technologist.
 9          THE SPECIAL MASTER:  All right.  So
10   plaintiffs, because they weren't there when it all
11   sort of started and you were, did you ever have
12   conversations with them about custodians?  How did you
13   come up with your list of custodians?
14          MR. TOSTRUD:  We assembled a list of
15   custodians initially through review of some documents,
16   I believe some of their disclosures, and some
17   interviews that we conducted with our plaintiffs.
18          THE SPECIAL MASTER:  What I'm basically
19   getting at is did you ever receive anything from them
20   that might indicate -- usually when custodians are
21   selected, each side goes off and interviews who they
22   believe are the relevant parties, and sometimes when
23   we have these custodial interviews, it turns out that,
24   oh, no, this person doesn't really do anything related
25   to what the dispute is about, and they should be
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
1   talking to this other person.
2           Were you ever made aware of any of that sort
3   of happening, on the other side, and when you made
4   your interview?
5           MR. TOSTRUD:  No, I'm not aware of any
6   custodian --
7           THE SPECIAL MASTER:  Thank you.  That's
8   all --
9           MR. TOSTRUD:  -- I just want to add also we
10  took the deposition of Mr. Espinoza and we pulled some
11  names from that deposition.
12          THE SPECIAL MASTER:  Mr. Espinoza we are
13  going to have a whole separate conversation about in a
14  second.
15          MS. FOLEY:  As far as I remember, the
16  custodians were proposed by plaintiffs.
17          MR. TOSTRUD:  That's accurate.
18          THE SPECIAL MASTER:  I'm trying to understand
19  if there was any effort by the defense to make sure
20  that the custodians that were identified were the
21  right people.
22          MR. TOSTRUD:  There was not.
23          THE SPECIAL MASTER:  Okay.  So this takes me
24  to one -- I'm going to go off the record and then back
25  on the record.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1                    (OFF RECORD.)
 2            THE SPECIAL MASTER:  Let's go back on the
 3     record.
 4            Counsel for UMC iterated with me through
 5     these custodian interviews -- she was actually fairly
 6     patient and cooperative.  I sent her back about -- a
 7     lot of questions -- I don't know the total number,
 8     many pages of questions about the custodian interviews
 9     that I wanted additional clarification.
10            I assume, when she offered to clean up the
11     custodian interviews, she's going to merge everything
12     that we've covered, and that includes specifically the
13     issue around executive assistants and how are they
14     used and in what capacity for the different executives
15     to ensure that there isn't any additional issues
16     there.
17            I will take -- did you have -- I just wanted
18     to clarify what we just covered for the record
19     purposes.  We're going to add an additional custodian,
20     because in the process of the custodian interview
21     process, we identified Claudette Myers, who is John
22     Espinoza's assistant, as a likely source of responsive
23     and relevant information.
24            MR. TOSTRUD:  May I approach, because we are
25     in possession of a document that was produced by UMC,
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    UMC Bates number 100004, which purports to come from

 2    Cindy Dwyer.

 3           THE SPECIAL MASTER:  Oh, I have lots of

 4    people I have questions --

 5           MR. TOSTRUD:  On behalf of Brian Brannman,

 6    one of our custodians.

 7           THE SPECIAL MASTER:  So what we've done -- so

 8    what I've done and requested is -- so let's run with

 9    that.  Let me first finish up.  We are going to table

10    that for one second.

11           We are going to return to going through with

12    counsel on the record who has executive assistants and

13    what they were used for, and that I would expect to be

14    immediately amended to the custodian interviews.  And

15    anybody in any way, shape or form that was acting in

16    the capacity to send, represent, communicate,

17    dialogue, however that we're talking about, that that

18    will be preserved.

19           If the collection was not done, I want that

20    identified to me immediately, and I would like it to,

21    obviously, be done immediately.  And obviously, the

22    chain of custody paperwork that will be provided will

23    reflect the work that was also done from Ms. Myers.

24    So it will be like Ms. Myers collected her e-mail

25    boxes, whatever was done.
```

```
 1              So we will have for every executive
 2    assistant, that is, when you receive the custodian
 3    interviews it will be crystal-clear.
 4              I'm simply talking about Claudette Myers,
 5    because -- but I fully expect and we covered,
 6    actually, I believe, Doug Spring, was it?  We had a
 7    conversation -- he -- his use was -- of his executive
 8    assistant was limited.  Was that --
 9              MS. WITTY:  He did not, actually --
10              THE SPECIAL MASTER:  He didn't have one.
11    They had a shared pool.  I covered all this.  You will
12    see it when you get it and they'll clean it.  I want
13    to respect the attorney-client and work product and
14    let them clean it up.  They will give it to you.
15              If I believe it is insufficient in any shape
16    or form, I will raise that and I will flag that for
17    discussion, but I don't think I foresee any issue
18    there.  You can talk among yourselves.  I just want to
19    make sure you didn't want to --
20              MS. WITTY:  We were just clarifying the need
21    to include Ms. Dwyer's law firm, and the CEO,
22    Brannman.
23              THE SPECIAL MASTER:  I suspect, when you go
24    back, for everybody that -- I try to be thorough, but
25    thank you for pointing out -- what was the name,
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1   again, for the record?

2       MR. TOSTRUD:  So this is an e-mail from Cindy

3   Dwyer --

4       THE SPECIAL MASTER:  Let's just enter it.

5   Let's just put it on the record so we'll have it.

6   That way I know how to spell her name.  Enter this as

7   an exhibit, please.

8           (Exhibit 5 was marked

9            by the Certified Court Reporter.)

10      THE SPECIAL MASTER:  Let the record reflect

11  that Exhibit 5 is an e-mail that's Bates stamped

12  UMC100004, and it is from Cindy Dwyer sent on behalf

13  of a Brian Brannman, which appears was his executive

14  assistant, I believe.

15      MS. WITTY:  Yes.

16      THE SPECIAL MASTER:  Okay.  Moving forward,

17  returning back to what I was just saying, we will get

18  the cleanup custodian interviews.  In it we'll include

19  that -- I would like you to also -- UMC provide said

20  interviews to -- I apologize.  I forgot your last

21  name.

22      MR. SCHAIBLEY:  Schaibley.

23      THE SPECIAL MASTER:  Schaibley.

24      I would like counsel for UMC to provide the

25  custodian interviews that are cleaned up to

Rough Draft of  Special Master's Hearing    April 4, 2014

Page  57

```
1   Mr. Schaibley to verify properly that everything was
2   done with the chain-of-custody paperwork that will
3   then be given to Joe and so on and so forth.  Okay?
4        It's a rolling production we're going to
5   cover before we leave here.  Obviously we need to add
6   Claudette Myers into that process for your timing
7   considerations.
8        Now, let's talk about voice mail messages for
9   a minute here.  I don't know if it would be within
10  your -- Mr. Schaibley, within your purview or you feel
11  comfortable answering questions on that.  If not, we
12  can write them down --
13       MR. SCHAIBLEY:  It would be better to write
14  them down.  I have nothing to do with the BlackBerry
15  server.
16       THE SPECIAL MASTER:  As with the voice mail,
17  the Nortel -- not Nortel.  I apologize.  With...
18       MR. SCHAIBLEY:  Avaya, the -- at work at UMC?
19       THE SPECIAL MASTER:  Yes.
20       MR. SCHAIBLEY:  Yeah, I don't have anything
21  to do with that system either.
22       THE SPECIAL MASTER:  I got a little confused.
23  Counsel, I apologize in advance, but when I was
24  reading over the discussion around the PBX system --
25       MS. WITTY:  Yes.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          THE SPECIAL MASTER:  -- I was, A, surprised
 2   that custodians knew what a PBX was.  B --
 3          MS. WITTY:  Well, it's used in the title for
 4   the personnel that they work with.  I don't know that
 5   they understood what PBX --
 6          THE SPECIAL MASTER:  For the record, in the
 7   custodian interviews they were referencing PBX
 8   systems.  PBX, for the record, is a phone-routing
 9   system that's used to manage phone networks, usually
10   for enterprises.  Naturally, I was a little surprised
11   when the custodian mentioned PBX and this and that.
12          And during the course of that I asked, if
13   they -- because a PBX system and a unified messaging
14   system are actually two different things, and I wanted
15   to understand if the voice mail messages that people
16   got left, A, could be e-mailed to them, B, were they
17   stored on their server, and how did that actually
18   work.
19          Can you please talk to someone within the
20   organization that can figure out whether they back
21   up -- so according to their backup policy, which is
22   different than what was provided, they need to figure
23   out which one is which.
24          MS. WITTY:  They do have a separate
25   communications recovery policy.  I'm not sure that
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   that was provided ahead of time.  It was just actually
 2   released to counsel last night, and we can provide
 3   that as well to you.
 4           THE SPECIAL MASTER:  Please do.
 5           MS. WITTY:  To you and to plaintiffs.
 6           THE SPECIAL MASTER:  Because, obviously, the
 7   reason why I'm even mentioning this, it just goes to
 8   the collection; right?  Like if they actually have a
 9   separate server where they have been storing the voice
10   mail messages that are being e-mailed to people that
11   relate to your key custodians, I'd like to have a
12   conversation -- I'm fully not ordering or saying that
13   it's necessary, because often voice mail message is a
14   very costly experience for all parties involve.
15           But I would like to first understand do they
16   have it and how does it actually work, because --
17   yeah, and send me the policy, and then I'll figure it
18   out, because their backup policy seems to suggest that
19   it would be, and another might suggest otherwise.  And
20   then we'll go from there on the voice piece.
21           I want to then talk about when the collection
22   was done, so let's talk about phones.  Again, the
23   work-product privilege I fully respect, but some of
24   the information there around it I would like to
25   disclose.  Is there any objection to that?
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          MS. WITTY:  No.
 2          THE SPECIAL MASTER:  It would appear -- I
 3   forget -- identify the individual.  Counsel, you know
 4   who I am referring to, where there was just -- what's
 5   the name of the individual, with the...
 6          MS. WITTY:  The one who mentions text
 7   messages and --
 8          THE SPECIAL MASTER:  Yes.
 9          MS. WITTY:  James Mumford.
10          THE SPECIAL MASTER:  Yes.
11          So given the total number of messages that
12   were collected against what Mr. Mumford indicated is
13   ongoing, or was at the time, or -- I'm a little
14   confused as to the disconnect.  Any thoughts?
15          MS. WITTY:  I'm not exactly sure.  From the
16   custodian interviews it's difficult to understand how
17   much of them, how many of them actually use their
18   texts for business purposes.
19          THE SPECIAL MASTER:  Someone uses it to talk
20   to their wife a lot.
21          MS. WITTY:  Yes.  And I actually -- I
22   visually inspected the phones of Mr. Mumford and of
23   Mr. Espinoza, the two custodians still with UMC that
24   have UMC-issued BlackBerries.  It's a very limited
25   scope.
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  The issue is, the issue
 2     with the mobile device is that for, at least
 3     Mr. Espinoza, this is the same one he had at the time,
 4     and the way I read it, when there was an...
 5            Mr. Schaibley, maybe you can clarify.  You
 6     mentioned you weren't -- on the BlackBerry, an expert
 7     in.
 8            So as I understand it, when a BlackBerry is
 9     pushed with a new image, it wipes the old one.
10            MS. WITTY:  Yes.
11            THE SPECIAL MASTER:  The way they have it set
12     up.  So, theoretically, everything that was there was
13     wiped by Mr. Espinoza.  No?
14            MS. WITTY:  Yes.
15            THE SPECIAL MASTER:  So that might explain
16     why --
17            MS. WITTY:  And further, something we've
18     raised with plaintiffs, the upgrade between the
19     Microsoft Exchange server 2003 --
20            THE SPECIAL MASTER:  Oh, we're talking
21     about --
22            MS. WITTY:  -- to Exchange 10, there would
23     have likely been an additional wipe --
24            THE SPECIAL MASTER:  Of the phone or of the
25     Black- --
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1             MS. WITTY:  Of the server.
 2             THE SPECIAL MASTER:  Of the BlackBerry
 3   server?
 4             MS. WITTY:  Yes, as part of the --
 5             THE SPECIAL MASTER:  You need to get that
 6   BlackBerry server person front and center on the phone
 7   or here or available, because I have run BlackBerry
 8   servers on occasion, and I don't understand how --
 9   unless he was under no knowledge that this was
10   relevant to be preserved, which is possible, I'm a
11   little confused as to -- when you get the updated
12   custodian interviews, I expect it to fully detail out
13   that for Mr. John Espinoza, you know, it was updated
14   twice on the following date.
15             MS. WITTY:  Yes.
16             THE SPECIAL MASTER:  And you'll get in detail
17   those dates.
18             MR. TOSTRUD:  Can I get the dates when they
19   were...
20             THE SPECIAL MASTER:  Well, there's a lot of
21   them.
22             MR. TOSTRUD:  Did he get a new BlackBerry?
23             MS. WITTY:  No.
24             THE SPECIAL MASTER:  This is -- off the
25   record for one second.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1                    (OFF RECORD.)

 2            THE SPECIAL MASTER:  Let's go back on the

 3    record.

 4            I'm still struggling, based on the

 5    information that I've been given, to understand when

 6    you upgraded from 2003 to 2010, that impacted the

 7    BlackBerries, first question.  I don't understand how

 8    when you are upgrading your exchange environment and

 9    you are not upgrading your BlackBerry server --

10            MR. SCHAIBLEY:  The BlackBerry server was

11    upgraded.

12            THE SPECIAL MASTER:  So you need to talk to

13    the BlackBerry server person, because I don't think

14    that has anything to do with your exchange upgrade.  I

15    think it has to do with the BlackBerry Server upgrade

16    much more than the exchange server upgrade.

17            My question about the upgrade to 2010, that

18    was, did you upgrade your exchange servers?

19            MR. SCHAIBLEY:  We did.

20            THE SPECIAL MASTER:  Did you make a copy of

21    the EDB?

22            MR. SCHAIBLEY:  It's a brand-new environment.

23            THE SPECIAL MASTER:  No, but I mean the old

24    one.

25            MR. SCHAIBLEY:  The old one is still sitting
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   there.
 2          THE SPECIAL MASTER:  Yeah, I mean, IT is -- I
 3   mean, I've run data exchange environments.  You
 4   don't -- wait two years before you turn off that old
 5   exchange box.
 6          MR. SCHAIBLEY:  Correct.  It's still sitting
 7   there right now.
 8          THE SPECIAL MASTER:  At least.
 9          So we still have the old exchange
10   environment.
11          So, Counsel, just turning back, for purposes
12   of edification, the BlackBerries shouldn't have been
13   impacted by the Outlook upgrade.
14          More importantly, even if it were impacted,
15   it doesn't matter because you guys have a full
16   operational set of the old exchange environment, I
17   assume, available.
18          So I need to figure out the BlackBerry piece,
19   because obviously the scope of the collection included
20   relevant messages or contemporaneous communications
21   that related to whatever the dispute as the Court
22   decided, which I was not involved with, but you guys
23   have already had prior conversations with the Court
24   around mobile devices, extensive conversations.  So...
25          MS. WITTY:  I think the confusion there --
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    and this is something that obviously is between the

2    parties and counsel that was needed for

3    clarification -- the request was made for the text

4    messages, and so we went to the phones to image them

5    for the text message purpose.

6         THE SPECIAL MASTER:  Which is a great place

7    to look if they didn't remotely wipe them.

8         The other place that people store text

9    messages, on the BlackBerry servers.

10        MS. WITTY:  At that time UMC was not

11   retaining text messages on the servers.

12        THE SPECIAL MASTER:  BlackBerry servers by --

13   you need to talk to the BlackBerry server

14   administrator, not the exchange server administrator.

15   They are two totally different people with two totally

16   different policies.

17        Luckily, according to their policy, they

18   would have a backup.  So you can pull it from the

19   backup tape if necessary.

20        At some point in the last year, what -- I

21   think -- my belief is -- well, if this backup is --

22   the window backup and restore matrices is followed as

23   set forth in what was provided as an exhibit in the

24   additional -- as an Exhibit, 4, and the additional

25   information was provided in the custodian interviews,

Rough Draft of  Special Master's Hearing    April 4, 2014

 1    I'd have to believe that they make a backup of the

 2    BlackBerry environment daily, weekly, monthly, and

 3    then hold one tape a month for at least a year and

 4    then they hold the year for ten years usually, is how

 5    it works, standard.  I'd like to -- so in worst-case

 6    scenario they'll have to load it up and pull it off.

 7          But what I think, counsel for UMC, you just

 8    need to make sure that you are talking to the right

 9    person within the UMC technology department to make

10    sure -- you need two people, actually.  The BlackBerry

11    people and the backup group.

12          And the backup group -- do they run CommVault

13    as well?  So CommVault is an enterprise backup

14    solution.  I've used it myself.  Excellent.  My

15    personal preference, better than Symantec.  Personal

16    preference, though.  CommVault Enterprise level backup

17    has that capability to include the BlackBerry servers.

18          Let's go off the record.

19              (OFF RECORD.)

20          THE SPECIAL MASTER:  Let's go back on the

21    record.  Two questions about Brian Brannman.  When you

22    ran his collection, did you run a script with it?  You

23    ran the script and then you personally made copies?

24          MR. SCHAIBLEY:  Everybody was run the same,

25    yes.

Rough Draft of Special Master's Hearing   April 4, 2014

1          THE SPECIAL MASTER:  So then who is the

2     J. Mumford?  I've got to just correlate the name.

3     That would be Mr. Mumford.  Mr. Mumford had 25

4     different mail containers.

5          MR. SCHAIBLEY:  It would be more appropriate

6     to say he had 25 different computer profiles.

7          THE SPECIAL MASTER:  Well, that was my

8     question.  So that's why I need you to go back to the

9     custodian and explain to me -- I need to understand

10    specifically, because 25 different -- one thing that

11    was mentioned by UMC, and, I think, counsel for UMC

12    you should think about, is it might be that you have a

13    whole lot of duplicative data.

14         MR. SCHAIBLEY:  Yes, I would say that's very

15    accurate.

16         THE SPECIAL MASTER:  But I don't know that

17    for a fact, because I don't actually know the -- I

18    have no -- I only saw the filenames.  But I have

19    yet -- it's not that often you will have -- how many

20    did I say now?

21         THE REPORTER:  25?

22         THE SPECIAL MASTER:  Yeah, that someone will

23    have 25 different mail containers, which leads me to

24    my next point.

25         Which is, you need to figure out how much

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    data is actually duplicative in the data collection
 2    you have, because it's either that or he loved e-mail.
 3    I mean, they are big files.  These aren't small
 4    mailboxes either.
 5           So my other question is, when you run the
 6    script, Yahoo mail and Gmail, I know there was a
 7    conversation in the custodian interviews where it was
 8    discussed, but do you have the actual text files, the
 9    script?
10           MR. SCHAIBLEY:  Yes, I do.
11           THE SPECIAL MASTER:  Okay.  Can you look at
12    J. Espinoza on page 26.  Or, actually, wait.  Look at
13    B. Brannman on 77 or page 12 -- or yeah, page 77.  And
14    show that to counsel as well, and then I'm going to
15    ask my question, but I think you might want to look at
16    it really quickly.  I can actually just show it to
17    you.
18           MR. SCHAIBLEY:  That would be quicker.
19           THE SPECIAL MASTER:  I'm just showing it to
20    him and then I'll present it to the parties, so they
21    know it -- what I did is I ran -- let's go off the
22    record.
23                  (OFF RECORD.)
24           THE SPECIAL MASTER:  Back on the record.
25           So I'm going to ask counsel for UMC to go
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    through the scripts that were provided and identify

 2    personal e-mail addresses that might have been

 3    associated with each of the five custodians and verify

 4    with them that they did indeed not use this for

 5    purposes relating to this (inaudible) litigation.

 6            (Cough noise.)

 7            THE REPORTER:  "Relating to"...

 8            THE SPECIAL MASTER:  This litigation.

 9            And the reason I'm requesting you do this is

10    because there was explicit questions in the custodian

11    interview -- do you have a question?

12            MR. O'MARA:  Can we get all of the custodian

13    records, not just the five as you have expanded them?

14    We've expanded it to six.

15            THE SPECIAL MASTER:  Oh, six, but I haven't

16    even seen -- yes, so for the six -- for Claudette,

17    thank you very much.  For the six, to look at them and

18    just verify, because based on the custodian interview

19    responses you got against the script that was run, it

20    doesn't fully -- they might have forgotten because it

21    was done so long ago.

22            I don't know how the scripts run.  I don't

23    know -- because I didn't actually get a chain of

24    custody, I don't actually know -- it could be that

25    they just sit at a terminal, they log into a terminal
```

1    wherever, and they are just using it to use their

2    personal e-mail account just on that box or something.

3    I just have no context.

4         So I need to get context and I need you to

5    verify with them, because some of them said they

6    didn't have any or they didn't use --

7         MS. WITTY:  Right.

8         THE SPECIAL MASTER:  -- personal e-mail, and

9    it's clearly every single one of them had some sort of

10   indicia of personal e-mail.

11        I don't need to know the personal e-mail.

12   I'm saying they could have forgotten for whatever

13   purposes.  But it's important to make sure that the

14   collection, if indeed they did use it at the time and

15   they forgot, that you check.

16        MR. SCHAIBLEY:  The only two that would have

17   been able to get to any personal e-mail would have

18   been Brian Brannman and John Espinoza.

19        Based on our policy, we actually do not allow

20   access to Yahoo, Gmail, any Web-based e-mail through

21   our processor.

22        THE SPECIAL MASTER:  Let's go off the record.

23             (OFF RECORD.)

24        THE SPECIAL MASTER:  Back on the record and

25   just reiterate the importance:

Rough Draft of  Special Master's Hearing   April 4, 2014

```
 1              I acknowledge to you, I understand and
 2    appreciate your policy.  I would just strongly --
 3    rather than focusing on those two individuals, you
 4    apply it all to six for purposes of what I have just
 5    shown you as the reason to revisit it.
 6              MR. TOSTRUD:  Just for clarification's sake,
 7    are we talking about the use of personal e-mail for
 8    any work setting?
 9              THE SPECIAL MASTER:  Yes, that's it.  The
10    only purpose I'm having this conversation, in the
11    custodian interview form, it says did you use personal
12    e-mail at work.
13              Now, what most people say is no.  Yes, I used
14    personal e-mail at work, but it was for only personal
15    things.  Most people say, no, I've never used e-mail,
16    and I never brought home a computer, and I never --
17    you know.  Most people say, yes, I did personal
18    e-mail, but it was for my personal e-mail.
19              Now, when someone says no, that usually
20    motivates me to -- I mean, as a human being, myself,
21    my wife e-mails me, and I can promise you that while
22    I'm at work or wherever I am in world, I will respond,
23    because she is my wife and I will always respond.
24              So similarly, I would expect that, so I would
25    encourage you to go back through and refresh them just
```

Rough Draft of Special Master's Hearing    April 4, 2014

1    to confirm.  I'm not saying anything one way or the

2    other.  I'm just saying check because of that issue

3    with -- and you'll see the custodian interviews when

4    you get them and you'll understand.

5            MR. TOSTRUD:  Okay.

6            MR. O'MARA:  Is it just specific to work or

7    specifically towards using their personal e-mail for

8    any work-related aspects whether they are at their

9    desk at work or if they are at their home e-mailing

10   from their computer?

11           THE SPECIAL MASTER:  Well, as I understand

12   it, and I'll let Dean speak to this exact -- because

13   he's in charge of networking security.  But as I

14   understand it, and Dean, correct me if I am wrong, the

15   only way you can actually access e-mail for work is

16   using TS Web something...

17           MR. SCHAIBLEY:  TS Web or Web build through

18   OWA ^ SPELLING.

19           THE SPECIAL MASTER:  So there is a very

20   limited way, and every custodian says we don't do it,

21   it's too difficult.  Literally I think every single

22   one of them in the responses said we don't use that.

23           Which again I just want you to revisit and

24   remind them, because if you run -- just as a heads-up,

25   you can just run it against the script, you just look

Rough Draft of  Special Master's Hearing   April 4, 2014

1    for Web mail, and you will see -- it speaks for

2    itself.

3         I assume, Counsel, when you spoke with them,

4    you asked them did you use personal e-mail for work

5    related business as well; right?

6         MS. WITTY:  Yes.

7         THE SPECIAL MASTER:  So that's in the

8    custodian interview when you get it, and it's

9    crystal-clear.

10        Again returning back to the purpose, the

11   whole purpose is just I want to make sure that on a

12   going-forward basis we've got all the right

13   information, and that includes from Counsel Foley

14   looking at the prior custodian interviews -- because

15   at some point in the transcript that was provided to

16   me, there was representations that there have been

17   multiple conversations with the IT Department, and I

18   just wanted to check those to make sure I see what

19   they may or may not have said.

20        Oh, perfect, collection.  I have several more

21   questions for you.  As to the collection effort, is

22   there any reason why you didn't pull from the exchange

23   environment?  Just for my own edification.

24        MR. SCHAIBLEY:  Just the way that our -- the

25   way our investigation process has always run when I

 1    got there and was trained on doing these

 2    investigations is how I was trained to do it, was just

 3    to do a back-end, pull the mailbox and create a PST.

 4           THE SPECIAL MASTER:  But you are not pulling

 5    from the exchange environment?  You are not exporting

 6    or ex-merging it?

 7           MR. SCHAIBLEY:  Correct.

 8           THE SPECIAL MASTER:  And you are going to

 9    resolve the failure points?  Counsel will be paying

10    close attention and look at the failure files which

11    are identified in the script that you ran?

12           MS. WITTY:  Yes.

13           THE SPECIAL MASTER:  Question about the

14    deleted e-mail issue, which ties to how the evidence

15    that was received -- question?  Was there a question?

16           MR. GODINO:  No.

17           THE SPECIAL MASTER:  So one of the error

18    issues we were having was that there were -- that

19    Mr. Edmondson and Mr. Pixley -- are you on the phone,

20    Mr. Pixley?

21           MR. PIXLEY:  Yes, I am here.

22           THE SPECIAL MASTER:  Okay.  I have a question

23    for you specifically because it relates directly to

24    your declaration that you provided.

25           One of the issues we had had to do with the

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   fact that there were deleted recovered e-mails.  Is
 2   that right?  Is that correct?
 3        MR. EDMONDSON:  Yes, I believe.  Well, there
 4   were e-mails that had to be recovered within the PST
 5   files during mounting.
 6        THE SPECIAL MASTER:  So I'm trying to
 7   understand -- is that accurate, Mr. Pixley?  Is that
 8   what you said was one of the possibilities in your
 9   declaration you provided?
10        MR. PIXLEY:  Yes.
11        THE SPECIAL MASTER:  So I want to understand
12   from a collections standpoint when it was done.  If
13   you are collecting active mailboxes, why would there
14   be the need to do what was just said?
15        MR. EDMONDSON:  Some of the PSTs during the
16   mail process did identify additional deleted e-mails
17   as it was opening it and mounting the PST file itself.
18   So there were some that weren't recovered prior to the
19   PST being provided.
20        MR. SCHAIBLEY:  I don't know.
21        THE SPECIAL MASTER:  I'm not saying -- I
22   mean -- okay.
23        MR. EDMONDSON:  There were PSTs provided that
24   came from the home share, PSTs from the copying.
25        THE SPECIAL MASTER:  If they were -- I
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    mean -- any idea?

2          MR. SCHAIBLEY:  The only e-mail where we go

3    in and do -- recover deleted items, we only do that

4    when we're going into the active mailboxes.  Any other

5    PSTs we don't even attempt to look at or recover any

6    deleted from any other cases other than the active

7    mailbox we go to.

8          THE SPECIAL MASTER:  That makes a ton of

9    sense.  So what do you think?

10          MS. FOLEY:  I'm not sure what the question

11    is.

12          MR. EDMONDSON:  I'm not sure what the

13    question is either.

14          THE SPECIAL MASTER:  My question is, how is

15    it possible that you are loading the mailbox, mail

16    files, PST, OST files into mail if theoretically there

17    are hard copies; right?  If you scan and repair them,

18    that's one thing.  It's totally different thing to

19    load it and then have to recover deleted fragmented

20    e-mails from an archive.

21          MR. EDMONDSON:  I don't know why.  I know

22    that they did recover some.

23          THE SPECIAL MASTER:  I get that.  Is that

24    normal?  Does happen a lot to you?

25          Mr. Pixley, can you hear this?

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            MR. PIXLEY:  Yes.

 2            THE SPECIAL MASTER:  I want to hear your

 3    thoughts on it.

 4            MR. EDMONDSON:  I wouldn't say it's

 5    un-normal.  There is usually some deleted e-mail on

 6    any PST.  That's why I always recover it.

 7            THE SPECIAL MASTER:  I get the recover part,

 8    but I'm talking about the fragment.  If you can't

 9    recover it, fine, but I mean, his script ran and he

10    only copied an archived OST, PST.  He wasn't

11    recovering deleted files.  He only searches active

12    files.

13            What I'm saying is that -- correct me if I'm

14    wrong, but your script only collects valid active

15    files.

16            MR. SCHAIBLEY:  Correct.  The Robocopy

17    script, it copies what's there.

18            The only thing I could say to that is if a

19    PST this was in, for example, a home folder, that is a

20    PST that the individual user created on their own.

21    If, for example, they were actively in their mailbox

22    and had that PST loaded --

23            THE SPECIAL MASTER:  I get it, the machine

24    shut off or whatever.

25            MR. SCHAIBLEY:  -- that would be a
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1   possibility.

2          THE SPECIAL MASTER:  Okay.  This is why the

3   chain of custody is so important, because when I saw

4   the home, whatever, etc., I interpreted it as

5   something else.  I interpreted it as being not their

6   own personal backup, but their OST and PST files.

7          Mr. Pixley, do you have any idea or wish to

8   speculate?

9          MR. PIXLEY:  On the recovery of deleted

10  e-mail messages?

11         THE SPECIAL MASTER:  From an active valid

12  file.

13         MR. PIXLEY:  My only thought, if we're

14  talking about PST files, is, if these people had

15  created archived PST files and then deleted messages

16  from within those PST files, then I could see the

17  recovery part.

18         THE SPECIAL MASTER:  Yes, but as fragments or

19  as a whole message in the active file?

20         MR. PIXLEY:  You could certainly pick up

21  entire messages, but I've also seen during that

22  recovery process where, as long as it can still find a

23  pointer, it will recover it, but what it's actually

24  pointing to is largely just a fragment that still

25  happens to be left.

```
 1            THE SPECIAL MASTER:  Right.  I get that part.
 2   I guess the part -- if the user created them -- never
 3   mind.  The user created them.  Ignore me.  I get it.
 4   Never mind.
 5            I'm just trying to figure out to make sure we
 6   don't have any production issues when we have this
 7   rolling production and if it's the user created it, we
 8   should be fine.  If it's not user-created and it's
 9   from the actual mailboxes itself, it could be --
10   that's where I get a little unclear.
11            So we'll see how it goes.  So we'll table
12   that for now and go forward, unless -- Mr. Pixley, do
13   you have anything -- were you here for the beginning
14   part, Mr. Pixley, where we established that EnCase 7
15   fixes the problems with Paraban?
16            MR. PIXLEY:  Yes.
17            THE SPECIAL MASTER:  Do you have anything you
18   would like to comment, Mr. Pixley, on that?
19            MR. PIXLEY:  No.
20            THE SPECIAL MASTER:  One other question:
21   Kronos and SAP, and then we can move forward from the
22   collection people.
23            Your script ran and collected SAP client
24   files?
25            MR. SCHAIBLEY:  Whatever was on a local
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   machine.
 2          THE SPECIAL MASTER:  Every single one of
 3   them, I believe, had an SAP directory folder.  I just
 4   want to understand:  Is SAP data -- you are not
 5   pulling from the server.  You are just pulling the
 6   client files?
 7          MR. SCHAIBLEY:  Correct.
 8          THE SPECIAL MASTER:  So the data still sits
 9   on the server side?  Within your org- -- I don't
10   understand how it's actually connecting to the SAP.
11          MS. WITTY:  That's the problem.  It's not
12   actually something that is --
13          MR. SCHAIBLEY:  It's not on our SAP system.
14          MS. WITTY:  It's connected to the larger
15   accounting --
16          THE SPECIAL MASTER:  That would be why it's
17   on everybody's computer.
18          When we went through it all, there was a
19   question about SAP and Kronos, and on every -- when
20   you ran the script, every computer, actually, it
21   appeared had an SAP client on it, but no data, and I
22   was a little confused.  I want to make sure that the
23   collection was done properly and that if -- you
24   don't -- UMC doesn't actually control the SAP server;
25   right?
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1            MR. EDMONDSON:  Correct.
 2            THE SPECIAL MASTER:  My concern was they
 3    controlled the SAP server itself and that they hadn't
 4    actually preserved -- oh, I don't even know what it's
 5    used for, but if it may have responsive information,
 6    that that information been properly preserved, but
 7    it's not within your custody or control, which would
 8    make sense, because everybody had the exact same file
 9    structure.
10            Plaintiff have any questions there?
11            MR. TOSTRUD:  I'd just like to understand
12    that a little bit better.
13            THE SPECIAL MASTER:  So on every -- when he
14    runs the script, right, the script basically goes
15    through and makes a copy of every profile for every
16    device --
17            MR. SCHAIBLEY:  The Robocopy script is a
18    Microsoft product, and it goes through and will copy
19    whatever source folder you tell it to.
20            In this instance we identified every computer
21    within our environment that each custodian had a local
22    profile on and we copied their local profile.
23    Everything in the profile --
24            THE SPECIAL MASTER:  Which included an SAP
25    client, and it wasn't clear to me why when we asked
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1   the question, nobody was like I use SAP.  And so I

2   wanted to double-check today during the hearing to

3   understand why did everybody have this but nobody

4   actually was using it.

5          MR. TOSTRUD:  Thank you.

6          MS. WITTY:  We can clarify further with

7   plaintiff's counsel with regards to what the content

8   and why the client for SAP was used.  It's essentially

9   the county interface for tracking personnel

10  information, which has all been provided with the

11  opt-in packets.

12         THE SPECIAL MASTER:  Do you require further

13  information around the SAP?

14         MR. TOSTRUD:  Not at this time.  Thanks.

15         THE SPECIAL MASTER:  Just one of those things

16  I saw on everybody's profile and I was like, nobody

17  uses it, huh.

18         Now, let's talk about -- are you the exchange

19  administrator.

20         MR. SCHAIBLEY:  Yes.

21         THE SPECIAL MASTER:  You are going to wear a

22  lot of hats.

23         Your policy, what is the current policy,

24  standing policy around your exchange environment?

25         MR. SCHAIBLEY:  What do you mean?

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  When you -- how long do
 2   you keep -- so starting from -- I'll run through three
 3   or four scenarios.
 4              I'm a user and plaintiff if you want to add a
 5   scenario, feel free.
 6              I'm a user, and I delete an e-mail, but
 7   usually in an exchange environment that e-mail will
 8   exist on the exchange server for X. Period of time.
 9              MR. SCHAIBLEY:  14 days.
10              THE SPECIAL MASTER:  And then is it purged
11   out?
12              MR. SCHAIBLEY:  Yes.
13              THE SPECIAL MASTER:  But it's captured by
14   your backup tapes?
15              MR. SCHAIBLEY:  Yes.
16              THE SPECIAL MASTER:  So you have an annual
17   backup of your exchange environment?
18              MR. SCHAIBLEY:  The backup is done by a
19   separate individual.
20              THE SPECIAL MASTER:  Can you confer with that
21   individual to see if they actually have a snapshot or
22   how far back they have a backup tape?
23              MR. SCHAIBLEY:  I can find that out.
24              THE SPECIAL MASTER:  For the exchange
25   environment?
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          MR. SCHAIBLEY:  Yes.
 2          THE SPECIAL MASTER:  Because the policy that
 3   was admitted into evidence doesn't -- it states
 4   that -- exchange is a window-based server?
 5          MR. SCHAIBLEY:  Yes.
 6          THE SPECIAL MASTER:  So you have full weekly
 7   backups, full monthly backups, and incremental daily
 8   backups, and it doesn't -- and it says for three
 9   cycles for you keep them, but it doesn't say if you
10   recycle them or if you pull them out or -- and then it
11   says [RPTR NOTE:  looking at an exhibit] I just want
12   to understand because the gentleman that was here last
13   time, what was his name at the time.
14          MS. WITTY:  Ernie McKinley.
15          THE SPECIAL MASTER:  He was kind enough to
16   tell us they kept it for several months.  I would
17   really like to talk to the back-up person and ask do
18   you have a backup snapshot.
19          For disaster recovery, don't you have a
20   snapshot at some point going back?
21          MR. SCHAIBLEY:  I don't know what it is they
22   have.  We have to speak to that individual.
23          THE SPECIAL MASTER:  Okay.  All right.
24   Because obviously if there are additional executive
25   assistants that we couldn't -- that we're not properly
```

Rough Draft of  Special Master's Hearing   April 4, 2014

```
 1   collected from, we'll need to collect from them, and
 2   we have to figure out where that may be.
 3          So I said a couple of scenarios.  That was my
 4   first scenario.  Second scenario I have with you is
 5   I'm running my exchange environment.  I make a backup
 6   much my own mailbox.  Do I have the ability to write
 7   it to my C drive directly.
 8          MR. SCHAIBLEY:  At this time, yes, and that
 9   is the reason we collect during our script running all
10   the mobile profiles because it will go to the local
11   profiles.  You don't have it to the top-level C drive,
12   but desktop or the default folder under your profile.
13          THE SPECIAL MASTER:  So can you tell me how
14   that works so I understand?  What we're talking about
15   now, Counsel, so you understand, is that when this
16   script runs, every -- a user gets a profile, and --
17   but if you think about a hard drive, it's actually --
18   a C drive will be an entire hard drive and that's what
19   we will call the big, big, big, all the data.  A local
20   profile is usually some segment of that hard drive at
21   that time.  Does that make sense?
22          MR. GODINO:  Yes.
23          THE SPECIAL MASTER:  So what I want to
24   understand is, was it possible at that time for users
25   to back -- create a local backup copy outside of their
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   profile to the C drive.
 2           MR. SCHAIBLEY:  No.
 3           THE SPECIAL MASTER:  Do you understand what
 4   that question is, Counsel.
 5           MR. TOSTRUD:  Uh-huh.
 6           THE SPECIAL MASTER:  So, then, can I -- is it
 7   IMAP, Pop, SMTP has --
 8           MR. SCHAIBLEY:  SMTP.
 9           THE SPECIAL MASTER:  Is it IMAP or Pop?.
10           MR. SCHAIBLEY:  IMAP.
11           THE SPECIAL MASTER:  So it's possible for
12   someone to use an iPhone to configure them out?  I
13   mean, iPad, iPhone, I do it on both, so I mean...
14           MR. SCHAIBLEY:  It was enabled at one point
15   in time in the past and for a specific user's use.  It
16   is against policy.
17           THE SPECIAL MASTER:  Do you know which users?
18           MR. SCHAIBLEY:  There were a total of, I
19   believe -- at the time, when the initial collection
20   was run, 86, that were utilizing the personal phone.
21           THE SPECIAL MASTER:  So because when I looked
22   through the script, it kind of looked -- I understand
23   it, since you're on I map -- did you tell counsel who
24   those six individuals were for the mobile purposes?
25           MR. SCHAIBLEY:  The 86 that were previously
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   using it?

 2            THE SPECIAL MASTER:  Yeah, yeah.

 3            MR. SCHAIBLEY:  I don't believe we did, no.

 4            THE SPECIAL MASTER:  Counsel, you need to

 5   have a conversation with them and figure what the

 6   overlap is with the 26, for the obvious reason that if

 7   they specifically turned it on so that they could use

 8   IMAP protocol on their iPhone, that probably that

 9   would mean that they were using their iPhone to do

10   work during that time.  Maybe not.  As the custodian

11   interviews seem to indicate, there is a very strong

12   culture there of enjoying your weekends and time off.

13            So I would encourage you, though, to make

14   that inquiry.

15            Does counsel understand what I'm conveying

16   here?

17            MR. TOSTRUD:  I believe so.

18            THE SPECIAL MASTER:  Do you have any

19   questions?

20            MR. TOSTRUD:  Not at this point.

21            THE SPECIAL MASTER:  So then returning back

22   to my scenario, I could have an I pad or an iPhone

23   with my I Mac configured and I can use it to do -- but

24   I have to get permission, right?  When I used to run

25   an IT department or whatever, it was a frustrating
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   experience to occasionally have certain executives
 2   that would take it upon themselves to come in and say
 3   I must use my device and whatever.
 4          And I would have to carve out a specific
 5   policy to allow them to use it.  It wasn't like
 6   anybody could just turn it on and make it work.  It's
 7   the same as UMC?
 8          MR. SCHAIBLEY:  At this time at that time;
 9   that is correct.  But at that time it was all or
10   nothing.  And that's the policy I inherited.  Anybody
11   can go up to Google and how do I sync my iPhone.
12          THE SPECIAL MASTER:  Then they could sync
13   their UMC iPhone?
14          MR. SCHAIBLEY:  Correct.  The way the policy
15   was set up it was all or nothing.  Everybody is able
16   to do it if they discover how or no one can do it.
17          THE SPECIAL MASTER:  Off the record for one
18   second.
19              (OFF RECORD.)
20          THE SPECIAL MASTER:  Back on the record.  I'm
21   going to ask UMC's counsel to add an additional search
22   term called iPhone and I want any or iPad and the
23   signature lines for the e-mails anywhere it hits I
24   want them to locate those e-mails, I want them to then
25   go talk to the custodians and clarify why that
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    directly contradicts what they told us in their

2    custodian interviews if that happened.

3              Off the record.

4                  (OFF RECORD.)

5              THE SPECIAL MASTER:  Back on the record.

6    Okay.  Returning back to the scenario we were just in,

7    I'm Mr. Brannman's executive assistant.  I configure

8    my iPhone or iPad to send messages at the time, not

9    today, but at the time, since it was an all-or-none

10   policy, and if I could go to Google how to configure

11   my iPhone to send e-mail using an IMAP environment or

12   just how to configure my iPhone to send mail.

13             They could theoretically make that work.

14             MR. SCHAIBLEY:  The only way to make that

15   work is if you had the actual password for the user.

16             THE SPECIAL MASTER:  Right.  We can pick a

17   user, right?  Forget the executive assistant.  Just

18   say Doug, Mr. Springer -- Mr. Spring had -- because I

19   believe an I device of some type.

20             So it would be possible at the time for him

21   to configure his phone, iPhone to do UMC-related work?

22             MR. SCHAIBLEY:  Yes.

23             THE SPECIAL MASTER:  Did you use exchange

24   messaging services?

25             MR. SCHAIBLEY:  No.

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  Did you use any other
 2    third-party messaging services?
 3              MR. SCHAIBLEY:  No.
 4              THE SPECIAL MASTER:  Do you allow Dropbox as
 5    a third-party storage services?
 6              MR. SCHAIBLEY:  No.
 7              THE SPECIAL MASTER:  Do you monitor it?
 8              MR. SCHAIBLEY:  Yes.
 9              THE SPECIAL MASTER:  Let's return back to the
10    BlackBerry server.  How is the exchange set to sync to
11    the BlackBerry?  How does it work?  Is it push or is
12    pull?  How does it work?
13              MR. SCHAIBLEY:  I believe that the BlackBerry
14    is pulling.
15              THE SPECIAL MASTER:  So when the initial
16    custodians were collected from, there were nobody
17    actually -- can we go off the record for a second.
18                   (OFF RECORD.)
19              THE SPECIAL MASTER:  Let's go back on the
20    record.
21              Okay.  So here's the scenario.  I'm a user.
22    I write an e-mail on my BlackBerry and my iPhone but
23    the might be different because I don't know -- let's
24    start with the iPhone.  I'm write an e-mail message on
25    my iPhone.  I send that message to my colleague within
```

Rough Draft of Special Master's Hearing    April 4, 2014

1    the UMC organization discussing something relating to

2    this litigation.

3         I then go to my computer at work and sit down

4    at my computer at work.  That e-mail doesn't show up

5    in the sent folder?

6         MR. SCHAIBLEY:  No.

7         THE SPECIAL MASTER:  The only place that

8    e-mail actually sits is where?

9         MR. SCHAIBLEY:  It was sit on the recipient

10   and it would sit on the device itself.

11        THE SPECIAL MASTER:  So it's on the mobile

12   device and on the recipient's device?

13        MR. SCHAIBLEY:  No, the recipient's mailbox.

14        THE SPECIAL MASTER:  Thank you.  So then --

15   okay.  So if the recipient deleted that e-mail message

16   from their mailbox, the only place that e-mail exists

17   would be on the phone?

18        MR. SCHAIBLEY:  It would still exist on the

19   server as well until it's purged.

20        THE SPECIAL MASTER:  Which is 14 days later?

21        MR. SCHAIBLEY:  Correct.

22        THE SPECIAL MASTER:  So now today it wouldn't

23   exist anywhere but that device?

24        MR. SCHAIBLEY:  Correct.

25        THE SPECIAL MASTER:  Did anybody from the UMC

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   internal legal team or HR talk with you about all of
 2   this, about how this works?
 3          MR. SCHAIBLEY:  No.
 4          THE SPECIAL MASTER:  Can we go off the
 5   record.
 6              (OFF RECORD.)
 7          THE SPECIAL MASTER:  Let's go back on the
 8   record.
 9          So, then, Counsel, this takes me to my
10   current concern, which is the possibility that the
11   only place that e-mails that were sent by key
12   custodians, if you run the iPhone iPad search and you
13   hit on one of those custodians, you are going to have
14   to image their devices immediately because the only
15   place that e-mail would sit today now if it doesn't
16   show up anywhere else is on that device.  Does that
17   make sense?
18          MS. WITTY:  Yes.
19          MR. GODINO:  That is assuming it wasn't
20   deleted on that device.
21          THE SPECIAL MASTER:  If it was deleted from
22   the device and deleted from the mail account -- but
23   the trick is, when he ran his script, he made a copy
24   of their sent box and their mailbox at the time.  So
25   what I'm saying is that if -- they might have
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    deleted -- so if you think of it like this.

2            We have a copy today of everything that was

3    actually in that person's mail environment on that

4    day, right, in their sent folder, trash and etc.

5            The only time this becomes an issue is isn't

6    the situation you are saying, but if it's if we search

7    and we find out A they were using the iPhone or iPad

8    mobile device and that then you would have to go and

9    look at that device, because the only place today that

10   possible that information would exist would be, we

11   don't know what they have on their device, but you

12   have to assume that whatever they captured they

13   captured accordingly, but if they deleted it from

14   theirs, rights, and they deleted it from here, yes,

15   nobody is going to know, but they have a copy of what

16   was in there at that day at that time so the only real

17   issue is if there are other messages on that device

18   that weren't captured in that time span on the iPhone

19   or iPad.  Does that make sense?  Because they have

20   everything that was there then, so it's a matter of

21   whether it was before or after.

22           But to keep it efficient just search for

23   iPhone and iPad and if it shows up in the signature

24   line, there is a reason to look.  Every one of the

25   custodians were asked the explicit question do they

Rough Draft of  Special Master's Hearing    April 4, 2014

1    use these devices for personal, for work related use,

2    and they disavowed it some multiple times.

3         So I have no reason to think that it's

4    otherwise, I just want to double-check, because it is

5    possible they forgot, it's possible that they -- you

6    know, lots of things have happened since that point,

7    so you just run the search and if it comes up clean,

8    which is what we would expect it to do, it shouldn't

9    be an issue.  This is just making sure that we got it

10   properly.

11        Did I get Claudette's custodian interview?

12        MS. WITTY:  Yes.

13        THE SPECIAL MASTER:  I did.

14        MS. WITTY:  I believe it's the last one

15   before the supplements.

16        THE SPECIAL MASTER:  I'll check it over in a

17   few minutes.

18        I have a question about personal laptops and

19   devices.  How does that work, because I'm a little

20   confused as to how that actually operates because some

21   of the custodians indicated --

22        MS. WITTY:  The only custodian that actually

23   has an UMC issued laptop to them is Doug Spring.  It

24   was issued to him prior to the SC I U negotiations in

25   2009 which occurred prior to the relevant time period

1    for this.  He hasn't used it since then.  The device
2    is still with UMC.  It can be searched.  It wasn't
3    because the use of that machine fell outside of the
4    relevant time period.
5          MR. TOSTRUD:  This is news to us.  When was
6    it issued to him?
7          MS. WITTY:  It was issued to him in late
8    2008.  It was used up until June of 2009.  So it was
9    regarding the SEIU negotiations prior to the relevant
10   time period.
11         MR. TOSTRUD:  Plaintiffs would request that
12   that device be searched because defendant has relied
13   extensively in its defense on a collective bargaining
14   agreement.  They rely on that defense throughout their
15   interrogatory responses and their RFP responses.  They
16   brought a motion to dismiss on the basis of that
17   ^ SPELLING, and we clearly think that's relevant.
18         THE SPECIAL MASTER:  I'm going to reserve and
19   read the briefing a little more before I make any
20   ruling there, but I'm going to assume that you will
21   continue to preserve it.
22         MS. WITTY:  I will make sure --
23         THE SPECIAL MASTER:  In a forensically sound
24   manner.  That's a lot of information.
25         MR. TOSTRUD:  We're happy to provide

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    information on --
 2            THE SPECIAL MASTER:  You guys are taking --
 3    your notes from last time are extremely useful.  So if
 4    you want to write that down for us to stay on top of.
 5            MR. TOSTRUD:  You bet.
 6            THE SPECIAL MASTER:  Super helpful.
 7            Turning back to personal laptops and the
 8    secure policies.  They reference -- is there any
 9    list -- do you track who has tablets and laptops
10    connecting into the OST laptop.
11            MR. SCHAIBLEY:  No personal laptops connects
12    to the network or tablets.  Only UMC issued and
13    observed devices connected to the network.
14            THE SPECIAL MASTER:  So no MDM.
15            MR. SCHAIBLEY:  Not at this time.  We're
16    looking at bringing one in in the future.  As far as
17    with our new 2010 exchange environment, personal
18    cellphones are starting to be able to brought in and
19    we control that through multiple policies.
20            THE SPECIAL MASTER:  But at the time of the
21    time period at issue that wasn't available?
22            MR. SCHAIBLEY:  Correct.
23            THE SPECIAL MASTER:  Have we figured out if
24    any of the -- when I looked at the mobile devices,
25    only three out of the five custodians actually had
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   them.

 2           MS. WITTY:  Yes.

 3           THE SPECIAL MASTER:  That were UMC issued.

 4           MS. WITTY:  Yes.

 5           THE SPECIAL MASTER:  At the time were you

 6   able to track if a mobile device was connecting to UMC

 7   systems?  So if I wanted to bring in my BlackBerry and

 8   I didn't want to tell UMC that I have my own

 9   BlackBerry 10 to whatever, would it be possible for me

10   to actually access that system?

11           MR. SCHAIBLEY:  No.

12           THE SPECIAL MASTER:  Except for e-mail?

13   Because I could set up e-mail.

14           MR. SCHAIBLEY:  Correct.

15           THE SPECIAL MASTER:  Do you have any

16   enterprise architecture diagrams?

17           MR. SCHAIBLEY:  I do not with regard to the

18   enterprise as a whole.  Each team will maintain their

19   own basic, the server team, the network team, etc.

20           THE SPECIAL MASTER:  The desktop team as

21   well?

22           MR. SCHAIBLEY:  I don't know if the desktop

23   team maintains any diagram.

24           THE SPECIAL MASTER:  Because where I get a

25   little confused, when I look at the script that was
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   collected, there is a whole bunch of WordPerfect
 2   documents.  Again, I can't see the content, so I don't
 3   actually know.  But when I read the custodian
 4   interviews, they're like -- (inaudible) WordPerfect.
 5        THE REPORTER:..."WordPerfect"?
 6        THE SPECIAL MASTER:  WordPerfect.
 7        MR. SCHAIBLEY:  Our desktops are extremely
 8   old.  I don't know how often they are swapped out and
 9   re-imaged.
10        THE SPECIAL MASTER:  When you run your
11   searching you are looking the Word document types?
12   When you are searching and running search terms.
13        MR. EDMONDSON:  Sent case 6 and 7.
14        THE SPECIAL MASTER:  List of file types.
15        MR. EDMONDSON:  We can double-check --
16        THE SPECIAL MASTER:  Just making sure because
17   I haven't seen a version for a while.  Off the record.
18             (OFF RECORD.)
19        THE SPECIAL MASTER:  Let's go back on the
20   record.  I want to talk about e-mail list servers?  Do
21   you manage them?
22        MR. SCHAIBLEY:  E-mail list servers.
23        THE SPECIAL MASTER:  Counsel for UMC,
24   multiple custodians indicate they use mail lists.
25        MR. SCHAIBLEY:  Oh, distribution lists?
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  No -- yes, I know the
 2    difference, but --
 3              MS. WITTY:  My technical misunderstanding.
 4              THE SPECIAL MASTER:  There was software that
 5    you identified that they -- they reference mailing
 6    lists.
 7              MR. SCHAIBLEY:  Those are distribution lists
 8    within the exchange environment.
 9              THE SPECIAL MASTER:  Did you pull those?
10              MR. SCHAIBLEY:  When the initial request came
11    in for the initial 26.
12              THE SPECIAL MASTER:  Mailing lists, I want to
13    cover.  In the custodian interviews they mention
14    mailing list.  Do you have any mailing list software
15    to the best of your knowledge?
16              MR. SCHAIBLEY:  I do not.  When a user refers
17    to a mailing list, they are referring to a
18    distribution group that we maintain on the exchange
19    server.
20              THE SPECIAL MASTER:  So UMC post --
21              MR. SCHAIBLEY:  UMC post is dynamic
22    distribution group on the exchange server that
23    includes everyone with a mailbox in the environment.
24              THE SPECIAL MASTER:  And it was something
25    people could have been using to communicate?
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1            MR. SCHAIBLEY:  The list that we maintain
 2      that only a small list of users are able to send to
 3      UMC posts.
 4            THE SPECIAL MASTER:  Let me tell you -- can I
 5      reference the custodian interviews?  Are you okay,
 6      Counsel?
 7            MS. WITTY:  Uh-huh.
 8            THE SPECIAL MASTER:  Mr. Spring was one of
 9      those individuals.  So when you did Mr. Spring's
10      collection, did that include the mailing lists.
11            MR. SCHAIBLEY:  It included whatever was in
12      his mailbox.  If he sent an e-mail to UMC post, it
13      would have been saved in his sent values.
14            THE SPECIAL MASTER:  But you never took a
15      copy of UMC post.
16            MR. SCHAIBLEY:  There is no way to take a
17      copy of it.
18            THE SPECIAL MASTER:  They are saying there
19      are multiple mailing lists.
20            MR. SCHAIBLEY:  There were two or three other
21      distribution groups that were referenced in the
22      original --
23            THE SPECIAL MASTER:  Patient service leaders,
24      mountain service group, and it was told to me that
25      they have been fully preserved and they are referenced
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    as lists.
 2           MR. SCHAIBLEY:  When the request came in, I
 3    responded to --
 4           THE SPECIAL MASTER:  I'll show it to you.
 5           MS. WITTY:  That may be a clarification that
 6    I could make because we actually just discussed this
 7    yesterday.
 8           It was included on the initial list for
 9    preservation, and I was informed by Mr. Schaibley's
10    supervisor that everyone on that list -- everything on
11    that list had been preserved.  After speaking to
12    Mr. Schaibley he explained because those are
13    distribution list, not a repository.
14           THE SPECIAL MASTER:  Let me understand from
15    my perspective.  Based on when the litigation started,
16    this has to do with people's working schedule and
17    whatever and related details therein that we're here
18    to talk about the discovery.
19           I would assume that there had been --
20    someone's phone is on still.
21           For my own edification, you get a
22    litigation -- I'm just trying to understand because
23    the way they describe these, the custodians describe
24    these mailing lists, which they are not actually
25    mailing lists.  They were using them to have
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   communications with large groups of individuals within
 2   the organization.
 3           MR. SCHAIBLEY:  Yes.
 4           THE SPECIAL MASTER:  And they are all dynamic
 5   lists, or how does that --
 6           MR. SCHAIBLEY:  No.  UMC host is the only
 7   dynamic lists.
 8           THE SPECIAL MASTER:  The others are
 9   preserved?
10           MR. SCHAIBLEY:  The others are just
11   individual users added to or removed from them based
12   off of the owner of the group list.
13           When the initial request came in, I responded
14   to the litigation group that sent the initial e-mail
15   that they were distribution groups and not mail
16   repositories, and was told to only concern myself with
17   collecting the custodians that were on the list.
18           THE SPECIAL MASTER:  Let's add to that those
19   mails, because they reference in their custodian
20   interviews, specifically Doug Spring, that he would
21   use it --
22           MR. SCHAIBLEY:  Any e-mail that he or any
23   other custodian would have sent to one of the
24   distribution groups would have been preserved in that
25   user's, that custodian's mailbox.
```

Rough Draft of  Special Master's Hearing   April 4, 2014

```
 1          THE SPECIAL MASTER:  As long as they didn't

 2    delete it?  I'm not saying he did or didn't.  All I'm

 3    saying is from appropriate -- in a sense of where the

 4    evidence sits, the best source of the evidence is the

 5    list.

 6          MR. SCHAIBLEY:  Correct.  And then

 7    additionally it would be in any other mailbox of

 8    recipient on that distribution group.

 9          THE SPECIAL MASTER:  Just one person that

10    doesn't delete the e-mails ever ideally would be the

11    mailing list if that exists.

12          On a go-forward basis, I need you to take

13    whatever you have for that time period relating to

14    that mailing list communications that weren't in their

15    sent folders, if I get what you are saying and see if

16    there is anything within that time period that still

17    exists.

18          Because based on Doug Spring's statements --

19    there is a difference between a mailing and a

20    distribution list, which is something I get the

21    difference of.

22          So my only concern is that -- let's go off

23    the record.

24                (OFF RECORD.)

25          THE SPECIAL MASTER:  Go back on the record.
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   Please state it again.  Sorry I forgot we were off the
 2   record.
 3        MR. TOSTRUD:  So UMC with respect to the
 4   issue of list serves and e-mail, what I will call
 5   blasts, which is probably the wrong term, but I'll use
 6   my layman's term, produced documents, including
 7   e-mails in hard copy form, not in electronic form, to
 8   plaintiffs with their initial disclosures and many
 9   supplements to their initial disclosures.  Included in
10   that grouping were e-mails as Ms. Witty just informed
11   us from something called the patient --
12        MS. WITTY:  Patient service leaders.
13        MR. TOSTRUD:  Patient service leaders lit
14   serve, and that's clearly a very relevant issue, that
15   those e-mails are relevant based on the issue of the
16   department of labor investigation and --
17        THE SPECIAL MASTER:  That's a whole -- we
18   have a whole set of other questions around department
19   of labor --
20        MR. TOSTRUD:  The so-called remediation
21   campaign.
22        THE SPECIAL MASTER:  Counsel for UMC.
23        MS. WITTY:  Yes.  So the patient service
24   leaders are in a distribution list.
25        THE SPECIAL MASTER:  It was at the time a
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    distribution list?

2            MS. WITTY:  Yes.

3            THE SPECIAL MASTER:  Under 2003 or 2010?

4            MR. SCHAIBLEY:  2003.  It's a distribution

5    group under 2003.

6            THE SPECIAL MASTER:  You understand the

7    obvious issue we have that if any one of the named

8    custodians for whatever reason deleted or purged their

9    sent folder or whatever was sent to that list, that

10   would end it, because the former counsel never

11   bothered to tell you to preserve --

12           MR. SCHAIBLEY:  When I responded to them that

13   it was a distribution group, they responded to only

14   concern with the custodian list because a number of

15   the custodians were in those distribution groups.

16           THE SPECIAL MASTER:  Do you actually know

17   which custodian?  Were they in every group?

18           MR. SCHAIBLEY:  I'm pull it up right now.

19           THE SPECIAL MASTER:  So can I get that

20   delineated in a document provided to me, like what

21   list, what users.  So here is a mailing list, here are

22   the custodians that they were collected from that were

23   in this, what version of the distribution 2002 you

24   were using, and then -- yes?

25           MR. TOSTRUD:  Yes.  Just for clarity's sake,

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    the documents and e-mails that I referenced were

 2    produced UMC's four settlement to documents and

 3    witnesses submitted to Federal Rule of Civil Procedure

 4    26.1, and the date on that production is August 29th,

 5    2013.

 6            THE SPECIAL MASTER:  Is there a Bates stamp

 7    on it?

 8            MR. TOSTRUD:  The Bates stamp numbers for

 9    that production are UMC 10000 through UM C100047.

10            THE SPECIAL MASTER:  Got it.

11            I need to get that information before I

12    figure out -- so I understand the importance of the

13    information and I note that for the record, I need to

14    make sure at the very least on a going-forward basis

15    that it's being preserved properly.

16            So what we need to do is identify a custodian

17    who exists or create a mailbox or -- I'm not exactly

18    sure your mail system is set up, but attempt to

19    identify -- it's tricky because effectively as I

20    understand it you have to find an individual that

21    never deleted an e-mail from the list.  Is that

22    accurate?

23            MR. SCHAIBLEY:  As accurate as it can be,

24    yes.

25            THE SPECIAL MASTER:  I'm trying to think of
```

```
 1   what the alternative might be, because obviously
 2   that's -- given the importance of the communications.
 3          MR. TOSTRUD:  I'm happy to enter these into
 4   the record.
 5          THE SPECIAL MASTER:  We took the Bates
 6   numbers.
 7          MR. TOSTRUD:  There is an e-mail, example,
 8   from Claudette Myers now on behalf of Doug Spring, not
 9   just on behalf of John Espinoza, and she appears to be
10   gathering many of the responses relating to the
11   department --
12          THE SPECIAL MASTER:  What's the Bates number?
13          MR. TOSTRUD:  UMC 100018.
14          THE SPECIAL MASTER:  So clearly like we need
15   to figure this out.  Were their mailboxes created --
16   this makes a nice segue.  We need to resolve this
17   issue.
18          Another area that I have -- want to get some
19   clarity around was, did counsel I guess prior counsel
20   ever -- so let me -- timing again -- in April again
21   you ran the scripts, right?
22          MR. SCHAIBLEY: Correct.
23          THE SPECIAL MASTER:  Did anybody ever
24   visually verify the mailbox structures that you were
25   getting?
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1              MR. SCHAIBLEY:  What do you mean?

 2              THE SPECIAL MASTER:  Like did counsel sit in

 3    front of you and say, oh, we've got the right user's

 4    mailbox?

 5              MR. SCHAIBLEY: No.

 6              THE SPECIAL MASTER:  And then just to verify,

 7    all I'm saying is did counsel seek to verify or

 8    validate the collection that was done, former counsel?

 9              MR. SCHAIBLEY:  I cannot answer that.  I

10    pulled the data --

11              THE SPECIAL MASTER:  Did they talk to you

12    about it?

13              MR. SCHAIBLEY: They didn't talk to me about

14    it.  I pulled the data as requested.  Their forensic

15    person made a forensic image of it and that was all I

16    had to do with it.

17              THE SPECIAL MASTER:  A duplicator and boom

18    done?

19              MR. SCHAIBLEY:  Correct.

20              THE SPECIAL MASTER:  I'm a little bit

21    concerned.  Maybe even more than a little bit

22    concerned about how the collection was actually done

23    and verified.

24              Counsel for UMC, you mentioned you were going

25    to get me snapshots demonstrating that you verified
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    what the mailboxes were indeed collected as said?
 2            MS. WITTY:  Yes.
 3            THE SPECIAL MASTER:  Is that in the works?
 4            MS. WITTY:  Yes.
 5            THE SPECIAL MASTER:  Because one of my
 6    concerns is that the collection was done, but no
 7    lawyer actually looked to verify that what they
 8    thought they were getting was what they got.
 9            And then you proceeded -- the custodians,
10    they proceeded to suggest the list of custodians,
11    never clarified that what you got for the custodians
12    when the scripts were actually the right information
13    for what you are looking for; for example, the mailing
14    list as an example, or related sort of communications,
15    or the BlackBerry server.
16            So I'm a little concerned, maybe even more
17    than a little, that that needs to be verified, I need
18    someone to verify that what you think you have and are
19    searching is indeed what it is.  Does that make sense?
20            MS. WITTY:  Yes.
21            THE SPECIAL MASTER:  Because then we know at
22    least on a going-forward basis we have the right
23    stuff, because we need to make sure.
24            So from plaintiff's perspective, I guess, and
25    we've agreed that we're going to add -- actually,
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   counsel for UMC and also Dean particularly, were you
 2   aware of any other laptops during the time period in
 3   question that were being used by any of the
 4   custodians?
 5           MR. SCHAIBLEY:  No.
 6           THE SPECIAL MASTER:  Any other devices?
 7   Because nobody apparently had a lab top ever outside
 8   of his personal laptop.
 9           MS. WITTY:  That's true, yes.
10           MR. SCHAIBLEY:  That's correct.
11           THE SPECIAL MASTER:  And nobody worked from
12   home.
13           MR. SCHAIBLEY:  Anybody that worked from home
14   would have worked over TS Web.
15           THE SPECIAL MASTER:  Which everybody said
16   they didn't use because it was too cumbersome?
17           MR. SCHAIBLEY: It is.
18           THE SPECIAL MASTER:  Well, have a strong
19   group of people from UMC who agree with you.
20           I guess I'm trying to reconcile, Counsel,
21   when we were at the custodian interviews I asked you
22   specifically how some people mentioned they checked in
23   on his laptop during his meeting?
24           MS. WITTY:  Yes.
25           THE SPECIAL MASTER:  No.  He checked it
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
1    during meetings.  He didn't say on his laptop.
2         MS. WITTY:  I'm confused.
3         THE SPECIAL MASTER:  Well, how can someone
4    check something during a meeting if they are not --
5         MS. WITTY:  The only person who had any
6    mentioned any access during meetings was James
7    Mumford.
8         THE SPECIAL MASTER:  Yes, James Mumford.
9         MS. WITTY:  And he mentioned that he used TS
10   Web in meetings to allow him to e-mail.
11        THE SPECIAL MASTER:  From what device?
12        MS. WITTY:  From his personal laptop,
13   probably in violation of policy.
14        THE SPECIAL MASTER:  So let me be clear.  I
15   think you should read the custodian interviews.  They
16   would probably be useful for you, but where I'm a
17   little let's say confused is Mr. Mumford told us that
18   he was able to, in meetings, access the --
19        MS. WITTY:  Specifically what Mr. Mumford was
20   referencing was the same as the SEIU negotiations.
21   That was the only time that he was using those,
22   because they had to have --
23        THE SPECIAL MASTER:  So he had his
24   personal -- I'm just trying --
25        MS. WITTY:  His off campus negotiations, he
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   would take his personal computer and connect via TS
 2   Web [RPTR NOTE:  it's TS Web].
 3           Actually one of the e-mails that was
 4   referenced in Mr. Pixley's declaration is from that
 5   time period, has his notes from those negotiations.
 6           THE SPECIAL MASTER:  Right.  So that leads me
 7   into -- do you have a question?
 8           MR. TOSTRUD:  Plaintiffs would make the same
 9   request with respect to Mr. Mumford's laptop that we
10   did with respect to Mr. Spring.
11           THE SPECIAL MASTER:  I order UMC to preserve
12   it until we can make a determination if it was indeed
13   used.
14           If he used it in relevance to or potentially
15   used it during that time period or was it using it
16   during the time period in question, he may or may not
17   have been using it.
18           MS. WITTY:  Prior to the time period that was
19   relevant -- if he was using the laptop prior to the
20   relevant time period, it's his personal laptop and it
21   has now elapsed five years.
22           THE SPECIAL MASTER:  I'm sure he doesn't have
23   it.
24           MS. WITTY:  I'm just trying to establish what
25   type of chain of custody information we're going to
```

 1    need to gather.  I can't guarantee that he has the

 2    same laptop.

 3            THE SPECIAL MASTER:  I hope he doesn't have

 4    the same laptop.

 5            MR. TOSTRUD:  Again, defendants relied

 6    extensively on the CBA as a defense in this matter.

 7    Plaintiffs and defendants have both briefed --

 8            THE SPECIAL MASTER:  What's the time period?

 9            MR. TOSTRUD:  I don't know the time period of

10    his laptop.

11            THE SPECIAL MASTER:  No, you are referring

12    to, when you say --

13            MR. TOSTRUD:  The topic I'm referring to is

14    the 2008 collective bargaining agreement which was

15    then I believe amended in 2012, but defendant has

16    maintained that the 2008 collective bargaining

17    agreement represents a defense for them to this

18    collective action.

19            THE SPECIAL MASTER:  Let me try this

20    differently.  Is the defense using the collective

21    bargaining agreement in any way in their arguments in

22    this case?

23            MS. FOLEY:  They did several months ago, yes,

24    filing a motion to dismiss, I believe prior counsel

25    did.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            MR. TOSTRUD:  If they are waiving their
 2   argument, we will on the CBA --
 3            THE SPECIAL MASTER:  I'm not the judge --
 4   strike it from the record.  Off the record.
 5                 (OFF RECORD.)
 6            THE SPECIAL MASTER:  I'm going to order you
 7   guys to preserve it because it falls within the time
 8   period.
 9            MS. WITTY:  I would actually like to counter
10   that issue.  What Mr. Tostrud is specifically
11   mentioning is that that information that is relevant
12   to the SEIU negotiations is relevant to the larger
13   issues.
14            However, at the time period the statute of
15   limitations relevant to this case starts in July of
16   2009.  All of this information was prior to that.  We
17   have collected through the ESI information from that
18   time period, information that was either e-mailed or
19   was in their custodian's home files or profiles, but
20   that time period, is SEIU negotiations actually fall
21   outside the statute of limitations in this case.
22            THE SPECIAL MASTER:  But just so I get it,
23   are you using the negotiation, whatever --
24            MS. WITTY:  It's not the negotiations that
25   are relevant to the defense.  The defense is the terms
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   of the CBA with the plaintiffs in this suit control

 2   certain procedures for timekeeping.

 3           MS. FOLEY:  The document itself...

 4           MR. TOSTRUD:  Very simple.  They have

 5   asserted it as a defense.  They brought a motion to

 6   dismiss on its basis.  There is no rule that requires

 7   relevant evidence to be limited to the statute of

 8   limitations for the claim.  That's just not the way

 9   preservation of evidence works.

10           MS. WITTY:  But the negotiation of the CBA is

11   not pertinent to the actual allegations of this suit.

12           THE SPECIAL MASTER:  I feel in some sense

13   there is more about the merits and I'm not qualified

14   to rule on anything to do with the merits.

15           What I can speak to is that you believe there

16   is relevant information that could consist on the

17   personal laptop.

18           MR. TOSTRUD:  Correct.

19           THE SPECIAL MASTER:  Distill it down to what

20   I need.  You believe in your perspective that there is

21   no relevant information on the laptop relating to this

22   dispute?

23           MS. WITTY:  Not locally.  It was all accessed

24   through TSY.

25           THE SPECIAL MASTER:  Just on the laptop.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   We're not doing it locally.  Just on that laptop?
 2           MS. WITTY:  No, at this point.
 3           MR. TOSTRUD:  Plaintiffs would simply ask it
 4   be preserved --
 5           THE SPECIAL MASTER:  I'm just thinking.  Give
 6   me two seconds.
 7           I'm going to order the preservation and
 8   finding the laptop for purposes of waiting for the
 9   Court to make a finding as to whether or not as to the
10   merits of what you are talking about, because based
11   upon what's been presented to me and the system has
12   been designed and built, he could have accessed it and
13   cashed the copies, set up his e-mail account on his
14   local laptop using the IMAP server and the SMPT to
15   send and receive from that local laptop.
16           There is no way to actually know with
17   certainty it was or was not happening, but we do know
18   he was using it at the time in negotiations off site,
19   and I have to assume that he was e-mailing or having
20   communications with people while he was off site using
21   some device.
22           And since we don't have any of his mobile
23   devices, it's near impossible for me to make a
24   determination as to whether or not that may or may not
25   have information, but the real possibility does exist
```

Rough Draft of Special Master's Hearing   April 4, 2014

1    that if he was working offsite in negotiations at the

2    time that he configured the laptop to send and receive

3    e-mails and that the only place that those e-mails may

4    exist today would sit on that computer, because of the

5    way UMC's backup policies and other procedures operate

6    today that that is literally -- and there is no

7    back-up tape, the only potential source of that

8    information and it's a practical perspective that it

9    could have that information if he was working offsite

10   and he didn't have -- if you read his custodian

11   interview he says that he didn't have a smart phone at

12   the time to communicate, and I'm assuming that he was

13   sending e-mails back and forth somehow.  I mean, maybe

14   I'm wrong, but...

15          Maybe I got it wrong, but you were going to

16   provide me that information and you gave it as a

17   supplement, and if you look at your supplement --

18          MS. WITTY:  Only had a cellphone at that

19   time.

20          THE SPECIAL MASTER:  So the only way he could

21   have been sending and receiving e-mail, as far as I

22   know from the information that has been given to me,

23   would be using that laptop.

24          So that's why I'm going to order the

25   preservation today that the judge make a ruling as to

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   whether or not -- I don't understand the intricacies
 2   of labor law, unfortunately, enough to participate in
 3   any dispositive action that I feel the remotest sense
 4   of comfort level.
 5        So I'm going to order the preservation.  I'm
 6   going to sit on it, look at the transcript, but I just
 7   want to understand.  My reasoning is very simple and I
 8   want to spell it out so there is no confusion.
 9        He had a laptop.  He did have a smart phone
10   that could send e-mails and communicate at the time.
11   He was working offsite using this laptop.
12        And I'm assuming if he was in negotiations he
13   was sending back and forth documents.  If he wasn't
14   then it's a core assumption but I have to assume if he
15   was negotiating he most likely was having some way of
16   communicating back and forth with individuals.
17        Since UMC's system itself requires a users it
18   was possible for them to configure their e-mail
19   account to be used by a personal laptop at that time,
20   and it's also possible and likely that the only place
21   that those e-mail messages could sit today would be in
22   one of three places, in his sent mail folder items on
23   the script that was run, but if he deleted them or
24   purged them or any one of a number of things could
25   have happened, they are not there.  There is no backup
```

```
 1    tapes from that time period.  So the only possible
 2    source today that we could use to validate if it turns
 3    out the judge rules that indeed this is within --
 4    before I go too far, strike the judge piece, but
 5    that's the reason why I'm ordering the preservation.
 6    I want a forensic image created, E 01, I want a change
 7    of custody form filled out, and I want it preserved.
 8    I'm making no ruling or determination at this stage
 9    until we actually see when the e-mails starts flowing
10    to your side you'll be able to make a much -- like,
11    for example, if he was actually e-mailing when he was
12    supposedly in negotiations, then we know fairly
13    definitively he was using his laptop at the time
14    because that was the only mobile device he had that
15    could have possibly be sending e-mails.  So we just
16    need to get a little more information and then we can
17    make a more educated determination as to whether or
18    not it's appropriate, but I think we can all agree
19    that there were e-mails sent during the time when he
20    was negotiating, using his personal laptop, then in
21    all likelihood, there probably needs to be searched.
22    But I'm going to reserve any judgment on that until --
23    and I also recognize that UMC's counsel relied upon
24    prior counsel to have done this and that the time has
25    elapsed, but with the utmost speed and urgency they
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    should do this.
 2          MR. TOSTRUD:  Special Master Garrie,
 3    plaintiffs initial presentation letter August 6, 2012,
 4    directed to Mr. Brandon specifically identifies and I
 5    quote from page 3 this preservation notice pertains to
 6    all documents as defined herein which have been
 7    written or generated from July 2008, 2008 through the
 8    present, and I'd like to enter --
 9          THE SPECIAL MASTER:  Can we enter that just
10    so I have a record because there was several
11    preservation letters provided to me and then there
12    were the same letters were attached to multiple
13    arguments and I got inherently confused.
14          MR. TOSTRUD:  That's the initial preservation
15    letter.
16                (Exhibit 6 was marked
17                 by the Certified Court Reporter.)
18          THE SPECIAL MASTER:  And I'm going to reserve
19    judgment until we actually go down a little bit.
20          Just for purposes of the IT security piece of
21    the puzzle, when someone wants to use a personal
22    laptop to access, they don't need to ask if they use
23    the TS Web; right?
24          MR. SCHAIBLEY: They have to be a member of
25    the TS Web group, so they do have to get authorization
```

Rough Draft of Special Master's Hearing   April 4, 2014

1  to use TS Web.  Now, once they have been approved to

2  use it, then they don't need to ask any time they go

3  in.

4          THE SPECIAL MASTER:  Is there a client?

5          MR. SCHAIBLEY:  It is, it is a remote desktop

6  server.

7          THE SPECIAL MASTER:  Oh, it is?

8          MR. SCHAIBLEY: Yes.

9          THE SPECIAL MASTER:  Do you have server logs?

10     A.   We do have the server log and with regard to

11  Mr. Mumford part of his collection that was done for

12  him was his local profile on that server.

13          THE SPECIAL MASTER:  Let's look at that.  So

14  does everybody understand what was just said?

15          MR. TOSTRUD:  Yes.

16          THE SPECIAL MASTER:  Checking.

17          I think now we're at a decent breaking point.

18  We still have several points --

19          MR. GODINO:  Before we break, with a huge

20  caveat that we have a limited ability to search the

21  ESI that was produced and a limited ability to view.

22  We were able to do a search for the phrase "sent from

23  my iPhone" and came up with about 100 hits.

24          THE SPECIAL MASTER:  Usually that's how --

25  let's go off the record.

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1                    (LUNCH RECESS.)

 2    //

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              Las Vegas, Nevada; Friday, April 4, 2014
 2                      1:09 P.M.
 3                   Afternoon Session
 4
 5         THE SPECIAL MASTER:  Without further ado, I'm
 6    going to continue forward.
 7         One thing I wanted to go forward, revisit
 8    that I wrote down and I want to touch on the
 9    production schedule, is I want to go through the
10    mobile devices.  I want to put -- I want to resolve
11    what we've actually done to date, what we understand
12    we have, what we understand is no longer with us in
13    our possession, custody, or control.
14         So based on the custodian interviews and
15    information I've provided.  I think what I'm going to
16    do is let counsel walk us through.  Would you mind,
17    Counsel, walking us through the mobile devices with
18    the information.
19         MS. WITTY:  Specific to the UMC issue
20    directly?
21         THE SPECIAL MASTER:  Yes.  We're going to
22    sort out -- let me write that down.  Par.
23         MS. WITTY:  There are only three of the
24    custodians and that also is including the newly added
25    Claudette Myers and Cindy Dwyer, only three St. Louis
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    UMC issued phones.  John Espinoza, James Mumford, and
 2    the former CEO Brian Brannman.
 3           Mr. Espinoza has had the same BlackBerry
 4    curve 8530 for the entire relevant time period.
 5           THE SPECIAL MASTER:  Can I ask, when did he
 6    get it?
 7           MS. WITTY:  That I do not have, but that can
 8    be obtained.  It was prior to September of 2008,
 9    because the first update to the BlackBerry was in
10    September, was on September 22nd of 2008.
11           THE SPECIAL MASTER:  That's what I thought.
12           MS. WITTY:  Yes.  It was also updated a
13    second time on January 20th of 2011.
14           THE SPECIAL MASTER:  When you mean updated,
15    specifically updating as the way we have already
16    discussed where it's wiped, where they push a clean
17    bill of -- and we're going to talk to the BlackBerry
18    administrator on Monday to understand, if you
19    preserve -- I want to understand how the BlackBerry --
20           MS. WITTY:  How it backs up.
21           THE SPECIAL MASTER:  How backs it up before
22    he wipes it, the other pieces that we'll clear up on
23    Monday.
24           MS. WITTY:  Yes.  The next custodian was
25    James Mumford.  He originally had a UMC flip phone.
```

1   It was non text enabled, non data enabled.  He

2   received that when he started with UMC, so it's been

3   13 years.  He was upgraded to a BlackBerry 9330 on

4   April 1st of 2011.  Since then he's had the same

5   phone.  It was update again on September 15th, 2011,

6   and a second time February 6th of 2012.

7          THE SPECIAL MASTER:  Just again, when we say

8   upgraded here, we're referring to the UMC protocol of

9   upgrade where they wipe and push a new build?

10         MS. WITTY:  Correct.

11         The final custodian was Brian Brannman.  His

12  initial phone, when he was hired in February of 2011

13  was a BlackBerry curve 8530.  It was updated -- excuse

14  me --

15         THE SPECIAL MASTER:  Got a new one.

16         MS. WITTY:  He received a new device, a

17  BlackBerry curve 4 on July 19th of 2013.  Mr. Brannman

18  is no longer with UMC, so both of those phones have

19  been wiped.  But the devices are sometime held by UMC.

20  So if there was anything that could be recoverable,

21  they still have those devices.

22         THE SPECIAL MASTER:  Joseph, you created

23  forensic images of them?

24         MR. EDMONDSON:  Yes, the three that were

25  presented to me.

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  There's more than...
 2              MS. WITTY:  I believe the forensic images
 3   were of the BlackBerry curve for Mr. Brannman.
 4              THE SPECIAL MASTER:  The 4?
 5              MS. WITTY:  The 4, yes.  The BlackBerry curve
 6   8530 for Mr. Brannman was not imaged.
 7              THE SPECIAL MASTER:  But you have it?
 8              MS. WITTY:  Yes.
 9              THE SPECIAL MASTER:  And, yeah, that's all I
10   wanted to -- and with regards to in the custodian
11   interviews we had further there was inquiries to
12   whether or not they had personal devices that they
13   worked for work, they all had different personal
14   devices but none of them were actually, as far as to
15   the best of their recollection besides --
16              MS. WITTY:  Mr. Mumford did not have a
17   personal device.
18              THE SPECIAL MASTER:  He did not have a
19   personal device.  He only had a work device, but
20   everybody else had a personal and a work that was
21   separated by church and state as one set.
22              I'm going to request that -- well, again, we
23   need to talk to the BlackBerry administrator because
24   if it was -- I mean, you have in your possession,
25   custody, and control right now, so before we create a
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    forensic image of it, let's make sure that there is

 2    something that can actually be recovered from the

 3    wipe.

 4         I don't know.  Wipe ask like an esoteric

 5    concept from a technology perspective it means one

 6    thing and to everybody it might mean something else,

 7    so I would rather have the available on Monday and we

 8    can quickly figure out what is or isn't necessary.

 9         With the mobile phone piece, I was also

10    thinking you might want to do iPhone, I pad or powered

11    by.  Because they have the Droid, I forget, like -- I

12    don't have T-Mobile but they have some of the Android

13    bases have power --

14         MR. TOSTRUD:  That's their signature line.

15         THE SPECIAL MASTER:  Signature powered by

16    something or other.  Just as a search phrase just to

17    make sure.

18         Theoretically it should be a fairly trivial

19    exercise to look at this.  It should be "powered by

20    colon," and you should -- the only hits you should be

21    looking for or seeing are iPhone or iPad or

22    Android-related devices, which you will figure out

23    they whether or not they were or were not being used

24    at the time.

25         Does anybody have anything they want to add
```

```
 1    there?
 2           MR. TOSTRUD:  Just a question.  Will the
 3    custodian interviews identify the dates that those
 4    so-called wipes occurred?
 5           MS. WITTY:  Yes.
 6           THE SPECIAL MASTER:  Just want to check in on
 7    Kronos.  Are we good with Kronos from the plaintiff's
 8    side?
 9           MR. FORREST:  So far so good we've gotten our
10    information and we have made calculations on that.
11    Now we're working on linking it up to the wage data.
12    I'm not sure there is going to be an outstanding
13    question in terms of wage data in Kronos not
14    reflecting modifications made in the SAP system.
15           THE SPECIAL MASTER:  The SAP system I believe
16    is only -- this is something I'd like clarity on as
17    well.  I'm not sure what the SAP system was used for.
18    I understood from your papers that you believe it was
19    used in some fashion relating to your complaint or
20    your claim.  No?  Is that incorrect?
21           MR. TOSTRUD:  I think our position is that
22    the defendants represented to us that there is some
23    electronic interface between Kronos and SAP.  They've
24    provided us, defendant provided us with the SAP or
25    with the Kronos database, but apparently that database
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    won't necessarily allow us to compute all of the --
 2              THE SPECIAL MASTER:  I got it.  You don't
 3    have full visibility into how it was configured.
 4              MR. TOSTRUD:  Correct.
 5              THE SPECIAL MASTER:  Does anybody on the UMC
 6    side most.
 7              MS. WITTY:  We're not exactly sure what
 8    information they are wanting.  It's our
 9    understanding --
10              THE SPECIAL MASTER:  Before we get to what
11    they are wanting, I want to understand, does the SAP
12    system actually have data relating to this dispute?
13    Because does it -- is it employee data relate or
14    the -- like what data is in the SAP system.
15              MS. WITTY:  It's personnel information.
16              THE SPECIAL MASTER:  So personal files.
17              MS. WITTY:  Yes.  So it would be if you were
18    looking for someone's contact information or someone's
19    title, you wanted the SAP --
20              THE SPECIAL MASTER:  But to be clear, that
21    system is actually run not by UMC but by the pseudo-
22    state organization.
23              MS. WITTY:  Correct, because Clark County
24    actually runs.
25              THE SPECIAL MASTER:  The SAP platform.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              MS. WITTY:  The SAP platform.
 2              THE SPECIAL MASTER:  Is there somebody within
 3   UMC that actually does SAP based work technically?
 4              MS. WITTY:  I don't believe so.
 5              THE SPECIAL MASTER:  So before we get into --
 6   I'm just trying to understand the big picture because
 7   I got a little confused with it.
 8              So who configures the SAP system to work with
 9   Kronos.  Is it an individual at UMC or an individual
10   with Clark County?
11              MS. WITTY:  I believe it's with Clark County.
12              THE SPECIAL MASTER:  So we would, then taking
13   me to my next question, does anybody actually know
14   from the UMC side how the Kronos and the SAP are
15   interacting?
16         A.  So SAP, the reason why it interacts is once
17   that timekeeping information --
18              THE SPECIAL MASTER:  Let's say I'm an
19   employee.  There is worker A who goes to work, Kronos
20   SAP, what happens?
21         A.  Just a regular employee.
22              THE SPECIAL MASTER:  Regular person.
23         A.  When they clock in, so when they call into
24   the system, that is captured by Kronos.  When they
25   clock out, that is captured by Kronos.  Similarly when
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    they have a missed lunch or some other adjustment to

 2    their time that is made, that is made in Kronos.

 3           THE SPECIAL MASTER:  Because Kronos and SAP

 4    can capture the very same data, you realize?

 5           MS. WITTY:  Yes.

 6           THE SPECIAL MASTER:  So that's why I'm

 7    asking, and I haven't seen any of your database field

 8    screen, so I have no knowledge to which one does what.

 9           So your Kronos system is used internally to

10    track basically hours?

11           MS. WITTY:  Yes.

12           THE SPECIAL MASTER:  For lack of a better

13    term.

14           How does SAP plug into that?

15           MS. WITTY:  So in order to generate -- so

16    from Kronos they generate essentially a report that

17    says this is how much time is worked.  That would

18    include your calculated enrollee, that would

19    include --

20           THE SPECIAL MASTER:  Kronos stores all of

21    this data about me and my work performance and

22    generates a report?

23           MS. WITTY:  If it includes over time, if it

24    includes all the other information.  It has to

25    interact with SAP because the payroll goes through
```

Rough Draft of  Special Master's Hearing   April 4, 2014

```
1    SAP.

2            THE SPECIAL MASTER:  Got it now.  SAP is a

3    payroll system?

4            MS. WITTY:  Yes.

5            THE SPECIAL MASTER:  Is that what we're

6    talking about here?  Okay.  We need to figure out

7    if -- because it makes a difference as to whether or

8    not, A, I assume it's being preserved because SAP is

9    fairly hard to delete data out of it, believe it or

10   not.  Most people can't figure out to delete the data

11   out of SAP most of the time, which is a blessing, I

12   guess, for everybody.

13           The question then becomes, you guys are then

14   taking Kronos data collectively, whatever it is, some

15   hourly reporting, provide some data a scheme a to SAP,

16   Clark County, SAP platform, which then cuts payroll,

17   is that how that works?

18      A.  Yes.

19           THE SPECIAL MASTER:  So then the wage

20   piece -- I just want to understand the systems and

21   then I'll entertain everything.

22           So then -- so if there is a problem with my

23   wage, I talk to the person that runs SAP, the person

24   who runs Kronos?

25      A.  You talk to someone in payroll because they
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    would be the ones that would interact with the SAP.

 2            THE SPECIAL MASTER:  So the payroll people

 3    internally use the client system, that's the Jackie

 4    Panzeri, she uses a client based system to input her

 5    work with the SAP Clark County system to resolve

 6    payroll issues?

 7        A.  Yes.

 8            THE SPECIAL MASTER:  But that data doesn't

 9    actually sit on your systems, it sits on their

10    systems?

11        A.  Correct, it is on their system.

12            THE SPECIAL MASTER:  All right.  So now at

13    least I have a decent understanding, which then would

14    explain when they run the script that everybody has

15    the same exact set of files.

16            MR. FORREST:  Also my understanding is from

17    earlier conversations it may be possible to make

18    adjustments in the wage data and the payment data over

19    on the SAP side.

20            THE SPECIAL MASTER:  Just to be clear, the

21    issue of your question is, I call up UMC and I'm like

22    I'm getting -- pretending a hypothetical here, I am an

23    employee and I worked 90 hours this week but you only

24    paid me for 50 of them and you shortchanged me 40

25    hours of my time in my paycheck.  The paycheck comes
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    from Clark County's SAP division, but I call UMC's

2    payroll person.  The question you have is so I call

3    her and I'm like here's my hours, whatever, she's oh,

4    you're right, she updates the system on her side,

5    amended that feeds into the SAP side, or your question

6    is, does she actually directly update the SAP and that

7    feedback into Kronos.

8            MR. FORREST:  Or not back into Kronos.

9            THE SPECIAL MASTER:  Either it does feedback

10   in or it doesn't feedback in, the fact that my 40

11   hours weren't documented.  That's your concern?

12           MR. FORREST:  Yes, or specific numeric

13   adjustments made in response thereto.

14           THE SPECIAL MASTER:  Just basically if I call

15   somebody up and I call up payroll and where are my 40

16   hours and they are what 40 hours are you talking

17   about, the question is when I fix it is it being fixed

18   in Kronos and SAP or just SAP or just Kronos, and

19   that's the question, as I understand it.  Is that

20   right.

21           MR. GODINO:  SAP and --

22           MR. FORREST:  Or there could be something

23   applied on a general basis.  There could be some sort

24   of adjustment rule that's applied or something.  We

25   don't know.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          THE SPECIAL MASTER:  When you say adjustment
 2   rule, let's stick with my 90-hour week and I was
 3   shorted 40 hours.  Help me understand.  When you say a
 4   adjustment -- we're talking payroll.  So the payroll
 5   person would have to do what to the SAP -- I just want
 6   to understand what an adjustment means from your
 7   perspective, because a SAP adjustment is you write a
 8   rule and it runs and the SAP has their own language.
 9          MR. FORREST:  I'm just talking about any
10   situation where the data that's retained in Kronos
11   would not reflect what was actually paid.
12          THE SPECIAL MASTER just want to make sure
13   that cash and timeline up.
14          MS. WITTY:  All of that information has been
15   provided in the packets.  Because we don't have access
16   to the SAP --
17          THE SPECIAL MASTER:  Whether it's provided or
18   not, I just want to make sure I understand it and you
19   understand it, and then we can talk about a solution
20   or whether it's been provided..
21          Okay.  So you understand what they are
22   saying.  I get it.  So we're all on the same page
23   here.  Basically the amount I got paid, minus the
24   number of hours I worked.  And if it doesn't --
25          MR. FORREST:  Have the right.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  Yeah, but if my amount
 2     has to be --
 3              MS. WITTY:  Based on --
 4              THE SPECIAL MASTER:  Forget we're on the
 5     record.  So yes, correct.  Off the record.
 6                   (OFF RECORD.)
 7              THE SPECIAL MASTER:  Back on the record.
 8              Opt-in packets, I've steered clear of these
 9     because there's 600 things I don't want to read.
10              And the Court, there was a whole discussion.
11     I had the fortune and opportunity to read the great
12     lawyering work that was done around this, and there
13     was zealous advocacy, and packets were provided in a
14     staggered fashion, I think 50, 100 -- but they all
15     eventually made it over.
16              The packets, as I understand it, as you
17     believe as UMC believes has this information in it.
18     Is that accurate.
19              MS. WITTY:  Yes, and that's how UMC accesses
20     that information.  That's exactly how they would have
21     access to it.
22              THE SPECIAL MASTER:  When you say they have
23     access to, so the data -- did you get the packets.
24              MR. GODINO:  Plaintiffs received them.
25              THE SPECIAL MASTER:  But have you guys
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    processed the packets and ingested the data from the

2    packets.

3         MR. TOSTRUD:  No.

4         MR. GODINO:  Well...

5         THE SPECIAL MASTER:  If they are saying the

6    data is in the packets, I'm just trying to figure it

7    out.

8         MR. TOSTRUD:  The issue with Kronos is that

9    we believed -- and I'm not looking to reargue this.  I

10   just would like to provide some background.

11        We believed that they could export some

12   information from Kronos and generate spreadsheets for

13   all the people.  This is routinely done in these

14   cases, litigated several of them, and that's what we

15   had hoped to do, but UMC, and this has been

16   litigated -- I'm not looking to re-litigate it -- UMC

17   represented that it either couldn't or wouldn't do

18   that, and that we all the information in these opt-in

19   packets, which can be somewhat unwieldy to try to, you

20   know, distill.

21        So the judge in the case said, okay, fine,

22   you don't -- you can't do it, I'm not going to force

23   you to do it, but what I am going to force you to do

24   is to give the plaintiffs the Kronos data in its raw

25   native form.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  I read that ruling.
 2            MR. TOSTRUD:  So that was provided to us
 3   sometime in early February, I believe, and we are now
 4   working with it.  We believe that all of the lines are
 5   there and those things are there, but what we are a
 6   little unclear about is how this interacts with SAP.
 7            THE SPECIAL MASTER:  At least I get what the
 8   issue is now.
 9            So here's what I'm going to suggest.
10            Why don't you figure out from the Kronos
11   perspective and take a dozen packets that they
12   provided and see -- and I don't particularly wanting
13   to see them.  I am hoping this solves the problem.  If
14   it doesn't, I'll revisit the issue.
15            Why don't we reexamine to see whether the
16   data in the packets they gave you have the requisite
17   data that you need out of SAP, because the problem
18   we're going to run into is they don't control the SAP
19   system, and because they don't control the SAP system,
20   to get a export out of SAP is going to take -- it's a
21   state-run organization.
22            MS. WITTY:  Local government.
23            THE SPECIAL MASTER:  Local government
24   organization -- let's go off the record for a second.
25                 (OFF RECORD.)
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  On the record.
 2              MR. TOSTRUD:  With respect to the issue of
 3    the Kronos database and in the interest of cooperation
 4    and the spirit of trying to be efficient, we would
 5    again extend to the defendant an opportunity to try to
 6    meet and resolve this together collectively if for no
 7    other reason than we both need this information and
 8    having an agreed-upon set of data that we can proceed
 9    with moving forward is absolutely in both parties'
10    interest.  I say that based on personal experience
11    having litigated many of these cases that --
12              THE SPECIAL MASTER:  It just makes sense that
13    you both need the same data so you can talk to the
14    Court.
15              MR. TOSTRUD:  Correct.  That's what we would
16    offer to go and sit with them, Mr. Schaibley or
17    whatever.
18              THE SPECIAL MASTER:  Before we get UMC
19    involved here, what I would like to suggest, if the
20    packets don't work or you need other pieces, come back
21    to me to the parties, say, hey, look, the packets
22    don't provide this like X, Y, and Z that we need.  As
23    soon as we have we can have intelligible conversation
24    and we can move across the finish line quickly.
25              MR. TOSTRUD:  Certainly.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1          THE SPECIAL MASTER:  I want to talk about

2     storage devices.  Now, I'm going to talk about removal

3     storage devices and I want to talk about storage

4     servers, Hitachi -- like big storage.  I first want to

5     talk about storage devices.

6          When somebody has a computer, a desktop and

7     we'll get to the desktops shortly, but when someone

8     has a computer, do they have the ability to burn a

9     disc of information?

10         MR. SCHAIBLEY:  A generally user, no, they

11    would have to go through somebody in the IT department

12    first.

13         THE SPECIAL MASTER:  When you say general

14    user is that a non IT user?

15      A.  Yes.

16         THE SPECIAL MASTER:  So all of the six

17    custodians, they would be general users and would have

18    to go to IT?

19      A.  Correct.

20         THE SPECIAL MASTER:  To be clear, because in

21    some of the custodian interviews it was brought to my

22    attention that -- counsel witty correct me if I'm

23    wrong -- that discs of scanned information were

24    created.  I'm not exactly sure what's on the discs.

25    But one thing that I would like counsel to do is at

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   least for the time period in question, since, as I

 2   understand it; correct me if I'm wrong, Counsel

 3   witty -- where are they stored?

 4        MS. WITTY:  Coordinate with iron mountain.

 5   It's a third party storage, both physical and

 6   electronic.

 7        THE SPECIAL MASTER:  Just so I understand,

 8   from your perspective, I come in, I have to talk to

 9   IT.  IT says okay, you can burn -- I'm going to give

10   you permission to cut a disc of information.

11        MR. SCHAIBLEY:  Correct.  It's coordinated

12   through IT for the users to be able to do that.  It

13   would typically be done through our ticketing service,

14   ticketing system.

15        THE SPECIAL MASTER:  Here's the situation.

16   We have custodian interviews where people have said

17   they made discs.  The problem is they didn't tell us

18   when they made the discs.

19        Counsel Witty?

20        MS. WITTY:  So the only person who actually

21   physically burns disc is Ms. Myers.  It's her

22   interpretation the discs she burns are related to

23   grievances hearings, however.  Mr. Espinoza, in the

24   previous recruitment and search for a CEO, believed

25   that there had been documentation that he had sent to
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   iron mountain and some of that was scanned, and he
 2   felt some of that scanning had been burned to the disc
 3   and submitted to iron mountain.
 4           THE SPECIAL MASTER:  Can you please check --
 5   how far back does your help IT ticketing system go.
 6           MR. SCHAIBLEY:  I'd have to check on that.
 7           THE SPECIAL MASTER:  I'm hoping you come back
 8   and tell me 2008 and we're good.
 9           MR. SCHAIBLEY:  I would honestly have to
10   check on that.
11           THE SPECIAL MASTER:  First I'm going to ask
12   quote order you to get me an answer.  It does go back
13   to the time period in question and if your IT systems
14   are built so that a user has to go to you with a
15   ticket, just run me a report for the custodians of
16   interest that have been identified to see if discs
17   have been burned during those time periods, and then
18   we'll go forward from there.  I would like that by
19   next Friday, if possible.
20           And the obvious reason is I want to make sure
21   if there are discs, that they are identified properly
22   and accordingly.
23           Now, what about USB sticks?
24           MR. SCHAIBLEY:  USBs are current little
25   denied by policy.  If an end-user needs to use USB
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    flashes they 22 have to come through IT security and
 2    they would get one similar to this one here.
 3            THE SPECIAL MASTER:  I use just old school
 4    cardboard and super glue.
 5            MR. SCHAIBLEY:  Just regular USBs are not
 6    allowed.  If you plug it in and we get it, access to
 7    them is disabled.
 8            THE SPECIAL MASTER:  Was that during the time
 9    period in question or now?
10            MR. SCHAIBLEY:  During the time period in
11    question we were set up in passive mode.  I do not
12    know when it began.  We turned off passive mode and
13    turned on active blocking in October of 2012.
14            THE SPECIAL MASTER:  I'm not terribly
15    concerned because none of the custodians stated they
16    were using USB storage devices, and I will take them
17    on their word at this point.  I believe none of them
18    said they were.
19            But if you could figure that out, that would
20    be helpful, for the USB devices, when it was switched
21    from passive.
22            MR. SCHAIBLEY:  Switched from passive to
23    active was October 2012.  What I don't know is when it
24    first got turned onto passive.
25            Passive means if a USB stick was plugged in,
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   the system was recognized it was plugged in, IT

 2   security would get an alert it was plugged in, but it

 3   wouldn't stop it from being accessible.

 4          THE SPECIAL MASTER:  But there would be a log

 5   of it?

 6          MR. SCHAIBLEY:  I would have to see if that

 7   log is still maintained, because we have recently

 8   upgraded the database.

 9          THE SPECIAL MASTER:  That's fine.  Nobody

10   said they were using it.  It's just me being diligent.

11   I don't actually foresee -- it's just the scanned

12   discs that are really of interest.

13          The one other thing -- well, there are

14   several other things, but I want to talk about the

15   department of labor.  I'm a little confused, and I now

16   apologize up front.  I tried to be diligent and it

17   took way more than 70 hours to read the 2500-plus

18   pages and make my data map.

19          In the course of reading everything I got

20   somewhat confused as to -- can someone start with the

21   investigation of the department of labor, when it

22   started from -- just when was UMC notified?  Like when

23   did that conversation start?  That started with prior

24   counsel, I assume.

25          MS. WITTY:  Prior counsel on this suit was
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    not actually involved in the D.O. L investigation.

 2              THE SPECIAL MASTER:  Who was attorney or

 3    in-house or otherwise that was -- or was it just

 4    Mr. Spring involved?

 5              MS. WITTY:  It was John Espinoza was the main

 6    contact within UMC for the department of labor

 7    investigation.  Doug Spring, as Mr. Espinoza's

 8    subordinate, assisted but not in direct contact.

 9    There was limited interaction with county counsel, so

10    not in-house but supervisor counsel through the

11    county.

12              THE SPECIAL MASTER:  And what was the time

13    period there?

14              MS. WITTY:  It was in -- correct me if I'm

15    wrong.  I'm thinking it would have been early --

16              THE SPECIAL MASTER:  Plaintiffs you must

17    know.  When was it?  Do you know?

18              MR. TOSTRUD:  We believe, based on discovery,

19    that it was in the fall of 2012.

20              MS. WITTY:  I think the initial contact was

21    made during the summer, because it was prior to --

22    most of the investigation prior to the filing of this

23    lawsuit.  It would have occurred in the late Spring or

24    early summer of 2012.  I can absolutely --

25              THE SPECIAL MASTER:  We definitely need to
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    know when.

2         MR. TOSTRUD:  We plaintiffs have not received

3    that notice if there is a document that indicated that

4    there was a notice.

5         THE SPECIAL MASTER:  We haven't received any

6    electronic documents.

7         MR. TOSTRUD:  No.  That's right.  But we've

8    received some documents between the department of

9    labor and UMC, but we are not aware of this notice.

10        THE SPECIAL MASTER:  Well, let's add that to

11   the notes that you guys are covering so we can make

12   sure that the --

13        Returning back to --

14        MS. WITTY:  I just want to make sure we'll

15   coordinate with the plaintiffs to make sure we have a

16   firm timeline on that.

17        THE SPECIAL MASTER:  Yes, firm timeline, and

18   if the notice letter is discoverable and there is no

19   objection by UMC, produced accordingly.  If there is,

20   then we can have a conversation about privilege, etc.

21        I need to understand something, I don't mean

22   to sound a bit slow here, but you had supervisor

23   counsel, were you aware of the department of labor

24   investigation?

25        MR. SCHAIBLEY:  No, I was not.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              THE SPECIAL MASTER:  And you would be the
 2    person who would be responsible for running any sort
 3    of collection or etc., for UMC if there was?
 4       A.  Yes, if it was brought to us, yes, if it
 5    happened prior to my starting at UMC.
 6              THE SPECIAL MASTER:  This was when?
 7       A.  I started in June of 2012.
 8              THE SPECIAL MASTER:  Wow, this date is going
 9    to come down to being really important.
10              The department of labor investigation, did
11    that involve, as far as UMC's involved the collection
12    of any data or documents.
13              MS. WITTY:  No.
14              THE SPECIAL MASTER:  Plaintiffs, do you have
15    any idea, from what you have been able to figure out?
16              MR. TOSTRUD:  Maybe I misunderstood the
17    question or misheard it.
18              THE SPECIAL MASTER:  Department of labor ran
19    an investigation and I asked UMC did they provide
20    any -- collect any information, electronically and
21    provide it to the department of labor.
22              And UMC said no, right, as far as you know?
23              MS. WITTY:  Right.
24              THE SPECIAL MASTER:  Do you know -- I mean --
25              MR. TOSTRUD:  We deposed Mr. Espinoza, who
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   was directly involved.  He indicated that he provided
 2   information --
 3           THE SPECIAL MASTER:   No, I read that.  If
 4   you wanted to provide me the transcript, that would be
 5   useful.  You have it.  You provided it in one of your
 6   filings that you gave me.
 7           MR. TOSTRUD:  Yes.  He testified about having
 8   I believe e-mailed with them.
 9           THE SPECIAL MASTER:  If we could put it in
10   the record, that might be useful.
11           MR. TOSTRUD:  I'll attempt to find that.
12   Furthermore, there are several documents that have
13   been produced to us, including e-mails related to the
14   department of labor investigation as well as what
15   looked to be spreadsheets relating to calculations of
16   over time paid that -- of pay -- of time worked that
17   was not compensated, uncompensated time, calculations
18   of uncompensated time.
19           THE SPECIAL MASTER:  Who provided you the
20   spreadsheets?  Can you provide them so we can put them
21   on the record?
22           MR. TOSTRUD:  They were produced in discovery
23   in this matter.
24           THE SPECIAL MASTER:  While you are looking
25   for that, UMC, are you aware of these spreadsheets?
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1          MS. WITTY:  Yes.  They were produced.
 2          THE SPECIAL MASTER:  I mean, but who made
 3   them?  Like how -- if you guys didn't collect
 4   anything, that would imply that you made these
 5   spreadsheets specific for them because that would
 6   imply you didn't collect any information.
 7          MS. WITTY:  They were created within John
 8   Espinoza's office.
 9          THE SPECIAL MASTER:  And they were created
10   specifically in response to the department of labor
11   investigation?
12          MS. WITTY:  Yes.
13          THE SPECIAL MASTER:  Did he create any data
14   to prepare the spreadsheets.
15          MS. WITTY:  I believe there was information
16   collected from Kronos.
17          THE SPECIAL MASTER:  I'm not trying to -- all
18   I am trying to figure out is the way I understand the
19   situation -- off the record.
20              (OFF RECORD.)
21          THE SPECIAL MASTER:  Back on the record.  I'm
22   going to request that UMC just verify via through
23   their IT -- I need somebody within UMC's IT Department
24   to verify that there was no internal collection in
25   relation to the department of labor investigation.  If
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   you weren't there at the time when this was done, I
 2   would prefer to hear firsthand from the person that
 3   was involved and say I did not do anything.  I
 4   understand you didn't, which makes total sense, but it
 5   would be -- I mean -- and I would like that by next
 6   Thursday.
 7        MR. TOSTRUD:  And I was able to identify some
 8   documents relating to the department of labor
 9   investigation, and we'll have to look through the depo
10   transcript on this, Special Master Garrie, but
11   certainly UMC 100001 and 10003 plus some additional
12   documents that are attached, these are calculations
13   that were made in spreadsheet form and we don't know
14   who made them, I don't believe, but they were provided
15   to UMC or UMC provided them to the department of
16   labor.  Clearly that was created electronically.  We
17   would like to put those into the record.
18        THE SPECIAL MASTER:  Counsel, do you want to
19   look at them?
20        MS. WITTY:  Yes, if you wouldn't mind.  I
21   didn't hear the Bates numbers.
22        THE SPECIAL MASTER:  So then, the question I
23   guess that remains to be resolved is did they create
24   information specifically for the department of labor
25   investigation, meaning did -- or did he collect
```

Rough Draft of Special Master's Hearing    April 4, 2014

1  information and then use that information he collected

2  to create the reports.

3          So basically did he use Kronos beyond just

4  typing a key button the keyboard and create the

5  spreadsheet, or did he actually collect data and

6  information and then use that to do his whatever you

7  were provided.

8          MR. TOSTRUD:  Okay.

9          THE SPECIAL MASTER:  According to as far as

10  UMC knows, as far as Dean knows, and they are going to

11  verify by next Thursday, there was no internal

12  collection done in relation to the department of labor

13  investigation.  Right, Counsel Witty?

14          MS. WITTY:  Correct.

15          THE SPECIAL MASTER:  Do you have any

16  objection to this?

17          MS. WITTY:  No.

18          THE SPECIAL MASTER:  Enter this.

19              (Exhibit 7 was marked

20           by the Certified Court Reporter.)

21          THE SPECIAL MASTER:  Just for my own

22  education from an UMC perspective, from timing,

23  departments of labor contacted you.  As far as you

24  know, they didn't do anything.  I mean, UMC didn't

25  collect anything or collect any information to

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   provide.  They just provided summary or whatever to
 2   the department of labor in relation to the
 3   investigation?
 4          MS. WITTY:  And it's purely upon the request
 5   of the department of labor investigator the
 6   information was collected or the spreadsheet was
 7   created.
 8          THE SPECIAL MASTER:  Created.  Not collected.
 9   Created.
10          MS. WITTY:  Right.
11          THE SPECIAL MASTER:  Much different.
12          MS. WITTY:  Yes.
13          THE SPECIAL MASTER:  So okay.  I'd like you
14   to talk to UMC's former IT individual to make sure
15   that there is no initial -- that that is indeed the
16   case.
17          The department of labor didn't request for
18   any records?
19          MS. FOLEY:  No, it was a very odd,
20   informal --
21          THE SPECIAL MASTER:  I'm not trying to imply
22   or impute anything of any nature.
23          MS. FOLEY:  I have to be careful what I'm
24   saying too because --
25          THE SPECIAL MASTER:  Let's go off the record
```

Rough Draft of Special Master's Hearing    April 4, 2014

 1    for a second please.

 2                    (OFF RECORD.)

 3            THE SPECIAL MASTER:  Back on the record.  As

 4    I understand it, was there any informal or otherwise

 5    collection done by UMC to collect information in

 6    relation to the department of labor investigation?

 7            MS. FOLEY:  My understanding is there was

 8    some sort of chart assembled with some kind of wage

 9    information entered into a spreadsheet by hand, a

10    little bit of data entry.  That's it.

11            THE SPECIAL MASTER:  No, I get the data entry

12    piece.  Who collected the data that went into the data

13    entry?  The data had to come from somewhere.

14            MS. FOLEY:  It was payroll data.

15            THE SPECIAL MASTER:  So if he wasn't doing

16    the collection -- let's try it differently.  You are

17    right about the terminology.

18            The department of labor ran an investigation,

19    formal or informal or otherwise.  UMC -- all i'm

20    trying to establish whether any information was

21    collected, formal or otherwise in connection with this

22    department of labor informal or formal investigation

23    that was via e-mail, spreadsheets, data entry, that

24    was not data created but data that was collected.  The

25    difference being they didn't -- they made a

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   spreadsheet, because when I read all the information
 2   that was provided to me, I didn't see any requests and
 3   I didn't see any data being provided.
 4          What I'm trying to understand is was there
 5   any -- did UMC ever collect any data, formal or
 6   informal, in relation to this department of labor
 7   investigation, because based on the information that
 8   I've been provided, all I'm trying to establish is,
 9   and I believe it directly relates to the scope of the
10   preservation, which is what I'm really trying to get
11   at here, is was this information collected, and if it
12   was collected, was it preserved and was it included
13   within the search and the etc.  So we can go through
14   each one of those.  That's all I'm interested in.
15          The first question is was there anything
16   formally or otherwise collected?
17          MS. FOLEY:  There was a chart made sort of --
18   Kronos --
19          THE SPECIAL MASTER:  -- because there is no
20   need for me to put you on the spot.
21          MS. WITTY:  The problem is I think what you
22   are asking for is a repository.  Wherever we go to
23   locate information that was collected.  What we have
24   street a spreadsheet that was created, and from my
25   understanding in discussion with payroll, it was they
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   were given a list of names to access information in
 2   Kronos in the database where the information is held
 3   and they manually input that information into the
 4   spreadsheet.
 5        THE SPECIAL MASTER:  So at the end of the day
 6   do you have the spreadsheets -- I'm focused on I don't
 7   really -- I don't know enough about labor litigation
 8   to actually participate here.
 9        What I'm interested in is whatever data
10   you've got, e-mail, spreadsheets, payroll,
11   conversations, whatever, it was data that was
12   collected and created in this process in some fashion
13   or another?
14        MS. WITTY:  Yes, and that's all been
15   preserved.
16        THE SPECIAL MASTER:  That's all I want to
17   know.  That's my only concern here.  The extent I'll
18   get to -- yes?
19        MR. TOSTRUD:  Two quick points.  Number 1,
20   Mr. Espinoza in sworn testimony in the deposition
21   provided to you and we'll pick out these points and
22   provide those specific pages and line numbers to you,
23   but he testified that data was collected that he had
24   multiple communications with the department of labor,
25   that's number 1.
```

Rough Draft of Special Master's Hearing   April 4, 2014

1           And number 2, a letter dated September 26,

2    2012, from Ybelka Hernandez of the U.S. Department of

3    Labor, this is UMC 000006 to 000007, indicates at

4    paragraph 4, this is a letter from Mr. Espinoza to

5    Ms. Hernandez, "I am proposing the following based on

6    our own evaluation and discussion with the supervisors

7    of the department in question," and then he proceeds

8    to outline a proposed resolution of the department of

9    labor investigation.

10          But Mr. Espinoza clearly lays out in this

11   document that there has been an evaluation and

12   discussion with supervisors of the departments in

13   question, and I'm happy to submit this for the record,

14   but plaintiffs firmly believe, based on our experience

15   in this case, that there is a tremendous amount of

16   information that exists with respect to the department

17   of labor investigation.

18          THE SPECIAL MASTER:  Well, let's be -- I

19   think that they're not disputing that --

20          MR. TOSTRUD:  So my understanding is that

21   they are saying there is a spreadsheet?

22          THE SPECIAL MASTER:  No, no.  I think what

23   they are saying -- correct me if I'm wrong.  One

24   second.  Just so -- I'd like to enter this into

25   evidence and we can go off the record once you enter

```
 1   it.
 2                   (Exhibit 8 was marked
 3               by the Certified Court Reporter.)
 4                   (OFF RECORD.)
 5        THE SPECIAL MASTER:  Back on the record.
 6        I have a question for UMC that I'm a little
 7   confused about.  When I read this letter that was
 8   entered as Exhibit Number 8.  From UMC to Ybelka
 9   Hernandez, where it says:
10               "I'm proposing the following, based on
11               our own evaluation and discussion with the
12               supervisors of the departments in question."
13               And then "admitting," etc., etc.
14        To me, an evaluation implies that they looked
15   at data or did something.  I mean, am I
16   misinterpreting what was meant by Mr. Espinoza?  I'm
17   trying to understand what did he -- by evaluating, if
18   no collection was done informally, what was he looking
19   at, what was he evaluating?
20        MS. WITTY:  I think it's more of a position
21   evaluation.  I cannot speak to Mr. Espinoza's --
22        THE SPECIAL MASTER:  Can you do me a favor.
23   Go back to Mr. Espinoza and ask him specifically what
24   he is referring to in his letter to clarify this
25   because it does in some sense to me suggest or
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   indicate that there was data that was used and looked
 2   at and it could be of course you are correct, it is
 3   possible, Counsel, that that's not what was meant, but
 4   I do understand where plaintiff does seek further
 5   clarification.
 6           I also want to know whether the prior IT
 7   person prior to Mr. Schaibley joining UMC was involved
 8   in any part of it, because for me, where this sort of
 9   in my head doesn't fully come together is that if they
10   were able to use Kronos to gather data to then create
11   the spreadsheet or data, who -- I'd be very -- I just
12   want to understand what was done and to make sure that
13   whatever was done was properly provided.  All right?
14   And then we'll see what he says.  I mean, there's only
15   so much that -- I assume that like you ran -- actually
16   this is a returning from the department of labor, the
17   next question I had, was when you actually responded
18   to the document request, did you run searches?  How
19   did you respond to the document request?  Because
20   given the huge amount in generally.  This is more for
21   my own edification.
22           We established that there is probably likely
23   repetitive -- a great deal of -- it's not 80 gigs of
24   unique data.  It's probably like 8 to 10 gigs of
25   unique data or maybe 15, but the point I'm trying to
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   make is, when you got these document requests, did you
 2   actually run -- how did you search the data that was
 3   collected to identify what was responsive, given that
 4   the prior production effort that has been ongoing
 5   with -- which we just cleared up with the EnCase,
 6   nothing -- how did that happen?  How did you actually
 7   find information, electronic or otherwise, and give it
 8   to them, just so I understand?  Was it a concordance
 9   database.  I'm just trying to determine what documents
10   you actually determined to turn over.  So they serve a
11   document request.  Document requests request
12   information relating to UMC's -- let's return back to
13   my hypothetical of my 90-hour a week and I got stiffed
14   40 hours or 50 hours.
15          How did UMC go about trying to identify that
16   information?  Because -- off the record for a second.
17                  (OFF RECORD.)
18          THE SPECIAL MASTER:  Back on the record.
19   Let's clarify the record because plaintiff raises a
20   very important point.  In the prior hearing it was
21   represented by -- what's his name again?
22          MS. WITTY:  Ernie McKinley.
23          THE SPECIAL MASTER:  McKinley that all that
24   had been collected to date was e-mail.
25          MR. GODINO:  That was all he was asked to
```

1    collect.

2            THE SPECIAL MASTER:  It turns out

3    Mr. McKinley was completely not involved or wrong,

4    because what I received, just to be clear, from UMC

5    was 1500 pages that identifies every file that was

6    collected, and the e-mails came -- are in containers

7    called PST and OST.  So theoretically the e-mails

8    should be at the most three pages, and I have 1500

9    pages of files that were collected.  There were Word

10   documents, spreadsheets, e-mails.

11           MR. GODINO:  Were those attachments to

12   e-mails, though?

13           THE SPECIAL MASTER:  No, these are in

14   addition to e-mails.  I was sitting here and looking

15   at this the whole time and I probably missed one of

16   the big pieces at the beginning.  So let me rewind to

17   offer a great deal of clarity.

18           It turns out that gentleman was completely

19   wrong in every -- well, there are additional things

20   that should have been collected and the BlackBerry

21   server and there were other additional issues we have

22   identified.

23           But with regards to what was collected, they

24   collected, by my estimation, for example, for B

25   Brannman, they collected for OST files, right, which

Rough Draft of  Special Master's Hearing    April 4, 2014

1    have in them e-mails with attachments and etc., okay?

2    They are embedded within this file -- 3 OST files, so

3    that probably has hundreds if not thousands of

4    attachments in those OST files.  Some of them are

5    pretty big.

6            Then we have one PST file on top of that.  So

7    you have those four files, and then you have upwards

8    of about I think I counted about 400 or 500 Word

9    documents and spreadsheets, in addition to, and on top

10   of that you have his entire Internet history, which

11   was -- the I might be able to realize people record

12   everything, and probably I should realize that.

13           And we also have all the Adobe PSTs, every

14   PDF document.  On top of that -- I want you look into

15   if it can read SAP data, because there are SAP data

16   files.  I'm assuming it can at least be searched

17   because it's a binary file, but there's actual DAT

18   files for the SAP as well.

19           Then there are like lots of encrypted files,

20   which takes me to a question I have for Dean.

21           What do you do with the encryption files if

22   you don't have a key?  How is he going to read them?

23           MR. SCHAIBLEY:  To be honest with you, I

24   didn't know that there were any encryption files.

25           THE SPECIAL MASTER:  There are encryption

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1    files.
 2            MR. EDMONDSON:  I believe so.
 3            MR. SCHAIBLEY:  If there were encrypted
 4    files, those were encrypted by each of --
 5            THE SPECIAL MASTER:  Okay.  Well, then I want
 6    UMC to figure out every one of those files and get an
 7    encryption key so they can be searched.  I mean -- I
 8    don't know any other -- I'm sorry that they were -- I
 9    fully recognize that this will be work but at the end
10    of the day there is a responsibility to collect the
11    information.  If the user decides to encrypt the files
12    it doesn't mean that they are not entitled to have
13    them searched, and so we need -- what he can do to
14    speed this up, you can run an end case, a report to
15    identify every encrypted file, give him that report as
16    an exported Excel spreadsheet so that way he doesn't
17    have to waste his time to find them.
18            Then you can go figure out -- because you
19    have Kryptos systems in there.
20            MS. WITTY:  I apologize.  Could we take a
21    short break?  I just need to run to the restroom.
22            THE SPECIAL MASTER:  Is it okay if we keep
23    going for like two minutes?
24            MS. WITTY:  Thank you.
25            (Ms. Witty exited the proceedings.)
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1          THE SPECIAL MASTER:  So I want to make --

2    first returning back to what we were talking about,

3    that is what was collected.

4          MR. GODINO:  Do we have an idea when?

5          THE SPECIAL MASTER:  What you are going to

6    get on the chain-of-custody paperwork when you get the

7    new one, it will say on this day, on this time, these

8    many files.  You will find it to be -- I think all

9    that's really happened, there has been some

10   communication errors, but we're going to create change

11   of custody for each custodian.  It actually says these

12   are how many files were copied, this is the day, this

13   is the time.  Everything was done properly with the

14   right switches and everything in Robocopy.

15          Unfortunately, the gentleman that was at the

16   last hearing, he was just wrong in every way, shape or

17   form as to -- anyway, the point being that that was

18   collected, but in their collection there were

19   additional issues that we've identified which are

20   there is encrypted files, there were error files in

21   the encryption.  So they are going to work to figure

22   out -- I should have done this at the beginning and I

23   do apologize.  That's why in the beginning I spoke to

24   them about the errors I found in their collection.

25          Because I don't want to turn over their

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    collection because it has every filename and every
 2    piece of detail, so I would rather them give you this
 3    is what was collected rather than the filenames etc.
 4    They collected word perfect documents, RAR files, ZIP
 5    files, but my point is, the other issue with the
 6    collection is in this collection they created ask that
 7    they encrypted these files, and you can't actually
 8    search it until they are decrypted.  Right?
 9         The rolling production on a going forward
10    basis that we will establish will be a search of the
11    universe for that custodian.  Are you with me?
12         MR. GODINO:  Yes.
13         THE SPECIAL MASTER:  Which will include their
14    e-mails.  One custodian had 25 e-mail.  And e-mail
15    archives.  Which each one probably had hundreds if not
16    thousands of files and attachments in e-mails which is
17    what my point is from earlier I wanted them to de-dup
18    it so they didn't end up -- well, two reasons.  One,
19    I'm sure they don't want to do a doc review of the
20    exact same files 20 times, and you don't want to read
21    20 of the exact same file.
22         So that is going to happen, but before that
23    can happen, I need to get the encryption keys.
24         MR. GODINO:  I understand.
25         THE SPECIAL MASTER:  That turns back to what
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   we were originally talking about which was the
 2   department of labor informal investigation.  So now
 3   you understand the universe of what we have for
 4   Mr. Espinoza, which includes all of his e-mail, his
 5   WordPerfect documents, his Word documents, whatever
 6   they have his script went and grabbed, and he did more
 7   than that.  That script, I have several questions --
 8           MR. GODINO:  If he created those documents
 9   before they did the actual collection --
10           THE SPECIAL MASTER:  I can tell you
11   exactly when --
12           MR. GODINO: -- some of those documents may be
13   done.
14           THE SPECIAL MASTER:  That's a separate --
15   that's an issue for Monday, and you will get --
16           MR. GODINO:  Because we requested documents
17   back in January of 2013.  I would be interested in
18   knowing when they actually started collecting --
19           THE SPECIAL MASTER:  Wait for counsel.  I
20   suspect in chain of custody that information is
21   included because it is only reasonable to state when
22   you acquired the information.
23           (Ms. Witty re entered the proceedings.)
24           THE SPECIAL MASTER:  Counsel Witty, great
25   timing.  One of the questions or concerns which I told
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    them we're tabling to Monday is when the collection

 2    occurred.

 3             So when did you serve your document?

 4             MR. GODINO:  January 23rd.

 5             THE SPECIAL MASTER:  So plaintiff served it

 6    January 23rd, and --

 7             MR. SCHAIBLEY:  We received an e-mail on

 8    April 9th to -- with the list of custodians to collect

 9    and the collection began on April 10th.

10             THE SPECIAL MASTER:  This was the August one

11    that was done, that's the one I got.

12             MS. FOLEY:  Yes.

13             MR. SCHAIBLEY:  Yes.

14             THE SPECIAL MASTER:  But you did two, April

15    and August, right?

16             MR. SCHAIBLEY:  Yes.

17             THE SPECIAL MASTER:  So I'd like --

18             MR. SCHAIBLEY:  The August one was only the

19    5.

20             THE SPECIAL MASTER:  The 5 which will now be

21    the 6.  Now, I would like you to provide me the text

22    files, the output -- now that I've within the script

23    myself, for all 26 that were done in April so I can

24    see the actual outputs.

25             But the point is that you will get all that
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    in the chain of custody form once it's updated.  To be

 2    clear, I expect it to say we collected these

 3    custodians information on two occasions, once here on

 4    this day we acquired this many files, in August, this

 5    many files, and we got them -- I was provided by

 6    counsel witty with a spreadsheet that was extremely

 7    helpful in figuring out what actually the names meant.

 8    Do you remember the name of that file, Counsel?

 9         MS. WITTY:  The full directory listing.

10         THE SPECIAL MASTER:  So if that wasn't clear,

11    the actual scope of what was collect dead was much

12    more extensive than what was represented.  It is all

13    of their e-mail as it was at the time I believe both

14    in April and in August.  Is that correct?

15         MR. SCHAIBLEY:  That's correct.

16         THE SPECIAL MASTER:  I've only verified

17    August but based on what I've seen in August and I'm

18    assuming April will be the same, it is literally all

19    the way down to what is in the person's Internet

20    cache.

21         It's not a forensic duplicate copy, but it

22    was whatever was in their local profile.

23         MR. TOSTRUD:  May I turn to another

24    big-picture question relating to Mr. McKinley's

25    testimony or statements.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          Mr. McKinley stated there were no backups at
 2    the March 10 hearing.
 3          THE SPECIAL MASTER:  Let me be clear.  Dean's
 4    specialty ask in the collection and the enterprise
 5    mail server, not the BlackBerry or the backups.  That
 6    person will be here on Monday.
 7          MR. TOSTRUD:  Okay.
 8          THE SPECIAL MASTER:  We've gotten and you've
 9    received and you'll review, if you look, he was also
10    completely wrong there, but you will review and I
11    believe it was entered as Exhibit Number --
12          MR. TOSTRUD:  Is this the backup policy?
13          THE SPECIAL MASTER:  Yes.  If you turn to
14    page number -- I don't know.  Just turn -- and you
15    will see they give you an example of whether is
16    actually backed up and the time is actually included
17    as well and the cycles and all of the details.
18          MR. TOSTRUD:  Okay.
19          THE SPECIAL MASTER:  Counsel, you wanted --
20          MS. WITTY:  I think part of my confusion was
21    with regard to archiving of e-mails, not necessarily
22    backup of the system.
23          THE SPECIAL MASTER:  But you don't
24    actually -- sorry.
25          MS. WITTY:  There is no archiving system.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          THE SPECIAL MASTER:  Mr. Schaibley, he
 2   established earlier that there is no archiving
 3   platform at UMC currently.  They are deploying or in
 4   the process of deploying I believe is it's called
 5   Simpana or CommVault they are in the process of doing
 6   that but at the time of question there was no
 7   archiving of e-mail.
 8          But turning back to our original premise,
 9   which is, if the collection -- so they collected these
10   users like the executive assistants, I don't know if
11   they collected all of them or not, but if they didn't
12   collect them all, there is -- which we'll all
13   hopefully figure out by Monday can you get us that
14   information as to whether or not you collected the
15   executive assistant's that are for Doug Spring --
16          MR. SCHAIBLEY:  Yes, I did.  They were in the
17   original 26, Claudette.
18          THE SPECIAL MASTER:  We'll just double-check
19   so that way we don't have any -- so if there are
20   custodians who didn't fall within that group, based on
21   their backup policies as I read it then they weren't
22   necessarily -- the data might not be there today
23   basically based on the way their backup system is set
24   up, as I understand it, but I only got it a day and a
25   half ago, so I was writing it out this morning.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            MR. TOSTRUD:  Are the policies that you put

 2    in place from this point forward?

 3            THE SPECIAL MASTER:  Thank you.  So with

 4    regards to preservation going forward, he was also

 5    wrong.  So thank you.

 6            So as to preservation, the way the script was

 7    actually written wasn't at all as he described it.

 8    What happened is he ran Robocopy for everything in

 9    this person's profile, then they created on the server

10    a separate stand-alone server that they still have

11    today for each user this directory.

12            So the evidence still exists for each one of

13    them.  Does that make sense?

14            MR. TOSTRUD:  Uh-huh.

15            MR. GODINO:  (Nodded head up and down.)

16            THE SPECIAL MASTER:  So the only issue we

17    have and then to put it in context and again I

18    apologize for -- because I spent so much time with

19    this and I apologize there was a huge oversight on my

20    part.  When we were having the conversation earlier on

21    about the e-mail trimming with the e-mails themselves,

22    the PST OST that had to be scanned and repaired.

23    Remember that whole conversation earlier on?

24            MR. GODINO:  Yes.

25            THE SPECIAL MASTER:  That was within the
```

Rough Draft of Special Master's Hearing   April 4, 2014

1  collection, and my point was if the collection for

2  that information wasn't done or had problems, right,

3  it might mean that the material isn't available

4  anymore.

5        MR. GODINO:  Right.

6        THE SPECIAL MASTER:  You are going to get a

7  copy of the error logs, which you have already been

8  provided, which will detail out exactly what happened

9  for each one of those.  Does that make sense?

10        MR. GODINO:  Yes.

11        THE SPECIAL MASTER:  So you will have a

12  chance to look at it and then on Monday we'll be able

13  to speak about it if you have questions after you have

14  had a chance to analyze the information.  Does that

15  make sentence?

16        MR. GODINO:  Yes, sure.

17        THE SPECIAL MASTER:  You will get the error

18  logs.  The error logs represent -- so why don't you

19  recap just one more time what you did for the e-mail.

20        MR. EDMONDSON:  For the e-mail itself?

21        THE SPECIAL MASTER:  Scan and repair.

22        MR. EDMONDSON:  I ran the scan on all of the

23  PST and OST files.

24        THE SPECIAL MASTER:  All being everything

25  that was collected for the five custodians.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          MS. FOLEY:  In August.

 2          THE SPECIAL MASTER:  In August.

 3          MR. EDMONDSON:  Correct.

 4          THE SPECIAL MASTER:  On August 24th?

 5          MR. EDMONDSON:  Yes.

 6          THE SPECIAL MASTER:  Just those, okay.

 7          MR. EDMONDSON:  Just those.

 8          THE SPECIAL MASTER:  And then what happened.

 9          MR. EDMONDSON:  And all of them generated log

10   files during the repair process.  Two of them could

11   not be repaired and required that additional data be

12   removed from them before they could be repaired

13   correctly.

14          THE SPECIAL MASTER:  And that project is

15   called trimming.

16          Mr. Pixley, are you there?

17          MR. PIXLEY:  No, I'm here.

18          THE SPECIAL MASTER:  Mr. Pixley, did you get

19   the log?

20          MR. PIXLEY:  I did.

21          THE SPECIAL MASTER:  So you'll be able to

22   analyze that and if you have any issues or questions

23   we can discuss it on Monday?

24          MR. PIXLEY:  Yes.

25          THE SPECIAL MASTER:  Good.  The whole point
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   is, what that details out, my concern and what I'm

 2   getting at is because it was the collection was done

 3   in a way that may or may not be forensically sound

 4   enough because of the number of errors in the log

 5   file, there could be an issue because there are no

 6   backup tapes as to whether the material is available.

 7          MR. GODINO:  Notwithstanding the preservation

 8   letters there is some material that may be gone.

 9          THE SPECIAL MASTER:  Yes, possibly, which is

10   the whole scan and repair log files, which we're going

11   to discuss on Monday once Mr. Pixley and you guys have

12   had a chance to look at it, we can have a more cogent

13   conversation as a group.  Does that make sense?

14          MR. GODINO:  Yes.

15          THE SPECIAL MASTER:  Before I can have that

16   conversation, I want to also have a conversation with

17   their backup person, there BlackBerry server, because

18   if they have the backup tapes, then at least if we

19   know that it didn't work or there are issues, we have

20   another source we can look at.

21          MR. GODINO:  Right.

22          THE SPECIAL MASTER:  As a back-up if

23   necessary.  And if reasonable.  It's a function of

24   figuring out how much information, how much had to be

25   trimmed, and what the whole -- understanding what the
```

Rough Draft of Special Master's Hearing    April 4, 2014

1    data set looks like as a composite, and according to

2    whatever your ESI experts determine, and then I will

3    also weigh in at that point as well as to what would

4    be appropriate or not.

5         My concern is, and I will let the record

6    reflect this, is that there was a lot of trimming and

7    it is a bit of -- and trimming being as was just

8    explained cutting the e-mail file down so it can be

9    actually used and processed and ingested, and for some

10   of the e-mails PST OST files.  I haven't extensively

11   reviewed the log files, which is some exciting work

12   for the weekend, but that is a point of concern for

13   me, but that is just the e-mail piece as I mentioned

14   before, everything else is there, the Word documents,

15   the Excel spreadsheets, the Word documents, the

16   WordPerfect documents, the Lotus notes, you name it,

17   they collected it.

18         MR. TOSTRUD:  And all of that in addition to

19   the e-mail will be part of the rolling production?

20         THE SPECIAL MASTER:  Yes, of course.  The

21   rolling production for an individual custodian will

22   represent the composite of their entire collection

23   that at least for the six that I reviewed for the five

24   that I reviewed from August and I assume that they

25   will provide me the April and you'll remove or de

Rough Draft of  Special Master's Hearing    April 4, 2014

1    duplicate whatever at the very least the duplicative

2    files between the collections, right?

3         MR. EDMONDSON:  I believe was that actually

4    (inaudible) -- (asked for clarification.)

5         THE SPECIAL MASTER:  Off the record.

6              (OFF RECORD.)

7         THE SPECIAL MASTER:  Back on the record --

8    off the record.

9              (OFF RECORD.)

10        THE SPECIAL MASTER:  Back on the record.  In

11   the custodian interviews you will receive hopefully

12   before Monday there is repeated dialogue about iron

13   mountain by all the custodians.  What isn't clear to

14   me is from a security and exchange and that

15   perspective, who handles iron mountain within UMC?

16        MR. SCHAIBLEY:  It does not come through the

17   IT security department.

18        THE SPECIAL MASTER:  Does it come through IT?

19        MR. SCHAIBLEY:  I believe it does.

20        MS. WITTY:  From my understanding, the backup

21   tapes, so the individuals within the server team that

22   participate in the backup go through iron mountain.

23   The custodian --

24        THE SPECIAL MASTER:  But that person will be

25   here on Monday?

```
 1          MS. WITTY:  Yes.  We'll have that
 2   information, yes.
 3          THE SPECIAL MASTER:  But we'll be able to
 4   call somebody on Monday?
 5          MS. WITTY:  Yes.  The actual custodians that
 6   were interviewed don't send any electronic information
 7   other than Claudette -- electronic information other
 8   than Claudette, who did the discs.
 9          The other files, the grievance files, those
10   are all --
11          THE SPECIAL MASTER:  Did any of the paper
12   documents that they referenced were being stored there
13   have any -- it's good first that they are being
14   preserved.  Lets recognize that they are being
15   preserved.  The next questioning I obviously want to
16   know is is there any -- have you been able to
17   discern what -- since I couldn't tell from what you
18   told me, if it had anything to do with -- there's no
19   date ranges, so I have no idea what dates they are
20   storing data or files or paperwork from.  I have no
21   understanding of what -- the scope of the paperwork
22   they are actually storing there, if it's copies or
23   originals or -- so if you could kindly go back and
24   inquire as to when they say that they are using iron
25   mountain, say when or whether you are putting iron
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   mountain because all I'm interesting in is --
 2            MS. WITTY:  That that information was
 3   reviewed --
 4            THE SPECIAL MASTER:  That it was reviewed
 5   accordingly and that they are destroying the originals
 6   and you saw copies or vice versa or that it wasn't,
 7   but I need more than we sent it to iron mountain, for
 8   multiple reasons.
 9            MR. TOSTRUD:  For purposes of efficiency from
10   plaintiffs standpoint I think it would be very helpful
11   to know if schedules and things like that are stored
12   at iron mountain --
13            THE SPECIAL MASTER:  We'll go off the record
14   really quick.
15                  (OFF RECORD.)
16            THE SPECIAL MASTER:  So on the record really
17   quickly, our objective and intent is by Monday that
18   plaintiffs will be provided the custodian interviews,
19   will have had the chance to look at them and review
20   them, counsel for UMC will have a chance to circle the
21   wagons to identify what was stored in iron mountain
22   and how it was stored and give further parameters to
23   that.  If they are able to, on Monday, we will answer
24   the questions that counsel for the plaintiff raise,
25   which were specific to -- what was the substance of
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    what they were sticking in iron mountain and is that

2    or has that been collected or reviewed by counsel for

3    UMC and if it has just to clarify that.

4          So if necessary we'll come up with a list of

5    questions and that will be presented to each of the

6    custodians if necessary.

7          Furthermore, we are now talking about the

8    amended stipulated ESI protocol and I wanted to

9    discuss with the parties different pieces of this to

10   understand now that I have a much firmer grasp of

11   everything that's moving, I wanted to just touch on a

12   couple of things.

13         The first being number 4, document image

14   formats, it says, "The parties shall meet and confer

15   to the extent reasonably necessary to facilitate the

16   import and use of the produced materials," which would

17   be, hopefully, they will come in the rolling

18   production, "with commercially available document

19   management or litigation software such as Summation or

20   Concordance."

21         I was under the impression you were using

22   something else.  Is that -- plaintiffs, am I wrong?

23         MR. FORREST:  We're -- our review platform is

24   IConnect, but we are perfectly happy with the

25   Concordance stat file.

Rough Draft of  Special Master's Hearing    April 4, 2014

1              THE SPECIAL MASTER:  Okay.  So you are -- I

2     just want to make sure --

3              MR. FORREST:  Stat file, OST file.

4              THE SPECIAL MASTER:  And you provided --

5     let's be clear.  You don't specify what fields you

6     want for a Concordance file.  You just say a "load"

7     file.

8              MR. FORREST:  I believe those fields are

9     specified in paragraph 13.

10             THE SPECIAL MASTER:  So everybody is okay

11    with that?  Yes?

12             MR. GODINO:  Yes.

13             THE SPECIAL MASTER:  I want to make sure

14    because now that we've actually figured out what we're

15    going to get to, the encryption hand the other pieces.

16             MR. FORREST:  We would definitely prefer

17    single-page tiffs.  Here it says single or multi.

18    Single would be our preference.

19             THE SPECIAL MASTER:  There might be some

20    give-and-take here.

21             MS. WITTY:  We had previously discussed not

22    doing tiffs as it's --

23             THE SPECIAL MASTER:  So this is my question:

24    What if they just -- are you wed to the tiffs?

25             MR. FORREST:  Well, to the extent they are

Rough Draft of Special Master's Hearing   April 4, 2014

1    producing natives, I think we need a placeholder with

2    a Bates stamp.

3         MS. WITTY:  We have previously with the

4    attempted production I'm not going to argue about on

5    compliance, we had agreed to doing the placeholder

6    image.

7         THE SPECIAL MASTER:  Right, but it's not in

8    here.  That's why I'm talking to you about it now.

9         MS. WITTY:  Right.  That's what we are trying

10   to iron out.  There is no need for the tiff as long as

11   there is a place holder, the native.

12        THE SPECIAL MASTER:  That is fantastic, but

13   that is not what you guys submitted to the judge.  So

14   what I need to happen is plaintiffs --

15        MR. FORREST:  Amended.

16        THE SPECIAL MASTER:  So what I do need to

17   happen is that I do need you to change this so that we

18   then have complete agreement about -- and we will

19   finalize the language on Monday but I would like you

20   to adjust this so it is reflective of what is --

21        MR. FORREST:  That's fine.

22        THE SPECIAL MASTER:  Because that will

23   also -- takes me to my question -- the next one,

24   filename and conventions.  Obviously that needs to be

25   changed as well.  Any thoughts?

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            MR. FORREST:  I don't think we have Bates
 2    numbers that can't be included in the filename, and I
 3    think the convention looks all right.  It's basically
 4    going to be for the first page.
 5            THE SPECIAL MASTER:  I think so too.  So can
 6    you adjust that.
 7            MR. FORREST:  Yes.
 8            THE SPECIAL MASTER:  I'm just asking because
 9    we had a whole conversation last time when you guys
10    submitted this and I was like maybe I missed -- maybe
11    you guys couldn't agree but I thought when we left
12    everybody had agreed.
13            So then presentations, decks, spreadsheets,
14    pictures and images, that needs to be adjusted as well
15    because they are coming in native.
16            MR. FORREST:  Everything is coming in native,
17    is my understanding.
18            THE SPECIAL MASTER:  Right.  The only reason
19    I'm asking is this is what was submitted to the Court.
20    Go off the record for a second.
21                 (OFF RECORD.)
22            THE SPECIAL MASTER:  Back on the record.
23            Then obviously 7 A, part of 7 A should be
24    adjusted.
25            MR. FORREST:  Yes.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          THE SPECIAL MASTER:  Unless either party has
 2   an objection, speak up, please, and adjust it to
 3   reflect what we have agreed upon with the natives.
 4   This will also allow both sides to save some time and,
 5   more importantly, money.
 6          With regards to the hard copy documents, I
 7   thought that was fine.  Anybody have any issue with
 8   this?  I don't know why you didn't want them OCR'ed.
 9          MR. TOSTRUD:  Can you give us just a second
10   on that.
11          (Conference between counsel.)
12          THE SPECIAL MASTER:  I don't know if you guys
13   are getting a lot of discovery.  If you are, you
14   should speak as well.
15          MS. WITTY:  We would ask it be in the same
16   form we produce it.
17          MR. FORREST:  Everything should come with a
18   text file and if it's hard copy it should be OST CR,
19   if it's electronic it should be slack Ted.
20          MR. GODINO:  If defendants don't object, we
21   can add the OCR.
22          THE SPECIAL MASTER:  I'm writing it down.
23          MS. WITTY:  That's not an issue, yes.
24          THE SPECIAL MASTER:  I mean, if they are
25   scanning it, they can just click another button and
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    it's OCR, so...

 2            For color, I'll leave that as is.

 3            MR. FORREST:  It's superfluous at this point.

 4            THE SPECIAL MASTER:  I assumed there was some

 5    reason you left it in.  If it's not, I would recommend

 6    removing it.

 7            There is one thing I want to make clear.

 8    This protocol will apply to both parties now.

 9    Counsel, this is important.  This protocol I'm going

10    to request applies to both parties.  So if you end up

11    producing, you are going to have to provide OCR --

12            MR. GODINO:  That's fine.

13            THE SPECIAL MASTER:  Because if you are

14    turning over information and receiving it --

15    duplicates, this is a question that I have.  This

16    comes down to -- this is really for plaintiffs.  You

17    need only to have produced a single copy of that

18    document.  I need to understand something.  Does

19    document mean e-mail too?

20            MR. FORREST:  Well, it does go on and talk

21    about multiple inconsistent electronic.  Also on

22    pages -- on 16 to 17.

23            THE SPECIAL MASTER:  I scratched those

24    already, but yes.

25            MS. WITTY:  Our druthers would be to
```

Rough Draft of Special Master's Hearing   April 4, 2014

1    de-duplicate on a custodian basis, and we actually

2    came to an agreement earlier that's not reflected

3    here, but this is an e-mail agreement as to what

4    fields would be used for de-duplication of e-mail.

5            THE SPECIAL MASTER:  That was not included --

6            MS. WITTY:  Yes.

7            THE SPECIAL MASTER:  But it wasn't included

8    in this.  So again I got confused.

9            So there is an e-mail that I read that you

10   guys were agreeing as to how de duplication was going

11   to happen.  That is not in here.

12           MR. FORREST:  That is correct on both counts.

13           THE SPECIAL MASTER:  So plaintiff I'm going

14   to look to you guys to make these changes.

15           Don't forget this is an FYI for number 12 to

16   make sure the reference is right, paragraph 2.

17           MR. GODINO:  Paragraphs.

18           THE SPECIAL MASTER:  Yes.  I didn't have any

19   problem with the production media, the only question I

20   have you say if the producing party encrypts or locks

21   the production, I'm going to require now the scope --

22   just to be clear, what they have collected is

23   expensive and I would rather err on the side of

24   caution and just have them provide you, unless there

25   is any objection, put it on an encrypted disc and ship

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    it that way because it is literally -- either that or
 2    they are going to have to search it for -- it's your
 3    call?
 4             MR. FORREST:  You mean they encrypt the
 5    production media?
 6             THE SPECIAL MASTER:  Yes.
 7             MR. FORREST:  That's fine.
 8             THE SPECIAL MASTER:  Because we're dealing
 9    with healthcare, better safe than sorry.
10             Do you have any objection to that?
11             MR. EDMONDSON:  No.
12             THE SPECIAL MASTER:  So then can you adjust
13    the -- so just be like all production will be done on
14    encrypted discs unless both parties agree and concept
15    in writing or something or you could say that might
16    contain -- however you want to phrase it.  Just we'll
17    go through -- now metadata.
18             MR. FORREST:  I guess there should also be an
19    LP T file.
20             THE SPECIAL MASTER:  Do you have any -- do
21    you want to raise that again?
22             MR. FORREST:  There should be an LP T file.
23    I mean, it's going to be a fairly simple LP T file.
24    There's only one image per...
25             THE SPECIAL MASTER:  Do you have any problem?
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1              MR. FORREST:  Producing an LP T file for the
 2     tiffs?
 3              THE SPECIAL MASTER:  Explain exactly what you
 4     want in the LP T.
 5              MR. FORREST:  We'll furnish it.
 6              THE SPECIAL MASTER:  He will furnish you the
 7     LP T how street that.
 8              MR. EDMONDSON:
 9              MR. FORREST:  ECapture and crank it out it is
10     a check box.
11              THE SPECIAL MASTER:  We'll revisit -- once
12     plaintiffs give it to both side the amended protocol,
13     we'll then review it again on Monday.  I just got very
14     confused, so I wanted to literally go through it with
15     your guys, so that way --
16              Now metadata, anybody -- the met data?
17              MR. FORREST:  It should be the new order,
18     yes.
19              THE SPECIAL MASTER:  I see it all, but you
20     are getting the native files; right?  Like began
21     attach, began doc.
22              MR. FORREST:  If they're -- those metadata
23     fields were suggested by Mr. Edmondson, and we added a
24     few more.  They are going to extract them anyway.
25              THE SPECIAL MASTER:  Oh, they are?  Okay.
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   Fantastic.
 2           The search terms, can someone please provide
 3   me a list of search terms?
 4           MS. WITTY:  We can do that, include the
 5   initial terms.
 6           THE SPECIAL MASTER:  So that way we have the
 7   new list locked and we're good, and if you could, just
 8   attach it to the order so there is no confusion at
 9   all, but I want to notice that it is the first as
10   plaintiff pointed out this is the -- actually don't
11   attach it to the order, now I think about it.
12           I want to make it clear, though, that these
13   search terms are the first in your discussion with the
14   other side and based on what the results are you will
15   have further conversations.
16           MS. FOLEY:  Once the results are reviewed,
17   yes.
18           THE SPECIAL MASTER:  Privilege logs are made
19   and conversations are had.  We're just trying to get
20   there.
21           Okay.  Databases, this is fantastic because I
22   almost forgot about it.  Microsoft access.
23           MS. FOLEY:  Uh-huh.
24           THE SPECIAL MASTER:  Mr. Schaibley, can you
25   please tell me how Mike soft access is handled to the
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   best as you know how.  If you don't know, say you
 2   don't know and let counsel --
 3          MR. SCHAIBLEY:  To the best of my knowledge,
 4   we no longer utilize any access databases, we no
 5   longer support any access databases.
 6          THE SPECIAL MASTER:  Counsel, with Mike soft
 7   access?
 8          MS. WITTY:  Yes.
 9          THE SPECIAL MASTER:  Did you get any further
10   clarification?
11          MS. WITTY:  I did.  James Mumford is the only
12   custodian who mentioned Access.  He has not used it
13   similar as it's reported at UMC during the relevant
14   time frame he literally said he hadn't used it in the
15   past seven years.
16          THE SPECIAL MASTER:  And the custodian
17   interview someone mentioned they used MS Access.
18          MS. WITTY:  He likes it.
19          THE SPECIAL MASTER:  He likes it.
20          MR. FORREST:  Well, that's one person.
21          THE SPECIAL MASTER:  Getting past personal
22   biases.
23          (RECESS TAKEN 3:10 P.M. TO 3:18 P.M.)
24          THE SPECIAL MASTER:  Back on the record.
25   Databases, I understand the databases.  This takes me
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1   to my -- when we finish this, I'm going to ask UMC to

2   provide a list of all the file types because there is

3   a litany of file types that you may not even be

4   interested in getting hits on, like DOL believe it or

5   not might also trigger on a lot of nonresponsive stuff

6   given what a lot of people are looking at on the

7   websites.  You can be surprised.  You never know what

8   words are embedded, like American Idol, I-d-o-l.  So

9   you just don't think about it and then all of a sudden

10  you are reading like 15,000 American idol webpages

11  because you asked for DOL. So, you know, it's --

12        On Monday I want a list of all the file types

13  provided and we're going to enter it as an exhibit as

14  well, so print a copy.  So that way you understand

15  when you are going to get a custodian these are all

16  the different file types that sit within that

17  universe.

18        So and then that will sort of take care of

19  the database thing because you will see the -- there

20  is not really that many database applications or

21  files.

22        So unless anybody has any comments for

23  database or wants to and it at all?  Plaintiff, are

24  you okay with it?

25        MR. FORREST:  With some --

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1          THE SPECIAL MASTER:  Speak now or forever
 2   hold your piece.  What part?  Is it okay?
 3          MR. FORREST:  I'm not crazy about it.  I
 4   think what they are doing with Kronos, if they could
 5   produce an adequate report in electronic format that's
 6   fine.  To the extent they can't.
 7          MR. GODINO:  I think we've already litigated
 8   that issue.  This would have applied to Kronos.
 9          THE SPECIAL MASTER:  That was my whole
10   question.  You are going to get a list of all the file
11   types.  Let's assume none of them are Kronos.
12   According to this you get the entire database or
13   report.
14          So when you get the list of file types, if
15   you can also please identify the applications, I think
16   it does it for you automatically, I think it does.
17          MR. FORREST:  Some of them.
18          THE SPECIAL MASTER:  Some of them.  At least
19   enough that you can Google the rest if you need to.
20          We'll talk about it on Monday.  I want you to
21   look at it.
22          MR. FORREST:  We're not going to have gone
23   through that by Monday.
24          THE SPECIAL MASTER:  You won't get it until
25   Monday.  You can think about do I really want the
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   whole database.
 2          MR. FORREST:  Normally I'm happy with an
 3   extract, depending upon how it can be normalized and
 4   so forth.
 5          THE SPECIAL MASTER:  For databases why don't
 6   you put a question mark staying to be determined on
 7   Monday.
 8          MR. FORREST:  Meets and confer.
 9          THE SPECIAL MASTER:  We're not going to meet
10   and confer.  We're going to have a conversation on
11   Monday and make some decisions.  If not we will have a
12   phone conference, because I don't think UMC, they are
13   going to evaluate the cost benefit ratio for their
14   client as well.
15          Production of other electronic documents, it
16   says you guys are going to meet and confer to agree on
17   the form of any production of electronic documents
18   other than the foregoing, which are databases,
19   e-mails, word-processing documents, spreadsheets,
20   presentations, image documents, and construction
21   documents.  I don't know how construction has to do
22   with it, but I'll leave it in.
23          Is there other documents that might -- like
24   filings maybe, electronic filings that are done?
25   Records?
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1            MR. FORREST:  PDF should probably be in
 2    there.
 3            THE SPECIAL MASTER:  You would think.  But I
 4    don't know.  Do you want to meet and confer about each
 5    file type or do you want to add more file -- because
 6    right now --
 7            MR. FORREST:  I mean, since everything is
 8    being produced as native, I think --
 9            THE SPECIAL MASTER:  I thought it was a moot
10    point.
11            MS. WITTY:  Yes.
12            MR. FORREST:  Yes, I agree.  I mean, the only
13    conceivable thing I can think about if it's not
14    precisely covered here, it's some form of native data
15    or aggregated data this you cannot in fact read
16    without --
17            THE SPECIAL MASTER:  The reader.
18            MR. FORREST:  Without the original
19    application.
20            THE SPECIAL MASTER:  So that might be the
21    only situation you would want to address rather than
22    all the other things, and I think it saves both sides
23    money and time.
24            Okay.  Acceptance of the protocol, I don't
25    have any problem with that.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              Redaction, I assume you guys covered how you
 2    want it.
 3              Use of documents, "extract detection not be
 4    used in any proceeding as a substitute for the image
 5    of any document."  Since we're doing native, is that
 6    an issue?
 7              MR. FORREST:  Well, I think, with the
 8    exception of impeachment material and
 9    cross-examination material, probably would be
10    furnished as Bates stamped tiffs, right.
11              THE SPECIAL MASTER:  Yes, but you would then
12    produce them and enter them into evidence.
13              MR. FORREST:  Enter the tiffs into evidence?
14              THE SPECIAL MASTER:  Yes, you would do that
15    in court, you would make a motion to the Court and
16    provide it to the Court.  They are not going to object
17    to you turning over paper documents to the judge.
18    Maybe they would, but the judge would say that's fine.
19    Give it to me on a memory stick?  And the judge will
20    be like I don't have a USB reader on my computer, and
21    the jury won't be able to see it, so I'll take it as a
22    paper document, and the judge will be, oh, that's a
23    great idea, and then everybody will be happy.
24              But I agree, you should put it in just to be
25    safe.
```

Rough Draft of Special Master's Hearing    April 4, 2014

1          Privilege logs, I assume you guys had a

2    conversation about privilege logs.  Is that an

3    accurate assumption.

4          MR. GODINO:  Yes.  I mean, we've been having

5    ongoing discussions.

6          MR. TOSTRUD:  We've met and conferred and we

7    have an amended privilege log already.

8          THE SPECIAL MASTER:  But as this production

9    starts going, I need to know that you guys have some

10   mechanism upon which a privilege log is being created

11   request sufficient data from both sides that's not too

12   unwieldy or burdensome and sufficiently substantive

13   for you to make a motion if necessary.

14          MR. TOSTRUD:  If not there already we're very

15   close to reaching an agreement on that.

16          Is that fair?

17          MS. WITTY:  Yes.

18          THE SPECIAL MASTER:  It would be good if we

19   got across the finish line by Monday or Tuesday, at

20   least before the production starts.

21          Cost service, I don't have any problems with

22   the rest of it.  I didn't know if anybody has any

23   issues, please let me know.

24          MR. FORREST:  You mentioned Tuesday.  Are you

25   contemplating Monday may run over?

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  We seem to be a pretty
 2    good power group.  We seem to have made decent
 3    progress.  I'm thinking after Monday there will be
 4    enough work that we will meet again in a week and a
 5    half.  My goal is that first production.  Off the
 6    record.
 7                 (OFF RECORD.)
 8            THE SPECIAL MASTER:  On the record.  I do
 9    commend counsel from both sides for both being
10    cooperative and moving the ball forward which is
11    actually good and nice.  I'm not used to such
12    civility.  So it's a pleasant change.  I know that
13    might sound odd, but it is true.
14            The next thing that I wanted to touch upon
15    now we've gone through this is I want to make sure we
16    will crystal-clear -- and I want to make sure that you
17    work here with Mr. Schaibley that you include the
18    April and August file types.  Are we clear?  Because
19    all I've seen is the August?  You understand?
20            MR. EDMONDSON:  I'll make sure that's what's
21    on --
22            THE SPECIAL MASTER:  And I will get the text
23    files for the collection from April for myself.  And
24    what that allows me to do is validate everything
25    that's coming through.  Okay?  Any questions there?
```

Rough Draft of  Special Master's Hearing   April 4, 2014

1    Either side?  Okay.

2         Mr. Pixley, do you have any questions?

3         MR. PIXLEY:  No.

4         THE SPECIAL MASTER:  Moving to what is the

5    last group of questions that I have, this is mainly

6    for Mr. Schaibley, are there any third party services

7    that UMC uses to store documents or access documents

8    or provide services that UMC doesn't store or control

9    themselves at the time period in question.

10        MR. SCHAIBLEY:  I don't believe so, no.

11        THE SPECIAL MASTER:  Are you the person

12   responsible for these?  Would you be the person

13   responsible or are there other people within the

14   organization as well?

15        MR. SCHAIBLEY:  To my knowledge, we don't

16   have any.  If we did have any, it would come through

17   the security team.

18        THE SPECIAL MASTER:  I would assume that you

19   would have to approve them?

20        MR. SCHAIBLEY:  Uh-huh.

21        THE SPECIAL MASTER:  Okay.

22        To be clear, you do not allow Dropbox?

23        MR. SCHAIBLEY:  No.

24        THE SPECIAL MASTER:  You should then redo

25   custodian interviews.

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1              MR. SCHAIBLEY:  Awesome.

 2              THE SPECIAL MASTER:  Counsel, you will make

 3    the BlackBerry person either available on the phone or

 4    in person?

 5              MS. WITTY:  Uh-huh.

 6              THE SPECIAL MASTER:  Can an UMC user save

 7    their documents to a local user computer outside of

 8    their profile?

 9              MR. SCHAIBLEY:  Not outside of their profile,

10    no.  They would be under their -- the desktop.

11              THE SPECIAL MASTER:  So if I log in and I go

12    to "save as" I select "C colon/," can I do that?

13              MR. SCHAIBLEY:  During the time frame in

14    question, it may have been possible.

15              THE SPECIAL MASTER:  But it was not the

16    practice or --

17              MR. SCHAIBLEY:  Correct; correct.  By

18    default, whenever it opens up it goes to My Documents,

19    and the My Documents will -- is auto redirected to

20    their home folder on a faster.

21              THE SPECIAL MASTER:  Do you have this policy

22    written anywhere so I could read it and understand it?

23    Because when I read the custodian interviews and your

24    collection script, sometimes I get a little confused.

25    So if you have how it works or how it was working,
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing    April 4, 2014

1    that would be very helpful.

2           MR. SCHAIBLEY:  Yes.

3           THE SPECIAL MASTER:  So, as we mentioned

4    before, the collection was fairly large and broad, and

5    I'm just verifying right now that the way a user

6    logged in to to use their computer, it wasn't that it

7    automatically defaulted to save to the local drive,

8    but it defaulted to save to the network file server or

9    whatever.  So that basically they couldn't store data

10   on their local computer that wasn't being collected.

11   Is that clear?

12          MR. GODINO:  Uh-huh.

13          THE SPECIAL MASTER:  So that was the purpose

14   of the questioning.

15          Counsel, with regard to Mr. Mumford and his

16   use of personal texting --

17          MS. WITTY:  Yes.

18          THE SPECIAL MASTER:  I'm a little perplexed

19   as to -- I know we've established that there was

20   wiping, they call it pushing a new image, but

21   effectively deletion of everything that was there

22   before.  Did that also wipe his text messages that he

23   sent to his wife?

24          MS. WITTY:  He --

25          THE SPECIAL MASTER:  Because I got a little

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   confused when I read over how he handled text
 2   messages.  Any light you could shed there?
 3        MS. WITTY:  I don't believe that the
 4   something out would have deleted the text messages.
 5   But he stated that he personally deleted his wife's
 6   text messages.
 7        THE SPECIAL MASTER:  Which is what led me to
 8   the question of besides why he was deleting them is
 9   that if it was being wiped, hopefully the BlackBerry
10   person if you can just let them know this is something
11   I'm going to want to understand in detail and if you
12   could bring additional materials or exhibits to
13   clarify these things or policies or anything, even of
14   a technical nature, it would be very useful, because
15   multiple custodians indicated that they used text
16   infrequently but if they were wiping or how it was
17   stored and pushed, and based on what was provided I
18   wasn't really able to discern outside of what was
19   imaged, and please also provide Mr. Brannman his first
20   mobile device, the first smart phone to -- for imaging
21   and inclusion as a -- if it was used during that time
22   period, which I believe it was, and include that in
23   your -- and I'd like that by next -- next week is
24   getting a little busy -- how about the week after
25   Monday?  The result.  That means I want it imaged and
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    I want the messages pulled and also returning back to

 2    the mobile devices, were there any e-mail messages on

 3    the mobile devices when you looked at them?

 4          MR. EDMONDSON:  I would want to double-check

 5    but I am fairly certain there were.

 6          THE SPECIAL MASTER:  Can you get me the date

 7    ranges.

 8          MR. EDMONDSON:  Yes.

 9          THE SPECIAL MASTER:  You can tell the

10    BlackBerry person that's coming I'm going to want to

11    know what's synched and how it's synched, push-pull,

12    how it works.

13          Is there anything you want to add, plaintiff?

14          MR. FORREST:  Just wondered between the

15    interaction between that --

16          THE SPECIAL MASTER:  How about mobile?  They

17    are going to image it, look at the text messages for

18    his other mobile device.  Is there anything that you

19    believe you would like to see included on his first

20    mobile phone that's yet to be imaged.

21          MR. FORREST:  Bruce.

22          MR. PIXLEY:  Yes, I couldn't hear the

23    question.

24          THE SPECIAL MASTER:  The question was, we're

25    going to image -- actually it won't happen till next
```

 1  week so if plaintiff will just write it down I can ask

 2  Mr. Pixley on Monday when he's here.

 3        MR. TOSTRUD:  Are we referring to

 4  Mr. Brannman's first phone?

 5        THE SPECIAL MASTER:  Yes.  The image, the

 6  second phone.

 7        You imaged the second phone; is that correct.

 8        MR. EDMONDSON:  Yes.

 9        THE SPECIAL MASTER:  They didn't image the

10  first phone.

11        MR. TOSTRUD:  Okay.

12        THE SPECIAL MASTER:  And when the BlackBerry

13  person comes he'll explain if there is each anything

14  on it, but we'll image it anyway because maybe that's

15  fragments and we'll re-touch on this with Mr. Pixley

16  here on Monday quickly just to make sure.

17        Now, with regards to Mr. Spring,

18  Mr. Schaibley I have a question for you:

19        In his custodian interview he references he

20  had two computers.  I've got really confused as to

21  how -- the way I read it was terminal, but I don't

22  know.  So I was hoping you could clear up what

23  constitutes a computer device for a custodian at UMC

24  to start.

25        MR. SCHAIBLEY:  Depending on their job --

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  I'm taking about Mr.
 2    Spring.
 3            MR. SCHAIBLEY:  As far as Mr. Spring, he
 4    would have a computer sitting at his desk in his
 5    office.
 6            THE SPECIAL MASTER:  And that would be his
 7    computer?
 8            MR. SCHAIBLEY:  That would be his computer
 9    that he uses.  It's an UMC-issued computer assigned to
10    him that he uses.
11            Because human resources has two different
12    offices, we've get human resources in one building and
13    human resources in a separate building, he would have
14    an office in both locations, so he would need a
15    computer in both locations.
16            THE SPECIAL MASTER:  And your collection
17    included both locations?
18            MR. SCHAIBLEY:  Yes.
19            THE SPECIAL MASTER:  And you will put in the
20    chain of custody which ones they are?
21            MR. SCHAIBLEY:  Yes.
22            THE SPECIAL MASTER:  So that was also
23    collected, both --
24            Now what about the profiles at the terminals?
25    Someone mentioned that you have terminals, dummy
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   terminals, Doug Spring referenced dummy terminals.  Do
 2   you have dummy terminals?
 3         MR. SCHAIBLEY:  I'm not sure why he would use
 4   the term "dummy" terminal.
 5         THE SPECIAL MASTER:  But dummy terminal in
 6   technical terms means a very --
 7         MR. SCHAIBLEY:  We have Dropbox and
 8   Workstations on Wheels, which is basically a computer
 9   that's attached to a cart that can be rolled in from
10   one hospital room to another and around on the floor.
11   Those terminals are used with a kiosk account which is
12   an individual account.
13         THE SPECIAL MASTER:  Is it separate from
14   their user account?
15         MR. SCHAIBLEY:  Yes, it's not a computer that
16   they log into.  This is a computer that's already
17   logged into and sitting on the desktop.
18         THE SPECIAL MASTER:  Just so I understand,
19   they have a user account, Doug Spring logs into the
20   computer; that's his desktop.  Does he have a
21   different log-in password for the other device?
22         MR. SCHAIBLEY:  No, there is no login for
23   that device.  It is already logged into a domain
24   account.  The end-user does not actually have a
25   password that they put into it.  When they get on that
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   machine at that time when they would log in would be
 2   when they are logging into our Citrix environment.
 3        THE SPECIAL MASTER:  Because when he
 4   described it, I got a little confused.  As I
 5   understand it, it is a free-floating station that I
 6   can bring up Citrix and log into my own terminal?
 7        MR. SCHAIBLEY:  Correct.  He would use his
 8   own log in and the password at Citrix, not on the
 9   machines.
10        THE SPECIAL MASTER:  Right, not on the dummy
11   terminal?
12        MR. SCHAIBLEY:  Correct.  The machine is
13   already logged into --
14        THE SPECIAL MASTER:  I've got it.  So it's
15   not a dummy terminal.  It's a computer where he was
16   able to use Citrix to access his user profile and
17   account.
18        MR. SCHAIBLEY:  Yes.
19        THE SPECIAL MASTER:  Can you make sure and
20   include that clarification and question in the
21   custodian interview?
22        MS. WITTY:  Yes.
23        THE SPECIAL MASTER:  What's SEIU?  Just
24   everybody said several times.
25        MR. TOSTRUD:  Service Employees International
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    Union.
 2            THE SPECIAL MASTER:  Now, mobile storage,
 3    that's another concept that I spoke with counsel -- do
 4    you allow mobile storage?
 5            MR. SCHAIBLEY:  What do you mean by mobile
 6    storage?
 7            THE SPECIAL MASTER:  So Mr. -- it says UMC
 8    does not allow personal mobile storage. " Does that
 9    mean on your mobile device?
10            MR. SCHAIBLEY:  To me, that would be
11    referencing one of two things, either referencing your
12    personal mobile phone or referencing your personal
13    thumb drive.
14            THE SPECIAL MASTER:  Thumb drive?
15        A.  Yes.
16            THE SPECIAL MASTER:  Does each one of UMC
17    employees have?
18        A.  No, we do not allow personal USB sticks.  If
19    an individual user requires having a mobile USB stick
20    they can request one from IT security, or an iron key.
21            THE SPECIAL MASTER:  Was that included in the
22    collection?
23        A.  It was not, because none of the custodians
24    had an iron key other than one, and the user who had
25    an iron key in the initial, he accessed it the day it
```

1    was given to him when he said his password and has not

2    accessed it since then.

3            THE SPECIAL MASTER:  We'll just work with

4    counsel to make sure that if necessary that you

5    preserve it accordingly because I don't have any

6    details as to who the custodian is or anything.  So I

7    just ask that counsel works with you by next Friday to

8    make sure that whatever -- I want you to physical ill

9    verify this list, Counsel, that you look at what has

10   been granted and what is in our custodian list and if

11   there is duplicate or if there are such individuals,

12   that you inquire further and just make as was just

13   explained because we've added more people.  Okay?  Any

14   questions there?

15           MS. WITTY:  No.

16           THE SPECIAL MASTER:  Plaintiff, any

17   questions?

18           MR. TOSTRUD:  (Shakes head side to side.)

19           THE SPECIAL MASTER:  Intranet, when you see

20   the custodian interviews, I apologize, see them now

21   but -- can you explain to me what is your intranet.

22       A.  It is our internal website.

23           THE SPECIAL MASTER:  Is it possible to store

24   and load documents?

25       A.  No, not for our users.  We do provide on the

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    intranet, it's general information for our users, our
 2    policies and procedures are accessible from this.
 3         THE SPECIAL MASTER:  What about messages to
 4    employees?
 5      A.  We utilize it only as a notification period
 6    for current and ongoing issues with the medical record
 7    system.
 8         THE SPECIAL MASTER:  Counsel for UMC, I just
 9    need you to verify that you reviewed the intranet to
10    make sure it doesn't contain any responsive
11    information or relevant information to what is at
12    issue here?  For example, I could see that it could be
13    used as a way -- is the mailing list tied to that at
14    all?
15      A.  No.
16         THE SPECIAL MASTER:  So just double-check
17    what data is there and verify.
18         MR. TOSTRUD:  I do believe that policies and
19    procedures that are available on the intranet are
20    definitely responsive to our recognizes and our RFPs.
21         THE SPECIAL MASTER:  Practice policies and
22    procedures.
23         MR. TOSTRUD:  Timekeeping policies and
24    procedures, orientations for new employees.
25         THE SPECIAL MASTER:  Can you bulletin that
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1    out for me?
 2            MR. TOSTRUD:  Sure.
 3            THE SPECIAL MASTER:  I see that counsel for
 4    UMC will also make -- because one of the issues is
 5    when I read over what's on the intranet, I wasn't
 6    actually based on the description that was provided to
 7    me to actually able to figure out what they were
 8    actually using it for, so before I go and spend the
 9    time looking at their intranet myself, if you are
10    storing such policies on there, I'd like a full list
11    of them and I'd like to -- we can then --
12            MR. TOSTRUD:  We'll bullet point those for
13    you.
14            THE SPECIAL MASTER:  I do agree with
15    plaintiff from my perspective that it would seem that
16    the intranet would logically be the place to store a
17    large number of policies that people do or do not read
18    and the versions of those policies and they may or may
19    not be relevant.  So I'm going to also to encourage
20    you that you talk to the webmaster of the intranet to
21    see if they have an archive of the policies.
22            What's the infrastructure for the intranet?
23    Is it an I SS?
24       A.  Yes.
25            THE SPECIAL MASTER:  It has built-in
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   archiving capabilities?
 2       A.  I'm fairly certain the archiving backup is
 3   running on it.
 4           THE SPECIAL MASTER:  Just double-check for
 5   the relevant time periods and see if you can look at
 6   what it was there just to make sure.
 7           This is for my own edification.  I'm a little
 8   confused as to how these mobile phones, especially in
 9   2013, ended up being wiped.  I'd like you to make an
10   inquiry within UMC, giving the litigational letters
11   that I read, which were multiple copies of the same
12   one, actually, attached to different briefs, I would
13   look further clarification and explanation as to how
14   at least for the key custodians how that message --
15   how is such a communication failure break down after
16   two letters had been sent and you have gone into court
17   on multiple occasions attaching these letters that the
18   IT people weren't actually -- I'd like to understand
19   where the breakdown happened to see from UMC's side
20   where that actually did or did not occur.
21           Are there any third party consultants that
22   you worked with were involved in the collection, the
23   physical collection, not the forensics, I'm talking
24   about the on-site collection?
25       A.  No.
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1          THE SPECIAL MASTER:  Your efforts to collect
 2   the data.
 3      A.  No, it was just myself.
 4          THE SPECIAL MASTER:  I'd like to get the
 5   formal configuration policies for your exchange server
 6   particularly because Mr. Espinoza says that -- are
 7   there default Outlook settings?
 8      A.  What do you mean Outlook settings?
 9          THE SPECIAL MASTER:  You said only folders
10   within the inbox have default Outlook settings?  I
11   don't even really care what he said.  What I really
12   understand is, when I log into Outlook, how is your
13   mailbox configured, how does it actually work?  I log
14   into my computer.  I assume that synchs all the way
15   through.  So then I open up Outlook.  Can you walk me
16   through that point.
17      A.  Well, you open up Outlook for the first
18   time -- and I'm referring to how it worked in 2003
19   during this time period -- I'm sorry 2012 during this
20   time period, on the 2003 exchange, when you open
21   Outlook for the first time, it will automatically take
22   your credentials from windows and --
23          THE SPECIAL MASTER:  Store them.
24      A.  -- configure your Outlook client directly for
25   you.  By default, when Outlook configures, it will
```

Rough Draft of Special Master's Hearing    April 4, 2014

```
 1   creat your internal OST file based on your profile on
 2   the local drive.
 3          Whenever a user is setting up their archive,
 4   they typically go through the desktop support and
 5   desktop support will walk them through creating a PST
 6   archive and the policy was for the desktop individuals
 7   to have them create their PST drives on the home drive
 8   and not on the local C drive, on your local profile,
 9   which is where it defaults.  Some individuals still
10   end up creating it under their profile because they
11   didn't create the instruction correctly and didn't go
12   through the help desk to get it set up --
13          THE SPECIAL MASTER:  So then it won't sync
14   for them?
15      A.  No, it still syncs.  It's just for that
16   reason is why we make sure when we do data pulls that
17   we go through and find whatever computers they have
18   locally logged into and we have added their local
19   profile from those computers so we can make sure we
20   recover any local PSTs that were stored there, but as
21   far as the folder structure and everything like that,
22   the very first time that they log in, it creates just
23   one individual folder of the inbox, the sent folder,
24   the default things there.  Anything beyond that that
25   they create, the very first time it stores that into
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1    their mailbox on the server.

2         So if user signs into computer A for the very

3    first time in Outlook, creates 10 folders beneath

4    their inbox, and then they end up going and signing

5    into computer B, create, open Outlook for the first

6    time.  It will automatically pull down their mailbox

7    based off of whatever structure they had from computer

8    A.

9         THE SPECIAL MASTER:  That happens with the

10   Citrix too.  So they are caching it?

11       A.  Yes.

12        THE SPECIAL MASTER:  So when you ran your

13   collection script -- and just for purposes of the

14   record I'm referring to the collection that UMC

15   actually did, not the erroneous one that was

16   represented in the last hearing but the actual one

17   that was done.  When that script is run, that would

18   explain why then for some custodians 20 plus OST files

19   because obviously they have several computers they are

20   sitting at?

21       A.  Correct.

22        THE SPECIAL MASTER:  And that 22 also then

23   explain why there was over 500 or 1,000-plus PST OST

24   files.  For the record for the five custodians I

25   looked at I came up with over 70 or 80 different PST

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1    OST files, because the way their scripts run, if you
 2    log into a local computer on your profile, it
 3    automatically creates a local OST, and he will log in
 4    and look at it, when you do the collection.
 5        A.   That's correct.  And for that reason, that's
 6    why we have a policy in place and direct users to
 7    store their PST archives on their home folder, so that
 8    way, no matter what computer they log into, they have
 9    access to the same PST files and they are not creating
10    duplicates and multiples.
11            THE SPECIAL MASTER:  Right, so anytime I lot
12    in somewheres on the file share rather than the local
13    device, the archive will work.
14        A.   Correct.
15            THE SPECIAL MASTER:  Okay.  And in the case
16    of Mr. Espinoza, he didn't have any archives.  Is that
17    normal?  I believe he was two two.  Was that the two
18    two?
19            MR. EDMONDSON:  Yes, that's the two two.
20            THE SPECIAL MASTER:  He had no archive.  He
21    had no PST or OST files on the August -- unless in the
22    April there was an archive, I didn't see one.  Based
23    on what you are telling me, there would be an
24    automatic default of an archive created.
25        A.   No, it does not automatically create a PST
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1    archive.  That is a step that you have to take
 2    individually.
 3          THE SPECIAL MASTER:  Did he have unlimited
 4    storage?
 5       A.  He did not.  At the time he was on 600
 6    megabyte storage limit.
 7          THE SPECIAL MASTER:  I'm just thinking --
 8    just reviewing everything that was said...
 9          When someone writes an e-mail message on
10    their BlackBerry and it's stored in their sent folder
11    but let's say that it's not stored on the local
12    profile, so Mr. Espinoza wrote a message on his
13    BlackBerry, he wrote his e-mail message and given that
14    it was wiped, whatever day it was that e-mail message
15    doesn't exist anywhere if you deleted it out of the
16    sent folder, right?  It wouldn't be in the sent
17    folder, so where would it --
18       A.  With regard to the BlackBerries I do not
19    recall if it would go into the sent folder or not with
20    the way the BlackBerry server syncs with the exchange
21    server.
22          THE SPECIAL MASTER:  Because on January 20th,
23    he got -- 8530 was updated, and based on the way you
24    are describing the e-mail system, if I extend an
25    e-mail to somebody from my BlackBerry, where does it
```

```
 1   sit?
 2       A.  Where does the --
 3           THE SPECIAL MASTER:  Mr. Espinoza wrote me an
 4   e-mail saying Daniel you're doing a fantastic job,
 5   hypothetically speaking, thank you very much, I like
 6   you a lot, you're my best friend and I wrote him back
 7   you are my BFF too, okay?  Hypothetical.  Where would
 8   that sit within UMC's environment.
 9       A.  Well, it would sit in --
10           THE SPECIAL MASTER:  Message 1 and message 2?
11       A.  Message 2 would sit in his inbox which still
12   has message 1 attached to it.  The original message 1,
13   it would sit in his sent folders definitely on his
14   BlackBerry and I do not have an answer for if that
15   would actually sit in the sent folder on his mailbox
16   as well.
17           THE SPECIAL MASTER:  We are going to have to
18   quickly figure that part out.
19           So then add to the search term BlackBerry --
20   how does it go for BlackBerry?  This message was
21   sent -- who -- anybody remember back in -- off the
22   record.
23               (OFF RECORD.)
24           THE SPECIAL MASTER:  Back on the record.  I
25   want to record we are adding several search terms.
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1   One will be -- plaintiff is going to provide a list of

2   the different linguistic lingua franca of the mobile

3   messaging that we will then -- it's not approved yet,

4   but I want to look at it, and then what we've agreed

5   ask that if it's a reasonable hit response within that

6   meaning under let's say 500 responsive hits -- not

7   hits, files, 500 files, not hits, and people

8   understand the difference between a hit and a file, a

9   file can have 100 hits, right, you know when your

10  parents used to make you swear I will not swear, I

11  will not swear, you could have 100 hits on I will not

12  swear in one file.  So we'll keep it at 500 files.

13  And if it's over 500 files, we'll sample it and I'll

14  log in remotely and look at it and I'm sample -- and

15  if more than 50 percent are responsive then we'll go

16  through the whole exercise of producing otherwise we

17  will refine the search.  Is that okay?  Because what I

18  didn't want to do is end up spending hours at looking

19  at the new iPad case.

20       MR. GODINO:  Right.

21       THE SPECIAL MASTER:  So I just want to add

22  the right colon or by or whatever it may be just to

23  limit it.  I don't want to ignore it as well.  So

24  we'll try it in this fashion.  Is that acceptable to

25  plaintiffs?

Rough Draft of Special Master's Hearing    April 4, 2014

```
1              MR. TOSTRUD:  Yes.

2              THE SPECIAL MASTER:  UMC, is that acceptable?

3              MS. WITTY:  Yes.

4              THE SPECIAL MASTER:  Let the record reflect

5    both parties agree.

6              Okay.  So

7    now we've cleared those hurdles, the last thing that I

8    have a question about, Mr. Espinoza again.  He printed

9    a weekly calendar.

10             MS. WITTY:  Yes.

11             THE SPECIAL MASTER:  What happened to it?

12   Because he says he has a weekly calendar printed for

13   him.

14             MS. WITTY:  Yes.

15             THE SPECIAL MASTER:  And it's a duplicate of

16   Outlook and it's discarded weekly.

17             MS. WITTY:  Yes, it's shredded at the end of

18   every week.

19             THE SPECIAL MASTER:  I just want to make sure

20   I understood that.  On Monday he comes to the office,

21   it's printed out, at the end of the week it's gone.

22             MR. TOSTRUD:  Is this in the custodian

23   interviews?

24             THE SPECIAL MASTER:  Yes.

25             MR. TOSTRUD:  Is he currently shredding these
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing   April 4, 2014

1   or has he been?

2           MS. WITTY:  Yes.

3           THE SPECIAL MASTER:  He is?  Let me go --

4   make this very, very simple.  If he is actively

5   currently shredding his schedules.

6           MR. TOSTRUD:  I just want to confirm we're on

7   the record here?

8           THE SPECIAL MASTER:  We're on the record.

9           MS. WITTY:  Let me clarify.  I'm not certain

10  that's what was understood.  I will clarify and make

11  sure that we know exactly what is happening.

12          THE SPECIAL MASTER:  I just want to know

13  because I thought it was -- I just want to know --

14  because the reason I ask is that the calendaring, he

15  says it's a duplicate of Outlook.  So if that's the

16  case, fantastic, but because of his executive

17  assistant and the way that she can use his calendar as

18  well --

19          MS. WITTY:  Right, she's the one printing it

20  out for him.

21          THE SPECIAL MASTER:  I need to figure out is

22  she printing out his calendar or her calendar on

23  her -- theoretically she could be printing up her

24  version of his calendar and giving it to him, and he

25  doesn't know.  Right?  She could have a view -- some

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   executive assistants, they have their boss's calendar
 2   fully available to them, and then they have their
 3   calendar, and all they are doing is printing out their
 4   boss's calendar, because their boss doesn't know how
 5   to print their calendar; right, but there's nothing
 6   actually changing in it.  Other times they are adding
 7   and working on the boss's calendar and the printed
 8   schedule is of relevance and of value.
 9           MR. GODINO:  Of course, that calendar could
10   contain his notes, the printed calendar, so
11   differently, obviously --
12           THE SPECIAL MASTER:  I just need to
13   understand what and how the print calendar -- like
14   just ask him what -- and if he is actively, I would
15   encourage him, that you advise him to cease until we
16   resolve -- I don't think it matters at this stage.
17   How does shredding today have any responsive
18   information on it?
19           MS. FOLEY:  The time period is over for the
20   opt-ins.
21           THE SPECIAL MASTER:  The way I read it, is
22   there still an ongoing need to preserve his calendar?
23           MR. TOSTRUD:  Yes, absolutely.
24           MS. FOLEY:  What is that --
25           THE SPECIAL MASTER:  It's Friday and I'm
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   happy to entertain the argument, but on Monday.  So
 2   what I'm going to encourage you to do is tell him on
 3   Monday morning don't -- today, tell him don't shred
 4   your schedule from this week, if you've been shredding
 5   it.  Maybe we misread the whole thing.  And on Monday
 6   we'll work our way through it, because I'm equally --
 7   I want to hear from both sides, but I'm not ready to
 8   jump into that at this moment.  I'm going to order
 9   just for the moment make sure that it's not being
10   shredded until at least we have a hearing on Monday
11   morning if it is indeed being shredded.
12          MS. FOLEY:  And we'll check with him.
13          THE SPECIAL MASTER:  It might not be being
14   shredded.  Get the clarification.  It is please stop
15   and I'll hear further about it.  When you have the
16   chance to read the custodian interviews I'm sure on
17   Monday we'll have a litany of other issues to dialogue
18   about at length.
19          One other reason why I didn't have them
20   circulated so I could have my questions answered
21   first.  Not that I don't appreciate your interaction
22   and contribution.
23          The other person obviously for the DOL on
24   piece that would be relevant is Claudette Myers and
25   her device, and so you might want to revisit that
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   because in her custodian interview she indicates that
 2   she was assisting both -- I'm going to show it to
 3   counsel because she's going to clean it up for you,
 4   and if it's not in there, then I will -- on Monday we
 5   can discuss it.  I just want to point something out to
 6   you.  Go off the record for a second.
 7                (OFF RECORD.)
 8        THE SPECIAL MASTER:  On the record.  And this
 9   is for Mr. Schaibley.  I had a general question.  When
10   you have scanners and copiers and all of these
11   other -- do you have a document management system?
12        A.  No.
13        THE SPECIAL MASTER:  Okay.  How do people
14   actually -- how does it work, then?
15        A.  Well, are you -- I'm just trying to
16   understand the scope of your question.  As far as --
17        THE SPECIAL MASTER:  We asked them what do
18   you use in your daily course of business to do your
19   work, what systems do you use, and I found it a little
20   odd given the size of your organization that nobody
21   actually -- there is no document management, there is
22   no standard header, footer, there is no document
23   controls for like -- like I asked one of the questions
24   we asked was -- maybe this will shed some light, so
25   John Espinoza, he's involved in HR; right?
```

```
 1        A.  Yes.
 2            THE SPECIAL MASTER:  And we discussed him
 3    what systems does he use on a daily basis, and he
 4    didn't mention a single document management system.
 5    I'm not saying that he's wrong, but he might not know
 6    that he's using, is what I'm saying.  I'm not
 7    saying that -- from his perspective, he might be just
 8    opening Microsoft Word, but you might have a back-end
 9    document management system, and all I want to make
10    sure is that your script, when it ran, hit those
11    documents.  If there is.  If there is not -- I just
12    found it a bid odd the guy that's running all of HR
13    doesn't have a standard template --
14            MR. SCHAIBLEY:  We have --
15            THE SPECIAL MASTER:  -- system.
16        A.  We have a central file server, UMC-FS01.
17            THE SPECIAL MASTER:  So I read that as
18    your -- what I couldn't figure out, is there a
19    document management letter in there, or is it?  Are
20    there folders?
21        A.  There is a folder structure, yes.  That is --
22    that file server is where the home folders are stored
23    under a shared comp home, h-o-m-e, and each individual
24    user has their local, not local, but their home folder
25    underneath that share.  We have an additional share
```

Rough Draft of Special Master's Hearing   April 4, 2014

```
 1   called shared.
 2         THE SPECIAL MASTER:  My question is, when you
 3   run your script, does it pull from -- do you get all
 4   of the shared files?  Because one other question I
 5   have for you about your script, this is probably one
 6   of the last questions for the day and I'll separate
 7   and talk to both sides.
 8         One thing I couldn't figure out, if user
 9   permissions give me access to, let's say, shared HR
10   folders --
11      A.  Yes.
12         THE SPECIAL MASTER:  The script, when I
13   looked at the script, it didn't pull from any of the
14   -- I don't know, which is why I'm asking you -- any of
15   the shared work like HR --
16      A.  Correct, it did not pull from there.
17         THE SPECIAL MASTER:  I need you to
18   immediately make sure that you are preserving from
19   there and a copy is made.
20      A.  Okay.
21         THE SPECIAL MASTER:  Obviously -- and then I
22   need you to look at their user permissions, and
23   whatever they do touch, obviously, for the six
24   custodians to include that in the ambit of what to
25   search -- to be clear to UMC's counsel, what I'm
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   referring to is when I read the script -- and the
 2   script is very thorough and it is much better than
 3   what your other colleague made, but that still
 4   doesn't -- there are still several large issues with
 5   it, and one of the big issues I have is that I assume
 6   there are file servers just like at a law firm they
 7   have like shared files, etc., but none of those were
 8   copied, and so -- or collected.  And so I need that to
 9   happen immediately.
10       A.  Okay.
11           THE SPECIAL MASTER:  And just run the same
12   script, copy it over, Robocopy them over, and look at
13   the user permissions and Robocopy it over.
14           MR. SCHAIBLEY:  Yes.
15           THE SPECIAL MASTER:  And then chain of
16   custody, and then give it to our colleague there.
17           MS. WITTY:  You are asking to include
18   anything that might be within the files and have
19   access to?
20           THE SPECIAL MASTER:  Yes, he took
21   literally -- what I assume when you collected is you
22   collect everything that is responsive or could be -- a
23   source where they are holding that information.  I
24   would assume the shared HR folders and the shared
25   accounting folders and the shared other directory
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1   structures that exist, that they have -- are members
 2   of like -- let's go off the record.
 3                  (OFF RECORD.)
 4          THE SPECIAL MASTER:  Back on the record.
 5          Just for purposes of clarity, I'm asking UMC
 6   to go identify each users, what they had access to in
 7   a network file share environment, specifically UMC-FS
 8   01 and I think there are several other file servers.
 9      A.  It's just the one.
10          THE SPECIAL MASTER:  Just the one.  Whatever
11   ones may or may not that they have access to.  I mean,
12   your user profile will say this person has permissions
13   to these network file-sharings.  Whichever file,
14   whatever server is there, I need a list generated, I
15   need you to provide it to counsel, I need counsel for
16   UMC to look at it say okay this is responsive and we
17   need to -- I want to see it.  I want counsel for UMC
18   to see it.  I need them to look at it and say this is
19   responsive, this is not responsive for whatever the
20   network file shares are.  Once that is done, I want a
21   chain of custody declaration added to it to document
22   what you collected; right?  And that is if there are
23   such network file share sorts of operations.  Are we
24   clear?
25      A.  Yes.
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1            THE SPECIAL MASTER:  So if you have a shared
 2    folder for HR, a shared folder for payroll, a shared
 3    folder for whatever that these key custodians have
 4    access to, I want counsel to know what they were, I
 5    want them to know what was in it, and I want them to
 6    make a decision, and I want to be provided with the
 7    same information.  Okay?
 8            Any questions, counsel for UMC?  Any
 9    questions, plaintiff?  Okay.
10            I think that's all we're going to get through
11    today because the next set of the effort is a little
12    bit more detail oriented and I would like Mr. Pixley
13    and the plaintiffs to digest the scan and repair
14    issues and the too things that were covered before I
15    take the time to discuss them with the parties.  So I
16    have nothing further to add.
17            MR. TOSTRUD:  You asked us to just make sure
18    a couple of things were covered by the end of the day.
19            THE SPECIAL MASTER:  Yes.
20            MR. TOSTRUD:  The first one was to set the
21    schedule for production, and I think you covered that
22    about a half-hour ago where early next week we'll
23    set --
24            THE SPECIAL MASTER:  On Monday we will set a
25    production schedule.  So that means over the weekend
```

Rough Draft of  Special Master's Hearing    April 4, 2014

```
 1    you need to figure out how long it's going to take.  I
 2    need answers to the encryption.  I need answers to the
 3    scan repair PST and I need answers -- I think whatever
 4    the other issues were.
 5            MR. TOSTRUD:  The second issue you asked us
 6    to make sure was covered was a major cut in e-mail
 7    files.
 8            THE SPECIAL MASTER:  Monday Mr. Pixley we're
 9    going to have.
10            MR. TOSTRUD:  Can I preview one issue for
11    Monday?
12            THE SPECIAL MASTER:  I have finished my need
13    to discuss things with you about the custodian
14    interviews.
15            MR. TOSTRUD:  This case revolves around UMC
16    policies and practices at UMC.  UMC which is about
17    five minutes from here is sort of centrally located on
18    one campus, but there are multiple so-called quick
19    cares that are around the city, around Clark County,
20    it's my understanding, approximately a dozen, and I
21    don't know how that IT system is set up or whether
22    that's been searched or its different.
23            THE SPECIAL MASTER:  What would be on those
24    systems, from your perspective?
25            MR. TOSTRUD:  Well, from our perspective --
```

```
 1    and we have people who joined our case from many of
 2    those different quick-care facilities.  I believe
 3    there are computers at those facilities --
 4           THE SPECIAL MASTER:  There are definitely
 5    computers at the facilities.  What is on them?  Are
 6    you looking -- from your perspective what data would
 7    they have there?  Would it be their time records?
 8    What is specifically at the facility that you think --
 9    because what -- I think you are right, but I want to
10    know specifically what you believe would be stored
11    locally at the facilities, and then we have a
12    conversation with UMC's IT department to make sure it
13    is stored locally, we get it, and if it's not stored
14    locally that -- because the way I understood it, that
15    everything is set up through network file server, but
16    they don't have an enterprise architecture diagram, so
17    one of the very exciting things we will do on Monday
18    is we are going to make an enterprise architecture
19    diagram so we can make sure that we have covered the
20    systems, because I don't actually -- I'm fully
21    aware --
22           MR. TOSTRUD:  So I know there are timekeeping
23    practices that are kept there, orientation and --
24    orientation manuals, policies and procedures, I think
25    some clients have drafted grievances that may exist on
```

Rough Draft of  Special Master's Hearing    April 4, 2014

1  those terminals, scheduling.

2       THE SPECIAL MASTER:  Why don't you come up

3  with a bullet list.  You don't have to share it.  We

4  can preview it and have a live conversation.

5       MR. TOSTRUD:  That's fine.

6       THE SPECIAL MASTER:  So I can come up -- and

7  share with co-counsel, so we can -- I want to

8  understand.  One thing that will be covered on Monday

9  just for counsel for UMC, is that one thing -- the

10 only other thing that I can't quite figure out is I

11 get how what was collected, but because there is no

12 diagrams and it's not a reflection of counsel here,

13 okay, but because there is literally -- can I call him

14 Mr. Schaibley, that it's no reflection upon him, but

15 frankly there is no documentation as to this is how it

16 works for a satellite office and this is what systems

17 are stored here.  So that inherently is -- besides

18 taking way more hours than what I estimated, it's

19 going to inherently require us to identify and

20 understand how it works.  So if UMC, Mr. Schaibley,

21 has anywhere something that could provide -- save me

22 the time of what exactly systems do you have operating

23 at a local -- what's local, what's server, and how is

24 it stored, because what's going to have to happen is

25 that they are going to come up with a list, and we're

```
 1   going to have to make sure that you collected it all
 2   and provided it to counsel.  Does that make sense?
 3       A.  Yes.
 4           THE SPECIAL MASTER:  My focus is I need to
 5   make sure that you properly collected from those
 6   locations anything that is stored locally if it is and
 7   provide it to counsel so that counsel can then
 8   properly comply with their obligations.  So if you
 9   have anything that you could provide, that would be
10   extremely helpful, because otherwise we will have to
11   get out a Sharpie pen and paper and draw it, because I
12   need to understand to make sure that you are
13   preserving everything that we have everything that if
14   grievances are stored locally at the offices I need to
15   make sure that when the supervisor leaves that the
16   grievances aren't going to go just as a hypothetical
17   example.  That may or may not have any merit.  Okay?
18   Does that make sense?
19           MS. FOLEY:  (Nodded head up and down.)
20           THE SPECIAL MASTER:  Just off the record.
21               (OFF RECORD.)
22
23
24
25
```

# Exhibit B

Special Master's Hearing  ‑   April 7, 2014
*** Volume II ***

```
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF NEVADA

 3

 4

 5   DANIEL SMALL, CAROLYN SMALL,   )
     WILLIAM CURTIN, DAVID COHEN,   )
 6   LANETTE LAWRENCE, and LOUISE   )
     COLLARD, Individually, and on  )
 7   Behalf of All Other Persons    )
     Similarly Situated,            )  Case No.
 8                                  )
            Plaintiff,              )  2:13-cv-0298-APG-PAL
 9                                  )
     vs.                            )
10                                  )
     UNIVERSITY MEDICAL CENTER OF   )     CERTIFIED
11   SOUTHERN NEVADA,               )      COPY
                                    )
12          Defendant.              )
     _____)

13

14

15      REPORTER'S TRANSCRIPT OF SPECIAL MASTER'S HEARING

16                          Volume II

17   BEFORE SPECIAL MASTER PRESIDING, DANIEL GARRIE, ESQ.

18              Taken on Monday, April 7, 2014

19                      At 9:12 a.m.

20          At 333 South Las Vegas Boulevard

21                     Courtroom 3C

22                   Las Vegas, Nevada

23

24

25   REPORTED BY:  Janet C. Trimmer, CRR, CCR No. 864
```

All‑American Court Reporters (702) 240‑4393
www.aacrlv.com

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1       APPEARANCES:

 2

         For the Plaintiffs:
 3
                 JON A. TOSTRUD, ESQ.
 4               Tostrud Law Group
                 1925 Century Park East, Suite 2125
 5               Los Angeles, California 90067
                 (310) 278-2600
 6               jtostrud@tostrudlaw.com

 7               MARC L. GODINO, ESQ.
                 GLANCY BINKOW & GOLDBERG, LLP
 8               1925 Century Park East, Suite 2100
                 Los Angeles, California 90067
 9               (310) 201-9105
                 mgodino@glancylaw.com
10
                 DAVID C. O'MARA, ESQ.
11               The O'Mara Law Firm, P.C.
                 311 East Liberty Street
12               Reno, Nevada 89501
                 (775) 323-1321
13               david@omaralaw.net

14
         For the Defendant University Medical Center of
15       Southern Nevada:

16               MARGARET G. FOLEY, ESQ.
                 CAYLA J. WITTY, ESQ.
17               Lewis Brisbois Bisgaard & Smith, LLP
                 6385 South Rainbow Boulevard
18               Suite 600
                 Las Vegas, Nevada 89118
19               (702) 893-3383
                 cayla.witty@lewisbrisbois.com
20

21       Also Present:

22               DOUGLAS FORREST, ESQ.
                 DEAN SCHAIBLEY
23               BRUCE PIXLEY
                 SHANE LATTIN
24               JASON CLARK
                 MARILYN SUSAN KISNER (Present Telephonically
25                                 at pages 81 to 98.)
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1                      INDEX OF EXHIBITS

 2

 3      NUMBER          PAGE   DESCRIPTION

 4      Exhibit 9         71   "Record Retention and Disposal"

 5

 6      Exhibit 10       120   E-mail chain, top e-mail from

 7                             Lonnie Richardson to UMCPost

 8                             dated 3-21-14

 9

10      Exhibit 11       203   "Joint Status Report"

11

12      Exhibit 12       213   Folder of documents

13

14      Exhibit 13       214   Spiral document titled "Search

15                             Instance"

16

17      Exhibit 14       260   E-mail dated 9-19-12 from John

18                             Espinoza to Doug Spring, Bates

19                             UMC 100006

20

21      Exhibit 15       262   Excerpt from the videotaped

22                             deposition of John Espinoza

23                             pages 151 through 171

24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      *********************Proceedings*********************

 2

 3          THE SPECIAL MASTER:  Let's go on the record.

 4     I've got the seating charts.  I have some housekeeping

 5     issues to go through.

 6          First, I would like to recognize and thank

 7     both sides for going the distance over the weekend,

 8     getting and turning around the revised order for the

 9     Court and also getting the custodian interviews and

10     circulating them, because believe it or not, they were

11     a lot of different pieces of paper that needed to all

12     be combined into one, and so I appreciate that effort.

13          I'm going to today do this in two ways.  I

14     wanted to just try to get right into the scan and

15     repair, but I did review --

16          Off the record.

17            (OFF RECORD.)

18          THE SPECIAL MASTER:  Back on the record.

19          I want to make clear to all parties that when

20     you offer testimony here, it is under the same

21     auspices of it being under oath.  I don't make people

22     formally swear in for anybody that's a member of the

23     bar.  I extend everybody that courtesy because you are

24     a member of the profession.  I'm an attorney.  I don't

25     believe it's ever necessary.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              I want the technology people -- I'm not going
 2       to -- unless Plaintiff objects, I want -- I don't see
 3       the need to have them swear -- like bring them in as a
 4       formal depo.
 5              But I want you to understand you are making
 6       statements to an Officer of the Court.  So
 7       forthrightness and truth is the utmost importance.
 8              Saying "I don't know" is completely
 9       acceptable.  Telling me something that then turns out
10       to be not true is not the right path.  Right?  So I
11       just -- and so I have no problems with anybody saying,
12       "I do not know, I need to get back to you and I will
13       provide you a written response."  We'll preserve it in
14       the record, and we'll go forward from there.
15              But making a statement that then -- I then
16       have to go back and when I'm reviewing my notes turns
17       out not to be true, based on the very materials you
18       provided to me, ends up being a problem downstream.
19              Is that crystal-clear to all parties?
20       Plaintiff?  Defense?  Sorry.
21              Plaintiff?  "Yes"?
22              MR. GODINO:  Yes, yes.
23              THE SPECIAL MASTER:  Defense?
24              MR. SCHAIBLEY:  Yes.
25              THE SPECIAL MASTER:  IT people in the back?
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1            MR. LATTIN:  Yes.

 2            THE SPECIAL MASTER:  And that would be Shane

 3     Lattin and Jason Clark.

 4            Okay.  So now, I'm going to do a couple of

 5     things today.  First thing I want to do is I want to

 6     go through the hearing transcript from Friday to make

 7     sure we all understand everything that's being

 8     expected to be provided and the dates and the times,

 9     because there were a lot of things covered.

10            I don't expect that to take us more than 45

11     minutes, but I think that's very important because

12     that way we'll also have a clean record, and we'll

13     also have, if Plaintiff wants to add or I forgot

14     things or Defense wants to respond or whatever, but we

15     can discuss that and it will all be clear, because we

16     covered a huge amount, and I'd like to just make it

17     all clear.

18            Is that okay to both sides?

19            MR. TOSTRUD:  Absolutely.

20            THE SPECIAL MASTER:  Okay.  So the first

21     thing we have is from the -- is that we were going

22     to -- for Mr. Espinoza, we were going to verify how

23     the two PSTs and OSTs came about.  You were going to

24     verify that.

25            I'd like to actually see -- I went through
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    the other -- the additional Excel spreadsheet that I
 2    got that is the entire serving sitting piece, and I
 3    ran that as well.  I didn't see the PST and OST files
 4    sitting in it for him.
 5           So what I want to know is where are they
 6    sitting, and I would like to have a screen shot of
 7    where they are sitting; I would like to know that,
 8    right, because I'm trying to figure out how the
 9    materials that I have -- I can't actually find the
10    e-mail files in the scan and repair -- where they are
11    sitting.
12           If Mr. Edmondson could be so kind as to
13    verify that for me as well within his collection,
14    okay, because I can't actually figure out what the
15    source was of Mr. Espinoza's e-mail.
16           The other thing I would like to happen is,
17    now that we've all had a chance to -- on Friday, we
18    are going to identify the different e-mail clients.
19           Mr. Edmondson, I need you to go through and,
20    for each custodian, identify the different mailboxes
21    that you find so -- for the six or seven that we have.
22    For -- to be clear as an example, Joe Espinoza --
23    sorry, not Joe -- is it John?
24           MS. WITTY:  Yes, John.
25           THE SPECIAL MASTER:  Mr. Espinoza has used
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1        Outlook, and we have OST and PST files.
 2              Next person, they had Outlook Express
 3        because, based on the custodial interviews I got,
 4        nobody -- like the Outlook Express wasn't captured
 5        anywhere.  And I understand that people don't know the
 6        difference, but I need to have -- I need to know,
 7        right, if they are using Outlook and Outlook Express;
 8        I believe that we need to understand who is using
 9        what.
10              Is that clear?
11              MR. EDMONDSON:  Yes.
12              THE SPECIAL MASTER:  Now, the scan/repair PST
13        issue.  And to be clear, I ordered you to produce, and
14        it was produced, the scan/repair PST logs, right, and
15        you received it.
16              There was also -- you provided me the -- and
17        I forgot to order you to produce it, if there is no
18        objection, the other repair -- I'm blanking right
19        now -- I got from you -- give me one second.
20              I'm just looking for the e-mail that was sent
21        to me with those attachments, Outlook Express.
22              Do you know what I'm referring to, Counsel
23        for UMC?
24              MS. WITTY:  I'm not clear exactly what you
25        are requesting.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  There was -- you sent me
 2     when it came with the scan/repair logs.
 3              MS. WITTY:  The full directory listing?
 4              THE SPECIAL MASTER:  No, not the full
 5     directory listing.  There was another repair.
 6              Mr. Edmondson, do you know what I'm referring
 7     to?
 8              MR. EDMONDSON:  Yes.
 9              THE SPECIAL MASTER:  What's the name of that
10     file again?
11              MR. EDMONDSON:  Let me check.
12              THE SPECIAL MASTER:  There we go.
13              MR. EDMONDSON:  Found it?
14              THE SPECIAL MASTER:  Yes.  "Test e-mail
15     eCapture export."
16              MR. EDMONDSON:  Yes.
17              THE SPECIAL MASTER:  Thank you.  I was trying
18     to remember because -- the "test" part.
19              I would like to provide that to the other
20     side.  Is there any objection to that?
21              MS. WITTY:  No.  We've reviewed it.
22              THE SPECIAL MASTER:  Okay.  So I'd like you
23     to provide that to -- I'm ordering that to be produced
24     as well.
25              So we can actually review that.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              I'm going to -- let's go through this.  I'm
 2     going to -- go off the record for a sec.
 3                   (OFF RECORD.)
 4              THE SPECIAL MASTER:  Let's go back on the
 5     record.
 6              I'm going to first defer to Plaintiffs since
 7     you've had a chance to refer the scan/repair logs.
 8     I'm going to let you -- do you have any issues with
 9     them?
10              MR. PIXLEY:  No.
11              THE SPECIAL MASTER:  Do you have any concerns
12     about the way it was done or the results?
13              MR. PIXLEY:  Not with the scan and repair
14     tool itself.  My concern is the other issue that you
15     raised with the truncating of the PST files.
16              THE SPECIAL MASTER:  So -- okay.  I had the
17     similar concern.  I just wanted to wait for you to
18     have the same chance to review it before I weighed in.
19              Do you have any other concerns based on the
20     repair logs themselves for particular custodians?
21              MR. PIXLEY:  No.  It just acknowledges that
22     he completed the task, but it's not like -- I don't
23     have access to the actual file, so it's just evidence
24     that he used the tool to complete the task.
25              THE SPECIAL MASTER:  Right.  And so I have --
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1    I'm going to want to know the -- in the results it

2    didn't actually detail out the files that were

3    repaired, did it?

4          MR. PIXLEY:  Well, it's the name of the file

5    itself.

6          THE SPECIAL MASTER:  Right.

7          MR. PIXLEY:  So that was the question that I

8    had.  He -- I've used the tool before.  So it

9    basically just takes the name of the PST file and it

10   just appends .log.

11         THE SPECIAL MASTER:  Right.  Right.  So I

12   just wanted to make sure.  But those were the only

13   ones that had problems or those were the only ones --

14   that was all the PST and OST files in the entire

15   collection today?

16         MR. EDMONDSON:  That was all of the

17   de-duplicated PST and OST files in the population --

18         THE SPECIAL MASTER:  De-duplicated by hash?

19         MR. EDMONDSON:  Hash value, yes, 75.

20         THE SPECIAL MASTER:  All right.  Now, I have

21   a similar concern, if Plaintiff has none, about the

22   scan and repair log files.  I would like to know, from

23   the containers that were created, I'd like to actually

24   know, once you have repaired them, how many e-mail

25   messages were logged.

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1          So you have a repaired file and you had the
 2   original, you should be able to right-click, get a
 3   message count, right-click, get a message count, and I
 4   should know.  So I would like a table created
 5   detailing that out so I have some knowledge of the
 6   specific messages and the total amount of loss values.
 7          Now, as to the tools, I think first the real
 8   solution here is we need a better tool, unless you
 9   disagree, because the solution that was provided with
10   the trimming that happened isn't going to -- it
11   doesn't work.  I mean, the trimming is really so
12   dramatic that we have no real idea of how much is
13   lost.
14          And, Mr. Schaibley, I do have -- you're
15   the -- among your peers here today, you are the
16   Exchange person I can go to today, or is there someone
17   else?
18          MR. SCHAIBLEY:  Yes.
19          THE SPECIAL MASTER:  Okay.  With regards to
20   the Exchange environment itself and those PST and OST
21   files, those two particular ones, I want the hash
22   values run for those two PST/OSTs.  I want them
23   compared against what he has.  I want to make sure
24   there was no issue with the -- the multiple people
25   that the image was made and another image was made,
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    that nothing -- that those two files are indeed the
 2    best possible source we have.
 3            Once that's verified, which I don't expect it
 4    not to be, I'm not -- I don't think anybody here --
 5    I'm just double-checking to -- to the easiest possible
 6    solution first.
 7            If that doesn't work, I'm going -- I'm open
 8    to suggestions from Plaintiff before I go down another
 9    path.
10            Do you have alternative solutions to the
11    trimming?
12            MR. PIXLEY:  Yes.  One, I -- I guess my first
13    thought is were those files able to be mounted within
14    EnCase in the first place, are they actually viewable,
15    or are they just corrupt?
16            MR. EDMONDSON:  I haven't tried, but I can
17    check right here, if that would help.
18            MR. PIXLEY:  So that would be the first
19    stage.
20            Then the second thing was, if it cannot be
21    opened, then we need to look at the idea of splitting
22    them.
23            THE SPECIAL MASTER:  Well, I agree -- I mean,
24    I don't -- I mean -- yes, I think that that would be
25    the most logical if they can't be actually opened,
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
1    full stop.  If they can be opened -- so there's two

2    paths; right?  First, see -- can they be mounted?  I

3    assume they could be.  If they can't be -- and it's

4    a -- thank you for pointing that out.

5           With the assumption they can be mounted, what

6    would you -- the path -- let's say they can be

7    mounted.  What would you want to do next?

8           MR. PIXLEY:  Well, if they can be mounted,

9    then we can just go ahead run the search terms against

10   them and just produce the responsive MSG files.

11          THE SPECIAL MASTER:  Right.  So the way I saw

12   it is that similarly, rather than do anything more,

13   the simplest solution is often the easiest and best

14   solution, which is just do the manual effort of

15   loading those specific files and running the search

16   terms through those specific files.  And if it works,

17   great, we can move forward.  If it doesn't work, we

18   can further address the issue.

19          If it can't be mounted -- so I'm going to

20   order you to run the search -- mount -- well, you want

21   to let us know the results?

22          MR. EDMONDSON:  Yes, I'm about to turn over

23   them right now.  It may take a couple of minutes.

24          THE SPECIAL MASTER:  Well, obviously, if

25   there were -- any error logs that come up, be provided
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    to -- with the error logs that are generated, if any

2    are.

3            The alternative, if they can't be mounted,

4    I'm going to suggest that we use an alternative tool

5    to try and repair it, unless you have some other...

6            MR. PIXLEY:  I agree.  I guess my other

7    thought is, I don't know the date range, like, what's

8    the last run date of these PST files?  So, I mean, are

9    they -- do we even know what those are?

10           THE SPECIAL MASTER:  And what are the --

11   yeah, what are the date time stamps?  I have them

12   written down.  I just...

13           MR. EDMONDSON:  There's -- one of them is

14   8-23-2013.

15           THE SPECIAL MASTER:  I mean, that's why I

16   pick -- I didn't -- yes.

17           MR. EDMONDSON:  Yes, 8-23-2013.  So if you --

18           MR. PIXLEY:  We do care what --

19           THE SPECIAL MASTER:  Yes, I mean, that's --

20   so let's assume that I have enough common sense,

21   generally speaking, that I -- if we're having -- yes,

22   100 percent, and I apologize for not stating what I

23   had already done, myself, because I had received all

24   of the PST and OST files in a file listing.

25           So assuming it's relevant --

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. PIXLEY:  The other step, just a simple

 2       thing, would be if it can't be mounted, we can still

 3       run the raw search terms.  We just have to set the

 4       search expression to make sure that we're using

 5       Outlook compressed --

 6              THE SPECIAL MASTER:  Could be one of the

 7       issues.

 8              MR. PIXLEY:  -- as -- make sure that our

 9       search parameters are run as Outlook compressed.  So

10       we'll just see if any of our search terms hit.  If our

11       search terms are not hitting within this PST file,

12       really going --

13              THE SPECIAL MASTER:  Going any further?

14              MR. PIXLEY:  Right.  So I have kind of a

15       phased approach, but I guess the first thing is --

16              THE SPECIAL MASTER:  I mean, so I agree.  I

17       thought before you would that, I mean, what I would do

18       is try to run maybe a different repair tool on it.

19       Maybe it might be more effective, just...

20              I mean, I've had different results with

21       different tools, and it really depends on the type of

22       error, because I can't exactly -- given that we can't

23       even figure out what the error was, because it wasn't

24       even repairable, I think maybe looking or trying a

25       different tool might at least give me some more
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    information before I go down the path of running the

2    search terms, seeing what hit, seeing if there are any

3    archive frag- -- whatever, fragments.

4         The other thing I would like to verify is,

5    that wasn't the live collection; right?  Just to be

6    clear, Mr. Schaibley, did you have a chance to look at

7    it?

8         MR. SCHAIBLEY:  Which one?

9         THE SPECIAL MASTER:  The PST and OSTs that

10   we're talking about.  Those aren't not from the

11   live -- you did tag them with the right --

12        MR. SCHAIBLEY:  Yes, anything in the home

13   drive was not live.

14        THE SPECIAL MASTER:  Right.

15        MR. SCHAIBLEY:  The one that was live was

16   actually labeled --

17        THE SPECIAL MASTER:  Well, yes, I know.  I

18   just -- because that's what I ran in -- my search on

19   the other one.  Have you actually just searched the

20   spreadsheet you gave me for the word "live"?  You will

21   see...

22        The -- so you weren't here on Friday, but

23   they ran it on the live mailboxes, as well as their

24   home drives themselves.  So what we are talking about,

25   what's stored in the user's home drive.

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1              So what I suggest is we run a tool, there are
 2       three or four tools out there, just to understand
 3       what -- if any tool can actually do it before we spend
 4       a great deal of time with the more detailed and
 5       nuanced approach of -- assuming -- well, could it be
 6       loaded?
 7              MR. EDMONDSON:  It's still attempting to map
 8       the file structure.
 9              THE SPECIAL MASTER:  So this is all assuming
10       it can't be done.
11              Well, what was your proposed -- I mean, the
12       only thing I would like to suggest before we go down
13       the path of a more refined, iterative approach is that
14       we just try -- you know, there's -- if my memory
15       serves me, I've used DateNumen before -- DataNumen
16       before when I've had some problems here and there.
17              Each one has -- I believe, fixes a different
18       issue.  I've never -- I mean, I have all four tools.
19       So I mean, I'm not going to recommend -- order you to
20       use all four tools, but is there a particular tool you
21       like, Phoenix -- is there a tool that you find...
22              MR. PIXLEY:  No, no.  I mean, I would go
23       through the same, just trying different ones just to
24       see what we get.
25              THE SPECIAL MASTER:  So I would like you to
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1     go through -- if they can't be mounted, we're talking,
 2     I would like you to just try the different tools.
 3     Pick -- I can suggest -- we could do Phoenix, I've
 4     used -- and DataNumen, or can you -- there are other
 5     ones, but I think those two are good as any of the
 6     others.
 7                 MR. PIXLEY:  That's fine.
 8                 THE SPECIAL MASTER:  So I would like you to
 9     just try it on those because it is within the relevant
10     date range and that the trimming was so big, it is
11     fairly important we, at the very least, try a way to
12     some extent to be able to search them for the search
13     terms.
14                 What were you going to suggest for the more
15     nuanced iterative approach?
16                 MR. PIXLEY:  If -- one was just using EnCase
17     if it saw it as a raw file.  If it couldn't be
18     mounted, it's just running the search terms.  But when
19     you run the search terms and you set up your search
20     expression, you have to set your code page to Outlook
21     compressible and -- because that's how the data is
22     stored.
23                 THE SPECIAL MASTER:  Right.  But I'm assuming
24     that's -- I assume that's how it was.  Fair point.
25                 Mr. Edmondson, I just want to confirm, when
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    you are doing it, you are setting the file type and

2    the -- like to -- to the Outlook compression?

3          MR. EDMONDSON:  In doing keyword searching,

4    right now I'm using the index because it's fully

5    processed in EnCase 7 and automatically identifies the

6    code page as the processes.

7          THE SPECIAL MASTER:  That'll work.  That does

8    it automatically.  That's fine.

9          So then what was the next -- Mr. Edmondson, I

10   just need you to make sure you are listening because

11   this is what we are proposing and your counsel is

12   going to be relying on you to help them here.

13         What was the next step?

14         MR. PIXLEY:  Well, if -- once we know that

15   something is there and if -- again, using Outlook,

16   it's -- Outlook compressible encryption is the code

17   page to use, then we would have to look at either

18   those tools that you just mentioned or splitting them.

19         THE SPECIAL MASTER:  Yes, I'm going to

20   suggest if the tools don't work, we split.  I don't

21   know how else to do it.  I genuinely don't think there

22   is a viable alternative.  You could use fragment

23   carver and go into X-Ways and look at the --

24         MR. PIXLEY:  No, I'm not --

25         THE SPECIAL MASTER:  -- and decompress.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              I mean, I agree with you.  I think the most
 2       practical solution here from a practical level is to,
 3       if it doesn't work, split them and then go from there.
 4              MR. PIXLEY:  Agreed.
 5              THE SPECIAL MASTER:  On what size would you
 6       like to see it at?
 7              MR. PIXLEY:  Well, if we are going to split
 8       them, I would probably split them just a little bit
 9       under the 2-gig mark there, just so they will actually
10       function.
11              THE SPECIAL MASTER:  I think you -- did you
12       try that last time?
13              MR. EDMONDSON:  I didn't try splitting them.
14       I just used the trim for Microsoft's knowledge.
15              THE SPECIAL MASTER:  All right.  So the --
16       okay.  So what should happen is that you will try
17       splitting them, and then usually if splitting doesn't
18       work, you then trim.  But you can -- I guess some
19       people do trim first then split, but usually splitting
20       allows you to preserve more of the data, so
21       you utilize trim as the last resort.
22              So when you trimmed, I assume that you had
23       tried splitting.  But if splitting hasn't been tried,
24       that is always the first approach before trimming.
25              Is that an acceptable path to go down there
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

1    for you guys?

2         MR. PIXLEY:  Yes.

3         THE SPECIAL MASTER:  I don't have any

4    problems with that.  I actually -- and to be clear, I

5    actually assumed that you had tried splitting.  But if

6    you haven't tried splitting, you should try splitting

7    them and to cut it as fine as possible.  At that

8    point, we'll go from there.

9         Is it mountable?

10        MR. EDMONDSON:  One is creating the cache

11   files, so it does look like at least one of them has

12   finished viewing.  It should be visible --

13        THE SPECIAL MASTER:  Which one?  I mean, its

14   filename would be useful.

15        MR. EDMONDSON:  I don't know yet until it's

16   done.

17        THE SPECIAL MASTER:  So once it's done, let

18   the Court know.

19        MR. EDMONDSON:  Yes.

20        THE SPECIAL MASTER:  Okay.  Any other

21   concerns about the scan/repair issue?

22        MR. PIXLEY:  No.

23        THE SPECIAL MASTER:  I will tell you one

24   general concern I have, and this is more directed

25   towards UMC's -- I guess not the -- unfortunately, you

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    guys are here, but it's more the people that were

2    making the decisions and asking you to do the work.

3            I'm a little shocked and surprised that they

4    didn't actually ask you to verify what was -- like you

5    did it perfect when you did your live collection.  You

6    got the live collection, you loaded it, you made sure

7    it worked, and you gave it to -- you know.

8            And I'm surprised that they didn't ask or

9    expect you to do the same for the mailboxes you were

10   providing.  Because at the end of the day, that would

11   have prevented nearly all or a large number of these

12   issues, I believe, from actually ever happening in the

13   first place.  I'm a little surprised that that didn't

14   happen.

15           I'm also -- you know, Mr. Edmondson, I do

16   think best practices sort of dictate that you make

17   sure that when -- that all of the e-mail PST and OST

18   files you are looking at are usable and loadable and

19   operational and can be used before you run anything.

20   You need to make sure the evidence you are bringing in

21   is actually usable evidence.  We shouldn't end up

22   going all the way downstream to now to find out that,

23   "Oh, yes, the PST and OSTs were corrupted."  Right?

24   This is, like, very late in the game, and it's proving

25   to be fairly costly for all sides.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              I mean, standard practice would be that when
 2      you import the evidence, you make sure that if there
 3      are any issues, you tell counsel, counsel then can
 4      raise it to opposing counsel, and there can be a
 5      conversation, and they can act -- if they believe it's
 6      necessary, if they believe it's in -- like we did.  I
 7      checked the date range.  Is it in a responsive date
 8      range?  Yes, it is.
 9              Okay.  I need to tell counsel that they have
10      two PST and OST files that have an issue or problem,
11      and then have a conversation with them so that the
12      counsel for UMC can then have an educated conversation
13      about what's next to do.
14              Without that information, it's very hard for
15      them -- while I appreciate Plaintiffs' frustration,
16      but I think UMC's -- I think you need to recognize
17      that -- you need to make sure the information is
18      bubbling up to the lawyers; right?
19              And it's not, and it can't -- this must
20      change, like, immediately this must change.  Like,
21      your lawyers must be brought into the loop and
22      explain.  Like, you must check the evidence as you
23      import it to make sure they are valid evidence files;
24      right?  And you must tell the lawyers that, "Hey, look
25      the collection we've got has these issues."  Right?
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

```
 1      So we don't end up here.

 2            Okay.  Moving right along, I don't have

 3      anything else on scan and repair.  I actually thought

 4      splitting had happened.  If it hasn't happened, you

 5      will let us know the results, and we'll revisit that.

 6            Moving forward, I did order you, just to be

 7      clear, for -- you to process, unless -- the

 8      Plaintiffs, if you have any objection to having the

 9      entire everything processed through EnCase 7.  Is

10      there any objection from Plaintiffs' side?

11            MR. PIXLEY:  No.

12            THE SPECIAL MASTER:  Okay.  And that's to

13      process everything, and the chain of custody should,

14      you know, obviously, map to the other side.

15            MR. EDMONDSON:  Uh-huh.

16            THE SPECIAL MASTER:  Okay.  We didn't set a

17      date for the rolling production, but we will shortly.

18            Encryption, did anybody make a -- I ordered

19      you to look into the encryption.  Did you look into

20      it?

21            MR. EDMONDSON:  Yes.

22            THE SPECIAL MASTER:  Can you shed any further

23      light to Microsoft Crypto being run?

24            MR. EDMONDSON:  The actual -- let me pull up

25      the list that I sent this morning.
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  And, again, you're --

 2    you need to check on a going-forward basis this

 3    information so that your lawyers know this.

 4              And, UMC, you must tell outside -- your

 5    outside IT people -- well, I think you don't allow

 6    encryption.  But if you do allow encryption of any

 7    shape or form, you need to -- you need to tell them,

 8    "We do not allow encryption."  Right?

 9              But if you do allow encryption, you need to

10    say, "We allow encryption of X, Y, and Z," so that

11    that information gets passed forward; because

12    otherwise, again, we end up with me looking at all the

13    paths.

14              MR. EDMONDSON:  The actual files identified

15    by EnCase as encryption included two DMG files for

16    Macintosh, four PGP ciphertexts, and two certificates,

17    Internet security certificates.  That was all.

18              There were additional password-protected

19    files which were password protected with varying

20    levels of encryption which were exported to Passware

21    and processed.

22              THE SPECIAL MASTER:  Without issue?

23              MR. EDMONDSON:  Without issue.  There were

24    some --

25              MS. WITTY:  For the court reporter, could you
```

Special Master's Hearing  ‑   April 7, 2014
*** Volume II ***

```
 1    repeat?
 2            MR. EDMONDSON:  They were exported from
 3    EnCase and processed with Passware to break the
 4    passwords.
 5            Some files that were identified by EnCase as
 6    having a signature of WordPerfect but did not have
 7    WordPerfect extensions could not be broken.  They do
 8    not appear to be actual WordPerfect files.  I have not
 9    been able to identify what they are yet.
10            THE SPECIAL MASTER:  Can you provide counsel
11    with those filenames?
12            MR. EDMONDSON:  Yes.
13            THE SPECIAL MASTER:  Counsel, have you
14    received those?
15            MS. WITTY:  Yes.
16            THE SPECIAL MASTER:  And when did they
17    receive it?  Yesterday?
18            MR. EDMONDSON:  This morning.
19            THE SPECIAL MASTER:  This morning?  Okay.
20            How many files?
21            MR. EDMONDSON:  There were unidentified that
22    it believes was WordPerfect.
23            THE SPECIAL MASTER:  How many total files do
24    we have at issue with this problem?
25            MR. EDMONDSON:  I would have to count them.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1        I exported the entire report from --

 2             THE SPECIAL MASTER:  If you have an Excel

 3    spreadsheet, just -- sum it for you at the bottom.

 4             While you are doing that, I have a question

 5    for Mr. Schaibley, or your colleagues, actually.

 6             DMG file, any ideas?  It's in Mac OSX file,

 7    in case you don't know.

 8             That's actually an image, Mac image.

 9             MR. LATTIN:  We can install --

10             THE REPORTER:  I cannot hear you.

11             THE SPECIAL MASTER:  Yes, it's a Mac install

12    file used -- or a load -- it's a -- any idea as to how

13    that ended up there?

14             MR. CLARK:  (Shakes head side to side.)

15             THE SPECIAL MASTER:  Is it allowed to be

16    there?  Because based on what I was told and what I've

17    read, that a Mac OSX DMG file should not be sitting on

18    anyone's device, unless I misread your policies

19    myself.

20             MR. LATTIN:  I don't know.

21             MR. SCHAIBLEY:  I have no answer to that.

22             THE SPECIAL MASTER:  All right.  I'm going to

23    go off the record.

24                 (OFF RECORD.)

25             THE SPECIAL MASTER:  Let's get back on the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     record.
 2            Once we get the total number of encrypted
 3     files that we're dealing with, I'm going to carve --
 4     what I'm going to suggest is -- and, Plaintiff, if you
 5     have no objection, because I want to get this rolling
 6     production -- you will document all of these files in
 7     a spreadsheet, and a Word doc attached.
 8            You will say you are dealing with these
 9     issues relating to these custodians for encrypted
10     files; we recognize that we're not running the search
11     terms on these files until we can do it for these
12     custodians.
13            But I'd like to start running search terms on
14     custodians and turning data over.  And once we fix the
15     encryption issue for these files, we will run the
16     search terms and produce anything that's responsive.
17            Does anybody have any objection to that?
18            MR. GODINO:  No.
19            THE SPECIAL MASTER:  UMC?
20            MS. WITTY:  No.
21            THE SPECIAL MASTER:  So that takes care of
22     one big problem for rolling production, encrypted
23     files.  I'm ordering you by Friday to come to me with
24     a solution; otherwise I will use a forensic neutral
25     myself who I know can give me a solution.
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1          So you have until this coming Friday to give

2     me a solution, or I will appoint somebody, a

3     third-party neutral, to get me a solution; right?

4     Because I don't want to look at all of your data.  I

5     just don't have the desire.  I mean, I can, and I will

6     remotely log in and verify results, myself.

7          We -- let's -- I was going to save it for

8     later today, but I intend to, with UMC, remotely log

9     in and verify and look at the different things that I

10    have and that certain things were done.  Okay?

11         You have till Friday to figure it out; right?

12    There should be no reason why at least the custodians

13    don't know the passwords to the encrypted files that

14    they have.

15         MR. EDMONDSON:  For the counts, there were a

16    total of 779 files with passwords of some type.  107

17    of them are the ones that appear to be WordPerfect but

18    cannot be broken and cannot be opened by WordPerfect.

19    They don't have WordPerfect extensions either.

20         THE SPECIAL MASTER:  And as far as -- is

21    there anybody with -- besides yourself,

22    Mr. Schaibley -- Mr. Schaibley, your two peers, does

23    any of you have any knowledge about the encryption?

24              (There was an off-the-record conference

25              between Mr. Schaibley, Mr. Clark, and

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

```
 1              Mr. Lattin.)
 2          THE SPECIAL MASTER:  Do you have users that
 3   use WordPerfect?
 4          MR. CLARK:  WordPerfect, we never use it now.
 5   It was taken out when they went to Word.  If somebody
 6   left a WordPerfect file there years ago.
 7          THE SPECIAL MASTER:  You have WordPerfect
 8   installed on the computers now?
 9          MR. CLARK:  No.
10          THE SPECIAL MASTER:  Okay.  What about Lotus,
11   just out of curiosity?
12          MR. LATTIN:  No.
13          THE SPECIAL MASTER:  Just thought I'd ask.
14          So then if it's not supposed to be a
15   WordPerfect-recognized file by EnCase -- I've seen
16   this once or twice, but I'm going to leave it for you
17   to figure out internally.  They are not supposed to be
18   encrypted.  There's 700 files.  We're carving them
19   out.
20          Do you have any objection to any of this?
21          MR. GODINO:  No.
22          THE SPECIAL MASTER:  All right.  Okay.  The
23   chain of custody forms and the server mappings, is
24   that in progress?
25          MR. SCHAIBLEY:  Yes.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Okay.  When -- I can --
 2    do you want to suggest a date or do you want me to
 3    pick one?
 4              MR. SCHAIBLEY:  I can have them to you before
 5    the end of the week, sir.
 6              THE SPECIAL MASTER:  Okay.  So we'll give you
 7    the following Monday to have them in my hands, so you
 8    will have till the 14th.
 9              Go off the record.
10                   (OFF RECORD.)
11              THE SPECIAL MASTER:  Back on the record.
12              BlackBerry, yes.
13              MR. EDMONDSON:  A quick note:  It has
14    finished mounting both of those PSTs successfully.
15              THE SPECIAL MASTER:  And what about the OSTs?
16              MR. EDMONDSON:  The OSTs, there were no OSTs
17    that needed trimming, so those have mounted
18    successfully as well.
19              THE SPECIAL MASTER:  So those two -- and they
20    mounted?
21              MR. EDMONDSON:  Yes.
22              THE SPECIAL MASTER:  Okay.  Perfect.  Run the
23    search terms.  Fantastic.  Scan and repair finished
24    hopefully.
25              I want the log file, though, of any issues
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1     you run into in that process.  And I also want the

2     file comparison counts for what -- for the PST --

3          MR. EDMONDSON:  (Inaudible.)

4          THE REPORTER:  I didn't hear that.

5          MR. EDMONDSON:  Just the counts before and

6     after for the repairs.

7          THE SPECIAL MASTER:  And we are going to

8     break every hour and a half for five minutes this

9     time, because I realize, reading the transcript, that

10    people were running out of steam.  I apologize.  I'm

11    going to cognitively just make a break, just five

12    minutes, though, but that way everybody wins.

13          Let's talk about BlackBerry.  Who does

14    BlackBerry here?

15          MR. CLARK:  I do some BlackBerries.

16          THE SPECIAL MASTER:  Off the record for a

17    second.

18               (OFF RECORD.)

19          THE SPECIAL MASTER:  I'm going to bring you

20    up to speed on the record so you are fully in the

21    loop, and then I'll ask you my questions.

22          MR. CLARK:  Okay.

23          THE SPECIAL MASTER:  Before I do that, I'm

24    going to let -- Plaintiff, do you want to share your

25    concerns for the record around the BlackBerry before

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      I --

2              MR. TOSTRUD:  I'd like to just summarize, if

3      I can.

4              THE SPECIAL MASTER:  Go for it.

5              MR. TOSTRUD:  We're on the record?

6              THE SPECIAL MASTER:  Yes, on the record.

7              MR. TOSTRUD:  So without getting into the

8      extensive background of preservation notices --

9              THE SPECIAL MASTER:  Curbing all of that,

10     BlackBerry.

11             MR. TOSTRUD:  -- carving all that out,

12     Plaintiffs expected to receive several months, if not

13     years, of BlackBerry messages between UMC executives

14     and others relating to the substance of our lawsuit.

15             This is a meal break class action.  We allege

16     that UMC employees didn't receive all their meal

17     breaks and weren't compensated when they missed those

18     meal breaks.

19             So we expect that any discussion relating to

20     that lawsuit that was done by messaging on

21     BlackBerries and other personal digital assistants or

22     mobile communication devices would be turned over to

23     us so that we could review them in relation to our

24     lawsuit.

25             When messages ultimately were produced to us

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1     on January 31, 2014, we only received approximately

 2     one month -- a one-month snapshot of BlackBerry

 3     messages.  And we were informed by UMC's counsel

 4     several times, verbally and in writing, that there

 5     would be no more BlackBerry messages and that we had

 6     received everything that was there.

 7            So we expect that there would be much more

 8     than simply one month's worth of BlackBerry messages,

 9     and we're hoping you can help us work through the

10     issue.

11            THE SPECIAL MASTER:  I'm going to supplement

12     that because I've had the fortunate opportunity of

13     reading over vast amounts of documents.

14            A BlackBerry server has more than just text

15     messages; right?  It has the BlackBerry messaging.  It

16     has the e-mail on it.  It has the BBM messages.  It

17     can have all the files that are actually downloaded,

18     depending on how it's configured.

19            The part that perplexes me -- and I read your

20     backup policies, and I don't know if they're all

21     followed.  But assuming that in some relative sense

22     that -- off the record.

23                   (OFF RECORD.)

24            THE SPECIAL MASTER:  Okay.  Back on the

25     record.
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1              BlackBerry's server, were you ever asked to
 2      preserve the BlackBerry server by anyone for specific
 3      users?
 4              MR. CLARK:  Yes, recently.
 5              THE SPECIAL MASTER:  How recently?
 6              MR. CLARK:  I want to say within two weeks or
 7      three weeks.
 8              THE SPECIAL MASTER:  Before that, had your IT
 9      people -- within your organization of UMC, does your
10      CIO understand that you have a BlackBerry server?
11              MR. CLARK:  Yes.
12              THE SPECIAL MASTER:  Does he understand
13      relatively how it works?
14              MR. CLARK:  I don't know.
15              THE SPECIAL MASTER:  Okay.  Let's try this
16      differently.  Does he know what your preservation
17      policy is supposed to be for the BlackBerry server and
18      the communications stored on it?  Have you been told
19      that policy?
20              MR. CLARK:  No.
21              THE SPECIAL MASTER:  Okay.  Is there any
22      written policy, Counsel, for UMC that you're aware of
23      as to what the preservation of records for BlackBerry
24      servers should be at UMC?
25              MS. WITTY:  Specifically for the BlackBerry
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    server, no.
 2            THE SPECIAL MASTER:  What about for e-mail
 3    communication?
 4            MS. WITTY:  There should be, yes.
 5            THE SPECIAL MASTER:  Okay.  What about for
 6    instant message communications through the BlackBerry
 7    server?  Not text messages.  Instant message
 8    communication, their communication backup policy, so
 9    to speak.
10            MS. WITTY:  I don't know of anything that
11    specifically touches on instant messaging.
12            THE SPECIAL MASTER:  You just ask UMC --
13    okay.  I assume, since your CIO knew that you had a
14    BlackBerry server and that he understands the basics
15    of how a BlackBerry server operates, how -- what
16    did -- can you explain to me, at a high level and then
17    we will go down, how is your BlackBerry server -- what
18    version are you running, how is it configured.  Like
19    start me at the beginning.
20            MR. CLARK:  At the beginning of all the
21    BlackBerries involved, or the current?
22            THE SPECIAL MASTER:  Start with 2011.
23            MR. CLARK:  2011, probably running the old
24    version of BlackBerry 5.0.3 --
25            THE SPECIAL MASTER:  5?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE REPORTER:  5.

 2              THE SPECIAL MASTER:  .0.3.

 3              MR. CLARK:  -- Service Pack 3 --

 4              THE SPECIAL MASTER:  Service Pack 3, okay.

 5              MR. CLARK:  -- talking to Exchange 2003.

 6       That was running on a vertical environment.

 7              THE SPECIAL MASTER:  What?

 8              THE REPORTER:  What?

 9              MR. CLARK:  Running on a vertical environment

10       on a VM.

11              THE SPECIAL MASTER:  On a dedicated VM or

12       a --

13              MR. CLARK:  Dedicated VM.  The database was

14       on (inaudible) cluster for the BlackBerry.

15              THE REPORTER:  I didn't hear that.  "Was on

16       a" what?

17              MR. SCHAIBLEY:  Database was running on an

18       SQL cluster.

19              THE SPECIAL MASTER:  Was it a dedicated

20       cluster?

21              MR. CLARK:  No.  It's a cluster throughout a

22       lot of databases in the archives.

23              THE SPECIAL MASTER:  So it's got -- when you

24       back up the -- when this cluster backs, does it back

25       everything?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MR. CLARK:  What, now?

 2            THE SPECIAL MASTER:  When the SQL server

 3    backs up, does the cluster back up everything?

 4            MR. LATTIN:  It would be all the database on

 5    the cluster.

 6            MR. CLARK:  Yes.

 7            THE SPECIAL MASTER:  So everything in there?

 8    There's no carve-outs?

 9            MR. CLARK:  Yes, it doesn't -- it's all in a

10    suite.  And then once it's on the server

11    (inaudible) --

12            (Reporter requesting clarification.)

13            THE SPECIAL MASTER:  Sorry, one sec.  You've

14    just got to talk slowly.

15            THE REPORTER:  I'm sorry.  I'm having trouble

16    understanding you.

17            THE SPECIAL MASTER:  Why don't you come up

18    and switch seats.

19            THE REPORTER:  Yes, if you could come closer,

20    that might help.

21            MR. CLARK:  Okay.  It talks to Exchange 2003.

22    I'm responsible for the server up and running, the

23    infrastructure, and to make sure the application is

24    running.  That's pretty much it.

25            In terms of connecting to Exchange, I do not
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    set policies on it.

2            THE SPECIAL MASTER:  Who does?

3            MR. CLARK:  That would be security's purview,

4    I believe.

5            MR. SCHAIBLEY:  The policies that were set on

6    it were set by our predecessors, and that's how they

7    were running.

8            THE SPECIAL MASTER:  Do we know what those

9    policies are?

10            MR. SCHAIBLEY:  I can pull them up and tell

11    you what they are, but primarily the policies, looking

12    at them, were strictly password-related and

13    update-related.

14            THE SPECIAL MASTER:  So there was no specific

15    data enforcement policy?

16            MR. SCHAIBLEY:  No.

17            THE SPECIAL MASTER:  Well, just pull them up

18    for my own edification and send them to myself and to

19    counsel.

20            Returning to BlackBerry, BlackBerry Messaging

21    Agent, is that included?

22            MR. CLARK:  BlackBerry Messaging Agent?

23            THE SPECIAL MASTER:  Yes.

24            MR. CLARK:  Is that like the PIN messages?

25            THE SPECIAL MASTER:  Yes.

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1            MR. CLARK:  I did not do any configuration on
 2      the server for that.
 3            THE SPECIAL MASTER:  But is it -- I mean, it
 4      comes installed and running.  Did you let it run?
 5            MR. CLARK:  Yes.  I would imagine that the
 6      PIN messages for -- between RIM NOCs and the
 7      Blackberries themselves.  I don't think it touched our
 8      server.
 9            THE SPECIAL MASTER:  And what about
10      BlackBerry messaging itself, the BBM messaging?
11            MR. CLARK:  The BBM messaging, I don't think
12      there was anything -- I don't know.
13            THE SPECIAL MASTER:  Best to stick with "I
14      don't know" and "I'll go check."
15            I'm going to repeat myself.  If you do not
16      know, I have no qualms with, "I do not know.  I need
17      to go check."  I realize you're not sitting in front
18      of your terminal and that I am asking you about server
19      configurations, and I'd rather you go check rather
20      than you make a statement and then we come up with a
21      theory and it doesn't work.
22            MR. CLARK:  Sure.
23            THE SPECIAL MASTER:  Okay.  So in 2011, you
24      were running SQL cluster 2003.  Was it push or pull?
25            MR. CLARK:  Push or pull?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  To the Exchange
 2     environment.
 3              MR. CLARK:  I don't know.
 4              THE SPECIAL MASTER:  Can you check, or who
 5     would know if you don't?
 6              MR. CLARK:  I would have to check.
 7              THE SPECIAL MASTER:  All right.  So then,
 8     please check.  I want to know -- and what I'm talking
 9     about specifically is, was it pulling the e-mail
10     message -- how was it synchronizing with your Exchange
11     environment?
12              MR. CLARK:  My understanding is that with the
13     RIM NOC being involved, when you register to the BES,
14     any messages come off of the handheld, goes to the
15     Sprint, which connects to the RIM NOC.
16              (The reporter requested clarification of.
17     Mr. Clark by way of repeating his last comment as
18     follows:)
19              MR. CLARK:  The Sprint network, which would
20     connect to the RIM NOC.  So the phone, being on
21     Sprint, would receive and send messages through
22     Sprint, then talk to RIM NOC, which would talk to our
23     BlackBerry server back and forth, two-way
24     communication.
25              THE SPECIAL MASTER:  Is that for messages or
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    e-mails?

 2            MR. CLARK:  E-mails.

 3            THE SPECIAL MASTER:  Did you get all of that?

 4            THE REPORTER:  Yes.

 5            THE SPECIAL MASTER:  So I need to know what

 6    BlackBerry server components you have up and running.

 7            MR. CLARK:  Okay.

 8            THE SPECIAL MASTER:  Okay.  From 2011 through

 9    present, I want to know the components.  Okay?

10            Now I want to understand something.

11            Mr. Espinoza -- oh, wait.  Let's go -- let me

12    go through a -- so then a user, I mean, sends an

13    e-mail message from their BlackBerry.  Walk me through

14    how that works within the way your current -- in 2011,

15    with the 2003 configuration, which you are going to

16    figure out was push or pull, how that works.

17            MR. CLARK:  You want me to explain that?

18            THE SPECIAL MASTER:  Yes.  Walk me through

19    that example.  I write an e-mail message, and I'm a

20    UMC employee with a UMC BlackBerry.

21            MR. CLARK:  My understanding is that the

22    handheld, being BlackBerry, if you write a message,

23    and you hit send, it sends it out, and it goes --

24            THE SPECIAL MASTER:  To the BlackBerry

25    server?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1          MR. CLARK:  To the BlackBerry server and

2     passes it through to the Outlook.

3          THE SPECIAL MASTER:  It stores a copy of it.

4          My question is, is your BlackBerry server

5     configured to store a copy of that message -- well, by

6     default, it stores it.  So if you haven't touched it,

7     it stored it.

8          MR. CLARK:  I don't know, but I'll try.

9          THE SPECIAL MASTER:  So they send the -- I

10    write an e-mail -- let's just -- for hypothetical, a

11    UMC employee writes an e-mail to his wife.  That

12    e-mail goes to your BlackBerry server.  You are going

13    to check to figure out if the BlackBerry stores a copy

14    of that message and how long it's -- the policy of how

15    long it's storing it and the other related data.

16          We'll get to the backup piece of this, by the

17    way, in a second.

18          It then is hanging out in the BlackBerry

19    server, saying come (inaudible) --

20          (Reporter requesting clarification.)

21          THE SPECIAL MASTER:  It's hanging out in the

22    BlackBerry server, my message to my wife.  Okay.  But

23    it needs to get to her.  So where does it go next?

24          MR. CLARK:  The BlackBerry server passes

25    through a connection to the Exchange Outlook.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Okay.  And then on the
 2    Outlook, that's where Mr. -- you -- your duties -- is
 3    it your duties or his duties?  So then -- and that's
 4    when you explained what happened last time.
 5              MR. SCHAIBLEY:  Yes.
 6              THE SPECIAL MASTER:  So then do you just
 7    want, for the record, to explain how it gets to my
 8    wife from -- explain how it gets out of UMC.
 9              MR. SCHAIBLEY:  When it goes from UMC's
10    Exchange server, if it is destined for outside the
11    network --
12              THE SPECIAL MASTER:  Outside, that's the
13    point.
14              MR. SCHAIBLEY:  -- it will pass through to
15    our external mail filter and, from there, make a
16    connection out to whatever destination mail server
17    it's going to.
18              THE SPECIAL MASTER:  So now, the mail
19    culture, do you use Postini?
20              MR. SCHAIBLEY:  We currently use McAfee
21    Ironmail.
22              THE SPECIAL MASTER:  How long have you been
23    using McAfee Iron?
24              MR. SCHAIBLEY:  I don't know the date that it
25    was installed.  It was before I got there.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            THE SPECIAL MASTER:  So we can say May of

 2    2012?

 3            MR. SCHAIBLEY:  Yes -- June of 2012.

 4            THE SPECIAL MASTER:  June, thank you.  June,

 5    not May.  June of 2012.  I would like to know what was

 6    there prior.  So counsel, please.

 7            The reason why I'm asking is, Postini, for

 8    example, archives every e-mail --

 9            I am supposed to speak slowly.  I apologize

10    to the court reporter.

11            Postini archive can be configured to archive

12    every e-mail that goes in and out, and it just keeps a

13    copy sitting there.  Law firms particularly love that

14    feature.  All right.

15            And the e-mail just sits there and

16    accumulates for 365 days, and then they get a bill and

17    they have to pay more money and they are like, "No

18    way, purge it."  And then, day 366, whatever was there

19    from day 1, first in, first out.

20            I want to know how McAfee is set up, and I

21    want to know how it existed prior to you joining.

22            MR. SCHAIBLEY:  I will find out prior

23    configurations before -- and what we had before I

24    arrived.

25            Currently, the Ironmail does not archive
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     anything.  It passes it and goes.  If it is unable to
 2     make the initial connection, it will retry for a
 3     week's period and purge.
 4              THE SPECIAL MASTER:  Okay.  Fair enough.
 5              Figure out where it was in 2011, just for my
 6     own edification.
 7              Okay.  And then it goes outside and
 8     theoretically hits another mail server, then another
 9     mail server, then ends up at my wife?
10              MR. SCHAIBLEY:  Yes.
11              THE SPECIAL MASTER:  Unless you're at Google
12     and you own the network, and then you don't have a
13     problem.
14              Okay.  What if it's internal?  So from -- I'm
15     sending it, pretend my wife hypothetically works at
16     UMC.
17              MR. SCHAIBLEY:  If it is an internal e-mail,
18     once it hits --
19              THE SPECIAL MASTER:  Once it hits his.  So
20     we hit your BlackBerry -- I'm assuming -- sorry.
21              Mr. Clark, I'm assuming that if it's an
22     internal communication and I wrote an e-mail message,
23     not a message but an e-mail message as a UMC employee
24     to another UMC employee, there is no difference; is
25     that correct?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MR. CLARK:  If you are running an e-mail, it
 2    depends on where you are running it from.  If you're
 3    not on the --
 4            THE SPECIAL MASTER:  The BlackBerry.
 5            MR. CLARK:  If you are running it from the
 6    BlackBerry, it should be no different; that's correct.
 7            THE SPECIAL MASTER:  So I'm running a
 8    BlackBerry to send to my wife, who is an employee at
 9    UMC, and she get -- and I'm sending her an e-mail from
10    my BlackBerry within your domain.  Okay?  Are you with
11    me with my hypothetical so far?
12            MR. CLARK:  Yes.
13            THE SPECIAL MASTER:  It is the exact same,
14    just so we are clear.  Now, what about once it hits
15    the Exchange?
16            MR. SCHAIBLEY:  Once it hits the Exchange
17    server, if it is an internal mailbox, it will pass it
18    to the -- whichever database the mailbox is located on
19    and deliver it to the inbox.
20            THE SPECIAL MASTER:  And that's e-mail
21    message?
22            MR. SCHAIBLEY:  Correct.
23            THE SPECIAL MASTER:  If you have -- if
24    Plaintiff has any question at any point, feel free to
25    speak, because now is the time to ask.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              Okay.  And that's -- now, it's still storing
 2    the SQL -- the whole SQL thing.  It's still all the
 3    same for the BlackBerry.  For Exchange, internal,
 4    external, is there any difference, servers?
 5              MR. SCHAIBLEY:  What do you mean?
 6              THE SPECIAL MASTER:  Sometimes people, when
 7    they route -- so I have an Exchange environment, and I
 8    look at the sender.  Sometimes they'll put additional
 9    levels of filtering on it before it goes outbound
10    versus inbound -- I mean, internal.  I'm sorry.
11              MR. SCHAIBLEY:  We had a single bridgehead
12    Exchange server that all messages were tracked -- were
13    passed to, whether it was --
14              THE SPECIAL MASTER:  Okay.  So no gateway or
15    anything like that?
16              MR. SCHAIBLEY:  -- whether it was inside or
17    outside, and that bridgehead would then either forward
18    it outside to the mail filter, external mail filter,
19    or internally to the -- whichever server hosted the
20    database to mailbox.
21              THE SPECIAL MASTER:  And there are no
22    gateways?
23              MR. SCHAIBLEY:  No.
24              THE SPECIAL MASTER:  Okay.  All right.  So I
25    then delete my e-mail message I wrote on my BlackBerry
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      to my internal -- there's two situations, here; right?
 2      I delete the e-mail message that I just wrote to the
 3      external-facing employee, to external third party from
 4      my BlackBerry.
 5             Would it -- I'm assuming no -- we'll get to
 6      back up in a second.
 7             If it's not backed up, there is nowhere else
 8      it would sit once it's purged from the Exchange
 9      server, which is on the two-week cycle.
10             I write the e-mail message on my phone to
11      whoever, "Let's go to lunch," hit send.  It goes
12      through the BlackBerry environment, gets to the
13      Exchange, gets sent out.  I then delete it from my
14      BlackBerry for whatever reason I wanted.
15             It doesn't -- what happens?  Where does it --
16      what happens to that deleted message, in your
17      environment, on the BlackBerry level, with the
18      BlackBerry server, when I delete it?
19             MR. CLARK:  BlackBerry?
20             THE SPECIAL MASTER:  When I delete that
21      message, that e-mail message I just wrote, on my
22      BlackBerry.
23             MR. CLARK:  If you delete it on your
24      BlackBerry, it depends on how the BlackBerry device is
25      set up to sync.  It may either leave it on the Outlook
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1        Exchange mailbox...
 2               THE SPECIAL MASTER:  But your BlackBerry
 3        server would have a copy of it?
 4               MR. CLARK:  I don't know how it's set.
 5               THE SPECIAL MASTER:  I mean, the default is
 6        to store a copy.
 7               MR. CLARK:  I don't know if the default is
 8        set that way.  I'd have to check.
 9               THE SPECIAL MASTER:  So -- and then it hits
10        Exchange, and does Exchange keep -- cache a copy, or
11        what's --
12               MR. SCHAIBLEY:  If it is synced to sync the
13        folders, it will sync into the sent items of the
14        mailbox.
15               THE SPECIAL MASTER:  I -- fair point.  I'm
16        making an assumption.  Are the folders set to sync?
17               MR. SCHAIBLEY:  I don't know the default on
18        that.
19               THE SPECIAL MASTER:  Do you know the default
20        on that?
21               MR. CLARK:  I don't know the default on that.
22        Handheld can override the Exchange mailbox.  It
23        depends on how the handheld device is set up.
24               THE SPECIAL MASTER:  I'm not talking about
25        the phone.  I'm talking about the syncing between the
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    servers.
 2            MR. CLARK:  Okay.  I would have to check on
 3    the BB'd VM if -- how it syncs with --
 4            THE SPECIAL MASTER:  I want to know if the
 5    Exchange folders sync to the BlackBerry server
 6    folders.  I get the device piece of it.  Do you
 7    understand my question as well?  And you can check as
 8    well?
 9            Now, returning back to the original question,
10    which was you were asked two weeks ago -- well,
11    actually, I forgot.  Internal employees, I sent it to
12    an internal employee on my BlackBerry, and I delete
13    it.  What happens, once we figure out if they sync
14    properly?  Because what I'm trying to figure out is,
15    if I write a message on my BlackBerry, does it end up
16    in my sent folder in the Exchange environment?  Can
17    either one of you answer that question?
18            MR. SCHAIBLEY:  If the handheld device is
19    configured to sync folders correctly, yes, it would
20    end up there in your sent items.
21            THE SPECIAL MASTER:  But the BlackBerry
22    server can also be configured to do the syncing
23    itself?
24            MR. SCHAIBLEY:  As we said, we would have to
25    look into the configuration.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Okay.  I would like to
 2      know that by this Friday.
 3              You understand the obvious problem here;
 4      right?  If you are telling me that I can send and
 5      delete e-mails from my BlackBerry that exist nowhere
 6      else but in my BlackBerry environment, we have a
 7      problem.
 8              MR. CLARK:  I understand what you are saying.
 9              THE SPECIAL MASTER:  Okay.  So, well, then,
10      you got your -- you need to figure out by Friday,
11      convey it to counsel by Friday so they can convey it
12      to me, because I need to know whether or not it is
13      possible to write e-mail messages in your environment
14      using a mobile device, the only place they exist in
15      the whole world is on the mobile device, and then once
16      they are deleted, they are gone.  Does that make --
17      and your lawyers definitely want to know.
18              So -- and I'll be very frank.  I need --
19      maybe you guys aren't the right people, so I am just
20      going to preserve it for the record and not
21      necessarily leave it for you guys since you guys are
22      the ones doing the work.
23              UMC's senior IT stakeholders need to figure
24      out and start communicating with counsel immediately
25      what's going on, because you've been before this Court
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    on multiple occasions, and your lawyers have relied

2    upon what you have told them.

3           And I understand you guys are doing your job,

4    and you guys are doing a good job at it.  But there is

5    a huge disconnect behind what your senior IT

6    stakeholders are telling the lawyers and what they are

7    telling the Court.

8           And it needs to be remedied immediately,

9    because it is wasting -- as much as I'm sure everybody

10   enjoys spending the day together and the weekends and

11   everything else, it's not a really acceptable use of

12   anyone's time.  But more importantly, it's

13   disrespectful to the Court, and the Court is entitled

14   to the respect from UMC's senior IT stakeholders to

15   know and to have a conversation with you guys and

16   understand what's going on so that when they talk to

17   their lawyers and UMC's counsel, they give them

18   accurate information.

19          Because your -- both parties -- and I keep --

20   and I appreciate Plaintiff for keeping the -- their

21   frustrations and showing cooperative things, but I

22   want to make it clear, there have been extensive

23   conversations before the Court about the preservation

24   of mobile communications.  And I promise you that your

25   lawyers would have loved to have been able to rely on

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    what the senior IT stakeholders at UMC were telling

2    them.

3         But the first time we're finding out that we

4    don't even know if the e-mail messages --

5         THE REPORTER:  Slow down a little.

6         THE SPECIAL MASTER:  -- we don't even know

7    that if the e-mail messages that a senior executive

8    writes on their mobile device are actually being

9    stored anywhere in the enterprise besides those mobile

10   devices, I promise you UMC's counsel has been nothing

11   but ethical and up-front and honest, and they need to

12   know that.  We shouldn't be finding out now, today.

13        And so it's not directed towards you, but

14   your senior IT stakeholders that have been passing

15   this information on.  It's not acceptable, and it must

16   be fixed immediately.

17        Now, since you are sitting here before me and

18   I can pick your brain myself and I actually know what

19   you're talking about, I'm going to take full advantage

20   of it, because I fully plan to get this done.

21        You'll check into those policies by Friday.

22        When you push a new -- so I understand how it

23   sort of works.  Now, I want to talk about messaging.

24        For messaging, now there's two types.

25   There's text messaging, right, which is SMS, which I

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    assume you don't run an SMS -- do you run or control

2    the SMS text message?  "No"; right?

3         MR. CLARK:  No.

4         THE SPECIAL MASTER:  You are not big enough.

5    I would be surprised if you did.  Some companies have

6    their own relays at actual Sprint, they're that big,

7    but you don't.

8         So I'm assuming that when someone writes a

9    text message and sends it to someone else, the only

10   place that sits, in all of UMC's world, the text

11   message, the SMS text message, meaning the -- that's

12   getting sent over the network, right, is going through

13   the telco network; right?  Is that correct?

14        MR. CLARK:  Yes.

15        MR. SCHAIBLEY:  Yes.

16        THE SPECIAL MASTER:  Okay.  Now, an internal

17   BBM message, be it PIN or otherwise, is going to hit

18   your server because the telco -- the PIN, maybe not.

19   The PIN you are going to look into.

20        But the BBM message, if you have the BBM

21   messaging server activated, and that module, it passes

22   through the BBM server; that's how messaging works.

23   That's why large businesses love BlackBerry; right?

24   Because then nobody can actually see what you are

25   messaging but the people within your enterprise;

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      right?

2            So do you know how BBM messaging is, if it

3      is, configured within UMC?

4            MR. CLARK:  I don't know.  I'd have to check.

5            THE SPECIAL MASTER:  Can you please check and

6      let counsel know by this Friday?

7            And, Counsel, I expect to hear from you on

8      Friday as to how it's configured.  I want you to be

9      able to explain it to your lawyers so they know what

10     is being said, so you might have to be a little

11     patient.  But it is very, very important.

12           Are there any -- do you lock down the

13     BlackBerry devices at all from installing third-party

14     apps or anything else?

15           MR. CLARK:  I don't know because I'm not over

16     the purview of the IT policies that you can set on the

17     BlackBerry.

18           THE SPECIAL MASTER:  Who is over that

19     purview?

20           MS. WITTY:  That would be Susie Kisner.

21           THE SPECIAL MASTER:  And who is she?  Sorry

22     for my ignorance, but...

23           MS. WITTY:  I'm not sure her exact title.

24           MR. LATTIN:  Manager.  She's over the

25     operations side managing.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  So she sets that policy?
 2              MS. WITTY:  Yes.
 3              THE SPECIAL MASTER:  Has she provided counsel
 4      with that policy?
 5              MR. CLARK:  My understanding is she's Dean's
 6      predecessor, and the predecessor of the IT director
 7      set the policy on the BlackBerry.
 8              THE SPECIAL MASTER:  Okay.  But he's no
 9      longer there, so someone's got to be -- either what he
10      set is still in force or she's reset it.  So if she
11      hasn't reset it, she must have what it was beforehand.
12              Somewhere within your organization someone
13      must know what the policy is; right?
14              MS. WITTY:  And she would be available by
15      phone, if you'd like to --
16              THE SPECIAL MASTER:  Yes.  Let's call her.
17      Let's call her after our first break.  Just let her
18      know we'll be calling her.
19              Court Reporter, can you let me know when it's
20      been an hour and a half, please?
21              THE REPORTER:  Yes.
22              MR. TOSTRUD:  Just one quick question.
23              THE SPECIAL MASTER:  If Plaintiff has any
24      questions, technical or otherwise, feel free to ask.
25              MR. TOSTRUD:  Okay.  I'd like to put on the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1     record and have these gentlemen identify the senior IT

2     stakeholders that you just mentioned.

3           THE SPECIAL MASTER:  I thought they were

4     identified for the record.

5           MR. TOSTRUD:  I don't know that they have

6     been.

7           THE SPECIAL MASTER:  Well, yes, let's go

8     through --

9           MR. TOSTRUD:  And -- according to them.  They

10    know who their bosses are and the people that are in

11    charge of --

12          THE SPECIAL MASTER:  Okay.

13          MS. WITTY:  Would it be more efficient to

14    provide an IT organizational chart?

15          THE SPECIAL MASTER:  Org chart?  Wouldn't

16    that -- would that suffice?

17          MR. TOSTRUD:  I'd like that, but I mean,

18    we're here and --

19          THE SPECIAL MASTER:  I'm going to get --

20    we're going to -- I'm not going to go through the

21    whole entire IT department, but we will get who is in

22    charge of what within -- relative, but I want to see

23    the actual org chart because they might not

24    actually -- how big is your IT Department?

25          MR. SCHAIBLEY:  Currently approximately 103

```
 1    people.
 2              THE SPECIAL MASTER:  Yes.  So they might not
 3    know all of the -- I'd like to get an org chart.
 4              But I want to quickly understand three quick
 5    things, which I think is what he's interested in.
 6              CIO, how does the BlackBerry link up through
 7    your organization, the BlackBerry in Exchange
 8    environment?  You have a NOC support?  You have a --
 9    how does it work?  Do you have a manager for
10    enterprise services, manager for messaging?  I'm just
11    trying to understand basically if Susan is the one
12    writing the policy and she didn't write the policy and
13    it's from her predecessor, who is actually, at the end
14    of the day, responsible for managing the BlackBerry in
15    Exchange environment?
16              MR. SCHAIBLEY:  At the end of the day, it
17    would be Susie.
18              THE SPECIAL MASTER:  So if the CEO loses his
19    BlackBerry one night because he's out doing whatever,
20    and he wants it wiped, he goes, sees her?
21              MR. SCHAIBLEY:  Does PBX handle the
22    BlackBerry?
23              MR. CLARK:  PBX is the first line of
24    BlackBerry handheld, and they are the ones who add the
25    people to the BlackBerry Enterprise Server.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              My understanding is that I'm responsible for
 2      the infrastructure because I'm the storage VMware
 3      guy --
 4              THE SPECIAL MASTER:  Storage VMware guy.
 5              MR. CLARK:  -- and that it's IT security
 6      that's responsible for the policy and the procedures
 7      on the BES.
 8              THE SPECIAL MASTER:  So let me rewind here.
 9              PBX -- we went over this last time.  PBX,
10      walk me through.  I'm a new employee.  Let's start at
11      the beginning.  We have two scenarios.
12              CEO or senior VP loses his phone, his
13      BlackBerry.  Who does he see about wiping it and
14      getting a new one within your organization?
15              MR. SCHAIBLEY:  Someone at that level would
16      go through the IT director, which is Lund Richardson,
17      or Susie Kisner, who is the manager over that area.
18              From there, they would work with PBX to --
19              THE SPECIAL MASTER:  Who is the individual?
20      You?
21              MR. SCHAIBLEY:  Individual, Trina
22      Burrage-Simon, B-u-r-r-a-g-e, hyphen, Simon.
23              And Trina would work on wiping the old
24      BlackBerry and issuing the new BlackBerry.
25              THE SPECIAL MASTER:  All right.  I get it.
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1              So then is Trina involved in syncing the
 2      BlackBerry data at all since she can wipe it?
 3              MR. SCHAIBLEY:  Yes, yes.
 4              THE SPECIAL MASTER:  What's her role?
 5              MR. SCHAIBLEY:  She's the PBX manager --
 6      supervisor.
 7              THE SPECIAL MASTER:  And so I get this -- off
 8      the record for a second.
 9                  (OFF RECORD.)
10              THE SPECIAL MASTER:  Let's go back on the
11      record to record that, because now it makes sense.
12              Okay.  So I understand, can you please
13      explain the different roles for the PBX team and the
14      BlackBerry server team?
15              MR. SCHAIBLEY:  The PBX team is the first
16      line of support and manages the BlackBerry handheld
17      distribution from an end-user perspective.
18              The server team, Jason Clark manages the
19      functionality of the server itself to ensure that it
20      is up and running.
21              THE SPECIAL MASTER:  Okay.  So let me
22      understand something.  If I want to get my messages
23      and I want them ported over to my new phone, who does
24      that?
25              MR. SCHAIBLEY:  PBX.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  So then I need to also
 2     have PBX on the phone?
 3              MS. WITTY:  That would be Susie as well.
 4              MR. SCHAIBLEY:  Yes.
 5              THE SPECIAL MASTER:  Perfect.  And so Susie
 6     has the ability, then, to port or whatever -- however
 7     she has it configured, does she work with the
 8     BlackBerry server environment?  She must.
 9              MR. CLARK:  She has access (inaudible) --
10              THE REPORTER:  Didn't get that.
11              MR. CLARK:  -- and administers from the PBX
12     perspective.
13              THE SPECIAL MASTER:  Yes, but she must have
14     admin rights.  In order to port it over, I mean,
15     someone's got to have admin rights to add a device and
16     sync messages?
17              MR. CLARK:  Yes, they have admin rights to
18     the handheld.
19              THE SPECIAL MASTER:  And the BlackBerry
20     server?
21              MR. CLARK:  I don't know if there are admins
22     on the server.
23              THE SPECIAL MASTER:  Okay.  And she would
24     be -- so then you didn't get any notification until
25     two weeks ago that you needed to preserve or collect
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

```
 1        the BlackBerry, the data stored in the BlackBerry
 2        server, which you are going to figure out what that is
 3        by Friday?
 4                MR. CLARK:  Yes.
 5                THE SPECIAL MASTER:  And you are the right
 6        person to know what should be in there within UMC?
 7        You are the person responsible for the policy, for
 8        administering the policy, not setting it, but
 9        administering it?
10                MR. CLARK:  No, I do not administer the
11        policy on the BlackBerry Enterprise Server.
12                THE SPECIAL MASTER:  Who does that?  Susie?
13                MR. CLARK:  It was Brandon and Susie in the
14        past.
15                MR. SCHAIBLEY:  So IT would be Susie at this
16        point.  The policy has not been -- since I've been
17        there, the policy has not -- the IT policy that can be
18        assigned on the BlackBerry server have not changed
19        since their original configuration by our
20        predecessors, with the exception of, as Jason said, a
21        couple of weeks ago, of ensuring the continued
22        collection of all material.
23                THE SPECIAL MASTER:  Wait.  So -- yes.  So
24        you've -- since you have heard of this, you have
25        started preserving all of the materials, correct, on
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    the BlackBerry server environment?

2         MR. CLARK:  I was not told to preserve all

3    materials from the BlackBerry --

4         THE SPECIAL MASTER:  For the 26 custodians

5    that are at issue.  Let me make it simple.  I'll ask

6    you the question about what was told.  Let me take

7    care of the most important thing:

8         I'm ordering you to preserve all mobile

9    device communications stored on any PBX, BlackBerry,

10   or magical cloud that is within your ambit, purview,

11   or control immediately relating to UMC in this

12   litigation.

13        Is there any confusion?

14        MR. CLARK:  No.  I understood when the CIO

15   called me, specific individuals had to be on the

16   BlackBerry server today, they have been preserved

17   since then.

18        THE SPECIAL MASTER:  Has anybody provided you

19   a list of these individuals?

20        MR. SCHAIBLEY:  Do you have the full list?

21        MR. CLARK:  I have an e-mail from the CIO of

22   people who are on the BlackBerry, but I don't think it

23   was 26.

24        THE SPECIAL MASTER:  Okay.  And Susie --

25   could Susie collect e-mail or messages from the PBX

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      environment that are on the BlackBerry?

 2              MR. CLARK:  (No response.)

 3              THE SPECIAL MASTER:  We'll ask Susie.  Fair

 4      enough.  Best say, "I don't know."  Remember, stick

 5      with the "I don't know" if you don't know.

 6              Okay.  Let's switch seats with backup, unless

 7      Plaintiff has any more questions about BlackBerry.

 8              MR. TOSTRUD:  I think I do.  First of all, I

 9      have a comment for the record, and then I have a

10      question, and then I'd like to put a document in as an

11      exhibit.

12              THE SPECIAL MASTER:  Okay.  Can I see the

13      document first?  And show a copy to...

14              MR. TOSTRUD:  Yes.  (Handed to counsel.)

15              MR. GODINO:  We think it's relevant to the

16      retention of information on the BlackBerry.

17              THE SPECIAL MASTER:  I got it.

18              MR. TOSTRUD:  I would like to show this to --

19              THE SPECIAL MASTER:  I'll do it.

20              MR. TOSTRUD:  Okay.

21              THE SPECIAL MASTER:  Is there anything else

22      besides showing him and asking him?

23              MR. TOSTRUD:  No.

24              THE SPECIAL MASTER:  Have you seen this,

25      counsel for UMC?  What I'm looking at, just for the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      record, is the record retention and disposal effective

 2      as of February 1, 2008, and revised January of 2014.

 3              MS. FOLEY:  I'm not sure if I've seen it.

 4              THE SPECIAL MASTER:  I'm not saying that you

 5      haven't -- I'm just asking if they have seen it.  I'm

 6      going to ask you about the document, clearly.

 7              But let's go off record for a second so you

 8      can look at it.

 9                    (OFF RECORD.)

10              THE SPECIAL MASTER:  Back on the record.

11              Before I admit it in, do you have any

12      questions, Counsel Witty?

13              MS. WITTY:  There is no administrative

14      approval listed on this.  The policies and procedures

15      identified by UMC generally have who is responsible

16      for...

17              THE SPECIAL MASTER:  Can you provide any

18      clarification as to this document?

19              MR. TOSTRUD:  Sure.

20              THE SPECIAL MASTER:  Was this provided to you

21      or produced?

22              MR. TOSTRUD:  It was a record that was not

23      produced by defendant which we believe is clearly

24      relevant.

25              THE SPECIAL MASTER:  Well, I would agree with
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1      you.
 2              MR. TOSTRUD:  It was produced to us by our
 3      plaintiff, Daniel Small, who I believe identified that
 4      document or was provided it either via e-mail or it
 5      was available on the intranet, UMC intranet.
 6              THE SPECIAL MASTER:  Counsel Witty, can he
 7      authenticate that and provide...
 8              MR. TOSTRUD:  Absolutely.  I would hope that
 9      it's --
10              THE SPECIAL MASTER:  I agree with you, but
11      just -- if he -- I just want -- Counsel Witty, if you
12      think they have from Mr. Small and can authenticate
13      the record --
14              MS. WITTY:  We're not opposed, and we just
15      would state our objection on the record that it does
16      not follow the traditional form; that even its
17      availability for review would not necessarily make it
18      the binding policy.
19              THE SPECIAL MASTER:  Okay.  Do you have any
20      objection or do you wish to respond?
21              MR. TOSTRUD:  Well, I think we need to get an
22      answer as to whether it is a binding policy or not.
23      It appears to be a business record.  It's available to
24      an hourly paid employee of UMC.  It directly addresses
25      all employees; it relates to all business records;
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1        that's the purpose of the document.
 2              Page 2 identifies that it relates to business
 3        records with respect to --
 4              MS. WITTY:  I would state that he's going to
 5        the content of this document.
 6              MR. TOSTRUD:  -- with respect to all
 7        mediums --
 8              THE SPECIAL MASTER:  All right.  One second.
 9        Before we get into the substance of the document,
10        which is -- I'm not quite yet there.
11              MS. FOLEY:  This was not produced in the
12        regular course of discovery, so we are entitled to say
13        we don't know.  We don't --
14              THE SPECIAL MASTER:  I have no problem with
15        you saying "I don't know"; I don't have any qualms
16        with you saying "I don't know," because I asked for
17        the record retention policies and schedules, and this
18        was not what I received.
19              MS. FOLEY:  Right.
20              THE SPECIAL MASTER:  So I mean, I fully
21        recognize there is an issue here.
22              MR. TOSTRUD:  Just so I'm clear, this hasn't
23        been produced to you either?
24              THE SPECIAL MASTER:  This particular document
25        has not.  I did receive and request, I believe -- I
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

1    don't know if I received it yet, but if not, I'm

2    requesting the like document, but I thought I had been

3    provided it.

4         MS. FOLEY:  Is -- does that have a Bates

5    stamp on it?

6         THE SPECIAL MASTER:  There's no Bates stamp.

7         MS. FOLEY:  Not on -- I'm sorry.  I thought

8    you were at the other one.  You were --

9         THE SPECIAL MASTER:  Oh, the other one that

10   you provided, you provided me -- did you provide me

11   the record retention?

12        MS. WITTY:  No.  They fall underneath County

13   record retention policies.  It's a 500-some-odd-page

14   document.

15        THE SPECIAL MASTER:  Can you do me a favor?

16   Can you find that?  And can you also -- let's go off

17   the record for a second.

18              (OFF RECORD.)

19        THE SPECIAL MASTER:  Okay.  Let's go back on

20   the record.

21        I'm going to request that you provide this in

22   an affidavit, and I will take it right now as

23   Exhibit 1, subject to the receipt of an affidavit

24   provided by you.  I would like the affidavit no later

25   than this coming Friday, if at all possible.

Special Master's Hearing  ‑   April 7, 2014
*** Volume II ***

```
 1              MR. GODINO:  Exhibit 9?

 2              THE SPECIAL MASTER:  Exhibit -- thank you.

 3              Will you please provide it to the court

 4     reporter?  Just the -- not the new document.  Just

 5     the -- with Appendix A, to the court reporter.

 6              MR. TOSTRUD:  I only have two copies, so I'll

 7     provide that to her.

 8                  (Exhibit 9 was marked for identification

 9                  by the Certified Court Reporter.)

10              THE SPECIAL MASTER:  That's fine.  And I'm

11     noting for the record that this is subject to being

12     provided an affidavit around the -- the affidavit

13     needs to speak to the following, so we're clear:

14     Authenticity, how he got it, who he got it from, when

15     he got it, where he got it from, and I think that

16     would provide sufficient background.  That's first.

17              Bear with me here.

18              Second, I'm going to ask UMC IT -- I hate to

19     put you guys on the spot, but you would theoretically

20     be the ones responsible for this in some capacity, be

21     it downstream or Susie -- what's her name -- Susie

22     Kisner.  Have you guys ever seen a document -- this

23     document or -- on your intranet or otherwise?

24              MR. SCHAIBLEY:  Prior to today, no.

25              THE SPECIAL MASTER:  I might remind everybody
```

Special Master's Hearing  -    April 7, 2014
*** Volume II ***

1      here that if push comes to shove, we will be searching

2      UMC's intranet ourselves for this document.  So I'm

3      just telling you.

4            Like, I just don't want there to be any

5      confusion downstream that I didn't make it

6      crystal-clear that saying -- okay.

7            So let me understand next:  I want to ask

8      each of you.  So Mr. Lattin, have you ever seen this

9      document?  Please look at it closely.  It's entered as

10     Exhibit Number 9.

11            MR. TOSTRUD:  Exhibit 9.

12            THE SPECIAL MASTER:  If you want to take a

13     second to look at it, feel free.

14            Off the record.

15               (OFF RECORD.)

16            THE SPECIAL MASTER:  Back on the record.

17            MR. LATTIN:  Prior to today, I don't remember

18     seeing this before.

19            THE SPECIAL MASTER:  Okay.  For the record,

20     Mr. Clark...

21            MR. CLARK:  (Examined document.)  I'm saying

22     the same.  If I had seen it, I don't remember seeing

23     it.

24            THE SPECIAL MASTER:  Okay.

25            MR. SCHAIBLEY:  (Examined document.)  Prior

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      to today, no.
 2              THE SPECIAL MASTER:  Now, my -- I'm going to
 3      just -- bear with me.  I know we hit an hour and a
 4      half.
 5              But do you have any such similar policy that
 6      you have seen that looks or covers the same that you
 7      have received, or have --
 8              MR. LATTIN:  As far as backups, I have a
 9      policy --
10              THE SPECIAL MASTER:  No.  I'm talking
11      about -- what's the title of that document?
12              MS. WITTY:  This says, at the top under
13      "Subject," "Record Retention and Disposal."
14              MR. LATTIN:  No.
15              THE SPECIAL MASTER:  Have you -- do you have
16      anything around record retention or disposal within
17      your purview?
18              MR. CLARK:  No, not that I know of.
19              THE SPECIAL MASTER:  Who would -- and then --
20              MR. SCHAIBLEY:  No.
21              THE SPECIAL MASTER:  I mean, somebody has got
22      to be setting your record schedule somewhere for how
23      long you are keeping stuff, and it's got to be in
24      writing somewhere.
25              MR. GODINO:  Or for any kind of legal hold.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            THE SPECIAL MASTER:  We'll get into legal

 2      holds in a second.  I just -- I just want to

 3      understand at a very basic level, when you get a

 4      litigation holder, you get a litigation destruction

 5      notice, or you get -- you don't keep data forever;

 6      right -- let's go off the record.

 7                  (OFF RECORD.)

 8            THE SPECIAL MASTER:  I'm going to order UMC

 9      to find me somebody within the IT department that sets

10      the record retention schedules for e-mails, for

11      BlackBerry messaging, for the different documents that

12      are being sought here in this case.  I'm very

13      confident that everybody here wants to get that done.

14            I'm a bit mystified -- strike that.

15            What I need from you guys is to find out what

16      they are and who set them and what you are currently

17      doing.  Okay?  Is that crystal-clear, Counsel for UMC?

18            MS. WITTY:  Yes.

19            THE SPECIAL MASTER:  Now we will take a

20      break, because I said we would take a break.

21            With BlackBerry, I actually don't have any

22      more questions until I get the additional data.

23            Does Plaintiff have any more

24      BlackBerry-specific questions?  Until I know how they

25      are configured, what you are syncing, and how you are
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      doing it, I don't have any more particular questions.
 2      But you do understand the order I gave, which is
 3      preserve -- talk to counsel, get the list of
 4      custodians, and make sure they are being preserved
 5      now.
 6              We'll touch on backup in a second.
 7              Plaintiff, anything about BlackBerry?
 8              MR. TOSTRUD:  I just have a comment about
 9      BlackBerry that's very quick, and that is, it's been
10      represented to us many times by counsel that e-mail
11      messages which were being sent or received to or from
12      a BlackBerry were absolutely going to the server.
13              THE SPECIAL MASTER:  Okay.  And we have
14      clearly established in this hearing that they are
15      going to go and verify that that is indeed what is
16      happening.  I'm sure counsel is not forthright-telling
17      you what is wrong.  It is clearly like -- their CIO of
18      UMC clearly is not the person syncing the servers and
19      sharing the information, because he just said he is
20      going to go check, and he is the person responsible
21      for knowing and making that happen.  Okay?
22              Now we will take a break.
23              I do have one more BlackBerry-based question,
24      which is I want to understand how new phones are put
25      on and images are set and how the -- why they need to
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1      be wiped and if you make a copy.  So it's a purview --
 2      I'm giving you a preview of what my next questions
 3      are.
 4              Let's go off the record.
 5              (RECESS TAKEN 10:46 A.M. TO 11:01 A.M.)
 6              THE SPECIAL MASTER:  Back on the record.
 7              I have six questions for -- Mr. Clark, I have
 8      six questions for you.  They pertain to the BlackBerry
 9      images that get pushed.
10              Are you with me?
11              MR. CLARK:  Yes.
12              THE SPECIAL MASTER:  Have you had a chance to
13      read the custodian interview forms?
14              Can Counsel Witty show him any one of the
15      custodian interview forms where what I'm talking about
16      comes up.
17              MR. CLARK:  Okay.  So I'm seeing something
18      about BlackBerry updates.
19              THE SPECIAL MASTER:  Okay.  According to my
20      understanding, when you push a BlackBerry update, what
21      happens?
22              MR. CLARK:  Push a BlackBerry update?
23              THE SPECIAL MASTER:  Right there, the
24      BlackBerry -- what are you looking -- Counsel Witty,
25      what did you give him?  Which one?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MS. WITTY:  These are the ones that were
 2     provided to the special master in camera.  It's
 3     regarding the updates and the dates for those updates.
 4              Are you going to look specifically at --
 5              THE SPECIAL MASTER:  I just want one of them.
 6     Was Mr. Mumford in the one you provided?  Let me look.
 7              MS. WITTY:  Are you talking about the
 8     updates?
 9              THE SPECIAL MASTER:  Yes, when the update
10     wipes the prior -- oh, yes, here we go.  I found one.
11     Can you please point yourself to Mr. Espinoza's chain
12     of custody.  I'll bring it over.
13              MS. WITTY:  The chain of custody?
14              THE SPECIAL MASTER:  No, sorry.  Custodial
15     interview.
16              Here you go (indicating).
17              MR. CLARK:  Okay.
18              MS. WITTY:  Do you want this too
19     (indicating)?
20              THE SPECIAL MASTER:  Perfect.  So my
21     question -- so we're talking about the BlackBerry
22     Curve 8530 on January 20th, 2011.
23              Do you see that?
24              MR. CLARK:  Yes.
25              THE SPECIAL MASTER:  Then it sends the 8530
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     on September 22, 2008.  Now, irrespective of his

 2     technical prowess and his understanding of how the

 3     BlackBerry syncs to the server, what I want to

 4     understand is, when you update the phone, do they get

 5     wiped?  Does the BlackBerry device ever get wiped by

 6     you?

 7               MR. CLARK:  No.

 8               THE SPECIAL MASTER:  Who would ever wipe a

 9     BlackBerry device if it's not wiped by you?

10               MR. CLARK:  PBX would handle the handhelds.

11               THE SPECIAL MASTER:  So then when a new

12     update comes out, and let's say a BlackBerry update to

13     the OS happens, okay?  So the BlackBerry OS updates.

14     How -- when -- on multiple custodial interviews, the

15     custodians say that their BlackBerries were updated

16     and the data was wiped, right, Counsel Witty?

17               MS. WITTY:  Correct.

18               THE SPECIAL MASTER:  Explain to me how that

19     happens or how that's possible, either one of those.

20               MR. CLARK:  My understanding is that when --

21     they get the handheld back to PBX and PBX wipes them

22     and then they put the latest OS on them and then get

23     them up on the BES.  So they do the updates that way,

24     they wipe it because --

25               THE SPECIAL MASTER:  Do they -- so you
```

```
 1      wouldn't know if they backed them up or anything?
 2              MR. CLARK:  No.
 3              THE SPECIAL MASTER:  And it's at the physical
 4      device level?
 5              MR. CLARK:  I'm sorry?
 6              THE SPECIAL MASTER:  It's at the device
 7      level?
 8              MR. CLARK:  Yes.
 9              THE SPECIAL MASTER:  When they wipe it, does
10      that remove the messages from the server?
11              MR. CLARK:  It should not.
12              THE SPECIAL MASTER:  I would think not,
13      because it would re-sync.
14              MR. CLARK:  That's right.  Again, like I
15      said, all the messages on the server -- on the
16      Exchange server would sync to the BlackBerry handheld.
17              THE SPECIAL MASTER:  And you are going to
18      figure out how it actually syncs and what policies?
19              MR. CLARK:  (Nodded head up and down.)
20              THE SPECIAL MASTER:  So when they say it was
21      wiped, it was a physical wipe done by the PBX team?
22              MR. CLARK:  (Nodded head up and down.)
23              THE SPECIAL MASTER:  I just want to
24      understand, because we're going to get on the phone
25      with her and I want to -- I want to understand when
```

1      there is one in 2013 -- well, multiple wipes in 2013,

2      I just want to make sure you weren't the person

3      wiping.

4              Have you ever wiped a BlackBerry device?

5              MR. CLARK:  I have wiped Blackberries.

6              THE SPECIAL MASTER:  For UMC?

7              MR. CLARK:  For myself at UMC.

8              THE SPECIAL MASTER:  For UMC.  Not for your

9      personal -- I know you are in IT.  I know that IT

10     people do all sorts of things for their own.  Has an

11     UMC employee ever come to you and said, "Wipe my

12     BlackBerry"?

13             MR. CLARK:  I don't recall wiping a

14     BlackBerry for UMC.

15             THE SPECIAL MASTER:  Employee.

16             MR. CLARK:  Yes.

17             THE SPECIAL MASTER:  Okay.  And to be clear,

18     for any of these six people -- and can you please list

19     the six people?

20             MS. WITTY:  It would be Brian Brannman, John

21     Espinoza, James Mumford, Doug Spring, Jackie Panzeri,

22     or Claudette Myers.

23             THE SPECIAL MASTER:  What about the -- who is

24     the other admin?

25             MS. WITTY:  You mean administrative

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      assistant?

 2              THE SPECIAL MASTER:  Yes.

 3              MS. WITTY:  Cindy Dwyer.

 4              THE SPECIAL MASTER:  Was there two or one?

 5              MR. PIXLEY:  There were two.

 6              THE SPECIAL MASTER:  Have any of those people

 7      ever come to you and said, "Wipe my BlackBerry"?

 8              MR. CLARK:  No.

 9              THE SPECIAL MASTER:  That's all I needed.

10      Thank you very much -- no, thank you.  That's what I

11      needed to know.  Perfect.  Let's call her.

12              So would she be the person who would know, as

13      far as you guys know?

14              MS. FOLEY:  Yes.

15              MR. CLARK:  Susie Kisner is the manager over

16      Trina.  She's the PBX supervisor.  I believe Trina is

17      the one who does the wiping of the handheld.

18              (Marilyn Susan Kisner now present via

19      telephone.)

20              MS. WITTY:  You are on speakerphone here with

21      counsel for UMC, counsel for plaintiffs, and the

22      Special Master in the Small lawsuit.

23              The Special Master has some questions for you

24      regarding PBX and the BlackBerry updates.

25              THE SPECIAL MASTER:  Okay.  So, hi, Susie,
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
1      this is Special Master Garrie.

2             How are you?

3             MS. KISNER:  I'm good.  How are you?

4             THE SPECIAL MASTER:  I'm all right.  I'm

5      inside, and it's sunny outside, but besides that,

6      okay.

7             I want to make sure before we go forward, I

8      want you to understand you are -- I'm speaking to you

9      as an Officer of the Court.  So anything you offer or

10     you state is being recorded for the record, it's like

11     testimony.

12            You understand that?

13            MS. KISNER:  Yes, I do.

14            THE SPECIAL MASTER:  Okay.  For the record,

15     what's your full name?

16            MS. KISNER:  Marilyn Susan Kisner.

17            THE SPECIAL MASTER:  Okay.  And just for the

18     record, what is your job title at UMC?

19            MS. KISNER:  IT customer support manager.

20            THE SPECIAL MASTER:  Okay.  And within that,

21     are you responsible for PBX systems within UMC?

22            MS. KISNER:  Yes, I am.

23            THE SPECIAL MASTER:  Does that also include

24     supporting the handheld BlackBerry devices themselves?

25            MS. KISNER:  Yes, it does.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Does it -- are you aware
 2      of this ongoing litigation?
 3              MS. KISNER:  I am.
 4              THE SPECIAL MASTER:  When were you made aware
 5      of it?
 6              MS. KISNER:  The first discussion I had was
 7      probably last week.
 8              THE SPECIAL MASTER:  Okay.  Has anybody at
 9      UMC told you to preserve the mobile devices before
10      last week?
11              MS. KISNER:  I'm trying to remember when.  We
12      were told to have them available for three people, I
13      believe, and I want to say maybe a month and a half,
14      two months ago.
15              THE SPECIAL MASTER:  Okay.  Do you have a
16      list of every individual that has a smartphone within
17      UMC that you support?
18              MS. KISNER:  I'm sorry.  Say that again?
19              THE SPECIAL MASTER:  Do you have a list of
20      every smartphone that you support within UMC?
21              MS. KISNER:  Yes, I do.
22              THE SPECIAL MASTER:  Can you please provide
23      that to Counsel Witty for UMC?
24              MS. KISNER:  Okay.
25              THE SPECIAL MASTER:  By end of day today?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MS. KISNER:  Yes.
 2              THE SPECIAL MASTER:  Now, I want to
 3    understand, when a user -- and have -- did you ever
 4    receive a litigation hold or preservation notice from
 5    anybody at UMC?
 6              MS. KISNER:  I don't believe I have, but
 7    possibly it came in to someone who works for me.
 8    That's possible.  I don't know.
 9              THE SPECIAL MASTER:  Okay.  Please check
10    within the people that work for you as well and please
11    read it yourself.
12              Counsel, please send her a copy, so she has
13    it.
14              Within the scope of your duties and
15    responsibilities, if a user -- there has been updates
16    to BlackBerry devices.  Are you responsible for those
17    updates?
18              MS. KISNER:  Yes.
19              THE SPECIAL MASTER:  Okay.  When you update a
20    device, do you back it up before you update it?
21              MS. KISNER:  No.
22              THE SPECIAL MASTER:  When you update a
23    device, you do not back it up?
24              MS. KISNER:  No, I don't believe we have
25    backed up any mobile devices to date.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  So if you lose a CEO,
 2    you update the CEO's BlackBerry device -- I want to
 3    understand -- it's just gone, and too bad for him?
 4              MS. KISNER:  We don't back them up.  We never
 5    have.
 6              THE SPECIAL MASTER:  Okay.  So when they
 7    bring you a phone and they ask you to update it, what
 8    do you do?
 9              MS. KISNER:  We do the update on it.
10              THE SPECIAL MASTER:  I need you to walk me --
11    I'm a technical person.  I need you to walk me through
12    in a little more detail than "we do the update."  I
13    need you to walk me through the steps.  I bring you
14    the phone, and what do you do?
15              MS. KISNER:  I don't have one in front of me.
16    I would follow the -- I'd go into "Settings" and --
17              THE REPORTER:  I can't hear.
18              THE SPECIAL MASTER:  Sorry, can you speak
19    slower?
20              MS. KISNER:  -- "Security Updates," and then
21    I would --
22              THE SPECIAL MASTER:  No, no.  Sorry, Susie,
23    just for the court reporter, can you repeat yourself
24    again.
25              MS. KISNER:  I would go into the "Settings"
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

 1    on the device and then to "Security Updates," and I
 2    would apply them.
 3                 THE SPECIAL MASTER:  And what if that would
 4    wipe -- and were you aware or have knowledge that
 5    could result in the deletion of the data or messages
 6    on the device?
 7                 MS. KISNER:  If it did, it did.  We do not
 8    back them up and we --
 9                 THE SPECIAL MASTER:  No, no.  I asked are you
10    aware that that happened.
11                 MS. KISNER:  It hasn't happened to date that
12    I know of.  I don't know.
13                 THE SPECIAL MASTER:  No.  Are you aware that
14    when you update a BlackBerry device, that it could,
15    depending on how you configure the update, wipe
16    everything that's on the phone?
17                 MS. KISNER:  Yes, it could.
18                 THE SPECIAL MASTER:  So you are aware?
19                 MS. KISNER:  Yes, it could.
20                 THE SPECIAL MASTER:  So yes, you -- meaning
21    "yes," you know, or "yes," you --
22                 MS. KISNER:  Yes.
23                 THE SPECIAL MASTER:  -- what I just told you
24    you heard?
25                 MS. KISNER:  What you just told me I heard,

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      and I am aware that it could.

 2              THE SPECIAL MASTER:  Okay.  That's all.

 3      Okay.  Sorry for the confusion.

 4              Have you been provided a list of all of the

 5      devices that if someone -- of custodians that, if they

 6      do bring you a device, that you are to make a backup

 7      copy before updating them?

 8              MS. KISNER:  Well, I am aware that we are

 9      keeping a box of devices that we have pulled back

10      because we don't want to do any kind of factory

11      default wipe on them.

12              THE SPECIAL MASTER:  I'm going to make it

13      easy for you.  I'm going to order you to do the

14      following:

15              Counsel, can you please provide her a list of

16      the individual custodians that are of interest to us

17      in this litigation, with the explicit instructions

18      that if she is brought any said device to be wiped,

19      that she is to not wipe them until a copy has been

20      made, a forensic copy has been created with MD5 hash

21      values verified by whatever forensic expert you want,

22      and that said copy has been verified and validated.

23              And then if she -- I would recommend against

24      wiping of it because of the potential downstream, but

25      at the very least, I would like to be notified of
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    this, if she does decide to wipe them.

2         Just so I understand, do you have access to

3    the BlackBerry server itself?

4         MS. KISNER:  I do.

5         THE SPECIAL MASTER:  Okay.  Do you have

6    administrative control or access?

7         MS. KISNER:  I believe I do.

8         THE SPECIAL MASTER:  Do you use this --

9         MS. KISNER:  -- utilize it, but I believe I

10   have access.

11        THE SPECIAL MASTER:  Have you ever used this

12   access or control?

13        MS. KISNER:  I have in the past; not the past

14   probably two years.

15        THE SPECIAL MASTER:  Okay.  But in the past

16   four years, you have?

17        MS. KISNER:  I have.

18        THE SPECIAL MASTER:  And what have you used

19   your access to do during that time period?

20        MS. KISNER:  Add users.

21        THE SPECIAL MASTER:  When you add a user, can

22   you please explain to me in a little more detail, what

23   are you adding them to?

24        MS. KISNER:  The BlackBerry server.

25        THE SPECIAL MASTER:  Does that include the

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    messaging?

2           MS. KISNER:  Yes, or -- so they would -- so

3    they would get their e-mails via that device.

4           THE SPECIAL MASTER:  They have the ability to

5    get their e-mail without that device using the IMAP

6    SMTP settings anyway, if they add their password to

7    their e-mail account.

8           Is that not correct?

9           MS. KISNER:  It's not, according to our

10   policy.

11          THE SPECIAL MASTER:  I know.  I'm not asking

12   you according to your policy.

13          MS. KISNER:  Yes.

14          THE SPECIAL MASTER:  I asked you, if I have

15   an iPhone, and I know your IMAP server, and I know the

16   ports to connect to, and I have a password, and I went

17   on Google, and I typed in "how do I configure my

18   iPhone to check my e-mail," and I had my own log-in

19   and password, I would be able to do that?

20          MS. KISNER:  On a smartphone through

21   ActiveSync, that --

22          THE SPECIAL MASTER:  Not through ActiveSync.

23   I said through any phone, smartphone.  I'm going to

24   say the answer is yes, considering your Exchange

25   administrator is sitting here and had just in the

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      prior hearing told me the IMAP configuration did allow

 2      for that with a password, unless you believe

 3      differently.

 4              MS. KISNER:  Okay.  I would agree that he

 5      would be the --

 6              THE SPECIAL MASTER:  I'm glad you agree.  He

 7      knows what he's talking about.  Through the entire

 8      hearing he's established that he's --

 9              MS. KISNER:  Yes, I would agree he knows what

10      he's talking about.

11              THE SPECIAL MASTER:  -- he's established that

12      he's technically competent and speaks well to UMC's

13      ability to manage the Exchange environment.

14              Just so I understand, for my own edification

15      here, up until -- has it always been your standard

16      policy -- do you have any policies or practices that

17      are in writing around to how to manage BlackBerry or

18      mobile devices?

19              MS. KISNER:  We have a mobile device policy.

20              THE SPECIAL MASTER:  Does that include record

21      retention and record schedule?

22              MS. KISNER:  No, it does not.

23              THE SPECIAL MASTER:  Okay.  Can you please

24      provide that policy to counsel for UMC?

25              MS. KISNER:  I believe I sent that to Cayla
```

```
 1     last week.
 2              MS. WITTY:   Should be in what was provided
 3     today.
 4              THE SPECIAL MASTER:   Okay.   And do you follow
 5     that policy?
 6              MS. KISNER:   Yes, we do.
 7              THE SPECIAL MASTER:   Okay.   And just so I
 8     understand, can I see that policy, Counsel Witty?   I
 9     didn't see mobile devices covered in it.   I don't mean
10     to say they're not.   I just...
11              MS. WITTY:   It's at "Communication Systems."
12     There's a "Loss of Communication Systems," and there's
13     a --
14              THE SPECIAL MASTER:   Oh, here it is.
15     "Communication Failure."   Is that what you're
16     referring to?
17              MS. WITTY:   There was a "Loss of
18     Communication Systems" and a "Communication" --
19              THE SPECIAL MASTER:   Oh, yes.   There we go,
20     "Loss of Communication" -- okay.
21              I understand for loss of communications.   I'm
22     talking about the support and maintenance and
23     preservation.
24              So a new employee joins --
25              MS. KISNER:   It is "Appropriate Mobile
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1    Device/Smart Phone Use."

2         THE SPECIAL MASTER:  Okay.  The title is

3    "Loss of Communication System."  Am I looking at the

4    right document?

5         MS. KISNER:  Not for mobile device.  Are you

6    still looking for the mobile device policy?

7         THE SPECIAL MASTER:  Yes.

8         MS. KISNER:  It is I-207.2, "Appropriate

9    Mobile Device/Smart Phone."

10        THE SPECIAL MASTER:  I have "Appropriate

11   Internet Use."  I don't have the policy you are

12   referring to.

13        Can you repeat yourself again, the number?

14        MS. KISNER:  I'm sorry?

15        THE SPECIAL MASTER:  Can you please repeat

16   the name of that -- number of the policy?

17        MS. KISNER:  It is I-207.2.

18        THE SPECIAL MASTER:  Okay.  One more time.

19        MS. KISNER:  I-207.2, "Appropriate Mobile

20   Device/Smart Phone Use."

21        THE SPECIAL MASTER:  Okay.  I'll have to look

22   that over, because I haven't seen it.  One second.

23   Thank you.

24        (There was a pause in the proceedings.)

25        THE SPECIAL MASTER:  This policy doesn't

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    speak to the wiping and support of these.  Do you have

2    a policy around the wiping and support of mobile

3    devices?

4           Nowhere in this policy, as I've read it, does

5    it talk about when you will be wiping, updating, or

6    etc., to the mobile devices.  Do you have any policy

7    that states how or what --

8           MS. KISNER:  I don't believe there is a

9    policy.

10          THE SPECIAL MASTER:  So -- that's fine.  It's

11   not -- it's okay if there is not.  I'm just trying to

12   understand.

13          So then I get this -- you -- they -- I'm just

14   trying to understand how it works, because my focus

15   and what I've been tasked with is to make sure that we

16   have all of the right mobile devices relating to the

17   custodians preserved.

18          You'll get a list, so we've got that covered.

19   I'm just trying to understand.

20          So I have context.  An executive will come to

21   you, and they will say, "I've lost my phone."

22          If they have lost their phone, what do you

23   do?

24          MS. KISNER:  We do an over-the-air wipe from

25   the BlackBerry server.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Do you log that?
 2              MS. KISNER:  I'm sorry?
 3              THE SPECIAL MASTER:  Do you log when you do
 4      this?
 5              MS. KISNER:  I haven't done that, but I would
 6      assume that, yes, that it would be logged.  There is a
 7      security report that they have to do for losing that
 8      device and, of which, at that point when we receive
 9      that, we would do -- if we couldn't wipe it over the
10      air, then we would call Sprint and have them do an
11      over-the-air wipe of the device.
12              THE SPECIAL MASTER:  You would call who?  I'm
13      sorry.
14              MS. KISNER:  Sprint.
15              THE SPECIAL MASTER:  What's --
16              MS. KISNER:  Sprint is our cellular carrier.
17              THE SPECIAL MASTER:  Oh, Sprint.  Sorry.
18              Did users connect their device to their
19      lap -- to their computers to sync their --
20              MS. KISNER:  No.
21              THE SPECIAL MASTER:  How did they sync their
22      calendars?
23              MS. KISNER:  They sync them over the air
24      through the BlackBerry server.  They are not allowed
25      to connect it to their computer.  We don't allow
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    people to connect anything into their USB devices.

2    That sends this to security.  And you can speak with

3    them, Dean, regarding that, but I believe that they

4    receive a notification when somebody tries to plug

5    something into their USB port.

6         THE SPECIAL MASTER:  Yes, that's passive

7    versus active.  The question that we're working, and

8    I'm going to get further answers to, is if there is a

9    log -- in the transcript from Friday -- but I'm

10   expecting a log of the USB device's connectivity

11   association with each of the six custodians, for my

12   own edification.

13        But we will -- so I'm -- or like, if we

14   covered that on Friday, this is nothing to do with

15   you.  Excuse me one second.

16        I am ordering you to provide me as special

17   master a list of USB device connectivity given the

18   issue with the mobile devices that we have had to date

19   for the custodians because there is no backups of any

20   of the wipes that were done internally by your

21   department.  That's correct; right?

22        MS. KISNER:  Yes.

23        THE SPECIAL MASTER:  That kind of clears up

24   wiping.

25        So I mean, when they say they do an "update,"

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    just so I get it, I need an update.  I bring you my

2    phone, and I say, "I need you to update my BlackBerry

3    operating system."

4         You would not back up their device.  You

5    would just simply wipe their device and put the new

6    update on?

7         MS. KISNER:  Correct.  And then they would --

8    that's correct.  And then as it completes, then it

9    would just reload their calendar and their e-mail

10   account.

11        THE SPECIAL MASTER:  It would sync somehow

12   between all of -- which we've --

13        MS. KISNER:  It does sync; correct.

14        THE SPECIAL MASTER:  And are you aware of the

15   sync?  Do you know what the policy --

16        One second and we'll get to your question --

17   or do you have a question?

18        MR. FORREST:  Well, I was just wondering if

19   she recorded whenever she did such an update or what.

20        THE SPECIAL MASTER:  So do you have any

21   record or log of any wiping that you have done?

22        MS. KISNER:  No, I don't believe we do.

23        THE SPECIAL MASTER:  Who's -- are you

24   responsible for doing this?

25        MS. KISNER:  For wiping the devices?  Yes.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      It's part of a process or a procedure.

 2           THE SPECIAL MASTER:  Well, I mean, luckily

 3      Sprint -- lucky for us, Sprint tracks all of that in

 4      detail.  So if you don't have it, we can go to the

 5      third party and get it.

 6           MS. KISNER:  Okay.

 7           THE SPECIAL MASTER:  Are you sure you don't

 8      have it?

 9           MS. KISNER:  I don't believe we have it, no.

10           THE SPECIAL MASTER:  Can you check?

11           MS. KISNER:  I can check, but I'm pretty sure

12      we don't have it.  You want us to go back to our

13      carrier?

14           THE SPECIAL MASTER:  Yes.

15           MS. KISNER:  Okay.  We can do that.

16           THE SPECIAL MASTER:  Okay.  Just so -- who

17      sets the policies here for how long e-mails are

18      allowed to sit on the BlackBerries?

19           MS. KISNER:  I have never set any policy.  I

20      think it's on -- it may be from the BlackBerry server.

21           THE SPECIAL MASTER:  Well, I can promise you

22      that he's not setting the policies, because he's

23      sitting here and I asked him who's setting the

24      policies.

25           MS. KISNER:  Then I don't know.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Let's go off record for
 2    one second.
 3                (OFF RECORD.)
 4                (Marilyn Susan Kisner no longer present
 5    telephonically.)
 6              THE SPECIAL MASTER:  Let's go back on the
 7    record.
 8              I'm going to order UMC's counsel to figure
 9    out with UMC's IT department and operational
10    executives who the individuals are that set the
11    policies that are then either been configured -- well,
12    we've established at least since June of 2012.
13              And how long have you been responsible for
14    the BlackBerry server?
15              MR. CLARK:  Since its implementation, back
16    in, I don't remember what year, but it's been quite a
17    while ago.
18              THE SPECIAL MASTER:  2010?
19              MR. CLARK:  Probably around there or earlier.
20              THE SPECIAL MASTER:  For sure 2010.
21              Well, whoever -- I mean, yes, 2010?  2011?
22              MR. CLARK:  I think 2010.
23              THE SPECIAL MASTER:  Let's be safe.  2011?
24              MR. CLARK:  Yes.
25              THE SPECIAL MASTER:  Okay.  So someone told
```

```
 1    you what the policies are or set the policies before
 2    you took control of it.  I need to know what those
 3    policies were that were set, because the alternative
 4    that remains is that I can have some third-party
 5    expert come on-site and get me all of my answers, and
 6    I'd like to avoid --
 7              MS. FOLEY:  We understand, and we'll endeavor
 8    to do that.
 9              THE SPECIAL MASTER:  Yes.  I'd like to avoid
10    costing you hundreds of thousands of dollars, which is
11    what it will cost to have someone to come in and learn
12    your entire IT infrastructure simply to get me these
13    answers.  All right.  That is not my desire.
14              My desire is to get through this as quickly
15    and cost effectively as possible, but we need to know
16    the very basics; right?
17              With regards to the mobile devices, I don't
18    think there is a lot more to be said.  I know that you
19    guys told -- I know at least I told the CIO at our
20    very first hearing that there was an expectation for
21    preservation, and I know that was more than two weeks
22    ago.
23              So I'm a little surprised and shocked that he
24    failed to tell the person that's responsible for
25    wiping them and give her a list.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1          Now, why he didn't bother to do that, even

2     though I ordered him and the judge ordered him to make

3     sure that that was the case.  I am going to repeat the

4     order.

5          For purposes of clarity and succinctity, I'm

6     ordering UMC to provide a list of custodians and their

7     devices to the people within UMC's organization

8     responsible for wiping and to have them cease such

9     behavior.  And if they do want to wipe, create a

10    forensic image with MD5 hash values, and I would

11    advise against doing it, but at the very least, make a

12    bit-level forensic copy, as I earlier stated.

13         Okay.  Does plaintiffs have anything

14    substantive they want to add?

15         Okay.  Perfect.

16         Now, we have covered the BlackBerry

17    environment, I think, for the most part.  So basically

18    when they said "updating," what they really were doing

19    is they were taking the phones in to the head of

20    customer service, saying, "I need my" -- she gives

21    them the phone, and she basically just wiped

22    everything off their phone, didn't make a copy, and on

23    the merry way she went.

24         I just -- that's as I understand it.  I mean,

25    you guys all heard the same thing I heard.  Is there

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     anything that you have that I didn't hear that you
 2     were involved with -- were you ever involved in this
 3     process?
 4            MR. SCHAIBLEY:  No.
 5            THE SPECIAL MASTER:  Were you ever involved
 6     in this process, the wiping?
 7            MR. CLARK:  Wiping, no.  I'm --
 8            THE SPECIAL MASTER:  That she just described
 9     to me with the PBX, I come, she -- they get a phone,
10     they wipe it.  Were you ever involved in that process?
11            MR. CLARK:  No.  I did my own --
12            THE SPECIAL MASTER:  No, no.  I wipe my
13     phones every three months and religiously dispose of
14     them every night.  So I do -- I get personal.  I'm
15     talking about for any of the six individuals which you
16     already said "no" to.
17            MR. CLARK:  No, I did not wipe any of those
18     individuals.
19            THE SPECIAL MASTER:  And you, sir?
20            MR. LATTIN:  No.
21            THE SPECIAL MASTER:  Okay.  Without any
22     further ado, let's switch to backup because there's
23     nothing like talking about with regards to mobile.
24     But I do want that order, and I want the CIO to sign
25     receipt of this order and that it has been done.
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

```
 1        Okay?  Because I just got off the phone with this lady
 2    and she was like, "I heard about a week ago," and she
 3    still doesn't have a list of the people.
 4            And please provide a copy to her of the
 5    preservation letter notice so she has one.
 6            Okay.  Backup.  Let's start at the beginning
 7    of the backup.
 8            How long have you been there?
 9            MR. LATTIN:  I've been doing the network side
10    which includes the backup since December 2008.
11            THE SPECIAL MASTER:  Okay.  When we say
12    "backup," let's be clear.  We're talking server
13    backups, computer backups, or all backups?
14            MR. LATTIN:  The workstations themselves, we
15    don't back up.  It'll be just servers.
16            THE SPECIAL MASTER:  So if there is backup
17    done, are you the go-to person?
18            MR. LATTIN:  Normally, yes.
19            THE SPECIAL MASTER:  Normally?
20            MR. LATTIN:  There is one other network
21    individual that could do it, but it's normally me.
22            THE SPECIAL MASTER:  Would you oversee -- do
23    you write -- let me try this differently.
24            What backup systems do you use?
25            MR. LATTIN:  Currently we are using
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    CommVault.
 2           THE SPECIAL MASTER:  Which version?  10?
 3           MR. LATTIN:  Version 10.
 4           THE SPECIAL MASTER:  What pack?  I'm just
 5    kidding.
 6           MR. LATTIN:  I can tell you.
 7           THE SPECIAL MASTER:  So you are running
 8    CommVault.  You are upgrading, I heard, to Simpana or
 9    some archiving that you're rolling out.
10           MR. LATTIN:  Yes.  They're looking at the
11    archiving feature.
12           THE SPECIAL MASTER:  But if I needed a backup
13    done, be it of a local computer, of a mobile device,
14    or a network file server, you are my go-to person?
15           MR. LATTIN:  Correct.
16           THE SPECIAL MASTER:  Okay.  We're going to
17    start at the very beginning and get all the way to the
18    end.
19           Let's first take care of the mobile phones,
20    because this is clearly the one -- they would
21    over-the-air wipe them, and they would never get
22    connected to outside of the BlackBerry server, as far
23    as I can tell.  But we're going to get a log.  There
24    is a chance that maybe the users didn't follow IT
25    policy, and they connected their phones and may
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      actually have a copy there.
 2              Otherwise, the only place we have a copy is
 3      sitting on the BlackBerry server, unless I'm missing
 4      something.  Is that incorrect?  From either the
 5      Exchange -- anybody --
 6              MR. SCHAIBLEY:  That sounds correct, yes.
 7              THE SPECIAL MASTER:  And Mr. Clark, is that
 8      correct?  You want me to repeat the question?
 9              MR. CLARK:  Yes, please.
10              THE SPECIAL MASTER:  Can you read the
11      question back, please?
12              THE REPORTER:  It might take a minute.  Hang
13      on.
14              THE SPECIAL MASTER:  I'll just repeat it:
15              My question again is, as I understand it,
16      based on the conversation I just had with Stephanie
17      and the conversations I've had with you, with
18      everybody from UMC, the group, the BlackBerry
19      environment today, when somebody wipes their phone,
20      when that wipe happens, the only place any information
21      could actually sit for that phone today would be on
22      the BlackBerry server environment or the Exchange
23      mailbox?
24              MR. CLARK:  That's correct.  Or through
25      possibly --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1                 THE SPECIAL MASTER:  And that's it?
 2                 MR. CLARK:  Yes.
 3                 THE SPECIAL MASTER:  You are responsible for
 4     the BlackBerry server backups?
 5                 MR. LATTIN:  Yes.
 6                 THE SPECIAL MASTER:  And then a SQL
 7     clustering as well?
 8                 MR. LATTIN:  Correct.
 9                 THE SPECIAL MASTER:  How does the backup
10     happen?
11                 MR. LATTIN:  Normally, we have -- let's just
12     start -- describe the policy.
13                 THE SPECIAL MASTER:  Yes, the policy as
14     implemented.
15                 MR. LATTIN:  We do a full backup every Friday
16     evening, and then Sunday through Thursday we do an
17     incremental, so all the changes on the servers are
18     during those days.
19                 As far as the BES server, I believe that was
20     on the virtual environment, Jason, or it is on the
21     virtual environment?
22                 MR. CLARK:  All BlackBerries have been
23     virtual since day one.
24                 MR. LATTIN:  So in CommVault, you have --
25     retention for at least the data backup retention goes
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      by cycles and days.  So on that --
 2              THE SPECIAL MASTER:  Do you pull tapes?
 3              MR. LATTIN:  Not currently, no.  We're all
 4      spinning discs, all magnetic media.  It's hard drives,
 5      sorry.  Backing up to hard drives, not tapes.
 6              THE SPECIAL MASTER:  You've always backed up
 7      to hard drives?
 8              MR. LATTIN:  Since I've been there, yes.
 9      They had a tape drive when I first started, but it was
10      out of date and we weren't able to use it anymore, so
11      we just moved to --
12              THE SPECIAL MASTER:  I need a date.  When did
13      you start?  Sorry.
14              MR. LATTIN:  December 5th, 2008.
15              THE SPECIAL MASTER:  Okay.  So during the
16      relevant time period, they were writing to disc?
17              MR. LATTIN:  Correct.
18              THE SPECIAL MASTER:  Did they backup the
19      discs?
20              MR. LATTIN:  No.  That's just the one --
21              THE SPECIAL MASTER:  Do you DR the discs?
22              MR. LATTIN:  We have -- the only policy we
23      have right now is data that resides in our on-site
24      data center gets backed up to the colo area.  We have
25      two separate backup systems.  Anything residing
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     primarily at the colo gets backed up in the data

 2     center side.

 3             THE SPECIAL MASTER:  Okay.  So walk me

 4     through.  Daily, weekly, monthly.

 5             MR. LATTIN:  Most of the servers, as far as

 6     Windows, go --

 7             THE SPECIAL MASTER:  We're talking about

 8     BlackBerry.

 9             MR. LATTIN:  I'm sorry, the --

10             THE SPECIAL MASTER:  We'll get to all the

11     other servers in a little bit.  The BES server for --

12             MR. LATTIN:  Sure.  BlackBerry, if it lived

13     on the virtual -- or if it lives on the virtual

14     environment, it would be backed up the Friday and then

15     incrementals during the week.  And the default

16     retention policy for that one is 28 days and three

17     cycles.  And a "cycle" is defined as the time between

18     a full backup, so it would be three Fridays minimum.

19             THE SPECIAL MASTER:  So you only have going

20     back 28 days?

21             MR. LATTIN:  Correct.

22             THE SPECIAL MASTER:  For HIPAA you only have

23     it going back 28 days?

24             MR. LATTIN:  That's -- yes.  That was the

25     only policy we have towards the -- for data retention.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Let's go off the record.
 2                   (OFF RECORD.)
 3              THE SPECIAL MASTER:  Let's go back on the
 4      record.
 5              It's not within the purview of my --
 6              MR. LATTIN:  Yes.
 7              THE SPECIAL MASTER:  Okay.  So then we
 8      basically have no records of anybody's BlackBerry or
 9      anything going past 28 days?
10              MR. LATTIN:  If it's been removed off the
11      server; that's correct.
12              THE SPECIAL MASTER:  I'm assuming everything
13      I'm talking to you about has been removed off the
14      server, and I'm looking at the backup discs because
15      that's the only place the information exists in the
16      whole wide world.
17              MR. LATTIN:  Right.
18              THE SPECIAL MASTER:  Do you never do an
19      annual backup, no -- no annual snapshots?
20              MR. LATTIN:  No.  There's certain servers we
21      have like one yearly backup, but that wouldn't be one
22      of them.
23              THE SPECIAL MASTER:  Would Exchange be one of
24      those?
25              MR. LATTIN:  Exchange has a little bit longer
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    retention policy --

 2            THE SPECIAL MASTER:  No, no, I got -- we'll

 3    get --

 4            MR. LATTIN:  Oh, no, not for --

 5            THE SPECIAL MASTER:  This is the annual

 6    backup; right?

 7            MR. LATTIN:  No.

 8            THE SPECIAL MASTER:  It's not with the

 9    Exchange either?

10            MR. LATTIN:  No, we don't have.  So I

11    misunderstood the question originally when you -- so

12    just like do a yearly one and keep that for a certain

13    amount of time?

14            THE SPECIAL MASTER:  Right.  Well, like every

15    year you make a backup snapshot of your entire

16    environment?

17            MR. LATTIN:  No, we don't have that.

18            THE SPECIAL MASTER:  Like January 2nd, you

19    say, "Okay, we want a snapshot of January for what

20    happened prior year" or December.  Usually you do

21    December 31st just to cover --

22            MR. LATTIN:  Okay.

23            THE SPECIAL MASTER:  -- and you keep that

24    snapshot for a full year.  Some people keep it for a

25    total of seven years, depending on the records that
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1    are required.

2            MR. LATTIN:  Yes, we don't have any policy

3    implemented to do that.

4            THE SPECIAL MASTER:  So I get this.

5            Okay.  And do you receive litigation hold

6    notices?

7            MR. LATTIN:  No.

8            THE SPECIAL MASTER:  Can you provide him a

9    copy of the litigation hold notice, and the

10   custodians?

11           MR. LATTIN:  (Nodded head up and down.)

12           THE SPECIAL MASTER:  So there is no way to

13   get data that's 30 days old, basically, from the BES

14   server?

15           MR. LATTIN:  Not for that, no.

16           THE SPECIAL MASTER:  From the BES server,

17   there's no way to get data that's 30 days old?

18           MR. LATTIN:  No, not for that.

19           THE SPECIAL MASTER:  Okay.  We're done with

20   the Blackberries and moving forward, unless you guys

21   have any further questions about the BlackBerry

22   backup.

23           All right.  Let's go to e-mail.

24           Moving forward, do we have time?  We're good?

25   Give me 10-minute notice, that way I can -- 10-minute

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    warning.
 2           Okay.  Moving on to -- actually, before we
 3    get to e-mail, let's talk about users.  I'm a senior
 4    executive hanging out at my house.  I'm told that
 5    there is nothing at my house that would be on my
 6    computer, like if it's -- I don't have a work laptop
 7    or whatever.  I only have desktops.
 8           Do you guys back up any laptops?
 9           MR. LATTIN:  No.
10           THE SPECIAL MASTER:  How does it work for an
11    individual at a desktop sitting at some -- I'm sitting
12    in my office.  Pretend this is my office.  I'm hanging
13    out, and I finish writing this huge treatise on Syrian
14    conflict, and I wrote it, and I'm really proud of
15    myself.  I go home, and then, for whatever reason, it
16    goes bye-bye, gone.  How does the backup work from my
17    end?
18           And I didn't save it to my home drive.  Yes,
19    I saved it to my C drive.  I saved it to
20    C:/DanielSyrianpolicies/version011.docx.
21           MR. LATTIN:  Yes, Unfortunately, if it wasn't
22    saved to the home drive on the file server, we
23    wouldn't have a backup.
24           THE SPECIAL MASTER:  So you don't back up
25    anything from the local computer?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1          MR. LATTIN:  There are probably four or five
2     select, like, workstations that we have backed up, I
3     had used for just testing, my personal one --
4          THE SPECIAL MASTER:  Testing is different.  I
5     get the fact that you've got to test to make sure the
6     backup works.  I'm talking about -- okay.  Let's list
7     the six custodians.  Let's just make sure.  Can you
8     list them again, the chosen ones?
9          MS. WITTY:  Brian Brannman, John Espinoza,
10    Doug Spring, Jackie Panzeri, James Mumford, Claudette
11    Myers, and Cindy Dwyer.
12          MR. LATTIN:  And none of those would be would
13    backed up.
14          THE SPECIAL MASTER:  Okay.  So if I save
15    something to my local drive, but now I learned on
16    Friday that's not -- at the time period in question,
17    it wasn't encouraged.  As of today, is it not
18    possible?
19          MR. SCHAIBLEY:  It will be not possible as
20    the computers are upgraded to Windows 7.
21          THE SPECIAL MASTER:  Let's go off the record.
22              (OFF RECORD.)
23          THE SPECIAL MASTER:  Back on the record.
24          So today, so I get it, a user has the ability
25    to save documents to anywhere they want on their local

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    desktop if they so desire, if they haven't been
 2    upgraded?
 3             MR. SCHAIBLEY:  I wouldn't say anywhere they
 4    wanted.
 5             THE SPECIAL MASTER:  Well, outside of the
 6    Windows administration folders, they could save it to
 7    their local drive.
 8             MR. SCHAIBLEY:  They could save it locally to
 9    the desktop or to the -- under their profile; correct.
10             THE SPECIAL MASTER:  Or not even under their
11    profile, could they save it to the --
12             MR. SCHAIBLEY:  Yes.
13             THE SPECIAL MASTER:  Okay.  So it is possible
14    for them to save it to their local C drive anywhere
15    they want, as long as it's not within the Windows
16    administration folders and other folders that you
17    prevented them from accessing?
18             MR. SCHAIBLEY:  Yes.
19             THE SPECIAL MASTER:  Okay.  But you don't
20    back that up anyways?
21             MR. SCHAIBLEY:  No.
22             THE SPECIAL MASTER:  Just making sure I get
23    it.  All right.
24             But you do have a network file share.  Each
25    user, now, so I get this, they get a -- they have a
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      user profile.  You use an Active Directory; right?

 2              MR. SCHAIBLEY:  Yes.

 3              THE SPECIAL MASTER:  So you have an Active

 4      Directory system?

 5              MR. SCHAIBLEY:  Yes.

 6              THE SPECIAL MASTER:  Now I have a question,

 7      and then I'll -- if you have a question.

 8              With the Active Directory profile, it

 9      specifies that every user has their own personal

10      drive; right, I'm assuming?

11              MR. LATTIN:  Yes.

12              THE SPECIAL MASTER:  And that gets backed up?

13              MR. LATTIN:  Yes.

14              THE SPECIAL MASTER:  How does that backup

15      work?

16              MR. LATTIN:  As far as the -- all their files

17      on the file server?

18              THE SPECIAL MASTER:  Well, whatever, yes.

19              MR. LATTIN:  Yes, the Active Directory, they

20      will be redirected to the file server for their

21      personal My Documents, then that's under the same type

22      of schedule, on Fridays.

23              THE SPECIAL MASTER:  30 days is all you've

24      got?

25              MR. LATTIN:  I believe that one is four
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    months.
 2              THE SPECIAL MASTER:  Yes, I think -- on the
 3    documents provided to me, it was.
 4              But you have no annual or semiannual backup?
 5              MR. LATTIN:  Correct.
 6              THE SPECIAL MASTER:  You basically have no
 7    data going back more than 12 months?
 8              MR. LATTIN:  That's correct.
 9              THE SPECIAL MASTER:  Unless it's on their
10    local computer?
11              MR. LATTIN:  Yes.
12              THE SPECIAL MASTER:  How does preservation
13    work, then?  Well, you answered that question.
14              I have a -- I don't get how UMC -- I guess
15    once the script is run, you assume you have it all and
16    you have a copy, I guess.
17              MS. FOLEY:  Do you leave it sitting on the
18    server for a long time, or no?  It's on the server?
19              MR. LATTIN:  Yes, that, I wouldn't know.
20    That's all handled by --
21              MR. SCHAIBLEY:  Are you referring to, like,
22    the data collection we did?
23              THE SPECIAL MASTER:  The data collection you
24    moved to a secure server that only IT security has
25    access to.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MR. SCHAIBLEY:  Correct.
 2            THE SPECIAL MASTER:  But if I didn't do a
 3    network file share collection, right, of the network
 4    file profile -- if I didn't collect, I'm part of the
 5    payroll group, and your script didn't collect the
 6    payroll group file shares?
 7            MR. SCHAIBLEY:  They did not.
 8            THE SPECIAL MASTER:  All right.  But just as
 9    an example, right, I don't know who the network -- oh,
10    that's one thing.
11            UMC, I'm going to -- Counsel, you --
12            And we'll get to yours in a second.
13            I need you to go and find out what network
14    file shares are relevant and responsive.
15            MS. WITTY:  We're already working on that.
16            THE SPECIAL MASTER:  Okay.  Good.
17            And then I need you to collect them.
18            MS. WITTY:  That's already been --
19            THE SPECIAL MASTER:  I need you to pull the
20    backup from four months ago from that disc once you
21    get those file shares.
22            MR. LATTIN:  Okay.  It's 112 days or 15
23    cycles, so...
24            THE SPECIAL MASTER:  Okay.  Well, then as
25    soon as they get it for you, I need you to pull it
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    from your tape as well.
 2            MR. LATTIN:  Absolutely.
 3            THE SPECIAL MASTER:  Just pull a copy of your
 4    tape, so that way I have something at least that's --
 5    okay?  We don't need to do anything with it.  Just
 6    make a copy of it.
 7            MR. LATTIN:  Okay.
 8            THE SPECIAL MASTER:  All right.  Now, I don't
 9    get -- how does it -- you are responsible also for the
10    clinics' backup?
11            MR. LATTIN:  For the connectivity?
12            THE SPECIAL MASTER:  No, their backup.  Like
13    if I'm running a -- you have clinic and satellite
14    offices.  How does that work?  You have -- UMC has
15    clinics; right?
16            MR. LATTIN:  Correct.
17            THE SPECIAL MASTER:  Are you -- do they back
18    up data at those clinics?
19            MR. LATTIN:  All the servers, they all
20    connect directly to the main campus, so all the
21    servers and stuff would reside there.
22            THE SPECIAL MASTER:  I run a clinic.  I'm the
23    manager at a local office.  I have people that work
24    for me, etc.  Is there a diagram that explains to me
25    how the clinic systems work?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. LATTIN:  I have a basic diagram of how
 2      it's all tied into the UMC network.
 3              THE SPECIAL MASTER:  That would be fantastic.
 4              MR. LATTIN:  But, yes, because it -- we all
 5      operate as basically one big organization.  The
 6      clinic, in terms of the network, it all looks the same
 7      to us so --
 8              THE SPECIAL MASTER:  I just want to -- that's
 9      all I want to know.  I just want to understand how you
10      actually organize data.
11              We're going to put this in as an exhibit.
12              MR. LATTIN:  Just kind of threw this
13      together.  It's a little rough.  But there on the
14      right-hand corner, we have Enterprise, Nellis, Spring
15      Valley, all -- that's all of our clinical areas, Quick
16      Cares, and then they connect directly back to our core
17      of our network, which is in the center.
18              THE SPECIAL MASTER:  And they have servers
19      locally there that connect?
20              MR. LATTIN:  No.  All the servers reside in
21      our -- either our data center on the main campus or --
22              THE SPECIAL MASTER:  Do you have dumb
23      terminals, then, at every clinic?
24              MR. LATTIN:  Normally be on, you know,
25      Windows XP or, more recently, 7 box that they connect
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     to.
 2            THE SPECIAL MASTER:  So they're not
 3     terminals.  They're like boxes?
 4            MR. LATTIN:  It's a full workstation, yes.
 5            THE SPECIAL MASTER:  All right.  So -- but
 6     everything those workstations connect to, there is no
 7     connectivity run out of the local clinic at a server
 8     level?
 9            MR. LATTIN:  It all runs back to the main
10     campus Exchange.
11            THE SPECIAL MASTER:  Everything?
12            MR. LATTIN:  Correct.
13            THE SPECIAL MASTER:  So we'll get back to
14     that, because that's actually in the transcript.  I
15     want to just touch back on the preservation.
16            Do you have a question?
17            MR. TOSTRUD:  Yes, I would like to enter into
18     evidence an e-mail from Lonnie Richardson to Plaintiff
19     Dan Small dated Friday, March 21st, 2014.  This was
20     provided us also by Mr. Small, and it relates the
21     right to the documents and files stored on local C
22     drive.  I provided a copy to defense counsel before
23     the break.
24            THE SPECIAL MASTER:  Would counsel like an
25     affidavit as well for this?
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1              MS. FOLEY:  Yes, please.
 2              THE SPECIAL MASTER:  When you provide an
 3      affidavit -- when you write the one affidavit for
 4      Mr. Small, can you please have them make --
 5              MR. TOSTRUD:  Can we just include both
 6      exhibits in one affidavit?
 7              THE SPECIAL MASTER:  That's fine.  As long as
 8      the who, what, when, and where...
 9              MR. TOSTRUD:  Yes.
10              THE SPECIAL MASTER:  Do you -- UMCPost, who
11      is on that list?
12              MR. SCHAIBLEY:  Everybody with a mailbox.
13              THE SPECIAL MASTER:  All right.  So now I
14      know you've seen this.  So, basically, as I read
15      this -- have you seen this, Counsel?
16              MS. FOLEY:  I have not seen it.
17              THE SPECIAL MASTER:  Here, take my copy if
18      you want.
19              MR. TOSTRUD:  Ms. Witty has seen it.
20                  (Exhibit 10 was marked for identification
21               by the Certified Court Reporter.)
22              THE SPECIAL MASTER:  This is a huge step
23      forward.  We have a network...
24              Did everyone have a chance to read it?  Did
25      you read it?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1             MR. LATTIN:  Yes.
 2             THE SPECIAL MASTER:  Okay.  So from a backup
 3    perspective, you don't back up the local computers?
 4             MR. LATTIN:  Correct.
 5             THE SPECIAL MASTER:  What is included in your
 6    backup, just for my own -- do you have a list of
 7    everything that you are backing up?
 8             MR. LATTIN:  I can -- yes, I have most of it.
 9    Normally we just do, you know, a slash, which backs up
10    everything on the server.
11             THE SPECIAL MASTER:  What server?  All the
12    servers?
13             MR. LATTIN:  The majority of them, yes.  I
14    have the giant list here, but, yes, I could probably
15    present --
16             THE SPECIAL MASTER:  I don't want another
17    giant list.  No more giant lists.
18             MR. LATTIN:  I could present a more concise
19    list of all the servers that are getting backed up.
20             THE SPECIAL MASTER:  But none of these
21    servers are actually kept for more than a year?
22             MR. LATTIN:  With the exception of a couple
23    of the UNIX servers that pertain to this.
24             THE SPECIAL MASTER:  What are they for?
25    Billing?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. LATTIN:  What are the UNIX -- UNIX
 2      servers, seven-year on that one?
 3              MR. CLARK:  Yes, we have seven-year policy on
 4      the UNIX servers and a one --
 5              THE SPECIAL MASTER:  System V?  May I ask,
 6      what kind of UNIX?
 7              MR. CLARK:  AIX HP-UX.
 8              THE SPECIAL MASTER:  Superdome?
 9              MR. CLARK:  No, we actually don't.  We've got
10      even an old Solaris.
11              THE SPECIAL MASTER:  Really?  What sits on
12      the UNIX boxes?
13              MR. CLARK:  AIX is mostly ancillary operating
14      packages like for the lab, MSAT, which is for the ER.
15      We have a SAP ERP box to transfer data to the County
16      on a homegrown product for file transferring.
17              THE SPECIAL MASTER:  You said "SAP"; right?
18              MR. CLARK:  Yes.
19              We call it UMPRP01.  We transfer files and
20      receive files from the County.
21              THE SPECIAL MASTER:  So it's your SAP sync
22      box?
23              MR. CLARK:  Uh-huh.  And then we have another
24      AIX box, two of them for a JCAPS, which is our
25      Enterprise interface engine, and that covers all the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    AIX boxes.
 2            THE SPECIAL MASTER:  Okay.  So beyond those,
 3    that's it?  That's all you keep for a year -- or seven
 4    years, actually?
 5            MR. CLARK:  Yes.
 6            MR. TOSTRUD:  Counsel, do we have the
 7    original desktops for the custodians?
 8            MS. WITTY:  The desktops that they currently
 9    use are the desktops that they've been using
10    throughout the period, yes.
11            THE SPECIAL MASTER:  And they've all received
12    preservation notices?
13            MS. WITTY:  Yes.
14            THE SPECIAL MASTER:  Did they sign they
15    received it?
16            MS. WITTY:  It is -- no, but we can document
17    when they received it.
18            THE SPECIAL MASTER:  Please do it, just for
19    everybody's sake.
20            Before I talk about your e-mail that you
21    provided, I want to talk about backup tapes.
22            Do you use any third-party backup services,
23    like Mozy or anything like that?
24            MR. LATTIN:  No.
25            MR. TOSTRUD:  Plaintiffs have any questions?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1          MR. FORREST:  I'm just wondering, there have

2     been references between XP and Windows 7.  Are all the

3     26, or the 6 and 7, are they all still on XP?

4          THE SPECIAL MASTER:  When we get the

5     custodian interview form -- the chain of custody will

6     document the systems from which -- actually, it won't.

7     Thank you.  I need to know, like he's wanting -- well,

8     ask your question and then I'll --

9          MR. FORREST:  Okay.  Are all of the relevant

10    26 custodians, plus or minus Myers and/or Dwyer,

11    whatever, are all of their desktops currently running

12    XP?

13          THE SPECIAL MASTER:  You can say "I don't

14    know" and "I have to check."

15          MR. SCHAIBLEY:  Yes, I need to get back to

16    you on that.

17          THE SPECIAL MASTER:  Can you please just

18    check and put together a list to provide to counsel

19    and circulate it?

20          MR. SCHAIBLEY:  Yes.

21          MR. FORREST:  It might be a good idea not to

22    update any of those desktops that have --

23          MS. WITTY:  We've already addressed that.

24          THE SPECIAL MASTER:  We've already taken care

25    of that.

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1               Who was in charge of the updates on the
 2      actual -- on the ground doing the work?
 3               MR. SCHAIBLEY:  Which updates?
 4               THE SPECIAL MASTER:  If I -- before you swap
 5      out any of the custodians' boxes, who would do it?
 6               MR. SCHAIBLEY:  Our desktop support team.
 7               THE SPECIAL MASTER:  Can you please make sure
 8      the desktop support team gets the litigation hold
 9      notice, signs receipt of it, and there is no
10      confusion, because we have tried through the CIO
11      level, and I have concerns that the message may be
12      getting lost.
13               MR. TOSTRUD:  May we also get the names of
14      the people who are on that team?
15               THE SPECIAL MASTER:  The desktop manager.  I
16      don't need all of the people.  I just need -- when
17      they get the --
18               MR. SCHAIBLEY:  The desktop manager is Susie
19      Kisner.
20               THE SPECIAL MASTER:  Oh, Susie.  We already
21      spoke to her this morning.
22               MS. WITTY:  And that's all included within
23      the IT org chart.
24               THE SPECIAL MASTER:  Exactly.  So I just want
25      to be clear.  My immediate concern, so we don't have
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    another conversation like I just had on the phone, and
 2    that they know not to do anything.
 3            So anything more relating directly to the
 4    backups?
 5            MR. TOSTRUD:  Just as Plaintiffs' counsel and
 6    we have an obligation to our class to protect the
 7    class, we would ask that mirror images be made of all
 8    those desktops, whether you are going to order it or
 9    not, but it's up to you, but I'm just on the record
10    making that request.
11            THE SPECIAL MASTER:  I do want to discuss
12    this e-mail because this e-mail suggests or indicates
13    that people don't actually follow your storage
14    policies.
15            I'll give UMC a chance to review the e-mail,
16    and I would like to -- if you could do me a favor.
17    Anybody within UMC's IT team, explain to them what
18    exactly is happening and then we can revisit this.
19            Let's go off the record for a second.
20            (LUNCH RECESS.)
21    //
22
23
24
25
```

Special Master's Hearing  ‑   April 7, 2014
*** Volume II ***

```
 1                 Las Vegas, Nevada; Monday, April 7, 2014

 2                        1:15 P.M.

 3                     Afternoon Session

 4

 5           THE SPECIAL MASTER:  So on the record.

 6           I'm going to order UMC to preserve and create

 7      forensic images -- before I get to that, I'm going to

 8      order UMC to create a spreadsheet of all 26 custodians

 9      that have their full name, their device, the operating

10      system version number on it, for any user who doesn't

11      have a computer that's dedicated to them, meaning in

12      their office, within, that they sit and log in -- that

13      they log in and access more than 10 times a month,

14      that they physically go to and sit in, that's what

15      constitutes a computer for a user, meaning it's in

16      their office and they sit down and use it.  Or I want

17      another table created -- or in addition, I want

18      another table created that identifies any computer

19      that any one of those 26 individuals, again with their

20      first name, their last name, the operating system

21      version number that has been -- that is accessed more

22      than five times by that user in a single month.

23           If it turns out that every one of the 26

24      custodians is accessing -- we'll see what the data

25      comes back as.  The goal here is to identify the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      computers that are used by these custodians on a

 2      regular basis to perform their duties.

 3              And this is largely based on my belief that

 4      by an e-mail provided by plaintiffs that's speaking to

 5      the current issues at UMC with regards to user

 6      behavior -- with regards to user behavior and how they

 7      are saving things.

 8              I'm also ordering UMC to provide an affidavit

 9      to provide me context for the e-mail and why it was

10      sent and what the reasoning was, meaning was there

11      some issue that came up, is it because of -- whatever

12      the reasoning was, to give me a context for the

13      e-mail.  Okay?

14              I'm also going to order for the next hearing,

15      whatever dates we will set, leaning towards the 24th

16      and 25th of April, that we -- that the CEO and CIO

17      make themselves here and present and available.

18              I am very disappointed and frustrated by the

19      fact that UMC, despite counsel for UMC's repeated

20      attempts, my repeated attempts to try to figure out

21      the most basic knowledge, including, but not limited

22      to we had a conversation earlier today when the

23      manager -- customer support manager said she was

24      contacted last week where she was informed that she

25      shouldn't be recycling or wiping.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1               Whether or not that has happened or not,
 2      which I make no judgment as to whether it's happened
 3      or not, it's not acceptable because we had a hearing
 4      on March 10th where the CIO was here, where both the
 5      Court and myself ordered him to inform his employees
 6      immediately therein to preserve and cease all
 7      potential spoliation of mobile devices and anything
 8      else.
 9               That clearly was not done because on the
10      record we had testimony today where she did not
11      receive such notice until last week.  I want them both
12      here and present so they understand the gravity and
13      importance of the situation.
14               My order will be reflected as such; and when
15      I issue my order based on the hearings in the last two
16      days, it will be included in there as well.
17               I now open it for any requests and additional
18      comments.  Counsel?
19               MR. TOSTRUD:  Plaintiffs' counsel would
20      simply request an addendum and the addition of
21      potentially three names to the list of 26 custodians
22      that you have ordered to be preserved, their local
23      drives, local computers be preserved.  When we reached
24      initial agreement on the list of 26 custodians, that
25      was done several months ago.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              Since that agreement was reached, we've
 2    learned a tremendous amount about this litigation and
 3    preservation efforts, or lack thereof, at UMC.
 4              So we would request that, at a minimum,
 5    Lonnie Richardson, who is the author of the e-mail you
 6    just referred to, Exhibit 10, I believe it is, we ask
 7    that his local drive be mirror-imaged or copied or
 8    preserved.
 9              We would also ask that Ernie McKinley, if
10    he's not on the list, that his be preserved and
11    copied.
12              And I think, importantly, there is a new CEO
13    at UMC, and I don't know who the person is.  It used
14    to be Brian Brannman, but whoever that new CEO is.
15    Maybe you guys can tell us who that is.
16              MS. WITTY:  The new CEO at UMC is Lawrence
17    Bernard, B-e-r-n-a-r-d.
18              MR. TOSTRUD:  I believe he was on the list;
19    correct?  Was he on our list of 26 custodians?
20              MS. WITTY:  No.
21              MR. TOSTRUD:  Okay.  That, to me, seems to be
22    an obvious one.
23              THE SPECIAL MASTER:  I'm going to take it
24    under advisement.
25              Do you have anything you would like to
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    respond with?

2            And let me be clear.  Just so I understand

3    from our last hearing, which we haven't fully gone

4    through, the initial list of custodians was what was

5    suggested by plaintiffs and you, and then you got --

6    and so if you want or have any comments as to each of

7    the three individuals, I'd welcome them.

8            MS. WITTY:  With regard to those three

9    individuals --

10            THE SPECIAL MASTER:  I would like an

11    affidavit, by the way, from plaintiffs explaining why

12    each one of those individuals would be considered, for

13    my records, because I don't know anything about any of

14    the individuals.

15            MR. TOSTRUD:  Certainly.

16            THE SPECIAL MASTER:  I'm not going to issue a

17    finding or order today around it.

18            MS. WITTY:  With regard to those three

19    individuals, Lonnie Richardson has not been with UMC

20    and was not with UMC during the relevant time period

21    to this lawsuit.  He is new to UMC within the past

22    eight months.  I believe he started in October of

23    2013.

24            THE SPECIAL MASTER:  So he wouldn't have made

25    any records?

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MS. WITTY:  Ernie McKinley is the chief

 2    information officer.  And while I understand the

 3    perspective from the preservation and ESI discovery

 4    standpoint, I'm not sure that his collection would

 5    regard any relevant material with -- as to the claims

 6    of this lawsuit.

 7            The CEO, understanding that he is currently

 8    in a position of authority, his role would not have

 9    covered -- again, it would not overlap with the time

10    period relevant to this lawsuit.

11            THE SPECIAL MASTER:  I'm not going to issue

12    any ruling today because I actually don't have any

13    context as to why -- I understand your explanation.

14    I'd like to know more as to why for each of these

15    individuals.  We have a bunch of other things to cover

16    today.  I'll take it under advisement.  I will,

17    however, issue -- I will, on a -- I have some

18    questions.  I mean, I'm going to quickly touch on it.

19            How does the current CEO that just joined, of

20    this year, have relevant information?

21            MS. FOLEY:  He's been with us for a while.

22            THE SPECIAL MASTER:  Oh, he has?

23            MS. WITTY:  Only about a year.

24            MR. TOSTRUD:  Well, not only that, but I

25    think that there is a fundamental misunderstanding
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    that the time period for the lawsuit is over.  We

2    filed our class complaint and collective action in

3    July of 2012, but it's continuing to this day.  We

4    don't know what's happening.  We haven't reached --

5          THE SPECIAL MASTER:  So your assertion is

6    it's still ongoing?

7          MR. TOSTRUD:  Well, they've changed --

8    they've remediated the practice.  They made a change

9    in timekeeping, but we don't know that things have

10   stopped.  We represent these people through today and

11   will continue --

12         THE SPECIAL MASTER:  Are they still

13   employees, some of these individuals or all of them?

14         MS. WITTY:  Some individuals that they added?

15         THE SPECIAL MASTER:  No, no, the class.

16         MR. TOSTRUD:  Yes, these are current

17   employees, many of them.  We have 614 Fair Labor

18   Standards Act --

19         THE SPECIAL MASTER:  So let me understand.

20         MS. WITTY:  Current and former.  They're --

21         THE SPECIAL MASTER:  Okay.  I got it.

22         But, I mean, there's more -- I get it.

23         But would the current CEO be involved in any

24   decisions relating to pay or these issues that are

25   before the Court now?

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MS. FOLEY:  No.  The time has passed.

 2              MR. TOSTRUD:  With all due respect, the time

 3      hasn't passed.  The lawsuit continues.  We filed the

 4      case, and it continues through today.

 5              THE SPECIAL MASTER:  Okay.  I'm going to

 6      table --

 7              MS. FOLEY:  The opt-in period is over.

 8              MR. TOSTRUD:  No.  The time period for opting

 9      in is over.

10              THE SPECIAL MASTER:  But they're saying the

11      abuse is still -- or the violation is still ongoing;

12      correct?

13              MR. TOSTRUD:  We're -- that's part of our

14      investigation.

15              THE SPECIAL MASTER:  That's what they are

16      asserting.

17              MR. TOSTRUD:  If the former CEO who was on

18      the list is relevant, then people --

19              THE SPECIAL MASTER:  Okay.  I understand.

20      I'm just trying to understand.  They are asserting

21      that the violation is ongoing.  What I'm asking you

22      is, your position is that it's not an ongoing

23      violation or there was no violation?  I'm just trying

24      to understand -- I'm just trying to understand if --

25              MS. WITTY:  It encompasses both of those.
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  -- these people will
 2     have relevant information, because based on what he's
 3     telling me, it sounds like the CEO, if they believe
 4     it's an ongoing violation, would certainly have
 5     relevant information.
 6              Now, I'm not ready to make a ruling because
 7     I'm also not sure -- I have to read over my order to
 8     see if, A, it's within the scope of my orders and that
 9     if I'm comfortable adding them.  I do think it is, but
10     I do want to read it over, and I do want to make it
11     through the other things that I have on my list to do
12     today.
13              MR. TOSTRUD:  Just in the interest of full
14     disclosure, we intend to send a further preservation
15     letter then to defense counsel --
16              THE SPECIAL MASTER:  Well, that's what I was
17     going to suggest.  I'm going to reserve issuing -- I'm
18     going to withhold issuing any order or decision on
19     this matter until I've had a chance to read a
20     three-page letter from plaintiffs and, if you want to
21     respond, three-page from defense.  You have seven days
22     from when he sends me the letter, CC both parties.  I
23     will issue a decision three days thereafter.  Okay?
24     Then if you want, you can appeal to the Judge.
25              Now off the record.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1                    (OFF RECORD.)
 2              THE SPECIAL MASTER:  Back on the record.
 3              Couple of pressing things I want to go over,
 4        and I want to keep going through the transcript.
 5              Before we broke for lunch -- let's go over
 6        the collection itself.
 7              I've been able to determine through
 8        conversation --
 9              MS. WITTY:  Oh.
10              THE SPECIAL MASTER:  Off the record or still
11        on the record?
12              MS. WITTY:  On the record.  I apologize.
13              Before moving on, could we clarify with
14        regard to the spreadsheet that you requested for the
15        computers whether you mean five log-ins or five days
16        in which they logged in to a specific computer?
17              THE SPECIAL MASTER:  Within a month five
18        log-ins.
19              MS. WITTY:  So if they logged in five times
20        in one day, that would qualify to be entered onto the
21        list?
22              THE SPECIAL MASTER:  If it turns out that my
23        algorithm results in 500 computers, please let me
24        know, and I will amend my algorithm immediately.
25        Okay?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1          MS. WITTY:  Okay.

2          THE SPECIAL MASTER:  I don't know.  Most

3   people log into a computer once and stay logged in for

4   the day.  But if people are floaters and they're

5   logging in and out of machines, I'll revise and amend

6   accordingly.

7          I'm operating under the assumption that a

8   user logs in, piddles around, does whatever, does

9   their work, views whatever in Las Vegas, logs off,

10   goes to lunch, comes back, logs back on; maybe they go

11   to a different area of the building.

12          If my assumption is wrong, please let me

13   know -- let counsel know and let me know as soon as

14   possible, and I will then amend it accordingly.  Just

15   provide me the statistics so I can then act in an

16   educated fashion.

17          Okay.  Returning back to the collection and

18   the collections scripts and the hash values, did we

19   make any progress in determining whether the evidence

20   is actually all of the evidence in your possession?  I

21   know you collected all the evidence minus the network

22   file shares; but the original evidence you collected,

23   is that now all in your possession?

24          MR. EDMONDSON:  I believe it's not all in my

25   possession at this point from what we have compared.

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1            THE SPECIAL MASTER:  All right.  So I'm going
 2     to go with near certain, because I just ran a -- the
 3     nice thing about the way it was given to me is I
 4     converted it all to a spreadsheet and then I just ran
 5     a sum totaling, and I got over 80 gigs.
 6            So I'm going with its not, because I ended up
 7     with about 195 gigs, and you said you only had 80
 8     gigs.  So that means 110 gigs didn't make the trip.
 9            Now, that's, again, no reflection of counsel,
10     because it was former counsel and former IT person.
11            Now, that doesn't excuse it.  Okay?  I want
12     to be clear.  It doesn't excuse it.  But my goal right
13     now is to just fix it.  So calculate the hash values,
14     put it on a -- yes?
15            MS. WITTY:  We actually discussed part of
16     this issue at lunch, and because we do have the
17     collection that was done both in April of 2013 and
18     August of 2013, and additional areas where information
19     will be collected, UMC now has the capability to do
20     with EnCase 7 a forensic image and generate MD5 hash
21     values for that, and that new subset or that new set
22     of data would be what we would continue processing.
23            THE SPECIAL MASTER:  The original collection,
24     just in EnCase?
25            MR. SCHAIBLEY:  Yes.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  So you're just getting

 2        just instead of him?

 3              MR. SCHAIBLEY:  Well, what I would look at

 4        doing is taking the original collection and creating a

 5        new forensic image of the original collection using

 6        EnCase with the assistance of Mr. Edmondson and then

 7        providing all of that, EO1 files, to him.

 8              And rather than creating one individual EO1

 9        file for the entire collection, creating an E01 file

10        for each custodian.

11              THE SPECIAL MASTER:  Well, that sounds smart.

12              Plaintiffs?

13              MR. PIXLEY:  You are making an EO1 of the

14        entire disc, or are you making a logical of his file?

15              MR. SCHAIBLEY:  Logical.

16              THE SPECIAL MASTER:  Oh, does that answer

17        that?  Did you answer?

18              MR. SCHAIBLEY:  I said "logical."

19              THE SPECIAL MASTER:  Any issue with that?

20              MR. PIXLEY:  No.  I think it's a good idea to

21        preserve it into an LO1 file.

22              THE SPECIAL MASTER:  I agree 100 percent.

23              MR. PIXLEY:  So then were you going to

24        de-dupe it and figure out what --

25              MR. EDMONDSON:  Yes, I'll process it in a
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    similar fashion.
 2            THE SPECIAL MASTER:  Can you record what you
 3    do?
 4            MR. EDMONDSON:  Yes.
 5            THE SPECIAL MASTER:  So that way we have a
 6    record.
 7            MR. PIXLEY:  That answers it.  Thank you.
 8            THE SPECIAL MASTER:  We can't have a rolling
 9    production until you have everything.  When will that
10    be?  I'm just asking, and then I'll order you.  So I'm
11    thinking Thursday.
12            How about this.  I'm going to help you both
13    out real quick.
14            Let's go off the record.
15             (OFF RECORD.)
16            THE SPECIAL MASTER:  Back on the record.
17            One more time.
18            MS. WITTY:  So the five agreed-upon
19    custodians are now a subset of seven to include the
20    two executive assistants to the chief human resources
21    officer and the CEO.  I'm going to name them again for
22    the benefit of the record.  That's Brian Brannman; his
23    executive assistant, Cindy Dwyer; chief human
24    resources officer, John Espinoza; the administrative
25    assistant to HR, Claudette Myers; Doug Spring; James
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

 1     Mumford; and Jackie Panzeri.

 2             THE SPECIAL MASTER:  So any -- I know you've

 3     requested three.

 4             MR. TOSTRUD:  We can make it a round 30.

 5             THE SPECIAL MASTER:  No, no, no.  We've

 6     requested three, and I'm not ruling.  But the 27 do

 7     you agree with?

 8             MR. TOSTRUD:  Yes.

 9             THE SPECIAL MASTER:  Okay.  Great.

10     Fantastic.

11             Now, I want a rolling production, and this is

12     how this is going to happen.  Did we get privilege log

13     agreement?

14             I take that as an overwhelming yes.

15             MR. TOSTRUD:  I think so.  They're going to

16     have to amend the privilege log perhaps.  I don't

17     know.

18             MS. WITTY:  Yes, there will absolutely be an

19     amended privilege log.

20             THE SPECIAL MASTER:  I'm going with the sense

21     not all the evidence has made the trip yet, and they

22     haven't seen it all, there is a very high likelihood

23     that there will be a substantial amount of amending

24     ongoing.

25             Have you agreed more to the -- rather than

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      the -- the substance to the form?

2              MR. TOSTRUD:  Yes.

3              THE SPECIAL MASTER:  And the process?

4              MR. TOSTRUD:  Yes.

5              THE SPECIAL MASTER:  That's all I care about.

6      I look forward to having very few privilege

7      conversations with you all.

8              Now, I'm going to do this rolling.  Minus the

9      700 encrypted mystery files that we're not exactly

10     sure how they ended up encrypted, that we are going

11     to, by Friday, give me an answer or I'm going to bring

12     someone in to get me an answer.

13             And I don't think we are going to include the

14     network file.

15             And then I'm going to carve out the network

16     file share -- shall we have the 27 custodians plus the

17     network file shares?  Is that how we are doing this?

18             MS. WITTY:  (Nodded head up and down.)

19             THE SPECIAL MASTER:  Does counsel for

20     plaintiff understand what I'm saying?  Because if not,

21     you can talk to your experts just to make sure.

22             I just want to make sure everybody is on the

23     same page, because I don't want to revisit this.

24             So we have 27 plus a potential 3, and we have

25     the network file shares that are responsive for those

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
1     specific custodian groups like payroll, HR, I have no

2     idea, whatever is deemed responsive that they touched,

3     that is included.  Okay?

4             We have a rolling production.

5             Do we know how to use eCapture to do the

6     de-duping of the multiple OST and PST files here?

7             MR. EDMONDSON:  It's used for the

8     de-duplication of the e-mails once they've been

9     extracted.

10            THE SPECIAL MASTER:  Yes, I get that.  But

11    I'm saying do you know how to use it to make sure that

12    they are not going to read 20 copies of the same

13    e-mail, because Mr. Mumford has 25 different PST

14    files, of which I'm assuming a large number of them

15    have duplicative e-mails in them.

16            MR. EDMONDSON:  As long as they are

17    identical, they will be removed during the

18    de-duplication process in eCapture, which it did

19    remove previously when we used it.

20            THE SPECIAL MASTER:  Send me a screen shot of

21    the configuration just so we can -- to both sides so

22    we can make sure it's configured as-is.  All right?

23    That way we know -- because one of the problems we had

24    earlier was with the options that were selected and

25    not selected.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              So before you do anything, take me a screen
 2      shot, send it to both sides, unless, Plaintiffs and
 3      UMC counsel, you have an objection to that.
 4              MS. WITTY:  No.
 5              THE SPECIAL MASTER:  Because one thing that
 6      that happened between the second and third was we
 7      forgot to hit the right buttons.  So hopefully, as a
 8      group, we will be able to make sure everything is
 9      configured properly.
10              We'll go over the revised ESI protocol in a
11      minute.
12              Does Plaintiff have anything else they want
13      to add to this before I list how this is going to go
14      with people?  So you are going get a screen shot of
15      the eCapture pro configuration.  I'm relying on you to
16      QC what the configuration is that he's going to be
17      running.  You are primary, meaning that I'm expecting
18      you to get it right, and we are simply QC'ing it.  The
19      idea is, is that there are 25 of the same e-mail
20      messages theoretically for some of these custodians
21      that nobody should have to read.
22              So we agree, Plaintiffs?  Is that acceptable?
23              MR. GODINO:  (Nodded head up and down.)
24              THE SPECIAL MASTER:  Okay.  Because when I
25      tallied your data sets, they were way bigger.  So I'm
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    trying to understand -- today's the 7th; right?
 2              MS. WITTY:  Yes.
 3              THE SPECIAL MASTER:  Let's say the 16th.  How
 4    much can you guys take in one shot?  Don't say
 5    everything, because nobody is going to read it all at
 6    once.
 7              So how many, like in a -- if we had a rolling
 8    production and I gave you three custodians -- how many
 9    custodians can you take at once and properly run
10    through whatever processes you are going to run
11    through before they get...
12              MR. FORREST:  It depends on how many gig it
13    is; right?
14              THE SPECIAL MASTER:  Figure lots of gigs.  I
15    mean, it's hard for me to guess because I couldn't
16    even remotely tell you.  I mean --
17              MR. FORREST:  Well, I think the last -- I
18    don't know how many gigs the last one was.  Whatever
19    it is, we'll process it, whether it's going to be a
20    day or two days...
21              THE SPECIAL MASTER:  Okay.  That wasn't
22    helpful.
23              Three custodians on the 16th to go across.
24    I'm going to start with just three, and I want to
25    troubleshoot it.  We're going to have a hearing on the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    17th for an hour to go over -- is that enough time

 2    between -- the 16th, 9:00 a.m.  You can send it Morse

 3    code, pigeon courier, however.  It's in his hands on

 4    the 16th at 9:00 a.m.

 5          MS. WITTY:  So essentially you're requiring

 6    the production on the 15th?

 7          THE SPECIAL MASTER:  Well, you can do it

 8    overnight using FTP, SFTP, or I don't know how you

 9    guys move data.

10

11          MR. TOSTRUD:  Well, as -- I mean, we --

12          MS. WITTY:  But we have to encrypt it.

13          THE SPECIAL MASTER:  Yes, but you can encrypt

14    it as a packet and send the encrypted packet.

15          MR. FORREST:  Well, yes, depending on how

16    large it is.  If we're getting -- taking 10 or 20

17    megabytes over FTP, then we've got to encrypt it, and

18    then we've got to move it to --

19          THE SPECIAL MASTER:  Sorry.  I have OCR to my

20    office.  You don't have OCR to your office.  I have a

21    cable that's -- it can run like --

22          MS. WITTY:  I can guarantee you that our

23    firm's system is not going to beat that.

24          THE SPECIAL MASTER:  Okay.  Recognizing we're

25    using FedEx, then, and TrueCrypt, I'm going to make it
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    the 17th at 9:00 a.m. -- 10:30 a.m., you have 10:30

 2    delivery.  So either you are blaming FedEx, or it's

 3    there.

 4           MS. WITTY:  I know previously we've gone

 5    directly to plaintiffs' counsel --

 6           MR. TOSTRUD:  Send it directly to

 7    Mr. Forrest.

 8           MR. FORREST:  Yes.  We'll give you the

 9    address.

10           MS. WITTY:  I don't -- okay.

11           MR. FORREST:  Okay.  So we have 10:30.  We

12    have to decrypt it, we've got to load it, we've got to

13    index it, and then we've got to examine it.

14           THE SPECIAL MASTER:  We're only looking for

15    errors.  If it works, have a party.  But all I care

16    about is making sure you get it with no errors.

17    Because before I have him do the remaining 23 plus the

18    network file shares, I want to make sure it works.

19           MS. WITTY:  I'm concerned about the time for

20    review for privilege.

21           THE SPECIAL MASTER:  I think you should be

22    too.

23           MS. WITTY:  I'm extremely concerned about

24    that.

25           MR. TOSTRUD:  We have a claw-back agreement
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    in place.

 2           THE SPECIAL MASTER:  They are looking at

 3    almost twice as much data.

 4           MS. WITTY:  And we've had -- well, we have --

 5           THE SPECIAL MASTER:  Let's go off the record

 6    here.

 7                 (OFF RECORD.)

 8           THE SPECIAL MASTER:  Let's go on the record.

 9           Plaintiff, can you please provide who you

10    would like for the three custodians to be initially.

11           MR. TOSTRUD:  For the initial three

12    custodians, we would ask for Mr. John Espinoza,

13    Mr. Doug Spring, and Mr. James Mumford.

14           THE SPECIAL MASTER:  And Counsel for UMC, it

15    was off the record you requested it just be one to

16    start.  I'm noting that I haven't --

17           MS. FOLEY:  Correct.  Ms. Witty knows the

18    kind of ratios of who is bigger and who is smaller.

19           THE SPECIAL MASTER:  Right.  So you want a

20    chance to confer with -- he has the actual current

21    data set on his computer right now.  You can look, if

22    you want to take a quick glance.

23           I know that won't answer the privilege

24    question.  So the question I have for you is, the

25    three custodians that were just identified, will they
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    have -- do you believe they will be privilege heavy?

2         MS. WITTY:  Mr. Espinoza and Mr. Spring have

3    been significantly involved in attorney-client

4    communications; Mr. Mumford, not as significant.

5         THE SPECIAL MASTER:  Why don't you spend a

6    minute, we'll go off the record, and you just look at

7    the data set real quick.

8              (OFF RECORD.)

9         THE SPECIAL MASTER:  Let's go back on the

10   record.

11        So do you have any preference as to the

12   three?

13        MS. WITTY:  Our preference would be to do

14   James Mumford first and Mr. Espinoza.  Doug Spring is

15   going to be much larger.

16        THE SPECIAL MASTER:  All right.  Here's

17   what's going to happen.  You're going to do

18   Mr. Espinoza first, you'll do Mr. Mumford second, and

19   you'll do Doug Spring third.

20        As to the first, we're just going to set the

21   date for the first one.  I'm not going to set the date

22   for the other three -- other two until I get the first

23   one done.  I'm going to keep that date -- I'm going to

24   help you out and push it a bit because I actually saw

25   the data, and I -- I looked at the Robocopy script,

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1        just on the filenames alone.

 2              MS. FOLEY:  What about the privilege issue?

 3              THE SPECIAL MASTER:  Well, that's what I'm

 4        saying.  I just looked at the filenames alone, and if

 5        you just look at the number of hits that come up for,

 6        like, labor or for -- and I'm just looking at the

 7        filenames.  I'm assuming counsel is going to want

 8        to -- I mean, it's a lot of docs to review.  I mean,

 9        you're talking about 4 to 5,000 -- there will be a lot

10        of scintillating reading.

11              The point being that -- let's make it the

12        21st.

13              Any errors and issues, though, that come up

14        technically need to be resolved by -- I want -- let's

15        be clear.  But I had this -- let me be clear.  By the

16        16th, counsel for UMC must have it, and I want written

17        confirmation from UMC's counsel that they are starting

18        their process.

19              You will have one week, more or less, to do

20        that privilege exercise.  Okay?

21              That means before that day, any technical

22        issues that arise need to be flagged immediately.

23        Okay?  Are we all crystal-clear as to this?  Counsels

24        for plaintiff?

25              MR. TOSTRUD:  (Nodded head up and down.)
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Do you have any
 2     objection to this?  I think one week is enough to get
 3     started, and then I'm going to rapidly increase the
 4     rate at which things are going to happen, but I'm
 5     going to let us and give everybody some leeway for the
 6     first, because I realize that, inevitably as an
 7     attorney, I've found that the privilege log, the form
 8     that you come up with sometimes needs tweaking because
 9     of document types, document formats, or any one of a
10     litany of things.
11              I do fully expect, though, that the network
12     file share collection is completed and in hand, not
13     necessarily processed but completed by -- before --
14     what is today?
15              MR. GODINO:  7th.
16              THE SPECIAL MASTER:  -- by the 14th.
17              I'm also ordering Mr. Lattin to pull a disc
18     today of the network file share until this is done.
19              MR. LATTIN:  The entire share or just this?
20              THE SPECIAL MASTER:  Whatever folders that
21     those custodians have access to to be pulled.
22     Shouldn't be a problem because you have a full month
23     backup.  So all you have to do is take the backup from
24     whatever it is, 28 days ago, and pull it and allocate
25     space or buy a new server if you have to, but I need
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    to know that since that hasn't happened, that nothing
 2    going forward is being deleted.
 3            I'd like ideally, and since it's on disc, can
 4    you run the script against the four months' old -- is
 5    the network file share four months?
 6            MR. LATTIN:  Correct.
 7            THE SPECIAL MASTER:  Could you run it four
 8    months back or do you want it run against current
 9    data?  I mean, because it should have actually been
10    done a year ago.  So I'm going to defer to Plaintiffs
11    as to how you would like it done, if you have any
12    preference, before I determine it.
13            Do you want a chance to confer?
14            MR. TOSTRUD:  Yes.
15            THE SPECIAL MASTER:  Off the record -- wait.
16    On the record.  It doesn't mean that I'm going to
17    grant it.  Just I wanted them to give their input
18    first.
19            Off the record.
20                (OFF RECORD.)
21            THE SPECIAL MASTER:  Back on the record.
22            MR. TOSTRUD:  So in response to your request,
23    Special Master Garrie, Plaintiffs would request both
24    the oldest version possible and the most recent
25    version; but failing that, we would -- our preference
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1     would be to get the older -- oldest version possible

2     if they force us to choose.

3            THE SPECIAL MASTER:  So I'm going to split

4     the difference, because I was thinking the same, but

5     then I thought we could split the difference.  Here's

6     what's going to happen:

7            You are going to collect the oldest.  You are

8     going to run the search terms on the oldest.  You are

9     going to collect the newest.  You are going to run the

10    search terms on that.  You're then going to run a hash

11    value calculation.

12           Outside of e-mails, if -- the PSTs and OSTs,

13    if you come back -- and you are going to notify me if

14    there is anything more -- I am hoping that there is

15    not a lot of PSTs and OSTs in your network file shares

16    relating to your work.  There shouldn't be, because

17    there's like over a thousand of them within just the

18    27 custodians that we have.

19           So I am assuming there will be no PST and OST

20    files or e-mail messages and just work-related

21    documents and spreadsheets.  Is that an accurate

22    assumption?  Is that safe, do you think?

23           MR. SCHAIBLEY:  Yes.

24           THE SPECIAL MASTER:  Okay.  So assuming that

25    that's the case, it should just be a simple hash value

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    analysis.
 2          So I would like you to collect from --
 3    preserve four months and current, run the search,
 4    provide him both.  Do you understand?  So whatever the
 5    network file shares are for both of them, provide them
 6    to him.  Run the searches against the oldest first,
 7    calculate the hash values for all of them, run the
 8    same search terms against the newest.  Obviously, the
 9    union, pull; the rest, junk.  Make sense?
10          MR. EDMONDSON:  Yes.
11          THE SPECIAL MASTER:  Any questions?  Does
12    that make sense, Counsel?
13          MS. WITTY:  (Nodded head up and down.)
14          THE SPECIAL MASTER:  Is that acceptable?
15          MR. FORREST:  I'm wondering about the junk
16    part in view of the fact that there may be additional
17    search terms coming down the road.
18          THE SPECIAL MASTER:  He's preserving both.  I
19    said preserve one --
20          MS. WITTY:  In terms of production,
21    production junk.
22          THE SPECIAL MASTER:  No, stop, stop.  I
23    said -- let me be crystal-clear.  I said preserve one,
24    preserve today, run the delta, because I'm talking
25    about production here.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. FORREST:  Okay.
 2              THE SPECIAL MASTER:  Right?  Whatever you --
 3     and going forward, for new search terms, they will do
 4     it the same fashion, right, given that we're running
 5     defendants late.
 6              At no point am I -- just to be crystal-clear,
 7     no deleting anything ever.  Okay?  Ever.  Are we
 8     crystal-clear on this?
 9              Mr. Lattin, you're just sitting back there
10     nodding, so I need to hear a "yes."
11              MR. LATTIN:  Yes.
12              THE SPECIAL MASTER:  Okay.  Thank you.  Okay.
13     Does that assure -- assuage your --
14              MR. LATTIN:  Actually, and by "deleting,"
15     you're including overwriting?
16              THE SPECIAL MASTER:  I'm saying anything
17     remotely resembling hitting the delete or backspace
18     key or command in a UNIX environment or anything at
19     all, whether it's overwrite, delete, or therein
20     otherwise.
21              You run backups, so I don't think you do it
22     anyway.  So nothing -- I'm not even saying UMC would
23     even think that that would happen or anything.  So I'm
24     not even -- I don't -- hope my order or my remarks
25     should not be interpreted that I believe that UMC is
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
1     doing anything, except UMC forgot to collect the
2     network file shares in the initial collection, which
3     is its own issue.
4           But I don't think that anybody in this room
5     is going to overwrite or delete or do anything outside
6     of follow the black letter of what I'm ordering.
7           Does that answer that?
8           MR. FORREST:  Well, now I was just wondering
9     whether the backups are still going to be on the same
10    rotation schedule and we're going to --
11          THE SPECIAL MASTER:  Well, why?  You've got a
12    four-month-old -- I mean, you want them to cease -- do
13    you want them to hold copies of all of their network
14    file shares?  You are talking about a petabyte
15    probably.  I mean, you have over a petabyte.  How much
16    do you have?
17          MR. LATTIN:  Currently on just the file
18    share?
19          THE SPECIAL MASTER:  Yes.
20          MR. LATTIN:  A single backup is probably 2.3
21    ter.  It's probably 30 ter total for the four months,
22    just estimating.
23          THE SPECIAL MASTER:  Every day or each day?
24          MR. LATTIN:  For the total.
25          THE SPECIAL MASTER:  So day one, two, three,
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1   total is 30 ter?

2               MR. LATTIN:  Yes.

3               THE SPECIAL MASTER:  And what are you asking?

4               MR. FORREST:  Withdrawn.

5               THE SPECIAL MASTER:  All right.  I'm just

6   saying that that's a lot of data.  I want to be clear.

7   You're going to be reviewing it all.  If I'm ordering

8   it, you're going to -- I'm going to make sure that you

9   understand that you are inviting 2.3 terabytes a day

10  of potential -- well, maybe not.  I have no idea, to

11  be honest with you.

12              So I think it's fine.  We have a snapshot.

13  The custodians -- all of the custodians have signed

14  and received and understand they should not be

15  deleting; right?

16              MS. WITTY:  And that will be reinforced.

17              THE SPECIAL MASTER:  So if we go down this

18  track and it turns out otherwise, we have a snapshot

19  to compare against.  So I don't believe there is any

20  need to have a rolling preservation.  They shouldn't

21  be deleted; right?  Nobody should be deleting from the

22  network file sharing in payroll, in HR, and anywhere

23  else; right?

24              The backup is just simply for collection

25  purposes.  We will have, if necessary, a separate

```
 1    conversation if it comes to light.
 2          Okay.  Now, to review, Mr. Espinoza is up
 3    first.  On the 16th -- 17th or 16th?
 4          MR. SCHAIBLEY:  16th.
 5          THE SPECIAL MASTER:  On the 16th, UMC
 6    technology forensic quasi team will provide to UMC
 7    counsel that information, whatever form they want, to
 8    review and create a privilege log.  That privilege log
 9    will be provided in complete and totality by the 21st.
10          MS. WITTY:  The 22nd will be the week.
11          THE SPECIAL MASTER:  21st is a Sunday?
12          MR. FORREST:  Monday.
13          THE SPECIAL MASTER:  All right.  22nd,
14    because if they ship it on Sunday on FedEx, then
15    they're probably -- the 22nd, 10:30 a.m. has to be
16    sitting in his hands with the privilege log fully
17    signed off on.  Okay?
18          MR. FORREST:  We'll take the disc.  They'll
19    take the privilege log?
20          THE SPECIAL MASTER:  You are going to get the
21    disc with the privilege log.  I'm not making this
22    complicated.  And you can pull it off and send it to
23    them using courier pigeon.  All right?  All right.
24          Now, my log files from my script -- I'm on
25    page 39 of my transcript from the last hearing -- I
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    didn't get them for the 26 custodians.
 2            MS. WITTY:  The 26, correct.
 3            THE SPECIAL MASTER:  Are they in the works?
 4            MS. WITTY:  Yes.  It was a failure on --
 5            THE SPECIAL MASTER:  It's all right.  We've
 6    met on Friday.  So there is no need to apologize.
 7            MS. WITTY:  Our law firm could not process
 8    the zip file to transmit them.  I have no idea why,
 9    but it's my --
10            THE SPECIAL MASTER:  It's probably too big.
11    Why don't you split it up and send it to her as three
12    different files -- maybe five different files,
13    actually.  How big is it?  I can put up a secure file
14    server if you want.  I'm just getting the Robocopy log
15    files here, is what we're talking about.
16            MS. WITTY:  I just sent electronic copies of
17    the five custodians' Robocopy scripts, so Plaintiffs
18    should have those five custodians.
19            THE SPECIAL MASTER:  The full scripts or just
20    the results?
21            MS. WITTY:  The full scripts.
22            THE SPECIAL MASTER:  Okay.  All they need
23    is -- actually, you know what?
24            MR. SCHAIBLEY:  It's a zip file that's 9
25    megs.
```

Special Master's Hearing  ‑   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  That's it?  Okay.  The
 2     script file is solely being submitted to Plaintiffs'
 3     counsel for no other evidentiary purpose other than to
 4     see the failure logs.  Are we crystal-clear here?
 5              MR. TOSTRUD:  Yes.
 6              THE SPECIAL MASTER:  Okay.  No conversation
 7     is to be had about this unless you see some pressing,
 8     dire need, and you will file a letter to me and to the
 9     other side about that.  Are we crystal clear?
10              Specific to the Robocopy scripts you have
11     just received, the sole purpose you received them is
12     so you can see the failure logs.
13              MR. TOSTRUD:  Yes.
14              THE SPECIAL MASTER:  Okay.  So 9 megs?
15              MR. SCHAIBLEY:  Yes.  It's a zip file that's
16     9 megs.  It contains a total of four folders.  I just
17     did each log file for the --
18              THE SPECIAL MASTER:  I can take full 9, so as
19     soon as you can get it, send it to me.  Okay?  I'm
20     going to look at it.  And the only reason -- it's the
21     same script was run, so you don't need it.
22              Okay.  Oh, I have a question for counsel from
23     plaintiff.  Last time we were speaking, you raised an
24     interesting point about the clinics.  We've got this
25     wonderful diagram.
```

Special Master's Hearing  ‑   April 7, 2014
*** Volume II ***

```
 1              As I understand it -- who is responsible for
 2      the clinics' IT systems?
 3              MR. SCHAIBLEY:  What do you mean "responsible
 4      for the clinics"?
 5              THE SPECIAL MASTER:  Well, he raised the
 6      point --
 7              Well, why don't you repeat your point from
 8      the prior -- I can -- I'll repeat it, or would you
 9      like to?
10              MR. TOSTRUD:  I can.
11              So UMC has a central campus which we've
12      visited a couple of times and toured it.  Our lawsuit
13      revolves around that campus, but also we have people
14      in our case who work at the Quick Care facilities.
15              And in the context of gathering relevant
16      evidence, we wanted to get a better understanding of
17      how the Quick Care facilities are managed
18      electronically and, parenthetically, we also want to
19      understand if there are other documents there.
20              But for your purposes, we want to understand
21      how they are managed electronically with information
22      and how they communicate with the central campus.
23              THE SPECIAL MASTER:  That was the request.
24      That wasn't what was granted.
25              But the gist that he does raise and that I do
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

1    have questions about is that the script that was run,

2    and it's -- the goal is to collect the responsive

3    information and then search it accordingly with

4    keyword search terms or predict what computer sys to

5    review and whatever term you use to filter it down and

6    turn it over.

7          In order to do that, we need to understand

8    where all the data may sit.  He raises a very good

9    point that there could be data sitting at clinics.

10         Based on my limited knowledge, and I'm

11   looking at this diagram, and I have the luxury of

12   actually having a decent memory and being able to

13   cross-reference the spreadsheet I was given earlier

14   with the servers and what they really stand for.

15         But that all said, explain to me from the

16   clinic side how -- what systems they have locally, if

17   any.

18         MR. LATTIN:  There shouldn't be any local

19   server-type systems at any of the clinics.

20   Everything, as far as they're concerned, would look

21   the same at the clinic as it does on the main campus.

22   It's all one big, contiguous network.  In either

23   service, they do use Exchange, file server, all come

24   from -- the same as everybody on campus would use.

25         THE SPECIAL MASTER:  So if a grievance is

Special Master's Hearing  ·  April 7, 2014
*** Volume II ***

```
 1      filed locally with a -- I think it was mentioned --
 2      they mentioned a grievance -- and I'm not speaking to
 3      merits or substance here.  I'm just using it for
 4      context.  Okay?  I'm not saying that this happened or
 5      has happened.  I'm just using it because the only
 6      other healthcare systems I know are patient-related,
 7      and that has no bearing here.
 8              An issue happened; a grievance is filed.
 9      Just so I understand, that is never stored locally at
10      the office or the clinic?  Sorry.
11              MR. LATTIN:  Not to my knowledge, no.
12              THE SPECIAL MASTER:  Counsel?
13              MS. WITTY:  It's kind of hard to answer that
14      because of the term of art of "grievance."
15              THE SPECIAL MASTER:  All right.  Forget
16      grievance.  Somebody files a complaint with their
17      manager, whatever, for -- I know digital sexual
18      harassment, so I'm just going to stick with something
19      that I have some expertise in serving...
20              But the point is, let's say somebody files a
21      sexual harassment complaint with their manager at a
22      clinic.  Okay?  Does that actually sit where?
23              MS. WITTY:  It would go through HR.
24              THE SPECIAL MASTER:  But I talked to the
25      manager -- what I'm trying to understand is, I go --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    is there any data that that manager would have on his

 2    local computer at that clinic?

 3            MS. WITTY:  They should not.

 4            THE SPECIAL MASTER:  The IT guys, anything?

 5            MR. LATTIN:  They shouldn't.  That was --

 6    what they've always been told is that you always save

 7    the files to the file share, file server so it gets

 8    backed up.

 9            MR. CLARK:  Can I go off record and help?

10            THE SPECIAL MASTER:  Yes, let's go off the

11    record.

12                 (OFF RECORD.)

13            THE SPECIAL MASTER:  Let's get back on the

14    record, because I'm going to have to draw it out

15    myself at some point.

16            MR. SCHAIBLEY:  If one of the 26 custodians

17    had logged into a computer at a Quick Care, that

18    computer would have been identified and logged in the

19    log scripts that Ms. Witty is providing you; and the

20    Robocopy script, because that computer is connected to

21    the network, would have gone and captured whatever was

22    on that computer.

23            THE SPECIAL MASTER:  Can you circulate the

24    script itself?

25            MR. SCHAIBLEY:  What do you mean "circulate
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     the script"?
 2             THE SPECIAL MASTER:  The Robocopy script,
 3     could you send it to me?
 4             MR. SCHAIBLEY:  It's included in the zip
 5     file.
 6             THE SPECIAL MASTER:  Got it.
 7             Theoretically, then, Counsel, based on what
 8     they are telling me, and that I've looked at the
 9     script right, if a user logs in from the clinic,
10     it's -- that data would still be collected.
11             MR. TOSTRUD:  I understand.  I guess our
12     concern is rather obvious, and that is that
13     Mr. Schaibley I think indicated that there are --
14     there is information stored on local C drives, and
15     that information I don't think makes it back.
16     Correct?
17             And in light of the e-mail in Exhibit 10 to
18     this transcript, when you combine those two, there may
19     be a lot of relevant information that's sitting out in
20     the Quick Cares.  So that's our concern.
21             THE SPECIAL MASTER:  How about you give me a
22     list of the custodians that sit in the Quick Care
23     facilities, and then I'll make a -- I'll further
24     explore it if I believe appropriate.
25             But right now, their script is pretty
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1    complete and thorough.  What we might -- yes?
 2         MR. PIXLEY:  I just noted that the Robocopy
 3    script is designed to just target the user profile on
 4    that machine, not the machine itself.  So that's why
 5    earlier I asked the question if somebody created a
 6    folder off the root of C called "My Stuff" and just
 7    put stuff in "My Stuff," the script would not include
 8    that data.
 9         THE SPECIAL MASTER:  Right.  I agree, and it
10    wouldn't be backed up, which is why we're grabbing the
11    26.
12         MS. WITTY:  A quick review of the 26, 27
13    custodians:  None of them are Quick Care, I don't
14    believe any of the plaintiffs are -- the named
15    plaintiffs, the original six.
16         MR. TOSTRUD:  No, I don't believe the named
17    plaintiffs have worked at Quick Care facilities, but
18    we have opt-ins who have worked at Quick Care
19    facilities, and we have opt-ins who would indicate
20    that they have complained about these issues while
21    they were working in Quick Care facilities.
22         THE SPECIAL MASTER:  So here's what I want:
23    I want a list of those individuals' names, and then
24    I'll go from there, because I don't -- we don't even
25    know how often they logged into the computers or what
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

1    they were doing.  So before I go down a rabbit hole, I

2    want to at least understand.

3         Give me the list.  I'm then going to order

4    UMC to give me a corollary spreadsheet that says,

5    "These users were logging into these computers," and

6    etc., etc., so that way I can get some context, and I

7    know how computers we're talking about, and I know how

8    many devices, and so it stays reasonable and focused,

9    if at all.

10         And that's also assuming that I believe

11   that -- and also, if you are going to list them, you

12   have to say why you believe they would -- what

13   relevant information would be on these systems.  For

14   each one of the people, I would need to know for that

15   person what it would be.  Because it's a lot of

16   relief, because they have -- these people could have

17   been walking around the clinics logging into God knows

18   what.

19         So before I even entertain it, there

20   better -- I would like to know why you believe it is

21   necessary, and then I will consider it.

22         And then, Counsel for UMC, I give you three

23   days, business days to respond to their request as to

24   why you believe it may or may not be necessary.

25         I am going to request, Mr. Clark, that you

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    take your very expert and wide set of knowledge skills
 2    that you have as to UMC's design of Enterprise and the
 3    SAN and the other pieces and create a diagram that is
 4    actually intelligible of the data, so that way I can
 5    have a more cogent and cost-effective conversation,
 6    because if I do it, it will cost you a substantial
 7    amount more money and I'd have to go on-site and take
 8    pictures.
 9            And if I find that that -- the diagram that's
10    provided is insufficient or lacking or whatever, I'll
11    then revisit your request.  But he seems to be more
12    than skilled and expert.  And if necessary, I will
13    virtually log in and verify it myself.  Okay?
14            All right.  And you are working on resolving
15    the errors in the scripts.  Did we pick a day when I'm
16    going to get that?
17            MS. WITTY:  We did not.
18            THE SPECIAL MASTER:  Fantastic.  Would you
19    like to suggest a day or would you like me to pick a
20    day?  Sort of a trick question, but we'll -- you can
21    suggest a day.
22            MR. SCHAIBLEY:  I'd prefer to suggest a day
23    for next week, just because I'm the one who will have
24    to do that, along with the new EO1 files.
25            THE SPECIAL MASTER:  Okay.  Let's make it the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    17th.
 2              And to your point, the Robocopy scripted
 3    error out on files, I pointed out in the last hearing
 4    we're going to find out what the files are and then go
 5    from there.
 6              Obviously, if they are PST, OST files, or
 7    anything of that nature, they are going to be -- we're
 8    going to need them.  If they are .dat files or etc., I
 9    will reserve right to judgment.  But any PST, OST,
10    doc, Microsoft Office program, Kronos-based file, or
11    the likes, similar such data, errored out, I expect
12    you immediately to go back and grab it, manually if
13    necessary.
14              We're updating the chain of custody; right?
15              MR. SCHAIBLEY:  Yes.
16              THE SPECIAL MASTER:  And we're calculating
17    MD5 hash values this time around?  You're going -- we
18    already figured -- right? -- that we are going to get
19    all the right evidence over.
20              I would like an explanation.  If you could
21    please go to your former forensic expert that was --
22    you retained and try to figure out how he completely
23    and totally missed two-thirds of your evidence.
24              I mean, you didn't know.  I'm not -- counsel
25    for UMC clearly had no knowledge or understanding --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    like you assumed you got -- he did his copying and he

 2    assumed the guy who showed up did the proper forensic

 3    imaging.  And then counsel for UMC actually came in

 4    several months later, assumed that it was also

 5    correct, and they didn't know otherwise.

 6             I'd like you to inquire, and if you would be

 7    so kind as to provide us a written response.  If not,

 8    please advise him I will order him to appear.

 9             What happens also with the script with the

10    path, the filename and the copy, what if the path, the

11    filename, is too long?

12             MR. SCHAIBLEY:  I don't believe I've seen one

13    that was too long that it errored for that specific

14    reason, but I would have to go back through and check

15    those specific errors to see if any of them were for a

16    reason like that.

17             THE SPECIAL MASTER:  All right.  Voice mail,

18    is there a person here today that knows the

19    voice mail?

20             MR. LATTIN:  I think it would be Susie

21    Kisner.

22             MS. WITTY:  Susie actually deferred on the

23    voice mail issue.

24             THE SPECIAL MASTER:  To Trina?

25             MR. LATTIN:  No.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1                    MR. SCHAIBLEY:  To Brett?

 2                    MS. WITTY:  Yes.

 3                    THE SPECIAL MASTER:  Brett who?

 4                    MR. SCHAIBLEY:  Brett Johnson.

 5                    THE SPECIAL MASTER:  Why don't you spell that

 6          for the record.

 7                    MR. SCHAIBLEY:  B-r-e-t-t J-o-h-n-s-o-n.

 8                    THE SPECIAL MASTER:  Can you have him submit

 9          a -- since he's not here, is he available to speak

10          right now by phone?

11                    MS. WITTY:  He was not.

12                    THE SPECIAL MASTER:  Okay.  So then get a dec

13          affidavit from him explaining to me exactly how the

14          phone systems work, how they back them up, do they

15          send them to e-mail, what exactly -- how -- are they

16          backed up?

17                    MR. LATTIN:  Not through our system, no, not

18          through CommVault.

19                    THE SPECIAL MASTER:  So are they backed up

20          separately and apart; if so, by who.  And have him

21          include as exhibits any relevant pieces of information

22          there.

23                    Let's go take a look -- the BlackBerry backup

24          policy, we don't have that; right?

25                    MS. WITTY:  There isn't one.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Yes, there is no
 2   BlackBerry backup policy.
 3              I'm going to request by the 13th that you
 4   circulate further clarification as to the use of the
 5   iPhone -- the search terms -- were you guys the ones
 6   responsible for providing them for the iPhone, iPad,
 7   whatever?
 8              MS. WITTY:  You should have received a -- did
 9   I not send that?  It was just an e-mail that had the
10   search terms in it.
11              THE SPECIAL MASTER:  Did they get it too?
12              MS. WITTY:  Should have.
13              THE SPECIAL MASTER:  Did you guys receive it?
14              MR. GODINO:  When did you send it?
15              MS. WITTY:  It would have been --
16              MS. FOLEY:  Half-hour ago?
17              MS. WITTY:  No.  It was Friday night.
18              THE SPECIAL MASTER:  I didn't -- I don't
19   think I got it.
20              MS. WITTY:  I will re-send that.
21              THE SPECIAL MASTER:  Okay.  I need Plaintiff
22   to review them if at all possible today and sign off
23   on them.
24              MR. TOSTRUD:  Okay.
25              THE SPECIAL MASTER:  I haven't seen them, so
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    as soon as I see them, I will add accordingly.

2         All right.  Let's talk about custodian

3    interviews.  Someone mentioned Mr. Espinoza.  Who was

4    that?  I forget.  Was it you, Mr. Forrest?

5         MR. FORREST:  I mentioned Mr. Spring and

6    Ms. Myers.  And actually I also have a comment about

7    Panzeri when we get to it.

8         THE SPECIAL MASTER:  All right.  Really

9    quickly, I also order plaintiffs to pull 10 of the

10   packets that you were provided to look at the SAP

11   correlation of data.  When will you have, could you

12   have that done?

13        MR. TOSTRUD:  I think you gave us a date

14   which may be by this Friday, but we are working on it.

15        THE SPECIAL MASTER:  Okay.  I just want to

16   know -- so that's fine.  Provide a written letter with

17   the response and the validation, so I understand.

18        MR. TOSTRUD:  Yes.

19        THE SPECIAL MASTER:  It's in the transcript,

20   page 81, if you need the record.

21        Okay.  So let's go through the custodian

22   interviews.  Page 81 of the transcript covers the

23   issue we just covered.

24        So who had a question?  Panzeri, you said?

25        MR. FORREST:  Yes.  And this goes --

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  And, Plaintiffs, if you
 2    have any questions as well, feel free to --
 3              MR. FORREST:  And this goes to the Kronos SAP
 4    question, the completeness of the data that we have,
 5    and we'll check that with respect to the 10 packets.
 6              THE SPECIAL MASTER:  Randomly picked packets.
 7              MR. FORREST:  Randomly picked packets.
 8              But I note in the description of the hard
 9    copies in Panzeri's custodian interview, she talks
10    about pack rat because so much documentation is
11    required for payroll/audit.  And in essence, a large
12    part of what we're doing is auditing the calculations
13    with respect to the wages and hours recorded for the
14    plaintiffs.
15              So that documentation may or may not be
16    useful.  We'll know shortly, I think.
17              And I will also note that --
18              THE SPECIAL MASTER:  Well, what's the
19    question?
20              MR. FORREST:  Well, I guess the question is
21    do we have enough data from -- just from Kronos to
22    essentially recreate the documentation required for
23    auditing, that the hours and payments were calculated
24    correctly.
25              MS. FOLEY:  Yes.
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1              MR. FORREST:  And I don't know how we can do

 2      that without having access to the SAP data.  We

 3      haven't --

 4              THE SPECIAL MASTER:  And we already had this

 5      conversation.  You are verifying that and then getting

 6      back to me by Friday.

 7              MR. FORREST:  Okay.

 8              THE SPECIAL MASTER:  And then you are going

 9      to detail out what you would additionally need if it

10      was not sufficient.

11              MR. FORREST:  All right.

12              THE SPECIAL MASTER:  No, I'm not saying you

13      do or do not.  I'm just saying we -- and once you can

14      give me specific "I need X, Y, and Z or A, B, C data

15      that is not provided in these packets," I can then

16      have an educated conversation about it.  But right now

17      it's too esoteric.

18              MR. FORREST:  Okay.

19              THE SPECIAL MASTER:  I had a question about

20      Ms. Panzeri's custodian interview, but do you have any

21      others, Counsel, or any --

22              MR. FORREST:  No.

23              THE SPECIAL MASTER:  From Plaintiff?

24              MR. GODINO:  No.

25              Hold on.  I think we would like, since we got
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      the interviews last night at 8:00 p.m., we really
 2      haven't a full --
 3               THE SPECIAL MASTER:  Chance to look at them?
 4               MR. GODINO:  -- opportunity to look at it.
 5      So I think maybe at the next hearing we would have a
 6      lot more questions on them.
 7               THE SPECIAL MASTER:  We'll make it a phone
 8      hearing and --
 9               MS. WITTY:  I was going to say, if we could
10      do that --
11               THE SPECIAL MASTER:  We'll do it as a phone
12      hearing, and we'll set hearing dates at the end, and
13      you'll -- but I will request that you circulate a
14      written bulleted list for each custodian.  So the
15      whole idea is to get the questions answered, not do
16      anything else.
17               Now, my question is, it says "created our own
18      distribution list for timekeepers."  I'm a little
19      confused.
20               MS. WITTY:  So essentially, what we've done
21      in this case to include everyone on e-mails, when
22      something is sent to all counsel, you know, it lists
23      out all the separate e-mails.  She essentially does
24      that for her timekeepers.
25               THE SPECIAL MASTER:  She doesn't mean a
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    distribution list per se at an Exchange level?
 2              MS. WITTY:  Exactly.  I can --
 3              THE SPECIAL MASTER:  Mr. Schaibley, she
 4    didn't actually request for you to do that; right?
 5              MR. SCHAIBLEY:  I don't recall creating a
 6    distribution list for her, no.
 7              THE SPECIAL MASTER:  All right.  Just
 8    checking.  So can you just double-check, yourself, to
 9    make sure?  She says a, quote, "distribution list for
10    timekeepers."
11              Now, let's go over the webmail question that
12    came up earlier.  You can access e-mail through the
13    Outlook Web client; no?
14              MR. SCHAIBLEY:  Correct.
15              THE SPECIAL MASTER:  And it's just going to a
16    URL and putting in a login and a password; right?
17              MR. SCHAIBLEY:  Yes.
18              THE SPECIAL MASTER:  So when she says
19    "webmail," she says "webmail," what is she referring
20    to there?
21              MR. SCHAIBLEY:  I can only assume she's
22    referring to the UMC Outlook webmail.
23              THE SPECIAL MASTER:  Okay.  So that's what
24    she's doing.  Which she can access from her phone or
25    from any device?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

 1            MR. SCHAIBLEY:  Correct.

 2            THE SPECIAL MASTER:  It doesn't --

 3            MR. SCHAIBLEY:  I'm sorry, did you say can or

 4     can't?

 5            THE SPECIAL MASTER:  Can, c-a-n.

 6            Counsel for Plaintiffs, does anybody have any

 7     questions beyond the ones I've asked?

 8            We can then go to Mr. Espinoza.  Do

 9     Plaintiffs have any questions about his custodian

10     interview that they would like further clarification

11     around?

12            MR. TOSTRUD:  Can you give us just one minute

13     to confer?

14            THE SPECIAL MASTER:  Yes, sure.  Off the

15     record.

16                 (OFF RECORD.)

17            THE SPECIAL MASTER:  Back on the record?

18            MR. TOSTRUD:  Back on the record.

19            With respect to the custodian interviews, we

20     will just reserve until the next hearing and get you a

21     list.

22            THE SPECIAL MASTER:  Okay.  I have them.

23     Okay.  Well, we can table them then to the next

24     hearing, if you want, my questions as well.

25            I do have three that I do want to understand

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      just because we have the IT people here.

 2              It says "But it is duplicate" and "is

 3      discarded weekly."  "He has a weekly calendar" --

 4      "calendar printed off," and then it says, "But it is a

 5      duplicate of Outlook and it is discarded weekly."

 6              Any clarification?  What does he use it for?

 7              MS. WITTY:  To keep on his desk.  There was

 8      a --

 9              THE SPECIAL MASTER:  Can you get an affidavit

10      from him explaining what he actually uses the paper

11      copy for?

12              MS. WITTY:  Yes.

13              THE SPECIAL MASTER:  My simple concern is

14      that he uses it, updates it, and doesn't get included

15      in his electronic file.

16              MS. WITTY:  This is an example of his --

17              THE SPECIAL MASTER:  Oh, yes, it was

18      provided.

19              MS. WITTY:  It was provided in the blue tab

20      in Mr. Espinoza's.  This is literally a scanned copy

21      of what was printed by Claudette Myers for John

22      Espinoza.  You'll notice that it has a smiley face

23      down in the bottom corner for Friday.  This is

24      literally what she prints out and is --

25              THE SPECIAL MASTER:  Okay.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. GODINO:  The question is whether he --
 2     you know, he makes handwritten notes on --
 3              THE SPECIAL MASTER:  I mean, that's --
 4              MS. WITTY:  You mean --
 5                   (Inaudible due to multiple colloquy.)
 6              MS. WITTY:  -- that's the information we'd
 7     like clarified.
 8              THE SPECIAL MASTER:  Okay.  So I want that in
 9     an affidavit from Mr. Espinoza.  I want him to explain
10     does he use it for taking notes, does he use it for
11     tracking his -- I mean, look, I joke with people --
12     this is my mini iPad (indicating).
13              I actually appreciate writing things down and
14     the value of just having it in your hands.
15              MR. GODINO:  I guess we might want to know if
16     he's shredding anything.
17              THE SPECIAL MASTER:  If he's shredding it?
18              MR. TOSTRUD:  Anything.
19              MR. GODINO:  Anything else besides those that
20     they mentioned at the last hearing, that he was
21     possibly shredding those.
22              THE SPECIAL MASTER:  Well, going forward he's
23     not shredding them, but in his affidavit just explain
24     what he does with them and what he's done with them,
25     be it shred, burn --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. GODINO:  And what type of documents he
 2      felt he could shred despite the preservation and
 3      litigation hold.
 4              THE SPECIAL MASTER:  Let's go off the record.
 5                  (OFF RECORD.)
 6              THE SPECIAL MASTER:  On the record?
 7              MS. WITTY:  Yes, on the record.
 8              Regarding asking a representative of UMC a
 9      question, I feel very hesitant to record my
10      communications with my client.
11              THE SPECIAL MASTER:  Fine.  I understand
12      that.  Have him here for the next time we have a
13      hearing.  He can answer it to me.
14              MS. WITTY:  I'd also request -- we'll address
15      the concerns for the printed calendar and any other
16      documentation in an affidavit.  Mr. Espinoza happens
17      to be on vacation this week.  If --
18              THE SPECIAL MASTER:  If you're not
19      comfortable at any point, I'm more than happy to have
20      him appear before me, and I'll ask him the question.
21              MS. WITTY:  No, I was just saying I would --
22      I would like to have additional time, because I know
23      he will not be here this week.
24              THE SPECIAL MASTER:  That's fine.
25              MS. WITTY:  So I can't have him sign
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

1    anything.

2         MR. TOSTRUD:  Okay.  I just want to make

3    sure you -- Plaintiffs would like him at the next

4    hearing, if possible, and I think you've requested --

5         THE SPECIAL MASTER:  He is going to be at the

6    next hearing.

7         MR. TOSTRUD:  Okay.

8         THE SPECIAL MASTER:  I did -- I did want to

9    understand two other things here.  Where was it?  When

10   he says, "His outlook Auto-deletes spam" -- this is

11   for you -- "gets a lot of diet plans and fake hospital

12   newsletters," is that using the McAfee again on the

13   back side, to do that, or how does that

14   automatically --

15        MR. SCHAIBLEY:  I honestly don't know what he

16   is referring to, because any spam that makes it into a

17   user's inbox would be -- it would be incumbent upon

18   that individual to delete themselves.  We do, with the

19   mail filters, stop the majority of spam coming into

20   our network, but obviously --

21        THE SPECIAL MASTER:  That's how I understood

22   mail filtering to work, so that's why I was a little

23   confused.

24        MR. SCHAIBLEY:  We do stop the majority of

25   it, but some things obviously do get through.

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  All right.  So Counsel
 2      for UMC, can you please sit down with him and
 3      Mr. Schaibley and just figure out -- make sure the
 4      mail filtering is what he's talking about, because I'm
 5      not clear.
 6              Is there different login information for TS
 7      Web?
 8              MR. SCHAIBLEY:  What do you mean "different
 9      login information"?
10              THE SPECIAL MASTER:  He says "can't remember
11      his login information."
12              MR. SCHAIBLEY:  This is for Mr. Espinoza?
13              THE SPECIAL MASTER:  Yes, on the last page.
14              MR. SCHAIBLEY:  The only thing I can surmise
15      from that is that he doesn't remember the URL.  The
16      login --
17              THE SPECIAL MASTER:  Okay.  So there's no
18      separate credentialing systems?
19              MR. SCHAIBLEY:  No.  The login is his Active
20      Directory credentials.
21              THE SPECIAL MASTER:  Okay.  Fine.
22              Counsel, I did read the responses around the
23      discs in the further clarification.  I'm going to
24      order you to preserve any discs that he did indeed
25      create during the time period in question --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MS. WITTY:  Okay.

 2              THE SPECIAL MASTER:  -- and preserve them

 3      accordingly, because --

 4              MS. WITTY:  When you say "he created"...

 5              THE SPECIAL MASTER:  Or Claudia (sic).

 6              MS. WITTY:  Okay.  That's what I wanted to

 7      make sure was clear.

 8              THE SPECIAL MASTER:  I recognize Claudia was

 9      the creator at his direction.

10              MS. WITTY:  I'm aware that from -- just for

11      clarification -- and Plaintiffs' Counsel, I'd asked

12      you to assist, it was -- we were looking at the time

13      period from, was it June or January of 2008 to

14      current?  I can't remember what was in the

15      preservation letter.

16              MR. TOSTRUD:  In the preservation letter, I

17      believe it was June 2008.  It was not January.

18              MS. WITTY:  That's the time period that we

19      will...

20              THE SPECIAL MASTER:  Does UMC have in-house

21      counsel?

22              MS. FOLEY:  They have counsel representatives

23      from the D.A.'s office and an in-house --

24              THE SPECIAL MASTER:  Are they actively

25      involved in this matter?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MS. FOLEY:  To some degree.
 2            THE SPECIAL MASTER:  Would they be the ones
 3      internally issuing the litigation hold?
 4            Are we on the record here?  I hope so.
 5            THE REPORTER:  Yes.
 6            THE SPECIAL MASTER:  Would they internal --
 7      like, what I'm trying to understand is, you send your
 8      client a litigation hold notice.
 9            MS. WITTY:  Yes.
10            THE SPECIAL MASTER:  Who then sends it out
11      for UMC internally?
12            MS. WITTY:  It would come -- with regards to
13      UMC, with the preservation letter that was sent, how
14      that was delineated, or --
15            THE SPECIAL MASTER:  I'm talking about
16      litigation -- no, no.  Preservation letter, fine, but
17      also just on the going-forward request that I'm making
18      that they receive these copies; is it going directly
19      from you to in-house counsel, or directly from you to
20      the IT individuals?
21            MS. WITTY:  With regard to the ones that we
22      have discussed today, those will come directly from
23      counsel to those individuals.  In the past, I believe
24      it went from counsel to the CEO, and from the CEO out.
25            THE SPECIAL MASTER:  Okay.  I'd like a list
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

1      as to who they went out to.

2              Mr. Pixley, I had a question for you around

3      the BlackBerry issue.  Did you have any ideas or

4      thoughts around BlackBerry materials about how we

5      could maybe alternatively obtain that data?

6              MR. PIXLEY:  (Shakes head side to side.)

7              THE SPECIAL MASTER:  I thought I would check,

8      because the only other alternative is that I subpoena

9      Sprint, because Sprint will have it.  And it's very

10     clear to me that -- I mean, can you please draft up

11     subpoenas to Sprint for at least the seven key

12     custodian -- whoever has got a BlackBerry, and send

13     Sprint a litigation hold letter for those three

14     custodians?

15             MS. WITTY:  Just for preservation's sake, do

16     you mind if we include anyone we --

17             THE SPECIAL MASTER:  Include all 26 folks and

18     then subpoena it as well for me, and I'll execute the

19     subpoena.

20             MR. PIXLEY:  I'm still curious about the

21     rules, if they are going to pull up how the

22     BlackBerry --

23             THE SPECIAL MASTER:  Oh, yes, thank you.

24     Preservation -- the rules, we mentioned before lunch

25     that there is this huge manual.  I'd like to know the

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    exact policies from the huge manual from UMC counsel
 2    as to the preservation policies that govern for all
 3    data.  And I'll be specific:  E-mail, mobile, Office
 4    documents.  I don't want to know about your patient
 5    records.  I want to know about human resource records,
 6    and I want to know within the policies, whatever they
 7    may be, County or otherwise, I'd like them provided to
 8    me and plaintiffs' counsel, I guess, as well, what
 9    they are.
10         MS. WITTY:  Just to clarify, e-mail, mobile
11    devices, HR --
12         THE SPECIAL MASTER:  Well, anything relating
13    to a technology system, data system, minus anything
14    relating to patient records, meaning people that they
15    treat in their hospitals.
16         And let me put a date next to that.  Let's
17    make that the 21st.
18         Now, with the personal laptop devices, I
19    wanted to go over -- he does not -- Mr. Espinoza, does
20    he or does he not have a personal laptop that he has
21    used in connection with his work?
22         MS. WITTY:  Does not.
23         THE SPECIAL MASTER:  Okay.  Who does?
24         MS. WITTY:  The two individuals that
25    mentioned using a laptop were Doug Spring and James
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1    Mumford.  James Mumford used his personal laptop, and

2    Doug Spring had one that was UMC issued.

3         THE SPECIAL MASTER:  So I'm ordering both of

4    them to provide their laptops to UMC counsel for

5    duplicate images to be created.

6         MS. WITTY:  And the other one -- and we will

7    obviously make an image of it as well, the

8    administrative office, which is where the chief human

9    resources officer -- officer is --

10        THE SPECIAL MASTER:  That's Claudette's.

11        MS. WITTY:  -- and Claudette's, she uses the

12    administrative laptop for Skype interviews.

13        THE SPECIAL MASTER:  But nothing else?

14        MS. WITTY:  But nothing else.

15        THE SPECIAL MASTER:  Let's just make a copy

16    of it, to be on the safe side.

17        If you can produce to me the policies that

18    governs said laptop, I'm amenable to not; but at this

19    stage of the game, I'm just going to order it.

20        Is that laptop on UMC's network?

21        MR. SCHAIBLEY:  The Skype one that Claudette

22    is using?  More than likely, yes.

23        THE SPECIAL MASTER:  So then make a copy.

24        Okay.  Department of Labor.

25        Before we touch on the Department of Labor

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    piece, mailing lists, did we set a date for when we

2    were going to try to figure that out, for the mailing

3    lists?

4            MS. WITTY:  Could you repeat that?

5            THE SPECIAL MASTER:  We had distribution

6    lists that weren't really distributions lists, and

7    then we had dynamic, which were --

8            MS. WITTY:  Yes.

9            THE SPECIAL MASTER:  -- but they were not

10   actually listservs; they were Exchange based --

11           MR. SCHAIBLEY:  Correct, we don't have any

12   listservs.

13           THE SPECIAL MASTER:  And we don't have any

14   backups, because they only go back four months.  Do we

15   have a solution that you can suggest or recommend?

16           Mr. Pixley and Mr. Forrest, did you guys hear

17   as well that issue?

18           MR. PIXLEY:  The distribution list?

19           THE SPECIAL MASTER:  Yes.  There is no actual

20   mailing mail list.  There's just --

21           MR. PIXLEY:  It's not an independent mailbox.

22   It's a group list, is the way I understood it during

23   the phone call.

24           MR. SCHAIBLEY:  Correct.

25           MR. FORREST:  Per their Exchange, their

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

 1      Exchange groups.

 2              THE SPECIAL MASTER:  Any idea how -- and

 3      those were not collected?  Which would be, just for

 4      context, would be a group list -- just so I get it,

 5      would be UMCPost.

 6              MR. SCHAIBLEY:  Well, I just want to

 7      understand what your -- what your definition of a

 8      "group list" is, because none of the lists that we

 9      maintain and use are independent repositories.

10              THE SPECIAL MASTER:  But there needed to be

11      collected at some point the communicate- -- whoever is

12      sending -- there's only authorized users that probably

13      can send on that list.

14              MR. SCHAIBLEY:  Yes.

15              THE SPECIAL MASTER:  Okay.  So whoever the

16      authorized senders are.  I mean, I don't know how else

17      to pull those, but clearly if they are used to

18      communicate around HR policies relating to the

19      company, that they would be a necessity to preserve.

20              MR. PIXLEY:  My understanding is your request

21      was that you were asking for a list of the people who

22      were members of those.

23              THE SPECIAL MASTER:  Yes, I did request that.

24              MR. PIXLEY:  And those people may still have

25      communications that was deleted by somebody else.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1          THE SPECIAL MASTER:  Yes, exact -- what I'm
 2    basically trying to get at is, you had these lists,
 3    and because they weren't collected at the time in
 4    2013, in August or in April --
 5          MS. FOLEY:  These are the share files?
 6          THE SPECIAL MASTER:  No, the lists, the
 7    mailing lists, the UMCPost, like, lists, for lack of a
 8    better term, given the nomenclature at UMC.
 9          Obviously we need to make sure we have a
10    complete -- certainly for the HR lists, a
11    complete-as-possible snapshot.
12          So what I ask is give me a list of the people
13    that are authorized to send, and maybe we'll come up
14    with a search protocol where you can search just their
15    mailboxes for a subject line or however the list is
16    configured to see if they have any e-mails that were
17    sent from them to that list.
18          And then, Counsel for UMC, I need you to
19    compile a spreadsheet of what the different lists
20    actually are.
21          Actually would be great is the name of the
22    list and who is authorized to send on that list.  So,
23    for example, UMCPost has whoever is authorized --
24    during the time period in question, not today.
25          MS. FOLEY:  Right.  Sorry.  What was your
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      example?  Your example was someone who'd send --
 2      UMCPost.
 3              THE SPECIAL MASTER:  Yes, just as an example.
 4      And then but your -- the custodian interviews
 5      identified four or five other lists.
 6              MS. FOLEY:  Okay.
 7              THE SPECIAL MASTER:  I can -- where are
 8      they?  Anybody remember any of the other list names?
 9      In the custodian interviews, there is a list.  I can't
10      remember where they are, but they reference at least
11      four different lists.
12              MS. FOLEY:  Okay.
13              THE SPECIAL MASTER:  We are going to take a
14      break for five minutes.  I'm kidding.  At 3:10 we can
15      meet back here.
16              (RECESS TAKEN 3:00 P.M. To 3:22 P.M.)
17               (Cayla Witty, Esq., not present.)
18              THE SPECIAL MASTER:  With Ms. Panzeri and the
19      SAP piece, something tells me that, Mr. Clark, you may
20      be able to answer some questions I have.
21              How familiar are you with the SAP on the UAX?
22              MR. CLARK:  I'm not familiar with the
23      application itself.  I'm just familiar with the file
24      transfer from UMC to go to the County and coming back
25      and --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Who within UMC itself --
 2     because what I was just simply trying to figure out
 3     is, from -- what data for SAP sits within your
 4     universe?  Because the script, to be clear, one thing
 5     about the script beyond the network file shares that
 6     we are going to need to collect is obviously data from
 7     third-party -- not third -- data from applications
 8     that the custodians were using that you guys have.
 9              For instance, if SAP was -- or maybe that's a
10     bad example.
11              For instance, let's say internal -- I don't
12     have a list of the applications that you run
13     internally, but I assume you have an intranet.  Right?
14     And your intranet keeps information on it.
15              I don't think the script pulled from the
16     intranet and pulled the data off the intranet as to
17     the policy like what would be the relevant
18     communications, as I understood it.  According to what
19     I assume, Mr. Schaibley, the script doesn't pull from
20     the Internet?
21              MR. SCHAIBLEY:  No, it does not.
22              THE SPECIAL MASTER:  All right.  So backup,
23     grab me a snapshot from four months ago, the intranet,
24     or as far back as you can go.
25              MR. LATTIN:  Okay.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1          MS. FOLEY:  And that should get us the

2     policies, maybe, we're hoping.

3          THE SPECIAL MASTER:  Well, we're getting

4     there.  We're getting there in a second.

5          So what I'm trying to understand is, the SAP

6     particularly and the intranet, we need to identify the

7     third -- the internal applications that individual

8     custodians access that they don't have within their

9     user profile where the data is stored.  They might

10    upload documents.

11          I don't know what they do on your intranet,

12    but I know on SAP, they put data into something, and

13    that data then goes from you to SAP at the County

14    level, and then they get data back, and it's got to

15    store data somewhere that it receives back.  And I'm

16    assuming that the custodian profile doesn't have the

17    data that they get back from the County.

18          I could be -- it might not be relevant.  I

19    don't know because I don't have a -- I don't know the

20    data flow, so to speak.  But what I just want to make

21    sure is that you are preserving the SAP data itself

22    that you are using or receiving back.  Does that --

23          MR. CLARK:  My understanding is on that

24    server that you asked about, AIX --

25          THE SPECIAL MASTER:  With the seven years.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MR. CLARK:  -- it -- the AIX server, we call
 2    it ERP EO1, it sends data out and receives data,
 3    everything that goes out and in is archived
 4    automatically.
 5            THE SPECIAL MASTER:  And it's for seven
 6    years?
 7            MR. CLARK:  Yes.  Longer too if it has to.
 8            MS. FOLEY:  And that's where the SAP is?
 9            THE SPECIAL MASTER:  That's where the data --
10            MS. FOLEY:  That's where the SAP goes out?
11            MR. CLARK:  That's the data feed.
12            THE SPECIAL MASTER:  Right.  That's what -- I
13    just want to make sure of the data feed, because when
14    I look at the script and it goes to her profile, it
15    doesn't look like it actually has access to the data
16    feeds that are going back and forth.
17            I'm not saying it has necessarily useful data
18    in it, but based on the already zealous advocacy that
19    has transpired around the SAP and the packets and
20    etc., I just simply want to make sure that a copy of
21    the SAP data stream that gets back is being preserved,
22    and that was what...
23            So as you understand it, it comes back and
24    forth and it's archived immediately.
25            MR. CLARK:  One, there is a .done file that
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1    gets archived after 30 days.  Once a month everything

2    gets archived.  So because if you have somebody calls

3    you up that's working in an application, we call them

4    senior analysts, ERP analysts, and they say, "I need

5    the files sent on that day we sent."  So we have to

6    coordinate with the County to re-send files if

7    necessary.

8           THE SPECIAL MASTER:  I get it.  So then

9    you're storing that on the AIX box?

10          MR. CLARK:  Uh-huh.  It's just an in and out.

11          THE SPECIAL MASTER:  Yes, it's a dumb -- but

12    you're just -- it's a -- whatever.  It's a flat text

13    file?

14          MR. CLARK:  It's a flat text file.

15          THE SPECIAL MASTER:  Yes, that's a UNIX file.

16    So it's a UNIX flat text file that just has the data

17    that was sent that day or received that day?

18          MR. CLARK:  Right.

19          THE SPECIAL MASTER:  So then it's being

20    preserved.  That was just a question I had.

21          So then you might, Counsel, once we get their

22    SAP data results, that might be an important place to

23    be mindful of --

24          MS. FOLEY:  Okay.

25          THE SPECIAL MASTER:  -- because it does go

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    all the way back.

 2            Okay.  That takes care of that.

 3            And Ms. Panzeri then runs reporting

 4    solutions, has a client software.  Just so I get it,

 5    she has a client software and four people that work on

 6    her team that interact with the SAP system, but they

 7    are using a client-based application?

 8            MR. CLARK:  I'm not really sure, but we could

 9    find out.

10            THE SPECIAL MASTER:  Well, that's what she

11    says in her custodian interview.

12            MS. FOLEY:  Yes, nothing --

13            THE SPECIAL MASTER:  I'm just trying to make

14    sure that the script that was -- like, if this is

15    about payroll and pay records, right, and the packets

16    aren't sufficient -- and I don't want to say they are

17    or not, I offer no opinion on that at all -- but what

18    I do want to make sure is that the system Ms. Panzeri

19    is using is the same SAP -- the right SAP client and

20    the data are the same.  There's not two SAP

21    applications here we're talking about?

22            MR. SCHAIBLEY:  Not that I know of.

23            THE SPECIAL MASTER:  Certainly not to my

24    knowledge, so I'm asking you guys --

25            MR. CLARK:  I think there's only one, but we
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1    could check.
 2            THE SPECIAL MASTER:  Just double-check.  I
 3    just want to make sure that what is sitting on her
 4    machine is the client-based software, is the same data
 5    that you are getting and receiving from the County on
 6    a regular basis.  I just want to dot my Is and cross
 7    my Ts.  Right?  I mean, there's no question it's
 8    preserved.  I just don't want there to be another
 9    application and we have to revisit this area.
10            With regards to the USB reporting, I just
11    want to be clear what I'm expecting.  They generate a
12    log; right?  It says, "This device was connected to
13    this by this user"; right?
14            MR. SCHAIBLEY:  Yes.
15            THE SPECIAL MASTER:  And I just want the log
16    files.
17            MR. SCHAIBLEY:  Yes.
18            THE SPECIAL MASTER:  You can do detailed log,
19    that's what I want.  There will be two or three
20    options.  The most detailed, the better.  The more the
21    detail, the better, for the log.
22            MR. SCHAIBLEY:  The log files are contained
23    within the antivirus database that we use.  It's not
24    like on the local machines.
25            THE SPECIAL MASTER:  No, I know.  But you
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    have a client to access the log?
 2              MR. SCHAIBLEY:  Yes.
 3              THE SPECIAL MASTER:  Yes.  So what I'm saying
 4    is, when you access that, I want things -- I don't
 5    want the -- I don't want the high-level report.  I
 6    want the detailed report.  For Doug Spring, I want to
 7    know that these devices were connected on this day
 8    from this IP address.  Whatever it is recording, the
 9    more detail it can give me, the better.
10              Does that make sense?
11              MR. SCHAIBLEY:  Yes.
12              THE SPECIAL MASTER:  Now, with Iron Mountain,
13    we'll wait until Ms. Witty comes back, just because --
14              MS. FOLEY:  Yes.
15              THE SPECIAL MASTER:  So do you want to wait
16    for Ms. Witty to return to talk about the Department
17    of Labor?  I'm okay waiting.
18              MS. FOLEY:  Yes.
19              THE SPECIAL MASTER:  I want to be
20    crystal-clear about my production date.  It won't
21    move.  That rolling production date is set in stone.
22    If you cannot get that data done by that date, I will
23    appoint someone that can come in and do it.  Because
24    it shouldn't take you more than 72 hours to get it
25    done right.  So if you can't do it, I'm going to
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    appoint someone to come in and get it done.  Because

 2    one way or the other, counsel is going to get it, it's

 3    going to be in a review log file, and that's how that

 4    will be.

 5            Is there any confusion here?

 6            MR. EDMONDSON:  No.

 7            THE SPECIAL MASTER:  Because it's very

 8    important to me that we start making progress.

 9            MS. FOLEY:  Right.

10            THE SPECIAL MASTER:  And if we can't make it,

11    I will resort to alternative resources.

12            Then the remaining issue -- I have a feeling

13    you'll want Ms. Witty here as well -- IT -- but on

14    page 142 of the transcript, we were going to check

15    with the IT help desk for the IT ticketing system to

16    see how far back it went, because they were involved

17    with the Iron Mountain piece.

18            MR. SCHAIBLEY:  I have that date for you.

19            THE SPECIAL MASTER:  And if they have a log

20    of the Iron -- because they were involved in it;

21    right?

22            MR. SCHAIBLEY:  The system goes back to

23    April 29th of 2013.

24            THE SPECIAL MASTER:  Nothing gets to be easy.

25            Counsel, can you reach out to Iron Mountain
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

```
 1      via UMC and get a written -- I'm going to order, or I
 2      can subpoena if necessary but request first, the Iron
 3      Mountain logs.  Iron Mountain keeps a log because they
 4      charge you.
 5            MR. SCHAIBLEY:  I need to correct that date.
 6      I was looking at the wrong thing.  It is April 13th,
 7      2012.
 8            THE SPECIAL MASTER:  So can you please create
 9      a report, provide it to counsel, around the burning of
10      the scanning of the disc thing.  At our prior hearing
11      it was established that they went to IT help desk to
12      get a DVD burned.  And so whatever requests you have
13      as of April 13th, 2012, forward till to date, relevant
14      to the custodians, please provide it to counsel.  The
15      more detail, the better, and counsel can parse it down
16      accordingly.
17            Does that make sense?
18            MS. FOLEY:  Yes.
19            THE SPECIAL MASTER:  All right.  Let me put a
20      date next to that.  I know that we're piling it on.
21            April 22nd.
22            MR. SCHAIBLEY:  April 13th.
23            THE SPECIAL MASTER:  No, I'm telling you when
24      I want that list.
25            MR. SCHAIBLEY:  Oh, I'm sorry.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  The list, obviously, is
 2    any IT requests that they received to have a DVD or CD
 3    burned by any of the custodians of interest.
 4              Do plaintiffs have any questions or comments
 5    with regards to what we've been discussing?
 6              We'll touch on Department of Labor when
 7    Ms. Witty is back.
 8              MR. TOSTRUD:  May I approach?
 9              THE SPECIAL MASTER:  Does it have to do with
10    the Department of Labor?
11              MR. TOSTRUD:  No.  You had previously
12    requested a list of the search terms.
13              THE SPECIAL MASTER:  Yes.
14              MR. TOSTRUD:  Okay.  So it's contained at
15    page 4 of the joint status report.  It's at the
16    bottom.
17              THE SPECIAL MASTER:  This was it, what was
18    agreed upon?  Because I read this.
19              MR. TOSTRUD:  Yes.
20              Correct?
21              THE SPECIAL MASTER:  Perfect.
22              MS. FOLEY:  I'm sorry.  I don't see it.
23              THE SPECIAL MASTER:  So here's what I want.
24    I want -- before you run the EnCase, I just want a
25    list of the search terms.
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1            MR. TOSTRUD:  We included them.

 2            THE SPECIAL MASTER:  Is this what everybody

 3       agreed upon (indicating)?

 4            MS. FOLEY:  Yes.

 5            MR. TOSTRUD:  There was no modification to

 6       that, right, Margaret?

 7            MS. FOLEY:  I don't think so.

 8            MR. TOSTRUD:  I don't think so either.

 9            MS. FOLEY:  There could have been something

10       small that was tweaked, but I don't think so.

11            THE SPECIAL MASTER:  Okay.  Well, here's

12       what -- we're going to modify it when we, I think,

13       modified it to add a bunch of iPhone and iPad search

14       terms --

15            MS. FOLEY:  Oh, right, right, right.

16            THE SPECIAL MASTER:  -- that counsel provided

17       us.  So here's what I want.  Can I enter this?

18            MR. TOSTRUD:  Of course.

19            THE SPECIAL MASTER:  Page 4 of this

20       exhibit -- here we go.

21            MR. TOSTRUD:  Why don't I give you all the

22       pages so it's a complete document (handed).

23                 (Exhibit 11 was marked for identification

24               by the Certified Court Reporter.)

25            THE SPECIAL MASTER:  And we're just going to
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    go off the record.

 2                   (OFF RECORD.)

 3                   (Cayla Witty now present.)

 4         THE SPECIAL MASTER:  I want to just -- there

 5    are a couple of things before we get to the Department

 6    of Labor that I would like to touch on.

 7         Now, we have determined that the original set

 8    of data that Mr. Edmondson was looking at was not the

 9    complete set of data, I would like to request, given

10    that the document requests that counsel from UMC has

11    already responded to, that they not redo it but simply

12    revisit the document requests that have already come

13    in from Plaintiffs against the full, entire universe

14    of the data that was collected.

15         MS. FOLEY:  And give an updated response?

16         THE SPECIAL MASTER:  Yes, and update your

17    responses accordingly.

18         Because, for instance, like, you actually

19    haven't had a chance to look at the intranet data

20    because it hasn't been collected.  So theoretically,

21    there might be no policies because they only sit on

22    the intranet, just as a hypothetical example.  So --

23    and I'm sure that you would happily turn them over if

24    they had actually been in the data that --

25         MS. FOLEY:  Right.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  -- you had.  So I'm not

 2       going to dictate or determine what search terms I need

 3       you to run for that or how you do it, but what I do

 4       want to happen is you to revisit the document requests

 5       that you have received as the collection from the

 6       client is further supplemented and perfected, because

 7       I firmly believe that if policies were indeed

 8       collected -- requested and they exist largely on the

 9       intranet, and the intranet was never collected or

10       provided to UMC's counsel for searching or reviewing,

11       that you probably will need to supplement your

12       response.

13              I'm going to let you make your own best

14       judgment, and I will make a determination at a later

15       date if there are any issues with it.

16              My whole point being is that I recognize that

17       UMC counsel wasn't even involved at the time, that

18       they assume the collection had been done properly.

19              But irrespective of how we ended up here,

20       what I do know for a fact is that whatever you were

21       looking at still doesn't contain the intranet, doesn't

22       contain the network file shares, and doesn't contain,

23       more or less, a large percentage of the data your

24       client originally collected.  So I firmly believe that

25       you probably will end up supplementing your document
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    production.

2            Does plaintiff have any objection to that?

3            MR. TOSTRUD:  No.

4            THE SPECIAL MASTER:  And as that happens and

5    occurs, we will then -- if there are major gaps or

6    etc., downstream, we will address them, but I don't

7    foresee there being any.

8            I just -- I think that once you have the

9    ability to have all of the data before you and run

10   searches or however you want to do it, and we'll see.

11           MR. TOSTRUD:  We would expect that the

12   interrogatory responses would also be amended.

13           THE SPECIAL MASTER:  Whenever the request for

14   data came across.  Here's my --

15           MS. WITTY:  Just to clarify:  I think,

16   underneath the Federal Rules, there is the contingent

17   application to supplement discovery.  We will just

18   approach it with that type of perspective, but is

19   complete.

20           THE SPECIAL MASTER:  Yes, I know.  Wait.

21   Stop.  Off the record.

22               (OFF RECORD.)

23           THE SPECIAL MASTER:  Back on the record.

24           So to be clear, I am ordering UMC to

25   supplement all of its production, be it in whatever

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1     form as required under the Rules, as it receives the

2     additional information from their client.

3             Once it's done and production has been

4     supplement and completed, we will, if necessary,

5     revisit that.

6             Plaintiffs, any questions or comments?

7             MR. TOSTRUD:  That's fine.

8             THE SPECIAL MASTER:  UMC, any questions or

9     comments?

10            MS. WITTY:  (Shakes head side to side.)

11            MS. FOLEY:  No.

12            THE SPECIAL MASTER:  Perfect.

13            Now, I want to just touch on the intranet

14    because it is fairly -- it is an IIS server, if my

15    memory serves me right.  Is it a virtualized?

16            MR. CLARK:  No, it's physical.

17            THE SPECIAL MASTER:  Physical, perfect.  Even

18    better.

19            What's the backup policy on that?

20            MR. CLARK:  We have it (inaudible).

21            (Reporter requesting clarification.)

22            THE SPECIAL MASTER:  He has it right there.

23    They're looking (to reporter).

24            MR. LATTIN:  The policies and procedures that

25    are located on there?

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            THE SPECIAL MASTER:  I want the backup for
 2    the entire intranet, and then I want -- I want to know
 3    the entire intranet.  Let me be crystal-clear:
 4            If there are policies and procedures stored
 5    on the intranet, I would strongly encourage that you
 6    collect those and provide them to UMC's counsel
 7    immediately; and if there are any archives of prior
 8    procedures or protocols, that they also be collected
 9    and provided.
10            Basically any data sitting on your intranet
11    that is a policy, practice, procedure, or anything,
12    really, that should be collected and then searched.
13            Actually, just take a copy of the -- how big
14    is the intranet?
15            MR. LATTIN:  How big is that server?
16            THE SPECIAL MASTER:  Of live data.
17            MR. CLARK:  I don't recall.  I'd have to go
18    look at it, but not very big.
19            THE SPECIAL MASTER:  All right.  And what
20    about archived data sitting on it?  How about this:
21    Any active data, any active file sitting on the
22    intranet server, I want just a copy made.
23            MR. LATTIN:  Okay.
24            THE SPECIAL MASTER:  Counsel for Plaintiffs,
25    do you have any -- and then I want it provided and
```

Special Master's Hearing  ‐   April 7, 2014
*** Volume II ***

```
 1    searched with hash, chain of custody, and the whole
 2    nine yards.
 3            Counsel, Plaintiffs?  Any specific -- do you
 4    need a bit-level copy, or is it logical or...
 5            MR. PIXLEY:  I think the logical copy of
 6    those files would be fine.  I would preserve it in LO1
 7    file, but --
 8            THE SPECIAL MASTER:  Can we do that?  You
 9    guys have EnCase, right, UMC?
10            MR. SCHAIBLEY:  Yes.
11            THE SPECIAL MASTER:  So can you do that?  Did
12    you hear the request?
13            MR. SCHAIBLEY:  I'm sorry.  I didn't hear
14    what he said.
15            THE SPECIAL MASTER:  One more time,
16    Mr. Pixley.
17            MR. PIXLEY:  We would just do a targeted
18    collection.  I don't see the need to do a physical
19    image of that server.  Just do a targeted collection
20    and preserve those files in a logical evidence file.
21            THE SPECIAL MASTER:  Any questions?
22            MR. SCHAIBLEY:  No.
23            THE SPECIAL MASTER:  Counsel, is that
24    all right for you?
25            MS. FOLEY:  Is that doable?
```

```
 1              MS. WITTY:  My only concern is the search
 2      terms.
 3              THE SPECIAL MASTER:  No, no.  Search terms
 4      are staying as you have agreed in your -- oh, you
 5      weren't here.  We entered into evidence the 12 search
 6      terms.
 7              MS. WITTY:  Does that include the iPad,
 8      iPhone, all of that information?
 9              THE SPECIAL MASTER:  I'm waiting to get
10      those.
11              MS. FOLEY:  But it was the ones back from
12      September.
13              MS. WITTY:  From the previous agreement?
14              MS. FOLEY:  Yes.
15              THE SPECIAL MASTER:  What's the issue with
16      the search terms?
17              MS. WITTY:  If I'm remembering correctly, you
18      know, there are such things as, the word "policy" is
19      one of the search terms.
20              THE SPECIAL MASTER:  It's right there.
21              MS. WITTY:  And depending on how they are
22      run, I just want to make sure that it's not -- it's
23      not turning over everything.  I think there might be
24      things that are responsive that don't.
25              THE SPECIAL MASTER:  "Policy" isn't one of
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    them.
 2            MS. WITTY:  If there is no meal break policy.
 3            THE SPECIAL MASTER:  "Meal/lunch policy," is
 4    that individual words, or is it a phrase?
 5            MS. FOLEY:  It's a phrase.
 6            MR. TOSTRUD:  However we negotiated it.
 7            THE SPECIAL MASTER:  I don't know how you --
 8    I wasn't in the negotiation.
 9            MS. FOLEY:  It's on the same line, so it's a
10    phrase.
11            MR. GODINO:  All those words appear on a
12    server.
13            MS. WITTY:  And see, that's the concern that
14    I have.
15            THE SPECIAL MASTER:  Did the Court issue an
16    order around this, or should I just quickly do this?
17            MS. WITTY:  I think it would be better to
18    clarify.
19            MR. TOSTRUD:  I think there was an order.
20    I'm happy to work through it.
21            MS. WITTY:  It's transcripts.  That's what
22    I --
23            THE SPECIAL MASTER:  Okay.  All right.  So
24    order or otherwise, if there is a transcript, can
25    someone please provide it to me?  Because I'm not
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    going to -- I'm going to prudently support whatever

2    ruling has been issued already.

3         MR. O'MARA:  What was that date of the

4    joint -- report?  September?

5         THE SPECIAL MASTER:  Yes, September.

6         MR. O'MARA:  2013.

7         MR. TOSTRUD:  I've got the transcript here.

8         THE SPECIAL MASTER: 9-19-13.

9         Off the record.

10            (OFF RECORD.)

11         THE SPECIAL MASTER:  Here's how this is going

12    to go.  On the record.

13         I'm ordering Mr. Edmondson to run -- take a

14    screen shot of how he has configured the EnCase of the

15    search terms that are currently listed plus the

16    mobile.  Okay?

17         I'm then ordering him to create a spreadsheet

18    that outputs to me the search hit, not -- search file

19    hits for each one of the search terms with -- I'd like

20    to also see the sources.  Since you are breaking

21    anything into individual E01s, it shouldn't be that

22    hard.

23         So I will know -- for instance, for

24    Ms. Panzeri, I will know that for these 12 search

25    terms against these sources, this is what was hit.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      Okay?
 2             Based on that, I will either refine the
 3      search terms or amend or add to the search terms
 4      accordingly.
 5             I will point out for the record that the
 6      document, which forthwith there is an affidavit
 7      coming, does someone have, that I could look at really
 8      quickly?  The --
 9             MS. FOLEY:  The e-mail?
10             THE SPECIAL MASTER:  No.  The...
11             MR. TOSTRUD:  Exhibit 11?
12             THE SPECIAL MASTER:  Yes.  Oh, not this one.
13      The exhibit that had the --
14             MR. TOSTRUD:  Oh, Exhibit 9.
15             THE SPECIAL MASTER:  Exhibit 9.  So just for
16      demonstrative purposes.
17             So -- and I'm also looking at -- oh, can we
18      enter these into evidence as well, Counsel Witty, the
19      folders you produced as one exhibit, the custodian
20      interviews?
21             MS. WITTY:  Yes.  There's actually a full
22      copy for...
23                   (OFF RECORD.)
24                   (Exhibit 12 was marked for identification
25                by the Certified Court Reporter.)
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1                    (Exhibit 13 was marked for identification
 2                 by the Certified Court Reporter.)
 3              THE SPECIAL MASTER:  I would recommend a
 4      search term like "retention schedules."  I would also
 5      recommend another one where they -- and see what we
 6      get.
 7              MS. WITTY:  And when you say "retention
 8      schedules," I'm assuming you mean that in a paired...
 9              THE SPECIAL MASTER:  What?
10              MS. WITTY:  So in as a single search term?
11              THE SPECIAL MASTER:  Yes.
12              My problem right now is that your policies,
13      when I'm looking at them, that you provided me, forget
14      what they gave me, they are all different.
15              MS. WITTY:  Yes.
16              THE SPECIAL MASTER:  I mean, they don't have
17      any of the same anything.  Just for example, like,
18      this one has attachment lists right here.  See how
19      that has attachment lists and then this one has
20      attachment lists, but the other two -- these don't,
21      but then others do, and then this has procedure and
22      others don't.
23              So before we get to the new search terms,
24      let's run the ones that I suggested, see what we get
25      back, recognizing that it might be necessary once we
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    see what the results look like.
 2            I don't want to -- I want to get the hard
 3    data and then we can revisit it in a hearing, because,
 4    as much as I want to issue it now, I would rather do
 5    it with understanding what the data set actually looks
 6    like prior to making any substantive findings to what
 7    would be or not be an appropriate search term.
 8            Who gave me this?
 9            I think once we know the numbers and the
10    data, we'll be able to do that.
11            Now, with regards to that, Mr. Edmondson,
12    you'll have till the 14th to share with me those
13    results.
14            MS. WITTY:  From the intranet?
15            THE SPECIAL MASTER:  No, from the first user.
16            MR. EDMONDSON:  Okay.  So we'll still work it
17    within the time frame to --
18            THE SPECIAL MASTER:  Yes, you will run the
19    search terms with Mr. Espinoza, provide me the hard
20    numbers, we'll have a phone hearing if necessary, and
21    I will amend accordingly.
22            I want to see what we get in a rolling
23    production, recognizing that we will supplement as
24    necessary as we learn more.  And as we actually see
25    what the universe of data is, we can then adjust
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

1    accordingly.

2          MR. TOSTRUD:  Okay.  May I emphasize the

3    importance of these specific search terms by

4    explaining the genesis of them?

5          THE SPECIAL MASTER:  They were running them.

6          MR. TOSTRUD:  Okay.  But just so you -- we

7    pulled all of those specific identifiers and search

8    terms directly from the Department of Labor

9    investigation documents that they provided.  That's

10   how we came up with them.

11         So we did what you did with the retention

12   schedule and pulled out their language from it.

13         THE SPECIAL MASTER:  I would -- so off the

14   record.

15              (OFF RECORD.)

16         THE SPECIAL MASTER:  Back on the record.

17         Is there any date parameter set for the

18   searches?

19         MR. TOSTRUD:  I think back to July of 2008.

20         MS. WITTY:  That was our understanding.

21         THE SPECIAL MASTER:  To when?

22         MR. TOSTRUD:  Present.

23         THE SPECIAL MASTER:  Today?

24         MS. WITTY:  Through collection.  Through the

25   collection, yes.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            THE SPECIAL MASTER:  Through the collection
 2     date.  Okay.  So there is a date limitation.
 3            File types, did you guys receive the list?  I
 4     haven't checked my e-mail since I've been sitting
 5     here, but Counsel Witty provided us a list of file
 6     types.  Is that correct?
 7            MR. O'MARA:  All I have from her today is
 8     that Exhibit A.
 9            THE SPECIAL MASTER:  Was the file type list
10     provided to us, to the parties yet?
11            MS. WITTY:  I don't know, sir.
12            THE SPECIAL MASTER:  Mr. Edmondson, you were
13     going to generate that?
14            MR. EDMONDSON:  Yes.  I sent it to --
15            MS. WITTY:  That was --
16            THE SPECIAL MASTER:  We'll push that till
17     Wednesday to circulate to us.  We'll schedule a
18     hearing for Thursday or Friday to go over that.
19            MR. TOSTRUD:  This Friday?
20            THE SPECIAL MASTER:  Yes.  We can do it over
21     the phone.  It will be a quick hour hearing.  What I
22     need to know, the goal is -- and, Plaintiffs, if you
23     want to see all the data types, fine.  It's an
24     opportunity for you to look at what the data file
25     types are and make a finding, if you want to look at
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    them all or not.

2          All right.  There was something else you

3    wanted to clarify?

4          MS. WITTY:  Oh, when we were talking

5    specifically about the policies and procedures

6    viewable through the intranet, I believe it was

7    represented by plaintiffs' counsel that one of their

8    named plaintiffs obtained the policy with regard to

9    record retention from the intranet.

10          However, there is a separate server that

11    holds all those policies that is accessible through

12    the intranet.  And so we want to make sure that it is

13    clear that we are going from the server that has --

14    holds all those policies and procedures.

15          THE SPECIAL MASTER:  I'm going to make it

16    even clearer.  I want both.  Unless someone at UMC can

17    tell me with 100 percent assurances that they are

18    duplicative and that there are no policies sitting on

19    the archive of the IIS server that are not in the new

20    source -- I understand what it is today.  What I'm

21    talking about is four years ago when you were running

22    the IIS server.

23          MR. CLARK:  Maybe I could clarify.  You want

24    me to do it on the record?

25          THE SPECIAL MASTER:  On the record, please.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MR. CLARK:  The server is a
 2  Lotus Notes/Domino.  It holds all the policies.  When
 3  you get to that, you click on the link on the
 4  intranet.  It redirects you.  It opens up another
 5  window in the browser.
 6            THE SPECIAL MASTER:  Perfect.  So then pull
 7  that server.  Pull both servers.
 8            MR. TOSTRUD:  And I represented that I wasn't
 9  sure where he identified it, but we are going to
10  provide an affidavit.  It may --
11            THE SPECIAL MASTER:  That's fine.  Give me
12  the affidavit.  All I want is that --
13            MS. WITTY:  We'll cover all of our bases.
14            THE SPECIAL MASTER:  I just want to make sure
15  we don't have the conversation again.
16            So perfect.  Let me be clear.  Any database
17  or server that is touching the intranet to provide
18  policies, procedures, or protocols needs to create a
19  logical file volume and search terms run.
20            Any other clarification there necessary?
21             Let's go off the record.
22                (OFF RECORD.)
23            THE SPECIAL MASTER:  Back on the record.
24            I did want to touch -- we will get to
25  Department of Labor.  I'm not putting it off, I
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     promise.
 2             I wanted to just touch on Doug Spring's
 3     custodian interview.
 4             You had a question --
 5             MR. FORREST:  Yes.
 6             THE SPECIAL MASTER:  -- Mr. Forrest?
 7             MR. FORREST:  I do.
 8             THE SPECIAL MASTER:  And just for purposes of
 9     clarification, he does not know what a dummy terminal
10     is.  They do not have dummy terminals at UMC.  They do
11     not exist.  They have computers with Citrix on it.
12             MR. FORREST:  Okay.  We are ready to discuss
13     the Q drive.  We said when we see all of the drive
14     mappings, all would be made clear --
15             THE SPECIAL MASTER:  To be clear, the Q drive
16     is a network file share that Mr. Spring references in
17     his custodian interview which, when we get the full
18     chain of custody, it will say, "This is the Q drive
19     and this is what it means."
20             Does that sufficiently answer what you are
21     looking for?
22             MR. FORREST:  It promises an answer.
23             THE SPECIAL MASTER:  Yes, it'll tell you Q
24     maps to this.
25             MR. FORREST:  Well, no.  I was just curious
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      whether when it says "Q is a share drive," whether
 2      it's a personal home share or whether --
 3              THE SPECIAL MASTER:  Any network file share
 4      that he has access to they are going to collect and
 5      then present to counsel, then counsel will -- remember
 6      where they are going to do that whole hash value
 7      comparison, and then counsel will review it.
 8              Obviously, Counsel, the Q network file share
 9      should be included.
10              When he -- he was accessing the network file
11      share, Q drive --
12              MS. WITTY:  Yes.
13              THE SPECIAL MASTER:  -- whatever the Q drive,
14      I think it's the human resource -- I don't remember.
15      Whatever the mapping was, that should be definitely
16      included.
17              Let me make it even more broad:
18              Any network file share referenced in any
19      custodian interview, Plaintiffs will have the pleasure
20      of pulling out the custodian interviews and providing
21      it to me and to you, so that way there is no confusion
22      as to what we're looking for, in addition to your own
23      review of the network file shares that are collected.
24              Is that clear?
25              MS. WITTY:  Yes.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  And I want that by
 2     Thursday.
 3              MR. FORREST:  Okay.  Because it refers
 4     separately to the HR share drive as well.  Maybe they
 5     are the same thing.
 6              THE SPECIAL MASTER:  So then what I'm going
 7     to request is that you create a table that says, "Doug
 8     Spring says" -- "references four or five different
 9     share drives in his custodian interview."
10              Then you're going to provide it to everybody,
11     so that when counsel and UMC is doing the actual
12     collection, they can make sure that that is included
13     within the collection.
14              MS. WITTY:  So by Thursday we'll have a list
15     of --
16              THE SPECIAL MASTER:  Just from the custodian
17     interviews.  They're going to -- you are going to
18     collect everything.
19              MS. WITTY:  Right.  Right.  That is not at
20     issue.
21              THE SPECIAL MASTER:  This is just what I
22     expect to be included, because the custodians are
23     stating that they store relevant documents there.
24              MS. WITTY:  But we don't need to provide by
25     Thursday --
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1            THE SPECIAL MASTER:  You provide nothing.

2      He's giving to me on Thursday and to you a list of

3      network file shares that are in the custodian

4      interviews --

5            MS. WITTY:  That he anticipates should be a

6      part.

7            THE SPECIAL MASTER:  -- that he anticipates

8      should be part of what -- de minimis.  I'm trying to

9      make your job a little easier.

10            MR. FORREST:  Okay.  And then my second

11      question from there was referring to the sentence in

12      the paragraph on page 2 labeled "Handheld Devices."

13      That's the fifth paragraph from the bottom, the line

14      that begins "personal home computers."  At the end of

15      that the sentence begins:

16                "As UMC does not allow his phone to

17                connect to servers, you can only access

18                e-mail through webmail within internet

19                browser."

20            THE SPECIAL MASTER:  This is just him being

21      technically illiterate, I believe, but what's your

22      question?

23            MS. WITTY:  Yes.

24            MR. FORREST:  Does that mean essentially that

25      he is accessing his UMC e-mail from outside using his

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     personal device?
 2           THE SPECIAL MASTER:  So let me offer some
 3     clarification -- okay.  Fair question.  The question
 4     is, is Doug Spring using his personal device to access
 5     UMC e-mail, in this statement?
 6           MR. FORREST:  Via webmail.
 7           MS. WITTY:  That was his assertion, that he
 8     was accessing it through webmail, yes.
 9           THE SPECIAL MASTER:  And webmail is their
10     Outlook client that you can log in.
11           MR. FORREST:  OWM, I see.
12           THE SPECIAL MASTER:  I'm assuming that's it.
13     Nobody has called it that.
14           But the point is, is that I'm assuming it's
15     OWM, and you are correct, and that he was using his
16     mobile device to access OWM.
17           MR. FORREST:  Well, I'm wondering
18     whether that -- whether we need to --
19           MS. FOLEY:  What does "OWM" stand for?
20           THE SPECIAL MASTER:  Outlook webmail.
21           MR. FORREST:  I mean, I'm just wondering
22     whether there are things that could exist there that
23     do not -- at this point do not exist anywhere else.
24     That's all.
25           THE SPECIAL MASTER:  In order for --
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1      Mr. Pixley, correct me if I'm wrong, but when you use
 2      OWM on a tablet, Outlook webmail client, and you send
 3      an e-mail, your tablet may cache -- it will cache the
 4      Internet page.  I don't think it caches the actual
 5      e-mail message itself separately unless you are using
 6      the new Windows.
 7            And I haven't actually used the Windows 8
 8      platform to how OWM integrates into it, but I do
 9      believe that on most tablets it just caches in a local
10      copy of the Internet browser, whatever the substance
11      of the e-mails.
12            MR. PIXLEY:  I would probably, then, say that
13      most browser -- most servers now will tell the browser
14      to use the rule do not cache so the body of the
15      message won't even be there.  So it's not really a
16      reliable method --
17            THE SPECIAL MASTER:  Right.  I agree with you
18      100 percent.  I mean, I don't -- do you guys set that
19      rule?
20            MR. SCHAIBLEY:  I'm sorry, I didn't hear what
21      he said there.
22            THE SPECIAL MASTER:  We should -- it's
23      actually a very valid point.
24            Off the record.
25                  (OFF RECORD.)
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Back on the record.
 2              What he pointed out is that OWM
 3     configuration, for most enterprises today, sets a flag
 4     at the server level not to cache the body of the
 5     message in the Web client.
 6              MR. SCHAIBLEY:  That is correct.
 7              THE SPECIAL MASTER:  I know he's right.  What
 8     I'm asking is, is that what UMC has?
 9              MR. SCHAIBLEY:  I would have to go back and
10     double-check on our policy on that.
11              THE SPECIAL MASTER:  Double-check, take a
12     screen shot, and provide it to counsel.
13              Even if they don't, even if they allow for
14     caching, you are still talking about if he's using
15     OWM, I don't think there is going to be anything
16     there.
17              If he has configured the e-mail client on the
18     iPad to directly connect through an IMAP or SMTP
19     client, that's a different story.
20              But using OWM, I mean...
21              MR. FORREST:  Well, he does say through the
22     browser, so I presume it's over at UA (inaudible)
23     or --
24              THE REPORTER:  "Or" the what?
25                 (No response.)
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Webmail, whatever
 2      they're going to call it, the point being is that
 3      it's --
 4              MR. FORREST:  Guided by the policies that
 5      they're setting.
 6              THE SPECIAL MASTER:  Yes.  So I don't think
 7      looking at his mobile device for that makes any sense.
 8      However, once I get my iPad, iPhone, Android results
 9      for the "sent by," that might very well change my
10      personal view right now, specifically being if there
11      are any communications or e-mails that say "sent by,"
12      and I mean, a one, in order for that to happen -- let
13      me make this crystal-clear.
14              In order -- and Mr. Pixley, you have more
15      experience with, I think, the newer versions of the
16      Macs.  I don't have a lot of 5s experience.  But the
17      way I understood at least the earlier versions, that
18      is virtually sent by iPhone 5s, you actually have to
19      configure your mail client on your phone so it will
20      append that to the signature line of the message.
21              MR. PIXLEY:  It's not there by default.
22              THE SPECIAL MASTER:  Right.  It's not there
23      at all.  So if it appears on a single one of those
24      e-mails sent by iPhone, it means that his phone was --
25      the user's phone was configured to connect to UMC's
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      mail client and servers, and that means local copies

 2      of the entire folder structure and contents could sit

 3      on that mobile device.

 4             Does that make sense?

 5             Counsel for UMC?

 6             MS. WITTY:  Yes.

 7             THE SPECIAL MASTER:  We can go off the record

 8      and they can explain it, if you would like.

 9             MS. WITTY:  I understand.

10             THE SPECIAL MASTER:  Okay.  Fine.

11             Anything else for Mr. Spring?

12             MR. FORREST:  No.

13             THE SPECIAL MASTER:  I have one.  It says:

14                 "Mr. Spring did not specifically

15                 identify any computer workstations other than

16                 his Trauma Building office computer and his

17                 Delta Point office computer.  He considers

18                 his Delta Point office computer 'a dummy

19                 terminal.'"

20              Because he doesn't regularly save.

21             All I want to know is, does he have his own

22      computer, what he's talking about here?

23             MS. WITTY:  Yes.  He has a separate office at

24      Delta Point.

25             THE SPECIAL MASTER:  And he has a computer
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      sitting there; is that what he is talking about?
 2              MS. WITTY:  Yes, yes.
 3              MS. FOLEY:  He's got two.
 4              MS. WITTY:  Yes.
 5              THE SPECIAL MASTER:  Yes.  Just he calls this
 6      one a "dummy terminal," but it's not --
 7              MS. WITTY:  Because he has no idea what that
 8      term means.
 9              THE SPECIAL MASTER:  Right.  But even if he
10      did know what it means or he did know it, he has two
11      computers that he -- if you don't have a key to his
12      office, you can't use it.
13              MS. WITTY:  Well, I don't know how they lock
14      the offices.  But yes, it's his office.  It's isolated
15      for his use.
16              THE SPECIAL MASTER:  I'm not allowed to go in
17      there and hang out and write e-mails, so I'm going to
18      go with --
19              MS. FOLEY:  Especially not you.
20              THE SPECIAL MASTER:  Especially not me.  I am
21      forsaken from entering.
22              Okay.  Let me see if there are any -- does
23      anybody have a hard stop?
24              That's fantastic.
25              Then I did have a chance to read Mrs. Myers'.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1     I'm going to ask that counsel for the plaintiffs will

2     go off the record and you specifically read Ms. Myers'

3     custodial interview and then we'll go back on the

4     record.

5             (OFF RECORD.)

6             THE SPECIAL MASTER:  Who is Maria Hernandez?

7             MS. WITTY:  She is an HR analyst.

8             THE SPECIAL MASTER:  And what does "long-term

9     storage for HR" mean?

10            MS. WITTY:  The -- so anything that leaves

11    the HR storage --

12            THE SPECIAL MASTER:  Electronic or paper?

13            MS. WITTY:  Yes.

14            THE SPECIAL MASTER:  Does she have a log?

15            MS. WITTY:  I would presume so.

16            THE SPECIAL MASTER:  Can you please get it

17    from her?

18            MS. WITTY:  I will say they have not sent

19    anything out in a very long time, but we'll make

20    sure --

21            THE SPECIAL MASTER:  I read it.  The last

22    thing is that the CEO got interviewed or hired.

23            MS. WITTY:  That was two CEOs ago.

24            THE SPECIAL MASTER:  Now, she also

25    mentioned -- people mention they have access to the

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    AS/400, which takes me to my point earlier about

2    applications and data.  That's patient tracking.  Does

3    the AS/400 hold payroll data?

4         MR. LATTIN:  I don't have any knowledge of

5    that.

6         THE SPECIAL MASTER:  The reason I ask is

7    because, if you read her sentence, she says,

8    "AS/400-older patient tracking information, used by

9    HR/payroll, purely historical information (check

10   timekeeping/pay rate that is now in SAP)."

11        When did you switch to SAP?

12        MS. WITTY:  I believe the same time they

13   switched to Kronos in 2007.

14        THE SPECIAL MASTER:  So there would be no

15   relevant records in the AS/400?

16        MS. WITTY:  No.

17        MR. CLARK:  What they -- let me clarify.

18        Okay.  When we switched over to Kronos in

19   2004, we put Kronos Timekeeper on the AS/400.  Then we

20   switched to Workforce Central, then we moved all that

21   data into Workforce Central, which is its own

22   application and own database server.  Then when SAP

23   went live, it kind of fed into SAP at the County.

24        THE SPECIAL MASTER:  Okay.  So it's not

25   sitting on the AS/400 today?

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1            MR. CLARK:  It shouldn't be.  My
 2    understanding is the application is gone.
 3            MS. WITTY:  The -- what I understand with --
 4    specifically with regard to what Claudette is
 5    accessing, is when there is someone who, from decades
 6    past, so ten years or more ago, needs specific
 7    information from their employment records, that's
 8    where it would be located and that's why she has
 9    access.
10            I know that there are several individuals on
11    the opt-in plaintiffs' list that have been there for
12    20 years or more, and that's where that information
13    would start.
14            MR. CLARK:  I might add, the AS/400 is just a
15    mid-range, and primary Timekeeper was on it,
16    MedSeries 4 is the clinical product that's on it as
17    well.
18            THE SPECIAL MASTER:  Oh, really?
19            MR. CLARK:  Yes.
20            THE SPECIAL MASTER:  Today?
21            MR. CLARK:  Yes.
22            THE SPECIAL MASTER:  You are running Kronos
23    off the AS/400?
24            MR. CLARK:  We moved it off to work with
25    Central on an application database server platform, HP
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    servers.
 2            THE SPECIAL MASTER:  Okay.  Which one?  You
 3    are using HP servers, not the AS/400?
 4            MR. CLARK:  Right.  The IBM --
 5            THE SPECIAL MASTER:  Did you migrate the
 6    data?
 7            MR. CLARK:  The company came in, and we moved
 8    everything off.
 9            THE SPECIAL MASTER:  All right.  Right.  So
10    they migrated?
11            MR. CLARK:  Right.
12            THE SPECIAL MASTER:  Okay.  So there was
13    nothing in there that wasn't in the new one.  As long
14    as they migrated it, I'm okay.  If they didn't, I have
15    an issue.
16            Okay.  Then my other question for her is --
17    oh, what was it?  The only thing Claudette burns to
18    disc are hearing records for union, labor relations,
19    and hearing officers.
20            I don't mean to sound ignorant about what you
21    do, but what does that mean?
22            MS. WITTY:  They're audio recordings.  All of
23    the hearings involving grievances that are taken up
24    through the union are recorded audio.
25            THE SPECIAL MASTER:  So these are, like,
```

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    audio actual recordings?
 2          MS. WITTY:  Hearings.  It'd be exactly like
 3    what the Court would record if they were recording
 4    today.
 5          THE SPECIAL MASTER:  Okay.  All right.
 6          MR. TOSTRUD:  Have those been produced, the
 7    audio of the hearings?
 8          MS. WITTY:  I don't believe that any have
 9    been produced.
10          THE SPECIAL MASTER:  They haven't been
11    collected yet.  So before we get to their
12    production --
13          MS. WITTY:  I don't know that they would
14    be --
15          THE SPECIAL MASTER:  Well, before we get
16    there, one sec.
17          Are the hearing -- do we have -- the reason
18    why I'm asking is, now that I know what they are, are
19    they considered to be a responsive source of
20    information?
21          MS. WITTY:  I would need to look specifically
22    at the request to know what they were responsive to.
23          THE SPECIAL MASTER:  Okay.  So can you
24    just -- now that we know they exist, can you go learn
25    more about them and then figure out if they are
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    responsive or not?  Because she doesn't even give us a

2    date range.

3         Okay.  My next thing, this is where the

4    intranet -- why I am making you pull from both.  It's

5    exactly this sentence:

6              "Posts copies of a lot of forms to

7              intranet.  Does not share a log-in with

8              anyone."

9         Can someone please explain to me where she's

10   writing on the intranet?

11        MS. FOLEY:  I don't see that she is.

12        THE SPECIAL MASTER:  It says:  "Post copies

13   of a lot of forms to intranet."  Third paragraph, same

14   page.  I can show you.

15        Off the record.

16             (OFF RECORD.)

17        THE SPECIAL MASTER:  Back on the record.

18        Does the intranet have read/rewrite -- well,

19   obviously it has write capability for some servers.

20   What is she writing to and where is she writing?  And

21   let me just throw on:  I'm ordering you to figure that

22   out and collect if you do not know.

23        MS. WITTY:  I think that might be additional

24   clarification required.

25        THE SPECIAL MASTER:  You can go back and talk

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      to them.  All I want you to do is figure out --
 2      because she says very clearly "posts copies of a lot
 3      of forms."
 4            She doesn't say I'm, like, posting.
 5      There's -- it's a very clear activity; right?  You
 6      collect, attach, and you hit "post" or "send" or
 7      something.  And she has her own login.
 8            So please go -- if you don't know, remember,
 9      it's okay to say "I don't know."  What I do need you
10      to do is figure it out and provide, and under a
11      page -- well, two pages on the outside, some sort of
12      explanation as to what she's posting to, how she's
13      posting to it, where is it storing it, how long -- how
14      far back does it go.
15            Because apparently she has -- I don't even
16      know -- I don't know.
17            MR. FORREST:  Do you know what "CHRO" is?
18            MS. WITTY:  Chief human resources officer.  I
19      apologize.
20            MR. FORREST:  "Has access to CHRO," makes it
21      sound like it's a thing.
22            THE SPECIAL MASTER:  You didn't read it
23      beforehand.  This is actually much cleaner.
24            What I think she's referring to is that --
25      when she says "has access to the CHRO," I assume that
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    means she has access to his calendar and e-mail.

2         MS. WITTY:  Yes.  And I don't know if this is

3    clear on the records that are attached.

4         THE SPECIAL MASTER:  Do you want to go on the

5    record?  Are we off?  We've been on the record.  Do

6    you want to go on the record for the statement?

7         MS. WITTY:  Oh, yes, that's fine.  There --

8    you can -- within the print screens of the custodian's

9    inboxes, you can see where they have shared access.

10        MR. FORREST:  It's kind of hard to read.

11        THE SPECIAL MASTER:  She sent a soft copy.

12   You could blow it up.

13        MR. FORREST:  Okay.  Those are all shared

14   mailboxes down there at the bottom?

15        MS. WITTY:  I believe so.

16        THE SPECIAL MASTER:  That's just the screen

17   shot.  We're going to ask the Exchange guy if they are

18   shared mailboxes.  But you are going to have a list of

19   questions from when you extensively review these, so

20   we don't revisit the issue twice.

21        My only other question I have, because I

22   assume they'll have a -- she -- if information -- if

23   important information is needed, she sends an e-mail,

24   Knows there's an option within SAP to send a message,

25   but doesn't know if anyone uses it.  She tried to send

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      a message, but it wasn't returned.

 2              Does anybody else use SAP messaging?

 3              MS. WITTY:  Nobody else even knew about it,

 4      and I checked with Jackie Panzeri because I figured

 5      she would be the most likely.  No, yes, no one else

 6      even knew that there was messaging available.

 7              It's also because of the limitations for

 8      people who have access to SAP, who has messaging

 9      capabilities is also limited.

10              THE SPECIAL MASTER:  Very limited.  Actually

11      that's kind of disappointing.

12              Now, here's my other question:

13                  "When phones needed upgrading or

14                  servicing, Telecommunications Specialist Tina

15                  Burrage-Simon or Sandra Sandoval serviced

16                  John's phone."

17              That's the whole conversation we had earlier

18      today; right?

19              MS. WITTY:  I apologize.  We were discussing

20      the mailboxes.  Could you repeat that?

21              THE SPECIAL MASTER:  Where she says that she

22      spoke to Telecommunications Specialist Trina

23      Burrage-Simon or Sandra Sandoval, services John's

24      phone, that's that whole upgrade thing?

25              MS. WITTY:  Yes.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              THE SPECIAL MASTER:  Does she have a record
 2      of when that happened?  Because they don't keep any
 3      records.
 4              MS. WITTY:  I will check.
 5              THE SPECIAL MASTER:  Is there no IT ticket
 6      help desk for the phone service?
 7              MR. SCHAIBLEY:  Typically for the phones, no.
 8      It would typically be a phone call or an e-mail
 9      directly down to either Susie or Trina or Sandra.
10              THE SPECIAL MASTER:  What about in the
11      atypical situation?  I just want to know.  Like, you
12      have a help desk system.  Do people use it to log and
13      request phone help, or it just a
14      walk-down-and-hang-out kind of --
15              MR. SCHAIBLEY:  Yes, typically you would call
16      the help desk and have a ticket opened.
17              THE SPECIAL MASTER:  So can you check to see
18      if any tickets were opened for that?  I'll give you
19      the 25th on that.  I'm kidding.  I'll take it on the
20      15th.
21              That covers the custodian interview questions
22      I have.
23              MR. FORREST:  I'm just wondering about this
24      whole scanning process.
25              THE SPECIAL MASTER:  For the CEO search?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. FORREST:  No, no, but you -- in the last
 2     paragraph here, "did not get involved with the DOL
 3     investigation except to assist" Espinoza and Spring
 4     and "in gathering information from other people
 5     (requesting reports from payroll, etc)."  She "does
 6     not remember specific documents, but by practice would
 7     have scanned everything possible into a folder on
 8     common drive.  Doug would have hard copy duplicates if
 9     any were kept."
10              THE SPECIAL MASTER:  That's that network file
11     share thing.
12              MS. WITTY:  And it has been requested.
13              MR. FORREST:  Okay.  I'm just wondering
14     whether she's the only person who's scanning
15     documents.  Is it typical that people are scanning
16     paper documents, putting them somewhere?
17              THE SPECIAL MASTER:  Okay.  Is it a specific
18     question for Claudette, before we get to everybody
19     else?
20              MR. FORREST:  Well, I guess it suggests that
21     there is a specific folder for the DOL --
22              THE SPECIAL MASTER:  There is no doubt that
23     they gathered records for the time that they ran the
24     investigation, by their own admission, and they
25     scanned them in and that they have them sitting in the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    network file share; and that Counsel for UMC, now that

2    they're aware of it, are going to go get that file

3    share and produce it.

4          That's the whole exercise of them having a

5    rolling production and getting the information and

6    giving it to us.

7          MR. PIXLEY:  I would be curious to what

8    format she is scanning those documents into, since we

9    were asking that question about file types.

10          THE SPECIAL MASTER:  Yes, I'm not sure.

11          MR. PIXLEY:  It just depends on the person.

12    I see some people scan things into JPEG format and

13    then you say, "Well, I don't need to look at JPEGs."

14          THE SPECIAL MASTER:  You're going to look --

15    oh, I get it.  So here's the deal.  If you guys want

16    them to cut down your format file type list, you are

17    going to have to answer his question.  If you don't

18    want to cut the format file type list down, then you

19    don't have to answer his questions.

20          MR. PIXLEY:  Sounds reasonable.

21          THE SPECIAL MASTER:  Does that make sense?

22          Off the record.

23             (OFF RECORD.)

24          MS. WITTY:  So the scanning stations, the

25    copy machines, the physical device that is set up for

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    this process for scanning is only configured to allow
 2    PDFs, and that is immediately saved to the Q drive.
 3            THE SPECIAL MASTER:  Do you have a -- is
 4    there a policy or a configuration?  Is this for -- my
 5    concern is that -- is this for the machine she's using
 6    or -- how about this:
 7            Confirm that the machine she's referring to
 8    that she has access to is configured in the same or
 9    similar fashion and then we're okay.  All right?
10            Any questions, Plaintiffs, about it, now that
11    I made you take a look at it, about that one
12    interview?
13            MR. PIXLEY:  That's fine.
14            MR. GODINO:  Are you talking about -- I
15    assume -- she talks about receiving cancellation --
16    run requests by e-mail.  So I assume that will get
17    picked up in the search.
18            THE SPECIAL MASTER:  Not with your search
19    terms, but yes, hopefully it would.
20            MS. WITTY:  Best intention.
21            MR. GODINO:  Well, it would, with our search
22    terms, "lunch."
23            THE SPECIAL MASTER:  You don't have "lunch"
24    stand-alone.
25            I'll fix the issue with the search term
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    downstream.  Why don't you just flag the issue and
 2    make sure we revisit it in a couple of days.
 3                MR. GODINO:  And on this, I question -- she
 4    says she keeps binders --
 5                THE SPECIAL MASTER:  There we go.
 6                MR. GODINO:  -- for attestation and
 7    attestation forms, and I don't think those have been
 8    produced.
 9                THE SPECIAL MASTER:  I had to look up what
10    that meant, and so that's why I had you read it,
11    because I didn't actually know your area of the law,
12    which is why I wanted you to read it specifically.  I
13    would actually -- it is relevant and responsive;
14    right?
15                MR. GODINO:  It is highly relevant.
16                THE SPECIAL MASTER:  Okay.  I'm just
17    checking.  I did not know.  So my point is, have they
18    been produced?
19                MS. WITTY:  I cannot speak to that at this
20    moment.
21                THE SPECIAL MASTER:  That's fine.
22                MS. WITTY:  I believe that some have.
23                THE SPECIAL MASTER:  Can you do me a favor,
24    please?  By this Thursday, check?
25                MR. GODINO:  I'm pretty sure none have.
```

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

1            THE SPECIAL MASTER:  I know you are "pretty

2      sure."  Let her double-check to confirm.  If any have,

3      please provide the Bates-stamp numbers.  If they

4      haven't, we have a rolling production.  Please be sure

5      to include them.

6            MR. GODINO:  And -- and the hundred percent

7      of them, not just some of them.

8            THE SPECIAL MASTER:  Well, whatever the

9      privilege she wants to search or relevancy or

10     whatever, then that's the whole idea of being a lawyer

11     in production, and you can bring the argument to me if

12     the production is insufficient.  But let us get there.

13            MR. GODINO:  Well, I'm saying, like she says

14     they have produced some.  I want all of them produced.

15     She's going to have -- she's going to withhold on --

16            THE SPECIAL MASTER:  Wait, wait.  One second.

17            Let's go off the record.

18                (OFF RECORD.)

19            THE SPECIAL MASTER:  Back on the record.

20            I'm going to order UMC to review and produce

21     everything that she had in her possession, custody, or

22     control that is in compliance with the order and

23     motion to compel that was already ordered as a rolling

24     production and to start immediately.

25            MS. WITTY:  I understand that.

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              My question is the form.  Do they want it
 2       scanned --
 3              THE SPECIAL MASTER:  I thought --
 4              MS. WITTY:  (Inaudible word.)
 5              THE SPECIAL MASTER:  -- in the production
 6       protocol.  Oh, wait, actually, you are right, because
 7       we got rid of that.  So can it just be scanned PDFs
 8       that are OCR searchable?
 9              MR. FORREST:  Well, I think it's covered in
10       the revised protocol.  And I think single-page TIFF
11       sounds --
12              THE SPECIAL MASTER:  I thought we got rid of
13       single-page TIFFs?
14              MS. FOLEY:  I thought we got rid of TIFFs?
15              THE SPECIAL MASTER:  I'm pretty sure we got
16       rid of single-page TIFFs.
17              MS. FOLEY:  We talked through it on the 7th.
18              MR. FORREST:  Of hard copy documents?
19              THE SPECIAL MASTER:  I thought you wanted OCR
20       PDFs.
21              MS. FOLEY:  Yes.
22              THE SPECIAL MASTER:  I thought you wanted to
23       receive the documents searchable as PDF forms that
24       were scanned in, and that they were going to do it,
25       and you were going to do it for them.  If you want
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      TIFFs as image files that you OCR yourself, I don't

2      think they are going to complain.

3            MS. FOLEY:  And I think you brought up TIFFs

4      but then said, "Oh, PDFs," but I could be wrong.

5            THE SPECIAL MASTER:  If you just wanted to

6      scan and I give you unsearchable TIFF files that you

7      then OCR, fantastic.  I don't know why you wouldn't

8      take OCRed PDFs.

9            MR. FORREST:  Well, I thought we were taking

10     OCR single-page TIFFs.

11           THE SPECIAL MASTER:  I can look at the

12     hearing notes.

13           Actually, you know what?  How about you find

14     in the transcript where we said we would take OCR

15     TIFFs?

16           MR. FORREST:  Okay.  I will.

17           THE SPECIAL MASTER:  Okay?  If we said OCR

18     TIFF -- however we agreed in the transcript is how

19     we'll produce.  We will move forward because everybody

20     agreed during that hearing, and I don't need to

21     revisit it now.

22           MR. FORREST:  That's fine.

23           THE SPECIAL MASTER:  What I do need to

24     revisit is I need it to be turned over and reviewed

25     starting immediately, because I had to go -- I didn't

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      even connect all the dots the first time I read it.
 2              So what I also would request is that you go
 3      ask the other custodians, "Do you have attestation
 4      forms behind your desk," because she seems to indicate
 5      that it's common practice, at least for her in her
 6      department.
 7              MS. WITTY:  She is a timekeeper in HR, so she
 8      would be the only individual in HR that would have
 9      those.
10              THE SPECIAL MASTER:  Okay.  I don't know if
11      there are other -- whoever else may be within the
12      ambit of that --
13              MS. WITTY:  Right.
14              THE SPECIAL MASTER:  -- please speak with
15      them and confirm.  And if they do have, please
16      accordingly update your production.
17              Anything else, Plaintiffs?
18              MR. GODINO:  She mentions several times --
19      she seems to be one of these shredding individuals,
20      and I just want --
21              THE SPECIAL MASTER:  Where?
22              MR. GODINO:  She mentions a few times about
23      she likes to shred documents.
24              THE SPECIAL MASTER:  Most people really like
25      the word "shred."  "Shred" just means that they are
```

```
 1    smart and getting rid of data.  Now, I don't read
 2    "shred" the same you do.
 3         MR. GODINO:  I know you mean literally shred
 4    it.
 5         THE SPECIAL MASTER:  I mean literally, like,
 6    I'll shred hard drives, I'll shred --
 7         MR. GODINO:  You're talking about eradicating
 8    or eliminating.
 9         THE SPECIAL MASTER:  Eradicate, eliminate,
10    destroy.  If you show me where she says "shred," I
11    actually have no qualms with exploring it, and I give
12    full merit and credence to your discussion.  I just --
13    if you point out where.
14         MR. GODINO:  Under "Hard Copies," she says,
15    "If minutes are required for meeting, Claudette will
16    type up notes and handwritten reference is shredded."
17         THE SPECIAL MASTER:  Then she's shredding.
18    So she gets her notes, types them up, and then shreds
19    them.
20         MR. GODINO:  So, I mean, my question -- she
21    mentions shredding in other parts of this, so I'm just
22    making sure that she knows that there's a litigation
23    and she's no longer destroying documents.
24         THE SPECIAL MASTER:  I'm assuming that nobody
25    within UMC that is involved in this litigation is
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      actively shredding anything at this point.
 2              Can you please make sure Claudette has
 3      received the litigation --
 4              MS. WITTY:  She has, and we will reaffirm as
 5      to custom.
 6              THE SPECIAL MASTER:  Fair enough.  So let's
 7      assume that everybody has gotten the memo.
 8              MR. TOSTRUD:  Dovetailing on that point --
 9              THE SPECIAL MASTER:  Department of Labor?
10              MR. TOSTRUD:  No.  I don't think the
11      plaintiffs have received any of the so-called meeting
12      minutes that she refers to.
13              THE SPECIAL MASTER:  That was a question I
14      had.  I didn't know -- this is where -- this speaks to
15      your litigation, and so I don't know -- again --
16              MS. FOLEY:  With County commissioners, yes,
17      there's -- a lot of these are open meeting law
18      meetings and with minutes posted.
19              MR. TOSTRUD:  Well, we haven't received
20      those, I don't believe.
21              Furthermore, Mr. Espinoza testified in his
22      deposition last April that there were multiple
23      meetings that occurred --
24              THE SPECIAL MASTER:  Let's focus on her.
25      We'll get to him.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              I had the same question, but I don't actually
 2      know the substance of it.  But if the meeting minutes
 3      are relevant, I would assume they should be reviewed
 4      and turned over.
 5              MS. FOLEY:  Right, and I'll look back at the
 6      requests.
 7              THE SPECIAL MASTER:  Yes, just look at the
 8      document requests.  But she clearly indicates there
 9      are meeting minutes and that they should be in --
10              MS. WITTY:  I think that what might be more
11      helpful instead of -- I don't want this to devolve.
12      With this information from the custodian interviews,
13      it may be more helpful instead of -- for there to be a
14      list created and say, "This is something we're
15      interested in and we don't think we have."
16              THE SPECIAL MASTER:  Perfect.  I'm going to
17      order Plaintiffs to please go through each one of the
18      custodian interviews by this Thursday and compile a
19      list of every -- and I am expecting UMC to do the
20      same, okay? -- that identifies all of the document
21      sources that are yet to be provided that are
22      accordingly, for example, the meeting minutes.
23              Because unfortunately, I don't know the
24      underlying merits of your case, so I don't know if the
25      meeting minutes make sense or not.
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. TOSTRUD:  We absolutely will do that,
 2     Mr. Garrie, but I want to point out that the
 3     obligation, particularly after losing a motion to
 4     compel, is on the defendant and on defense counsel.
 5              THE SPECIAL MASTER:  Did that include meeting
 6     minutes?
 7              MR. TOSTRUD:  To identify all relevant
 8     evidence and turn it over to us.
 9              Now, we can have a further discussion.  I
10     don't think Magistrate Leen wants us to go back in
11     there on a motion to compel again.  She ordered that
12     they produce all relevant information.  I think there
13     can be no question that now the obligation is on them.
14              But we will provide a list of things that we
15     identified --
16              THE SPECIAL MASTER:  How about you -- how
17     about provide, in the spirit OF cooperation, a helping
18     hand to facilitate the expeditious production, and
19     they will diligently do the same.
20              And I expect UMC to provide and identify a
21     full and exhaustive list of everything that's in these
22     custodian interviews upon which -- and you will
23     provide as well, so nothing falls through the cracks.
24              MR. TOSTRUD:  I will just put on the record
25     now that one of the things that Plaintiffs are
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1     absolutely interested in and need to be produced

 2     immediately in whatever format we agreed to on Friday

 3     are the schedules and, you know, anything relating to

 4     employee schedules and assignment sheets for all the

 5     people in the hospital, all of our 600-plus people.

 6              THE SPECIAL MASTER:  Right.  So we're going

 7     to identify anywhere they reference in here that may

 8     or may not have been collected the first time.  And if

 9     they haven't --

10              MS. FOLEY:  Didn't we give you samples?  I'm

11     trying to remember.

12              MR. TOSTRUD:  Well, you've provided samples,

13     but we want all of the information.

14              MS. FOLEY:  Okay.  Okay.  I may have missed

15     that.

16              THE SPECIAL MASTER:  So we've got it recorded

17     for the record.

18              I, unfortunately, don't know the

19     underlying -- to me, meeting minutes are like --

20              MR. TOSTRUD:  I understand.

21              THE SPECIAL MASTER:  So, I mean, if it's

22     critical to your case, then I'm encouraging you to

23     educate me as the e-discovery special master that

24     meeting minutes are critical.  Because, mind you, I've

25     read now 47,000-plus pages of paper in this matter.
```

Special Master's Hearing  ·   April 7, 2014
*** Volume II ***

1     So I am becoming familiar with the topic, but I

2     certainly don't have your expertise or skills.

3           And for that matter, can you also when you

4     search -- when you go -- this returns back to my point

5     early on right after the break.

6           When you supplement your production in the

7     rolling, I'm betting that on the intranet there are

8     similar sorts of records perhaps stored, so please be

9     mindful of that.

10          And my advice to UMC is that you consider

11    creating some search terms rather than reading every

12    document on the intranet that will allow you to

13    identify this, because I have a hunch that there are a

14    lot of them.

15          But if that's where they are storing them,

16    you have an obligation to check and in a complete and

17    thorough and reasonable fashion.

18          MS. FOLEY:  Okay.

19          THE SPECIAL MASTER:  Okay.  Department of

20    Labor, I'm going to take a stab here at this because

21    we had prior conversations about this.

22          Based on what Claudette testifies to, I'm

23    going to go -- or, no, didn't testify; I stand

24    corrected -- submitted in her custodian interview, I'm

25    going to go out on a limb and say that it might be

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      worthwhile for UMC's counsel to go back and speak with

2      Mr. Spring and the others who Claudette -- and John

3      Espinoza, who she says "scheduling telephone calls,

4      gathering information from other people, requesting

5      reports from payroll."

6              MS. FOLEY:  Yes.  And Jackie Panzeri, I

7      believe, said she assembled the data, and that was the

8      spreadsheet that we produced.

9              THE SPECIAL MASTER:  She says "gathering

10     information from other people."  One spreadsheet is

11     different than like, etc., etc.

12             MS. FOLEY:  Sure.  But there were also some

13     hard file documents that -- correspondence and stuff

14     that was produced.  But we'll keep --

15             THE SPECIAL MASTER:  Then she goes on to say:

16                 "Claudette does not remember specific

17                 documents, but by practice would have scanned

18                 everything possible into a folder on a common

19                 drive."

20              Which means somewhere within UMC's network

21     exists several or at least one folder, which probably

22     has sub-folders in it, that relate to the efforts by

23     these different custodians to gather documents in

24     response to the Department of Labor investigation.

25             MS. FOLEY:  And I believe we have produced

Special Master's Hearing  -  April 7, 2014
*** Volume II ***

```
 1    those, but I will certainly check on that.
 2              THE SPECIAL MASTER:  But you'd have -- the
 3    folder, the network file share folder, hasn't been
 4    provided to them.
 5              MS. FOLEY:  But if she scanned documents and
 6    put them in a folder.
 7              THE SPECIAL MASTER:  No.  She helped
 8    participate.  She didn't own the folder.  She didn't
 9    say, "I created the folder and I was the folder
10    owner."
11              She is part of the network file share where
12    multiple people were all contributing files to it.
13    And unless they gave you the folder --
14              MS. WITTY:  Right.  Essentially, what you are
15    asking is that, in our review of that --
16              THE SPECIAL MASTER:  It's a common drive.
17              MS. WITTY:  Right.
18              THE SPECIAL MASTER:  So, like, what it means
19    is that multiple people, in all likelihood, were
20    contributing to that folder which you haven't been
21    provided because it was never collected and never
22    searched.
23              MS. FOLEY:  It's -- it's possible, certainly.
24              THE SPECIAL MASTER:  Well, I mean, unless the
25    network file --
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MS. FOLEY:  You see, I -- my -- the way I
 2     picture it is that she just -- there were some --
 3              THE SPECIAL MASTER:  No, I think she --
 4              MR. FOLEY:  -- there.
 5              THE SPECIAL MASTER:  Let's be clear.
 6              MS. FOLEY:  Other people suggest --
 7              THE REPORTER:  One at a time.
 8              THE SPECIAL MASTER:  So I believe that
 9     whatever she had, that she -- you in good faith have
10     given over.  I'm not saying -- I'm not in any way
11     stating that you have withheld anything.
12              What I am saying is that UMC, your client,
13     created a network file share folder called the
14     "Department of Labor," whatever, as a common file
15     share, which would imply that more than just she was
16     using and putting documents in it.
17              So I would --
18              MS. WITTY:  We need to identify other --
19              THE SPECIAL MASTER:  Just identify who has
20     had access to it, who is putting documents into it,
21     and just make sure to turn them over.
22              MS. FOLEY:  Okay.
23              THE SPECIAL MASTER:  And then, obviously, any
24     other sources that may or may not --
25              MR. GODINO:  So, obviously since defense
```

1    counsel hasn't even reviewed those documents yet,

2    obviously they couldn't have been produced.

3            THE SPECIAL MASTER:  Well, they reviewed --

4            MS. FOLEY:  Well, you are assuming that they

5    exist.

6            THE SPECIAL MASTER:  Wait.  So let's be

7    clear.  They reviewed the paper versions that

8    Claudette has had and they've given to you.

9            What we have established is that the network

10   file shares were not collected.  So until they are

11   actually collected, the common folders that they are

12   referring to in her custodial interview could not have

13   been searched or reviewed by counsel because they

14   weren't given to counsel by UMC.

15           MR. GODINO:  That's what I'm saying.

16           THE SPECIAL MASTER:  So even though counsel

17   requested them, there is a disconnect.  Okay?  So once

18   they get them, I promise you, on our rolling basis,

19   they will happily turn them over to you.  I don't

20   think there is any desire to not turn them over.  It's

21   more a desire to have UMC as the client saying, "Here

22   you go."

23           And so which leads me to my point, at the

24   next hearing, I'm on the fence about whether -- strike

25   that.

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1              Yes, Counsel?
 2              MR. TOSTRUD:  A couple of documents that I'd
 3      like to enter into the record.
 4              THE SPECIAL MASTER:  Regarding the Department
 5      of Labor investigation?
 6              MR. TOSTRUD:  Regarding the -- yes, exactly
 7      what we are talking about with Ms. Panzeri.
 8              THE SPECIAL MASTER:  I didn't get to
 9      Ms. Panzeri, but you can kick us off.
10              MR. TOSTRUD:  Okay.  This is an e-mail
11      Bates-stamped UMC 100007 from Jackie Panzeri, dated
12      Thursday, March 28, 2013, relating to calculations
13      that were done in response to the Department of Labor
14      meal break compensation.
15              THE SPECIAL MASTER:  Before you read it into
16      the record, can you show it to counsel, and strike
17      what he just read and we'll submit it and he can read
18      it.
19              MR. TOSTRUD:  Fair enough.
20              THE SPECIAL MASTER:  And just for everybody's
21      edification, it's the last piece for the -- unless,
22      Counsel for Plaintiff, there is additional points that
23      you'd like to discuss.
24              MS. WITTY:  I guess I'm not sure why this is
25      being entered.  We fully understand that there are
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1     additional custodians that would have collected

2     information and data for this, and this has already

3     been produced.  We intend to produce any and

4     everything that is relevant and not privileged.

5              THE SPECIAL MASTER:  Can I see it?

6              MR. TOSTRUD:  Sure.  The reason it's being

7     entered into the record is that the document

8     specifically references simulations that were done in

9     SAP relating to the Department of Labor calculations.

10              THE SPECIAL MASTER:  That's TS1.

11              MR. TOSTRUD:  And so we would like to get a

12     copy of whatever those simulations were based on.

13              MS. FOLEY:  You have the copy, I believe.

14              MR. TOSTRUD:  I don't believe we do.

15              THE SPECIAL MASTER:  Wait, wait.  You do

16     believe; you don't believe.  Let's make it simple.

17     Can you please check to see if it's been turned over.

18     If so, provide the Bates stamp numbers, and that'll

19     put an end to that.

20              Now, what I do want to point out -- I'm going

21     to enter it in for one single, simple purpose -- is

22     that I would believe -- I want to know where

23     Ms. Panzeri put these documents.  I just want to know

24     that, Counsel for UMC, that Ms. Panzeri, whatever she

25     did with this, that you have -- she can properly

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1    account for and what and where the documents were

2    provided.

3         And I fully believe that when you say you

4    have turned them over, that you have turned them over

5    and you will provide the Bates stamps.  If you

6    haven't, you will turn them over and then they will be

7    Bates-stamped.

8         So my point being is that what I am more

9    interested in is, is where did she stick them.

10        MS. WITTY:  Could you read the date?

11        THE SPECIAL MASTER:  It's been entered in.

12   March 28th, 2013, 11:37 a.m.

13        (Exhibit 14 was marked for identification

14   by the Certified Court Reporter.)

15        We can go off the record.

16            (OFF RECORD.)

17        THE SPECIAL MASTER:  Back on the record.

18        I'm going to request that UMC identify what

19   TS1 is, and I believe it is the SAP test environment

20   as she indicates, but if you could please identify it.

21        I'm also ordering UMC to go back to

22   Ms. Panzeri and find out where she stuck these

23   documents within the network file share that she did

24   generate, and make sure that all documents that do

25   exist tangentially, directly, or otherwise are

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1    reviewed and either recorded and documented and

 2    produced or withheld on privilege or ignored because

 3    they're pictures of her dog, okay, or whatever.

 4    Whatever may fall within that purview.  Okay?

 5           MR. TOSTRUD:  There is one final document I'd

 6    like to introduce.

 7           THE SPECIAL MASTER:  So please show them.

 8           MR. TOSTRUD:  It's part of Espinoza's

 9    deposition.

10           MS. WITTY:  What pages?

11           MR. TOSTRUD:  I'm going to mark pages 151

12    through 171, but specifically the page that I'm going

13    to refer to is at page 170, line 21.

14           THE SPECIAL MASTER:  Do you have any

15    objection?  I haven't seen it yet, but do you have any

16    objection?

17           Can I see it?

18           MR. TOSTRUD:  Sure.  It's the Espinoza

19    deposition.  And here he refers to a summary report

20    that he thinks is available.

21           THE SPECIAL MASTER:  Who is Ms. Hernandez,

22    again?

23           MS. WITTY:  Ms. Hernandez is Maria Hernandez.

24    She is an HR analyst.

25           As has been stated, we intend to review the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1          DOL information.  We will continue to supplement any

 2          information that is located and not privileged for

 3          production.

 4               MS. FOLEY:  And I believe we did produce

 5          that.

 6               MS. WITTY:  We do believe that the

 7          calculations that are referenced were produced.

 8               THE SPECIAL MASTER:  The summary report?

 9               MS. FOLEY:  Yes.

10               MS. WITTY:  Yes.

11               THE SPECIAL MASTER:  Okay.  So what I'm going

12          to do is I'm going to enter it in and you are going to

13          provide the Bates stamp numbers for your production of

14          it, and I'll put that to -- as the next evidence --

15               MR. TOSTRUD:  15, I think.

16                    (Exhibit 15 was marked for identification

17                by the Certified Court Reporter.)

18               THE SPECIAL MASTER:  Off the record.

19                    (OFF RECORD.)

20               THE SPECIAL MASTER:  Let's go back on the

21          record really quickly.

22               I'm ordering UMC to provide the Bates stamp

23          number for the documents they provided.

24               Again, what I want to know is where did he

25          store it in UMC's network file share, and if he put it
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      in a shared file folder, take a look.  Okay?

2              MS. FOLEY:  The one he shares with Claudette?

3              THE SPECIAL MASTER:  It could be Claudette.

4      Who knows.  Okay.

5              But please, UMC's IT people, can you please

6      go back to Mr. Spring and Mr. Espinoza and explain to

7      them what a "dummy terminal" is and is not?  All

8      right.  And just, if you need to, I'm happy to have

9      them appear before me so I can explain, because they

10     are making our lives more difficult.

11             Okay.  Now -- anything else with the DOL?

12             MR. TOSTRUD:  Yes.  We have yet, I think, to

13     get the exact date of the start of the Department of

14     Labor investigation.  They were going to provide that

15     today.

16             MS. WITTY:  Timeline.  Mr. Espinoza is not

17     available and that is why we do not have a firm

18     timeline.

19             THE SPECIAL MASTER:  There you go.  I'm going

20     to order you, by next Monday, the 14th -- the 15th,

21     Tuesday, so he has one day back, to provide a written

22     statement or -- from Mr. Espinoza as to the timeline.

23     Strike that.  Redo.

24             I'm going to order you to get from

25     Mr. Espinoza an e-mail, a written timeline by Tuesday

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1      the 15th.

2             MR. TOSTRUD:  Including the start date?

3             THE SPECIAL MASTER:  Which should include,

4      but not be limited to, the start date for the purposes

5      of complete and total specificity, which I understand

6      the need from Plaintiffs to have that included.

7             Okay.  Now, let's go through this TIFF/PDF

8      discussion on OCR.

9             Do you want TIFFs?

10            MR. FORREST:  Yes.

11            THE SPECIAL MASTER:  I want to be clear that

12     if -- let's go off the record for a second.

13                   (OFF RECORD.)

14            THE SPECIAL MASTER:  On the record.

15            There is a litany of things to be done.  I'm

16     going to have to issue a formal order based on the

17     last two days of hearings.  I am going to encourage

18     both sides to provide me any additional language or

19     thoughts or anything they would like to see in such an

20     order.  Please provide me such language.  You'll have

21     48 hours to get me the language with attachments.

22            Okay?  Are we -- does this -- any questions?

23            MR. O'MARA:  When do we get the dirty copy?

24            THE SPECIAL MASTER:  I'll make it easy.

25     We'll do it on Thursday.

Special Master's Hearing   -   April 7, 2014
*** Volume II ***

```
 1                   (OFF RECORD.)
 2          THE SPECIAL MASTER:  So then you'll have by
 3    Thursday, end of business, because I've got to turn
 4    around from that and work on an order myself that I
 5    then have to send to the Judge.
 6          So that's that.
 7          With the other -- and in my order I will
 8    have -- I have actually reviewed all of the things
 9    that need to go outstanding, but I welcome from you
10    anything as well.
11          As to face-to-face hearings, I am going to
12    suggest the 24th and 25th.
13          MS. WITTY:  UMC's counsel is going to
14    politely request different dates.
15          THE SPECIAL MASTER:  For both of them?
16          MR. GODINO:  How about the -- can we make it
17    earlier maybe, on the 21st?
18          THE SPECIAL MASTER:  The 21st, 22nd can work.
19          MR. TOSTRUD:  That works for Plaintiffs'
20    counsel.
21          MR. GODINO:  Monday, Tuesday.
22          THE SPECIAL MASTER:  But you guys will be in
23    the middle of producing.  So let's do the 22nd.  The
24    production will be pushed out -- when are you guys
25    receiving the first production?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. PIXLEY:  The 22nd, 10:30, unless there is
 2     a FedEx exception report.
 3              THE SPECIAL MASTER:  Unless there's a FedEx
 4     strike; correct.
 5              MS. WITTY:  Don't say that.
 6              THE SPECIAL MASTER:  We will meet at 10:30 on
 7     the 22nd.  Prepare to go late.  We will have a phone
 8     hearing this Thursday at four o'clock.  By that time,
 9     you will have circulated your list of -- from the
10     custodian interviews.
11              MS. WITTY:  Four o'clock.
12              MS. FOLEY:  Yes.
13              THE SPECIAL MASTER:  The custodial interview
14     will be circulating.
15              MS. WITTY:  And on the 22nd, will that be
16     here?
17              THE SPECIAL MASTER:  10:30.
18              MS. FOLEY:  10:30 a.m. here?
19              THE SPECIAL MASTER:  Yes.  And we'll run
20     late.
21              MS. FOLEY:  Are we required to bring persons
22     from UMC with us?
23              THE SPECIAL MASTER:  Oh, yes.  They're going
24     to be here.
25              MS. WITTY:  You want the CEO; the CIO;
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1        Mr. Espinoza; similarly, a court reporter?

 2              THE SPECIAL MASTER:  Yes.

 3              MS. WITTY:  Same setup?

 4              THE SPECIAL MASTER:  Yes.  And can you let

 5     them know the reasons for them being called before me.

 6              Also, let's schedule another hearing, just to

 7     be on the safe side, for Tuesday, the 15th.

 8              MS. FOLEY:  Are we bringing our tech people

 9     on the 22nd?

10              THE SPECIAL MASTER:  If there are no

11     problems, no.  But if there are problems, yes.

12              MR. TOSTRUD:  Phone on the 15th or in person?

13              THE SPECIAL MASTER:  Phone.

14              I would keep it open.  Their CIO might want

15     them to be here because I will be asking him

16     questions.

17              MR. TOSTRUD:  I'm sorry.  We have a phone

18     hearing on Tuesday, the 15th?

19              THE SPECIAL MASTER:  Yes.  I was going to

20     suggest that we have -- just to slot it.  If we don't

21     need it, we won't.  But we have everybody here.

22     Again, would four o'clock work?

23              MR. TOSTRUD:  Four p.m. Pacific?

24              THE SPECIAL MASTER:  Yes.  And each hearing

25     will go for two hours.  All phone hearings will be two
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      hours, with a break in an hour for five minutes for
 2      the restroom break.
 3                  Off the record.
 4                      (OFF RECORD.)
 5                  THE SPECIAL MASTER:  On the record here.
 6                  My goal is that production will be either --
 7      all ESI production will be coming to a close by May
 8      30th.  So it will be a busy month of May for privilege
 9      reviews and lot of conversations and me making lots of
10      rulings around all of those issues as they arise, but
11      I fully expect ESI to be done by the 30th.
12                  I will, also my goal being, is that by the
13      first week of June, provide to the Court my
14      recommendations as to the other issues that have been
15      ongoing as they've arisen.
16                  You can let the senior executive team know
17      when they are appearing before me that I fully expect
18      to understand how the litigation hold notices were not
19      pushed out to the key, critical individuals within
20      their organization.
21                  I also expect a detailed explanation as to
22      why UMC counsel has not been in receipt of all of the
23      information that is necessary for them to do their
24      job.  And clearly, they have very technical and
25      skilled individuals at doing the work, so what is the
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1      disconnect.  And that will be the focus of some
 2      portion of our discussion.
 3             In addition to, we will cover and discuss
 4      with the custodians that do appear their custodial
 5      interviews and get any outstanding questions that we
 6      may have about dummy terminals or whatever answered by
 7      those individuals --
 8             MS. FOLEY:  Webmail.
 9             THE SPECIAL MASTER:  -- webmail and others.
10             I -- also, we will go through everything.
11             As to the iPhone, iPad, other situation, I
12      will be issuing -- I will be expecting to receive data
13      from UMC as to the basics using those search terms,
14      and then also if you want to do a review of those
15      search -- but let me make this very clear.
16             If there is a single e-mail message that
17      comes from any one of those custodians that says "sent
18      from iPad," "sent from iPhone," anything, "sent from
19      Android," we're going -- that phone is getting imaged.
20      Okay?  Or device or tablet.
21             MS. FOLEY:  And no upgrades, yes.
22             THE SPECIAL MASTER:  No upgrades at all until
23      this is resolved for any of their personal cell phones
24      or mobile devices based on my initial quick check of
25      the data.  Okay?  Any further questions?
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

```
 1              MR. TOSTRUD:  No, sir.

 2              THE SPECIAL MASTER:  All right.  Thank you

 3     all very much for your time.

 4              Off the record.

 5               (The proceedings adjourned at 5:33 p.m.)

 6

 7                        *     *     *     *     *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Special Master's Hearing  -   April 7, 2014
*** Volume II ***

1

2

3

4          I, the undersigned, an RPR, CRR, and

5   Certified Shorthand Reporter of the States of Nevada

6   and California, do hereby certify:

7          That the foregoing proceedings were taken

8   before me at the time and place herein set forth; that

9   a record of the proceedings was made by me using

10  machine shorthand which was thereafter transcribed

11  under my direction; that the foregoing transcript is a

12  true record of the proceedings held.

13          I further certify I am neither financially

14  interested in the action nor a relative or employee

15  of any attorney or party to this action.

16          IN WITNESS WHEREOF, I have this date

17  subscribed my name.

18  Dated: April 11, 2014

19

20

21

22          JANET C. TRIMMER
            CCR No. 864

23

24

25

Exhibit C

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3            UNCERTIFIED ROUGH DRAFT TRANSCRIPT

4

5

6   DANIEL SMALL, CAROLYN SMALL,    )
    WILLIAM CURTIN, DAVID COHEN,    )
7   LANETTE LAWRENCE, and LOUISE    )
    COLLARD, Individually, and on   )
8   Behalf of All Other Persons     )
    Similarly Situated,             ) Case No.
9                                   )
            Plaintiff,              ) 2:13-cv-0298-APG-PAL
10                                  )
              vs.                   )
11                                  )
    UNIVERSITY MEDICAL CENTER OF    )
12  SOUTHERN NEVADA,                )
                                    )
13          Defendant.              )
    _____)

14

15           UNCERTIFIED ROUGH DRAFT TRANSCRIPT

16      REPORTER'S TRANSCRIPT OF SPECIAL MASTER HEARING

17              HEARD TELEPHONICALLY BEFORE

18             SPECIAL MASTER DANIEL GARRIE

19            Taken on Thursday, April 10, 2014

20                   At  4:04 p.m.

21

22              Taken at the Law Offices of:
        Lewis Brisbois Bisgaard & Smith, LLP
23        6385 South Rainbow Boulevard, Suite 600
                 Las Vegas, Nevada

24

25  Reported By: Gale Salerno, RMR, CCR No. 542

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    APPEARANCES:

 2    Telephonically, for the Plaintiffs:

 3            JON A. TOSTRUD, ESQUIRE
              Tostrud Law Group
 4            1925 Century Park East, Suite 2125
              Los Angeles, California  90067
 5            (310) 278-2600
              jtostrud@tostrudlaw.com
 6

 7            MARC L. GODINO, ESQUIRE
              Glancy Binkow & Goldberg, LLP
 8            1925 Century Park East, Suite 2100
              Los Angeles, California  90067
 9            (310) 201-9105
              mgodino@glancylaw.com
10

11            DAVID C. O'MARA, ESQUIRE
              The O'Mara Law Firm, P.C.
12            311 East Liberty Street
              Reno, Nevada  89501
13            (725) 323-1321
              david@omaralaw.net
14

15    For the Defendant:

16            CAYLA J. WITTY, ESQUIRE
              MARGARET G. FOLEY, ESQUIRE
17            Lewis Brisbois Bisgaard & Smith, LLP
              6385 South Rainbow Boulevard, Suite 600
18            Las Vegas, Nevada  89118
              (702) 893-3383
19            cayla.witty@lewisbrisbois.com

20
      Telephonically, Also Present:
21
              DOUGLAS E. FORREST, ESQUIRE, ILS
22            MR. BRUCE PIXLEY
              MR. JOSEPH EDMONDSON
23

24                     EXHIBITS

25            (None were offered.)
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                    April 10, 2014

 3                    4:04 p.m.

 4                 -    -    -

 5           SPECIAL MASTER GARRIE:  This is Special

 6    Master Garrie.  We're holding the hearing -- someone

 7    just join?

 8           This is Special Master Garrie.  We're

 9    holding a hearing over the phone today.

10           I'm going to dial in from a land line.  So

11    I'll be right back.

12           (A discussion was held off the record.)

13           SPECIAL MASTER GARRIE:  Without further

14    ado, if you parties can hear me, I would like to

15    first request that we discuss search terms.

16           Counsel for UMC, can you please state your

17    position for the record?

18           MS. WITTY:  Yes.  This is Cayla speaking.

19           We submitted a list of mobile device search

20    terms, including iPhone, iPad, Blackberry, Blackberry

21    Curve, Android, and Windows phone, as a singular

22    term, as well as the phrase, within quotations, Sent

23    From My, which we believe would capture any other

24    variations, such as Smartphone or other devices that

25    were not specifically listed.  And to use those terms
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1    to search for e-mails that came from a UMC custodian

2    from a mobile device using their UMC e-mail.

3           Initially, our request was to also limit

4    the search to those UMC custodians' e-mails in the

5    "from" field.  However, after Special Master Garrie's

6    e-mail from last night, we understand why the

7    restriction to the "from" field had been negated.

8           SPECIAL MASTER GARRIE:  Perfect.  Thank

9    you, Counsel.  This is Special Master Garrie.

10          Counsel for plaintiffs, do you have any

11   objections you would like to raise?

12          MR. GODINO:  This is Marc Godino.  No,

13   that's acceptable.

14          SPECIAL MASTER GARRIE:  And the date

15   ranges, June 2008 to present, that's acceptable to

16   all parties?

17          MR. GODINO:  Those dates are acceptable.

18          SPECIAL MASTER GARRIE:  Counsel for UMC?

19          MS. WITTY:  We're not opposed to

20   information that's created during those time periods.

21          Joe, was there something specifically that

22   you wanted to mention with regard to the date range?

23          MR. EDMONDSON:  This is Joe.  I had wanted

24   to clarify whether we were filtering on date created,

25   date modified and date accessed, particularly in the

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1   network shares because they did replace the server in
 2   2011.
 3           The access time for pretty much every file
 4   within the network share is going to fall within
 5   those dates.
 6           SPECIAL MASTER GARRIE:  Can you please
 7   provide me a statement in writing explaining that in
 8   further detail so I understand what network file
 9   share you're referring to?
10           Because -- this is Special Master Garrie,
11   UMC has a multitude of file shares, so without having
12   more specific detail, it's very hard for me to say
13   one way or the other that this is the user network's
14   file share, is it the share -- I mean, I need a
15   great deal more detail before I would grant any
16   modification.
17           MR. EDMONDSON:  This is Joe.  Yeah, we can
18   definitely provide that.  And I don't see any issue
19   with the June 2008 being used for e-mails for that
20   filter.
21           SPECIAL MASTER GARRIE:  My concern is -- I
22   would be amenable to filtering it; however, what in
23   order for -- I'm going to deny your request right now
24   as to modifying it.  I want created access or
25   modified, because I don't know what server you're
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   referring to.  So it makes me -- I can't at this
 2   stage limit anything without being provided a great
 3   deal more technical information, and given that time
 4   is of the essence, and that information is not
 5   available, I'm going to request that you run the
 6   search as is, because effectively what you're telling
 7   me, as I understand it, is that all of the actual
 8   metadata date applied on whatever file server or file
 9   share server have been reset, but I don't have any
10   other context than that.
11           MS. WITTY:  This is Counsel Witty.  That
12   shouldn't be an issue with the initial custodians for
13   the data that was pulled for John Espinoza, James
14   Mumford and Doug Spring for the initial searches
15   through their PSTs and the other loose files.
16           When we get to the Q-drive, that's all of
17   the common drives that would be a part of the shared
18   network, that's when that date will become an issue.
19           But as we understand it, that is later in
20   the rolling production schedule, so we'll make sure
21   to have that detailed information to you.
22           SPECIAL MASTER GARRIE:  And also, please --
23   counsel for the plaintiffs, can you please add to --
24   or actually counsel for UMC, can you just add to our
25   discussion topic list on the 22nd, if there had been
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    these sorts of issues, that an affidavit from someone

2    at UMC explaining what exactly happened and what

3    exactly is stored on these servers?

4            MS. WITTY:  Yes.

5            SPECIAL MASTER GARRIE:  And without having

6    more detail, there are quite a few questions that

7    need to be clarified and answered.

8            And for purposes of the record, the

9    question would include, but not be limited, the

10   network file share for the user directory, or is it

11   for the groups?  And if so, when as it migrated and

12   who it impacted are other additional questions that

13   we would be clarified.

14           With regards to the mobile search, let's

15   just right now, the sixth custodian, let's get that

16   moving.  Because we're only talking about looking for

17   mobile search right now.  We're not doing anything

18   else.  Let's just go for this order.

19           Is that clear, counsel for UMC?

20           MS. WITTY:  Yes.

21           SPECIAL MASTER GARRIE:  I mean, and counsel

22   for plaintiffs, any objections?

23           MR. GODINO:  This is Marc Godino.  I don't

24   have any objections.

25           MR. FORREST:  Douglas Forrest, ILS.  No

```
 1   objections.

 2            SPECIAL MASTER GARRIE:  All right.

 3            MR. TOSTRUD:  Jon Tostrud, counsel for

 4   plaintiffs in Los Angeles.  I just wanted to make it

 5   clear early on to the court reporter that we would

 6   like a dirty copy of this transcript.  I mention that

 7   to you because sometimes it matters to the court

 8   reporter in terms of how fast people speak and how

 9   clearly they speak, but we would request a dirty copy

10   to be available by tomorrow afternoon if possible.

11            THE COURT REPORTER:  Thank you, counsel.

12   You'll have it in the morning.

13            MR. TOSTRUD:  Thank you.

14            SPECIAL MASTER GARRIE:  Off the record.

15            (A discussion was held off the record.)

16            SPECIAL MASTER GARRIE:  So all parties, we

17   have resolved, as far as the issue, counsel for UMC,

18   regarding the mobile search terms, correct?

19            MS. WITTY:  This is Counsel Witty, yes.

20            SPECIAL MASTER GARRIE:  And as to the

21   protocol we're going to follow, correct?

22            MS. WITTY:  With regard to those searches?

23            SPECIAL MASTER GARRIE:  Yes.

24            MS. WITTY:  Yes.

25            SPECIAL MASTER GARRIE:  And Mr. Edmondson,
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   you're aware that I'm going to log in and remotely
 2   review the results on or before 12:00 p.m. on the
 3   15th of April?
 4           MR. EDMONDSON:  This is Joe Edmondson.
 5   Yes.
 6           SPECIAL MASTER GARRIE:  And so what I
 7   expect when I log in is to be -- and you also, just
 8   for purposes of the record, notice that you're going
 9   to circulate screenshots of the search configuration,
10   and allow me remote access just to observe the
11   configuration before running searches?
12           MR. EDMONDSON:  This is Joe.  Yes.
13           SPECIAL MASTER GARRIE:  So please shoot me
14   an e-mail when it's ready to go, and I'll remotely
15   view in using Team Viewer just to make sure it's set
16   up properly.  And circulate the snapshots,
17   screenshots to all parties.
18           Okay.  Moving forward.  I would like to get
19   to -- did counsel for UMC receive Dan Small's
20   declaration?
21           MS. WITTY:  This is Counsel Witty.  Yes.
22           SPECIAL MASTER GARRIE:  All right.  You're
23   aware --
24           MR. TOSTRUD:  This is Jon Tostrud.  I
25   should note that Mr. Small indicated that there are
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    multiple policy documents, similar type things,

2    policies and procedures that exist in similar places

3    on the intranet.

4         SPECIAL MASTER GARRIE:  I do have some

5    remarks to Dan Small's declaration for counsel for

6    UMC.

7         Can you please confirm with UMC your

8    client that -- the question is, is Dan Small a

9    current -- he's currently an hourly employee at UMC,

10   correct?

11        MR. GODINO:  This is Marc Godino.  Yes.

12        SPECIAL MASTER GARRIE:  Okay.  Because it

13   says University Medical Center.  I just wanted to

14   make 100 percent certain.

15        And has counsel for UMC had a chance it

16   review it?

17        MS. WITTY:  This is Counsel Witty.  We have

18   reviewed the declaration, yes.

19        SPECIAL MASTER GARRIE:  Do you have any

20   questions about the declaration?

21        MS. WITTY:  We will await your questions at

22   this time.

23        SPECIAL MASTER GARRIE:  Okay.  I have

24   questions, because in Dan Small's declaration, he

25   does review or mention that additional such policies

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1   might exist on what I believe to be the intranet.  Is

2   that not correct?

3          MS. WITTY:  This is Counsel Witty.  That is

4   how we understood it.  And we are, as per Monday's

5   Order, collecting those servers, preserving that

6   information.  And we can provide remote access to the

7   Special Master as requested.

8          SPECIAL MASTER GARRIE:  Okay.  And I might

9   request access, but my first simple question is:  Can

10  you get an affidavit from someone at UMC to make sure

11  that we're talking about the same intranet?

12         MS. WITTY:  Could you clarify, please?

13         SPECIAL MASTER GARRIE:  Yes.  So they're

14  proposing a collection of the intranet, and intranet

15  can have multiple servers, or there could be multiple

16  intranets within a single organization.

17         MS. WITTY:  Uh-huh.

18         SPECIAL MASTER GARRIE:  I want to make sure

19  that whoever is responsible at UMC for performing

20  this collection is providing an affidavit as to what

21  the intranet they're collecting from is, and/or that

22  it is the only intranet or source of record.

23  Specifically because I want to make sure that the

24  employee, Daniel Small's, statement that says I went

25  to the policies and procedures on-line manual on the

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1   University Medical Center's intranet and typed an

 2   I-25 to view the newly revised policy, we're getting

 3   the proper servers and the right intranet, because

 4   he's not technical.

 5           And I recognize that UMC -- counsel for UMC

 6   would benefit by making sure that -- and as well as

 7   the Court -- that the correct intranet server is

 8   being collected.  And to do that I would request a

 9   affidavit from the person doing the collection.

10           MS. WITTY:  Understood.

11           MR. TOSTRUD:  This is Jon Tostrud for

12   plaintiffs.  Of course, if there are any documents

13   that are responsive to our discovery requests, we

14   expect that those would be produced.

15           SPECIAL MASTER GARRIE:  That is noted for

16   the record, and the prior hearing where I think

17   Counsel Foley and Counsel Witty both agreed that they

18   would be obviously amending the date, as counsel for

19   UMC has been constantly diligent, it is apparent that

20   UMC failed to collect the documents in the first

21   place.

22           MR. TOSTRUD:  Okay.

23           SPECIAL MASTER GARRIE:  Is that accurate,

24   counsel for UMC?

25           MS. WITTY:  This is Counsel Witty.  Yes.
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    That is how we understand our obligation.
 2              SPECIAL MASTER GARRIE:  And to date,
 3    there's been no collection of the intranet, correct?
 4              MS. WITTY:  This is Counsel Witty.
 5    Correct.  It is currently under process.
 6              SPECIAL MASTER GARRIE:  But to be clear,
 7    there's no way plaintiff could have -- you didn't
 8    have this document prior, so that -- if you had such
 9    a document as the one attached as record retention
10    disposal, you would have turned that over, correct?
11              MS. WITTY:  Yes.
12              SPECIAL MASTER GARRIE:  Okay.  So I don't
13    think there's any question.
14              Plaintiff, any other questions you have
15    there?
16              MR. TOSTRUD:  No, sir.
17              SPECIAL MASTER GARRIE:  Counsel for UMC,
18    now that I have an understanding from Daniel Small
19    where actually it was, I want to point out a couple
20    of key shared directories that you want to the
21    collect from.
22              If you turn to page 4 of Exhibit A.  Tell
23    me when you're there, counsel for UMC.
24              MS. WITTY:  Give me just a moment.
25              SPECIAL MASTER GARRIE:  Okay.
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1            MS. FOLEY:  We're having a little trouble
 2  with our WiFi, your Honor.  Would you mind just kind
 3  of reading the information to us that's in front of
 4  you.
 5            SPECIAL MASTER GARRIE:  Specifically, I'll
 6  read the following:  It's Appendix A of record
 7  retention, page 4 of o4.
 8            And it says Retention.  There's a column,
 9  and that column, the first -- the third row, it says
10  how long they keep it for original schedules, three
11  years.  And it says it will be maintained in the
12  nursing administration office.
13            They say the original to be scanned
14  electronically and saved on a Q-drive under nursing
15  administration.
16            I would like counsel for UMC to make sure
17  that when they perform the collection of the network
18  file shares, that they collect the folder nursing
19  administration.
20            MS. FOLEY:  From the Q-drive, correct?
21            SPECIAL MASTER GARRIE:  From the Q-drive,
22  that is correct.
23            MS. FOLEY:  Thank you.
24            SPECIAL MASTER GARRIE:  I would also like
25  counsel for UMC, based on the testimony we took on
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1    Friday, when they said nothing will be stored on

2    site, if you look at descriptions of the said row, it

3    says staff assignment sheets will be maintained by

4    the clinical managers.  It doesn't specify where

5    they're keeping them.

6            Can you please clarify as to ensure that

7    that -- because there's no data map, and there's no

8    way I can actually reference any sort of document

9    repository, it is not clear to me at this time where

10    the staff assignment sheets are actually being

11    maintained by the clinic managers.

12            So obviously, I would assume -- or the

13    daily staffing reports as well, may have relevant

14    information at this time.

15            Is that -- and I would like counsel for UMC

16    to inquire with their client where these records are

17    kept and make sure that they are included.

18            Is that clear?

19            MS. FOLEY:  Yes.  This is Counsel Foley.

20            SPECIAL MASTER GARRIE:  Okay.  And my next

21    question is, for my edification, what are acuity

22    reports?

23            MS. WITTY:  Could you say that again?

24            SPECIAL MASTER GARRIE:  What are acuity

25    reports, a-c-u-i-t-y?

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1            MS. WITTY:  I could not tell you.
 2            SPECIAL MASTER GARRIE:  Okay.  Do -- well,
 3    can you inquire and confirm that they are not at all
 4    related to this litigation?
 5            MS. WITTY:  Absolutely.
 6            SPECIAL MASTER GARRIE:  And then with that
 7    in mind, also if they do end up being related to the
 8    litigation, inquire as to what the grasp database is.
 9            MS. WITTY:  Yes.
10            MR. GODINO:  This is Marc Godino.  I would
11    just like to add to that, if they're going to
12    determine whether the acuity reports are relevant,
13    that they provide a description of what those reports
14    are so that we can weigh in on the relevancy, and
15    maybe even provide a copy of one so we can review it.
16            SPECIAL MASTER GARRIE:  Let's first make
17    sure --
18            MS. WITTY:  Let us verify -- this is
19    Counsel Witty.  Let us verify this information for
20    our own knowledge, and we will make sure to address
21    that properly with the Court.
22            SPECIAL MASTER GARRIE:  Thank you.
23            Now, original department staff meeting
24    minutes and nursing administration office, again, it
25    says the original is to be scanned electronically and
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   saved object the Q-drive under nursing
 2   administration.  Just repeating the importance of
 3   that folder.
 4           MS. WITTY:  Yes.
 5           SPECIAL MASTER GARRIE:  Now, it says
 6   original department shared governance committee
 7   meeting minutes will be maintained by the clinical
 8   manager.
 9           That's just taking it back again, not to
10   the specific document, but I want you to confirm that
11   these clinical managers are actually storing the
12   documents.
13           MS. WITTY:  Understood.
14           SPECIAL MASTER GARRIE:  All right.  And
15   then can financial reports with relevant?  It's sort
16   of ambiguous, but the financial reports would be
17   maintained by the managers, and it doesn't, again,
18   say where they're storing them.
19           And I just want to make sure that counsel
20   for UMC, if it is indeed relevant, that you identify
21   where they're actually keeping them.
22           MS. WITTY:  This is Counsel Witty.  We
23   understand.
24           MR. TOSTRUD:  This is Jon Tostrud for
25   plaintiffs.  It's plaintiffs' position that those
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    documents are absolutely 100 percent relevant, as we

2    made clear to counsel in the past.  And I believe

3    this is actually the subject of the motion to compel,

4    that documents relating to financial and management

5    reports, including labor analysis, is absolutely

6    relevant to the case.

7          MS. FOLEY:  When they are including labor

8    analysis, correct?

9          MR. GODINO:  No, not just when they're

10   including labor analysis, but --

11         MS. WITTY:  This is Counsel Witty.  Again,

12   with the regard to the information that we do not

13   have in front of us, we will review it and address as

14   appropriate.

15         SPECIAL MASTER GARRIE:  This is Special

16   Master Garrie.  So would I like to happen is counsel

17   for UMC, why don't you first get what these records

18   are.  Figure out if -- make sure that you collect

19   them.  You'll run the search terms, and obviously if

20   they're responsive to -- directly responsive to any

21   document requests, I assume you will act accordingly.

22         And so I would note your statement, counsel

23   for the plaintiffs for the record.  And I would like

24   to proceed with what I just set out.  And if

25   necessary downstream, once counsel for UMC has a

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    better grasp of what they are, we can, if necessary
 2    revisit it on April 22nd.  Okay?
 3              MR. TOSTRUD:  This is Jon Tostrud.  Fair
 4    enough.  Thank you.
 5              MS. WITTY:  This is Counsel Witty.
 6    Understood.
 7              SPECIAL MASTER GARRIE:  Now, I was reading
 8    through the policy.  Did counsel for UMC have a
 9    chance to read through this?
10              MS. WITTY:  We've read through it briefly.
11              MR. GODINO:  This is Marc Godino.  Can you
12    just clarify what policy you're referring to?
13              SPECIAL MASTER GARRIE:  Exhibit A, the
14    record retention and disposal, page 2 of 4.
15              I would point out for counsel, and for my
16    own edification, I found it very insightful that they
17    have a legal hold.
18              MS. FOLEY:  So noted.  This is Margaret.
19              SPECIAL MASTER GARRIE:  And the last --
20    that was all I had for that.
21              I had no other issues or questions.
22              Daniel Small's -- Counsel Foley, would the
23    affidavit provide sufficient clarity for you?  For
24    the declaration, my apologies.
25              MS. FOLEY:  Yes.  Yes, it does, thank you.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1              SPECIAL MASTER GARRIE:  I would like to
 2    quickly -- that's a relative term.
 3              I also want -- on Tuesday, April 8th,
 4    counsel for UMC issued an additional e-mail.  I don't
 5    know if you received it.  I asked you to submit a
 6    list of user network share mappings.
 7              MS. WITTY:  Yes.  We understood that you
 8    wanted those by April 14th.
 9              SPECIAL MASTER GARRIE:  When I put in some
10    dates -- if you read through it closely, some of it
11    have different dates.  I sent the e-mail to you on
12    Tuesday, April 8th, at 12:57 p.m.
13              MS. WITTY:  And what is your request for
14    that -- from that information?
15              SPECIAL MASTER GARRIE:  I just want to make
16    sure you received it.
17              MS. WITTY:  Oh, yes.  I thought we had
18    confirmed that by e-mail.  I apologize.
19              SPECIAL MASTER GARRIE:  No apologies.  I
20    just wanted to make sure you got it.
21              Perfect.  Now, I want to go over
22    plaintiff -- I'm going to let counsel for UMC go
23    through their notes, and then they'll go through
24    their notes, and then I have some general comments.
25              Is that acceptable to everyone?
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1              MS. FOLEY:  Yes, it is for UMC.

 2              SPECIAL MASTER GARRIE:  UMC, ball in is in

 3   your court.

 4              MS. WITTY:  The very first thing, and

 5   again, I apologize, these were done after the request

 6   to type them up and to provide them for all.

 7              The very first thing with regard to

 8   verification of the PSTs for Mr. Espinoza, in light

 9   of the recopying to include both the April 2003 and

10   August 2003 collections, we wanted to verify exactly

11   how you wanted that chain of custody to be

12   established.

13              Deny Schaibley, who conducted both of those

14   collections, and is making the logical file copies,

15   is fully prepared to explain.  We just wanted to make

16   sure that we had -- that the information that you

17   need is contained within those documents.

18              SPECIAL MASTER GARRIE:  So the first thing

19   that I need to be -- certainly.  So I'll offer some

20   clarification, and I believe some of my e-mails

21   provided additional.  And I will be issuing an order

22   hopefully by end of day tomorrow pursuant to the

23   request of the Court, summarizing everything and

24   including most, if not all, of the orders that we

25   have gone over.
```

Rough Draft of  Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1            What must be included in a chain of custody
 2   is what was collected and how it was collected, when
 3   it was collected, who collected it.  And I need that
 4   for both the April and the August.
 5            And I need to know if there were personal
 6   computers where the collection was done.  Meaning an
 7   actual physical device, or if they were collected
 8   from a network file server.  I need to -- and the
 9   chain of custody to identify the source of the
10   evidenced items that were collected for each
11   custodian.
12            And if you collected a network file share
13   during that time, which I didn't read, if that did
14   occur, that you will create a separate chain of
15   custody saying you collected a network file share for
16   these individuals.
17            MS. WITTY:  Understood.
18            SPECIAL MASTER GARRIE:  Help you out?
19            MS. WITTY:  Yes.  Thank you.
20            SPECIAL MASTER GARRIE:  Now, I would still
21   like -- I believe that Mr. Edmondson needs to provide
22   an affidavit clarifying his scan and repair findings.
23            And with regards to screenshot on server,
24   Counsel Witty can you clarify what you mean?  Because
25   I'm not sure -- I know what I meant, but I'm not sure
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1    I understood your shorthand.

2          MS. WITTY:  I'm not sure either.  And

3    that's partially why we wanted to clarify.

4          SPECIAL MASTER GARRIE:  Okay.  So what I

5    would like to know, what I would like is a screenshot

6    of the PSTs collected for John Espinoza to be

7    included.

8          Specifically when I searched through the

9    spreadsheets that were provided to me, I wasn't able

10   to identify -- the PSTs and OSTs, I wasn't able to

11   find a single archived PST or OST file.

12         And I need that -- I need a screenshot of

13   what was actually collected for John Espinoza,

14   because based on what I have had reviewed, and maybe

15   Mr. Edmondson, you can clarify this further, but

16   there's a discrepancy between the scanner repaired

17   statement and what was actually -- I was actually

18   able to discern.

19         MR. EDMONDSON:  This is Joe Edmondson.

20   Yes, I have submitted a preliminary version of that

21   correction to Counsel Witty.  There were actually two

22   PSTs and no OSTs.  I had accidentally typed the table

23   incorrectly.

24         The two PSTs, for clarification, appear to

25   be created from the export when they manually

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    exported the PSTs they were not part of the copy

 2    script.

 3              SPECIAL MASTER GARRIE:  So part of the live

 4    collection, so to speak.

 5              MR. EDMONDSON:  Correct.

 6              SPECIAL MASTER GARRIE:  I need you to

 7    detail that in some sort of affidavit, and provide a

 8    screenshot giving your entire representation.

 9              MR. EDMONDSON:  This is Joe.  Understood.

10              SPECIAL MASTER GARRIE:  So counsel, have we

11    cleared that up?

12              MS. WITTY:  Yes.  Thank you.

13              SPECIAL MASTER GARRIE:  I'll turn it back

14    over to you.

15         MS. WITTY:  And this is Counsel Witty.

16    Again for more my understanding, the mounting of the

17    files that was performed during the hearing on

18    Monday, does that -- as they were able to be mounted,

19    does that also now require us to still split the

20    files to do the search?

21              SPECIAL MASTER GARRIE:  No.

22         MS. WITTY:  That's what I understood, but I

23    didn't want to put that in my notes to say that that

24    didn't have to happen.

25              SPECIAL MASTER GARRIE:  That's fine.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1              MS. WITTY:  But everything --
 2              SPECIAL MASTER GARRIE:  I need counsel --
 3              MS. WITTY:  That's what I had understood
 4    with regard to what Joe had said, that all the
 5    processing would go through EnCase 7.  And that
 6    again, that the chain of custody would show all of
 7    that processing information, how it was collected,
 8    when, who, what, all of that.
 9              The next topic that came up was the
10    encrypted files.
11              SPECIAL MASTER GARRIE:  But counsel, just
12    really quickly, I want to offer two points of
13    clarification.  During the hearing, we set out how he
14    was -- because he had issues with the PST files for
15    Ms. -- I'm blanking on her name.
16              MS. WITTY:  Ms. Panzeri.
17              SPECIAL MASTER GARRIE:  Ms. Panzeri.  He
18    was to search processors we set forth for actually
19    searching those specific PSTs, and I request that he
20    provide a screenshot of the configurations for his
21    administering those searches so I can verify that it
22    was, indeed, run as we set forth and defined during
23    the hearing.
24              So we don't have to trim and split, but we
25    do need to follow the protocol we set forth.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1              Mr. Edmondson, does this make sense to you?

2              MR. EDMONDSON:  This is Joe Edmondson.

3     Yes, I understand.

4              SPECIAL MASTER GARRIE:  So Counsel Witty, I

5     just wanted to clarify that and your forensic expert

6     understood those records.

7              MS. WITTY:  Yes.

8              SPECIAL MASTER GARRIE:  I do want also --

9     we'll get to plaintiffs as well, so we'll keep going

10    with yours.

11             The hash value verification requested,

12    plaintiff -- we'll clarify it there.  Let's just turn

13    it back to you.  You were going to talk about

14    encryption.

15             MS. WITTY:  Yes.  And Joe, feel free to

16    speak up with regard to your understanding of this.

17             The encrypted files that have been

18    identified, from what I understand, are significantly

19    older than the relevant time period.  They haven't

20    been modified since 2005.

21             But because of the -- or because of the

22    access dates that would be included in the search,

23    they would fall under that because of the transfer of

24    the home files, I believe.

25             SPECIAL MASTER GARRIE:  Joe, Mr. Edmondson,

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   can you please speak up and just talk in technical
 2   terms and clarify, please.
 3            MR. EDMONDSON:  Yes.  This is Joe.  If I
 4   could clarify:  The specific files that we identified
 5   that Encase believed were encrypted Word Perfect
 6   files, all but four of them, which were, in fact,
 7   password protected, Word Perfect, Passware was able
 8   to process them.  All the rest of those files were
 9   actually in old Novell GroupWise post office.  And
10   the files only contained e-mails from 2000 to 2002.
11   So I believe that puts them out of scope.
12            SPECIAL MASTER GARRIE:  Can you provide me
13   an affidavit with screenshots, or I can log in
14   remotely, but if you can submit an affidavit with
15   screenshots verifying that, and that's fine.
16            What about the DMG files?
17            MR. EDMONDSON:  This is Joe.  The DMG files
18   I have not attempted to mount on a Mac at this point.
19            SPECIAL MASTER GARRIE:  So as to the next
20   step, I would like counsel, or Mr. Edmondson, you
21   provide an affidavit setting forthwith screenshots
22   what you just stated.  And I will at that point then
23   find with regards to whatever file the -- with
24   regards to ones that are out of date.  All the other
25   files that are within date, I would like you to
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    provide, counsel for UMC, and the details around
 2    those files so we can -- and by 4/11 it would be good
 3    to have a solution of those files, if any do exist.
 4              Because I don't actually understand.
 5    Because what I understand is 779 were encrypted.
 6              (Mr. David O'Mara joined the hearing.)
 7              SPECIAL MASTER GARRIE:  And I require in
 8    writing further clarification of your statement.
 9              MR. EDMONDSON:  Understood.
10              SPECIAL MASTER GARRIE:  And then what about
11    the -- what other files besides the Word Perfect
12    files were encrypted?
13              MR. EDMONDSON:  This is Joe Edmondson.  All
14    of the other files exported were Word documents and
15    Excels, or other document-type or office-type files,
16    which could easily be broken by the Passware password
17    recovery software.
18              SPECIAL MASTER GARRIE:  I'll need a list
19    verifying file names and that they were broken.
20              So as I understand it, what about the DMG
21    files?  Because you said all the files.  Does that
22    include all the DMG files or not?
23              MR. EDMONDSON:  It does not include the DMG
24    files, as they were Mac files.  This is Joe.  Not
25    standard office files.  I will melt them on a Mac and
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1   provide you with the results.

2          SPECIAL MASTER GARRIE:  Counsel for

3   plaintiffs, do you have anything to say here?

4          MR. TOSTRUD:  This is Jon Tostrud.  I think

5   we would like to sort of turn this discussion over to

6   our ESI experts, typically Doug and/or Bruce, if they

7   have any comments.

8          SPECIAL MASTER GARRIE:  Certainly.  Any

9   comments?

10          MR. PIXLEY:  This is Bruce.  I do not have

11   any comments right now.  I'm listening to what's

12   being set, but I don't have any comments to what's

13   being said.

14          MR. FORREST:  This is Doug, and I also do

15   not have any comments at this point.

16          SPECIAL MASTER GARRIE:  All right.  First

17   page, and then I would like to then go to plaintiffs'

18   one page transcript summary, and then we'll go back

19   to yours.  We'll go back and forth.

20          MS. WITTY:  Okay.  Really, for the rest of

21   that first page, you requested server mappings to be

22   completed by 4/14.  I apologize for my shorthand.  I

23   understood that to be the shared drives and who had

24   access to what.  That is underway.

25          And similarly, the updated chain of custody

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    will follow for those collections in production.

2              Regarding the Blackberry issues, this was

3    just my understanding and tracking of the discussion

4    that was based on the server configuration for the

5    Blackberry exchange server.

6              I welcome anyone's comments if there is

7    something I have incorrect, or they don't understand,

8    but that would be something I have to take back to

9    UMC to clarify.

10             SPECIAL MASTER GARRIE:  Okay.  Well, let's

11   go through with plaintiffs, if you have anything you

12   would like to add to the Blackberry comment, please

13   feel free to add.

14             At this point I would like to turn to the

15   material provided by Mr. Tostrud to the Special

16   Master, myself, with a chart outlining the duties of

17   the parties pursuant to the hearing of the Special

18   Master attended at 9:00 a.m.

19             I would like to go through page one of

20   that, because I think it lines up relative to counsel

21   for UMC's first page.

22             Plaintiffs, I'll turn it over to you.

23             MR. GODINO:  Just give us a second while we

24   pull the document up.

25             MR. TOSTRUD:  This is Jon Tostrud.  Do you

Rough Draft of  Special Master's Hearing   April 10, 2014
(Telephonic)

 1   have any specific questions, Special Master Garrie?

 2   Or would you like us to just run through --

 3            SPECIAL MASTER GARRIE:  Just run it

 4   through.

 5            MR. TOSTRUD:  Run through the issues that

 6   we identified?

 7            SPECIAL MASTER GARRIE:  Counselor, we can

 8   do this.  Counsel for UMC, did you get a chance to

 9   review it?

10            MS. WITTY:  Yes.

11            SPECIAL MASTER GARRIE:  Did you have any

12   questions or concerns?  I thought it was fairly

13   accurate.  I had three comments, but do you have any

14   comments with regards to page one?

15            MS. WITTY:  So the document that I have

16   does not clearly designate between pages, but I do

17   not -- what I have reviewed, I do not have any.

18            SPECIAL MASTER GARRIE:  Okay.  Well, then

19   perfect.  I'm going to take a stab.

20            Is anybody from UMC's technical team on the

21   phone?

22            MS. WITTY:  Dean was not available for the

23   call today, so there is not anyone specifically from

24   UMC.

25            SPECIAL MASTER GARRIE:  Okay.  I believe,

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   and I could be wrong, and editing my hearing notes
 2   rather extensively, but I do not believe that they
 3   actually have tape.
 4           MS. WITTY:  Correct.  They stated that
 5   there was only hard discs.
 6           SPECIAL MASTER GARRIE:  All right.  So it
 7   says, and Counsel Tostrud, this is a copy of the
 8   tape?
 9           MR. TOSTRUD:  Yeah --
10           MS. WITTY:  I think tape was used as a
11   shorthand.
12           SPECIAL MASTER GARRIE:  Okay.
13           MS. WITTY:  After it was explained.
14           SPECIAL MASTER GARRIE:  Okay.  Well, let's
15   correct to today.  It that applies to Counsel Witty's
16   summary as well.
17           I just want to make sure all parties
18   understand, they don't use tape, they use discs.
19           MR. TOSTRUD:  That's fine.
20           SPECIAL MASTER GARRIE:  Plaintiff want to
21   point anything out here?
22           MR. TOSTRUD:  Yes.  I would just point out
23   that at the third line from the bottom, which starts
24   at page 112, lines 10 through 21, I think the
25   transcript indicated that the CEO and the CIO were to
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    be available for the next hearing.  I would simply

2    amend that to include the chief of human resources,

3    as well.

4              SPECIAL MASTER GARRIE:  I thought he was

5    added.

6              MR. TOSTRUD:  Yes, he was.  But that may

7    come later.  But I just wanted to point out that at

8    this point in our summary of the transcript, it

9    didn't include Mr. Espinoza.  But obviously, later on

10   in the transcript, I think your Honor made that

11   clear.

12             MS. FOLEY:  Yes, this is Counsel Foley.  We

13   have him on that list.

14             SPECIAL MASTER GARRIE:  I'm still -- I

15   haven't gotten the file type list.  I know

16   plaintiffs -- I didn't get it.

17             MS. WITTY:  This is Counsel Witty.  That

18   was my oversight.

19             SPECIAL MASTER GARRIE:  I would be

20   interested to know what they are.

21             Does counsel, I was hoping to have a look

22   at that.  That was a topic of what I was hoping to go

23   over today, but we might have to save it for the

24   15th.

25             I would like both sides, once I've received

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1   it and had a chance to review it, to be prepared to
 2   discuss it, and whether or not any -- whether the
 3   plaintiffs are amenable to eliminating certain file
 4   types.  I haven't seen it, so I can't really engage
 5   in a conversation.
 6           MS. FOLEY:  Okay.  We understand.
 7           MR. GODINO:  This is Marc Godino.
 8           Cayla, did you provide that to us?
 9           MS. WITTY:  It was sent to everyone on the
10   distribution list.  But due to -- and Special Master
11   Garrie, this is the same reason that the zip file
12   came through empty.  For some reason our e-mail
13   system would not allow me to transfer that document.
14   It was an issue with security coming from UMC to our
15   firm's e-mail.
16           I'm going to rectify that as soon as
17   possible, hopefully while we're still on this call.
18           SPECIAL MASTER GARRIE:  I received an
19   e-mail from Dean.
20           MS. WITTY:  Yes, directly from him.
21           SPECIAL MASTER GARRIE:  Yeah.  Does that
22   have that in there?  Because I didn't see that in
23   there.  I didn't know where to look.
24           MS. WITTY:  No.  The file list would have
25   come from Joe.  And it's purely -- I apologize, it's
```

Rough Draft of  Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    our law firm's security issues that are creating
 2    that.
 3            SPECIAL MASTER GARRIE:  Okay.  And the
 4    other -- sorry.  Counsel for plaintiffs, it says
 5    define TS-1.
 6            MR. TOSTRUD:  Okay, yeah, we found that at
 7    229.  I think that had to do with the document that
 8    we put in relating to, you know, one of the documents
 9    from Mr. Small.  But I could go back to the full
10    transcript.  I think that was a request that perhaps
11    your Honor had about defining TS-1.
12            SPECIAL MASTER GARRIE:  I did.  I just
13    wanted to make sure that you're referring to the
14    server references.
15            Maybe Mr. Pixley, is that what you intended
16    and what you believe as well?  Or Mr. Forrest?
17            MR. FORREST:  I would have to go back to
18    the transcript -- this is Mr. Forrest -- whether it
19    related to the remote log-in capability.  Exhibit 15.
20            SPECIAL MASTER GARRIE:  I'm just looking
21    right now.
22            Yeah, that's in response to your exhibit.
23            MR. FORREST:  That's my recollection.  And
24    I think we -- I'm not sure that we ever got a clear
25    explanation of the definition of that TS-1.
```

Rough Draft of Special Master's Hearing  April 10, 2014
(Telephonic)

```
 1              SPECIAL MASTER GARRIE:  I don't believe we
 2   did.  So counsel for UMC, do you understand what's
 3   being requested?
 4              MS. WITTY:  The TS-1 server that was
 5   identified?
 6              SPECIAL MASTER GARRIE:  Yeah.  We
 7   speculated in the hearing as to what it may apply to,
 8   but we don't actually know.
 9              MS. WITTY:  So you want to know what that
10   actually connects to?
11              SPECIAL MASTER GARRIE:  Yes.
12              MS. WITTY:  Would you like that as well in
13   an affidavit form with screenshot?
14              SPECIAL MASTER GARRIE:  Yes.  That would be
15   very helpful.  Again, if the client has a data map or
16   something of the like, I'm more than amenable to
17   taking that as well, if I can verify it.
18              Okay.  Plaintiffs, I wanted to just clarify
19   with regards to your duties, I want to make a
20   revision to it.  I'm not exactly sure how you'll be
21   able to use the data recovery tools that you
22   mentioned that were mentioned in 18 colon 8 dash 14.
23   I think that was assigned to Mr. -- I believe that
24   you're not -- Mr. Pixley, correct me if I'm wrong,
25   but you don't have any of the evidence that was --
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1    OST files were in your possession, correct?

2           MR. PIXLEY:  Correct.

3           SPECIAL MASTER GARRIE:  So I'm just reading

4    over my notes.  I know there were a lot of them.

5           We need to amend that, and basically

6    because the PST files are mountable, we don't need to

7    do that.  But for the purposes of clarification, the

8    individual that would have been responsible for the

9    activity would have been UMC and whoever they tasked

10   with that duty.

11          MS. WITTY:  This is Counsel Witty.  Could

12   you identify what line you're addressing?

13          SPECIAL MASTER GARRIE:  18 colon 8 dash 14.

14   I believe Mr. Edmondson was the individual who was

15   capable of doing it.  Plaintiffs don't actually have

16   any of the original evidence files --

17          MS. WITTY:  Okay.

18          SPECIAL MASTER GARRIE:  -- for UMC.

19          MR. TOSTRUD:  This is Jon Tostrud.  It's

20   the first line, Cayla, under plaintiffs' duties.

21          MS. WITTY:  I just saw that, thank you.

22          SPECIAL MASTER GARRIE:  So I think there

23   was some confusion there.

24          It's not necessary at this point for the

25   repair tools to be run.  But in the case that they do

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    need to be run, Mr. Edmondson would be the individual

 2    responsible for doing it because he has the evidence

 3    items.

 4             Is that clear counsel for UMC?

 5             MS. WITTY:  This is Counsel Witty.  Yes.

 6             SPECIAL MASTER GARRIE:  Counsel for

 7    plaintiffs, do you acknowledge this?

 8             MR. GODINO:  Yes.  This is Marc Godino.

 9             SPECIAL MASTER GARRIE:  And Mr. Pixley, do

10    you have any reservations, or do you agree with the

11    finding?

12             MR. PIXLEY:  I agree with what was there.

13    At the time we were talking about a base approach,

14    and so no other comments other than UMC will handle

15    this task.

16             SPECIAL MASTER GARRIE:  Have you

17    received -- was someone going to say something or did

18    I -- sorry.

19             MS. FOLEY:  No, please go ahead.

20             SPECIAL MASTER GARRIE:  Those were my only

21    comments with regards to plaintiffs' summary of the

22    April 7th hearing.

23             With respect to counsel for UMC, the

24    Blackberry server, that's page 2 of Counsel Witty's

25    summary.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

 1            MS. WITTY:  This is Counsel Witty.  Page 2

 2   continues with a discussion of the Blackberry

 3   exchange server, and the information that was

 4   requested to be identified, including the components

 5   that are up and running from 2011 to current.

 6            The server configuration with regard to

 7   pushing or pulling of updates, the syncing of

 8   folders, and what information is contained on the

 9   Blackberry server.

10            SPECIAL MASTER GARRIE:  And I don't

11   understand your comment, pulling not providing

12   specific data.  I'm going to just go with what I'm

13   looking for at a very basic level.

14            MS. WITTY:  Okay.

15            SPECIAL MASTER GARRIE:  I want someone from

16   UMC that knows what the data retention policies and

17   implementation are for the Blackberry environment

18   that can answer this.

19            So how long does the Blackberry server

20   actually support e-mails?  What is the policy?  How

21   is the serving configured for messaging and e-mails?

22            MS. WITTY:  And would you like this person

23   to be available for questioning from you, or would

24   you like those -- would you similarly like that in an

25   affidavit?

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1            SPECIAL MASTER GARRIE:  I'll take it in an
 2    affidavit considering -- unless UMC can identify this
 3    individual and make sure that they know, because this
 4    would be the second time we've tried this.
 5            MS. WITTY:  Understood.
 6            SPECIAL MASTER GARRIE:  So but I would like
 7    whoever signs the affidavit to be available by phone
 8    for the day we have the hearing on the 22nd.
 9            Counsel for UMC did a phone call, and the
10    transcript where we discussed the Blackberry server,
11    and we established we don't know who at UMC actually
12    wrote the policies.
13            MS. WITTY:  Yes.
14            SPECIAL MASTER GARRIE:  I also request that
15    counsel for UMC draft a subpoena for Sprint since the
16    wiping was -- I'm not even exactly sure.  When I read
17    the transcript, I couldn't actually figure out when
18    they stopped wiping phones for the custodian, all 27
19    of them.
20            With that in mind, I request that counsel
21    for UMC send or subpoena the -- draft a subpoena for
22    me to issue in my capacity as Special Master to
23    Sprint requesting all text messages and other
24    information they have for the custodian devices that
25    were UMC devices.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1            MS. WITTY:  Understood.

 2            SPECIAL MASTER GARRIE:  I also direct for

 3   the record -- I was off the record when I instructed

 4   UMC to review their policies in regards to HIPAA and

 5   their alignment as being beyond the scope of this

 6   hearing.

 7            Off the record.

 8            (A discussion was held off the record.)

 9            SPECIAL MASTER GARRIE:  We agree that tapes

10   will replace discs -- discs will replace the word

11   tapes, sorry.

12            One thing that I did want to get clarified

13   from Mr. Clark was the Unix server, and what is

14   actually stored on it in an affidavit where he says

15   the Unix server keeps records for seven years.  It

16   stores information from the following systems.  These

17   systems include X, Y and Z.

18            Again, if UMC a data map or some diagram

19   that could detail this out this wouldn't be

20   necessary, but because it's not available, I have no

21   other solution, but request that or the alternative

22   is go on site and verify it myself.

23            Counsel for UMC, is there anything else you

24   would like to point out in your notes summary, or

25   seek clarification on?
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1          MS. FOLEY:  We're looking.
 2          MS. WITTY:  This is Counsel Witty.  I will
 3    defer to Joe.  I think there was one additional
 4    question that he may have had with regard to
 5    clarification.
 6          MR. EDMONDSON:  This is Joe.  I did want to
 7    ask as far as production for the password-protected
 8    files.  Some of the files -- actually the Word
 9    Perfect 5.1 password-protected files, Passware is
10    unable to make an unprotected version of them, and is
11    unable to open them.
12          Did we want to provide a password list
13    since they're all going to be native files?  Or do we
14    want to provide the unprotected version on files that
15    that's possible to do?
16          SPECIAL MASTER GARRIE:  Has counsel for UMC
17    seen these files?  All of them?
18          MS. WITTY:  This is Counsel Witty.  I have
19    not reviewed the specific files completely.
20          SPECIAL MASTER GARRIE:  Why don't counsel
21    for UMC, you review all of the files.  If any of them
22    are responsive or relevant, we'll then cross that
23    bridge.  Unless counsel for plaintiff have any
24    objection?
25          MR. GODINO:  This is Marc.  No.
```

Rough Draft of  Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1              SPECIAL MASTER GARRIE:  Counsel for UMC,
 2    acceptable?
 3              MS. WITTY:  Yes.
 4              SPECIAL MASTER GARRIE:  With regard to -- I
 5    would like to point the parties' attention to the
 6    summary provided by plaintiff of the April 4th
 7    special master hearing.
 8              MS. FOLEY:  We just have the 7th, I
 9    believe.
10              MR. TOSTRUD:  I circulated the 4th last
11    night.
12              MS. FOLEY:  Okay.  Thank you.
13              MR. TOSTRUD:  So you should have it.
14              MS. FOLEY:  Okay.
15              SPECIAL MASTER GARRIE:  I just want to make
16    sure that counsel for UMC has been able to obtain
17    Doug Spring and James Mumford's laptops.
18              MS. WITTY:  Yes.  Doug Spring's work laptop
19    is still in UMC custody.  We are going to make it
20    available to Mr. Edmondson for imaging.
21              Due to the personal nature of Mr. Mumford's
22    laptop, our client has requested that we wait to
23    image it until an order from the Court is issued.  He
24    has been instructed completely with regard to
25    preservation and not to remove or delete or alter any
```

Rough Draft of Special Master's Hearing April 10, 2014
(Telephonic)

1   information.  But we are asking that we receive the

2   order to direct that imaging.

3            SPECIAL MASTER GARRIE:  Let the record

4   reflect right now that I do and will be ordering this

5   in writing and am further ordering Mr. Mumford's

6   laptop to be handed over, because of the fact that

7   Mr. Mumford's statement in his chain of custody

8   declaration, and the fact that he states that he was

9   off site meeting and negotiating something to do with

10  SEIU, and the time had no Smartphone, so the only way

11  he could have been communicating at the time via

12  e-mail or with anybody was via that laptop.

13           Therefore, I am ordering the preservation

14  of his laptop, and I will issue that said order

15  forthwith.

16           MS. WITTY:  Thank you.  This is Counsel

17  Witty, with regard to the summarized notes for

18  counsel, plaintiffs' counsel, for the 4th --

19           SPECIAL MASTER GARRIE:  They weren't

20  summarized notes.  They were just bullet points of

21  all the data during the hearing.

22           MS. WITTY:  I don't believe that --

23           SPECIAL MASTER GARRIE:  Can you please

24  resend it?

25           MR. GODINO:  Sure.  Happy to do so.

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1            MS. WITTY:  I don't know if it's necessary
 2   to review it.  I just wanted you to know that we did
 3   not receive it.
 4            SPECIAL MASTER GARRIE:  You're on the
 5   e-mail chain, so...
 6            MR. GODINO:  And that may be your law
 7   firm's security.
 8            MS. WITTY:  That's what I'm worrying about.
 9            SPECIAL MASTER GARRIE:  Off the record.
10            (A discussion was held off the record.)
11            MR. GODINO:  This is Marc Godino.  I just
12   want to note to defense counsel that I just resent
13   our notes of the April 4th hearing, so you should get
14   it momentarily, if not already.
15            MS. WITTY:  Thank you.
16            SPECIAL MASTER GARRIE:  All right.  We're
17   back on the record, correct?
18            All right.  So now I would like to look at
19   Mr. Jon Tostrud's notes dated April 9th, 2014.
20            Counsel for UMC has them open?
21            MS. WITTY:  Yes.  Those we have.
22            SPECIAL MASTER GARRIE:  So I'll let counsel
23   for plaintiffs -- off the record.
24            (A discussion was held off the record.)
25            SPECIAL MASTER GARRIE:  Turning over to
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1  plaintiffs, I would like them to walk through their

2  questions and concerns about the custodian interviews

3  so we can address and ensure that we have properly

4  accounted for and acknowledged all the potential

5  sources of the material.

6          Counsel for plaintiffs, please take the

7  lead, starting with ESI data storage that was

8  identified.

9          MR. TOSTRUD:  Just a second, we're getting

10  to that document.

11          SPECIAL MASTER GARRIE:  I will point out

12  that counsel for UMC, you should read this fairly

13  closely because they do identify several different

14  file servers in other locations that you will

15  certainly want to make sure are being collected from.

16          MS. FOLEY:  Thank you.  We understand.

17          MR. FORREST:  Jon, this is Doug.  Do you

18  want me to walk through this?

19          MR. TOSTRUD:  Yes.  I think it would be

20  helpful if you could run through those questions, and

21  then Marc and I may do some cleanup.

22          MR. FORREST:  Okay.  This is the section,

23  this is beginning on the bottom of page 1, just

24  identifying some abbreviations.  And then we go to a

25  section on the following page, page 2, ESI Data

 1    Sources Identified.

 2            And basically this we went through the

 3    custodian interviews provided to us and tried to

 4    identify the ESI data sources.

 5            There is a subsequent separate section

 6    dealing with additional document types, as opposed to

 7    locations.

 8            And a lot of these, you know, we put down

 9    the information that we were able to glean, but we

10    don't -- a lot of it is fairly ambiguous using terms

11    like network server, home server, home folder, shared

12    drive, Q-drive.

13            SPECIAL MASTER GARRIE:  Can I make a

14    suggestion?  What I'm hoping you can do -- I

15    recognize that.  And so when you say network server,

16    can you please -- like if you want things clarified,

17    state for the record you would like to know further

18    clarification A, B and C because you believe this is

19    old X, Y and Z.

20            MR. FORREST:  Okay.  Well, then I'll just

21    run through them one at a time.

22            Jackie Panzeri stated the notes regarding

23    her entry states that she saved everything to the

24    network server, possibly the home folder.

25            We don't have the data map.  I would like

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    that network server and the possible home folder

2    identified.

3          Next she also talked about full timekeeping

4    and payroll database is on network server.  She

5    appears to be referring to a database, singular.  And

6    I would like identification of that.  And I would

7    like identification of mapping of the network server

8    that's being referenced.

9          SPECIAL MASTER GARRIE:  One at a time.  One

10    at a time, because I have points on each of them.

11          So rewinding one, with the network server,

12    I believe we're going to get a list.  Dean, I

13    believe, from UMC is going to provide us a list with

14    every file server that a user had access to.

15          Because I agree that network server that

16    she's referencing counsel for UMC, you need to make

17    sure, you need to verify (a) what it is, and provide

18    further clarification, and to make sure that is isn't

19    improperly collected.  Because I don't know if it's

20    her home directory or based on the script, it's not

21    clear.

22          Is that clear UMC?

23          MS. WITTY:  Yes.

24          SPECIAL MASTER GARRIE:  Okay.  Moving to

25    point number two.  I actually -- I had a similar

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1   question.  Can you clarify or respond to, was that --

2   who was that talking about?

3        MR. FORREST:  Who?  JP or Doug?

4        SPECIAL MASTER GARRIE:  Doug, thank you.

5        So if Doug's comment about the payroll

6   database is on a network server, again, I find -- I

7   know they're not technical people.  I just want to

8   make sure, given that there's no data map, no

9   nothing, that you guys are getting the right payroll

10  database server, and that she's, indeed, referencing

11  Kronos.  I mean, I just don't know.

12       So I think that we need clarification there

13  from maybe the IT people or from JP herself.

14       MS. WITTY:  This is Counsel Witty.  Are you

15  wanting us to clarify where the Kronos database is in

16  the server infrastructure?

17       SPECIAL MASTER GARRIE:  We want to make

18  sure that what when she said full timekeeping and

19  payroll database is on the network server, that she

20  is, indeed -- what systems is she referring to?

21       MS. WITTY:  She was referring to Kronos.

22       MR. FORREST:  Is it Kronos?  Is it SAP?  Is

23  it some kind of --

24       SPECIAL MASTER GARRIE:  So counsel for UMC,

25  you were just going to answer that.  What were you

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   going to say?
 2           MS. WITTY:  I spoke with Ms. Panzeri today.
 3   The timekeeping and payroll database that she's
 4   referencing is Kronos.
 5           With regard to its location, she was saying
 6   that it's not on her computer, that it's on a server
 7   that she accesses.  And I guess I'm just not sure
 8   what you want us to document in terms of its
 9   location?
10           SPECIAL MASTER GARRIE:  I mean, based on
11   the information that will be provided by Dean, I
12   don't think we, with the file maps, the network pass
13   and the names, I don't think we require that, it will
14   require more.
15           So Mr. Forrest, am I missing anything?
16           MR. FORREST:  I would expect that a lot of
17   these, if we actually finally get the data map,
18   enhanced data map, that a lot of those questions will
19   be answered.
20           You know, we just have to tie up the
21   pointers and say that's, in fact, a reference to the
22   here on the map, so to speak.
23           SPECIAL MASTER GARRIE:  Okay.  So let's
24   move forward and make sure to revisit it if we don't
25   receive sufficient detail.
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1            MR. FORREST:  And let me just raise an
 2    additional point, too, if I might.  It just occurs to
 3    me as we're talking now.
 4            I'm wondering if there's any sort of, you
 5    know, instruction guide that's given to the employees
 6    here, you know, in terms of the use of the computer
 7    system, and maybe there will be some definitions of
 8    some of the terms we're coming across.  I'm just
 9    thinking out loud.
10            Okay, next, Jackie backed up everything in
11    archiving.  And I'm not sure whether this is a
12    reference to archives that she's making in Outlook,
13    or whether those are common archives somewhere.  And
14    I would like identification of those.
15            MS. WITTY:  Understood.
16            MR. FORREST:  And the second one, same
17    question, specifically with reference to the separate
18    archive to the small lawsuit and the DOL
19    investigations.
20            DOL investigations, I tried to -- I did not
21    find that the screenshots were that much easier to
22    read in the electronic version.
23            MS. WITTY:  I can say, this is Counsel
24    Witty, with regard to the archive for the small
25    lawsuit and the DOL investigation, Ms. Panzeri does
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1   have e-mail archives specific to those topics.
 2           MR. FORREST:  A personal archive you're
 3   saying?
 4           MS. WITTY:  Yes.
 5           MR. FORREST:  Within her e-mail?
 6           MS. WITTY:  Yes.
 7           MR. FORREST:  So is she referring to e-mail
 8   archive or other document archive?
 9           MS. WITTY:  With regard to the stuff above,
10   I believe she was specifically discussing Outlook and
11   her e-mail archives.  She very extensively archives
12   her e-mails.  I've actually looked at it today.
13           But I want to make sure that she doesn't
14   have any other archiving before I confirm.
15           SPECIAL MASTER GARRIE:  Okay.  The next
16   one.
17           MR. FORREST:  The next one is a typo there.
18   Jackie instant messaging with Claudette Myers.
19   "Non-mall" is non-small.
20           She doesn't store the messages.  Obviously,
21   we have a question about doesn't store messages.
22   Obviously, there's no way to tell at this point.
23   That would be argumentative.
24           I guess essentially, is that, in fact, the
25   case, and are those messages stored anywhere else?
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   Perhaps CM retains them?

 2           MS. WITTY:  We will clarify.

 3           MR. FORREST:  Okay.  Next is Mr. Mumford's

 4   personal laptop.  It's been referenced earlier in

 5   this hearing.  Used for business with wireless access

 6   and TS Web.

 7           It's the Special Master's order to

 8   preserve.  I don't have any further comment with

 9   respect to that.

10           Next is Mr. Mumford's statement, or the

11   notes of his statement, that he mainly saves to

12   shared drive, unsure if department or home folder.

13           And again, we would like this clarified.

14           MS. WITTY:  This is Counsel Witty.  I spoke

15   with Mr. Mumford today as well, and clarified that he

16   was referencing his home folder.

17           MR. FORREST:  Okay.  Next is some JM

18   negotiation notes saved on desktop or My Documents

19   folder on C drive.

20           As I read the robocopy script, I think they

21   were -- and correct me if I'm wrong, Bruce -- but

22   essentially they are collecting everything under the

23   document and settings directory for the particular

24   user.  So that the desktop would have been preserved

25   as well; is that correct?
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1            MR. PIXLEY:  As far as your question, the
 2    robocopy script grabs the entire user profile, so
 3    starting at the root of the user profile, and working
 4    down.  So it would include those items.
 5            MR. FORREST:  Okay.  Next is the voicemail
 6    system Call Pilot version, whatever the version
 7    number is.
 8            I would like to know whether -- how long
 9    the messages are saved?  Is there any backup?  Is it
10    searchable?  Basically the full rundown.
11            SPECIAL MASTER GARRIE:  Counsel for UMC, do
12    you have anything to add?
13            MS. WITTY:  I apologize.  This is counsel.
14    That is understood.
15            MR. FORREST:  Okay.  And then we have
16    Mr. Mumford's text messages, which are characterized
17    as being mostly personal.
18            I understood that to be text messages on
19    his Blackberry device.  And I guess this is just
20    subsumed in the larger question of Blackberry backup
21    and so forth.
22            We then have -- I'm about to mangle
23    somebody's name here -- Mr. Brannman's materials, his
24    desktop, and his never-used laptop.  And I'm not sure
25    whether those were imaged or not.  They should have
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    been, I believe.

2            SPECIAL MASTER GARRIE:  Before we get to

3    what we believe, why don't you just ask a question.

4            MR. FORREST:  Yes.  Well, I want to know

5    whether his desktop and laptops were preserved.

6            SPECIAL MASTER GARRIE:  Counsel for UMC?

7            MS. WITTY:  This is Counsel Witty.  The

8    laptop and being located.  It is still in the

9    possession, and will be imaged.

10           The desktop would have been part of the

11   collection, and everything would have been collected

12   underneath his profile.  The desktop is still in the

13   possession of UMC, and as part of the order from

14   Monday, we understand that it will be imaged.

15           MR. FORREST:  Okay.  Let me take the next

16   two other as comments on the population of BB

17   documents.

18           And we understand from here that he saved

19   most documents to the desktop My Documents folder.

20   No questions about that.  That would have been

21   preserved.

22           And then he placed a large document on

23   share drive.  We would like the identification of

24   what that share drive is.

25           And we would like to know whether most

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1  documents and large documents constitutes the

2  entirety of the BB document collection, or whether

3  there's some portion of it which does not fall into

4  either category.  And if so, where it is to be found.

5          MS. WITTY:  Understood.

6          SPECIAL MASTER GARRIE:  Understood what?

7          MR. EDMONDSON:  Okay.

8          SPECIAL MASTER GARRIE:  One second.

9  Understood what?

10          MS. WITTY:  This is Counsel Witty.  I

11  understand that what he's asking is whether there are

12  other documents outside of most on his My Documents

13  folder and large documents on the shared drive.  That

14  if there are other documents, that fall outside of

15  those descriptions, that we would be identified as to

16  location.

17          And similarly, UMC will be identifying the

18  share drive folder that would hold the large

19  documents referenced.

20          MR. FORREST:  Okay.  We're now moving on to

21  Mr. Espinoza.  It's a description of documents

22  emailed mailed to Claudette Myers saved by her in

23  shared folder.  We would like identification of the

24  shared folder.

25          It goes on to indicate that Claudette Myers

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   determined what needs to go in the HR department
 2   drive.  We would like identification of that drive.
 3   I don't know whether it's -- if that's the same as a
 4   folder that's been defined elsewhere, whether it is
 5   some other storage device modality that's somewhere
 6   else on the network.  So we would like that
 7   identified.
 8            SPECIAL MASTER GARRIE:  Okay.  Is that --
 9   counsel for UMC, is that a problem?
10            MS. WITTY:  No.
11            MR. FORREST:  Then we have Mr. Espinoza
12   saves mainly to the personal drive on network home
13   folder.  Likely some information on his C-drive.
14            Again, we would like identification of the
15   personal drive on the network and the home folder.
16   And if there could be any information on the C-drive
17   stored outside of his user profile.
18            SPECIAL MASTER GARRIE:  At the time --
19   let's be clear.  Not today, but at the time in
20   question, because UMC's systems have changed since
21   then.
22            MR. FORREST:  Understood.  That's
23   acceptable.
24            MS. WITTY:  This is UMC counsel.  That's
25   understood.
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1              MR. FORREST:  Okay.  Next we have Claudette

 2   Myers who also scans in hard copies for archiving as

 3   needed.

 4              We would like to know how -- how the

 5   determination of being needed is made, and where

 6   those hard copies, those scanned hard copies are now

 7   resident or were resident at the time.

 8              SPECIAL MASTER GARRIE:  One second.  This

 9   is Special Master Garrie here.

10              You said you want to know how she

11   determines what is needed for scanning?

12              MR. FORREST:  I think that may be outside

13   the scope here.

14              SPECIAL MASTER GARRIE:  I'm just checking

15   what your request was.

16              MR. FORREST:  Yes.  Yes.  I mean, that

17   indicates that there is a binary classification as to

18   those which need to be archived and those which don't

19   need to be archived.

20              SPECIAL MASTER GARRIE:  I got it.  Thank

21   you for clarifying.  I just wanted to make sure

22   UMC -- counsel for UMC understood it as well.

23              Counsel for UMC, do you have anything you

24   would like to state here?

25              MS. WITTY:  I spoke with Ms. Myers today.
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    With regard to the scanning capabilities as discussed
 2    at the hearing on Monday, it only creates PDFs.  They
 3    are automatically saved to a directory file in the --
 4    excuse me, into a file on the Q-drive, so the shared
 5    network that is identified for Claudette directly and
 6    her scans.
 7            So it goes directly from the machine that
 8    is scanning into her file from the scanner on the
 9    Q-drive.
10            It is then determined whether or not that
11    scan goes into the -- whether it stays there as just
12    general filing.  And I would say Claudette scans the
13    vast majority of hard copy documents that come from
14    John Espinoza.
15            The only thing that we have identified that
16    isn't scanned as needed would be documents that are
17    temporal in use.  They are not something that was
18    created or will be used in any other term.  It's
19    something that's printed out and shredded that day.
20            They shred everything that is not required
21    hard copy.  They are no longer doing that with regard
22    to --
23            SPECIAL MASTER GARRIE:  As of what date?
24            MS. WITTY:  I can't tell you that exactly.
25    I know that Jackie Panzeri has been retaining
```

Rough Draft of  Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   documents for the past six months.  I would have to

 2   clarify.  I don't have my notes right in front of me

 3   with regard to Ms. Myers.

 4           MR. TOSTRUD:  This is Jon Tostrud, and I

 5   would like to interject and see if we could get a

 6   date certain by when we'll get an answer to that

 7   question?

 8           SPECIAL MASTER GARRIE:  Well, I can help

 9   speed that up.  I would like to order counsel for UMC

10   to provide a date by the end of tomorrow, assuming

11   it's in your notes.

12           MS. WITTY:  This is Counsel Witty.  I guess

13   I'm confused as to exactly what I am supposed to

14   clarify.

15           SPECIAL MASTER GARRIE:  Counsel for

16   plaintiffs, you can state your point and then --

17   counsel for UMC -- let's go off the record.  Strike

18   the last two sentences.

19           (A discussion was held off the record.)

20           SPECIAL MASTER GARRIE:  So let's go back

21   the record.

22           I would like Counsel Witty, can you please

23   reask your question, and we'll answer that, and then

24   counsel for plaintiffs, and I'll then make -- I'll

25   issue my ruling.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1          Counsel UMC?
 2          MS. WITTY:  I'm uncertain as to what
 3  exactly needs clarification.
 4          MR. TOSTRUD:  This is Jon Tostrud for
 5  plaintiffs.  It's my understanding that counsel for
 6  UMC indicated that some documents were being shredded
 7  before they were scanned, and we would like to get an
 8  answer to the question of when the shredding of those
 9  documents that were not scanned, when that stopped?
10  When did the shredding stop?
11          SPECIAL MASTER GARRIE:  Does that help you
12  out, Counsel Witty, and clarify?
13          MS. WITTY:  This is Counsel Witty.  Yes.
14  Just to clarify, is the special master ordering that
15  to be determined by end of day tomorrow?
16          SPECIAL MASTER GARRIE:  Well, as I
17  understood your prior comments, you had it in your
18  notes.  Do you not -- have you not had this
19  conversation?
20          MS. WITTY:  I have.  I just want to make
21  sure that that was your -- I was just clarifying that
22  was the timeline.
23          SPECIAL MASTER GARRIE:  Yes.  Assuming that
24  you have it in your notes, you just have to look at
25  your notes, yes.  By end of day tomorrow, 5:00 p.m.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1              MS. WITTY:  Thank you.

 2              MR. FORREST:  This is Doug, should I

 3    continue?

 4              SPECIAL MASTER GARRIE:  Yes, please.

 5              MR. FORREST:  Okay.  Now, we were on to

 6    Doug Spring.  He's got two desktops, one in two

 7    offices, a laptop and then the mobile work stations.

 8              We are requesting that the two desktops and

 9    laptops be imaged.  And with respect to the mobile

10    work stations, the Special Master has already ruled

11    in terms of identification of mobile work stations

12    which were used by Mr. Spring, or anyone else for

13    that matter, more than five times within a month.

14    And I think that, as eventually interpreted and

15    developed in conjunction the data that we get back,

16    is sufficient.

17              Now, prior to 2009, everything sent to

18    Doug Spring via e-mail and saved to shared HR drive,

19    we want identification of the HR drive.

20              SPECIAL MASTER GARRIE:  One second.  Hold

21    on one second.  Sorry for interrupting one second.

22              Counsel for UMC, the HR drive is an example

23    of the network file share that should certainly be

24    collected just for the purposes of demonstrating what

25    I have in mind, as to reading the custodian
```

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    interviews to make sure that everything is collected
 2    from the network file share.
 3            MS. WITTY:  This is counsel.  We
 4    understand.
 5            MR. FORREST:  This is Doug again.  The next
 6    portion I found somewhat contradictory.  We had
 7    Mr. Spring being noted as he knows to only save to
 8    the home folder network saved, but on the other hand
 9    he always saves on the HR shared drive.
10            So I guess there's some confusion here.  So
11    what I'm asking for is both identification of those
12    locations, and clarification as to the apparent
13    contradiction.
14            MS. WITTY:  This is Counsel Witty.  This
15    was actually one of the questions that I discussed
16    with Doug Spring today.  Because I saw that, because
17    it was pointed out to me in these notes, the
18    contradiction.
19            He always saves to his home folder.  That
20    home folder is the one that is backed up as part of
21    the network.
22            But we understand that you're asking for
23    that to be identified, and similarly his access to
24    the -- to any HR shared files, as well, is to be
25    identified.
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1          MR. FORREST:  This is Doug again.  Moving
 2   on to Doug Spring's personal drop box, mainly for
 3   grandkid photos.  Which indicates that -- mainly
 4   implies that there are times when there are things
 5   other than grandkid photos, and the question that I
 6   would have is, is there any UMC work-related material
 7   that Mr. Spring keeps in his personal drop box.
 8          MS. WITTY:  This is Counsel Witty.  Again,
 9   this is something that I discussed with Doug Spring
10   today.  He actually does not have drop box on his UMC
11   desktop.  And I did look at this.  I did visually
12   confirm this today.  It's something he uses on his
13   iPhone, his personal iPhone.
14          The other thing that he keeps on his drop
15   box are recipes from his wife, in case you're
16   curious.
17          We are still looking at the file name pass
18   that indicate drop box files to confirm timing and
19   how that is captured in the collection.
20          MR. FORREST:  Okay.  And then the final one
21   in this category, Doug Spring e-mail archives saved
22   Q-share drive.
23          Again, identification of the Q-share drive,
24   and identification of those e-mail archives and where
25   they are stored.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1           MS. WITTY:  Okay.

2           SPECIAL MASTER GARRIE:  Okay yes?  Or okay?

3           MS. WITTY:  Yes, sorry.  That will be done.

4           MR. FORREST:  This is Doug again.  The next

5    section is just an identification of the mobile

6    devices for our -- as long as I was going through, I

7    just wanted to record those.  Again, in terms of the

8    wipe asking so forth, I think that's already covered

9    by the Special Master's orders and directives.

10          The only issues that I have here which we

11   have not come upon is on page 3 at the top, DS, Doug

12   Spring.  He indicates on his personal iPhone he's

13   occasionally texting to individuals in HR and to UMC

14   directors.  And that he's occasionally syncing to his

15   home computer, and that he's accessing UMC e-mail,

16   that's my interpretation, through web mail, with an

17   internet browser within the iPhone.

18          So obviously, in terms of -- not obviously.

19   In terms of those texts to individuals in HR and UMC

20   directors, which may or may not be on his iPhone or

21   synced to home computers, we would submit perhaps

22   that iPhone 5S needs to be imaged.

23          With respect to accessing UMC e-mail

24   through web mail with an internet browser, depending

25   upon whether the Cache setting for the UMC mail

Rough Draft of  Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   server permits the bodies of e-mails to be saved in
 2   the internet history, and so forth, if it doesn't
 3   allow saving, then we don't have much interest in it.
 4   If it does, then I guess that would be captured and
 5   part of the imaging and why we're requesting them.
 6              SPECIAL MASTER GARRIE:  Counsel for UMC?
 7              MS. WITTY:  This is Counsel Witty.  I spoke
 8   with Doug Spring about his personal iPhone today.  He
 9   has only had the iPhone 5S since January of 2014.
10              The only individual that he had texts in
11   connection with was John Espinoza.  He is personal
12   friends with John Espinoza and John Espinoza's wife.
13              And so there is -- and I verified this
14   visually.  He does text with regard to going to lunch
15   as in, hey, are you at lunch or, hey, would you like
16   to get lunch.  But there is a significant hesitance
17   to the imaging of his personal phone.
18              SPECIAL MASTER GARRIE:  Well, what phone
19   did he have before the 5S?
20              MS. WITTY:  It was a previous version of
21   the iPhone.  The reason why he upgraded was because
22   it was completely destroyed.  He was not able to
23   transfer over any information.  There was no
24   migration of data.  And that is why -- I mean, the
25   only thing that's going to be on that phone is
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    information from January 2014 to current.  It's an

2    extremely limited reference.

3              MR. TOSTRUD:  This is Jon Tostrud for

4    plaintiffs.  I just wanted to confirm that we're on

5    the record.

6              THE COURT REPORTER:  Yes, we are and I have

7    been.

8              MR. TOSTRUD:  Plaintiffs, first of all,

9    would ask whether the previous phone or any other

10   phones that Mr. Spring has used, iPhone or otherwise,

11   are available?

12             MS. WITTY:  This is counsel for UMC.  Are

13   you asking if any of his previous personal phones are

14   available?

15             MR. TOSTRUD:  Yes.  The ones that you just

16   indicated he texted with Mr. Espinoza on.

17             MS. WITTY:  This is Counsel Witty.  I'm

18   not sure that I indicated that he texted with

19   Mr. Espinoza on any prior phones.  I'm not sure what

20   you're asking for.

21             MR. TOSTRUD:  I'm asking if the previous

22   versions of the iPhone are available.  Where are

23   they?

24             SPECIAL MASTER GARRIE:  One second.  This

25   is Special Master Garrie.  I'm going to try this

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1   differently, and then we can -- I'll let plaintiff,
 2   if I believe necessary, make further inquiries.
 3              He's asking does he have any old iPhones?
 4              MS. WITTY:  This is Counsel Witty.  No.
 5              SPECIAL MASTER GARRIE:  Did he use the
 6   iPhones to -- he uses the current iPhone 5S.  Did he
 7   use his prior iPhone -- sorry, someone want to say
 8   something?
 9              Did he use his prior iPhones to perform or
10   communicate with UMC individuals, either in HR or
11   directors?
12              MS. WITTY:  The only -- this is Counsel
13   Witty.  I apologize.
14              The only individual that he mentioned
15   within UMC with regard to texts was Mr. Espinoza.
16              He mentioned -- so I want to clarify, this
17   is Counsel Witty again.  With regard to the UMC
18   directors, his personal cell phone is available to
19   UMC director level employees.
20              So the director of nursing or the director
21   of a particular service area would have access to
22   that number.  He would not necessarily be engaging in
23   any text communications with them.
24              He did not have any communications with any
25   other UMC individuals on his phone.
```

```
 1            SPECIAL MASTER GARRIE:  Counsel for

 2    plaintiffs, do you have any questions?

 3            MR. TOSTRUD:  No, I don't have any

 4    additional questions.  I think Ms. Witty has laid the

 5    foundation herself with her own description for the

 6    relevance and the importance of these phones, both

 7    the phones that no longer exists and the current

 8    phone.  And plaintiffs would request that that phone

 9    be imaged.

10            Plaintiffs would further emphasize the

11    importance of the developments in this case since

12    January of 2014.  There have been an extraordinary

13    number of important developments.  So that that phone

14    and what's on it, beginning in January 2014, if he's

15    communicating with the chief of human resources,

16    John Espinoza, contains critical relevant evidence,

17    and that's the plaintiff's position.

18            And plaintiffs would just further add that

19    the past destruction of other Doug Spring phones that

20    the current phone, it's even more important now than

21    ever to mirror image it.

22            MS. WITTY:  This is counsel for UMC.  I

23    think that the previous discussion that was made by

24    Special Master Garrie with regard to creating a

25    record of legal conclusions or personal advocacy
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    would be inappropriate at this time.  I don't believe

 2    that there has been established a place for that

 3    argument.

 4              SPECIAL MASTER GARRIE:  For the parties,

 5    I'm still on the call.

 6              I'm going to note plaintiffs' point for the

 7    record, and I'm going to point out that counsel for

 8    UMC is correct in her statements.

 9              I do have -- I do want to discuss this.  I

10    would like to discuss it on the 15th.  And I would

11    like to generally and broadly discuss the phones.

12              But I would like to it post seeing the

13    iPhone, iPad, and other mobile results.  It isn't

14    something from plaintiffs' side that I am not

15    cognizant or aware of, but I would certainly prefer

16    to see the results of the mobile searches prior to

17    going anywhere.

18              But I do want to repeat my request that we

19    keep legal argument to a minimum here, and we keep

20    focusing on just getting through the custodian's

21    interviews.

22              And I would note for the record that at the

23    hearing on the 15th, I did plan to have further

24    discussions and an opportunity to evaluate the

25    findings from the searches.  Is that clear to
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    plaintiffs?

 2              MR. TOSTRUD:  Yes.

 3              SPECIAL MASTER GARRIE:  And to UMC as well?

 4              MS. WITTY:  Yes.

 5              SPECIAL MASTER GARRIE:  And to be fair to

 6    both sides, at that time I will certainly welcome

 7    discussion into how long those limited -- advocacy

 8    around the imaging or collection of personal mobile

 9    devices.

10              Take charge.  Keep moving.

11              MR. FORREST:  This is Doug again.  And next

12    we have some bullet points about Mr. Espinoza's

13    mobile devices.

14              I will note -- first back to Doug Spring.

15    Text individuals in HR and UMC directors, that we got

16    from the custodian information forms.  So if that is

17    no longer correct, we request that it be corrected.

18              Under Mr. Espinoza, he says he will text in

19    response to work requests.  That doesn't seem to line

20    up on all fours with representation of the statement

21    of Mr. Spring.

22              SPECIAL MASTER GARRIE:  Let's stick with

23    what you want clarified.

24              And I'm going to help you out here

25    Mr. Forrest.  What you would like clarified -- do you
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1   understand the direction I would like?  So if you

 2   want clarification, that's fine.  I don't need to

 3   understand -- I want to understand what you want

 4   clarified.  And if I need to understand the reason

 5   why, I will ask.

 6            MR. FORREST:  Okay.  We would like a full

 7   description of Mr. Espinoza's texting.

 8            MS. WITTY:  This is counsel for UMC.

 9            SPECIAL MASTER GARRIE:  You were about to

10   say something.

11            MS. WITTY:  I would request a more specific

12   clarification.  A full description of texting is

13   rather vague.

14            MS. FOLEY:  Not to mention broad.

15            SPECIAL MASTER GARRIE:  So I'll help narrow

16   it down.  This is Special Master Garrie, and then

17   plaintiffs, if this is not sufficient, please object,

18   and I'll note it for the record.

19            I would like to know who he was texting,

20   when he was texting, and with relations to people at

21   UMC, about UMC.  And I would like to know, you know,

22   what he was doing.

23            I mean, the text messages that we received

24   obviously -- one second here, ones that were as of

25   January 2014 -- am I correct, that's all we were able
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    to acquire, Mr. Edmondson?

 2             MR. EDMONDSON:  This is Joe Edmondson.

 3    That is correct.

 4             SPECIAL MASTER GARRIE:  Thank you.

 5             So what I want to understand is who he was

 6    texting, since when was he texting.  And since we

 7    don't have any information here that we can actually

 8    look at, I would like counsel for UMC to go to him

 9    and his best recollection to figure out who he was

10    texting before January 1, 2014, and what he was

11    texting them about, so we have at least some context

12    to see if it's necessary to collect or inspect his

13    personal devices, or broaden the subpoena to Sprint

14    or otherwise.

15             Because as far as I'm concerned, he said

16    that he had this device as of January 20th, 2011, but

17    we have no text messages before in 2011, 2012, or

18    2013, only from 2014.  And that's a point of concern

19    for me at this point.  Is that clear?

20             MS. WITTY:  Yes.

21             SPECIAL MASTER GARRIE:  And I would also

22    like an affidavit from Mr. Espinoza, or he can

23    discuss it with me on the 22nd, explaining how if

24    he's had the same phone since January 20th, 2011,

25    there's only text messages as of January 2014.
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1          MS. WITTY:  This is Counsel Witty.  Due to
 2   the technical nature of how UMC maintains its
 3   UMC-issued phones, if Mr. Espinoza is not technically
 4   able to explain that, are you requesting that someone
 5   else be available for that?
 6          SPECIAL MASTER GARRIE:  Well, if he was
 7   using the phone -- I don't know how else to explain
 8   if Mr. Espinoza was sending text messages prior to
 9   January 2014 that are no longer on his phone.  I
10   guess maybe -- yes, yes, I would like that person to
11   be available by phone.  But he should be prepared to
12   discuss that.
13          MS. WITTY:  Understood.
14          MR. TOSTRUD:  This is Jon Tostrud for
15   plaintiffs.  Just for further edification and
16   clarification on this issue, absent Mr. Espinoza's
17   ability to speak to the technical issues, which we
18   understand -- plaintiffs understand he was deposed,
19   and I think could at least speak to the issue of the
20   April 2013 to January 2014 time period, after which
21   he was deposed, and was specifically asked about his
22   communication devices, and was provided with a copy
23   of the preservation letter.
24          SPECIAL MASTER GARRIE:  When was he
25   deposed?
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1            MR. TOSTRUD:  Mr. Espinoza was deposed in
 2    April 2013.
 3            SPECIAL MASTER GARRIE:  Is that correct,
 4    counsel for UMC?
 5            MS. WITTY:  This is Counsel Witty.  Yes,
 6    Mr. Espinoza was deposed in April of 2013 under prior
 7    counsel.
 8            SPECIAL MASTER GARRIE:  I got it.  And were
 9    you aware that he received a copy of the
10    preservation?
11            MS. WITTY:  I believe it was actually done
12    within the deposition.
13            SPECIAL MASTER GARRIE:  Can someone please
14    provide that exact transcript language for myself?
15            MR. TOSTRUD:  This is plaintiffs' counsel.
16    Happy to do that.
17            SPECIAL MASTER GARRIE:  Okay.  That will be
18    a question and topic of discussion.
19            I'm a little perplexed at -- Mr. Edmondson,
20    you're certain you created a full image of the
21    iPhone, correct?
22            MR. EDMONDSON:  That was the phone service,
23    Joe Edmondson.  That was the phone that was handed to
24    me at the time, yes.
25            SPECIAL MASTER GARRIE:  The Blackberry
```

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    Curve 8530?

2           MR. EDMONDSON:  I will review my notes.  I

3    don't believe there was an 8530.

4           SPECIAL MASTER GARRIE:  I don't believe so

5    either.  I'm a little confused.

6           MR. EDMONDSON:  Let me double check my

7    chain of custody.

8           SPECIAL MASTER GARRIE:  Counsel for UMC,

9    can you double check to make sure we have all the

10   right phones?

11          MS. WITTY:  Yes.  In light of that,

12   definitely.

13          SPECIAL MASTER GARRIE:  Because the way I

14   read it, the chain of custody -- and I would like

15   him, Mr. Espinoza, to admit his -- make him aware

16   that his iPhone, iPad, that I'm refraining from

17   ordering the production in a court order at this

18   point until I get the results this Friday.  And I'll

19   expect he is not deleting anything from his personal

20   iPhone or iPad especially given that he was served

21   and received the preservation order, and yet there's

22   no text messages post January 1, 2014.

23          MS. WITTY:  You mean -- this is Counsel

24   Witty.  I want to clarify.  You want to make sure

25   that there's nothing deleted from his iPhone or iPad

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   in light of his UMC phone not having any text
 2   messages prior to January of 2014?
 3            SPECIAL MASTER GARRIE:  And the fact that
 4   he was deposed in April of 2013 and given a copy of
 5   the preservation notice at that time.
 6            MS. WITTY:  Thank you for clarifying.
 7            SPECIAL MASTER GARRIE:  And after my review
 8   on the 15th and the hearing on the 15th, I'll make a
 9   formal ruling at that time.
10            MS. WITTY:  We understand.
11            SPECIAL MASTER GARRIE:  And I also --
12   sorry, keep going, Doug.
13            MR. FORREST:  Okay.  In the section he also
14   refers to the IM instant messaging system is very
15   new.  The new CEO likes it.
16            In light of Mr. Tostrud's comments about
17   the relevance of post January 14th materials, we
18   would like to know the specifications of the instant
19   messaging system:  What is it?  Where is it
20   installed?  What are it capabilities?  Who uses it?
21   How are the instant messages saved or recorded?  If
22   they're not being saved and recorded, is that a
23   capability of the system?  Is it backed up?
24            SPECIAL MASTER GARRIE:  And that would
25   require how Blackberry messaging works, or if that's
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    what he's referring to?

2            MS. WITTY:  This is counsel Witty.  He is

3    not referring to his Blackberry with regards to the

4    instant messaging.  The instant messaging is purely

5    through Outlook.  I don't believe it's available on

6    their Blackberry devices.

7            SPECIAL MASTER GARRIE:  You don't believe

8    or you're certain it's not?

9            MS. WITTY:  I will clarify, but none of

10   them have indicated they can instant message through

11   their Blackberry.

12           SPECIAL MASTER GARRIE:  This can all use

13   BBM through their Blackberry, as I understand it,

14   based on what was provided in the hearing.  Maybe

15   once we get further clarification...

16           MS. WITTY:  Certainly.

17           SPECIAL MASTER GARRIE:  Doug, keep going.

18           MR. FORREST:  Okay.  There are other

19   references to the instant messaging, which I guess is

20   something new, at least in terms of usage.

21           The next section is specific documents

22   which are identified.

23           MR. GODINO:  This is Marc Godino from

24   plaintiffs' counsel.

25           I want to interject because I had another

1    question regarding the phones, based on the custodian

2    interviews.  And that had to do with Brian Brannman,

3    who says that he had an iPhone 3 and 5, and wanted to

4    know if he ever used that phone to communicate with

5    UMC personnel.

6            MS. WITTY:  This is counsel for UMC.  You

7    want us to clarify whether or not he used his

8    personal iPhone 3S to communicate with --

9            SPECIAL MASTER GARRIE:  I want to broaden

10   that.  I want any personal phone or device he had in

11   his custody or control at any time for the time

12   period in question.

13           MS. WITTY:  Okay.  We understand.

14           SPECIAL MASTER GARRIE:  And if he

15   communicated with anybody from his personal e-mail

16   account or to their personal e-mail account regarding

17   or relating to UMC-related work.

18           MS. WITTY:  Understood.

19           MR. TOSTRUD:  I mean, I guess that question

20   would go to any of the custodians who had personal

21   communication devices, whether they used those

22   devices to communicate to UMC personnel regarding UMC

23   business.

24           SPECIAL MASTER GARRIE:  Can you broaden the

25   question, counsel for UMC.

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1            MS. WITTY:  This is counsel for UMC.  Could
 2   you please clarify what you say broaden that question
 3   and to which custodians?
 4            SPECIAL MASTER GARRIE:  Fair enough.  I
 5   apologize for the confusion.
 6            What I'm requesting is that counsel for the
 7   six identified custodians specifically inquire as to
 8   whether they used any personal phone or communication
 9   device in their possession, custody or control during
10   the time period in question to communicate regarding
11   UMC-related work with any UMC-related employee or
12   consultant or third parties.
13            MS. FOLEY:  During the time period in
14   question as for Mr. Brannman?  This Margaret.
15            SPECIAL MASTER GARRIE:  One more time,
16   sorry?
17            MS. FOLEY:  I would just note that for
18   Mr. Brannman, you instructed this to specify to the
19   time period in question, and I wanted to know if the
20   other custodians have the same parameters?
21            SPECIAL MASTER GARRIE:  Yes.  All
22   custodians, June 2008 to present.
23            Off the record.
24            (A discussion was held off the record.)
25            SPECIAL MASTER GARRIE:  Mr. Forrest?
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1              MR. FORREST:  Okay.  So the next section is
 2    documents identified from the custodian interviews.
 3              And the first one is reports on individuals
 4    for the DOL investigation as referenced in Jackie
 5    Panzeri's custodian interview on page 1.
 6              SPECIAL MASTER GARRIE:  Okay.  Can I make a
 7    suggestion here for -- and I don't want -- I want to
 8    make a general broad statement and reiterate it, so
 9    we don't have to have the same conversation.
10              Any documents that are identified in the
11    custodian interviews that would have been responsive
12    to prior document requests, I fully expect counsel
13    for UMC, as they represented to us on multiple
14    occasions forthwith, with that they would inquire and
15    obtain those records, and inspect them and produce
16    them if they are responsive.
17              Is that clear, counsel for UMC?
18              MS. WITTY:  This is counsel for UMC.  Yes.
19              SPECIAL MASTER GARRIE:  Okay.  Mr. Forrest,
20    is that clear to you, as well?
21              MR. FORREST:  It is clear to me.  And we
22    can dispense, I gather, with going through bullet by
23    bullet here?
24              SPECIAL MASTER GARRIE:  We could.  There's
25    one or two that I would like to clarify.
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1              Mr. Brannman and yellow note pad thing.  I
 2    don't understand.
 3              If someone from UMC could just walk me
 4    through what that means, like she had filed his
 5    yellow stickie notes?
 6    BY MS. WITTY:
 7       Q.   This is Counsel Witty.  Are you looking at
 8    the line that starts, "BB took a lot of personal
 9    notes on yellow pads"?
10              SPECIAL MASTER GARRIE:  Yeah.
11              MS. WITTY:  Okay.  That actually is Brian
12    Brannman.  That was his personal notation system.  He
13    would essentially carry around a yellow legal pad.
14    He would fill it up so that he would have it for
15    reference at the time.  When it was full, he would
16    discard it.
17              SPECIAL MASTER GARRIE:  But it says that he
18    would provide the yellow file to CD to file.
19              MS. WITTY:  Yes.  So if there was something
20    that was taken that was not a temporary note, he
21    would provide the relevant yellow pad to Cindy Dwyer
22    to scan and file.
23              SPECIAL MASTER GARRIE:  Can you do me a
24    favor and make sure that you get access to
25    wherever -- I don't even -- can counsel for UMC
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    inquire as to where these were stored?

 2           MS. WITTY:  Yes.

 3           SPECIAL MASTER GARRIE:  And make sure they

 4    have the opportunity, when they do this collection

 5    from the network file share, that they are indeed

 6    collected?  Because I don't think they will actually

 7    be searchable.

 8           MS. WITTY:  That could be.  We will look

 9    into that.

10           SPECIAL MASTER GARRIE:  So just please be

11    mindful of that.  Because if it was scribblings, then

12    obviously his former -- it is former CEO?

13           MS. WITTY:  Correct.

14           SPECIAL MASTER GARRIE:  I don't believe

15    that the scanned yellow pad will be OCR, so you need

16    to make sure that you check the network file share

17    where she stored it for this file.

18           And that goes --

19           MR. GODINO:  This is Marc Godino, and I

20    just had a further question regarding the yellow

21    pads:  Whether Mr. Brannman at some point, pursuant

22    to preservation order or litigation hold, stopped

23    shredding the yellow pads?

24           MS. WITTY:  We will clarify.

25           SPECIAL MASTER GARRIE:  I would like that
```

```
 1    clarification by the 15th.

 2            One other point I want to make to counsel

 3    so that they're aware I believe it's important that

 4    counsel be neutral of the fact that UMC scans in

 5    Post-its and other handwritten notes, and it is very

 6    likely that they are illegible.

 7            And so when you're looking at those network

 8    file shares or scanned-in repositories, running key

 9    word searching on documents that aren't searchable

10    might not be effective.

11            MS. WITTY:  Right.  Review would need to be

12    visual.

13            SPECIAL MASTER GARRIE:  Yes.  That is

14    correct.

15            MS. WITTY:  Linear.  That's the term,

16    right?

17            SPECIAL MASTER GARRIE:  Yes, it is

18    actually.

19            Mr. Forrest?

20            MR. FORREST:  Yes.

21            SPECIAL MASTER GARRIE:  Do you want to talk

22    about the personal file cabinet?

23            MR. FORREST:  So we would like to know what

24    is Mr. String's personal file cabinet with the

25    Department of Labor investigation folders
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    hand-printed policy drafts, and whether that has been

2    searched.  And to the extent that they're responsive

3    materials, whether those have been preserved and are

4    being produced.

5         SPECIAL MASTER GARRIE:  I'm assuming they

6    preserved the whole thing, but the question I have

7    is -- you asked a very good question which is, is

8    counsel for UMC aware of this cabinet?

9         MS. WITTY:  This is counsel for UMC,

10   Counsel Witty.  And I actually did visually inspect

11   the DOL investigation folder today.  Everything

12   inside it that is not attorney/client privilege has

13   been produced.

14        SPECIAL MASTER GARRIE:  Mr. Forrest, are

15   you clear?

16        MR. FORREST:  Yeah.  I'm unfamiliar, and my

17   involvement in the case is relatively new.  I'm not

18   aware of any production other than the ones that

19   we've been discussing.  And, you know, in terms of

20   what's contained in that, we have not done an

21   exhaustive look, or really any look at all, so...

22        MR. TOSTRUD:  This is Jon Tostrud,

23   plaintiffs' counsel.

24        Now that Ms. Witty has had an opportunity

25   to look at the Department of Labor investigation

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    file, I'm wondering if we can get a date of when the

2    investigation was initiated?

3            MS. WITTY:  I can give you an approximate

4    time.  I can't tell you on DOL's side.  I can tell

5    you that the complaint that was filed by a group of

6    employees from UMC was done so in August of 2012.

7            MR. TOSTRUD:  The earliest time period the

8    documents that have been produced to plaintiffs have

9    the earliest date of September of 2012.

10           MS. WITTY:  Yes.  That would be UMC's

11   response.  Like I said, I cannot tell you what the

12   DOL has in their possession.

13           MR. TOSTRUD:  When you visually inspected

14   Doug Spring's cabinet with the DOL investigation

15   folder, did that include any DOL-generated

16   investigation report?

17           MS. WITTY:  This is Counsel Witty.  I'm not

18   exactly sure what you're referring to with regard to

19   the DOL report, or what they might have generated.

20           SPECIAL MASTER GARRIE:  Can I -- this is

21   Special Master Garrie.  I'm going to suggest that if

22   counsel for the plaintiffs wants to draft letters as

23   to what their concerns are, and send it to me on or

24   before the hearing of the 15th, we can cover it on

25   the 15th.  Otherwise maybe we can cover it on the

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1   22nd, and counsel for UMC, if you feel a desire or

2   need to respond, I would request that then I receive

3   a letter by the 18th, and I receive a response by the

4   21st.

5          Moving forward.

6          MR. FORREST:  Okay.  The next section are

7   references to lien from the custodian interviews,

8   which will refer to documents being destroyed or not

9   actively being preserved.  Check sperring.

10         I think most of these we've already talked

11  about.

12         With respect to e-mails printed for

13  reference, discarded once issue dealt with, the

14  concerns is whether any of these ever had any

15  handwritten notes on them, and whether that can be

16  established as to whether Ms. Panzeri was in the

17  habit of making handwritten notes on these e-mails

18  printed for reference, which were then discarded.

19         SPECIAL MASTER GARRIE:  So, but there's --

20  the focus is to ask questions where you need

21  clarification.  So I will again help you.

22         Have you had a chance to speak with

23  Ms. Panzeri as to the issue that was just raised?

24         MS. WITTY:  I have not specifically

25  addressed -- this is Counsel Witty.  I have not

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1    specifically addressed handwritten notes only on

2    printed e-mails.

3              SPECIAL MASTER GARRIE:  Given that she does

4    allude to them in her custodial interview, she might

5    scan -- this is Special Master Garrie.  I would like

6    to get further clarification if she did, indeed, scan

7    them in, or preserve the notes.  Otherwise, it's not

8    fair to me.

9              Scratch my last three words.

10              Can counsel for UMC please seek further

11    clarification?

12              MS. WITTY:  This is Counsel Witty.  I want

13    to make sure that I am seeking the correct

14    information.

15              You want me to clarify whether or not any

16    e-mails printed for reference included handwriting

17    that was scanned, or preserved otherwise?

18              SPECIAL MASTER GARRIE:  Yeah.  If she was

19    printing e-mails, I want to know, and she was writing

20    on them, I want to know what happened.

21              Let me try this a little differently.  Has

22    counsel been provided any printed e-mails by

23    Ms. Panzeri with any handwritten notes on them?

24              MS. WITTY:  This is Counsel Witty.  No.

25              SPECIAL MASTER GARRIE:  Can Counsel Witty

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    please inquire with Ms. Panzeri as to what she was

2    referring to, and seen examples of such, and inquire

3    as to what happened to the e-mails, where she may

4    have written handwritten notes on them, if they

5    relate to this or are responsive to the document

6    request?

7            MS. WITTY:  Yes.  Counsel can do that.

8            SPECIAL MASTER GARRIE:  Mr. Forrest, I'll

9    let you go through questions if you need any

10   clarification around your questions?

11           MR. FORREST:  Okay.  Well, the first

12   question is a reference to the hard copy reports for

13   timekeeping, payroll, audit compliance kept in the

14   fourth floor file room, as referenced in

15   Ms. Panzeri's study information.  Have they been

16   produced?

17           SPECIAL MASTER GARRIE:  One question at a

18   time.  Have they been produced?

19           MS. WITTY:  This is Counsel Witty.  These

20   specific reports are not clearly responsive.  The

21   information contained within these reports have been

22   produced through the opt-in packets.

23           SPECIAL MASTER GARRIE:  Have all of these

24   files been reviewed on the fourth floor by counsel in

25   the file room?

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

 1            MS. WITTY:  This is Counsel Witty.  I did
 2    not go through every single drawer, no.  I can tell
 3    you that these reports are not individualized.
 4    They're not something that is identified to a
 5    particular person.  They are comprehensive reports.
 6            SPECIAL MASTER GARRIE:  Okay.  All right.
 7    And then the next question from Mr. Forrest, that
 8    obviously is a good follow on, is what information is
 9    in the reports that's not in Kronos?
10            MS. WITTY:  Everything that is tracked with
11    regard to time and pay would be within Kronos or the
12    opt-in packets.
13            SPECIAL MASTER GARRIE:  And what he's
14    asking for is in those reports that isn't in Kronos.
15            MS. WITTY:  This is my understanding is
16    that there isn't anything that would be in those
17    reports that is not within Kronos or the opt-in
18    packets.
19            SPECIAL MASTER GARRIE:  Okay.  I'm going to
20    make a suggestion:  Counsel for UMC, can you please
21    speak with Jackie Panzeri and make sure that those
22    reports that you have are all reports that are
23    generated via Kronos?
24            MS. WITTY:  Yes.
25            SPECIAL MASTER GARRIE:  As I understand,

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    plaintiffs have the entire Kronos database.

2            MR. TOSTRUD:  This is Jon Tostrud, counsel

3    for plaintiffs.

4            I think I would like to better understand

5    what types of -- when you say these are comprehensive

6    reports, they're comprehensive of what?

7            MS. WITTY:  This is Counsel Witty.  The

8    entire payroll for UMC.  Each pay period certain

9    documents -- certain information is required to be

10   maintained for each pay period.  These are

11   comprehensive documents of everything at UMC.

12           MR. TOSTRUD:  And plaintiffs think and

13   obviously consider those documents to be responsive

14   and would like those produced.

15           MS. WITTY:  I think that that is a

16   subjective argument that is not within the scope of

17   this discussion.

18           SPECIAL MASTER GARRIE:  Again, well pointed

19   out.

20           Counsel for UMC, Counsel Witty, I am not

21   opposed to hearing argument on this.  I would like to

22   see a sample report provided to me for my review.  I

23   would like, again, the same if counsel -- if

24   plaintiff does want to seek said report, I would like

25   a three-page letter on the outside, meaning no more

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1   than, provided to me on or before April 18th.

2           MR. TOSTRUD:  And Daniel -- are plaintiffs

3   going to receive a copy of those reports as well?  So

4   we're able to make some argument about them?

5           SPECIAL MASTER GARRIE:  Counsel for UMC, is

6   there any privileged information?  Do you have any

7   objection to providing some redacted version of these

8   reports for plaintiffs?

9           MS. WITTY:  This is Counsel Witty.  I am

10  not currently able to do that.

11          MR. TOSTRUD:  Able to do what?

12          MS. WITTY:  I do not have the documents in

13  front of me.  I cannot tell you what would be --

14          SPECIAL MASTER GARRIE:  I got it.  I got

15  it.  Strike my last sentence.

16          Can Counsel Witty please, counsel with UMC,

17  on or before 4/15 as to the substance of these

18  documents and advise me one way or the other if they

19  will be asserting or willing to provide a report to

20  plaintiffs for analysis redacted or otherwise?

21          MS. WITTY:  That is understood.

22          MR. TOSTRUD:  And this is Jon Tostrud

23  again.  And I'm not trying to create more work for

24  anyone.  And I think it's important to note that

25  these reports were specifically identified, and I'm

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1    happy to include this in a letter -- identified as

2    part of the motion to compel in Magistrate Means'

3    order.

4              SPECIAL MASTER GARRIE:  I got it.  So I

5    look forward to reading your letter, and I look

6    forward to making a ruling.

7              Does anybody have any objection to the

8    schedule?  A three-page letter, short, sweet and to

9    the point.

10             Counsel for UMC?

11             MS. WITTY:  This is counsel for UMC.  Was

12   there a schedule set up for any response or rely?

13             SPECIAL MASTER GARRIE:  If you feel the

14   need to.  So I have written down the date of 4/15.

15   You'll inform the parties and myself if you're

16   willing to provide a report, redacted or otherwise,

17   to plaintiffs.

18             And plaintiffs, I will make a ruling -- I

19   would like to know before 5:00 p.m.  I will make a

20   ruling on 4/15 whether or not to compel the

21   production of said report.

22             Plaintiff will provide a written brief, no

23   more than a three-page letter, for the request, and

24   UMC will be able to respond on or before the 21st.

25             MR. TOSTRUD:  And plaintiffs, just for the

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1    record, are reserving all rights to seek continuing

 2    sanctions.

 3              SPECIAL MASTER GARRIE:  So noted for the

 4    record.

 5              MR. FORREST:  Should I read?

 6              SPECIAL MASTER GARRIE:  Yes, please.

 7              MR. FORREST:  Okay.  So let me just clarify

 8    here.  The question is being asked separately with

 9    respect to Kronos and with respect to the packets.

10              Kronos is the full Kronos database, and

11    everything that we can do with the database.

12              We have very powerful tools at our disposal

13    you know, database tools and so forth.

14              The information in the packets, the packets

15    consist of PDFs of scanned images of reports and of

16    other files.  There's no text in them.  We have OCR'd

17    a sample to take a look.

18              So obviously, if things are Kronos, it's a

19    lot easier to access.

20              And then the question is, is the material

21    in those hard copy reports that are being kept in the

22    fourth floor file room, which are not -- at least

23    with respect to the opt-in and named plaintiffs, in

24    the packets.

25              SPECIAL MASTER GARRIE:  Basically what
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

```
 1    you're asking is, is there any information in the
 2    these reports in the fourth floor file room that is
 3    responsive that speak to -- that was not provided
 4    either in the packets or in Kronos; is that accurate?
 5             MR. FORREST:  Yes.
 6             SPECIAL MASTER GARRIE:  Okay.  Perfect.
 7             Counsel for UMC, you have until 4/15 to
 8    answer that question, as well as whether you'll
 9    provide the report.
10             MS. WITTY:  Understood.
11             SPECIAL MASTER GARRIE:  Okay.  I'm going to
12    take over from here, Mr. Forrest, and take the
13    last -- I'll the robocopy log part for the broad
14    discussion with everybody.
15             Have counsel sought further clarification
16    from JP?  Have you seen everything she has?  When she
17    says a professional pack rat, you know, I understand
18    that, you know, people refer to things and metaphors
19    and et cetera.
20             But have you had a chance such that you
21    have been able to gather or gain access to all the
22    information and documents that she's referring to
23    that may be relevant?
24             MS. WITTY:  This is Counsel Witty.  Yes, we
25    do have full access.  The vast majority of what she's
```

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

1    referencing are those same payroll, timekeeping,

2    audit compliance records that are stored on the

3    fourth room file room.

4            She's merely -- she's merely expressing the

5    fact that she is diligent in her job.

6            SPECIAL MASTER GARRIE:  Okay.  So noted for

7    the record.

8            I assume we'll have further discussions on

9    the 15th and certainly on the 22nd about the reports

10   that she keeps on the fourth floor.

11           I do want to make sure, the full

12   timekeeping and payroll databases that she

13   references, I think we already covered this, but you

14   will confirm that she is referring to only one

15   system, or what system she's indeed referring to?

16           MS. WITTY:  Yes.

17           SPECIAL MASTER GARRIE:  Thank you.  Now,

18   the next question is actually fairly relevant, and I

19   stand remiss for missing it myself -- well, strike

20   that.  Never mind.

21           One question is:  Does UMC record log-ins,

22   local and via TS Web?  Meaning I would like -- and I

23   actually want this as well.  I would like to know

24   what log-in capabilities are available for TS Web.  I

25   would like a full set of logs for the six custodians,

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

 1   going back as far as they go.

 2           MS. WITTY:  Just for clarification.  This

 3   is Counsel Witty.  When you say a full set, are you

 4   regarding just TS Web?

 5           SPECIAL MASTER GARRIE:  I want to know if

 6   any remote access via log-ins, local or remotely, via

 7   the TS Web interface.

 8           MS. WITTY:  Okay.

 9           SPECIAL MASTER GARRIE:  For those six

10   custodians.

11           I would also like a log of any remote

12   access done by any other six custodians as far back

13   as UMC keeps, for TS Web or any other system.

14           Mr. Pixley, is there anything you would

15   like to add?

16           MR. PIXLEY:  This is Bruce Pixley.  When I

17   think when you asked about these logs, they may

18   understand them to be security event logs.  So that

19   may be a term that you want to use.  But they may

20   also have other types of logs as well, not just the

21   Microsoft security logs.

22           SPECIAL MASTER GARRIE:  Specifically, I

23   would assume that they have -- thank you very much,

24   Mr. Pixley.

25           So let me give you a little more detail

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

1   here.   I want firewall logs for any remote in-bound

2   traffic access that's been approved through VPN.

3          I want the network security logs.  I want

4   any VPN log-in software.  I would like the log files

5   off of that.

6          Anything else you can think of, Mr. Pixley?

7          MR. PIXLEY:  I think once we have an

8   understanding of the type of logs they maintained,

9   that we may have other questions.  But we don't even

10  know what they're currently logging at the time.

11         SPECIAL MASTER GARRIE:  So again,

12  Mr. Pixley makes a good.

13         Can UMC provide a list of what they do

14  log -- what UMC does keep from a logging perspective

15  with regards to accessing systems?

16         MS. WITTY:  This is Counsel Witty.  We

17  understand, and we will work on that.

18         SPECIAL MASTER GARRIE:  Off the record.

19         (A discussion was held off the record.)

20         SPECIAL MASTER GARRIE:  The last thing to

21  discuss is robocopy.  I'll let Mr. Forrest and

22  Mr. Pixley explain their recommendation.

23         MR. PIXLEY:  This is Bruce Pixley.  When I

24  reviewed the robocopy logs, there were references

25  that some of the e-mails, such as PST files, were not

```
 1    collected.
 2            And so now that I understand the backup
 3    system, if there is a robocopy log that references a
 4    missed PST file that wasn't collected, and it's part
 5    of a backup, my preference would be that they obtain
 6    a copy of that PST file from the oldest backup, as
 7    opposed to the current location.
 8            The other thing is the robocopy logs that I
 9    have is from August 2013, and I understand there may
10    be robocopy logs from the first collection, so I
11    can't speak to those because we haven't reviewed
12    them.
13            SPECIAL MASTER GARRIE:  So I have reviewed
14    them, and I also if you remember in the last hearing,
15    one thing I was very concerned and focused on was the
16    error files, or files that they weren't able to copy
17    properly.  And they're supposed to put together a log
18    of those files and what they were.
19            And obviously, once I receive that, which I
20    believe is -- I'm not sure when I am to get that, but
21    as soon as I get that, I will obviously make a
22    ruling, not only for the PST files, but the other
23    files.
24            I certainly do intend to take the oldest
25    backup copy of any PST file that should have been
```

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    reserved that wasn't preserved, and have them go from

2    that.  That would be the best source at this point of

3    the game.

4           MS. WITTY:  This is Counsel Witty for UMC.

5    We understand that and are coordinating that with

6    Dean Schaibley at UMC.

7           SPECIAL MASTER GARRIE:  Mr. Pixley, does

8    that sound acceptable to you?  Or would you like to

9    modify my suggestion?

10          MR. PIXLEY:  No, I think that was spot on.

11          SPECIAL MASTER GARRIE:  I mean, that was my

12   whole entire intent the first time.  My big concern

13   to even now is that exact issue, that there are PST

14   files that script did not catch and given.  It's just

15   important that we identify all of them, and there was

16   a multitude of logs.  And I know that counsel for UMC

17   is working through them.

18          I would also like the record to reflect

19   that I would have expected certainly somebody via

20   their forensic, the first forensic person or their

21   second forensic, anybody that was supporting UMC's

22   counsel or UMC and UMC's collection -- let me try

23   this again.  Strike that and let me try this again.

24          I would have expected under best practices

25   that UMC, who ran the script and informed counsel at

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Rough Draft of Special Master's Hearing    April 10, 2014
(Telephonic)

1    this time of the errors that occurred during the

2    collection.

3            I would have also expected the forensic

4    expert, either original or current, to have expected

5    said logs, and informed UMC's counsel of the

6    potential error issues that did exist at that time.

7            And I would like the record to reflect

8    that.

9            Counsel for -- I have no other comments in

10   regards to custodian collection.

11           Counsel for UMC.

12           MS. WITTY:  I'm sorry, you were cut off.  I

13   don't know if you were finishing your thought?

14           MR. FORREST:  This is Doug Forrest.  If I

15   might, I would just like to add one additional

16   comment before we move off the subject of the

17   recommendation.

18           SPECIAL MASTER GARRIE:  I couldn't hear.

19   Mr. Forrest what was that?

20           MR. FORREST:  With respect to the

21   recommendation, my understanding would be that we

22   have a -- possibly with respect to any given

23   custodian, we would have at least three PSTs, one

24   from April, one from August, and the current version.

25           And there may be different data in all of

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1   them because of deletions, and obviously because of

 2   data that's been created post August 2013.

 3            So I think that all three of them are

 4   required, and they can be duplicated and so forth.

 5            But not just the one from the oldest one

 6   from the backdrop system.

 7            SPECIAL MASTER GARRIE:  Well, let's look at

 8   the list.  I'm going to take the oldest -- let's see

 9   what we have on the backup system first.  Let's first

10   identify the file, and then we'll come up with the

11   protocol to do the collection.

12            Because if you review the backup policies

13   that they have, I think what I ordered was I think

14   what I ordered was -- I think what I ordered, and I'm

15   not trying to reverse my order from the original

16   hearing, which is for any file that wasn't collected

17   that should have been collected, I believe what it

18   was is that to pull the oldest back up in the current

19   copy, the current state, and then accordingly.  But

20   we will find out what those specific files are and

21   address it at that time.

22            So I'm going to note your request for the

23   record, and we'll make the ruling at a later date.

24            MR. FORREST:  Thank you.

25            SPECIAL MASTER GARRIE:  Counsel for
```

Rough Draft of  Special Master's Hearing    April 10, 2014
(Telephonic)

 1    plaintiffs, do you have any other questions or

 2    concerns you would like to discuss regarding the

 3    custodian interview forms?  Hello?

 4            MR. FORREST:  Hello?  This is Doug.  Who

 5    else is still on the line?

 6            MR. PIXLEY:  Bruce is here.

 7            SPECIAL MASTER GARRIE:  Special Master

 8    Garrie is here.

 9            MS. WITTY:  UMC is here.

10            MR. FORREST:  Marc?

11            MR. GODINO:  Yes.

12            MR. FORREST:  Reporter?

13            THE COURT REPORTER:  Yes.

14            SPECIAL MASTER GARRIE:  So without further

15    ado, counsel for the plaintiffs, do you have any

16    further comments or remarks regarding the custodian

17    interviews?

18            MR. FORREST:  This is Doug, I don't.

19            SPECIAL MASTER GARRIE:  Counsel?  Counsel

20    for plaintiff?

21            MR. GODINO:  This is Marc.  Sorry about

22    that.  In answer to your question, plaintiffs'

23    counsel doesn't have any further questions regarding

24    the custodian interview reports.

25            SPECIAL MASTER GARRIE:  Okay.

Rough Draft of Special Master's Hearing   April 10, 2014
(Telephonic)

```
 1              Counsel for UMC, is there any additional
 2   supplemental information you would like to provide at
 3   this point?
 4              MS. WITTY:  Not at this point.
 5              SPECIAL MASTER GARRIE:  If there any
 6   additional supplemental information necessary or
 7   required, I request that you send it to me as soon as
 8   possible, and as last time, clean it up as necessary
 9   and circulate to parties, subject to the same process
10   as before.
11              MS. WITTY:  That is understood.
12              SPECIAL MASTER GARRIE:  Thank you everybody
13   very much.  I think we made good progress.
14              And I appreciate everybody taking the time
15   and the effort to send me their notes and their
16   summaries.  And I will do my best to turn around an
17   order summarizing, clarifying and memorializing the
18   prior three hearings.
19              MS. FOLEY:  Thank you, Special Master.
20              SPECIAL MASTER GARRIE:  Thank you.
21                   (Concluded at 6:51 p.m.)
22
23
24
25
```

# Exhibit D

# PANZERI

**[CUSTODIAN INTERVIEW REPORT FOR JACQUELYN**
Confidential **PANZERI, COMPLETED MARCH 26, 2014]**

TO:        Daniel Garrie, Esq.
           Electronic Discovery Special Master

FROM:      Cayla Witty

*Revised and produced per Special Master Order*

Jacquelyn ("Jackie") Panzeri, Payroll/Accounting Manager, contact info: via counsel.

No formal education related to position. Attended beauty school. Has been with UMC 24 years and 4 mo., worked her way up through payroll systems. Oversees all processing of electronic transactions for timekeeping and payroll.

Relevance to *Small* suit: ran reports on individuals for DOL investigation, assisted with document production, communicated about payroll documentation through email to HR department

Creates mainly email. Tracks reports and other electronic processing on computer through Kronos/SAP. If receives hard copy of document, she will keep. (See more on filing systems below).

#### Hard copies

General description of location of files: if printed email for reference, email would be discarded once issue is dealt with. Occasional handwritten notes (post-its, etc.) to place reminders, keeps a personal paper calendar, but not work-related. Policies and reference materials kept in office. Otherwise, hard copy reports for timekeeping/payroll/audit compliance (i.e., corrections to pay records tracked, donated leave forms, pay period reports, mandated deductions/taxes, warrants for release of county funds, etc.) kept in 4th floor file room, 6th floor storage (both in Trauma building). Professional "packrat" because so much documentation is required for payroll/auditing Reports for past year are in on-site filing. Go to Iron Mountain after 1 year (or if space is exceeded).

All filing organized by pay period. Jackie has 4 staff people that assist with report generation and filing. Those staff maintain the 4th floor filing. Then when no more room, move oldest stuff to 6th floor storage. Finally, after a year, can move to long-term Iron Mountain storage.

Jackie keeps an Org Charts for nursing leads (timekeepers), but not any other. She has copies in office of payroll policies and procedures, but hasn't revised in recent history. All others accessible on intranet.

#### ESI

Computer usage: daily, heavy report and data entry responsibilities for Kronos/SAP. Desktop in office, no laptop, no other UMC device.

[CUSTODIAN INTERVIEW REPORT FOR JACQUELYN PANZERI, COMPLETED MARCH 26, 2014]

Desktop

Unsure of how long desktop used. Several years. Uses dual monitors, one is more recent development(within last two years or so).

This is the device Ms. Panzeri used during the relevant time period. It is still in custodian possession. UMC IT was responsible for any hardware/software upgrades or data migration.

Applications

Mainly timekeeping software – Kronos/SAP, some office suite (excel, word). Doesn't use any healthcare-specific applications.

Track versions/revisions/drafts: doesn't create a lot of revised documents. Must save reports as different each time run. Saved based on date run.

Prefers electronic copy only. Certain records must be maintained hard copy for auditing (storage addressed above).

Saves everything to network server (possibly home folder). Claims doesn't know how to save "locally." Full timekeeping and payroll database is on network server.

Encryption/Passcodes: Very specific encryption due to level of access to timekeeping/payroll data. Separate passcodes for each application.

What about email? (counsel is working on a hard copy print screen of the inbox organization) No personal file system, but backs up everything in archiving. Organizes archived emails by topic or sender. Does not file sent mail. Has a separate archive for *Small* lawsuit and DOL investigation. Doesn't know of any recent policy changes. Recent emails on *Small?* claims never had much on substance, just ran reports during DOL investigation and produced information in response to requests for production from counsel.

Uses UMC distribution list for Payroll Dept. Created her own "distribution list" for timekeepers (people who make changes in Kronos).

Handheld Devices

No UMC device. Personal device is Galaxy S3 (ATTservice) smartphone. Has had for 8 to 9 months, previously had a PanTech phone. No data migration as her old phone was sent to her son. Very limited texts, only with family; none relevant to *Small*. Is her only personal phone line, but not listed in UMC contact directory. Doesn't sync or track her data as husband handles bills/logs, etc. Doesn't know UMC policy because phone is personal use only. Does use a passcode for access.

Instant Messaging

IM is very new at UMC, only communicates with Claudette Myers, examples: when to join lunch; none relevant to *Small*. Doesn't personally store IMs.

Removable media: None. Does not use Dropbox or similar services.

Remote Access: doesn't work from home. Can access email through webmail, but doesn't log in through TS Web. Doesn't keep any documentation at home.

Other

Involvement in case: due to maintenance of records, some policy influence, very important to keep good records.

Expect continuing requests, understands continuing obligation to retain and supplement documents

Non-identical documents: none at issue.

[CUSTODIAN INTERVIEW REPORT FOR JACQUELYN PANZERI, COMPLETED MARCH 26, 2014]

Unincorporated Special Master follow-up question:
- Did Ms. Panzeri ever create a local backup of here data before and/or after data migration?

*Counsel requested additional clarification.*

# MUMFORD

[CUSTODIAN INTERVIEW REPORT FOR JAMES MUMFORD, COMPLETED MARCH 26, 2014]

TO:      Daniel Garrie, Esq.
         Electronic Discovery Special Master

FROM:    Cayla Witty

*4-6-14 revised and produced per Special Master Order*

James Mumford, Sr. Human Resources Analyst, contact via counsel.

Education: BA in Political Science, Masters in Public Administration emphasis in HR. Has been with UMC 13 years. Work with administration and union on policy and procedures as defined by the CBA, oversees all FMLA for UMC, address HR compliance for certain departments.
Relevance to *Small* suit: oversees HR compliance for admitting representatives

Creates following types of documents: FMLA requests/reports, approval/denial letters, notifications and medical request forms, draft counseling forms, question outlines for investigations, disciplinary hearing information (position statements), reports on shift bids, FMLA presentations, supervisor boot camp training documents, immigration paperwork

Hard copies
HR department files for grievances, everything gets printed to hard copy for formal grievances, if informal complaint made, James may have personal file to address the situation or follow-up as needed, but not placed into formal folder until others involved. FMLA kept in HR until closed. Training documents are stored in Delta Point building Does not keep files away from office personally. Grievances will eventually move to Iron Mountain (based on space, not time frame). Delta Point handles repositories of trainings and presentations that are standardized (not something created by James personally). Closed immigration and FMLA files go to Iron Mountain.
HR has storage rooms in Trauma Building and Delta Point. Sent to Iron Mountain when space needed.
James is often involved in employee-engagement programs that involve marketing and employee handouts, so he has personal copies of those in his office filing cabinet.

ESI
Computer usage: daily, Desktop in office. No UMC laptop or tablet. Has a personal laptop; used personal laptop for business with wireless access and TS Web for the SEIU labor negotiations in 2009 for typing notes. James Mumford's personal laptop was not purchased or reimbursed by UMC. It was not preserved at time of collection. Has UMC blackberry. Uses BB as personal and work cell phone.
      Desktop- Unsure of how long desktop used. Several years. Desktop maintenance is completely monitored and updated by UMC IT Security/Server team.



Applications

Likes excel spreadsheets, used to prefer Microsoft Access (create databases local to his desktop) (UMC hasn't supported Access in relevant period), uses word and powerpoint, tracks revisions through saving separate documents.

Prefers to save everything electronically. Must print out grievance files and investigation files. Some FMLA has specific filing requirements which require hard copies.

Mainly saves to shared drive (unsure if department or home folder), some negotiation notes on Desktop or saved in My Documents folder (C: Drive local).

Uses separate passcodes for computer and blackberry.

Email: Inbox print screen attached. Knows of no recent UMC policy changes. Doesn't personally delete anything but doesn't personally archive information. As grievance material is always duplicated by printing, doesn't have a separate personal practice for archiving. Recent emails on *Small*? Doesn't think so. Doesn't use email lists.

Handheld Devices

UMC-issued Blackberry 9330 (specific model identified by UMC IT), received on April 1, 2011. Previously had basic flip phone (not text enabled / shredded after turned in by Mr. Mumford). Takes it to PBX (UMC Telecommunications Supervisor) for upgrades and maintenance, possibly every 3-4 months. Any data migration / back-up performed by UMC telecommunications. UMC used to provide call logs, etc. for review but no longer does so. All information is maintained by PBX. Following dates relate to specific upgrades.

- Blackberry 9330 on Feb 6 2012; and
- Blackberry 9330 on Sept 15, 2011.

*Clarification at request of Special Master:*

· What did Mr. Mumford mean when he said PBX -- Private Branch Exchange? Can Counsel please obtain and provide all UMC policies relating to the PBX? Data migration? Backup relating to the PBX system? Clarify if the PBX store voice mail messages? Did the PBX serve as an archive for unified messaging system communications? If so, did UMC include this in the collection?

The voice mail system is Call Pilot v.5.00.41.167. The voice mail system uses an external tape system and is backed up weekly every Monday evening. It does store the voicemail messages currently held in each mailbox but it is overwritten every Monday evening.

The PBX is not a unified messaging system. UMC uses an Avaya Blue (formerly Nortel) CS1000 v.5.5 PBX for communications. The telephone switch is backed up to an internal drive nightly during its midnight routine. The previous backup is overwritten nightly on this internal drive as part of its midnight routine. This was not included in the collection.

Mumford does not sync his phone. Everything on phone is accessible to UMC through server so no personal maintenance required. Does have passcode enabled.

Confidential [CUSTODIAN INTERVIEW REPORT FOR JAMES MUMFORD, COMPLETED MARCH 26, 2014]

Texting is mainly personal, not very prolific. Deletes personal texts from wife regularly. No texts relevant to *Small.* Informed not to delete texts now.

Instant Messaging - just got access through Outlook three weeks ago, has used only 2 or 3 times with HR office personnel, none relevant to *Small.* Does not personally store. Believes contacts are within HR dept. (Leah Conedy, John Espinoza)

Removable media: None. Cannot burn data discs.

Remote Access: Doesn't work from home. Has remote access through TS Web, occasionally uses for meetings with labor.

External document preservation? Likely has copies of SEIU binders at home, but doesn't formally keep anything away from office.

Other

Involvement in case

Due to receipt of complaints/notice from plaintiffs, policy influence. Told to expect continuing requests, understands continuing obligation to retain and supplement documents.

Non-identical documents: none at issue.

⚠ CONFIDENTIAL

# BRANNMAN

TO:     Daniel Garrie, Esq.
        Electronic Discovery Special Master

FROM:   Cayla Witty

*4-6-14 revised and produced per Special Master Order*

Brian Brannman, former UMC CEO, currently CEO with St. Rose Hospitals/Dignity Health, contact via counsel.

Bachelors from Southern Illinois-Carbondale, healthcare administration. Worked with the military in healthcare logistics. M.A. from Webster University in management, M.S. in finance

Started with UMC in April 2008 as Chief Operating Officer. Transitioned to CEO in April 2011.

Created Mostly emails (gathering info, requests for action, relaying information), generally correspondence was prepared by others for his signature or dispersal. If going to large group, his executive assistant (Cindy Dwyer) or the head of the area (HR, Patient Care, etc.) would disseminate his communications. If it came from him personally, it was his communications covering day to day operations, creating new independent oversight board, and management of physician residency program.

Hard copies
Office located on 5th Floor of Trauma Building. Didn't keep hard copy calendar, good memory prevented need to print emails, etc. for reference. Any hard copy documents were likely copies provided by others. Did not keep personal filing. Actual documents within file cabinets in office are probably from predecessor.
Took a lot of personal notes on yellow pads. Would "pitch" (i.e., shred) once filled. If needed to retain notes, provide yellow pad to Cindy to file. Retrieve through her files.

ESI
Computer usage- daily. Had desktop in office and was given laptop for travel. Never used laptop, stayed in bag under his desk. Had access to log in from home, but didn't use it. Felt email connection through blackberry sufficed for majority of communication.
        Smartphone- Original UMC device was a Blackberry Curve 8530, received on February 1, 2011. Upgraded to a Blackberry Curve 4 on July 19, 2013. Both phones have been wiped as Mr. Brannman left UMC in January 2014, but the devices are likely still being held by UMC. IT responsible for upgrades. Cindy contacted IT for particular service. Syncing was all through server; automatic from IT. Very concerned with passcode on phone as he needed to maintain patient information security.
Texted occasionally. Text would be with external contacts such as physicians asking about contracts, etc.; not internal activities. Don't believe any were relevant to Small. He


did not delete any; kept his threads as they came in. Main contacts were med school dean, Dr. McBeth (advisory Board Member), Dr. Spirtos.

Call logs - IT would send quarterly copy of account to assess need for adjustments in use, etc. There was an issue earlier on in tenure for bills including texts when Brannman was not using texts.

Didn't retain his voicemail. Cindy was able to monitor voicemails and would remind Brannman of entries.

Personal Iphone, kept completely separate. Upgraded from Iphone 3 to 5. Never accessed UMC email from iphone.

Applications: used Office Suite- Outlook, Word, Excel. Nothing healthcare specific. Others (Chief of Nursing) might print reports from Excel or ppt or him to review. Specifically avoided recent upgrade for electronic med records called medseries four as he personally found it too cumbersome to use. Would receive printed reports from patient service leaders.

Didn't personally save revisions separately. Cindy might when a document was sent to her for printing. Saved most documents to desktop (My Document folder). Did place large documents on share drive for group review, etc. Didn't keep correspondence on shared file. Kept everything purely electronic.

Knows that Cindy (Exec. Asst) could monitor his email and other communications through network, but had different access codes. Kept separate intranet page for evaluations, no one else had his log-in information.

Email: Originally set a bunch of folders up, but too much volume to maintain filing. Keep in inbox and then block copy for archives. Also done with Sent emails.

Remembers County policies (particularly document retention) were updated c. 2010. Ernie McKinley assisted with review, archiving and data destruction policy.

Doesn't recall any recent emails re: *Small*. May have notice of something from John Espinoza.

Knows that Cindy would send email to all employees/UMC mailboxes through UMCPOST. Also used a group email called BRIEFINGS which sent information to media, and used to advise all county commissioners and advisory board of information Has an Apple mail account (personal). Never used for work. Didn't take anything but his personal contacts when he left UMC. No UMC documents at home or new office.

Instant Messaging- wasn't available during his tenure.

Removable media - none.

Remote Access - didn't like to work from home. Never took documentation home for patient information security. Could access email on phone so no need to travel with laptop or other devices.

# ESPINOZA

TO: Daniel Garrie, Esq.
Electronic Discovery Special Master

FROM: Cayla Witty

*4-6-14 revised and produced per Special Master Order*

John Espinoza, Title: Chief Human Resources Officer, contact via counsel.
Education: BA from University of Texas in organizational communications. Masters in
Public Administration from Texas State University, emphasis in HR. With UMC 14 years,
4 more with County HR functions, position has been upgraded several times but duties
similar. Oversees all HR functions for UMC, including but not limited to compensation,
employee assistance, benefits, systems management, records management, contract
negotiations, administrative counsel to CEO and Hospital Board.
Relevance to *Small* suit: Chief of HR, deposed early on in suit. Direct contact with DOL.

Creates position papers, reports on activities, summaries of HR issues for admin, email
to supervisors and staff

### Hard copies

Most documents John creates are saved electronically by Claudette Myers, his
assistant. If he needs a particular reference, he will keep a hard copy in his office filing.
Does not create a large amount of paper work. He knows large projects are stored off-
site. He has a weekly calendar printed off for him, but it is a duplicate of Outlook and is
discarded weekly. (Latest example attached.)
John does not keep any specific filing as Claudette manages his office. He knows his
office oversees significant filing (grievances, union negotiations, payroll, etc.) but is not
responsible for managing it personally. Claudette maintains org chart. Policies and
procedures mainly delegated to Doug Spring.

### ESI

Computer usage: daily, Desktop in office, Blackberry from UMC. No laptop, no other
UMC device.

Desktop

Unsure of how long desktop used. Several years. If it has been updated, that is a UMC
overhaul and handled by Chief Information Officer or delegate.

Applications

Works mainly in word, and lots of emails through outlook. Reviews excel, but doesn't
create documents in that program. Doesn't track revisions in most documents. Hates to
use track changes. Also usually relies on legal support staff or James Mumford to follow
revising contract language in union negotiating.
Claudette maintains electronic filing for John. He will email her information and she
saves to shared folder. Claudette will determine what needs to go to HR dept drive John
saves mainly to personal drive on network (home folder), but believes Claudette has



access. There is likely some information on desktop C: Drive. Claudette also scans in hard copies for archiving as needed. While Claudette has access to files, his passcode is personal and separate.

Email: not aware of any recent policy changes. Generally aware of limits on storage space, but administration has more reserved space. His outlook Auto-deletes SPAM (gets a lot of diet plans and fake hospital newsletters). Claudette handles any necessary regular email archiving. Believes pnly folders within inbox are default Outlook settings. Printscreen attached.

Recent emails on *Small* are all counsel requests for documentation. There was some mention (likely from counsel) regarding a new suit that is related to *Small* collective action. Also may have communicated with new CEO in 2014 regarding status update on lawsuit.

Doesn't use email lists, as he sends mass emails through Claudette. Is aware of distribution lists generally.

Handheld Devices

PDA/Tablet/Smartphone: Blackberry through UMC. same mobile device during the relevant time period, Blackberry Curve 8530. Updated twice on the following dates:

- Blackberry Curve 8530 on Jan 20, 2011;

- Blackberry Curve 8530 on Sept 22, 2008.

Understands blackberry syncs through server. Used to see phone records to acknowledge and pay for personal use. Now, it is identified as required for work and listed as a work contact number. Cannot download personal applications, etc. on phone. It is passcode enabled.

Uses an Iphone 3s personally. Has personal tablet. Doesn't sync information. Does not mix use of personal and work devices. IPhone and IPad are completely personal.

Texting: Prefers actual conversation, but will text in response to work requests on Blackberry. None relevant to *Small*, except possible request from new CEO, which may actually more likely be email viewed on Blackberry.

Instant Messaging- very new, new CEO really likes it, none relevant to *Small*. Doesn't personally store these messages.

Removable media: None. Sometimes Claudette will burn discs of scanned information for storage, but John doesn't.

*Clarification for Special Master:*

- ❖    ·    What happened to the "discs of scanned information for storage" Mr. Espinoza states were created in his interview? Were these discs preserved? Where are they stored? Were they included in the collection? Production?

- ❖ *The discs of scanned information for storage are sent to long-term storage with Iron Mountain. All such discs would have been preserved through this off-site storage. After Ms. Myers' custodian interview, the volume of such discs is very limited. Specifically, Mr. Espinoza was referencing scanned documentation from the past CEO search in 2008 and 2009 which was not*

 [CUSTODIAN INTERVIEW REPORT FOR JOHN ESPINOZA, COMPLETED MARCH 26, 2014]

*sent to storage on disc. Ms. Myers actually did not send data discs to storage.*

Remote Access: doesn't like to work from home. TS Web to difficult to use. Can't remember his log in information. Plus he can get email/calendar on his blackberry. Doesn't keep any documents at home.

Other
Involvement in case: key, only deposition testimony on record, Chief HR, involvement with DOL investigation, etc., Expect continuing requests, understands continuing obligation to retain and supplement documents
Non-identical documents: possible electronic copies of the reference materials he maintains in office filing cabinet. None otherwise.

⚠ CONFIDENTIAL

# John Espinoza

**March 31, 2014 - April 04, 2014**

<table>
<tr><td colspan="2">March 2014</td></tr>
<tr><td>Su Mo Tu We Th Fr Sa</td><td>Su Mo Tu We Th Fr Sa</td></tr>
</table>

| | 31 Monday | 1 Tuesday | 2 Wednesday | 3 Thursday | 4 Friday |
|---|---|---|---|---|---|
| | Brenna Leising; Recruitment & Retention I | Claudette M: 10:30a-@11:30a Tel Interview | Patricia K: Wkg 8:00a-3:00p (.5L/1.5 Cal; | Jamie M: 4/3-4/4 Cal; Raquel Johnson | |
| | Debbie R: 8hrs FMLA; Raquel Johnson | Claudette M: Lvg @12pm; Claudette Myers | Rhonda W: 4/2-4/4 Cal; John Espinoza | Peter B: 3:00p-4:30p Cal/Off; Claudette My | Ernie M: 8hrs Admin Leave; Raquel Johnson |
| | Gail Y: 8hrs Cal; Raquel Johnson | Wendy K: 3/26-4/8 Cal; Claudette Myers | Wendy K: 3/26-4/8 Cal; Claudette Myers | Rhonda W: 4/2-4/4 Cal; John Espinoza | Jorri Strasser's Last Day: 4/4/14 (?); Clause |
| | Gregg E: 3/28-3/31 Admin Leave/Cal | | | Wendy K: 3/26-4/8 Cal; Claudette Myers | Leah C: 4/4-4/7 Cal; Claudette Myers |
| | Regina P: 3:00p-4:30p Cal; Claudette Myers | | | | Prabha I: 8hrs Cal; Doug Spring |
| | | | | | Rhonda W: 4/2-4/4 Cal; John Espinoza |
| | | | | | Wendy K: 3/26-4/8 Cal; Claudette Myers |
| 7:00 | | | | | |
| 8:00 | | | | | |
| 9:00 | New Employee Orientation — Emerald Room; Cindy Dwyer | | Weekly Ops CR ADMIN Raquel Johnson | Discuss Urban letter w/Doug (call to Ricciardi?) John/James | Weekly Ops CR ADMIN Raquel Johnson / Gregg: Neonatologist Issue |
| 10:00 | Dr. Vohra re: / John/Ernie- Standby / Review ethics | | | | Special Director's M CR 1&J; Raquel Johnso / John/Nina: Standing JE's Ofc, Trauma Bay |
| 11:00 | Payroll Audit Admin Conf R | Information Request from HR & Exec Compen HR Conf Rm; Claudette Myers | Labor/Management Meeting HR Conf Rm; Claudette Myers | / Discuss Urban letter w Ricciardi! Larry/John; Bi-Weekly Larry's Office; Raque | |
| 12 pm | | | BD Lunch Lola's Prabha Iyengar-Cox | | Lunch The contents of this appointment have been updated. Open this appointment to see the |
| 1:00 | | | | | |
| 2:00 | John/Nina: Discuss IRB JE's Ofc; Claudette Myers | Off | Conf Call: Morrison Client Satisfaction Survey They will call us | | Call David L x3714 (.9 Issue & Long Line vs Interpreters) |
| 3:00 | "Labor Unit" Staff Meeting HR Conf Rm; Claudette Myers | | John/Claud: Orientation Island / Discuss Morrison Co Larry's Office; Raquel | Leadership Review of EOP CR 1&J; Raquel Johnson | |
| 4:00 | John/David L: Projects John's Office; David Loiza-Funk | | Review RFQ re: Executive / John/Doug/Brennan P JE's Ofc; Claudette Mye | | |
| 5:00 | | | | | Heart Ball |
| 6:00 | Introduction to Business- BUS 101 | | | | |

John Espinoza                                    1                                    4/3/2014 4:49 PM

CONFIDENTIAL

Inbox

| From | Subject | Received | Size |
|---|---|---|---|
| Claudette Myers | Automatic reply: | 4/1/2014 12:37 PM | None |
| Nina Carter | FW: Confidentiality Agreement | 4/1/2014 12:33 PM | None |
| Claudette Myers | RE: Reminder: [illegible] | 4/1/2014 12:21 PM | None |
| Nina Carter | SAP access | 4/1/2014 12:16 PM | None |
| Claudette Myers | RE: UMC/[illegible] follow up [illegible] | 4/1/2014 12:05 PM | None |
| Peter Belmonte | Service Response Representative | 4/1/2014 12:04 PM | None |
| Kathy McCall | RFQ - Compensation Market Survey [USE THIS] | 4/1/2014 11:40 AM | None |
| David Lozita-Funk | Allowed: Sharing request: Calendar | 4/1/2014 11:36 AM | None |
| Joan Brookhyser | FW: Health Insurance Benefit | 4/1/2014 11:19 AM | None |
| Nina Carter | previous employee | 4/1/2014 11:13 AM | None |
| Claudette Myers | Welcome to "Interactive Services" to the HR Division | 4/1/2014 10:55 AM | None |
| Doug Spring | RE: vendor 902277 Mignon Baugus | 4/1/2014 10:32 AM | None |
| Joan Brookhyser | RE: 3.28-19.14 night report | 4/1/2014 10:24 AM | None |
| Doug Spring | RE: He got fired for urinating in a cup...then he sued (If you've ever th... | 4/1/2014 10:15 AM | None |
| House-Payment-Savings | Regarding: Homeowners | Requirements have been lowered | 4/1/2014 10:13 AM | None |
| techsupport@nationalresearch.com | Catalyst - HCAHPS Stoplight Report | 4/1/2014 10:15 AM | None |
| Karen Oglesbee | FW: vendor 902277 Mignon Baugus | 4/1/2014 10:07 AM | None |
| Stephanie McCarthy | Let's Talk at NACHA Payments 2014 | 4/1/2014 10:03 AM | None |
| Claudette Myers | RE: non-scientific member opening | 4/1/2014 9:55 AM | None |
| TeamUMC | TeamUMC - March of Dimes - Sign Up Today! | 4/1/2014 9:47 AM | None |
| Chelissa Ivan | University Medical Center, Your complimentary invitation | 4/1/2014 9:24 AM | None |
| Claudette Myers | RE: [illegible] Audit Committee | 4/1/2014 9:27 AM | None |
| Dale McWilliams | Update UMCSN Subscriptions 7-2-13.xls | 4/1/2014 9:27 AM | None |
| Danita Cohen | RE: Employee Suggestions | 4/1/2014 9:26 AM | None |
| Ginger Christian | RE: non-scientific member opening | 4/1/2014 9:25 AM | None |
| Claudette Myers | Employee Suggestions | 4/1/2014 9:25 AM | None |
| techsupport@nationalresearch.com | Catalyst - Inpatient Adult Stoplight Report | 4/1/2014 9:17 AM | None |
| techsupport@nationalresearch.com | Catalyst - Outpatient Surgery Stoplight Report | 4/1/2014 9:17 AM | None |
| Claudette Myers | RE: [illegible] Mandatory Education [illegible] | 4/1/2014 9:09 AM | None |
| Fisher & Phillips | Labor Letter (April 2014) | 4/1/2014 8:57 AM | None |
| Nina Carter | RE: Inviting you to our Nursing Engagement webconference | 4/1/2014 8:55 AM | None |
| Bill Pellegrino | RE: 3.28-19.14 night report | 4/1/2014 8:50 AM | None |
| Bill Pellegrino | FW: Report 3/31-4/1, 2014 6p-6a | 4/1/2014 8:41 AM | None |
| Raquel Johnson | 3/31/14 ADS Report | 4/1/2014 8:40 AM | None |
| Peter Belmonte | Employee Health Memo-Employees not vaccinated for Flu | 4/1/2014 8:40 AM | None |
| Claudette Myers | [illegible] | 4/1/2014 8:35 AM | None |
| Doug Spring | Claudette's role | 4/1/2014 8:24 AM | None |
| Collin Owings | A Deeper Dive into Population Health Management | 4/1/2014 8:23 AM | None |
| Nina Carter | FW: Inviting you to our Nursing Engagement webconference | 4/1/2014 8:11 AM | None |
| Claudette Myers | RE: Suggestion [illegible] | 4/1/2014 8:11 AM | None |
| KronosTimeKeeping@umcsn.com | UMC Employee Tardy Report for John.Espinoza@umcsn.com | 4/1/2014 6:01 AM | None |

204 Items

# SPRING

TO:       Daniel Garrie, Esq.
          Electronic Discovery Special Master

FROM:     Cayla Witty

*4-6-14 revised and produced per Special Master Order*

Doug Spring, Director of Personnel Operations, contact via counsel.
Education: BA in Organizational Communications, Masters in Public Administration. Has been with UMC 10 years, performing same work but with a variety of titles. Generally responsible for contract administration, union and employee negotiations, recruitment and selection.
Relevance to *Small* suit: would investigate complaints against supervisors, participated in meetings with Department of Labor (DOL) though not main contact, assist with policy revisions and training on new policies

Creates lots of email, correction and counseling notices to employees, drafting communications for administration to distribute re: HR policies, investigation reviews for possible rehires, presentations for training/orientation, policy documents and training materials, occasional HR newsletters.

## Hard copy
Keeps grievance files in HR departmental filing, grievance files may include printed duplicates of emails. Has a personal file cabinet in his office – folders related to DOL timeclock investigation, also keeps some printed policy drafts in personal filing if revisions are relevant to other policies.
Does not keep calendar outside of Outlook. Not a note-taker in minutes, will ask an assist to perform that duty if necessary.
Inactive grievance files sent to long-term storage with Iron Mountain. Nothing has been set to Iron Mountain in over a year. These are only large scale filing he interacts with. Other big project, i.e., SEIU negotiations maintains most documents electronically. Org Charts are not generated by him, come through administration (CHRO or CEO office). Sometimes keeps hard copy drafts of new policies and procedures, but most maintained only electronic form.

## ESI
Computer usage: daily, Mr. Spring has two separate desktop computers. One is placed in his office in the Trauma Building at UMC. One is placed in a second office in the Delta Point Building at UMC. Unsure of how long either desktop has been in use. Several years at least. Previously (prior to 2009 and relevant period) had a laptop for SEIU negotiation sessions. Everything from that period was sent by Doug via email and saved to shared HR drive after contract signed. Doug also occasionally logs in via "dummy terminals" (likely mobile workstations within UMC facility). Knows to only save to home folder (network saved).



At some point in past (over 5 years ago), Doug had a flip phone (non text enabled) from UMC. Doug determined he did not need the phone for work and it was turned over to UMC PBX, wiped, and recycled / shred.

Applications

Mainly Office Suite, mostly Word and Powerpoint. Has opportunity to view other people's excel spreadsheets, but doesn't create spreadsheets himself. Doesn't use any healthcare-specific applications. Has access to Kronos/SAP, but usually has reports run for him.

Don't have other documents with revisions. In negotiations, there is generally a starting point and an ending point, and a whole lot of negotiated language is not preserved to prevent frustration in negotiation. For policies/procedures, save different versions/drafts with different file names.

Prefers electronic to hard copy storage. Always saves on HR shared drive. UMC does not allow personal mobile storage media. Doug does use Dropbox personally (mainly for pictures of grandkids).

Has separate password for computer log-in and Kronos/SAP application. Also a separate password for TS Web (remote access software). Policy not to share.

Email: No recent changes to policy. Understands that administration has larger storage capacity than regular employees. Signed security agreement upon hire. If policy changed, Doug would expect to be informed by email and would have to sign new notification. Policies also available on intranet.

Personally has only a couple subfolders within inbox. Printscreen attached. Archive files by quarter (monthly if very busy), saves to Q: (sharedrive). Has a separate archive for emails on *Small*. Nothing other than counsel's communications since last fall. Knows that an HR group email exists, also patient service leader list, and manager/supervisor list, but doesn't use lists often.

Handheld Devices: Current personal smartphone is an Iphone 5s. Has had for several months. Will occasionally text with other individuals within HR department or Directors from UMC, but not a general contact number for UMC. Occasionally syncs to personal home apple computer. Does not track text messages. As UMC does not allow his phone to connect to servers, he can only access email through webmail within internet browser. Keeps all of his phone records electronically. Doesn't have any work-related voicemails.

Mr. Spring had an earlier iphone device prior to the iphone 5s. He was not clear as to its actual model. Because Mr. Spring's contact phone number is his cellphone, certain HR personnel and Director-level employees have his phone number and he occasionally uses his personal cell for UMC business. Mr. Spring did not mention a tablet.

Texting - limited to very short responses, does not initiate texts. None are relevant to *Small*. Doesn't believe UMC has a texting policy and does not back up his texts personally. Only work contacts are within HR and on the Director level.

Instant Messaging - just started, very seldom use. Doesn't initiate, really just response to requests. Example: "Yes, I'm going to the meeting." None relevant to *Small*. Doesn't personally store. Contacts are mainly administrative personnel.

Removable media: None. Desktop does not burn data discs, external media not allowed per UMC policy.

[CUSTODIAN INTERVIEW REPORT FOR DOUG SPRING, COMPLETED MARCH 26, 2014]

Remote Access: doesn't work from home. He can access through TS Web but it is a hassle (he would have to check the instruction manual) and he doesn't like to take work home. Knows that remote access is limited to needs of individual. Similarly, doesn't take documents home for filing.

Other

Involvement in case: Key due to assistance with litigation (document production etc.), Expect continuing requests, understands continuing obligation to retain and supplement documents

Non-identical documents: Discussed as part of grievance files, and some electronic filing by exec asst to CHRO, but mainly keeps only electronic versions

Further Clarifications Requested by Special Master In Regard To Doug Spring Custodian Collection Interview Responses:

Can Counsel please work with UMC to clarify what is meant by "dummy terminals" with nothing on "C"? Were these terminals being referenced, accessed in addition to the two computers by Mr. Spring?  Can Counsel please speak with UMC IT department and ensure that someone from UMC IT Dept is available on April 4, 2014 to explain Mr. Spring's statement in further detail? Please also be prepared to explain how the script collected from these "terminals".

> *UMC maintains several hundred "workstations on wheels" and other desktop computers available to staff not confined to a specific office. Any UMC employee with a profile log-in and password can log into these terminals. The accessibility at these workstations are limited depending on the specific employee's need for mobility in their work. For example, some employees would only have access to Outlook and the intranet on these stations. Others might have complete access to network drives or other connected servers, etc. Mr. Spring did not specifically identify any computer workstations other than his Trauma Building office computer and his Delta Point office computer. He considers his Delta Point office computer a "dummy terminal" because he does not use it as regularly and does not save to the Delta Point local drive.*

Can Counsel please work with Mr. Spring to clarify the statement "UMC does not allow personal mobile storage media"? Does UMC allow mobile storage that is non-personal?

> *Please see UMC Information Security Agreement. If mobile storage (such as a flashdrive) is required for work purposes, UMC IT Security will provide an Iron Key mobile storage device with additional password and encryption support to maintain the security of any data that is stored to the Iron Key device.*

CONFIDENTIAL

Inbox - Microsoft Outlook

File Edit View Go Tools Actions Help

New | Reply | Reply to All | Forward | Send/Receive | Search address books | Type a question for help

PDF Converter 4.1

**Mail**

Favorite Folders
- Inbox (15)
- Unread Mail
- Sent Items

Mail Folders
- All Mail Items
- Mailbox - Doug Spring
  - Deleted Items (10)
  - Drafts [8]
  - Inbox (15)
    - Links
    - Silent Whistle
  - Junk E-mail [1]
  - Outbox
  - RSS Feeds
    - Microsoft at Home (22)
    - Microsoft at Work (34)
  - Sent Items
  - Search Folders
    - Call Logs
    - Categorized Mail
    - For Follow Up
    - Large Mail
    - Missed Conversations
    - Unread Mail
- Archive - Doug Spring
  - Deleted Items
  - Inbox
    - Links
    - Silent Whistle
  - RSS Feeds
    - Microsoft at Home (197)
    - Microsoft at Work (214)
  - Sent Items

Mail | Calendar | Contacts | Tasks | Notes | Folder List | Shortcuts

**Inbox**

Search Inbox

Date: Today

| From | Subject | Received | Size | Start |
|---|---|---|---|---|
| Maria Hernandez | RE: Seniority List | Fri 4/4/2014 2:49 PM | 16 KB | None |
| John Espinoza | Food Services positions. | Fri 4/4/2014 2:47 PM | 11 KB | None |
| Brenna Leising | FW: Meeting w/ PIZZA | Fri 4/4/2014 2:47 PM | 24 KB | Wed 4/9/201... |
| Brenna Leising | RE: 2015 Budget Review | Fri 4/4/2014 2:45 PM | 37 KB | None |
| Latonia (Toni) Burns | Nepotism Report 040414.xls | Fri 4/4/2014 2:41 PM | 38 KB | None |
| Claudette Myers | RE: Meeting w/ PIZZA | Fri 4/4/2014 2:37 PM | 16 KB | None |
| Prabha Iyengar-Cox | Automatic reply: 2015 Budget Review | Fri 4/4/2014 2:34 PM | 10 KB | None |
| James Mumford | ernest todd and apprenticeship pay | Fri 4/4/2014 2:19 PM | 10 KB | None |
| Claudette Myers | RE: you need to fix your signature block on your "re... | Fri 4/4/2014 2:15 PM | 17 KB | None |
| [REDACTED FOR ATTORNEY-CLIENT PRIVILEGE] | | | | |
| Brenna Leising | RE: Georgette LaChapelle-Brewer | Fri 4/4/2014 2:13 PM | 30 KB | None |
| Regina Pfaff | RE: KRONOS and SAP | Fri 4/4/2014 2:09 PM | 18 KB | None |
| Kathryn Hughes | RE: KRONOS and SAP | Fri 4/4/2014 2:09 PM | 17 KB | None |
| Kathleen Reese | http://www.marchforbabies.org/Reesespieces48 | Fri 4/4/2014 2:07 PM | 47 KB | None |
| Raquel Johnson | Director's and Manager's Quarterly Meeting | Fri 4/4/2014 2:07 PM | 84 KB | Thu 4/24/201... |
| Suzanne Dessaints | RE: stand by | Fri 4/4/2014 2:03 PM | 14 KB | None |
| Brenna Leising | RE: RE: | Fri 4/4/2014 2:00 PM | 24 KB | None |
| Kerry McCall | FW: RFQ - Compensation Market Survey without ne... | Fri 4/4/2014 1:56 PM | 192 ... | None |
| Danita Cohen | FW: Approved Requisitions | Fri 4/4/2014 1:56 PM | 89 KB | None |
| Brenna Leising | RE: Georgette LaChapelle-Brewer | Fri 4/4/2014 1:51 PM | 27 KB | None |
| Claudette Myers | NHA Survey: Need info | Fri 4/4/2014 1:50 PM | 167 ... | None |
| Claudette Myers | Invitation for Comp Tickets for "Panda" (Tonite Only) | Fri 4/4/2014 1:26 PM | 255 ... | None |
| Claudette Myers | RE: I need: | Fri 4/4/2014 1:26 PM | 79 KB | None |
| Brenna Leising | RE: updated report - Nsg Positions w/min requireme... | Fri 4/4/2014 1:23 PM | 15 KB | None |
| Brenna Leising | RE: Approved Requisitions of Classification Watch List | Fri 4/4/2014 1:22 PM | 18 KB | None |
| [REDACTED FOR ATTORNEY-CLIENT PRIVILEGE] | | | | |
| Claudette Myers | Iron Mountain Boxes: Physician Grievances- which o... | Fri 4/4/2014 12:54 PM | 52 KB | None |
| BenefitsLink.com | BULLETIN: BenefitsLink Retirement Plans Newsletter | Fri 4/4/2014 12:40 PM | 35 KB | None |
| Gregg Fusto | | Fri 4/4/2014 12:27 PM | 11 KB | None |
| Maria Hernandez | Seniority List | Fri 4/4/2014 12:25 PM | 17 KB | None |
| Virginia Carr | moving forward | Fri 4/4/2014 11:49 AM | 19 KB | None |
| Brenna Leising | RE: 2015 Budget Review | Fri 4/4/2014 11:22 AM | 31 KB | None |
| John Espinoza | Return to Orientation Island Comments | Fri 4/4/2014 11:17 AM | 3 MB | None |
| Daisy Markham | RE: Graphs for Governing Board | Fri 4/4/2014 11:13 AM | 124 ... | None |
| Stephanie Merrill | FW: Dept. of Pediatrics_Employee | Fri 4/4/2014 10:51 AM | 86 KB | None |
| Shirley Phillips | RE: Managed Care Sr. Analyst Position | Fri 4/4/2014 10:39 AM | 18 KB | None |
| Rose Coker | Managed Care Sr. Analyst Position | Fri 4/4/2014 10:38 AM | 16 KB | None |
| Jackie Dee | updated report - Nsg Positions w/min requirements | Fri 4/4/2014 10:37 AM | 40 KB | None |
| Reports | UMCSNV-14-04-0003 WPA Initial Report (Priority C) | Fri 4/4/2014 10:33 AM | 17 KB | None |
| Brenna Leising | RE: 2015 Budget Review | Fri 4/4/2014 10:33 AM | 27 KB | None |

**To-Do Bar**

April 2014

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

"Labor Unit" Staff Meeting
Mon 9:00 AM - 10:00 AM
HR Conf Rm; Claudette Myers

John Absent
Mon 9:00 AM - 9:30 AM

Lunch
Mon 11:30 AM - 1:00 PM

Arranged By: Due Date

Type a new task

Today
- Ernie and Connie
- Eval-Qual Toni (...

Next Month
- Eval: Jackie ...
- Eval: Leah C...

Later
- Eval: Daisy (6...
- Eval: Regina ...
- Jun/July Ne...
- Aug/Sep Ne...
- Eval: Maria (...
- Eval: Lateefa...
- Eval: Toni B/...
- Eval: Brenna...
- Eval: James ...
- Eval: Shirley ...
- Oct/Nov Ne...
- Eval: Mel Fa...
- Feb/Mar Ne...
- Eval: Ann R (...

265 | Send/Receive Complete | Connected to Microsoft Exchange



# MYERS

[CUSTODIAN INTERVIEW REPORT FOR CLAUDETTE
Confidential MYERS, COMPLETED APRIL 1, 2014]

TO:     Daniel Garrie, Esq.
        Electronic Discovery Special Master

FROM:   Cayla Witty

*4-6-14 revised and produced per Special Master Order*

Claudette Myers, Administration Assistant to John Espinoza (CHRO), also acts as
clerical support to Doug Spring and HR department as well as office manager to HR
        Education: none post-high school. Work experience with UMC- 28 years. Hired
as temporary file clerk in patient accounting, permanent full-time. Collection clerk in
legal department. Secretary for controller, then current. Job responsibilities:
administrative support CHRO, ensure up-to-date on education and annual
requirements, equipment running and supplied, maintain budget, processing payments,
calendaring for John and Doug (others as well depending on need), ensure
coverage/staffing
        Specific duties relating to CHRO: monitor communications, task management
Relevance to *Small* suit- assistance to CHRO, timekeeper for HR (would receive
cancellation of lunch requests by email or verbally and then document in Kronos
system)

Creates spreadsheets, letters, correspondence, powerpoint presentations, email blasts,
forms (created within word)

Hard copies
Only keep hard copies as required. If an email was printed, it was shred after use.
Required hard copies: Attestation forms (timeclock change requests) - original is kept for
three years per policy. Kept in Binders by year behind her desk, started in October 2012.
As HR timekeeper, Claudette keeps just HR department.
Also have hard copy HR policies on demand
If minutes are required for a meeting (with county commissioners or other organization),
Claudette will type up notes and handwritten reference is shredded.
Claudette maintains the HR Org Chart, and is the only person who can edit it. Can be
printed, but is generally available on common drive for reference in pdf form.
Big projects end up at Iron Mountain, but those are not regular filings. HR sends
departmental files such as recruitment files (although may not now as applications are
all online), personnel files (also now scanned/online), microfiche and film for old records,
and labor relations (grievances) when closed. Maria Hernandez monitors the long-term
storage for HR.

ESI
        Computer usage - Daily. Just her desktop, previously used to cover front desk of
HR and would log-in to that computer. Also will log-in to administration office laptop for
Skype interviews (but no other use of laptop).

No phone, tablet, or laptop from UMC. Personal phone: Iphone4s, has had since it first came out. Prior to that had earlier Iphone (unsure of specific model). Syncs to her home computer the following: apps, calendar, music, contact information. Still have prior device. Uses ATT cloud for iphone/ipad. No dropbox/vault/etc.

Applications: MS Office: Word, Excel, Powerpoint, Visio (flowchart program) Has access to AS/400 - older patient tracking information, used by HR/payroll, purely historical information (check timekeeping/pay rate that is now in SAP). Doesn't use new electronic health records program. Uses SAP to pull personnel information (titles, rate of pay, benefits) and to create check requests and purchase orders

As timekeeper, uses Kronos for time change entries (stores timekeeping/hours worked, vacation, sick time, tardies, educational time).

If saved documents need history maintained, will save with dated file (e.g., v.3 April 2014). If involved in review of policies, will maintain track changes in certain policies. Prefers to maintain pure electronic files. Saves a lot on home drive, common drive for John and Doug (secured access) (e.g., office of diversity issues, labor communications); sometimes saves forms on full HR dept drive. Posts copies of a lot of forms to intranet. Does not share log-in with anyone. Has access to CHRO, but not shared log-ins.

Mobile storage: no flashdrive or external. Only thing Claudette burns to disc are hearing recordings for union, labor relations, and hearing officer. Doesn't burn anything else.

Email: Organizes folders by subject. Print screen attached. Archives by year. Knows email use policy on intranet. Doesn't remember any specific emails relating to Small lawsuit allegations other than discovery production requests from counsel. Can send emails to distribution list for UMC-POST. Understands that individuals that can send to that list are determined by the CEO and his executive assistant. Then IT provides permission.

Texts: yes, on personal phone. Some are work-related, such as telling CHRO about scheduling conflicts, etc. None relevant to *Small*. Always deletes texts immediately as a personal habit. The work contacts that might be included are: John Espinoza, Doug Spring, Jackie Panzeri, various HR staff

Instant Messaging: doesn't personally archive. Knows of option to keep message history. Treats like texting: saves nothing. If important information needed, sends email. Knows there is an option within SAP to send messages, but doesn't know if anyone uses it. She has tried to send messages, but not returned.

Mobile Storage: none used except burning discs for hearings.

Previously had Remote Access, hasn't used in years, unsure if still available. Doesn't work from home.

Other
Involvement in case: Important Custodian, Continuing and Historical

Regarding interactions with John Espinoza's ESI:
The documents from the CEO search that were sent to Iron Mountain were items that could not be scanned. If it was scanned, it was saved to common drive electronically

and it remains there. Claudette saved it to a folder in John's common drive. Because of certain restrictions on documents, certain hard copies had to be stored with Iron Mountain, but no discs were sent to Iron Mountain. Iron Mountain has been storage maintenance for a long time. Unsure exactly of time frame, but definitely before 2009.

When phones needed upgrading or servicing, telecommunications specialists Trina Burrage-Simon or Sandra Sandoval serviced John's phone. Claudette arranged for the service with these supervisors in communications/PBX department.

For minutes taking in meetings, this was not Claudette's responsibility, except for labor negotiations. That Claudette does take down.

Depending on need for formally recorded minutes, Doug Spring might ask other HR staff to assist such as Maria Hernandez, James Mumford, or Leah Conedy. Most times, notes were just keeping track of conversation.

Claudette also assists: Prahba Iyengar-Cox, personnel services manager, the new Recruitment and retention manager, and Doug Spring, Director of Personnel Operations.

Claudette did not get involved with the DOL investigation except to assist John Espinoza and Doug Spring in scheduling telephone calls and in gathering information from other people (requesting reports from payroll, etc.). Claudette does not remember specific documents, but by practice would have scanned everything possible into a folder on common drive. Doug would have hard copy duplicates if any were kept.

🗎 CONFIDENTIAL



[ REDACTED FOR ATTORNEY-CLIENT PRIV ]

*shared*

*Conference*
*Room*
*scheduling*

# Exhibit E

 O'MARA LAW FIRM, PC

P.O. Box 2270
311 E. Liberty Street
Reno, Nevada 89505
(Tel) 775-323-1321
(Fax) 775-323-4082

August 6, 2012

## VIA FIRST CLASS CERTIFIED MAIL

Brian Brannman
Chief Executive Officer
UMC Southern Nevada
1800 W. Charleston Blvd
Las Vegas, NV 89102

RE:  *Small, et al. v. University Medical Center of Southern Nevada.*: Preservation
of Evidence, Including Electronic Discovery and Other Issues, Case No.
3:12-cv-00395

Dear Mr. Brannman:

I am counsel for Plaintiffs in the above-captioned action. In accordance with
the 2004 decision, *Zubulake v. UBS Warburg, LLC*, 02 civ, 1243, 2004 US Dist.
LEXIS 13574 (S.D.N.Y. July 20, 2004), Plaintiffs put you on immediate notice of
your duty to preserve all electronic data that is relevant to this litigation matter.[1]
As you are aware, once litigation is reasonably foreseeable, a party must take
affirmative measures to preserve potential evidence that might otherwise be
destroyed in the course of normal business. Specifically, University Medical
Center of Southern Nevada (hereinafter "UMC") is required to preserve all
electronic data including, but not limited to, data stored on company computers,
company servers, pagers, timekeeping programs, scheduling programs, payroll
programs, home computers and removable media (floppy disk, CD-R's, DVR's

---

[1]  The affirmative and proactive duty to safeguard documentary and tangible evidence, including electronic
evidence, is long established. *See, e.g. Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443 (C.D. Cal
1985) (imposition of monetary sanctions and striking of defendant's pleadings for abuse of discovery and
destruction of evidence, including electronic data).

WILLIAM M. O'MARA  •  DAVID C. O'MARA

etc.).  The electronic data that must be preserved includes all timekeeping records, scheduling records, payroll data and relevant information contained in e-mails, video, date books, word-processing files, spreadsheets, databases, HTML files, etc.

The specified electronic data is vitally important to this litigation and can be easily manipulated or destroyed.    The rules prohibiting the destruction of traditional paper evidence apply equally to the destruction of electronic evidence. "Reasonable preservation" requires but is not limited to, the discontinuance of all electronic data destruction policies.

Please take notice that UMC[2] and all persons in active concert or participation with UMC are restrained and enjoined from altering, interlining, destroying, permitting the destruction of, or in any other fashion changing any "document" in the actual or constructive case, custody or control of such person, wherever such document is physically located, or irrevocably changing the form or sequence of the files in which the document is located.  Such persons are also enjoined from changing the location of any such documents except to facilitate compilation, review or production (as by filing in a document depository).

"Document" shall mean and include any electronic data such as e-mail database(s), e-mail messages and attachments sent or received, reports or records of any kind generated from Defendant's email and payroll systems, timekeeping records, pagers, computer storage tapes, computer storage cards or disks, dvr and other recordings from client cameras, writings, drawings, film, videotapes, charts, photographs, phonograph records, tape records, mechanical or electronic sound recording or transcript thereof, retrievable data (whether carded, taped coded, electrostatically or electromagnetically recorded, or otherwise), or other data compilation from which information can be obtained, including (but not limited to) employee manuals or handbooks, notices, memoranda, diaries, minutes, purchase records, purchase invoices, market data, correspondence, books, journals, ledgers, statements, reports, invoices, bills, vouchers, worksheets, jottings, notes, letters, abstracts, audits, charts, checks, diagrams, drafts, recordings, instructions, lists. Logs, orders, recitals, telegram messages, telephone bills and logs, resumes, summaries, compilations, computations, and other formal and informal writings or tangible preservations of information.

---

[2] For purposes of this letter, "University Medical Center of Southern Nevada" refers to University Medical Center of Southern Nevada, as well as all known and unknown entities as identified and contemplated in Plaintiffs' Complaint.

This preservation notice pertains to documents containing information that may be relevant to, or may lead to the discovery of information relevant to this litigation or the claims or defenses asserted herein, including but not limited to: all documents regarding Defendant's employment of individuals as Respiratory Therapists; all records regarding or generated by UMC's timekeeping system; pay records for Respiratory Therapists; policies and procedures regarding overtime for all of Defendants' employees; any and all data and pager information relating to the pagers required to be utilized by Respiratory Therapists; and all documents regarding duties and responsibilities of Respiratory Therapists. This preservation notice pertains to all documents as defined herein, which have been written or generated from July, 2008 through the present.

Accordingly, you should have already issued instructions to directors, officers, employees, IT personnel, attorneys, and anyone else acting on behalf of or within the control of your client to suspend destruction of documents, things, and other electronic data while this matter is pending, or until such items have been determined not to contain discoverable evidence.

In the event that you have not issued any instructions in this regard, at a minimum, and to help avoid any subsequent dispute between the parties, please issue immediate written instructions to employees that direct them to:

- Refrain from the practice of "recycling" backup tapes and storage media;

- Refrain from any activity that would alter or damage data on any computer systems including deleting, defragmenting, or compressing data, or disposing of any electronic media including backup tapes, hard drives, diskettes, pagers and CD-ROMS;

- Refrain from saving new data to media that already contains electronic data (thus overwriting existing electronic data);

- Refrain from installing new software or files on any media that already contains electronic data subject to discovery.

Please note that the above list is not exhaustive and there are additional measures that must be immediately implemented to protect discoverable electronic

3

evidence depending on your client's computer systems and network configuration. You and your client should thus consult immediately with your client's senior systems analysts and/or architects to determine what measures must be implemented to comply with the your obligation to preserve all discoverable electronic data.

The failure to preserve documents, including electronic data and metadata, could result in extreme penalties such as monetary sanctions, adverse jury instructions, and even a directed verdict. Further, the destruction of evidence can give rise to an emerging tort and separate cause of action for evidence spoliation. We strongly recommend that you seek experienced counsel regarding proper preservation methods of all electronic data.

Very truly yours,

David C. O'Mara, Esq.

4

# Exhibit F

## Claudette Myers

| | |
|---|---|
| **From:** | Cindy Dwyer on behalf of Brian Brannman |
| **Sent:** | Monday, April 15, 2013 8:14 AM |
| **To:** | Patient Service Leaders |
| **Subject:** | Department of Labor Requests for Information |

**Categories:** DOL

As discussed in Patient Service Leader meeting, UMC continues to respond to requests for information from the Department of Labor and attorneys representing employees who have filed a complaint regarding meal and rest break claims and overtime claims. As we work through these complaints I want to remind you of our obligation to preserve documents that may relate to this issue. Please make sure that you do not destroy any emails, staffing schedules, correspondence, meeting minutes or any other related documents. If you have a question regarding how relative a document might be, please contact Human Resources.

*Brian Brannman, CEO*

1

UMC100004

# Exhibit G

```
 1              UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF NEVADA

 3

 4   DANIEL SMALL, CAROLYN SMALL,    )
     WILLIAM CURTIN, DAVID COHEN,    )
 5   LANETTE LAWRENCE, AND LOUISE    )
     COLLARD, Individually, and      )
 6   on Behalf of All Other          )   CASE NO.
     Persons Similarly Situated,     )   13-cv-00298 MMD-GWF
 7                                    )
            Plaintiffs,              )
 8                                    )
       vs.                           )
 9                                    )
     UNIVERSITY MEDICAL CENTER OF    )
10   SOUTHERN NEVADA,                 )
                                      )
11          Defendant.               )
     _____ )
12

13

14

15

16         VIDEOTAPED DEPOSITION OF JOHN ESPINOZA

17   Taken at the law offices of Morris Polich & Purdy, LLP

18            3883 Howard Hughes Parkway, Suite 560

19                  Las Vegas, Nevada

20               On Monday, April 8, 2013

21                  At 8:58 a.m.

22

23

24

25   REPORTED BY:  Blanca I. Cano, CCR No. 861, RPR
```

EXHIBIT *15*
WIT: *SM Hearing*
DATE: *4-7-14*
All-American Court Reporters

1

BARKLEY

1       Q.    Was she alone?

2       A.    She was alone.  I had with me the manager of

3   the payroll department.

4       Q.    What was discussed at the last meeting held

5   two -- two weeks ago?

6       A.    We had provided documentation on how we would

7   calculate any potential back pay based on her initial

8   assumptions.

9       Q.    You provided a document to Ms. Hernandez?

10      A.    Yes.

11      Q.    Something in writing?

12      A.    Yes.

13      Q.    Has that been produced in this case?

14      A.    I don't know.

15      Q.    Do you still have a copy of it?

16      A.    Well, what it is is it's -- it's pieces and

17  parts of looking at individuals' payroll stubs, the

18  calculations that were done based on a prescribed missed

19  lunch per her analysis, and the actual calculations that

20  came from that.  So, yeah, I think the -- I think there

21  was a summary report that is available.  All the detail

22  I think may have been handed over to Ms. Hernandez.

23      Q.    Is it your testimony that you haven't kept

24  copies of any of the detail backing up that summary

25  report?

170

BARKLEY

1    A.   No.  I think the -- the detail can -- if -- if

2  payroll doesn't already have a copy of it, I know that

3  they can probably reproduce it.  I just don't know

4  because I don't keep any of those documents.  Payroll

5  kept all those documents.

6    Q.   Earlier we looked at two preservation letters,

7  correct?

8    A.   Yes.

9    Q.   Okay.  You understand that those preservation

10  letters apply to you?

11    A.   Yes.  Like I said, I don't think the

12  documentation doesn't exist, I just don't have it.

13    Q.   Okay.  Well, where is it?

14    A.   With the payroll department.

15    Q.   So the payroll department has it?

16    A.   Yes.

17        MR. TOSTRUD:  We're going to ask that that --

18  those documents, Jeremy, be main -- be maintained,

19  preserved, and produced immediately.

20        MR. THOMPSON:  (Counsel nods head.)

21  BY MR. TOSTRUD:

22    Q.   What other documents were used in the course of

23  that 20-minute meeting with Ms. Hernandez two weeks ago?

24    A.   None.

25    Q.   How were these meetings with Ms. Hernandez

171

BARKLEY

# Exhibit H

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

DANIEL SMALL, CAROLYN SMALL, WILLIAM CURTIN, DAVID COHEN, LANETTE LAWRENCE, and LOUISE COLLARD, Individually, and on Behalf of All Other Persons Similarly Situated,

   Plaintiffs,

vs.

UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA,

   Defendant.

Case No.: 2:13-cv-00298-APG-PAL

## DECLARATION OF DANIEL SMALL

I, DANIEL SMALL, hereby declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the following is true and correct:

1. I am over the age of 21, competent to testify and if called to testify would do so consistent with all matters set forth herein.

2. I currently work as an hourly employee for the University Medical Center of Southern Nevada ("University Medical Center"). I have been employed with University Medical Center from October 31, 2005 to the present.

3. On or around March 21, 2014, I received an email to my University Medical Center Outlook email account marked "UMC Post" via the University Medical Center intranet. The email contained a notice about a newly revised University Medical Center Policy, "I-25," regarding record retention and disposal.

4. I went to the "Policies and Procedures" online manual on the University Medical Center intranet and typed in "I-25" to view the newly revised policy.

5. A document then appeared with the following subject line: "Record Retention and Disposal." Attached hereto as Exhibit A is a true and correct copy of the document.

6. On or around March 21, 2014, I received an email to my University Medical Center Outlook email account from "Lonnie Richardson" with the subject line reading as follows: "System Alert: Documents and Files Stored on Local "C" drive." Attached hereto as Exhibit B is a true and correct copy of the document.

7. I understand that by signing this Declaration I am swearing under oath to the best of my knowledge and belief that everything stated in this Declaration is true and that I am acting of my own free will and am not under any undue pressure, influence or duress.

Dated: April 9, 2014

Signature

Daniel D. Small

Printed Name

# EXHIBIT A

UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA
ADMINISTRATIVE POLICY AND PROCEDURE MANUAL

| SUBJECT: Record Retention and Disposal | ADMINISTRATIVE APPROVAL: |
|---|---|
| EFFECTIVE: 02/01/08    REVISED:    1/14 | |
| POLICY #: I-25 | |
| AFFECTS:   All Personnel | |

**PURPOSE:**

To ensure the proper creation, retention, preservation, and disposal of UMC records.

**POLICY:**

UMC will use effective and efficient measures to ensure the maintenance of complete, accurate, and high quality records. All records will be retained in accordance with applicable laws and regulations.

All UMC records will be retained and preserved in keeping with appropriate regulatory statutes and/or recommendations.

When the limitation of record retention has been met, records will be destroyed in such a manner that patient confidentially is maintained. The unauthorized destruction of any records or removal of records from UMC is strictly prohibited.

Records containing confidential and/or proprietary information will be securely maintained, controlled, and protected to prevent unauthorized access and disclosure. Anyone with knowledge of the unauthorized removal, destruction or alteration of UMC records should report the same to the Compliance Officer at (702) 383-6211 or the Compliance Hotline at (702) 383-2208. The Compliance Hotline is anonymous and available 24 hours a day, 7-days a week.

All records generated and/or received by UMC are considered UMC property. No employee, medical staff member, contractor, or vendor has a personal or property right to such records.

Records will be modified, amended, altered only in accordance with UMC policies and procedures.

Each department that creates and maintains documents required by state and/or federal laws and regulations, that are not on the Retention Schedule will keep and annually update a department specific retention schedule. Each department specific retention policy will be reviewed annually for changes and revisions.

| Subject:  Record Retention and Disposal | Page 2 of 4 |
|---|---|

The retention period for a record applies to the record regardless of the medium in which it is maintained.  When scanning staff minutes for electronic retention you must include the following: meeting agenda, sign-in sheet and a copy of the signed minutes.

<u>Record Disposal</u>:

Confidentiality will be maintained when disposing of hospital sensitive and patient information. Each department will have available either a shredder or confidential disposal bin for this purpose.

Any deviation from the retention schedule must have written administrative approval.

<u>Legal Holds:</u>

This schedule does not authorize destruction of records that could be deemed relevant to current or pending litigation. All records deemed relevant are to be placed on a Legal Hold and destruction is to be suspended until after the matter has been wholly or partially resolved and legal counsel releases the Hold and issues instruction to return to routine records destruction.

<u>Definitions:</u>

1.  Health Care Records. Retrievable information recorded, regardless of medium. Health Care Records include reports, notes, orders, photographs, x-rays or other recorded data or information whether maintained in written, electronic or other form which is received or produced by a provider of health care, or any person employed by him, and contains information relating to the medical history, examination, diagnosis or treatment of the patient.  These records are subject to a retention schedule and can only be discarded on the expiration of their respective retention period.

2.  Company Business Records.  Information generated or received relating to the transaction of UMC business.   These records include, but are not limited to, letterhead correspondence, UMC policies and procedures, official meeting minutes, personnel records, staff schedules and assignment sheets, patient logs/registries, benefit programs, accounts payable and receivable, purchase requisitions, documents evidencing reimbursement or receipt, finance and audit reports, contracts, and insurance documents.

    Email messages and documents transmitted via email can be considered Company Business Records and are subject to this policy.  The retention period for emails is directly related to its message content.  To determine the applicable retention period, treat the email like a paper document.

    Company Business Records are subject to a retention schedule and can only be discarded on the expiration of their respective retention period.

3.  Non-Records.  This includes duplicate copies of Company Business Records, blank forms, documentation evidencing the informal communication of information such as sticky notes or telephone message pads, and forms and documents used and

| Subject:  Record Retention and Disposal | Page 3 of 4 |
| --- | --- |

maintained with short-term business/administrative value.  Non-Records may be
discarded once the business/administrative use ends.

**Retention Schedules:**

1. All records will be maintained and retained in accordance with applicable federal and state laws and regulations.  The minimum retention schedule is attached to this policy as Appendix A.

2. Proposed changes or additions to current Health Care Records and Non-Company Business Records will be submitted to the Administration for review and approval before implementation.

3. Administration will review and approve any changes to the Retention Schedule.

4. Health Care Records and Company Business Records will be reviewed periodically to determine continued propriety of continued use and storage.

**References:**
Nevada Administrative Code 239
NRS 629.021 Health care records defined
NRS 629.021 Health care records
NAC239.151 Categories of records
CFR 405.2139- CMS guidelines

**Joint Commission Standards:**

Management of Information: IM 6.10

| Subject:  Record Retention and Disposal | Page 4 of 4 |
| --- | --- |

## Appendix A
## RECORD RETENTION

| DESCRIPTION | RETENTION |
| --- | --- |
| Original Schedules will be maintained in the Nursing Administration Office | 3 years<br>Media:  The original to be scanned electronically and saved on the "Q" drive under Nursing Administration. |
| Staff assignment sheets will be maintained by the Clinical Managers | 3 years |
| Daily staffing reports will be kept by the Clinical Manager | 1 year  (minimum) |
| Acuity Reports | 1 month (minimum)<br>Available online GRASP Data Base |
| Refrigerator, Freezer, Warmer, and Point of Care temperature logs will be maintained per NRS 629.051 and JCAHO | 5 years |
| Logs for emergency cart checks will be maintained from JCAHO to JCAHO by the Clinical Managers | 5 years |
| Patient Log/Registry will be maintained by the specific department (Emergency departments, Burn unit, L&D... | 3 years (minimum) |
| Original Department Staff Meeting Minutes in the Nursing Administration office. | 1 year<br>Media:  The original to be scanned electronically and saved on the "Q" drive under Nursing Administration. |
| Original Department Shared Governance committee minutes will be maintained by the Clinical Manager | |
| Original Interdisciplinary & Nursing Committee Meetings will be maintained in the Nursing Office | 3 years |
| Financial Reports will be maintained by the Managers | The previous fiscal year |

# EXHIBIT B

**Daniel Small**

| | |
|---|---|
| **From:** | Lonnie Richardson |
| **Sent:** | Friday, March 21, 2014 11:57 AM |
| **To:** | UMCPost |
| **Subject:** | System Alert: Documents and Files Stored on Local "C" drive |
| **Importance:** | High |

**Why am I contacting you?**
- Many folks within UMC are storing files and documents on the local "C" drive and on the computer "Desktop".
- As we progress with the Microsoft Windows Operating System upgrade to version 7, we need to remind everyone of the UMC policy on the location of files and documents.

**What is the policy?**
- Documents and files are NOT to be stored on the local "C" drive or on the computer's "desktop"
- The reason is two-fold. 1) These two locations are NOT backed up at all. 2) Storing large amounts of data on the desktop seriously hampers the performance of the machine.

**Who does this affect you?**
- You must move anything you need to keep, that is stored on the "C" drive or "Desktop", to your "My Documents" location or a shared drive folder.
- Anything on the "C" drive or Desktop will NOT be saved as your workstation is upgraded to Windows 7.  We cannot restore these objects after the upgrade,  as they are NOT backed up.

**What will happen if you do not move the files to a shared folder or "My Documents" location?**
- The files will be lost.
- Information Technologies will NOT be able to restore these files.

**What is your next step?**
- Move the files that you need to keep  off the "C" drive and your Desktop, now.
- Moving the files to the correct locations will ensure they are backed up, and are able to be restored.
- They will be available to you after the Windows 7 upgrade.
- You will be in compliance with UMC computer usage policies.

---

Lonnie Richardson
Director
Information Technology

University Medical Center of Southern Nevada
1800 W Charleston Blvd
Las Vegas, NV 89102

O:  (702) 383-7397

Compassion • Accountability • Integrity • Respect

1

# Exhibit I

EXHIBIT 2

# PST Repair and Production tests for UMC
Updated 04.02.14

## ScanPST Results
ScanPST (15.0.4561.1000) run on all PST and OST files

| Custodian | PSTs | OSTs |
|---|---|---|
| Brian Brannman | 3 | 3 |
| Doug Spring | 21 | 7 |
| Jackie Panzeri | 13 | 2 |
| James Mumford | 4 | 14 |
| John Espinoza | 2 | 2 |

Jackie Panzeri had 2 ANSI Format PST's that were over the 2GB file limit and could not be repaired without trimming.

PST2GB.exe (1.5.0.2) was used to trim the ANSI PST files until ScanPST could successfully run.

| PST File | MB Trimmed to allow repair |
|---|---|
| Jackie Panzeri\JackiePanzeri_HomeDrive\Jackie.Panzeri.pst | 36 MB |
| Jackie Panzeri\JackiePanzeri_HomeDrive\Archived e-mail\Archive1.pst | 512 MB |

All log files have been provided in native format.

## Email Test Results
ScanPST (15.0.4561.1000) run on all PST and OST files
EML and MSG files Exported from P2 Commander (2.2.4688.24628)
MSG files exported from EnCase 6 (6.19.7.2) and EnCase 7 (7.07.00.138)
Exported files reviewed in Outlook 2013 (15.0.4569.1503)

All files processed and exported in Ipro eCapture (6.2.2)
Export reviewed

| Bates | Software | Format | Native Body View | Native Attachment View | eCapture Text Extract | Ipro eCapture Attachments |
|---|---|---|---|---|---|---|
| 1 | P2 Commander | EML | Blank | SMime.txt | Raw Mime | |
| 1 | P2 Commander | MSG | Can't Open | Can't Open | Appears Correct | |
| 1 | EnCase 6 | MSG | Appears Correct | | Appears Correct | |
| 1 | EnCase 7 | MSG | Appears Correct | | Appears Correct | |
| 4 | P2 Commander | EML | Body Text Cut Off | | Rich Text Content | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4 | P2 Commander | MSG | Appears Correct | | Appears Correct | |
| 4 | EnCase 6 | MSG | Appears Correct | | Appears Correct | |
| 4 | EnCase 7 | MSG | Appears Correct | | Appears Correct | |
| 2857 | P2 Commander | EML | Raw Mime Encoding | No Attachments | Raw Mime Encoding | No Attachments |
| 2857 | P2 Commander | MSG | Appears Correct | Attachments | Appears Correct | Attachments |
| 2857 | EnCase 6 | MSG | Appears Correct | Attachments | Appears Correct | Attachments |
| 2857 | EnCase 7 | MSG | Appears Correct | Attachments | Appears Correct | Attachments |
| 3715 | P2 Commander | EML | 'Chinese Characters' | | No Body Text | |
| 3715 | P2 Commander | MSG | 'Chinese Characters' | | HTML Code | |
| 3715 | EnCase 6 | MSG | Appears Correct | | Appears Correct | |
| 3715 | EnCase 7 | MSG | Appears Correct | | Appears Correct | |
| 16221 | P2 Commander | EML | Raw Mime Encoding | No Attachments | Raw Mime Encoding | No Attachments |
| 16221 | P2 Commander | MSG | Appears Correct | .MTH Files | Appears Correct | .MHT Files |
| 16221 | EnCase 6 | MSG | Appears Correct | .RTF Files | Appears Correct | .RTF Files |
| 16221 | EnCase 7 | MSG | Appears Correct | .RTF Files | Appears Correct | .RTF Files |
| 29140 | P2 Commander | EML | Raw Mime Encoding | No Attachments | Raw Mime Encoding | No Attachments |
| 29140 | P2 Commander | MSG | 'Chinese Characters' | Attachments | HTML Encoding | Attachments |
| 29140 | EnCase 6 | MSG | Empty | Attachments | Empty | Attachments |
| 29140 | EnCase 7 | MSG | Empty | Attachments | Empty | Attachments |
| 38219 | P2 Commander | EML | Empty | Attachments | Raw Mime Encoding | Attachments |
| 38219 | P2 Commander | MSG | Empty | Attachments | Empty | Attachments |
| 38219 | EnCase 6 | MSG | Empty | Attachments | Strange Characters | Attachments |
| 38219 | EnCase 7 | MSG | Empty | Attachments | Empty | Attachments |

## Summary of Email Test Results

Despite the manufacturers claims of compatibility the results of these tests show that it is likely that most errors were caused by P2 Commander not processing the source files accurately.

Ipro eCapture also failed to process attachments correctly as confirmed by their technical support, due to their use of the 3rd party Anpop plugin.

EnCase 6 did generate one email with some incorrect body text, however most files produced with EnCase 6 or 7 did not exhibit any issues during pre-processing, or produce unexpected results once processed in Ipro eCapture.

## Test of Ipro eCapture 'Body' Metadata field

Since Ipro eCapture is not capable of removing the Mime, RTF or HTML Formatting from the exported txt files automatically their technical support suggested that the meta-data field called 'Body' could be exported in the load-file.

The 'Body' field was exported for the test emails and still contains the Mime, RTF and HTML Formatting.

## Attachments

    a. All ScanPST Log Files.zip
    b. Test Email eCapture Export.zip

Joseph Edmondson, CCE, EnCE



# Amendment to PST Repair and Production tests for UMC

Updated 04.11.14

This document is to correct a misprint in the previously produced report entitled "PST Repair and Production tests for UMC" dated 04.02.14 and entered into evidence as Exhibit #1.

In the table provided for ScanPST Results for custodian John Espinoza the count of OST Files was incorrectly entered as 2, the correct number of OST files was 0.

The corrected table is provided below.

## ScanPST Results

ScanPST (15.0.4561.1000) run on all PST and OST files

| Custodian | PSTs | OSTs |
|-----------|------|------|
| Brian Brannman | 3 | 3 |
| Doug Spring | 21 | 7 |
| Jackie Panzeri | 13 | 2 |
| James Mumford | 4 | 14 |
| John Espinoza | 2 | 0 |

## Screenshots

Below are screenshots showing the correct count of PST and OST files for John Espinoza

2 PST Files



**0 OST Files**





Joseph Edmondson, CCE, EnCE