# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

DANIEL SMALL, CAROLYN SMALL, WILLIAM CURTIN, DAVID COHEN, LANETTE LAWRENCE, and LOUISE COLLARD, Individually, and on Behalf of All Other Persons Similarly Situated,

*Plaintiffs*,

**vs**.

UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA,

*Defendant*.

Case No.:  2:13-cv-00298-APG-PAL

**REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE**

Hon. Andrew P. Gordon

Magistrate Judge Peggy A. Leen

**TABLE OF CONTENTS**                                                             **Page**

I.       **INTRODUCTION**..................................................................................1

II.     **PROCEDURAL HISTORY AND DISCOVERY PROCEEDINGS**...........................2

     A.    **Pleadings And Conditional Class Certification**.................................2

     B.    **Discovery Requests And Production Issues**.....................................3

     C.    **Motions And Seven Status Conferences Between May 2013 And March 2014**....................................................................................4

          1.    **Plaintiffs' May 15, 2013 Motion To Compel ESI**.....................4

          2.    **The First Discovery Status Conference On August 15, 2013: Initial Agreement On Search Terms And Custodians**...........................4

          3.    **The Second Discovery Status Conference On September 24, 2013: Initial Agreement On Production Timeline** ..................................5

          4.    **The Third Discovery Status Conference On November 12, 2013: Requests Concerning Kronos And Mobile Phone Text Message Data** ..........................................................................5

          5.    **The Fourth Discovery Status Conference On November 26, 2013: Further Discussion Regarding Kronos And Mobile Phone Data** ..........................................................................5

          6.    **The Fifth Discovery Status Conference On January 21, 2014: UMC Ordered To Preserve Text Message Data, Discussion Of Sanctions**.........................................................................6

          7.    **The Sixth Discovery Status Conference On February 11, 2014: Errors In UMC's Production, Discussion Of Special Master Appointment** ..................................................................6

          8.    **The Seventh Discovery Status Conference on March 10, 2014: Special Master and ESI Vendors Attend, Sanctions Discussed.**............7

     D.    **Scope Of Special Master Report**.................................................8

III.    **FINDINGS OF FACT**...........................................................................9

     A.    **UMC's Preservation Efforts Were Insufficient** .................................9

          1.    **UMC's Preservation Efforts Were Insufficient: Preservation Chronology** ..................................................................10

          2.    **UMC Preservation Efforts Were Insufficient: UMC's Prior And Current Counsel Failed To Conduct Timely Custodian Interviews, Leading To The Failure To Identify Key Evidence Repositories Resulting In The Destruction Of Significant Amounts Of Responsive ESI**....................................................12

               (a)    **UMC Failed To Identify And Preserve: Failure To Identify To LBBS, And Preserve, The Network File Shares "Q-Drive" Resulting In The Destruction Of Responsive ESI** ..................................................13

               (b)    **UMC Failed To Identify And Preserve: Two Laptops Belonging To Key Custodians James Mumford And Doug Spring Were Not Identified Or Preserved Until After The Custodian Interviews In May Of 2014** .....................15

(c)      **UMC Failed To Identify And Preserve: Work Computers That Were Used By 24 Of The 27 Custodians** ........................................................................15

(d)      **UMC Failed To Identify And Preserve: Intranet Server That Includes The Policy And Procedure Server** ....................17

(e)      **UMC Failed To Identify And Preserve: Personal Mobile Phones That Key UMC Custodians Used For Work** ...............19

(f)      **UMC Failed To Identify And Preserve: ESI On The BlackBerry Server And UMC Mobile Devices** ..........................20

3.      **UMC's Preservation Efforts Were Insufficient: UMC Failed To Institute A Timely And Effective Litigation Hold** ................................22

4.      **UMC Preservation Efforts Were Insufficient: Who's On First? – UMC's Executives Failed To Take Responsibility For Preservation And Failed To Notify The Appropriate IT Stakeholders To Prevent The Loss Of Relevant ESI** ...........................23

(a)      **Brannman (CEO From July 2011 To January 2014) Received At Least Two Plaintiff Preservation Notice Letters** ..........................................................................23

(b)      **Lawrence Barnard (CEO From February 2014 To Present) Learned Of Preservation Obligation In Passing In The Hallways** ..........................................................24

(c)      **McKinley (UMC's Chief Information Officer) Received No Preservation Notice But Was Involved In Connecting Initial ESI Vendor With Schaibley To Perform "Initial" Collection** ..................................................................24

(d)      **MacIntyre (Director Of Risk Management) The Individual Responsible For Effectuating Litigation Holds For Some Types Of UMC Litigation Was Not Involved in UMC's Preservation Efforts** ................................25

(e)      **Doug Spring (Director Of Human Resources) Was Not Involved In UMC's Preservation Efforts** ...............................25

(f)      **Kisner (IT Manager Tasked With Blackberry Preservation) Received Preservation Instruction Over 500 Days After Initial Complaint Was Served** ..........................26

(g)      **Carmelito Mendoza Shane Lattin, Dave Williams, Ruben Ghosal, And Several Other Critical IT Individuals Did Not Receive Litigation Hold Notice Until The Special Master Hearings** ......................................26

B.      **UMC's Collection And Production Was Riddled With Problems** .................28

1.      **UMC's Production And Collection Was Riddled With Problems: Collection And Production Timeline** ..............................29

2.      **UMC's Production And Collection Was Riddled With Problems: Failures By UMC In Collection** .......................................32

(a)      **UMC Self Collected ESI In Both April And August 2013 Using Unreliable Collection Methodology Such That The**

Effectiveness Of These Collections Remains
Undetermined ........................................................33

(b) UMC Did Not Collect From Known Responsive ESI
Repositories Including: Q-Drive, UMC Workstations,
All ESI For Claudette Meyers, Clarity, CrimeStar,
TeleTracking, And Blackberry Server Data Until
April 2014 Or Later ...............................................34

(c) UMC Delayed Collection Without Suspending Backup,
Resulting In The Loss Of Responsive ESI. ................34

3. UMC's Production And Collection Was Riddled With
Problems: Failures By UMC's Electronic Discovery
Consultant In Production And Collection...........................36

(a) UMC ESI Vendor Did Not Make A Complete Copy Of
The Collection Or Complete Requisite Chain-Of-
Custody Paper Work ..............................................36

4. UMC's Production And Collection Was Riddled With
Problems: Failures By UMC's Counsel In Production And
Collection ...................................................................39

C. UMC Made Multiple Misrepresentations In These Proceedings As To
The Existence Of Relevant ESI Repositories, UMC's Ability To
Produce Summary Spreadsheets Via Kronos And The Completeness
Of The Production Of DOL Documents Submitted In These
Proceedings....................................................................39

1. UMC Made Multiple Misrepresentations In These Proceedings:
UMC Custodians Lied About, Or At Best Failed To Disclose,
Several Key ESI Repositories To LBBS And Special Master
Garrie, Of Which Were Later Proven To Contain Relevant ESI
..................................................................................39

(a) Key Timekeeping Systems Clarity, Crime Star,
TeleTracking, And GRASP Were Only Disclosed To The
Special Master More Than Three Months Into The
Proceedings...........................................................40

(i) Clarity Timekeeping System Was Used By Opt-In
Plaintiffs, Contains Responsive ESI, And Was
Not Disclosed Until May 2014............................41

(ii) CrimeStar Timekeeping System Was Used By
Opt-In Plaintiffs, Contains Responsive ESI, And
Was Not Disclosed Until June 2014.....................43

(iii) TeleTracking Timekeeping System Was Used By
Opt-In Plaintiffs, Contained Responsive ESI And
Was Not Disclosed Until June 2014.....................44

(iv) GRASP Timekeeping System...........................45

(v) Additional Timekeeping System Findings ..................45

2. UMC Made Multiple Misrepresentations In These Proceedings:
UMC Does Have The Capability To Generate Excel

Spreadsheets From Kronos And Did So For The DOL Investigation ................................................................46

3.   UMC Made Multiple Misrepresentations In These Proceedings: UMC Did Not Produce All Of The DOL Documents Until The Special Master Proceedings. ..................................................48

D.   UMC's Serial Misrepresentations And Repeated Failure To Act In Good Faith In These Proceedings Directly Caused Large Monetary Costs And Time Delays.....................................................49

E.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Q-Drive; SMS Text Messages On UMC BB; Key Custodian Computers; Data On Personal Mobile Device.........................................50

1.   UMC Lost or Deleted ESI Likely To Be Relevant And Responsive: UMC's Failed to Preserve the Q-Drive Which Resulted in the Loss of Thousands of Files Including Responsive ESI ..................................................................................50

2.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: SMS Text Messages On UMC Mobile Devices. ...............52

3.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Data (Different From SMS) Stored On UMC Mobile Devices And Personal Mobile Devices Used To Conduct UMC Business. ................................................................54

4.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Data Written To Local UMC Computers. .......................55

5.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Intranet Application And The Associated Data And The Siemens Policy & Procedure Server. ...............................................56

IV.   CONCLUSIONS OF LAW .....................................................................56

A.   Nothing New Under The Sun: The Importance Of Cooperation, Communication, And Transparency In Electronic Discovery. ....................56

B.   Client And Counsel: The Bad Actor Problem ("The Blame Game") ............57

C.   UMC Spoliated Responsive ESI In This Matter ("Hasta La Vista ESI") ..................................................................................57

1.   The Duty To Preserve Attaches When A Potential Claim Is Identified And Encompasses All Reasonably Relevant ESI ...............57

2.   Parties Have An Affirmative Duty To Ensure Preservation And Communicate Obligations To Employees.......................................58

3.   UMC Breached Its Duty To Preserve ...........................................58

4.   UMC Willfully Spoliated ESI ("Did I Do That…")...............................59

D.   UMC's Spoliation Of Evidence Is Sanctionable Under Ninth Circuit Law ("May It Be So") .....................................................................60

1.   The Court May Issue Sanctions Under Its Inherent Powers ..............60

2.   The Court May Issue Sanctions Under The Federal Rules Of Civil Procedure..................................................................60

3.   Discussion Of Appropriate Sanction Under The Prevailing Ninth Circuit Five Factor Test..................................................61

　　　　　　　　(a)　　UMC's Conduct Meets The Willfulness Or Bad Faith Standard........................................................................61

　　　　　　　　(b)　　Application of the Five-Factor Test for Case Dispositive Sanctions. ...............................................................62

　　　　　　　　　　　(i)　　The Expeditious Resolution Of This Litigation Serves The Public Interest....................................63

　　　　　　　　　　　(ii)　　UMC's Actions Have Hindered The Court's Ability To Manage Its Docket...............................64

　　　　　　　　　　　(iii)　　Plaintiffs' Have Suffered Prejudice As A Result Of UMC's Spoliation ....................................65

　　　　　　　　　　　(iv)　　Public Policy Does Not Prevent Granting Case Dispositive Sanctions Against UMC..............65

　　　　　　　　　　　(v)　　Less Drastic Sanctions Cannot Remedy The Prejudice Plaintiffs Have Suffered .......................66

V.　　RECOMMENDATIONS...............................................................68

　　A.　　Recommendation As to FLSA Opt-in Plaintiffs..................68

　　B.　　Recommendation As To Putative Class Plaintiffs .............69

　　　　1.　　Class Certification Under Federal Rule Of Civil Procedure 23(a) ...............................................................................69

　　　　2.　　Liability And Damages ........................................71

　　C.　　Recommendation Of Costs And Fees .................................72

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

In this class action against the University Medical Center of Southern Nevada ("UMC"), Plaintiffs allege UMC systematically deprived its employees of appropriate wages and overtime compensation.  [Dkt. 37 ("Amended Complaint")].  Plaintiffs state claims under the Fair Labor Standards Act, 29 U.S.C. §§201 et seq. (the "FLSA"), and Nevada state wage and hour laws (*id.* at ¶¶ 68-70), asserting UMC failed to credit meal breaks not taken (*id.* at ¶¶20-22); keep employee time records (*id.* at ¶¶23, 56); and train hourly employees on meal period deductions (*id.* at 54-56).

Plaintiffs first commenced this action on July 27, 2012, nearly two years ago. The parties are still resolving discovery issues. To date discovery has required a fully briefed motion to compel[1] with accompanying oral argument;[2] seven discovery status conferences over eight months before Magistrate Judge Peggy A. Leen;[3] the appointment of Special Master Daniel B. Garrie;[4] five in person, all day hearings conducted by the Special Master;[5] 14 telephonic hearings before the Special Master;[6] over 20 declarations submitted by employees and agents of UMC (many supplementing or amending prior incomplete or inaccurate declarations); and written submissions by counsel and ESI experts.[7]

Upon the extensive factual findings detailed herein, Special Master Garrie concludes UMC destroyed evidence by failing to identify, preserve, collect, process, and search multiple

---

[1] [Dkt. 92].

[2] [Dkt. 112].

[3] [Dkt. 121]; [Dkt. 128]; [Dkt. 138]; [Dkt. 140]; [Dkt. 143]; [Dkt. 146]; [Dkt. 151].

[4] [Dkt. 152].

[5] Ex.2 (4/4/14 transcript); Ex.3 (4/7/14 transcript); Ex.4 (4/22/14 transcript); Ex.5 (5/6/14 transcript); Ex.6 (6/16/14 transcript).

[6] Ex.7 (4/10/14 transcript); Ex.8 (4/15/14 transcript); Ex.9 (5/1/14 transcript); Ex.10 (5/30/14 transcript); Ex.11 (6/4/14 transcript); Ex.12 (6/26/14 transcript); Ex.13 (7/3/14 transcript); Ex.14 (8/4/14 transcript).

[7] These discovery related activities have generated thousands of pages of hearing transcripts, in addition to voluminous declarations, exhibits, and documents concerning discovery in this matter.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APAL

repositories.   Worse, UMC's executives and personnel made numerous misrepresentations to UMC's counsel, the Court, and Special Master Garrie, further delaying these proceedings and driving up their costs.   Special Master Garrie notes his serious doubts that UMC can complete discovery in a defensible manner going forward without increased candor to the Court and their own counsel, and more competent technical assistance.

Section II of this Report and Recommendation (the "Report") describes the procedural history and extensive discovery proceedings.   Section III presents relevant factual findings. Section IV summarizes the relevant legal standards and conclusions of law.   Section V presents recommendations on sanctions.

## II.   PROCEDURAL HISTORY AND DISCOVERY PROCEEDINGS

### A.   Pleadings And Conditional Class Certification

Plaintiffs filed their initial complaint in this matter against UMC on July 27, 2012. [Dkt. 1].[8]   Plaintiffs filed an amended complaint on December 13, 2012. [Dkt. 37].   To date 613 individuals have filed written consents opting to join the putative Plaintiff class (the "Opt-In Plaintiffs").   Ex.6 (6/16/14 transcript), at 32:3-7.

Acting through its prior counsel, Morris, Polich & Purdy ("MPP"), UMC moved to dismiss on September 10, 2012. [Dkt. 23].   The Court denied that motion on November 14, 2012. [Dkt. 33]. UMC then filed its Answer on January 2, 2013. [Dkt. 42].   Thereafter, on January 11, 2013, Plaintiffs moved to conditionally certify the class.   [Dkt. 46].   After further briefing and argument, the Court granted the motion on June 14, 2013.  [Dkt. 106].

---

[8] Plaintiffs then served a letter on August 6, 2012 asking that UMC institute a preservation instruction to preserve information potentially relevant to this matter. *See* Section III.A.3, *infra*. Plaintiffs sent a similar letter to UMC November 14, 2012. *See* Section III.A.3, *infra*.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

2

## B.  Discovery Requests And Production Issues

On January 23, 2013, Plaintiffs served their first set of written discovery including interrogatories and  requests for production of documents and electronically stored information. Ex.15 (Plaintiffs' First Set of Requests for Production).  Plaintiffs requested, *inter alia*, any documents and data relating to: time worked, labor allocation, and budgeting or allocation of hours. *Id*. at ¶¶ 15, 18, 35.

Thereafter, the parties filed a Joint Case Management Report on January 28, 2013 that identified documents created from a related 2012 U.S. Department of Labor ("DOL") investigation into UMC's meal break practices.[9]  During February and March of 2013, UMC produced approximately 5,600 pages.  [Dkt. 109, at 1:2-23].   This production included no relevant electronically stored information ("ESI") or emails. [10]

In March of 2013, the parties agreed to a protocol for production of ESI, and the Court entered an order governing the production of electronically stored information ("ESI") on March 20, 2013. [Dkt. 77 (the "ESI Protocol")]. The ESI Protocol was later amended on May 7, 2014 [Dkt. 165 (primarily adding additional meta-data fields to be produced)], and again on June 5, 2014 [Dkt. 171 (addressing the confidentiality treatment of ESI, and production formatting for previously scanned hard copy documents and un-scanned hard copy documents)].

As described in more detail below, UMC's initial electronic discovery consultant did not perform a complete collection of ESI.  Several collections were later undertaken by a second consultant, all riddled with problems.  Eventually Special Master Garrie was forced to do a line by

---

[9] This DOL investigation involved several UMC executives, including: John Espinoza (Chief Human Resources Officer), Doug Spring (Director of Human Resources Operations), Jackie Panzeri (Payroll Manager) and Brian Brannman (UMC's CEO from July 2011 to January 2014, and its COO from April 2008 to July 2011). [Dkt. 49, at ¶9(a)].

[10] The Special Master notes that UMC misrepresented that its February production of DOL investigation related documents was complete. Ex.18 (3/5/13 Thompson email): "…we have been informed that all the DOL documents have been produced."). Plaintiffs later learned of much more extensive documents through FOIA requests to the DOL.  *See* Ex.19 (5/9/14 Tostrud letter).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

3

line review of the collection script, and collection and production process, to hand hold the parties to a successful resolution.  *See* Section III.B, *infra* (describing collection efforts).

## C.    Motions And Seven Status Conferences Between May 2013 And March 2014

On May 2, 2013, UMC substituted the firm of Lewis Brisbois Bisgaard & Smith ("LBBS") as counsel for this matter.  [Dkt. 90 (notice of appearance of Margaret Foley and Cayla Witty of LBBS as counsel)].

### 1.    Plaintiffs' May 15, 2013 Motion To Compel ESI

On May 15, 2013, Plaintiffs filed a Motion  to Compel  specifically seeking electronic discovery and ESI production. [Dkt. 92].  On July 12, 2013, after full briefing and two hearings, Magistrate Judge Leen granted Plaintiffs' Motion.  [Dkt. 115].  After that hearing, UMC agreed to hire a new electronic discovery consultant and search available sources, including mobile phones, by August 2, 2013. [Dkt. 119, at 20:9-23, 23:15-16.] The Court also ordered monthly status conferences, and set the first for August 15, 2013.  [Dkt. 115].

### 2.    The First Discovery Status Conference On August 15, 2013: Initial Agreement On Search Terms And Custodians

At the August 15, 2013 status conference, the parties agreed to search the ESI of five custodians with ten search terms.  [Dkt. 121].  The Court also ordered the parties to meet and confer to identify these custodians and the ten search terms.[11] [Dkt. 121].   At this hearing, the Plaintiffs requested data from UMC's "Kronos" timekeeping system in spreadsheet form, and UMC's counsel misrepresented that UMC did not keep Kronos data in this form. These statements were belied by UMC's provision of Kronos spreadsheet data to the DOL in its investigation, a fact Plaintiffs later discovered through FOIA requests. [12]

---

[11] At the August 15, 2013 status conference, Plaintiffs' counsel reiterated their request that UMC's servers, individual computers (or hard drives), and cell phones (or PDAs) be preserved and searched for relevant ESI in this matter. [Dkt. 121, at 10:8-18].

[12] UMC again stated that such reports could not be readily accessed or produced in an easily usable

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

4

### 3.    The Second Discovery Status Conference On September 24, 2013: Initial Agreement On Production Timeline

At the September 24, 2013 status conference, the Court ordered UMC to produce ESI for the five custodians' data responsive to the ten search terms within two weeks. [Dkt. 128]. UMC produced the results October 9, 2013.  [Dkt. 142].

### 4.    The Third Discovery Status Conference On November 12, 2013: Requests Concerning Kronos And Mobile Phone Text Message Data

At the November 12 status conference, Plaintiffs repeated their requests for Kronos data in spreadsheet form, including Kronos spreadsheets related to the DOL investigation.  [Dkt. 137, at 4].  Plaintiffs also repeated their request for mobile phone data. *Id.*  LBBS represented to the Court that UMC had produced text message data in its "control and possession." [Dkt. 138]. The Court then ordered the parties to meet and confer, with technical staff present to assist in confirming compliance with the ESI Protocol.  [Dkt. 138].

UMC subsequently engaged a new ESI vendor, Joseph Edmondson ("Edmondson"), for the follow-up production, and the parties held a phone conference on November 20, 2013 including both sides' ESI consultants. [Dkt. 141, at 5].

