# EXHIBIT Y

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| GERALD HESTER, on behalf of himself and all others similarly situated, | Case No.: 2:09-cv-00117-RLH-RJJ |
| Plaintiff, | **O R D E R** |
| vs. | (Motion for Sanctions–#180) |
| VISION AIRLINES, INC., | |
| Defendant. | |

Before the Court is Plaintiff Gerald Hester's **Motion for Sanctions** (#180), filed October 5, 2010. The Court has also considered Defendant Vision Airlines, Inc.'s Opposition (#184), filed October 14, 2010, Hester's Reply (#187), filed October 20, 2010, and the supplements provided by both parties. The Court held a hearing (#189) on this motion on October 25, 2010.

## BACKGROUND

Since 2005, Defendant Vision Airlines has provided air transportation services for the United States government as a subcontractor. Twice weekly, Vision transports individuals and cargo to and from Bagdad, Iraq and Kabul, Afghanistan. Although this service ultimately benefits the federal government, Vision does not contract directly with the United States. Initially, the U.S.

1

government contracted with Computer Sciences Corporation ("CSC") to provide transportation via an Air Bridge Program to Bagdad and Kabul. CSC, in turn, subcontracted with Capital Aviation, Inc., which then subcontracted with Vision to provide the air transportation services. Vision ultimately provided these services pursuant to its subcontract with Capital Aviation until the summer of 2007, at which point, Vision contracted with McNeil Technologies, Inc. ("McNeil") (who apparently stepped into the shoes of CSC or Capital Aviation). Vision currently provides air transportation services to Iraq and Afghanistan under the Air Bridge Program subcontract with McNeil.

According to Hester, the government pays the first contractor who then passes the money down either directly to Vision or to another contractor who then pays Vision. Hester further alleges that as part of CSC's and McNeil's subcontracts with the U.S. Government, they each provided Vision with hazard pay for the employees who operate Vision's flights to and from the Middle East. Capital Aviation and McNeil allegedly then both provided that hazard pay to Vision. Vision is then required to remit the hazard pay to its crew members.

Hester alleges that starting in May 2005, he operated flights twice weekly to and from Kabul International Airport. Hester further alleges that from May 2005 to September 2005, Vision collected hazard pay for its employees, but made only "sporadic payments" during that time. (Dkt. #63, Mot. 3.) According to Hester, at the end of September 2005, Vision "decided to retain [the] hazard pay for itself and fire[] all of the employees who were aware that Vision was required to pay its employees hazard pay." (*Id*.) Thus, Hester alleges that from October 2005 until mid–2007, Vision received hazard pay from Capital Aviation for its flights to Iraq and Afghanistan, but did not remit any of these payments to its employees. Finally, Hester alleges that Vision has received hazard pay from McNeil since mid–2007 to the present, but has not paid out this money to its employees.

On January 20, 2009, Hester filed suit in this Court alleging (1) unjust enrichment; (2) constructive trust; (3) money had and received; (4) quantum meruit; (5) conversion; (6)

2

AO 72
(Rev. 8/82)