### 5.    The Fourth Discovery Status Conference On November 26, 2013: Further Discussion Regarding Kronos And Mobile Phone Data

At November 26, 2013 status conference Magistrate Judge Leen expressed concerns and reminded counsel of the critical importance of dialogue and cooperation between counsel and ESI vendors to prevent future problems.  [Dkt. 141, at 11-14].  In a January 17, 2014 Joint Report to the Court, UMC represented that it would produce text message data of the five identified custodians  by the end of January 2014. [Dkt. 143].

---

format.  [Dkt. 121, at 5]. These statements were later contradicted by testimony of UMC employee Jackie Panzeri. Ex.5 (5/6/14 transcript), at 22:10-23; s*ee* Section III.C.2., *infra*.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

5

6.     **The Fifth Discovery Status Conference On January 21, 2014**: UMC Ordered To Preserve Text Message Data, Discussion Of Sanctions

At the January 21, 2014 status conference, Magistrate Judge Leen ordered UMC to "turn over the prepared Kronos data[,]" and produce all responsive text message data by January 31, 2014. [Dkt. 143].  Plaintiffs moved to appoint a Special Master, and Magistrate Judge Leen stated that she would appoint a Special Master at UMC's expense if problems continued:

> if this continues to be a problem, and I will feel it appropriate to use the full panoply of Rule 37 sanctions that I have at my disposal up to and including case dispositive sanctions against UMC if we can't get this case ready for trial and discovery of routine information and ESI produced to Plaintiffs' counsel.

> Because I have worked with you folks [UMC]; I've tried to be patient with you folks [UMC]; I have listened to problem after problem after problem. If you [UMC] spent $100,000 on consultants, maybe you don't have the correct consultants to be able to produce ESI according to a protocol that you [UMC] proposed.

[Dkt. 144, at 19:20-22:2].

7.     **The Sixth Discovery Status Conference On February 11, 2014**: Errors In UMC's Production, Discussion Of Special Master Appointment

At the February 11, 2014 status conference, Magistrate Judge Leen expressed her concern regarding UMC's production of gibberish email documents "[c]omplete with Japanese and Korean characters and the embedded data."  Magistrate Judge Leen further added these examples were "outrageous." [Dkt. 147].[13]

---

[13] Although UMC asserted its production met the requirements of the ESI Protocol, Magistrate Judge Leen flatly rejected UMC's claims, noting that UMC produced ESI "[c]omplete with Japanese and Korean characters and the embedded data that makes nonsense out of a simple e-mail. The examples that have been attached to Mr. Pixley's declaration are outrageous."  [Dkt. 147, at 15:16-19 (emphasis added); 18:15-16 (characterizing "UMC's production as "pages and pages of codes and gibberish") (emphasis added)]. The source for the gibberish and Asian characters in the third production, and likely in the other two productions, was determined to be the software tool UMC's ESI vendor, Joseph Edmondson, used. *See* Section III.B.3, *infra*.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

6

Because of UMC's repeated production failures, Magistrate Judge Leen ordered the appointment of a Special Master at UMC's expense stating:

> On balance, I've carefully read the status report and your respective positions and the declarations or affidavits of your respective experts and I am not at all satisfied that plaintiffs have received what they're entitled to receive by virtue of the ESI protocol and the orders that have been entered in this case.

[Dkt. 147, at 20:21-21:1].

The Court ultimately selected Daniel B. Garrie to be Special Master in this litigation on March 3, 2014.  [Dkt. 149].[14]

### 8.  The Seventh Discovery Status Conference on March 10, 2014: Special Master and ESI Vendors Attend, Sanctions Discussed.

At the March 10, 2014 status conference between the parties, their respective ESI vendors, Magistrate Judge Leen, and Special Master Daniel B. Garrie it was determined, based on statements by various UMC IT executives at the hearing, that UMC potentially had serious ESI issues relating to identification, preservation, collection, search, and production. UMC was ordered to "provide a data-map of the ESI involved in this litigation for in-camera review on or before the 23rd day of March, 2014. If no data-map exists, then…UMC [was to] to explain why no ESI data-map exist[ed] and how Counsel for UMC educated themselves about UMC's information and record keeping systems."15  [Dkt. 154, at 2].

Magistrate Judge Leen ordered that "UMC shall take all steps necessary to preserve ESI potentially relevant to the parties' claims and defenses in this matter in full compliance with the

---

[14] Two days following Special Master Garrie's appointment, Plaintiffs moved for discovery sanctions, seeking monetary sanctions in the amount of $36,210.83 for expert fees incurred by Plaintiffs.  [Dkt. 150].  That motion is fully briefed. [Dkts. 150, 155, and 157]. This Report, however, does not directly address motions *sub judice* before Magistrate Judge Leen.

[15] Despite Special Master Garrie repeatedly requesting a data map from UMC (*see* Ex.7 (4/10/14 transcript), at 36:14-17; 40:17-21), UMC failed to provide such a document. Special Master Garrie was forced to create his own data map of UMC's systems from scratch, by synthesizing testimony from IT personnel and other employees.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

7

litigation hold/preservation letters sent by Plaintiffs' counsel shortly after this lawsuit was filed," and that "[f]ailure to comply will result in sanctions, up to and including a recommendation . . . [for] dispositive sanctions." [Dkt. 151]. Finally, in her minute order, Magistrate Judge Leen set forth the scope of Special Master Garrie's powers and duties in these proceedings. [Dkt. 152].

### D.    Scope Of Special Master Report

Under the appointment order, Special Master Garrie was ordered to "undertake an investigation that is limited to the custodians identified by the parties in prior proceedings." [Dkt. 152, at 2].  The Court's order required Special Master Garrie to provide a report analyzing and presenting: (1) "the scope of the collection and the processes used to perform the collection;" (2) "specific findings of fact" about "destruction, deleting or overwriting"  of ESI and possible recovery of deleted or lost ESI; (3) adequacy of preservation, including document retention policies and procedures; (4) UMC's role in any failure to preserve and maintain relevant evidence; and (5) whether the current preservation efforts comply with UMC's on-going obligations.  *Id.* at 3.[16]

This Report follows under that order, and the Special Master's powers as provided in Rule 53 of the Federal Rules of Civil Procedure.[17]

---

[16] Special Master Garrie has taken efforts to ensure privileged or confidential information uncovered in these extensive proceedings are not entered into the trial record as exhibits to this report.

[17] That Rule states in relevant part that a Special Master may "perform duties consented to by the parties;" "hold trial proceedings and make or recommend findings of fact on issues" where the appointment is due to some "exceptional" condition.  *See also,* Scheindlin and Redgrave, *Special Masters And E-Discovery: The Intersection of Two Recent Revisions to the Federal Rules of Civil Procedure*, 30 CARDOZO L. REV. 347, 352 (2008) (noting "The revised Rule 53 is far more flexible than the original rule"); Scheindlin and Redgrave, *Revisions in Federal Rule 53 Provide New Options for Using Special Masters in Litigation*, 76 J. N.Y. STATE BAR ASSOC. 18 (Jan. 2004).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

8

## III.   FINDINGS OF FACT

Electronic discovery is no longer a nascent topic, and the basic structure of proper electronic discovery long ago matured into a standard workflow model. Consistent with that model, the July 2014 Sedona Conference Glossary E-Discovery & Digital Information Management (4th ed.) defines electronic discovery as "[t]he process of identifying, locating, preserving, collecting, preparing, reviewing, and producing Electronically Stored Information (ESI) in the context of the legal process." [18]

As detailed herein, Special Master Garrie finds that UMC failed to properly identify relevant repositories, failed to preserve relevant repositories, failed to properly collect relevant ESI, failed to appropriately search for relevant ESI, and failed to properly produce relevant ESI.[19] Special Master Garrie further finds that, throughout these proceedings, UMC's executives made statements ranging from misrepresentations to deliberate falsehoods, despite being given multiple opportunities to correct these statements. *See* Section III.D, *infra*. This pervasive misconduct by UMC delayed these proceedings and substantially increased its costs.[20]

### A.   UMC's Preservation Efforts Were Insufficient

In hearing testimony and declarations, UMC witnesses admitted they failed to take appropriate steps to identify ESI sources.[21] UMC's failure to identify ESI sources in a reasonable

---

[18] *The Sedona Conference® Glossary: E-Discovery & Digital Information Management* 15 (2d ed.)*, available at* http://www.thesedonaconference.org/publications_html?grp=wgs110.

[19] Some of these problems were exacerbated by UMC retaining less than effective counsel and electronic discovery consultants who had to be replaced midstream.

[20] While some problems have been remedied due to Special Master Garrie's involvement and cooperation of counsel, these serial misrepresentations likely resulted in loss of relevant information.

[21] *See, e.g.*, Ex.2 (4/4/14 transcript), at 26 (failing to identify the BlackBerry server as a potential source of responsive ESI); *id.* at 86-87 (failing to identify personal devices as a potential source of responsive ESI); *id.* at 115-119 (failing to identify custodian laptops as a potential source of responsive ESI); Ex.3 (4/7/14 transcript), at 116:2-10 (failing to identify UMC network file share as a potential source of responsive ESI); Ex.17 (8/1/14 Schaibley declaration), at ¶4 (failing to include key custodian James Mumford in the initial custodian group).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

9

and truthful fashion in these proceedings (1) substantially increased the time and cost of the proceedings, and (2) resulted in the loss of responsive ESI.

1. **UMC's Preservation Efforts Were Insufficient:** **Preservation Chronology**

The partial chronology below highlights UMC's serial failures to preserve ESI and concomitant loss of responsive ESI.

- <u>July 27, 2012</u>: Plaintiffs filed their initial complaint in this action. [Dkt. 1].

- <u>August 6, 2012</u>: Plaintiffs drafted a preservation notice and sent it by certified mail to Brian Brannman ("Brannman"), UMC's then CEO.[22] Ex.20 (Brannman declaration), at ¶5.

- <u>August 7, 2012</u>: Plaintiffs served UMC with their first complaint in this action.

- <u>August 2012</u>: UMC retained MPP as outside counsel. *See* Ex.21 (8/6/14 Witty email).

- <u>August 20, 2012</u>: Patricia Kennedy, a legal specialist in UMC's Risk Management Department, sent Plaintiffs' preservation notice to Doug Spring ("Spring"), UMC's Director of Human Resources and Personnel Operations.  Ex.22 (8/6/14 Edmondson declaration), at ¶25.  Spring took no further action.

- <u>September 10, 2012</u>: UMC had not issued any preservation notice, but filed a motion to dismiss the complaint. [Dkt. 23].  The Court denied this motion on November 14, 2012. [Dkt. 33].

- <u>November 7, 2012</u>: NicholasWieczorek at MPP ("Counsel Wieczorek") received a preservation letter and forwarded it by email to Spring and John Espinoza ("Espinoza"), the Chief Human Resource Officer at UMC, the same day. Ex.23 (Wieczorek declaration), at ¶5.

- <u>November 14, 2012</u>:  Counsel Wieczorek met with Spring and Espinoza and Espinoza "confirmed the obligation to preserve and maintain documents related to this litigation with the Human Resources staff that [he] supervise[s] in-person." Ex.24 (4/30/14 Espinoza declaration), at ¶ 5; Ex.23 (Wieczorek declaration), at ¶6.

- <u>November 14, 2012</u>: Plaintiffs sent a second preservation notice to Brannman at UMC.

- <u>November 2012</u>: Espinoza first received a preservation notice letter from UMC's Risk Management Department.  Ex.24 (4/30/14 Espinoza declaration), at ¶4.

---

[22] Brannman later denied receipt of the letter, but this assertion was shown to be incorrect. *See* Section III.A.4, *infra*.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

10

- <u>February-March, 2013</u>:  UMC made its initial productions of documents, but did not produce ESI.

- <u>April 5, 2013</u>:  MPP contacted UMC's Chief Information Officer, Ernie McKinley ("McKinley"), who contacted UMC's Network Security Administrator, Dean Schaibley ("Schaibley"), to assist MPP's ESI vendor in the collection effort. Ex.25 (6/13/14 Espinoza declaration), at ¶9. However, "UMC's ESI review shows no record that McKinley or Schaibley received the preservation notice letter from Plaintiffs' Counsel or [Espinoza's] office." *Id*. at ¶10.

- <u>April 8, 2013</u>: Plaintiffs deposed Espinoza. Espinoza claimed he could "find no record of receipt of [Plaintiffs' preservation] letter at UMC prior to [his] deposition." *See* Ex.24 (4/30/14 Espinoza declaration), at ¶6. Spring also claimed that "the first time [he] knew about preservation of documents was after that deposition." Ex.5 (5/6/14 transcript), at 70:1-7.  Shortly following the deposition, Brannman "was approached by Mr. Espinoza…about sending notice to supervisors and director-level management within UMC to preserve information."  Ex.20 (Brannman declaration), at ¶ 14.

- <u>April 15, 2013</u>:  Spring drafted a preservation e-mail distributed to UMC employees by Brannman. *See* Ex.20 (Brannman declaration, Ex. A); Ex.5 (5/6/14 hearing), at 113:21-114:15. Cindy Dwyer ("Dwyer"), executive assistant to Brannman, then sent the email to the UMC Patient Services Leaders distribution group, instructing those individuals to preserve documents. Ex.20 (Brannman declaration), at ¶ 15.

- <u>April 24, 2013</u>: UMC notified Counsel Wieczorek that they were replacing MPP with LBBS as counsel and MPP ceased all litigation activities. Ex.23 (Weiczorek declaration), at ¶10.

- <u>May 2, 2013</u>: UMC substituted LBBS as counsel.  [Dkt. 90].

- <u>January 21, 2014</u>: UMC's IT Customer Services Manager responsible for managing UMC mobile phones, Marilyn Sue Kisner ("Kisner"), first "learned of the need to preserve cell phone data for certain custodians' BlackBerries" through an email forwarded to her by Lonnie Richardson, UMC's Director of IT. Ex.26 (Kisner declaration), at ¶6.[23]

- <u>Late March 2014</u>: Jason Clark, a System Administrator at UMC, was instructed to begin preserving the BlackBerry server. Ex.3 (4/7/14 transcript), at 36:1-7.

- <u>Late April 2014</u>: UMC's Payroll Manager, Jackie Panzeri ("Panzeri"), first received a preservation notice from Spring.  Ex.5 (5/6/14 transcript), at 6:1-12); *see also*, Ex.27 (Panzeri declaration).

The partial chronology demonstrates that UMC did not issue or put any litigation hold in place until *after* Plaintiffs had deposed a UMC witness, which was more than 250 days after

---

[23] This was just one day prior to UMC's ESI Vendor coming onsite to preserve the mobile devices.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

11

Plaintiffs initiated this action.[24] In fact, these proceedings confirmed UMC has no "litigation hold" policy, and did not institute any "litigation hold" procedures in response to this lawsuit.[25] *See* Ex.9 (5/1/14 transcript), at 21:24-22:1 (Cayla Witty of LBBS ("Counsel Witty") stated: "There's no formal policy or protocol that is laid out for litigation such as this lawsuit."); *see also,* Ex.5 (5/6/14 transcript), at 119:5-10 (Spring testifying that he is not aware of any "formal policy" or "formal procedure" for preserving documents upon receipt of a litigation hold notice).[26]

> **2.** **UMC Preservation Efforts Were Insufficient**: UMC's Prior And Current Counsel Failed To Conduct Timely Custodian Interviews, Leading To The Failure To Identify Key Evidence Repositories Resulting In The Destruction Of Significant Amounts Of Responsive ESI

Special Master Garrie established early on in these proceedings that UMC and MPP did not have a grasp of what IT systems at UMC might contain responsive ESI. For this reason Special Master Garrie ordered UMC to conduct custodian interviews of high priority custodians with the intent of identifying all ESI repositories. [Dkt. 154, at 2].[27]

Later, Special Master Garrie determined  that UMC did not perform any investigation of likely ESI sources for any of the custodians, including: Espinoza, Spring, Dwyer, Brannman, Panzeri, Claudette Myers, Leah Conedy, Kristy Crowley, Regina Pfaff, Stephanie Merrill, Jerri

---

[24] Arguably, UMC's duty to preserve was triggered when the DOL investigation was initiated.

[25] UMC purported to rely on procedures set forth in county documents that, although produced in this litigation (Bates No. UMC000522-869), were never followed.

[26] Special Master Garrie noted in his April 14, 2014 order that UMC failed to preserve many sources of responsive information: the UMC Intranet (citing Ex.3 (4/7/14 transcript), at 45:10-18; 46:12-20); UMC network file shares (citing *id.*); the computers of the 27 UMC custodians (citing *id.* at 112:1-18, 127 – 129); and UMC email and messages stored on the BlackBerry server (citing *id.* at 36:3-25; 63:21-25; 64:1-10; 65:1-23; 83:6-18) (Multiple UMC IT stakeholders stated that they had not yet preserved the BlackBerry server data as of April 7, 2014, and  that UMC only gave notice to the IT individual who could effectuate preservation two weeks prior to the filing date of the April 14, 2014 order). [Dkt. 159 at 4-5].

[27] Upon ordering interviews, Special Master Garrie also provided a template custodian interview form as an exhibit to his order, to assist UMC in this matter.  [Dkt. 154].

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

12

Strasser, Pat Greaux, Daniel Small, Carolyn Small, William Curtin, David Cohen, Lanette Lawrence, Louise Collard, April    Martin, Alicia Jones, Tracy Sutter, Cynthia Jones, Amber Robinson, Tiffanie Fleming, Shaheen Ahmed, and Oscar Borbon. Ex.2 (4/4/14 transcript), at 51:1-8 ("COUNSEL WITTY: In review of prior counsel's records, there is no indication that specific custodian interviews were done. The profiles that were initially requested for preservation I believe were based upon the list that came from plaintiff's counsel, and the discussions, I believe, with regards to scope remain mainly with the prior technologist."). The parties later identified James Mumford ("Mumford"), UMC's Senior Human Resources Analyst,  as a new custodian for a total of twenty-seven custodians.

The custodian interviews LBBS later conducted at the Special Master's instruction made it clear that "UMC ESI [c]ollection was [i]ncomplete as of April 10, 2014," uncovering ESI from a variety of sources: network file shares, two laptops, the BlackBerry server, and twenty-four desktops. [Dkt. 159].[28] These network file shares, laptops and desktops were not preserved until the spring of 2014, 600 days after the filing of the complaint. Ex.28 (chain of custody forms).

        (a)      **UMC Failed To Identify And Preserve: Failure To Identify To LBBS, And Preserve, The Network File Shares "Q-Drive" Resulting In The Destruction Of Responsive ESI**

The UMC network shares contained a drive called the "Q-Drive" which stores UMC user's home folders and shared folders between individuals and departments. Apparently, no UMC personnel disclosed to MPP that UMC stored documents responsive to this litigation on the Q-Drive.

*Ernie McKinley* ("McKinley")*,* UMC's current Chief Information Officer, testified:

        SPECIAL MASTER:   Your former counsel, when you sat there and talked to them, did    you tell [MPP] that some of their custodians

---

[28] UMC conducted these interviews over a year from service of the complaint, likely making them far less effective than contemporaneous documentation; however this was better than conducting no interviews at all.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

13

| | |
|---|---|
| | used "Q-Drive," as they called it today, your former lawyers? |
| MCKINLEY: | Can I answer what – I've never spoke to our former lawyers. |

Ex.4 (4/22/14 transcript), at 158:25-159:7.

*Glen MacIntyre* ("MacIntyre"), UMC's former Director of Risk Management, testified:

| | |
|---|---|
| SPECIAL MASTER: | Had you mentioned to former counsel the existence of the Q-Drive? |
| MACINTYRE: | Not me personally, no. |

Ex.6 (6/16/14 transcript), at 132:11-13.

MacIntyre testified that "in each risk management office you have a file of active cases or potentially compensable claims." Ex.6 (6/16/14 transcript), at 146:11-13. MacIntyre went on to explain how these types of files were stored on the Q-Drive:

| | |
|---|---|
| SPECIAL MASTER: | And then [Patricia Kennedy] would scan it and stick it where? |
| MACINTYRE: | On a Q-Drive in the file. |
| SPECIAL MASTER: | Where on the Q-Drive? |
| MACINTYRE: | In risk management on the Q-Drive. |
| SPECIAL MASTER: | So it would be Q colon slash risk management slash Small versus UMC? |
| MACINTYRE: | Probably. |

Ex.6 (6/16/14 transcript), at 147:21-23.

*Panzeri* testified:

| | |
|---|---|
| TOSTRUD: | The spreadsheets that you just described, do those still exist? |
| PANZERI: | Yes. |
| TOSTRUD: | And how quickly could you get your hands on those? |
| PANZERI: | My hands on them? |
| TOSTRUD: | Sure. Could you access them? You're going back to your office today? |
| PANZERI: | Yes. |
| TOSTRUD: | How quickly could you access those spreadsheets? |
| PANZERI: | As soon as I get back to my office. They're not in any archive file. They're right where I can get at them [on Q-Drive]. |

Ex.5 (5/6/14 transcript), at 10-20.