1  injunctive relief; and (7) declaratory relief. (Dkt. #1, Compl.) The Court granted summary
2  judgment against the Class as to the constructive trust and *quantum meruit* claims. (#159, Order,
3  Sept. 15, 2010.) The Court then affirmed the Magistrate Judge's Order (#152, Sept. 9, 2010)
4  granting the Class' Motion to Compel Discovery (#93). (#172, Order, Sept. 21, 2010.)
5          On September 29, 2010, the Court held a pretrial conference with the parties during
6  which it ruled on various matters. Particularly, the Court ordered Vision to comply with the Order
7  (#172) compelling certain discovery items with great haste, by the end of the week if at all
8  possible. The Court also ordered that trial of this case would trail criminal case 2:07-cr-51-RLH-
9  PAL rather than proceeding on October 4, 2010, as scheduled.
10          On October 5, 2010, the Class brought the present Motion for Sanctions (#180)
11  arguing that Vision had not complied with the Order (#172) compelling discovery . The Class also
12  alleged and explained that Vision had made false statements to the Court at the September 29
13  hearing regarding what discovery Vision had previously provided. The Court ordered the parties
14  to submit briefs on an expedited schedule and further ordered Vision to show cause why it should
15  not be sanctioned. (#182, Order, Oct. 8, 2010.) After having again told the Court that it had
16  completed its discovery production in its Response (#184), Vision provided new documents as part
17  of its Supplement (#186) to its Response (#184). Some of these documents also showed recent
18  efforts by Vision to obtain documents that it should have obtained and produced months earlier.
19          The Court then held a hearing on the Motion for Sanctions (#180) on October 25,
20  2010. The Court heard argument regarding Vision's alleged discovery abuses. Vision again
21  represented to the Court that it had provided everything it had access to–despite directly
22  contradictory deposition testimony by Vision's own witnesses. High-level Vision employees
23  (such as Vision's chief executive officer, Vision's chief financial officer, the person in charge of
24  the Air Bridge program, and others) testified to the existence of various documents that still have
25  not been produced. As deposition witnesses testifying pursuant to Fed. R. Civ. Pro. 30(b)(6) as the
26  people most knowledgeable, many of these witnesses failed to prepare themselves on noticed

AO 72
(Rev. 8/82)

1  topics. They particularly failed to prepare themselves regarding what efforts Vision took to search
2  for and produce responsive documents. Many of these witnesses testified that they had no
3  knowledge of any discovery efforts beyond their own, minimal actions.

4  Further, the Class used a particular document (Bates Number SUPP001) as a
5  representative example of Vision's noncompliance during the Oct. 25 hearing. This document is
6  labeled as page 20, but page 20 of what, the Court and the Class do not know as the rest of the
7  document has not been produced. Vision provided the document to the Class in redacted form
8  and without a privilege log, the same manner in which Vision produced many other documents. The
9  Court asked whether Vision could provide this document unredacted. Vision replied that it could.
10 The Court then ordered that Vision produce the document, in unredacted form, that same day after
11 the hearing. (# 189, Hr'g. Mins.) Also during that proceeding, and in various other court
12 documents, Vision again represented to the Court that it had completed its discovery obligations
13 by delivering all responsive documents that Vision could access to the Class. These assertions
14 turned out to be false.

15 After the hearing, Vision informed the Class that it no longer had an unredacted
16 copy of the Bates Number SUPP001 document notwithstanding the Court's order during the
17 hearing and Vision's own representations. Instead, however, Vision sent the Class a different,
18 similar document that had never before been produced despite it being responsive to discovery
19 requests and relevant to this litigation. This document is labeled Section 6.3.3, meaning that it is
20 part of a larger document that has still not been produced to the Class. In attempting to justify
21 production of this document rather than the SUPP001 document, Vision claims that this document
22 is even more detailed than the SUPP001 document.

23 The above clandestine actions and misrepresentations are representative of Vision's
24 conduct, but are only a portion of Vision's discovery abuses. Vision, amongst other things, also
25 forced the Class to litigate in a different district against McNeil, one of Vision's up-stream
26 contractors, to obtain some of the documents that Vision itself would not produce. (McNeil had

4

AO 72
(Rev. 8/82)

these documents because Vision produced them when Vision previously sued McNeil.) This evidence obtained from McNeil is the reason that the Class has much of the information that it does. This evidence also shows that other, non-produced evidence exists. Then, when the Class produced this information to Vision, Vision merely restamped it with a new Bates stamp and reproduced to the Class claiming that it was Vision's own production for this case. For the reasons the Court stated in the hearing and the reasons set forth below, the Court grants the Class' motion.