The above testimony demonstrates that it is beyond refute that UMC failed to disclose the existence of the Q-Drive folders to counsel until the custodian interviews were conducted in the

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

14

spring of 2014. Ex.29 (custodian interviews). Indeed, testimony established that UMC did not

initially collect any ESI from any UMC network file shares. Ex.3 (4/7/14 transcript), at 116: 2-10;

*see also, id.* at 254:15-257:14 (Custodian interview of Claudette Myers stating that UMC had a

network file share folder relating to the DOL investigation that had not been produced).

> **(b)**    <u>UMC Failed To Identify And Preserve</u>**: Two Laptops Belonging To Key Custodians James Mumford And Doug Spring Were Not Identified Or Preserved Until After The Custodian Interviews In May Of 2014**

UMC failed to identify and preserve two laptops used by custodians Mumford and Spring

until May of 2014, approximately 640 days after filing of complaint. These laptops were identified

through the custodian interviews. Ex.29 (Spring and Mumford custodian interviews).[29] Special

Master Garrie later determined these two laptops contained potentially responsive ESI. *See* Section

III.B, *infra*.

> **(c)**    <u>UMC Failed To Identify And Preserve</u>**: Work Computers That Were Used By 24 Of The 27 Custodians**

At the April 14, 2014 hearing, Schaibley, UMC's Network Security Administrator testified

that while it was possible for users to save data to local drives on workstation desktops, UMC's

policy was for UMC users to save to the network file share. Ex.2 (4/4/14 transcript), at 217:2-19.

In addition, Shane Lattin ("Lattin"), a Network Engineer at UMC, stated "if it wasn't saved to the

---

[29] Spring disclosed in his interview that he had a laptop for SEIU (labor union) negotiation sessions. Ex.29 (Spring custodian interview). Although Spring indicated the laptop was not used during the relevant period for this case, counsel should at least have identified this evidence repository. Mumford disclosed in his interview that he used his personal laptop for typing notes during the 2009 SEIU labor negotiations. Ex.29 (Mumford custodian interview). Although the custodian interview is not clear as to whether the laptop was used during the relevant period, Mumford may have saved relevant ESI to the laptop and this should have been identified by counsel**.** As Special Master Garrie determined, "[Mumford] had a laptop. He didn't have a smartphone that could send emails and communicate at the time. He was working offsite using his laptop." Ex.2 (4/4/14 transcript), at 118:9-11. Special Master Garrie notes that it is troubling that these laptops were not the subject of any inquiry by counsel, nor were they independently disclosed to counsel by UMC prior to the Special Master proceedings.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

15

home drive on the file server, we wouldn't have a backup." Ex.3 (4/7/14 transcript), at 111:18-23. Based on this information, LBBS apparently did not believe it necessary to instruct UMC to preserve the ESI on these individual work computers.[30]

Later in the same hearing, Plaintiffs submitted a declaration from Daniel Small with an email attached from UMC's Director of Information Technology. The email stated that "many" UMC employees "were storing files and documents on the local C: drive" contrary to UMC policies.[31] *See* Ex.30 (Small declaration), at ¶6.

The Small declaration and the custodian interviews conducted by LBBS in April of 2014 confirmed that the aforesaid policy was not followed, meaning responsive ESI was stored on local workstations. The failure by UMC to preserve ESI on these workstations, means that UMC failed to preserve responsive ESI for more than 600 days after the filing of the Complaint. For example:

- ▪ Brannman:  Brannman stated he used the computer "daily" and largely used Office Suite applications such as Outlook, Word, and Excel.  He also stated that he saved most documents to his My Document folder on his desktop. Ex.29 (Brannman custodian interview).

- ▪ Espinoza:  Espinoza stated that he has had a desktop for several years and uses the desktop "daily."[32]  He primarily used Microsoft Word and Outlook, and his assistant Claudette Myers, maintained his electronic filing by saving documents to a shared folder on his instructions.  He saved mainly to a personal drive on the UMC network, but he did state there was likely some information on his desktop C: Drive. Ex.29 (Espinoza custodian interview).

- ▪ Mumford: Mumford stated that he has had a desktop for several years which he uses daily. Ex.29 (Mumford custodian interview).  He uses Excel, Word, and PowerPoint

---

[30] Special Master Garrie identified these 24 computers by analyzing each custodian login history. The heuristic applied to identify these machines focused on the number of logins a user made on a monthly basis on a specific computer. This heuristic was applied to the computers that were not in a custodian office. Those computers were collected if they were in use during the time period.

[31] Special Master Garrie notes for the record that this email was sent two weeks before LBBS conducted custodian interviews.

[32] Espinoza stated in his custodian interview that his assistant, Claudette Myers, maintained electronic filing, regularly accessed both Mr. Espinoza's calendar and email, archived Espinoza's e-mail and calendars, and sent email and documents on Mr. Espinoza's behalf. [Dkt. 159 at 2:16-21].

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

16

and tracks revisions by saving separate electronic copies. Although he stated he mainly saves documents to a shared drive, he acknowledged some negotiation notes would likely be saved on his Desktop or saved in his My Documents folder on his local C Drive. Ex.29 (Mumford custodian interview).

The above custodian interviews demonstrate that key custodians stored documents on their local computer. Coupled with the fact that there is no backup of the data of these computers, UMC's failure to preserve this responsive ESI likely resulted in its destruction.[33]

### (d)   UMC Failed To Identify And Preserve: Intranet Server That Includes The Policy And Procedure Server

But for Special Master Garrie's involvement, UMC would likely never have identified, preserved, or produced any documents from its Intranet. Here, Special Master Garrie ordered, [Dkt. 174], UMC to contact Ruben Ghosal ("Ghosal"), UMC's IT Programming Services Supervisor, and work with him to identify applications and ESI repositories on UMC's Intranet that might contain responsive data, including:

- At least one web-based employee complaint application;[34]
- UMC's Siemens Policy and Procedures database server; and
- Multiple departmental websites that each department could control -- add or delete job descriptions.[35]

UMC did not identify or preserve any of these ESI repositories. In fact, not a single UMC employee disclosed these systems to LBBS even though several of the "seven high priority custodians" interacted with these systems on a daily and/or weekly basis.[36]

---

[33] It should be noted that LBBS' decision to not preserve the ESI on these individual work computers was likely without fault because UMC did not disclose this information to LBBS.

[34] This Intranet application went live in January of 2011. Ex.31 (Ghosal letter).

[35] Plaintiffs requested in their first request for production from UMC the following: "ALL job descriptions, position descriptions, or similar documents, however named, purporting to list or describe some or all of duties and responsibilities of named PLAINTIFFS and SUBJECT EMPLOYEES." Ex.15 (Plaintiffs' First Set of Requests for Production), at 6.

[36] See, e.g., Ex.29 (custodian interviews); Special Master Garrie's April 14, 2014, order detailed the then-apparent failures of UMC to preserve, inter alia, data on the UMC Intranet and ordered that "on a going forward basis," the intranet servers be "preserved using industry best practices."

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

17

The UMC web-based employee complaint application was "UMC WIRE." It was deployed to the Intranet in 2011.[37] UMC WIRE is still in use and it "allows any employee to submit a complaint to UMC administration." Ex.31 (Ghosal letter). UMC failed to preserve UMC WIRE until late spring of 2014. This failure to preserve UMC WIRE coupled with the fact that UMC produced responsive information later obtained from UMC WIRE supports the conclusion that UMC's failure to preserve UMC WIRE resulted in the destruction of responsive ESI. *Id*; *see also*, Section III.E.5, *infra*.

The Siemens Policy and Procedures database server on the UMC Intranet, which contains policies as to meal breaks and compensation, was not preserved until late spring of 2014.  UMC later produced responsive data from this server. *See* Section III.E.6, *infra*. Ghosal testified at the June 4, 2014 hearing that the Siemens Policy and Procedures database server stored all of UMC policies and procedures, including those relating to break policies. Ex.11 (6/4/14 transcript), at 50. Ghosal also testified that certain individuals at UMC could access these polices and edit an existing one or upload a new one onto the server. *Id*. UMC's failure to preserve the Siemens Policy and Procedures database therefore resulted in the loss of responsive ESI.[38]

---

*See* [Dkt. 159, at 9:3-17]; Ex.29 (Claudette Myers custodian interview) (stating she "posts copies of a lot of forms to intranet"); Ex.2 (4/4/14 transcript), at 227:8-229:16 (identifying UMC Intranet as a storage repository for UMC policies and procedures and other potentially responsive documents and information); Ex.3 (4/7/14 transcript), at 205:9-10 (Special Master noting, "the intranet was never collected or provided to UMC's counsel for reviewing").

[37] UMC initially represented in these proceedings that the Intranet was not able to receive or collect information from users (i.e., whether the Intranet had write capabilities):

SPECIAL MASTER: Is it possible to store and load documents?

SCHAIBLEY: No, not for a user. We do provide on the Intranet, it's general information for our users. Our policies and procedures are accessible from this.

Ex.2 (4/4/14 transcript), at 227:12-17.

However, upon further technical investigation by Special Master Garrie, it was determined that the Intranet had write capabilities (Ex.8 (4/15/14 transcript), at 21:5-15).

[38] UMC ultimately produced responsive data from this application. *See* Section III.E.5, *infra*.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

18

It was further determined that UMC's Intranet was "departmental" in nature. This functionality allowed each department to add and delete information from its Intranet page. Ex.4 (4/22/14 transcript), at 160:12-162:24. The information that was posted to Intranet included job descriptions. *Id.*at 172:11-14.  In fact, Schaibley testified that UMC's HR Department could add or remove job descriptions as they "saw fit." *Id.*  Here too, UMC failed to preserve responsive ESI, including job descriptions on the departmental Intranet pages.[39]

In summary, UMC's failure to identify and preserve these systems on the UMC Intranet coupled with the fact that UMC produced responsive ESI from each of these systems supports the conclusion that there has been destruction of responsive ESI.  *See* Section III.E.5, *infra.*

### (e)   <u>UMC Failed To Identify And Preserve</u>: Personal Mobile Phones That Key UMC Custodians Used For Work

UMC employees initially stated in their custodial interviews that they did not use their personal mobile devices for work.[40] As a precaution, Special Master Garrie had UMC analyze the signature lines of emails to verify that UMC's custodians had not been sending work related emails from personal phones. *See* [Dkt. 159, at 9].  The results of this analysis demonstrated that some of these custodians had indeed used their personal mobile phones for work. This was confirmed with subsequent testimony by several high priority custodians that they used their personal mobile devices for work-related purposes.[41]

---

[39] *Id.*

[40] Special Master Garrie, remarked "[e]very one of the custodians were asked the explicit question do they use these devices for personal use -- for work-related use, and they disavowed it, some multiple times." Ex.2 (4/4/14 transcript), at 100:6-9. But later, Leah Conedy testified that she may have used her mobile device for work-related purposes, including texting Spring. Ex.5 (5/6/14 transcript), at 139-140. Spring also stated that he uses personal device for work, but has not provided it to counsel because his emails are forwarded to his UMC account and he had discussed with counsel the nature of the text messages sent and received on that device. *Id.* at 118-119.

[41] *See, e.g.,* Ex.4 (4/22/14 transcript), at 47:25-49:5 (Lawrence Barnard, current UMC CEO, testified that he used his personal mobile device for work-related functions, but that he had not previously informed counsel of this; Special Master Garrie instructed him to preserve data on the personal mobile device.); *id.* at 51:10-13, 51:24-53:18 (Espinoza confirmed he used his personal

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

19

As a result, Special Master Garrie ordered LBBS to inspect the personal phones of the high priority custodians for responsive communications.  Aside from Brannman, who was no longer with UMC, LBBS determined (and Special Master Garrie verified) that there was no responsive ESI currently exiting on these devices.[42] Ex.13 (7/3/14 transcript), at 95.  UMC's failure to identify, preserve, collect, or search these personal mobile devices prior to these hearings *likely* resulted in the destruction of responsive ESI. *See* Section III.E, *infra*.

### (f) <u>UMC Failed To Identify And Preserve</u>: ESI On The BlackBerry Server And UMC Mobile Devices

Ms. Kisner stated that she first learned of the need to preserve data from the BlackBerry devices of Espinoza, Brannman, and Mumford on January 21, 2014. Ex.26 (Kisner declaration), at ¶6; *see also,* Ex.5 (5/6/14 transcript), at 187:1-12.

With respect to any preservation directives given to UMC or LBBS, Kisner testified:

> SPECIAL MASTER:   So nobody instructed you at that time [when she was instructed to collect mobile data on January 21, 2014] to preserve all the data?
>
> KISNER:   No. But I don't believe we wiped them from that day forward.

device, an iPhone, to conduct UMC-related work, but insisted that it was just to make phone calls, denying that he ever used text or email functions. The Special Master informed Espinoza and LBBS that, based on his review of Espinoza's personal device, it appeared that he did at least receive UMC emails to his iPhone); Ex.5 (5/6/14 transcript), at 120:19-122:13 (Spring stated that he uses an iPhone for UMC-related texting in his custodian interview, although it appears that device never had been collected or searched.); Ex.8 (4/15/14 transcript), at 9:20-22 (Kisner and McKinley testified to Spring's use of a personal mobile device (an iPhone) in lieu of an UMC-issued BlackBerry); *see also* Ex.5 (5/6/14 transcript), at 163:20-164:10 (Kisner confirmed that Spring has used a personal phone and has had no UMC-issued device for "at least the last two or three years."); Ex.8 (4/15/14 transcript), 10:2-12:17 (further confirming use of personal mobile devices by at least some of the seven high priority custodians; Special Master orders counsel for UMC to provide more information as to the use of personal mobile devices by UMC personnel); *id*. at 25:15-19 (Special Master orders the preservation of all personal mobile devices for the seven high priority custodians). This all occurred prior to UMC instituting its bring your own device ("BYOD") policy in 2014.

[42] UMC's failure to answer truthfully to LBBS in the custodial interviews regarding their use of personal mobile devices makes finding fault with LBBS for not inquiring a moot point.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

20

SPECIAL MASTER:  I got it. I'm just inquiring.
KISNER:  Have they all been wiped?  Yes.  Because we moved them.
GODINO:  Were you aware of any efforts by anyone toward the end of 2013 to preserve or collect this type of cell phone data?
KISNER:  No.
GODINO:  No one ever asked you?
KISNER:  No one ever said anything.

Ex.5 (5/6/14 transcript), at 184:16-185:5 (emphasis added).

Similarly, Williams represented as having responsibility for UMC's BlackBerry server, stated that he was not instructed to preserve text message information until "the end of March 2014."  Ex.32 (6/25/14 Williams declaration), at ¶3.  Williams further stated:

Toward the end of March 2014, I was instructed by IT management, Ernie McKinley, the Chief Information Officer, with Susie Kisner present, to review Blackberry Enterprise Server settings and begin retaining SMS messages sent by certain UMC employees. This was the first I heard of data preservation for this lawsuit although I did not immediately know the reason for the change at that time of the request. We later found out later that day why the change was requested.   The preservation efforts were later expanded to workstations and other data repositories by mid-April 2014.

Ex.32 (6/25/14 Williams declaration), at ¶3.

While UMC failed to identify this repository to LBBS,[43] the failure to identify the BlackBerry server likely did not result in the loss of ESI. *See* Section III.E.2, *infra.* This is because UMC's configuration of the BlackBerry server is such that "all calendar and email entries from UMC-issued BlackBerry devices would be captured on the Microsoft Exchange server." Ex.26 (Kisner declaration), at ¶5. However, it is possible that, for the time period in question, the BlackBerry server had a different configuration that did not capture calendar and email entries, meaning responsive ESI could have been lost.[44]

---

[43] [Dkt. 159 at 3].

[44] It is possible through forensic analysis to establish how the BlackBerry server was configured during this time period. This analysis has not been undertaken, and the mere possibility of a different configuration acknowledged herein was not considered in reaching the recommendation set forth in this Report.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

21

### 3. __UMC's Preservation Efforts Were Insufficient__: UMC Failed To Institute A Timely And Effective Litigation Hold

Although, in June 2013, UMC claimed to have a "comprehensive document retention policy," [Dkt. 104], LBBS later admitted: "There's no formal policy or protocol that is laid out for litigation such as this lawsuit." *See* Ex.9 (5/1/14 transcript), at 21:24-22:1; *see also,* Ex.6 (6/16/14 transcript), at 151-152 (MacIntyre testifying that there were no preservation policies at UMC while he at UMC regarding class action litigations.). Moreover, Spring, the individual identified by UMC as being responsible for preservation for this litigation, testified that he was not aware of any "formal policy" or "formal procedure" for preserving documents. Ex.5 (5/6/14 transcript), at 119:5-10. [45]   UMC admitted it did not issue any timely litigation hold here until over 250 days after service of the complaint, asserting that it never received Plaintiffs' litigation hold notice.[46]

The record shows that UMC did receive a litigation hold letter, not issued internally but from Plaintiffs, in August 2012 and again in November 2012. More fundamentally, the declarations and testimony by multiple UMC custodians in multiple hearings show that UMC

---

[45] MacIntyre stated that Spring was in charge of labor dispute document preservation. Ex.6 (6/16/14 transcript), at 125:4-10. But Spring stated that he thought the attorneys were responsible for instructing Schaibley to begin collecting even though he had said he was the "primary point of contact" (Ex.5 (5/6/14 transcript), at 68:7-8) with MPP:

SPECIAL MASTER: Did you have any interaction with Mr. Schaibley in this process of collecting?
SPRING: No.
SPECIAL MASTER: Who within UMC, to the best of your knowledge, was responsible for this?
SPRING: For the preservation of electronic data?
SPECIAL MASTER: For instructing Mr. Schaibley to do the collection.
SPRING: My assumption would be our attorneys did that.

Ex.5 (5/6/14 transcript), at 119:14-25.

[46] UMC's Director of Risk Management, Shaunda Phillips ("Phillips"), submitted a declaration and explicitly testified that UMC did not follow its preservation policy here because "in the records with Risk Management for the Small litigation [she] could not locate any document preservation letter." Ex.33 (Phillips declaration), at ¶6; *see also,* Ex.11 (6/4/14 transcript), at 148-149 (Phillips stating, "What I was told is that there was no receipt of a letter. And based on that, the protocol would not have been followed.").

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

22

failed to grasp that they had a duty to issue a preservation notice and preserve evidence *irrespective of receiving a letter from Plaintiffs once they were in receipt of the complaint in August of 2012.* Finally, the record further demonstrates UMC failed to comply with its duty to verify preservation was on-going, or for that matter taking place, even after it was subject to a duty to preserve. [47]

**4.  UMC Preservation Efforts Were Insufficient: Who's On First? – UMC's Executives Failed To Take Responsibility For Preservation And Failed To Notify The Appropriate IT Stakeholders To Prevent The Loss Of Relevant ESI**

Not a single UMC executive took any of the steps necessary to ensure the preservation of evidence. No UMC executive took responsibility for instituting or enforcing a "litigation hold," or otherwise acting to ensure the preservation of documents in this case.

**(a)  Brannman (CEO From July 2011 To January 2014) Received At Least Two Plaintiff Preservation Notice Letters**

In a May 23, 2014 sworn declaration, Brannman stated he did not get an instruction to notify employees about preservation until Espinoza contacted him in April 2013. Ex.20 (Brannman declaration), at ¶14.  Brannman stated he was not involved in any preservation efforts. *Id.* at ¶9. [48] Nonetheless, it is evident that someone at Brannman's office received Plaintiffs' preservation letter. In this regard, after searching UMC emails at Special Master Garrie's request, Edmondson, UMC's ESI vendor, found an August 20, 2012 "email sent from Patricia Kennedy to Doug Spring with three pdf attachments. One of those attachments is the August 6, 2012 preservation notice

---

[47] Phillips and MacIntyre both stated that they believed Spring would be in charge of ensuring preservation. Ex.33 (Phillips declaration), at ¶8; Ex.6 (6/16/14 transcript), at 125:8-10.  However, Spring stated that he had received no preservation notice until Espinoza's deposition in 2013. Ex.5 (5/6/14 transcript), at 70:5-7.  Additionally, Counsel Witty stated, "Prior counsel represented they have turned over their entire file to current counsel, and that within that file there is no indication for preservation notice sent to UMC." Ex.5 (5/6/14 transcript), at 65:17-20.

[48] These proceedings have shown that UMC received two preservation letters from Plaintiffs addressed to Brannman in August and November of 2012.  Accordingly, it is at best unclear how Brannman could have been unaware of UMC's preservation obligations until the first deposition taken in this matter almost a year later.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

23

letter from Plaintiff's counsel to Brannman. Ex.22 (8/6/14 Edmondson declaration), at ¶25.[49]  It is therefore apparent that before April 2013, Brannman took no preservation action after receiving notice.