## DISCUSSION

### I. Legal Standard

"Courts need not tolerate flagrant abuses of the discovery process." *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). If a party fails to obey a court order to provide discovery the court may order any of the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) dismissing the action or proceeding in whole or in part;

(v) rendering a default judgment against the disobedient party; or

(vi) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

*Tobin v. Granite Gaming Group II, LLC*, No. 2:07–cv–577–BES–PAL, 2008 WL 723337, at *7 (D. Nev. March 17, 2008) (citing Fed. R. Civ. P. 37(b)(2)(A)); *see also Harry and David v. Pathak*, No. CV 09–3013–CL, 2010 WL 2432071, at *6 (D. Or. Apr. 7, 2010) (noting that a district court may enter a default judgment under Fed. R. Civ. P. 55 for discovery violations.) The Court may also impose sanctions for discovery abuse pursuant to its inherent authority. *Harry and David v. Pathak*, No. CV 09–3013–CL, 2010 WL 3154589, at *1 (D. Or. Aug. 6, 2010) (adopting

AO 72
(Rev. 8/82)

the magistrate judge's recommendation of case dispositive sanctions under the court's inherent authority.) In *Harry and David*, the Oregon district court entered a default judgment against a party because of its "history of inadequate responses to discovery, noncompliance with court orders, and general disrespect for federal rules," similar to Vision here. 2010 WL 2432071, at *1.

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to provide or permit discovery.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (internal citations omitted). To impose discovery sanctions under Rule 37(b)(2)(A), a party must violate a court order compelling discovery. *Hyde & Drath v. Baker*, 24 F.3d 1162, 1170 (9th Cir. 1994). Further, "[i]n evaluating the propriety of sanctions [a district court may] look at all incidents of a party's misconduct" as long as the abuses are of the same kind, *i.e.* all discovery abuses. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) (citation omitted). Therefore, in determining sanctions, the Court may consider all of Vision's discovery abuses as a whole. This includes the astonishing failure to abide the Court's order issued at the hearing on the Motion for Sanctions and Order to Show Cause.

A district court must analyze several factors to determine if striking a party's pleadings is an appropriate sanction. Specifically, a district court considers: (1) the public's interest in the expeditious resolution of litigation, (2) the court's need to manage its docket, (3) the risk of prejudice to the non-offending party, (4) the public policy favoring disposition of cases on their merits, and (5) the availability of less drastic sanctions. *IDX Sys.*, 464 F.3d at 958 (citing *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)) (applying the same test used to determine the propriety of Rule 37 sanctions to sanctions granted under the court's inherent power). These factors, however, "are not a series of conditions precedent before the judge can do anything, but a way for a district judge to think about what to do." *In re*

6

*Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1226 (9th Cir. 2006) (citation and internal quotations omitted); *see also IDX Sys.*, 464 F.3d at 958 (noting that the district court need not make explicit findings as to each factor and upholding a terminating sanction where the court only considered the plaintiff's level of culpability, the prejudice suffered, and the availability of lesser sanctions.)

## II.     Vision's Arguments against Sanctions

Vision contends that the Court's Order (#179, Hr'g. Mins. Sept. 29, 2010) regarding the Class' expert's report made any other request for sanctions moot. At the September 29 hearing, the Court ordered that the Class' expert's final report must be finished within two weeks of Vision providing all discovery covered by the Motion to Compel. The Court further ordered that if Vision's procrastination made it impossible to depose the expert or review his report before trial, then Vision would simply not have an opportunity to do so.

Vision's argument that this Order limits further sanctions is flawed. First, imposing one sanction or order does not inhibit this Court from imposing further sanctions or orders. Second, Vision's contention, taken to its logical conclusion, would allow Vision to never produce anything under the Court's Order with the only sanction being that they could not depose the Class' expert or view the incomplete report before trial. The Court will not allow such a result because it would defeat the interests of justice.

Vision's other arguments only seek to obfuscate the issue. Vision's Reply (#184) essentially only addresses what discovery Vision has produced and claims that such discovery is sufficient under the Federal Rules of Civil Procedure. Vision does not address what it failed to produce or its misrepresentations and violations of this Court's orders. This simply bolsters the Court's conclusion that Vision's conduct is inexcusable.

## III.    Vision's Intentional Conduct Justifies Striking its Answer

In order for Vision's conduct to justify striking its pleadings, Vision's conduct must be the result of willfulness, bad faith, or fault. *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir.