      **(b)**     **Lawrence Barnard (CEO From February 2014 To Present) Learned Of Preservation Obligation In Passing In The Hallways**

UMC CEO Lawrence Barnard ("Barnard")[50] stated that if he received any notice it "would have been in a hallway in passing, someone saying, 'We need to preserve based on this case,' and [him] saying, 'Okay, preserve what we need to preserve.'"  Ex.4 (4/22/14 transcript), at 31:1-4. The nonchalant attitude to preservation evidenced in this testimony is reflective of UMC's widespread failure to take its duty to preserve seriously.

      **(c)**     **McKinley (UMC's Chief Information Officer) Received No Preservation Notice But Was Involved In Connecting Initial ESI Vendor With Schaibley To Perform "Initial" Collection**

McKinley did not receive any notice to preserve and was not involved in ensuring that preservation was occurring until the Special Master Proceedings. Ex.4 (4/22/14 transcript), at 158-159 ("The first official notice I got of a preservation order…was the order I got from [Special Master Garrie] after our first meeting."). In fact, McKinley testified that he never spoke to UMC's counsel in this matter until the late spring of 2013. Ex.4 (4/22/14 transcript), at 157:16-17. This is particularly troubling because it was a member of McKinley's staff, Schaibley, who undertook UMC's collection efforts.  *See* Ex.17 (8/1/14 Schaibley declaration), at ¶4.[51] McKinley's only apparent involvement was in connecting UMC's initial ESI vendor (Mare) to Schaibley.

---

[49] Special Master Garrie was unable to determine how a letter addressed to Brannman was purportedly never seen by him, but was still directed to the Risk Management department.
[50] Barnard was COO from August 2012 to January 2014. Ex.4 (4/22/14 transcript), at 6:8-10;27:5-6.
[51] It should be noted that McKinley was a recipient of Spring's after-the-fact email instructing employees to preserve. Ex.9 (5/1/14 transcript), at 45:10-15. Here, UMC failed to comply with the key factor that permits a company to self-collect, namely, that the company undertake the preservation obligation in a reasonable, good-faith, well thought-out manner, in consideration of

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

24

> **(d)** **MacIntyre (Director Of Risk Management) The Individual Responsible For Effectuating Litigation Holds For Some Types Of UMC Litigation Was Not Involved in UMC's Preservation Efforts**

MacIntyre, UMC's then Director of Risk Management and a key custodian in this matter, testified that he was unsure whether anyone in UMC's IT department was contacted to assist in any initial preservation efforts for this action:[52]

| | |
|---|---|
| SPECIAL MASTER: | And to the best of your knowledge, was anybody in IT contacted to assist in that effort? |
| MACINTYRE: | I do not know. I mean initially. I don't know. Down the road, yes, there were. |
| SPECIAL MASTER: | At what time – can you shed some light, subject to the -- |
| MACINTYRE: | I don't recall the exact dates. |
| SPECIAL MASTER: | The dates aren't as important as to the best of your recollection, whatever you can remember. |
| MACINTYRE: | By that time, the defense attorney was already doing electronic discovery. I don't remember, you know, the days or what time that occurred. |

Ex.6 (5/6/14 transcript), at 129:10-130:1.

Notably, it was the Risk Management Department that initially forwarded Plaintiffs' preservation notice to Spring. Therefore, MacIntyre's failure to be aware of, or involved in, UMC's basic preservation obligations is inexplicable.

> **(e)** **Doug Spring (Director Of Human Resources) Was Not Involved In UMC's Preservation Efforts**

Spring testified he "did not even know there was such a thing" as a preservation notice issued in this matter in 2012. Ex.5 (5/6/14 transcript), at 78:23. This testimony is particularly perplexing given that he received multiple preservation notices, both from LBBS and from

---

the facts of the litigation at issue. That simply did not occur. *See* Section III.A, *supra* (discussing the litany of UMC preservation failures).

[52] "MACINTYRE: I was responsible for claims management, directing claims on all of the med mal cases, personal injury cases and property cases….The employment cases were the responsibility of the HR department." Ex.6 (6/16/14 transcript), at 122:1-3;122:23-24. Doug Spring is the director of HR.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

25

Plaintiffs, had met with outside counsel, and was identified by a number of witnesses as the individual responsible for preservation. *See* Section III.A.2, *supra*.  Regardless, even after drafting a preservation notice in April of 2013, Spring apparently did not take any further steps to ensure preservation.

Indeed, Special Master Garrie determined Spring had no relevant, substantive  interaction with UMC's IT department:

| | |
|---|---|
| SPECIAL MASTER: | So there was no formal request to Mr. Schaibley to do a collection? There was no interaction with IT department to go and gather documents? |
| SPRING: | From me, no. |
| SPECIAL MASTER: | One concern I have, to be very frank, is that you gathered information from UMC. It was provided to prior counsel to review, right? |
| SPRING: | Right. |
| SPECIAL MASTER: | We're not exactly sure of the sources that you collected the information from today. |
| SPRING: | Okay. |

Ex.5 (5/6/14 transcript), at 110:20-111:8; *see also, id.* at 119:14-25 (Spring again confirming he had no interaction with Schaibley in the collection of any responsive data).

> **(f)    Kisner (IT Manager Tasked With Blackberry Preservation) Received Preservation Instruction Over 500 Days After Initial Complaint Was Served**

UMC represented to the Court that it would produce text messages on January 17, 2013. *See* Section II.C.6, *supra*. Yet, UMC's counsel and executives failed to instruct Kisner  to preserve evidence until January 21, 2014. Ex.3 (4/7/14 transcript), at 84:2-8. This delay in instruction caused the wiping of a substantial number of text messages prior to UMC's text message production. *See* Section III.E.2, *infra.*

> **(g)    Carmelito Mendoza Shane Lattin, Dave Williams, Ruben Ghosal, And Several Other Critical IT Individuals Did Not**

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

26

**Receive Litigation Hold Notices Until The Special Master Hearings[53]**

Carmelito Mendoza ("Mendoza") is a UMC database analyst who has worked at UMC for five years. Ex.11 (6/4/14 transcript), at 8:19-22.[54] Through hearing testimony, Special Master Garrie established that Mendoza had not received a preservation notice as of his hearing testimony in June of this year. Ex.6 (6/16/14 transcript), at 18:9-16.

David William ("Williams") is a UMC System Administrator. Williams learned of the lawsuit via an email from Human Resources in July of 2013, approximately 400 days after the filing of the complaint. Ex.32 (6/25/14 Williams declaration), at ¶2. At that time, Williams was not contacted or notified to preserve any information to the lawsuit by LBBS or any UMC executive. *Id*. It was in March of 2014 that Williams was requested by McKinley to preserve data for this litigation, approximately 500 days after the filing of the suit. Ex.32 (6/25/14 Williams declaration), at ¶2. Williams further testified that he received no instruction to preserve the timekeeping system data for Clarity, CrimeStar, GRASP, and TeleTracking timekeeping systems until the summer of 2014. Ex.14 (8/4/14 transcript), at 110--118.

Shane Lattin ("Lattin") is a UMC Network Engineer. Lattin learned of the litigation and received a preservation notice in the spring of 2014. Lattin was responsible for creating back-ups

---

[53] By UMC's own admission, however, they have no one on staff with sufficient expertise to preserve and collect the data from these systems:

> SPECIAL MASTER: It is clearly obvious to me that UMC, while Mr. Williams and Mr. Mendoza and Ms. Kisner may mean well, do not have, I believe,… the ability to run reports for some of the systems, extract data, or get the data. UMC is going to need to retain third-party expertise immediately to get this data out for each one of these systems.

Ex.14 (8/4/14 transcript), at 200:17-201:2.

[54] Initially, Mendoza was identified as the only individual at UMC with specialized knowledge of key timekeeping systems. *See* Ex.34 (7/10/14 Witty email). As it turns out, the expertise he has related only to the databases and not the applications themselves. Ex.14 (8/4/14 transcript), at 114-115. The individual with expertise pertaining to these four timekeeping systems is apparently David Williams. Ex.14 (8/4/14 transcript), at 115. UMC's failure to provide Mendoza with a timely preservation instruction is inexplicable.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

of "Clarity, TeleTracking, CrimeStar, and GRASP database." Ex.35 (8/1/14 Lattin declaration), at ¶2. At the August 4, 2014 hearing, Lattin testified that he did not receive instructions to preserve and collect the data in these timekeeping systems until late June of 2014. Ex.14 (8/4/14 transcript), at 126-132.

Ruben Ghosal ("Ghosal") is a UMC IT Programming Supervisor. Ghosal learned of the litigation in 2014 and he testified that that he never received a litigation hold letter or notice, as of June 4, 2014. Ex.11 (6/4/14 transcript), at 61:22-62:2. Ghosal is responsible for the Intranet applications, which were determined to have several systems that contained potentially responsive ESI. *See* Section III.A.2.d., *supra*.

In summary: (i) UMC did not have any protocol or process and did not follow any protocol or process, in regards to preserving responsive information; (ii) failed to have any executive "own" the responsibility of ensuring compliance with UMC's discovery obligations; (iii) failed to inform or provide notice to several key UMC IT system owners; and (iv) never followed up to see if preservation occurred or whether any of the aforesaid individuals had been properly informed of their preservation obligations. These multiple failures resulted in the destruction of responsive ESI.

**B.     UMC's Collection And Production Was Riddled With Problems**

Special Master Garrie identified multiple problems with UMC's collection and production. Among other things UMC failed to collect:

- Data on the UMC Intranet. *See* Ex.3 (4/7/14 transcript), at 45:10-18; 46:12-20 (UMC states that it did not collect or preserve ESI that existed on its Intranet).
- UMC network file shares. *See* Ex.3 (4/7/14 transcript), at 45:10-18; 46:12-20 (UMC states that it did not collect or preserve ESI that existed on the network file shares).
- UMC e-mail and messages stored on the BlackBerry server. *See* Ex.3 (4/7/14 transcript), at 36:3-25; 63:21-25; 64:1-10; 65:1-23; 83:6-18 (Multiple UMC IT stakeholders state they had not yet preserved the BlackBerry server data as of April 7, 2014).
- 24 UMC computers that were used by the 27 UMC custodians. *See* Ex.3 (4/7/14 transcript), at 112:1-18, 127 - 129; Ex.30 (Small declaration), at ¶9 (including as an

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

28

exhibit an e-mail sent to all UMC employees that states many UMC employees store documents on their local computers). [55]

- Laptops of Spring and Mumford, both potential sources of relevant ESI. *See* Ex.29 (custodian interviews) (Both Mumford and Spring stated that they had personal laptops they used to conduct UMC business, including SEIU labor negotiations in 2009.).

- ESI of Claudette Myers, Executive Assistant to Espinoza.[56]

- UMC network file shares. *See* Ex.3 (4/7/14 transcript), at 116: 2-10 (Schaibley states that UMC collected none of the network file shares). This means, among other things, that UMC collected no information from the UMC payroll network file share or the human resource small litigation folder. *See* Ex.29 (custodian interviews) at 8, 13, 21, and 22 (indicating that Mumford, Brannman, and Spring all stored responsive documents in UMC network file shares).

## 1. UMC's Production And Collection Was Riddled With Problems: Collection And Production Timeline

The timeline below demonstrates how, during the course of these proceedings, UMC failed to collect evidence from a litany of sources. UMC's collection efforts were far below the *de minimis* requirements for a reasonable collection and resulted in high costs, significant delay, and loss of responsive ESI. *See* Sections III.D and III.E, *infra*.

- April 2, 2013: Jeremey Thompson ("Counsel Thompson") of MPP contacted Craig Renard ("Renard") of LDG to discuss UMC's ESI collection and to provide him with an ESI protocol.

- April 5, 2013: Counsel Thompson contacted McKinley (UMC's CIO) regarding collection of ESI at UMC with the assistance of Renard.

- April 9, 2013:   Renard notified Leon Mare ("Mare") of the UMC project, arranged for Mare to meet with Schaibley (UMC IT employee) at UMC on April 10, 2013 to collect ESI and emailed to confirm the appointment. Ex.36 (Renard declaration), at ¶5; *see also,* Ex.1 (Mare declaration).

---

[55] Special Master Garrie identified a relevant computer as one that any of the custodians "log in [to] and access more than 10 times a month…[or] is in their office and they sit down and use it." Ex.3 (4/7/14 transcript), at 127:12-16.

[56] In this regard, Espinoza stated in his custodian interview that Myers maintained electronic filing, regularly accessed both Espinoza's calendar and email, archived Mr. Espinoza's e-mail and calendars, and sent email and documents on Espinoza's behalf. *See* Ex.29 (custodian interviews), 15-17.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

29

- **April 10, 2013**: Schaibley conducted the first collection of ESI and worked with Mare to create a forensic image of the ESI, which included home profile data, local workstation data, and mailbox copies of 26 custodians: Brannman, Dwyer, Espinoza, Spring, Claudette Myers, Panzeri, Daniel Small, Carolyn Small, Louise Collard, William Curtin, David Cohen, Lanette Lawrence, Cindy Jones, Shaheen Ahmad, Oscar Borbon, Leah Conedy, Regina Pfaff, Tiffanie Fleming, Jerri Strasser, Pat Greaux, Stephanie Merrill, Christie Crowley, April Martin, Tracy Sutter, and Amber Robinson.[57]

- **April 19, 2013**: Mare handed the drive containing the data to Renard. Ex.36 (Renard declaration), at ¶7-8. No back up of the UMC ESI data collection was made. *Id.* at ¶8. However, the data collected by Schaibley was stored on UMC's IT Network Security Server. Ex.28 (chain of custody).

- **April 24, 2013**: MPP instructed Renard to cease all UMC work with regard to UMC ESI data collection and processing.[58] Ex.23 (Wieczorek declaration), at ¶7.

- **June 24, 2013**: Schaibley received word via an email chain from Spring, IT Director Lonnie Richardson, and IT Security Officer Connie Sadler of a new request to pull all email addresses for UMC users. Ex.17 (6/24/13 Spring email, Ex.C to Schaibley declaration).

- **July 15, 2013**: Margaret Foley ("Counsel Foley") of LBBS contacted Mare concerning further collection and forensic imaging of UMC data. Ex.1 (Mare declaration), at ¶4.

- **August 16, 2013**: Schaibley performed a second collection effort pursuant to Judge Leen's order. [Dkt. 119, at 17:24]. The collection included home profile data, local workstation data, and mailbox copies of five high priority custodians: Brannman, Espinoza, Spring, Mumford, and Panzeri.[59] Ex.22 (8/6/14 Edmondson declaration), at ¶16.

- **August 26, 2013**: Mare worked with Schaibley to create a forensic copy of the data Schaibley collected on August 16, 2013. Ex.17 (8/1/14 Schaibley declaration), at ¶4.

- **October 3, 2013**: Edmondson, a new ESI discovery consultant, participated in a meeting with LBBS to determine what specific processing needed to be accomplished as it had been determined that the initial LDG's report was insufficient pursuant to the ESI Protocol. Ex.22 (8/6/14 Edmondson declaration), at ¶4.

---

[57] UMC received no instruction from former counsel or its ESI vendor to document the steps taken to collect these initial repositories or instruction as to what to preserve beyond the users' email and home folders. Ex.17 (8/1/14 Schaibley declaration), at ¶4. This does not relieve Mare of the obligation to follow industry standard best practices and verify the collection.

[58] UMC apparently never approved the hiring of LDG, and McKinley never met with them. Ex.6 (6/16/14 transcript), at 130.

[59] Edmondson did not verify any of these representations with UMC IT Security, or the previous ESI Vendor, as is best practice when receiving a hard-drive.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

30

- **November 14, 2013**: Edmondson again met with LBBS and received a hard drive containing the original source data for the five identified custodians (collected in August 2013) used by Mare to create the log report.[60] At this meeting, LBBS requested that Edmondson re-create the results from the original report provided by Mare as closely as possible and provide the native files, TIFF files, OCR text and load-files in compliance with the ESI Protocol. Ex.22 (8/6/14 Edmondson declaration), at ¶5.[61]

- **November 16, 2013**: Edmondson using FTK Imager 3.1.2 mounted the forensic images that were provided on the hard drive. Edmondson then used EnCase Forensic to acquire the files and preserve them in an EnCase Evidence File (E01) Format.[62] During processing, EnCase 6.19.7.2 and 7.07.00.138 were unable to mount all of the email container files, so Edmondson used Paraben P2 Commander 2.24688.24628 to mount all of the email containers, apply date filters, perform keyword searches, and export responsive hits. Ex.22 (8/6/14 Edmondson declaration), at ¶10. Once this was completed Edmondson finished the processing in Ipro eCapture 6.2.2.  *Id.*

- **December 8, 2013**: Edmondson completed this first processing of ESI and gave the data to Counsel Witty.

- **January 3, 2014**: Plaintiff's ESI vendor, Bruce Pixley ("Pixley"), identified that the first production did not contain the extracted text from the documents because Edmondson had incorrectly configured eCapture.

- **January 14, 2014:** Edmondson completed re-producing the data in eCapture with the correct extraction option selected. Edmondson participated in a call with LBBS, Plaintiffs' Counsel and Pixley regarding another issue with the production: UMC incorrectly decoded MIME attachments and illegible email content.[63] Ex.22 (8/6/14 Edmondson declaration), at ¶11-12.

- **January 22, 2014:** Edmondson collected forensic images of three BlackBerry Devices: 1 RIM BlackBerry 9350 from Brannman, 1 RIM Blackberry 9330 Curve 3C from Mumford, and 1 RIM Blackberry 9330 Curve from Espinoza. *See* Section III.A.2.f, *supra*.

---

[60] Edmondson was informed by LBBS that this was a collection of the full data source for these five custodians and was the entire production. He was further informed by LBBS that Mare should have made a complete copy of all of the custodians' collections. Ex.22 (8/6/14 Edmondson declaration), at ¶6. The hard drive contained data in an FTK AD1 forensically sound file format totaling 29.9GB (compressed) in size. *Id.* As discussed above, neither state was accurate.

[61] *See* [Dkt. 79]. No chain of custody documentation or detailed information about the content of the hard drive was given to Edmondson at this time.

[62] The total uncompressed size of the source files on the hard drive was 57.8GB. Ex.22 (8/6/14 Edmondson declaration), at ¶7.  Edmondson searched all user-created files on the hard drive using the agreed upon search terms. [Dkt. 126].

[63] These two issues were detailed in a declaration by Pixley, filed with the Court on February 7, 2014. [Dkt. 145].

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

- **April 4, 2014:** It was determined by Special Master Garrie that the source data contained on the hard drive Edmondson received in November 2013 was substantially incomplete. Ex.22 (8/6/14 Edmondson declaration), at ¶16-17.

- **April 8, 2014:** Schaibley was ordered by Special Master Garrie to re-process all the evidence collected to date and create chain-of-custody paper work as well. Schaibley was also ordered to collect each custodian in a separate E01 file that would contain the custodian's home folder contents, workstation profile contents, contents of the custodian's Outlook mailbox, and archive PST and OST files. Ex.17 (8/1/14 Schaibley declaration), at ¶6.

- **April 9, 2014:** Schaibley provided Edmondson with the seven high priority custodians' preserved data in Lx01 format. Ex.22 (8/6/14 Edmondson declaration), at ¶19. *This was necessary because the original ESI collection from which Edmondson had performed the prior work was not complete. Id.*

- **April 15, 2014:** Schaibley provided an additional six PST files that were never captured during the initial robocopy collection. Ex.17 (8/1/14 Schaibley declaration), at ¶8. Neither of UMC's ESI vendors inspected the robocopy script that detailed the error log posts that would have made apparent that UMC failed to collect the six PST files during the robocopy collection.[64] Ex.17 (8/1/14 Schaibley declaration), at ¶7-8.

- **April 19, 2014:** Edmondson conferenced with Pixley to conduct a quality control test; to ensure that all requested meta-data was captured; and to ensure that the production format was compatible with their systems. As a result of this conference, the ESI protocol was amended. *See* [Dkt. 171].

UMC is still collecting ESI from various repositories as of the authoring of this Report, including the timekeeping systems discovered in June of 2014. *See* Section III.C.1.a, *infra*.

### 2. UMC's Production And Collection Was Riddled With Problems: Failures By UMC In Collection

Special Master Garrie finds that the collection of ESI by UMC was riddled with problems and is still not complete.