7

1  2003).  "[D]isobedient conduct [within] the control of the litigant is all that is required to
2  demonstrate willfulness, bad faith or fault."  *Henry v. Gill Inds.*, 983 F.2d 943, 948 (9th Cir. 1993)
3  (internal quotations omitted); *see also Jorgensen*, 320 F.3d at 912.  Here, Vision has intentionally
4  delayed production of documents, misrepresented its current and past production to both the Court
5  and the Class, and otherwise engaged in bad faith conduct.  Since the Court has determined that
6  Vision has acted wilfully and in bad faith, the Court will now address the *Anheuser-Busch* factors
7  to determine whether striking Vision's Answer (#47) is appropriate.

      **A.**      **The Public's Interest, the Court's Interest, and Public Policy**

9        The Court finds that the public interest in the expeditious resolution of cases and
10  the Court's interest in managing its docket are best served by striking Vision's answer and entering
11  a default against it.  Vision's conduct has prejudiced the Class and limited the Class' ability to try
12  this case through intentional, bad faith conduct in the discovery process.  This has led to multiple
13  hearings and motions before this Court which have nothing to do with the merits of this case, but
14  have been necessary due to Vision's misconduct.  These extra motions and hearings have
15  interfered with the Court's ability to efficiently manage its docket in a manner fair to all parties
16  with pending cases.  While public policy favors that cases be heard on their merits, Vision has
17  done everything it can to prevent such resolution.  Through its conduct, Vision has attempted to
18  ensure that an accurate and fair trial on the merits of this case will never happen.  Therefore, each
19  of these three factors weighs towards striking Vision's Answer (#47) and entering a default.

      **B.**      **Less Drastic Alternatives**

21        The Court finds that no less drastic, alternative sanction would be sufficient
22  because of the prejudice Vision has already caused to the Class.  "The district court abuses its
23  discretion if it imposes a sanction of dismissal without first considering the impact of the sanction
24  and the adequacy of less drastic sanctions."  *Malone v. U.S. Postal Serv.*, 833 F.2d at 132 (quoting
25  *United States v. Nat. Med. Enter., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986); *cf. Pagtalunan v.*
26  *Galaza*, 291 F.3d 639 (9th Cir. 2002) (affirming sanction of dismissal even though the district

1    court had not considered lesser, alternative sanctions). Also, in determining whether prejudice has

2    occurred, the Ninth Circuit "examine[s] whether the [sanctioned party's] actions impair the

3    [moving party's] ability to go to trial or threaten to interfere with the rightful decision of the case."

4    *Malone*, 833 F.2d at 131. Unreasonable delay results in a presumption of injury and prejudice.

5    *Anderson v. Air West, Inc.*, 542 F.2d 522, 524 (9th Cir. 1976). The Court has carefully weighed

6    the impact and severity of this sanction and has considered whether alternative sanctions would be

7    sufficient. After consideration, the Court has determined that no alternative sanction would be

8    sufficient and Vision's conduct warrants striking its Answer. The Court will now discuss why the

9    two best, alternate sanctions would be insufficient and ineffective.

10                 **1.     Discovery Extension**

11           One possible lesser sanction would be to simply extend the period of discovery and

12    make further demands that Vision produce the previously demanded discovery. However, the

13    Court finds no reason or evidence to believe that this would be effective. One particular reason

14    that this would be ineffective is that Vision did not act to preserve documents when this litigation

15    began. (Dkt. #180, Ex. 17, Miller Dep. 57, 68; Ex. 15, Maguire Dep. 47–52, 97–98.)

16    Additionally, some of Vision's officers continue, even now, to erase emails (*Id.*, Ex. 18 Acor Dep.

17    596), and other documents are no longer available such as James Maguire's crew salary

18    computation spreadsheet (*Id.*, Ex. 15, Maguire Dep. 46-50). It is now impossible to know whether

19    some of these discovery items would have been available had Vision acted properly, but they are

20    unavailable now.