---

[64] Schaibley stated in his August 1, 2014 supplemental declaration the following regarding Mumford: "six PST files were …not copied during the robocopy collection because they were in use at the time of copy…." Ex.17 (8/1/14 Schaibley declaration), at ¶8. Mumford's PST files and all of Claudette Meyer's ESI were not preserved or collected until April, 2014. [Dkt. 159, at 2]. UMC and LBBS could have identified this failure if they had properly requested that the ESI Vendor follow e-discovery best practices.[64]

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

32

### (a) UMC Self Collected ESI In Both April And August 2013 Using Unreliable Collection Methodology Such That The Effectiveness Of These Collections Remains Undetermined

On April 18, 2013, Schaibley, completed a collection of 26 custodians' emails and personal folders.[65]  *See* Section III.B.1, *supra*. "The total data was 583,714 files; 90,974 folders; and 173 gigabytes uncompressed." Ex.17 (8/1/14 Schaibley declaration), at ¶4.[66]

After the "initial collection," UMC performed a second self-collection of Espinoza, Spring, Mumford, Brannman, and Panzeri, on August 26, 2013, pursuant to Magistrate Judge Leen's Order.[67]  Again, the emails were collected but a portion of some custodians' personal directory files were missing.  While UMC and LDG designated Schaibley as the UMC IT individual responsible for performing the collection, UMC failed to establish a documented process collection or collect in a uniform, defensible, and documented manner.[68]  Self-preservation and self-collection is permissible, a party that chooses to do so must perform these actions in a defensible process and in collaboration with counsel.  This did not happen here.[69]  UMC had no process and did not collaborate with either MPP or LBBS.

---

[65] Ex.17 (8/1/14 Schaibley declaration), at ¶4.("April 18, 2013: I met with Craig Renard, from Litigation Document Group, and Leon Mare, a forensic investigator from Expert Data Forensics, to determine what data was to be copied from my collection for the 26 individual users. All data from my Robocopy script was to be copied, which included all data from the individuals' local workstation profiles and home folders. It was also determined that the active Outlook mailboxes of these 26 custodians should be collected and copied.")

[66] *UMC failed to suspend the auto-delete functionality and thus made it impossible for UMC to perform the collection again as some of the data from the "initial collection" no longer exists. See Section III.B.1, supra.*

[67] [Dkt. 121]; The search terms were: 1. Missed meal period break!; 2. Compensate!; 3. Department of Labor OR DOL 4. Lunch!; 5. FLSA OR Fair Labor Standards Act; 6. Kronos; 7. Time report; 8. Correction Form; 9. Interrupt!; 10. Meal/lunch policy. [Dkt. 126].

[68] During the course of these proceedings the Special Master worked with UMC to develop and document a defensible collection protocol. Ex.22 (8/6/14 Edmondson declaration Ex. A. process documentation).

[69] A party cannot delete reasonably accessible relevant ESI repositories before it collects the ESI. However, once a party collects reasonably accessible relevant ESI repositories using a defensible process in collaboration with Counsel, they may delete the ESI.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

33

**(b)** **UMC Did Not Collect From Known Responsive ESI Repositories Including: Q-Drive, UMC Workstations, All ESI For Claudette Meyers, Clarity, CrimeStar, TeleTracking, And Blackberry Server Data Until April 2014 Or Later**

On or about June 2014, more than a year after UMC's initial collection, Special Master Garrie found that UMC's collection did not include numerous reasonably accessible relevant ESI repositories, including:

- Multiple network file shares (*see* Section III.A.2.a, *supra);*
- Intranet applications data, *(see* Section III.A.2.d, *supra*);
- BlackBerry server data and personal mobile devices, (*see* Section III.A.2.e, III.A.2.f, *supra*);
- Personal laptops used to perform UMC work (*see* Section III.A.2.b, *supra*);
- Data from UMC issued BlackBerry phones and multiple UMC issued computers (*see* Section III.A.2.f, *supra*);
- Multiple timekeeping systems (*see* Section III.C.1.a, *infra*).

In addition, LDG failed to properly collect the ESI for the five key custodians as ordered by the Court. *See* Ex.17 (8/1/14 Schaibley declaration), at ¶5; Ex.22 (8/6/14 Edmondson declaration), at ¶16 (stating "I verified the source data that had been provided to me in November of 2013… was incomplete…").

**(c)** **UMC Delayed Collection Without Suspending Backup, Resulting In The Loss Of Responsive ESI.**

As the chronology in Section III.B.1 demonstrates, UMC's information technology personnel failed to suspend backup or implement a litigation hold for multiple repositories: e-mail, Q-Drive, UMC work computer and devices.   This failure to suspend the backup or perform a timely collection of these repositories resulted in the loss of responsive ESI. *See* Section III.A.2.a-f. (UMC's failure to preserve ESI repositories).

The table below, provided by Edmondson, demonstrates that responsive ESI was discovered in all the repositories UMC failed to preserve and collect.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

34

| Review Package of ESI Custodian Provided to LBBS | Number of Responsive Documents Provided to Counsel for Privilege Review |
|---|---|
| John Espinoza (Original Review was performed without a Review Package) | 7850 |
| Doug Spring (Original Review was performed without a Review Package) | 26023 |
| James Mumford (Originial Review was performed without a Review Package) | 2361 |
| Cindy Dwyer Review Package | 5451 |
| Jackie Panzeri Review Package | 52571 |
| Claudette Myers Review Package | 27358 |
| Brian Brannman - Review Package | 6351 |
| Q-Current - Review Package | 417 |
| Policy and Procedure - Review Package | 18 |
| Tracy Sutter - Review Package | 678 |
| Tiffany Flemming - Review Package | 2981 |
| Shaheen Ahmad Review Package | 1005 |
| Stephanie Merrill Review Package | 6223 |
| Regina Pfaff Review Package | 5167 |
| Pat Greaux Review Package | 3 |
| Oscar Borbon Review Package | 1125 |
| Kristi Crowley Review Package | 1677 |
| Louise Collard Review Package | 21 |
| Lanette Lawrence Review Package | 121 |
| Jeri Strasser Review Package | 878 |
| Leah Conedy Review Package | 1002 |
| David Cohen Review Package | 20 |
| Daniel Small Review Package | 253 |
| Cindy Jones Review Package | 1101 |
| Bill Curtin Review Package | 56 |
| April Martin Review Package | 305 |
| Amber Robinson Review Package | 2135 |
| Alicia Jones Review Package | 469 |
| Carolyn Small Review Package | 96 |
| Amber Robinson Review Package 2 | 196 |
| Alicia Jones Review Package 2 | 191 |
| Brian Brannman - Review Package 2 | 122 |
| Cindy Dwyer Review Package 2 | 164 |
| Q-Current - Review Package 2 | 26028 |
| Q Backup Review Package | 10265 |
| Daniel Small Review Package 2 | 118 |
| Doug Spring Review Package 2 | 119 |
| Cindy Jones Review Package 2 | 93 |
| Claudette Myers Review Package  2 | 258 |
| Jackie Panzeri Review Package 2 | 231 |
| James Mumford Review Package 2 | 220 |
| Tiffany Flemming Review Package 2 | 218 |
| Tracy Sutter Review Package 2 | 226 |
| Pat Greaux Review Package 2 | 57 |
| Regina Pfaff Review Package 2 | 77 |
| Shaheen Ahmad Review Package 2 | 148 |
| Stephanie Merrill Review Package 2 | 115 |

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

35

| | |
|---|---|
| Kristi Crowley Review Package 2 | 102 |
| Lanette Lawrence Review Package 2 | 248 |
| Leah Conedy Review Package 2 | 113 |
| Oscar Borbon Review Package 2 | 320 |
| Jeri Strasser Review Package 2 | 61 |
| John Espinoza Review Package 2 | 92 |
| UMC Intranet Review Package | 5853 |
| OCR Responsive (PDF) Review Package | 18812 |
| OCR Fail (PDF) Review Package | 2550 |
| OCR Errors (TIF/JPG)- Review Package | 29008 |
| OCR Responsive (TIF/JPG)- Review Package | 39540 |
| Q-Current - Review Package 3 | 1115 |

The thousands upon thousands of responsive files provided to UMC Counsel for privilege review by Edmondson shows that UMC's failure to preserve and collect ESI in a timely manner,[70] together with its failure to suspend backup or institute a litigation hold, resulted in the destruction of responsive ESI.

**3.     UMC's Production And Collection Was Riddled With Problems: Failures By UMC's Electronic Discovery Consultant In Production And Collection**

**(a)     UMC ESI Vendor Did Not Make A Complete Copy Of The Collection Or Complete Requisite Chain-Of-Custody Paper Work**

As the chronology above sets forth, in April of 2014 LDG subcontracted Mare to create a forensic image of what Schaibley had collected. Ex.17 (8/1/14 Schaibley declaration), at ¶4; *see also,* Ex.36 (Renard declaration), at ¶¶5-7.  In April of 2014, a year later, Special Master Garrie discovered that the forensic image of Schaibley's collection was not complete. Ex.17 (8/1/14 Schaibley declaration), at ¶4.[71] Thus the ESI collection that was the subject of all the discovery conferences was based on a false premise. Had Special Master Garrie not identified this error,

---

[70] UMC failed in preserve and collect ESI from these repositories for 300 to 700 plus days depending on the repository.

[71] Renard "did not supervise the copying and was not involved in any way, except for spending ten minutes to introduce Mr. Schaibley and Mr. Mare." Ex.36 (Renard declaration), at ¶¶5-7.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

Plaintiffs would have been materially harmed because UMC results were derived from a partial image of an incomplete collection. [Dkt. 159, at 2-3].

This failure could have been avoided had forensic collection best practices been followed and chain-of-custody paperwork been completed. Indeed, LDG's performance was so sub-standard that, as UMC testified: "we refused to pay [them]". Ex.4 (4/22/14 transcript), at 104:17-106:8.[72]

As noted above in the collection timeline (*see* Section III.B.1, *supra),* Edmondson used processing and production software that created problems in production. UMC productions suffered from technical issues that prevented collection search from being completed. *See* Ex.22 (8/6/14 Edmondson declaration), at ¶14 (stating that "despite the software manufacturer's claims, the original processing software used, i.e., 'Paraben P2 Commander,' had in this case incorrectly produced the responsive email files and that re-processing in EnCase 7.09.03 was the most accurate option currently available"). It is Special Master Garrie's opinion that had Edmondson followed industry best practices, Edmondson would have been able to identify and resolve, or even prevent, most if not all of these technical issues.

All of UMC's ESI vendors have failed repeatedly to follow best practices or use appropriate forensic tools to process and produce ESI under the ESI Protocol.[73]

---

[72] The Special Master also notes for the record that, on March 18, 2014, UMC was ordered to create chain-of-custody paperwork before the April 4, 2014 hearing. [Dkt. 154, at 3]. Special Master Garrie even supplied the chain-of-custody forms and explained how to fill them out. Ex.2 (4/4/14 transcript), at 28:19-29:7. While UMC did submit a chain-of-custody, it was inadequate for its purpose. *See* Ex.2 (4/4/14 transcript), at 46-48. Specifically, the chain-of-custody failed to record several things, including (i) what sources UMC collected data from for each of the 27 custodians, (ii) how they identified the ESI, (iii) how they collected the ESI, (iv) how the ESI was preserved, (v) what criteria were used to identify the ESI that was collected. [Dkt. 154, at 3]. As a result, UMC was ordered to redo the forms, which further delayed these proceedings and increased the costs.

[73] These repeated failures to properly use tools ultimately forced Special Master Garrie to create a step by step picture book showing how to properly collect and process ESI in EnCase. Ex.22 (8/6/14 Edmondson declaration, Ex. A thereto). With this picture book and the direct involvement

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

37

- Edmondson and LDG did not complete or document the forensic collection of data obtained from UMC. *See* Section III.B.3.a, *supra*.

- Edmondson and LDG did not inform or assist UMC or MPP in identifying ESI repositories to preserve and collect. *See* Ex.3 (4/7/14 transcript), at 24.

- Edmondson failed to identify several encrypted files in production, which were not searched. *See* Ex.3 (4/7/14 transcript), at 26-29 (Edmondson states there were various encrypted files which included two DMG files for Macintosh, which UMC cannot explain since none of the custodians supposedly had or used Macintosh devices.).

- Edmondson failed to identify relevant databases even though he verified that he was complying and was told by counsel that he was to inform them of any databases. *See* Ex.14 (8/4/14 transcript), at 208:1-5 ("SPECIAL MASTER: I'm very disappointed that Mr. Edmondson failed to do what standard practice would have been, which is to search the data that's provided for databases and bring that to the attention of counsel.").[74]

- Edmondson did not follow the ESI Protocol and "OCR" pdf, tiff, and image files, leaving them unsearchable. *See* [Dkt. 165].[75]

The above problems were remedied by Special Master Garrie's efforts. *See* Section III.D, *infra*.[76]

---

of the Special Master and Plaintiff's ESI Vendor, Mr. Pixley, collection and processing was finally able to get back on track.

| | |
|---|---|
| SPECIAL MASTER: | Okay. Now, paragraph 30. Did we determine whether this was a database? Because as I read it, it is a database, based on the declaration I did receive. |
| EDMONDSON: | This is Mr. Edmondson. It's an entire C-drive. |
| SPECIAL MASTER: | But on that C-drive is the database for the policy and procedure server? |
| EDMONDSON: | There could be one, yes. I do not know what's in the database or databases that may exist on that drive. |
| SPECIAL MASTER: | Well, obviously if there's a database – |

Ex.14 (8/4/14 transcript), at 70:21-71:8.

[75] Notably, UMC does not explain how or why Edmondson deviated so significantly from the ESI Protocol: "COUNSEL TOSTRUD: No, we'd like anything that is produced to be produced in accordance with the ESI protocol. COUNSEL WITTY: Understood, as scanned OCR in PDFs." Ex.4 (4/22/14 transcript), at 217:8-12. UMC does not explain how Edmondson could possibly have gone from, on one hand, being told to OCR all PDF and TIFF files to, on the other, not doing anything with these files.

[76] However they added significant time and cost to these proceedings.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

38

### 4.   UMC's Production And Collection Was Riddled With Problems: Failures By UMC's Counsel In Production And Collection

While there is little doubt that UMC's failure to be forthright with LBBS exacerbated many collection issues, LBBS is responsible for some of the collection failures. Specifically, LBBS failed to dialogue with UMC or the electronic discovery vendors, leaving everyone in the dark about what to collect and when ESI should be collected. *See* Section III.B.1, *supra*. [77]

LBBS may be forgiven for trusting that MPP's collection efforts followed a semblance of basic protocol and practices, and for relying on their own client's representations. Yet, LBBS' decision not to verify what UMC told them, and not serially engage UMC IT stakeholders in substantive e-discovery dialogue, contributed to UMC's failures regarding identification, preservation, collection, search, and production. In summary, LBBS did not meet its affirmative duty to inform UMC it needed to put its document retention program on hold and save and collect relevant documents. [78]

### C.   UMC Made Multiple Misrepresentations In These Proceedings As To The Existence Of Relevant ESI Repositories, UMC's Ability To Produce Summary Spreadsheets Via Kronos And The Completeness Of The Production Of DOL Documents Submitted In These Proceedings.

UMC and LBBS proffered multiple false representations and statements (many of which are detailed above) that obstructed discovery in these proceedings, causing delays and increased costs, and leading to likely loss or deletion of responsive ESI.

### 1.   UMC Made Multiple Misrepresentations In These Proceedings: UMC Custodians Lied About, Or At Best Failed To Disclose, Several Key ESI

---

[77] Ex.17 (8/1/14 Schaibley Declaration), at ¶4.  Similarly, David Williams, a System Administrator at UMC, was not instructed to begin retaining mobile phone text messages (SMS messages) from the BlackBerry Enterprise Server for collection until March of 2014.  Ex.32 (6/25/14 Williams declaration), at ¶¶1,3.

[78] LBBS should have worked with UMC to ensure compliance, including drafting a notice regarding the litigation hold, making sure UMC employees certified that they received the litigation hold notice, and making sure UMC employees both understood and implemented the notice.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

39

**Repositories To LBBS And Special Master Garrie, Of Which Were Later Proven To Contain Relevant ESI**

UMC custodians lied, or at best withheld, the existence of several key ESI repositories from LBBS and Special Master Garrie, including: (a) multiple time keeping systems; (b) Intranet applications;[79] and (c) personal mobile phones; and (d) a BlackBerry server.

**(a)   Key Timekeeping Systems Clarity, Crime Star, TeleTracking, And GRASP Were Only Disclosed To The Special Master More Than Three Months Into The Proceedings**

This is a dispute about wages and hours and UMC personnel and custodians failed to disclose the existence of four timekeeping systems to counsel and the Special Master: Clarity, CrimeStar, TeleTracking, and GRASP.   Indeed, the only timekeeping system any UMC custodians disclosed was "Kronos" and, to a limited extent, GRASP. *See* Ex.2 (4/4/14 transcript), at 141; Ex.7 (4/10/14 transcript), at 16-17. [80] UMC custodians did not disclose these systems despite being specifically asked about the use of such applications by UMC counsel in custodian interviews and by Special Master Garrie in numerous hearings.[81]

---

[79] The July 2014 Sedona Conference Glossary E-Discovery & Digital Information Management (4th ed.) defines an intranet as "A secure private network that uses Internet-related technologies to provide services within an organization or defined infrastructure."

[80] UMC did not disclose that GRASP is a timekeeping system until late into the proceedings, and it is still unclear exactly how GRASP is configured or used in UMC's technology environment.

[81] *See, e.g.,* Ex.11 (6/4/14 transcript), at 65:8-20:

SPECIAL MASTER:  Are you aware of any databases that track time beyond Kronos?
        MENDOZA:  Yes. Clarity.
SPECIAL MASTER:  What?
        MENDOZA:  Clarity.
SPECIAL MASTER:  Clarity? Did you say Clarity?
        MENDOZA:  Yes.
SPECIAL MASTER:  But is Clarity still tracking time?
        MENDOZA:  No longer.
SPECIAL MASTER:  Any others?
        MENDOZA:  That's all.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

40

**(i)** **Clarity Timekeeping System Was Used By Opt-In Plaintiffs, Contains Responsive ESI, And Was Not Disclosed Until May 2014**

Clarity was a timekeeping system used by employees at UMC from May 2006 until May 5, 2014 to collect data for analysis of time spent by UMC staff. Ex.32 (6/25/14 Williams declaration), at ¶6.

It was not until the May 30, 2014 hearing, when Special Master Garrie asked about a security group called Clarity that LBBS revealed for the first time a new system that can track breaks, over 650 days after Plaintiffs served their complaint. Clarity was the name of a software system related to timekeeping. Ex.10 (5/30/14 transcript), at 27.

Subsequent declarations submitted to Special Master Garrie in these proceedings show that UMC's management used Clarity reports to review time per project. Ex.32 (6/25/14 Williams declaration), at ¶ 9. It was also determined that lunch breaks could be selected as a line item in the Clarity system. Ex.40 (7/8/14 Williams declaration), at ¶9.[82] To date, three opt-in Plaintiffs had access to Clarity – Roxanne Barela, Lisa Rainford and Linda Williams. Ex.37 (6/12/14 Oliveri declaration), at ¶ 10). Importantly, time tracked on Clarity is not necessarily tracked on the Kronos timekeeping system. Ex.11 (6/4/14 transcript), at 74-76.

Upon the discovery of the Clarity timekeeping system, Special Master Garrie ordered LBBS to produce a UMC witness with knowledge of the system for questioning, out of concern that UMC had failed to search the right systems. Ex.10 (5/30/14 transcript), at 27-28. [83]

---

[82] Upon discovery of this information, LBBS promptly requested that Williams restore Clarity. He quickly restored the system and verified that certain opt-in Plaintiff class members were Clarity users. Ex.32 (6/25/14 Williams declaration), ¶14.

[83] UMC was also ordered to produce sample reports from Clarity for *in camera* review to determine how Clarity was being used at UMC. *Id.* at 30:3-4. Special Master Garrie also ordered UMC's counsel to perform an exhaustive search for the existence of any other timekeeping systems and to provide, for any system identified, the following: "sufficient information and detail, including software, version, vendor number, use, and how it's used at UMC" for *in camera* review. Ex.11 (6/4/14 transcript), at 94:12-23. It should be noted that UMC witnesses had repeatedly denied the existence of other systems. In fact, on June 4, 2014, Mendoza testified that he was not aware of

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

41

UMC has misrepresented the use and functionality of Clarity.  UMC claimed, for example: Clarity was not a "time-keeping" system used by hourly employees; Clarity was used only for the "McKesson project" (also referred to by UMC as the Electronic Health Records (EHR) rollout);[84] Clarity's use was limited to the IT Department, and Clarity "was used only in UMC IT until 2012". Ex.38 (6/30/14 Witty letter).  In fact, Special Master Garrie has determined that: Clarity was indeed used to keep or "track" time at UMC by hourly employees, including certain Opt-In Plaintiffs;[85] UMC used Clarity for more than the McKesson project;[86] UMC used Clarity outside the IT Department;[87] and UMC's use of Clarity extended well beyond 2012, until at least May 2014.[88] In summary, UMC failed to disclose Clarity to LBBS, in custodian interviews, and to Special Master Garrie in hearings even though Spring and several other individuals in the HR department

---

any time tracking systems other than Kronos and Clarity. Ex.11 (6/4/14 transcript), at 65. However, on June 16 on what was supposed to be the last day of hearings in these proceedings, UMC revealed the existence of three additional time-tracking systems: (1) CrimeStar Records Management System ("CrimeStar"); (2) GRASP; and (3) TeleTracking. In the course of these proceedings, it has since been determined that Mr. Mendoza supports the databases for these timekeeping systems. Ex.16 (Mendoza declaration).