21           In the Court's view, Vision will act to delay this litigation and prevent discovery by

22    any means necessary. The Court has no reason to believe that given an extension Vision would

23    now begin to adhere to its obligations and comply with the Court's orders. Nor does the Court

24    believe that Vision could rectify the harm that it has already caused by not preserving documents.

25    To extend discovery would merely give Vision what it desires–further delay–and would simply

26    /

AO 72
(Rev. 8/82)

1  validate Vision's misconduct. Therefore, the Court finds that extending discovery would not be an
2  adequate sanction.

### 2. Adverse Inference Instruction

The best lesser sanction would be an adverse inference instruction. A district court has the "power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). This power includes the power to sanction the party responsible for spoliating or otherwise destroying or failing to turn over evidence by instructing the jury that it may infer that the spoliated or destroyed evidence would have been unfavorable to the responsible party. *Id.*; *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). The standard for an adverse inference instruction is lower than that for striking a party's pleadings. It requires only bad faith or gross negligence on the part of the sanctioned party in spoliating or failing to turn over relevant evidence. *Karnazes v. Cty. of San Mateo*, No. C 09–0767 MMC (MEJ), 2010 WL 2672003, at *2 (N.D. Cal. July 2, 2010) (citing *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 268 (2nd Cir. 1999)).

In determining whether to issue an adverse inference instruction, a court examines "whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *IDX Sys.*, 464 F.3d at 959 (alteration in original) (citations and internal quotations omitted). "In *Anheuser-Busch*, [the Ninth Circuit] found prejudice when a party's refusal to provide certain documents forced Anheuser to rely on incomplete and spotty evidence at trial." *IDX Sys.*, at 959 (internal quotations omitted). Here, much (if not most) of the Class' evidence came from McNeil–not from Vision. Vision's refusal to provide discovery forced the Class to sue a third party which had relevant documents, which Vision also had or has, to obtain the Class' evidence. Even with the evidence obtained from McNeil, Vision's conduct would force the class to "rely on incomplete and spotty evidence at trial." *Id.*

/

10

1  Here, an adverse inference instruction would be insufficient and likely ineffective.
2  Vision has taken limited, if any, effort to preserve, search for, or produce documents relevant to
3  this litigation.  It has also become evident that Vision is willing to mislead the Court time after
4  time in order to keep from producing relevant, possibly critical, discovery material.  This is further
5  demonstrated by Vision's production of a new, never before produced document instead of the
6  Court ordered document after the Court's hearing on the Motion for Sanctions.  As a result, neither
7  the Class nor the Court has any idea what else Vision has failed to produce.  *Merrick v. Paul*
8  *Revere Life Ins. Co.*, 500 F.3d 1007, 1015 (9th Cir. 2007) ("the existence of withheld documents
9  may be inferred from the paucity of material actually produced.")  While the Court is aware of
10 certain categories of documents that Vision has failed to produce, such as abundant email and
11 contract modifications, Vision's conduct makes the Court believe that more is likely available.
12 Because Vision has produced so little to the Class and because of the limited information Vision
13 has made available to the Court, a mere adverse inference instruction would be insufficient and
14 would not remedy the great prejudice to the Class.  A jury would not be able to determine, nor
15 would the class be able to show, what documents have been withheld or spoliated or what type of
16 information such non-produced documents might contain.  Any jury instruction that the Court can
17 conceive would be too broad and amorphous to be actually effective in helping the jury deliberate.
18 Therefore, the Court concludes that the only viable sanction is striking Vision's answer and
19 entering a default against it.
20  Vision has failed to show cause why it should not be sanctioned for its misconduct
21 by having its Answer (#47) stricken and a default entered against it.  Vision's conduct is
22 inexcusable and Vision has no reason persuading this Court otherwise.  Therefore, the Court
23 strikes Vision's Answer and enters a default against it.
24 /
25 /
26 /

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Hester's Motion for Sanctions (#180) is GRANTED. The Clerk of the Court is instructed to STRIKE Vision's Answer (#47) and enter a default against Vision.

Dated: November 3, 2010.

_____
**ROGER L. HUNT**
**Chief United States District Judge**