[83] UMC has attempted to split hairs between "time-keeping" and "time-tracking" – arguing, ostensibly (and incorrectly) that because UMC's pay records are calculated according the Kronos, timekeeping system, UMC had no obligation to identify or produce ESI from Clarity, CrimeStar, and TeleTracking.  *See, e.g.*, Ex.12 (6/26/14 transcript), at 68:15-17 (Counsel for UMC, Cayla Witty, so distinguishing); Ex.38 (6/30/14 Witty letter) (explaining Clarity as a "time-tracking" as opposed to "time-keeping" system).

[84] Ex.11 (6/4/14 transcript), at 23:11-14 ("COUNSEL GODINO: Was Clarity used for any other project other than this McKesson project? OLIVERI:  No, it wasn't."); *see also* Ex.11 (6/4/14 transcript), at 22:1-17 (UMC counsel objecting that UMC's official timekeeping was done through Kronos, and special billing records were tracked through Clarity only for the McKesson/EHR project); Ex.37 (6/12/14 Oliveri declaration), at ¶6 (stating that the purpose of Clarity "was to track time of employees spent on the McKesson project").

[85] *See, e.g.*, Ex.38 (6/30/14 Witty letter) (stating "Clarity is a time-tracking system at UMC"); *See* Ex.37 (6/12/14 Oliveri declaration), at ¶10 (identifying Opt-In Plaintiffs that used Clarity).

[86] Ex.11 (6/4/14 transcript), at 29:9-30:3 (admitting that Clarity was used to track time for projects other than McKesson).

[87] Ex.6  (6/16/14 transcript), at 65:16-19 (Mr. Oliveri confirming that none of the three Opt-In Plaintiffs he identified in the Clarity database worked in IT).

[88] Ex.32 (6/25/14 Williams declaration), at ¶12.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

42

had Clarity accounts.[89] In addition, UMC failed to preserve Clarity ESI until June of 2014, 650 days after service of the Complaint. Ex.39 (6/25/14 Witty letter); *see also,* Section III.C.1.a.v, *infra*.

(ii)     **CrimeStar Timekeeping System Was Used By Opt-In Plaintiffs, Contains Responsive ESI, And Was Not Disclosed Until June 2014**

CrimeStar is a dispatching software system public safety officers at UMC used to track time, including meal breaks.[90] Special Master Garrie determined that data captured in CrimeStar is not captured in Kronos. Ex.39 (6/25/14 Witty letter).

In fact, UMC stated in a letter submitted in these proceedings:
One of the codes entered into CrimeStar includes a meal break code, The officer would radio in that s/he was taking a break, and the dispatcher would enter this code into CrimeStar. When the officer finished the break period, s/he would radio back in to inform the dispatcher that the break was finished. This would also be entered into CrimeStar. This data is not captured in Kronos, because the Public Safety officers only use Kronos for clocking in and out for the woprk day.
Ex.39 (6/25/14 Witty letter).

Special Master Garrie found that UMC failed to disclose the CrimeStar system to LLBS, in custodian interviews, and to Special Master Garrie in hearings.   This is even more outrageous that Clarity because Special Master Garrie determined  from declarations that "[a] proposal was made to and approved by Doug Spring in UMC Human Resources to allow PSOs to track their meal breaks in our computer aided dispatch (CAD), a part of CrimeStar RMS." Ex.41 (7/8/14 Gurrola declaration), at ¶9. This meant that Spring and Espinoza had direct knowledge as to CrimeStar and its functionality and intentionally withheld the existence of the system from LBBS in custodian interviews, and Special Master Garrie, who questioned them under oath about the existence of any other timekeeping systems at UMC.   In addition, UMC failed to preserve

---

[89] Espinoza, Spring, Panzeri, and two other individuals in UMC's HR Department had Clarity accounts and used the system. Ex.48 (8/7/14 Williams declaration, Ex. B thereto).
[90] Special Master Garrie's analysis of sample reports UMC produced from CrimeStar showed these included code entries for meal breaks. Ex.50 (7/8/14 sample CrimeStar report).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

43

CrimeStar ESI until June of 2014, 650 days after service of the Complaint.  *See* Section III.C.1.a.v, *infra*.

> (iii) **TeleTracking Timekeeping System Was Used By Opt-In Plaintiffs, Contained Responsive ESI And Was Not Disclosed Until June 2014**

TeleTracking Timekeeping System consists of two separate pieces: (1) Capacity Management Suite and (2) Service Tracking (ST). Ex.48 (8/7/14 Williams declaration), ¶9.[91]

UMC's counsel stated:

[B]oth components are used to track assignments, tasks, and locations for employees in these departments, including certain opt-in plaintiffs. Because the employees in these departments do not maintain a central location during shifts, they track their breaks (including meal periods) through the TeleTracking system."

Ex.39 (6/25/14 Witty letter).

Special Master Garrie found that UMC used the TeleTracking system, specifically to track assignments, tasks, breaks, and locations for employees, including certain Opt-In Plaintiffs. Ex.39 (6/25/14 Witty letter).[92] UMC has not been able to identify specifically which Opt-In-Plaintiffs beyond those identified in Counsel Witty's letter used TeleTracking.[93] Again, UMC failed to disclose the TeleTracking Timekeeping System to LBBS in custodian interviews, and the Special

---

[91] Capacity Management Suite ("CMS") consists of the following applications: (a) BedTracking, used primarily by Administration, ODA, PPC and the nurses on the floor; (b) PreAdmitTracking, used primarily by Trauma and ER and Admitting; (c) TransportTracking, used primarily by Transportation and EVS; (d) PatientTracking, used primarily by Administration, ODA, PPC and the nurses on the floor; (e) Standard and custom reporting, used by Application users. Ex.48 (8/7/14 Williams declaration), at ¶10. UMC hosts these CMS applications on a production (umccmsprod), test (umccmstest), and train servers (umccmstrain). *Id.* Service Tracking ("ST") consists of ServiceTracking application that is hosted on production (umcstprod), test (umcsttest), and train (umcsttrain).

[92] Special Master Garrie inspected several sample reports from the TeleTracking system that show when and whether meal breaks are taken, and further records the length of the break, all of which data is not captured in Kronos. Ex.49 (7/8/14 sample TeleTracking report).

[93] In addition, UMC has not made clear the manner and extent to which the ESI contained in TeleTracking system differs from that in Kronos ESI. Ex.39 (6/25/14 Witty letter).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

44

1  Master in hearings. In addition, UMC did not preserve TeleTracking data until June 2014, over

2  650 days after the filing of the Complaint. Ex.35 (8/1/14 Lattin declaration), at ¶7; *see also,* Section

3  III.C.1.a.v, *infra*.

### (iv)     GRASP Timekeeping System

5          GRASP is another system at UMC that might be a repository of potentially relevant ESI in

6  this case, relating to timekeeping.  While UMC stated that Kronos, Clarity, TeleTracking, and

7  CrimeStar comprise "the universe of time-tracking systems at UMC" (Ex.39 (6/25/14 Witty

8  letter)), it appears that GRASP may have been utilized by UMC for employee scheduling and time

9  management for patient care. *See, e.g.*, Ex.11 (6/4/14 transcript), at  67:14-20 (Mendoza testified

10  that GRASP was used for "scheduling").    As a result, Special Master Garrie ordered UMC to

11  produce relevant ESI stored in GRASP to Plaintiffs for further analysis. [Dkt. 183].

### (v)     Additional Timekeeping System Findings

13          Special Master Garrie determined at the August 4, 2014 hearing that for all the timekeeping

14  systems, aside from TeleTracking, it was possible for a user of the system to overwrite the data

15  entry. Ex.14 (8/4/14 transcript), at 182:1-2, 184:24-25. *At the hearing, Special Master Garrie also*

16  *determined that UMC did not preserve the data captured in Clarity, CrimeStar, TeleTracking, or*

17  *GRASP and that UMC could not demonstrate that responsive ESI was not lost or destroyed from*

18  *Clarity, Crimestar, and GRASP. See* Ex.14 (8/4/14 transcript), at 125-127; Ex.42 (Linda Williams

19  declaration), at ¶2; Ex.43 (8/7/14 Gurrola declaration), at ¶2.[94]  Special Master Garrie also found

20  that no one person or group of persons at UMC had the sufficient skill, knowledge, and expertise

21  with any of the four timekeeping systems to competently collect, search, and produce responsive

---

26  [94] UMC has represented to the Special Master that TeleTracking information is not deleted.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

45

ESI from these systems. [Dkt. 183].[95] As a result, Special Master Garrie ordered UMC to retain outside individuals to collect, search, and produce responsive ESI from these systems. [Dkt. 183].[96]

In summary, but for Special Master Garrie's diligent and thorough questioning of LBBS and UMC witnesses the Clarity, CrimeStar and TeleTracking timekeeping systems likely would have remained undiscovered for the entirety of this litigation.[97]

### 2. UMC Made Multiple Misrepresentations In These Proceedings: UMC Does Have The Capability To Generate Excel Spreadsheets From Kronos And Did So For The DOL Investigation

In the course of the Special Master proceedings, UMC presented Panzeri to provide testimony as an individual knowledgeable about the creation of the Kronos summary spreadsheets.[98] As it turns out, contrary to the prior representations of UMC and its counsel, UMC

---

[95] It is unclear what information was preserved and what is now missing. Ex.40 (7/8/14 Williams declaration), at ¶4. The oldest backup UMC for all these timekeeping systems is June of 2014. Ex.35 (8/1/14 Lattin declaration); Ex.14 (8/4/14 transcript), at 40:120-133(Lattin describes UMC backup protocols for these timekeeping systems.).

[96] Special Master Garrie required UMC was to identify an individual with sufficient skill and expertise with the specific timekeeping system. Once this individual was identified, they were to go onsite to UMC and ascertain answers to the following: how UMC used the timekeeping systems; what data was captured (e.g., lunch breaks or start time); how the database and system were implemented; what reports and other output can the timekeeping system provide. *Id.* Once the timekeeping system expert understood how UMC deployed, used, and operated the timekeeping system, the expert was to speak with Plaintiffs' ESI expert to answer Plaintiffs' questions. [Dkt. 183]. After this step, UMC was to produce all responsive ESI from the appropriate timekeeping systems.

[97] *See, e.g.,* Ex.12 (6/26/14 transcript), at 82:19-83:5 ("SPECIAL MASTER: All I'm interested in knowing is if these systems track time or are timekeeping systems -- according to your letter, let's just go through it, TeleTracking has opt-in plaintiffs and it tracks tasks, assignments, and locations. And they track their base -- breaks including meal periods through the TeleTracking system. So obviously the system, I would believe, would have responsive and relevant data, especially with the last sentence, the data is not captured in Kronos. These departments only use Kronos for clocking in and out of the workday.")

[98] Ex.5 (5/6/14 transcript), at 47:14-21, 51:6-10:

> WITTY:   When you were working in the Department of Labor spreadsheets, the information collected for the Department of Labor, you pulled information from Kronos, correct?

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

had the ability to easily convert data from the Kronos system into an excel spreadsheet or "summary" report format. *See* Ex.5 (5/6/14 transcript), at 22:3-5, 27:10-22, 28:2-6, at 28:15-29:2, 33:5-13. Despite this having been a repeated subject of hearings before Magistrate Judge Leen, it quickly became apparent that Panzeri had never before been questioned by UMC or its counsel about her role in the creation of Kronos summary reports or spreadsheets. *Id.* at 36:7-24.

Panzeri confirmed that not only was the creation of such "summary reports" or spreadsheets possible, she in fact had reports she had created in connection with the DOL investigation readily available. Ex.5 (5/6/14 transcript), at 24:19-23 (SPECIAL MASTER: "how quickly could you access those spreadsheets?" PANZERI: "As soon as I get back to my office. They're not in any archive file. They're right where I can get at them."). It is evident that UMC was able to create Kronos summary reports and that UMC did this in the normal course of business. *See also*, Ex.11 (6/4/14 transcript), at 169:2-10.

The record proves that UMC failed to produce the Kronos "summary report" data that was in UMC's possession, and that UMC's repeated representations that it did not produce such reports in the normal course of business, and that to do so was unduly burdensome was inaccurate. [Dkt. 126, at 4:5-8].[99]

---

PANZERI: Yes.
    WITTY: And then you used that information pulled from Kronos to create a separate spreadsheet?
PANZERI: Yes.
   *     *     *
SPECIAL MASTER: So then someone at UMC was able to take the Kronos data and convert it to an Excel spreadsheet that you then worked on?
PANZERI: Correct.
[99] It is not clear whether UMC had informed LBBS that it did have the ability to generate these spreadsheets with relative ease.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.: 2:13-cv-00298-APG-PAL

47

    **3.**    **UMC Made Multiple Misrepresentations In These Proceedings**: UMC Did Not Produce All Of The DOL Documents Until The Special Master Proceedings.

Until the Special Master proceedings, UMC maintained that its initial production of documents related to the DOL investigation was complete. Ex.18 (3/5/13 Thompson email). Documents obtained from FOIA requests to the DOL contradicted the testimony of Spring, who testified that he did not take any notes at meetings with the DOL or receive any documents from them. Ex.5 (5/6/14 transcript), at 91:5-92:25. Upon further questioning by Special Master Garrie, Spring admitted  there were meeting notes that had not been disclosed or produced. Ex.5 (5/6/14 transcript), at 93:8-96:2.  These notes were later produced with Spring's declaration dated June 10, 2014. Ex.45 (Spring declaration). In fact, it was determined that UMC created a variety of DOL-related documents relevant to and discoverable in this action.

In addition, Special Master Garrie found at the April 7, 2014 hearing that UMC had gathered extensive records relating to the DOL matter and that UMC scanned in these documents and saved them on the Q-Drive.  Ex.3 (4/7/14 transcript), at 240:22-241:3. At the hearing, it was also determined that UMC had faxed communications back and forth with DOL representatives, scanned in the faxes as images, and stored these faxes on the Q-Drive.[100]  *In summary, UMC's failure to timely preserve and collect from sources now known to contain DOL related documents likely led to the loss of this responsive ESI. See* Section III.A.2.a, *supra* (discussing failure to identify or preserve responsive ESI on the Q-Drive).

---

[100] *See also*, Ex.4 (4/22/14 transcript), at 170:7-20 (describing process for electronically storing faxes; Ex.5 (5/6/14 transcript), at 80:14-16 ("SPECIAL MASTER: Did you receive faxes from the DOL? SPRING: Yes.").

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

### D.   UMC's Serial Misrepresentations And Repeated Failure To Act In Good Faith In These Proceedings Directly Caused Large Monetary Costs And Time Delays.

The Special Master process has come at a high cost to all of the parties in this matter.  These costs have run into the hundreds of thousands of dollars.  This does not include the attendant attorney time and costs.

The Special Master finds that UMC's serial misrepresentations and repeated failure to follow e-discovery best practices were the primary reason for the substantial time and costs of these proceedings, specifically:

- UMC failed to identify all responsive ESI repositories to counsel (*see* Section III.A, *supra*);
- UMC did not perform a complete collection (*see* Section III.B, *supra*);
- UMC executives Brannman (former UMC CEO), Espinoza (CHRO), Spring (Director of Human Resources), and UMC's prior counsel misrepresented receiving a never having preservation letter from Plaintiffs' counsel in August of 2012 (*see* Sections III.A.3, III.A.4, *supra*);
- UMC did not follow e-discovery best practices in processing ESI, resulting in the need to repeat multiple productions (*see* Sections II.C.7 and III.B.2 *supra*);
- UMC did not perform QC of production (*see* Section III.B.3, *supra*).
- UMC did not make UMC IT people available (*see* Section III.C, *supra*); and
- UMC repeatedly failed to provide LBBS access to critical IT stakeholders to facilitate discovery, causing unnecessary delays (*see* Sections III.A.3, III.A.4, *supra*).

These misrepresentation and omissions increased costs by requiring the Special Master to hold multiple additional hearings, review thousands of pages of technical script output, analyze and review hundreds of pages relating to security groups and file access permissions, and invest hundreds upon hundreds of hours reviewing transcripts, declarations, manuals specific to UMC's systems, and other documents submitted in these proceedings.[101]

---

[101] Special Master Garrie is deeply troubled by UMC's failure to independently disclose these timekeeping systems as a repository of potentially relevant information and finds that UMC's failure to do so caused undue delay and prejudice.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

49

### E.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Q-Drive; SMS Text Messages On UMC BB; Key Custodian Computers; Data On Personal Mobile Device.

ESI that is not properly preserved is often subject to loss, deletion, or modification, for example due to user activity, automatic system updates, or data migrations.

### 1.   UMC Lost or Deleted ESI Likely To Be Relevant And Responsive: UMC Failed to Preserve the Q-Drive Which Resulted in the Loss of Thousands of Files Including Responsive ESI

In the Joint Report filed on September 19, 2013, UMC stated that UMC's ESI contractor had searched the computers, servers, and cell phones of the five custodians generating more than 5 million hits. [Dkt. 126]. This substantial number of responsive hits did not include the Q-Drive at that time. The Q-Drive was determined to be a key ESI repository. Ex.29 (custodian interviews).

UMC did not preserve or collect the Q-Drive until April of 2014. However, UMC was able to recover and restore a December 2013 Q-Drive snapshot.[102]  Once UMC recovered and restored the Q-Drive, UMC was ordered to produce a spreadsheet of all the folders/subfolders that the seven custodians could access as of April 4, 2014. *See* Ex.17 (8/1/14 Schaibley declaration), at ¶10(j) and Exhibit O thereto ("Spreadsheet entitled "Custodian_SecurityGroups & Q-Drive Folders.xlsx" (listing the network file shares to which the seven (7) high priority custodians had access, created on May 9, 2014 noting access on that date.")).  Special Master Garrie then performed a through independent folder level analysis of the Q-Drive and determined that there was a substantial amount of responsive ESI contained on the Q-Drive. [103]

---

[102] UMC did not have any backups going further back than December 2013 for the Q-Drive.
[103] Special Master Garrie identified more than fifty folders with the words "DOL", "small", "labor", and "payroll", including:
- Q:\Department\Payroll\PAYWORK\Department of Labor Audits\Ready for Jackie\Completed ot entd & sim\Ready for DOL
- Q:\Department\Administration\CFO_COO\DOL
- Q:\Department\HR\HRCOMMON\File room\SUBPOENA'S AND ATTORNEY REQUESTS SCANNED\3RD PARTY REQUESTS\STATE OF NEVADA OFFICE OF LABOR COMMISSIONER- RAJIV MALAVIARACHCHI

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

50

After this was determined, Edmondson analyzed the Q-Drive from December 14, 2013 against the Q-Drive from April 4, 2014 and created a report that contained the number of files that were modified or deleted between the oldest existing backup of the Q-Drive from December 14, 2013, and Schaibley's April 4, 2014 collection four months later. *See* Ex.22 (8/6/14 Edmondson declaration), at ¶22. The report was limited to the folders the seven key custodians were able to access.[104]

The report provided by Edmondson showed that over the 116 days between the December Q-Drive backup and the collection, there were a total of 8,969 Q-Drive files in the shared folders of the seven high priority custodians that were modified or deleted. Ex.44 (File comparison Q-Drive file comparison analysis 08.05.14). The specific breakdown of the 8,969 files is as follows: 6,614 files deleted; 1,425 files modified; 930 files moved.  Ex.44 (File comparison Q-Drive file comparison analysis 08.05.14).[105] With this data as a starting point, Special Master Garrie extrapolated these numbers over the 450+ day period between service of the Complaint and the December 13, 2013 Q-Drive backup to arrive at a rough estimate of 37,731 files lost, modified or moved. The specific breakdown of the 37,731 files is as follows: 27,824 files deleted; 5,994 files

---

- Q:\Department\HR\HRCOMMON\File room\SUBPOENA'S AND ATTORNEY REQUESTS SCANNED\3RD PARTY REQUESTS\STATE OF NEVADA OFFICE OF LABOR COMMISSIONER- RAJIV MALAVIARACHCHI
- Q:\Department\Payroll\PAYWORK\Department of Labor Audits\Ready for Review-Calc 01312013 finished

[104] It should be noted that while the December 2013 backup means that files may be recovered if they were lost or deleted after the date of that backup, any documents deleted or modified between August 7, 2012 when Plaintiffs served their complaint and the December 2013 backup are likely irretrievably lost.

[105] The files that appear to have been deleted included human resources, corporate compliance, employee grievances, and payroll related files.

- "\\Department\HR\HRCOMMON\Labor\Grievance Logs\2013 Grievance Log\Grievance logs (active).doc";
- "SAP PAYROLL PROCESSING new Kronos jf.xlsx";
- "\\Department\HR\...\Labor\corporate compliance.andcmt.xls"

Ex.44 (File comparison Q-Drive file comparison analysis 08.05.14).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

51

modified; 3,912 files moved.[106]  In light of the discussion herein, Special Master Garrie finds that

UMC disregarded its preservation obligations and irremediable spoliation occurred.[107]

### 2.   UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: SMS Text Messages On UMC Mobile Devices.

On January 31, 2014, after Magistrate Judge Leen considered and ordered preservation and

production of smart phone data, UMC produced "a CD-R disc production of Excel files containing

the text message data extracted from UMC-issued BlackBerry devices of custodians Brannman,

Espinoza, and Mumford." *See* Section II.B, *supra*.  UMC stated it contained "all of the text

message information contained on the devices." Ex.47  (1/31/14 Witty letter).  In fact, the

production of UMC issued BlackBerry text data was of only roughly one month of text message

data.  [Dkt. 145, at 9:9-12]; *see also,* Ex.3 (4/7/14 transcript), at 34:25-35:10.

In the parties' February 7, 2014 Joint Report, UMC acknowledged that the "production

was extremely limited" but wrongly blamed "the lack of storage space on the Blackberry devices

each custodian possessed."  [Dkt. 145, at 10:1-12].[108]  The "storage space" explanation UMC

provided was untrue. Special Master Garrie quickly determined that UMC failed to collect ESI

---

[106] While it should be noted that timely preservation would likely not have occurred on July 29, 2012 the day after the complaint was served, the number of deleted files would still be in the tens of thousands.

[107] The spoliation numbers were based on only those folders to which the seven original custodians had access, not on the number of folders to which all relevant custodians had access, or across the Q-Drive in its entirety.

[108] Lest there be any doubt, the record confirms that relevant custodians used mobile devices to conduct business.  *See* Ex.4 (4/22/14 transcript), at 53:20-22, 80:19-23 (Espinoza confirmed he conducted business at UMC via text messaging and e-mail on his UMC-issued BlackBerry).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

52

from the UMC Blackberry server[109] for *any* of the twenty-seven custodians.  [Dkt. 159, at 3:3-6 (citing 4/7/14 transcript, testimony of Jason Clark at 63-67)].[110]

Special Master Garrie further determined that UMC failed to preserve e-mails and text messages on the BlackBerry server(s) and devices, noting that UMC issued no preservation notice until *after* the appointment of the Special Master. *Id.* at 5:4-9 (citing 4/7/14 transcript, at 36:3-25, 63:21-25, 64:1-10, 65:1-23, and 83:6-18).  Because no preservation notice was issued, certain UMC-issued BlackBerry devices were "wiped" just prior to UMC's production of mobile phone data on January 31, 2014.  *See* Ex.2 (4/4/14 transcript), at 64:15-21, 133:15-19; Ex.5 (5/6/14 transcript) at 184:16-185:5; Ex.32 (6/25/14 Williams declaration) at ¶ 3.[111]

After establishing these facts, Special Master Garrie issued a subpoena for phone records from Sprint, UMC's mobile provider. Sprint produced 914 pages of records in June 2014, relating to 12 individuals, including several custodians in this matter.  Upon inspection of these records, the Special Master established the following information:

---

[109] The Special Master notes that information on a BlackBerry server should contain more than just text messages; it would likely contain instant messages and BlackBerry messaging (or "BBM"), as well as e-mail, and downloaded files, etc.  *See* Ex.3 (4/7/14 transcript), at 35:14-18 (the Special Master so noting for the record).

[110] On April 7, 2014, UMC presented Jason Clark to testify as to his responsibilities for UMC's BlackBerries and BlackBerry servers during the relevant period.  Jason Clark testified that he was not directed to preserve the BlackBerry server until two to three weeks before the April 7 hearing. Ex.3 (4/7/14 transcript), at 36:1-7.  *See also* Ex.2 (4/4/14 transcript), at 27:9-11, 16-24 (IT individual responsible for initial data collection, Schaibley, never collected from BlackBerry servers, and was never instructed to by anyone at UMC or UMC's counsel).

[111]  Accordingly, the Special Master ordered UMC to preserve its BlackBerry server archives and provide chain of custody paperwork by Wednesday April 9, 2014.  *Id.* at 33:4-23. As BlackBerry-related questions were still unresolved after the April 7th and April 10th hearings, the Special Master again requested UMC to provide an individual familiar with the data retention policies on the BlackBerry server to submit an affidavit and be available to testify at the April 22, 2014, hearing.  *See*, *e.g.*, Ex.7 (4/10/14 transcript), at 39:14-40:12.  The Special Master also ordered UMC to draft a subpoena to issue to Sprint (the mobile service provider for UMC's BlackBerries) in an attempt to recover potentially deleted texts and other information.  *Id.* at 40:13-25.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

53

| Custodian | Starting Date | Total Text Messages |
|---|---|---|
| James Mumford | 11/19/2012 | 2478 |
| Brian Brannman | 11/19/2012 | 687 |
| John Espinoza | 11/27/2012 | 463 |
| Doug Spring | 4/4/2013 | 753 |
| Leah Conedy | 11/27/2012 | 348 |
| Stephanie Merrill | 11/20/2012 | 2079 |
| Alicia Jones | 12/7/2012 | 234 |
| Cindy Jones | 11/27/2012 | 583 |
| Tiffanie Fleming | 11/21/2012 | 353 |
| Shaheen Ahmad | 11/19/2012 | 11156 |
| Oscar Bourbon | 11/19/2012 | 6974 |
| Lisa Pacheco | 3/25/2013 | 266 |

Taking the 26,374 text messages identified by Sprint as having been sent or received since November 19, 2012 and subtracting the 64 text messages UMC produced, one finds that approximately 26,310 messages were lost or deleted by UMC prior to UMC making its production of text messages.[112]

### 3. UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Data (Different From SMS) Stored On UMC Mobile Devices And Personal Mobile Devices Used To Conduct UMC Business.

UMC took no appropriate steps to preserve, collect, and/or produce data whether connected to ActiveSync or not – prior to being ordered to do so by Special Master Garrie – from UMC issued mobile devices or personal mobile devices used to conduct UMC business. *See* Section III.A.2.e (preservation of personal mobile devices used for work).[113]

---

[112] While the 520 day gap assumes that UMC preserved from day one, it is indisputable that the number of text messages lost or deleted would still be in the tens of thousands.

[113] *See, e.g.*, Ex.4 (4/22/14 transcript), at 47:25-49:5 (Barnard testified that he used his personal mobile device for work-related functions, but that he had not previously informed counsel of this; the Special Master instructed him to preserve data on the personal mobile device.); Ex.4 (4/22/14 transcript), at 51:10-13, 51:24-53:18 (Espinoza confirmed he used his personal device, an iPhone, to conduct UMC-related work, but insisted that it was just to make phone calls, denying that he ever used text or email functions. The Special Master informed Espinoza and counsel for UMC that, based on his review of Espinoza's personal device, it appeared that he did at least receive

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

54

While LBBS worked diligently with UMC to inspect the personal mobile devices of UMC custodians, its efforts do not eliminate the possibility that relevant data was lost or deleted from personal mobile devices in the approximately two years leading up to this point. Admittedly, Special Master Garrie did not find any responsive communications in the UMC work-related messages he reviewed on these personal mobile devices.

However, the loss of responsive ESI is a very likely possibility given (1) the extended period of time that lapsed prior to the preservation of the personal mobile devices, (2) the fact that several custodians upgraded or replaced their personal mobile devices during the time period in question, and (3) the fact that none of key UMC custodians disclosed the use of their personal mobile devices despite being asked by LBBS and the Special Master.

### 4.    UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive: Data Written To Local UMC Computers.

As detailed above (*see* Section II.A, *supra*), UMC failed to preserve ESI on local computers, despite Plaintiffs having requested data from local computers be preserved as early as the August 15, 2013 status conference before Magistrate Judge Leen (and even earlier in the preservation letters Plaintiffs sent in August and November of 2012). In the 250 days between service of the complaint and this collection, it is likely that responsive files were lost.  [Dkt. 159,

---

UMC emails to his iPhone.); Ex.2 (4/4/14 transcript), at 120:19-122:13 (Spring stated that he uses an iPhone for UMC-related texting in his custodian interview, although it appears that device never had been collected or searched. UMC's counsel, for the first time, collected Spring's personal phone to search for potentially relevant or responsive text messages or other data after the April 4, 2014, hearing); Ex.8 (4/15/14 transcript), at 9:20-22 (Kisner and McKinley testified to Spring's use of a personal mobile device (an iPhone) in lieu of an UMC-issued BlackBerry); *see also* Ex.5 (5/6/14 transcript), at 163:20-164:10 (Kisner confirmed that Spring has used a personal phone and has had no UMC-issued device for "at least the last two or three years."); Ex.8 (4/15/14 transcript), 10:2-12:17 (further confirming use of personal mobile devices by at least some of the seven high priority custodians; Special Master orders counsel for UMC to provide more information as to the use of personal mobile devices by UMC personnel); *id*. at 25:15-19 (Special Master orders the preservation of all personal mobile devices for the seven high priority custodians).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

55

at 5:10-14]; *see also,* Section III.A.2.c. (discussing UMC preservation of local computers), III.B.2.c. (discussing UMC collection of local computers).

> **5.**      <u>UMC Lost Or Deleted ESI Likely To Be Relevant And Responsive</u>: **Intranet Application And The Associated Data And The Siemens Policy & Procedure Server.**

UMC failed to preserve several repositories with responsive ESI located on the Intranet. *See* Section III.2.d. (Intranet preservation by UMC). In fact, Ghosal's testimony suggests that it was more than likely that UMC Departments used the Intranet to add and delete job descriptions, which were requested by Plaintiffs in 2013. *See* Ex.15 (Plaintiffs' First Set of Requests for Production), at 6. Accordingly, UMC likely lost or destroyed responsive Intranet ESI.

## IV.     CONCLUSIONS OF LAW

> **A.**      **Nothing New Under The Sun: The Importance Of Cooperation, Communication, And Transparency In Electronic Discovery.**

Civil discovery does not change just because ESI is involved. Counsel and parties have duties to clearly communicate, cooperate in the discovery process, and undertake an adequate investigation of facts before making representations. These duties arise irrespective of whether relevant evidence is electronic or non-electronic.

Moreover, ignorance of technology does not excuse counsel or clients from carrying out their duties to preserve and produce ESI. More than a decade of federal court common law and repeated refinements to the Federal Rules of Civil Procedure has established a robust and well-settled body of law on electronic discovery. Today, ignorance of technology is simply an inadequate excuse for failure to properly carry out discovery obligations.

The Federal Rules of Civil Procedure authorize broad discovery of any matter that may lead to the discovery of admissible evidence, and is not privileged, facially harassing or oppressive. Fed R. Civ. 26(b). The Federal Rules mandate disclosure and require counsel and parties to undertake adequate investigation of facts. *See, e.g.,* Fed, R, Civ. 26(a), 26(f), 26(g).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

56

**B.     Client And Counsel: The Bad Actor Problem ("The Blame Game")**

Here, while Special Master Garrie recognizes LBBS' cooperation, especially that of Counsel Witty, in an extensive and protracted discovery process, UMC's behavior in this matter fell far short of the required standards of transparency and good faith described above.[114]  Repeated failures to identify, preserve, collect, and properly produce documents, coupled with repeated incomplete and incorrect representations by UMC witnesses, made efficient and effective discovery efforts a lost cause.  *See* Section III.A and D, *supra*.

**C.     UMC Spoliated Responsive ESI In This Matter ("Hasta La Vista ESI")**

UMC failed to preserve and collect responsive ESI in this matter, and this failure led to the spoliation of ESI.   *See* Section III.A, *supra*. UMC's behavior with near certainty caused irreversible destruction of evidence relevant to these proceedings.  *See* Section III.C, *supra*.

**1.     The Duty To Preserve Attaches When A Potential Claim Is Identified And Encompasses All Reasonably Relevant ESI**

It is well-settled that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents".  *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *see also, United Factory Furniture Corp. v. Alterwitz*, No. 2:12–cv–00059–KJD–VCF, 2012 WL 1155741, at *3 (D. Nev. Apr. 6, 2012) (citation omitted); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006). "[T]rial courts in the Ninth Circuit

---

[114] Of course, MPP and LBBS share some responsibility. However, at some point, counsel must rely on the client and their outside consultants, and may assume their competency comply with discovery obligations counsel need not supervise every step of the document production process and may rely on their clients in some respects . . . [and a] lawyer cannot be obliged to monitor her client like a parent watching a child , , , [a]t the end of the day . . . the duty to preserve and produce documents rests on the party.  *Zubulake v. UBS Warburg*, 2004 WL 1620866 (S.D.N.Y. July 20, 2004).   The record contained herein reflects that LBBS put forth substantial effort in attempting to work with UMC IT and senior management in the discovery process. However, UMC's serial omissions to LBBS, the Special Master, and Magistrate Judge Leen, frustrated discovery and resulting in widespread spoliation of responsive ESI.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

57

generally agree that, '[a]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.'" *Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F.Supp.2d 976, 991 (N.D.Cal. 2012) (citing *In re Napster, Inc.*, 462 F.Supp.2d at 1067; *AmeriPride Servs., Inc. v. Valley Indus. Serv., Inc.*, S–00–113 LKK/JFM, 2006 WL 2308442, at *4 (E.D.Cal. Aug. 9, 2006) (same); *see also, Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1346–47 (Fed.Cir. 2011) (litigation hold required when litigation is reasonably certain). Irrespective of the particular test applied, the Special Master reaches the same conclusion: UMC failed to preserve responsive ESI.

## 2. Parties Have An Affirmative Duty To Ensure Preservation And Communicate Obligations To Employees

The preservation duty is an affirmative duty and requires active involvement of parties. Nonfeasance does not satisfy preservation obligations. *In re Napster, Inc.*, 462 F.Supp.2d at 1060; *Zubulake*, 220 F.R.D. at 218. A party must not only suspend routine document destruction policies and put in place a hold, but, corporate officers with notice of discovery obligations "must communicate those obligations to employees in possession of discoverable materials," *Nat'l Ass'n. of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557–58 (N.D.Cal.1987); *Zubulake*, 220 F.R.D, at 218. [115]

## 3. UMC Breached Its Duty To Preserve

Here, as detailed in the factual findings above, UMC and its counsel failed to preserve evidence. *See* Section III.A, *supra*. First, UMC and counsel failed to implement a timely litigation hold, despite receiving two preservation notices from Plaintiffs' counsel. *See* Section, III.A.2, *supra*. Indeed, no litigation hold issued at UMC until *after* Plaintiffs deposed a UMC witness, more than 270 days after Plaintiffs served their complaint. *See* Section III.A.3, *supra*. This nine-

---

[115] Preservation duties "extends to those employees likely to have relevant information-the 'key players' in the case." *Zubulake*, 220 F.R.D. at 218.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

58

month delay in beginning to fulfill UMC's preservation obligation (an obligation not entirely met until July 2014) does not satisfy the legal requirement of implementing a litigation hold promptly.

Exacerbating the problem was that nobody within UMC's executive team took responsibility for preservation, or engaged key IT personnel and/or custodians in UMC's preservation effort. *See* Section III.A.4, *supra*. The law of this Circuit unequivocally demands that parties communicate preservation obligations to employees and key players in a case to ensure proper preservation. *See, e.g., Nat'l Ass'n of Radiation Survivors,* 115 F.R.D., at 557–58. UMC's executives' total disregard of their responsibility in this regard directly contributed to the spoliation of responsive ESI. *See* Section III.E.1 (Q-Drive), III.E.2 (SMS messages and mobile devices), III.E.3 (personal mobile phone data), III.E.5 (work computers and laptops), III.E.6 (intranet and Siemens server).

### 4.    UMC Willfully Spoliated ESI ("Did I Do That…")

"A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed," *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (internal quotation marks and citation omitted); *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (internal quotation marks and citation omitted).

As discussed above, there were *seven* status conferences before Magistrate Judge Leen during which she repeatedly ordered preservation of responsive ESI that UMC failed to preserve. *See* Section III.A, *supra*. UMC's deletion of Q-Drive files, and the loss of timekeeping system data, in the face of these preservation orders, are among the more egregious examples of this failure. *See* Sections III.A.2.a, III.C.1.a, *supra*. This willful conduct constitutes spoliation through the destruction of critical information of central and potentially dispositive import in this case. *See* Section III.C, *supra*.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

59

### D.  UMC's Spoliation Of Evidence Is Sanctionable Under Ninth Circuit Law ("May It Be So")

In the Ninth Circuit, there are two sources of authority for spoliation sanctions.  First, "[a] federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Med. Lab. Mgmt. Consultants v. American Broad. Cos.*, 306 F.3d 806, 824 (9th Cir. 2002) (internal quotation marks and citation omitted). Second, the Court has power to sanction under the Federal Rules of Civil Procedure, specifically 26(g) (regarding representations in signed discovery documents) and 37(b)(2)(C) (for failure to "obey an order to provide or permit discovery").  *Young v. Facebook, Inc.*, No. 5:10–cv–03579–JF/PVT, 2010 WL 3564847, * 1 (N.D.Cal. Sept.13, 2010) (citing *Leon*, 464 F.3d at 959); *Am. Honda Motor Co., Inc.*, 762 F.2d 1334, 1337 (9th Cir. 1985); *Fjelstad v. Am. Honda Motor Co.,* 762 F.2d 1334, 1337–38  (9th Cir. 1985).

### 1.  The Court May Issue Sanctions Under Its Inherent Powers

The inherent authority to impose sanctions discussed above applies to those who act "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir. 1997). UMC's behavior, as described herein, constituted bad faith making the Court's exercise of its inherent power to award sanctions appropriate. *See* Section III (Findings of Fact).[116]

### 2.  The Court May Issue Sanctions Under The Federal Rules Of Civil Procedure

The Federal Rules of Civil Procedure, state that if a party "fails to obey an order to provide or permit discovery . . . the court may issue further just orders." Fed.R.Civ.P. 37(b)(2)(A).

---

[116] The bad faith requirement restrains the District Court's discretion and "preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Id.*; *see also*, *Brown v. Baden (In re Yagman),* 796 F.2d 1165, 1184 (9th Cir.), *as amended by* 803 F.2d 1085 (1986) (monetary sanctions must be "reasonable.").

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

60

Included among the available sanctions are orders ranging from adverse inferences to outright dismissal of the action or proceeding, in whole or in part. Fed.R.Civ.P. 37(b)(2)(A)(v).

### 3.    Discussion Of Appropriate Sanction Under The Prevailing Ninth Circuit Five Factor Test

The District Court has discretion in its imposition of discovery sanctions. *Insurance Corp. of Ireland, Ltd., v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).  "[C]ourts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."  *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (internal quotation marks and citations omitted);

### (a)    UMC's Conduct Meets The Willfulness Or Bad Faith Standard

Case-dispositive or case dispositive sanctions generally are available in limited circumstances. *Connecticut General Life Insurance Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Only "willfulness, bad faith, and fault" justify this severe sanction. *Id.*; *Anheuser-Busch,* 69 F.3d at 348 (citation omitted); *Henry*, 983 F.2d at 947–48, citing *Fjelstad*, 762 F.2d at 1337; *see also, Valley Engineers Inc. v. Electric Engineering Company*, 158 F.3d 1051 (9th Cir. 1998).

Spoliation of evidence is willful where the party has "some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (italic emphasis in original).  Further, "'disobedient conduct not shown to be outside the control of the litigant' is all that is required to demonstrate willfulness, bad faith or fault." *Henry*, 983 F.2d at 948, citing *Fjelstad*, 762 F.2d at 1341; *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990).

UMC's failure to issue a timely preservation notice after Magistrate Judge Leen's repeated orders to preserve ESI, standing alone, on its own constitutes willfulness or bad faith, notwithstanding the many additional discovery failures identified above. *See* Section III.A.3, *supra*

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

61

(discussing UMC failure to issue litigation hold). As Judge Koh found in *Apple Inc. v. Samsung Elec. Co.*, 881 F. Supp. 2d 1132  (N.D. Cal. 2012) ("*Apple I*"), failure to turn off an email auto-delete function alone constituted willful spoliation. Later, in *Apple II* (dealing with Apple's spoliation of evidence), Judge Koh stated:

> [b]y failing to do as little as issue a litigation hold notice to any employees for eight months after its preservation duty arose, and by further delaying issuance of litigation hold notices to several key custodians, the Court finds that Apple acted with not just simple negligence but rather conscious disregard of its duty to preserve.

888 F. Supp. 2d at 998.

Special Master Garrie finds that UMC acted with "conscious disregard of its duty to preserve" by failing to institute a litigation hold for at least nine months, conduct that parallels Apple's misconduct in *Apple II*. UMC (following in Apple's footsteps) similarly failed to ensure that any preservation was effectively implemented, or that key custodians and personnel were informed or educated about preservation. *See* Section III.A.4, *supra* (discussing UMC's failures to effectuate preservation). These failures, when coupled with the multiple preservation Orders by both Special Master Garrie and Magistrate Judge Leen constitute willful spoliation. *See* [Dkt. 121]; [Dkt. 143]; [Dkt. 154]; [Dkt. 159]. Accordingly, Special Master Garrie concludes that UMC's actions were willful and/or in bad faith.

**(b)   Application of the Five-Factor Test for Case Dispositive Sanctions.**

In imposing the "harsh sanction" of dismissal, a court must consider: (1) the public interest in expeditions resolution of litigation; (2) the Court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Jorgensen v. Cassiday,* 320 F.3d 906, 912 (9th Cir. 2003) (quoting *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987)); *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Special Master Garrie finds that UMC's actions meet all five of these criteria.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

62

### (i)    The Expeditious Resolution Of This Litigation Serves The Public Interest

The public's interest in expeditious resolution of litigation always favors dismissal." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 990 (9th Cir. 1999).   Here, as recounted above and incorporated herein by reference, UMC violated *numerous* of the Court's and the Special Master's orders and deadlines with respect to discovery.  These violations, including: the willful deletion of SMS messages in *direct* contravention of Magistrate Judge Leen's order, failure to preserve responsive ESI in Clarity, Crimestar, GRASP, Q-Drive data, and local drives, resulted in the spoliation of evidence. *See* Section III (A). This spoliation was coupled with multiple misrepresentations by UMC as to the completeness of its productions and UMC's purported compliance with the Court-ordered ESI protocol. *See* Section III B.3.b; III.C.

UMC's failure to cooperate with counsel and the Court is not harmless. UMC's conduct hindered the Court's and Plaintiff's ability to move this dispute forward diligently. *See Godfrey v. Astrue*, No CV 07-003336 SS, 2010 U.S. Dist. LEXIS 7578 at * 5 (January 29, 2010, C.D. Cal. 2010) (granting motion to dismiss for failure to prosecute where plaintiff failed to comply with discovery deadlines, failed to respond to defendant's motions and court's order, and failed to attend a court hearing); *see also, Ferdik v. Bonzelet, et al.*, 963 F.2d 1258, 1261 (9th Cir. 1992) (upholding district court's dismissal of action where case dragged on for over  year and a half before dismissal, during which time it consumed large amounts of court's valuable time that it could have devoted to other cases on the docket); *see also, Moneymaker v. CoBen (In re Eisen),* 31 F.3d. 1447, 1452 (9th Cir.1994*),* citing *Malone v. United States Postal Service*, 833 F.2d 128 (9th Cir.1987) (upholding dismissal where Plaintiff failed to take any substantive action in his case until after the motion to dismiss was filed: "Anything Moneymaker did to move his actions to trial was after he was forced to do so and he "cannot use his actions after the motion to dismiss was filed as evidence of his diligence in prosecuting the suit.") *quoting Fidelity Philadelphia Trust Co., v. Pioche Mines*

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

63

1  *Consol., Inc.,* 587 F.2d 27, 29 (9th Cir. 1978).[117] Thus, Special master concludes that the first

2  factor weighs in favor of ordering case dispositive sanctions against UMC.

3  **(ii)  UMC's Actions Have Hindered The Court's Ability To Manage Its Docket**

4  It has long been recognized that the court's inherent power to control its docket includes

5  the ability to issue severe sanctions, such as striking an answer or entering a default judgment,

6  where appropriate. *See Thompson v. Housing Authority of Los Angeles*, 782 F.2d 829, 831 (9th

7  Cir. 1986). Indeed, the Supreme Court has noted that case-dispositive sanctions "must be available

8  to the district court in appropriate cases, not merely to penalize those whose conduct may be

9  deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the

10  absence of such a deterrent." *National Hockey League*, 427 U.S. at 643. *Herb Reed Enterprises,*

11  *Inc. v. Monroe Powell's Platters, LLC,* 2:11-CV-02010-PMP, 2013 WL 3729720 (D. Nev. July

12  11, 2013) report and recommendation adopted, 2:11-CV-02010-PMP, 2013 WL 5278518 (D. Nev.

13  Sept. 17, 2013)).

14  Here, UMC's failures to: (1) comply with multiple discovery orders, including the ESI

15  Protocol, as well as the Court's specific orders to preserve evidence; (2) adhere to deadlines set by

16  the Court and the Special Master; and (3) cease misrepresenting its productions as complete and

17  

18  

19  

20  

21  

---

22  [117] The Ninth Circuit has "squarely rejected" the construct that a belated offer remedies a parties failure to comply with discovery. *Henry v. Gill Industries, Inc*., 983 F.2d 943, 947 (9th

23  Cir.1993), citing *North Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th

24  Cir.1986) (order of dismissal affirmed: "Belated compliance with discovery orders does not preclude the imposition of sanctions."); *G-K Properties v. Redevelopment Agency of San Jose*,

25  577 F.2d 645, 647-48 (9th Cir.1978) [order of dismissal affirmed: "last minute tender" of

26  discovery does not cure effects of discovery misconduct].

27  REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE

28  Case No.:  2:13-cv-00298-APG-PAL

compliant, has effectively halted the timely advancement of this case and the Court's ability to manage its docket.

UMC has violated multiple simply stated orders from the Court and Special Master Garrie. When called to account for the violations, UMC has pleaded their size, their organization structure, their employee turnover, and other individual factors. "Where a court order is violated, the second factor also supports case-dispositive sanctions. " *Adriana*, 913 F.2d at 1412.   For all these reasons Special Master Garrie concludes that the second factor weighs in favor of ordering case dispositive sanctions against UMC.

(iii)    **Plaintiffs' Have Suffered Prejudice As A Result Of UMC's Spoliation**

The prejudice inquiry "looks to whether the [spoliating party's] actions impaired [the non-spoliating party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988) (citation omitted).

Data has been lost from UMC's failure to preserve ESI on three timekeeping systems, the Q-Drive, as well as several other key ESI repositories. *See* Section III.C, *supra*. It is uncontroverted that UMC's spoliation includes thousands of files on network file shares and thousands of text messages. *See* Section III.E, *supra*. UMC's significant delay and errors in preserving and collecting ESI makes it a near certainty that responsive evidence was irretrievably lost or deleted. *See* Sections III.A, III.B, *supra*.   Thus, Special Master Garrie concludes that Plaintiffs have suffered prejudice.

(iv)    **Public Policy Does Not Prevent Granting Case Dispositive Sanctions Against UMC**

While public policy favors the resolution of cases on their merits, the prejudice Plaintiffs has suffered here outweighs this public policy.  *See, e.g., Herb Reed*, 2013 WL 3729720, at *5

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

65

(citing *Daniels*, 2013 WL 1332248, at *3).  UMC's extensive discovery-related misconduct has made it impossible for the Court to continue the case with reasonable assurance that Plaintiffs have sufficient access to facts needed to prosecute their claims. *Id.*

In addition, the deterrent effect of dispositive sanctions is a public policy interest that supports dispositive sanctions here. UMC is a public institution and there is a need to deter UMC's executives from continuing to turn a blind eye to their discovery obligations. *See, e.g.*, *Herb Reed*, 2013 WL 3729720, at *4 (noting that "case-dispositive sanctions 'must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.'") *quoting Nat'l Hockey League*, 427 U.S. at 643); *see also, Chilcutt*, 4 F.3d at 1325 (noting importance of deterrent effect).

In summary, it is in the interest of public policy that discovery abuses of the scale and extent present here be met with substantial consequences. Such consequences not only justifiably penalize UMC for its disregard of its obligations and protect Plaintiffs from the resulting prejudice, but it provides a credible deterrent effect that prevents future abuses.  Thus, Special Master Garrie concludes that the fourth factor weighs in favor of ordering case dispositive sanctions against UMC.

### (v) Less Drastic Sanctions Cannot Remedy The Prejudice Plaintiffs Have Suffered

The district court must consider "less severe alternatives" than case-case dispositive sanctions before granting such extreme relief.  *Leon*, 464 F.3d 951; *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 603 (9th Cir. 1988).[118] In the Special Master's

---

[118] Notably, Magistrate Judge Leen warned UMC on at least two occasions of the possibility of case dispositive sanctions. *See, e.g., Malone v. US Postal Service,* 833 F. 2d at 128 (Warnings of case-termination support such sanctions and reduce the need to consider alternative sanctions).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

estimation, less drastic sanctions can address some but not all of the problems caused by UMC's spoliation.

The increased costs and delays caused by UMC's serial errors and misrepresentations can be remedied by an order shifting "reasonable" costs and fees to UMC.[119] *Knickerbocker v. Corinthian Colleges* (awarding monetary sanctions for failure to implement a litigation hold, deletion of evidence, lack of cooperation, ineffective search, and inaccurate representations); *accord*, *Herzog v. Zyen, LLC (In re Xyience, Inc.)*; *Perez v. Vezer Indus. Prof'ls*; *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997).

Likewise, courts in this Circuit have "inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Leon*, 464 F.3d at 958; *Glover v. BIC Corp*., 6 F.3d 1318, 1329 (9th Cir. 1993); *Apple I*, 881 F.Supp.2d at 1135. Here, adverse inference sanctions may remedy some of the prejudice Plaintiffs suffer from the unavailability of relevant evidence at trial. *See Zest IP Holdings, LLC v. Implant Direct Mfg. LLC,* 2013 U.S. Dist. LEXIS 149727 (S.D. Cal. Oct. 16, 2013).[120]

Finally, neither the parties nor Special Master Garrie have been able to locate extensive case law discussion regarding the issuance of dispositive sanctions to a Plaintiff class. Such a sanction would be at the very least procedurally problematic. Case dispositive sanctions against defendant UMC would first require the certification of the class and the issuance of a default judgment or its equivalent. Such a judgment would also appear to require an inquest or

---

[119] While it is unfortunate that this will come from the tax payers, this sanction is meant to incentivize UMC to implement proper e-discovery, and save UMC substantial costs going forward in future proceedings.

[120] Other types of sanctions are likely to be ineffective or untenable here. For example, exclusionary sanctions here would likely be ineffective as they would likely not remedy the prejudice suffered by Plaintiffs from the unavailability of evidence. Similarly, some courts have issued sanctions by shifting the burden of proof on claims and defenses. *See TR Investors, LLC v. Genger*, 2009 Del. Ch. LEXIS 203 (Del. Ch. Dec. 9, 2009). However, such burden shifting may contravene the intent of Congress in enacting the FLSA and the agency rulemaking authority of the Department of Labor.

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.: 2:13-cv-00298-APG-PAL

67

determination of damages, thus forcing a damages trial and arguably undermining one of the benefits of the sanction to the non-spoliating party. Nevertheless, Special Master Garrie finds that case dispositive sanctions are warranted here as lesser sanctions do not fully address the prejudice to Plaintiffs.

This litigation alleges that UMC improperly deprived its employees of appropriate wages and overtime compensation. UMC's widespread failure to preserve, collect and produce ESI, including ESI from timekeeping systems and plainly relevant folders on the Q-Drive  (*see* Section III.A.2.a, *supra*), robs Plaintiffs of ESI and information relevant to their claims. Most perniciously UMC's actions make it impossible to know the degree of prejudice Plaintiffs have suffered. In these circumstances, only case dispositive sanctions fully protect Plaintiffs from UMC's willful failures.

## V.    RECOMMENDATIONS

### A.    Recommendation As to FLSA Opt-in Plaintiffs

The Special Master RECOMMENDS sanctions. Defendant UMC's extraordinary misconduct and substantial and willful spoliation of relevant ESI in this case resulted in substantial prejudice to Plaintiffs and the classes, and misled Plaintiffs, the Court, and the Special Master on numerous discovery issues. *See* Section III, *supra*. The level of intentional destruction of evidence by UMC shocks the conscious.  As such, as to the 613 Opt-In Plaintiffs, default judgment should be entered against UMC pursuant to Rule 37(b)(2)(A)(iii) & (vi) and the Court's inherent powers. *Anderson v. Air West, Inc.*, 542 F.2d 522, 524 (9th Cir. 1976) ("The law presumes injury from unreasonable delay."); *Leon* , 464 F.3d at 958 (spoliation of discoverable information is prejudicial in that it interferes with a party's ability to go to trial); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (affirming dismissal of counterclaim where court observed that defendant would "say anything at any time in order to prevail in this litigation.").

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

68

**B.     Recommendation As To Putative Class Plaintiffs**

Pursuant to Rule 37(b)(2)(A)(i) & (ii) and the Court's inherent powers, the Special Master believes Plaintiffs are entitled to sanctions in the form of specific factual findings relating to class certification, and a rebuttable presumption regarding certain merit issues.

**1.     Class Certification Under Federal Rule Of Civil Procedure 23(a)**

The Special Master is generally familiar with the allegations in the Amended Complaint [Dkt. 37] and understands that Plaintiffs have filed this case as both an FLSA collective action and a Rule 23 class action.  UMC's actions and willful failure to comply with the Court's orders has interfered with the Court's ability to hear this case, substantially delayed the litigation, disrupted the timely management of the Court's docket, wasted judicial resources, prejudiced Plaintiffs and thousands of putative class members, eviscerated the integrity of the Court's case management and discovery orders, and made a mockery of the orderly administration of justice.

Given the breadth of UMC's intentional and willful spoliation, and given that UMC has so grievously and wantonly damaged the integrity of the discovery process such that there can never be an assurance of proceeding on the true and complete facts of this case, the Special Master hereby RECOMMENDS that the Court issue factual findings in support of Rule 23 class certification.

Rule 37(b)(2)(A)(i) expressly provides that the Court can "direct" or "designate [that] facts be taken as established for purposes of the action," while Rule 37(b)(2)(A)(ii) authorizes the Court to issue sanctions "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."  These Rules rightly support ordering factual findings regarding certification as a sanction here, and also support barring UMC from opposing Rule 23 certification in this case.  *See, e.g.*, *Gaddis v. Abell*, No. 03-10773-PM, 2006 WL 4671850, at *1 (Bkrtcy. D. Md. July 13, 2006) (court granted certification of class action as a sanction under Rule 37(b) for defendant's failure to produce documents in response to a scheduling order and order requiring production, and denied reconsideration of that

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

69

order); *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719, 726 (2010) (discovery sanction in form of striking of defendant's evidence filed in opposition to class certification motion was appropriate).[121]

Accordingly, the Special Master RECOMMENDS that the following facts "be taken as established for purposes of the action" in accordance with Rule 37(b)(2)(a)(A)(i), and that UMC be precluded from opposing these findings in accordance with Rule 37(b)(2)(a)(A)(iii):

- This case consists of more than 600 FLSA Opt-In Plaintiffs and thousands of putative plaintiffs;

- Plaintiffs' proposed classes are so numerous that joinder of all members is impracticable [Dkt. 37, at ¶¶41(a), 42];

- Plaintiffs, Opt-In Plaintiffs and putative class members worked for UMC as hourly-paid employees [Dkt. 37, at ¶20];

- These hourly-paid employees are largely homogenous across job-titles in that, within each job-title category, employees shared similar training, job descriptions, job requirements, and compensation, as well as working conditions, and were in fact

---

[121] Plaintiffs alleged the factual prerequisites and requested Rule 23 class certification in their Amended Complaint. [Dkt. 37, ¶¶40-50]. That Plaintiffs have not yet filed a motion for Rule 23 certification does not preclude the certification-related issue sanctions requested here. Indeed, UMC's pervasive and repeated discovery misconduct in this case substantially interfered with Plaintiffs' ability to move for certification in the first place. Instead of gathering certification-related evidence and preparing their motion, Plaintiffs have spent the better part of 18 months embroiled in a tedious and frustrating battle to obtain even the most basic of discovery from UMC. Thus, where UMC's own conduct has rendered the preparation and filing of a motion for Rule 23 class certification impracticable, certification is an appropriate sanction, even without a previously-pending motion. *See Ward v. NationsBanc Mtge. Corp*., 2006 WL 1516406 (Ct. App. Ohio 2006) (trial court did not abuse its discretion by certifying the action as a class action as a discovery sanction in the absence of a motion for class certification; however, the trial court still should have made factual findings in support of certification). *Telford v. Ideal Mortg. Bankers, Ltd.*, No. 09–CV–5518 (JS)(AKT), 2010 WL 3909313 (E.D.N.Y Sept. 27, 2010) (in putative class action, entering default judgment on liability and allowing plaintiff 90 days to move for class certification); *Skeway v. China Natural Gas, Inc.*, No. 10-728-RGA, 2014 WL 2795466 (D. Del. June 18, 2014) (after defendant defaulted in putative class action, court properly certified the class before entering default judgment, noting "[a]s a policy matter, any other conclusion might give defendants an incentive to default in situations where class certification seems likely.") (quotation omitted).

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

70

subjected to the same UMC policies, procedures and practices on the job during the time period examined [Dkt. 37, at ¶¶20, 31];

- UMC managed hourly employees' work, including the number of hours worked and when they worked, and UMC further was in control of the conditions under which hourly employees worked, including but not limited to, staffing levels and meal break procedures [Dkt. 37, at ¶21];

- UMC dictated and controlled the wages paid and hours reported by hourly employees [Dkt. 37, at ¶21];

- UMC agreed and was required by law to pay its hourly-paid employees for all time worked [Dkt. 37, at ¶22];

- Hourly employees' meal breaks were missed and/or interrupted without compensation [Dkt. 37, at ¶23];

- There are questions of law or fact common to the hourly employees classes [Dkt. 37, at ¶¶41(b), 43];

- The claims or defenses of the representative parties are typical of the claims or defenses of the hourly employees classes [Dkt. 37, at ¶¶41(c), 46-47];

- The representative parties will fairly and adequately protect the interests of all hourly employees [Dkt. 37, at ¶¶41(d), 45];

- Plaintiffs and other hourly employees are similarly situated and subject to UMC's central control and common policies regarding meal breaks and compensation, and all suffered damages as a result [Dkt. 37, at ¶¶17, 19-21, 23, 28, 52];

- Factual issues common to all hourly employees predominate over any questions affecting only individual members [Dkt. 37, at ¶49]; and

- That a class action is the superior method of adjudicating the claims of Plaintiffs and the putative classes [Dkt. 37, at ¶50].

### 2.     Liability And Damages

The Special Master also RECOMMENDS that as a further discovery sanction Plaintiffs should be granted the following facts as a rebuttable presumption:

- UMC failed to maintain, and still fails to maintain, proper time records reflecting when and if its hourly-paid employees actually take bona fide 30-minute meal breaks, or whether they worked through some or all of their purported meal break [Dkt. 37, at ¶23], such that UMC failed to keep true and accurate time records for all hours worked by its hourly-paid employees [Dkt. 37, at ¶43];

- UMC has not paid its hourly-paid employees for the bona fide meal breaks its employees did not receive [Dkt. 37, at ¶24];

- UMC made deductions from its hourly-paid employees' pay for meal breaks not taken. [Dkt. 37, at ¶43];

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL

71

- UMC has known since before Plaintiffs filed this lawsuit that its hourly-paid employees were in fact working during meal breaks while UMC was automatically deducting 30 minutes each day of work time its employees actually performed [Dkt. 37, at ¶25];

- UMC knew that its hourly employees were performing work during the purported meal breaks, yet failed to pay them for such time in violation of the FLSA and Nevada state wage and hour laws [Dkt. 37, at ¶33], and UMC's violations were willful [Dkt. 37, at ¶¶28, 34, 56, 58];

- Despite this knowledge, UMC continued to automatically deduct 30 minutes of work time from each 8 hour shift which resulted in depriving its hourly-paid employees of payment for work being performed.

- UMC had an "On-Duty Meal Policy" as described in the Amended Complaint that automatically deducted 30 minutes per full shift from each hourly-paid employees' pay [Dkt. 37, at ¶43];

- UMC automatically deducted 30 minutes of pay for each 8-hr shift that each hourly employee worked as a purported meal break, regardless of whether a bona fide 30-minute meal break was actually taken [Dkt. 37, at ¶23];

- UMC's practice of automatically deducting 30 minutes from each 8-hr shift as a purported meal break was uniformly applied to all hourly-paid employees, and resulted in the underpayment of wages to all hourly-paid employees [Dkt. 37, at ¶23].

- UMC's, hourly-paid employees missed, on average, one meal break for every shift worked in each pay period during their employment.

## C.    Recommendation Of Costs And Fees

It is further RECOMMENDED that UMC be ordered to reimburse Plaintiffs' reasonable costs and fees in these proceedings, including their costs in bringing a motion to compel production, in attending discovery status conferences before Magistrate Judge Leen, and for time spent in the proceedings before Special Master Garrie.


**IT IS SO RECOMMENDED**


Daniel Garrie, Esq.
Court Appointed Electronic Discovery Special Master

REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
SPECIAL MASTER DANIEL B. GARRIE
Case No.:  2:13-cv-00298-APG-PAL