ROBERT W. FREEMAN
Nevada Bar No. 3062
E-mail: robert.freeman@lewisbrisbois.com
MARGARET G. FOLEY
Nevada Bar No. 7703
E-mail:  margaret.foley@lewisbrisbois.com
CAYLA WITTY
Nevada Bar No. 12897
E-mail:  cayla.witty@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
702.893.3383
FAX: 702.893.3789
*Attorneys for Defendant*
*University Medical Center of Southern*
*Nevada*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

***

| | |
|---|---|
| DANIEL SMALL, CAROLYN SMALL. WILLIAM CURTIN, DAVID COHEN, LANETTE LAWRENCE, and LOUISE COLLARD, Individually, and on Behalf of All Other Persons Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA,<br><br>Defendant. | CASE NO. 2-13-cv-0298-APG –PAL<br><br>**DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S OBJECTION TO THE REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSION OF LAW OF SPECIAL MASTER DANIEL B. GARRIE** |

COMES NOW Defendant UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA

("Defendant" or "UMC"), by and through its attorneys, Robert W. Freeman, Esq., Margaret G.

Foley, Esq., and Cayla Witty, Esq., and Lewis Brisbois Bisgaard & Smith LLP, and hereby files this

1    Reply in Support of Defendant's Objection to the Report and Recommendation and Final Findings

2    of Fact and Conclusion of Law of Special Master Daniel B. Garrie (Dkt. No. 207).

3    　　　This Reply is based upon the pleadings and papers on file in this case, the following points

4    and authorities, and the argument of counsel at the time of the hearing set on this matter.

5    　　　DATED this 26th day of September, 2014.

6    　　　　　　　　　　　　　LEWIS BRISBOIS BISGAARD & SMITH LLP

7

8

9    　　　　　　　　　　By　　　/s/ *Margaret G. Foley*　　　　　
                                 Robert W. Freeman, Esq.
10    　　　　　　　　　　　　Nevada Bar No. 3062
                                 Margaret G. Foley, Esq.
11    　　　　　　　　　　　　Nevada Bar No. 7703
                                 Cayla Witty, Esq.
12    　　　　　　　　　　　　Nevada Bar No. 12897
                                 6385 S. Rainbow Boulevard, Suite 600
13    　　　　　　　　　　　　Las Vegas, Nevada 89118
                                 *Attorneys for Defendant*
14    　　　　　　　　　　　　*University Medical Center of Southern Nevada*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4827-9773-6478.1                              ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... iii

TABLE OF AUTHORITIES ................................................................................................ v

POINTS AND AUTHORITIES ........................................................................................... 1

I.      INTRODUCTION .................................................................................................... 1

II.     SUPPORT FOR OBJECTION ................................................................................ 2

      A.      Regardless of Any Particular Reason or Motive, Special Master
            Garrie Senselessly Condemned UMC From the Start Instead of
            Performing His Court-Ordered Duties ..................................................... 2

      B.      There Can Be No Doubt That UMC Paid for Special Master
            Garrie's Services and Did Not Receive the Services Intended .............. 3

      C.      Special Master Garrie Was Specifically Directed by the Court to
            Determine the Scope of Potentially Relevant ESI By UMC, But He
            Did Not Do So ......................................................................................... 5

      D.      The R&R's Findings of Fact Are Rife With Erroneous Statements
            Lacking Record Support and Other Serious Errors That Undermine
            the Reliability of the Entire Report ......................................................... 7

      E.      The R&R and Plaintiffs' Response Fail to Address How Specific
            Discovery Issues Prejudice Plaintiffs' Claims ...................................... 8

III.    R&R FACTUAL ISSUES ...................................................................................... 11

      A.      Timekeeping systems ........................................................................... 15

      B.      Excel Spreadsheets ............................................................................... 18

      C.      Personal Mobile Devices ...................................................................... 19

IV.     R&R LEGAL ISSUES ........................................................................................... 19

      A.      The Only Party Threatening to Damage the Integrity of the
            Discovery Process Is Plaintiffs ............................................................ 19

      B.      The R&R and Plaintiffs' Response's Arguments are Inadequate to
            Uphold the Recommended Sanctions Applicable a Putative Rule 23
            Class of UMC Hourly Employees ...................................................... 24

            1.     *Plaintiffs Cannot Establish a Mental State or Data*
                  *Relevance Argument to Support Recommended Sanctions* ...................... 25

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                    iii

|  |  | 2. | *Class Certification Sanctions NOT Warranted* | 26 |
|  |  | 3. | *Liability and Damages Sanctions NOT Warranted* | 27 |
|  | C. | Plaintiffs' Response Regarding Monetary Sanctions Fails to Address the Issues at Hand | | 31 |
| V. | CONCLUSION | | | 32 |
| CERTIFICATE OF SERVICE | | | | 33 |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## TABLE OF AUTHORITIES

2

Cases

3

*Adriana Intl. Corp. v. Lewis & Co.*, 913 F.2d 1406, 1413 (9th Cir. 1990) ........................31

*Apple, Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976 (N.D. Cal. 2012) ...........22, 24, 26

4

*Benedict v. Hewlett-Packard Co.*, 2014 U.S. Dist. LEXIS 18594 (N.D. Cal. Feb. 13, 2014) ....................................................................................................................................16

5

*Blixseth v. Kirschner* (In re Yellowstone Mt. Club, LLC), 436 B.R. 598 (Bankr. D. Mont. 2010)..............................................................................................................................11, 12

6

*Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324 (5th Cir. 1972) ....................................16

*Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001)....................23

7

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091 (9th Cir. 2007)19, 20

8

*Cottle-Banks v. Cox Communs., Inc.*, 2013 U.S. Dist. LEXIS 72070, *44 (S.D. Cal. May 21, 2013)................................................................................................................23, 25

9

*Desilva v. North Shore Long Island Jewish Health System*, 2014 U.S. Dist. LEXIS 77669 (E.D. N.Y. June 5, 2014)................................................................................................17

10

*Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981) ............16

11

*Gaddis v. Abell*, No. 03-10773-PM, 2006 WL 4671850 (Bankr. D. Md. July 13, 2003) ..26

*Henry v. Gill Industries, Inc.*, 983 F.2d 943 (9th Cir. 1993).......................................20, 21

12

*Hester v.Vision Airlines, Inc.*, Case No. 2:09-cv-00117-RLH-NJK (D. Nev.) ............27, 28

13

*In re Consol. Pretrial Proceedings in Air West Secs. Litig.*, 73 F.R.D. 12, 16 (N.D. Cal. 1976), *aff'd Anderson v. Air West, Inc.*, 542 F.2d 1090 (9th Cir. 1976)........................27

14

*Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006)................................................25, 26

*Lillehagen v. Alorica, Inc.*, 2014 U.S. Dist. LEXIS 67963 (C.D. Cal. May 15, 2014)......16

15

*Lucas v. S. Carolina Coastal Comm'n*, 505 U.S. 1003 (1992) ..........................................2

16

*McKeen-Chaplin v. Provident Sav. Bank*, 2013 U.S. Dist. LEXIS 113654 (E. D. Cal. Aug. 9, 2013)........................................................................................................................16

17

*Montoya v. Orange Cnty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 1010 (C.D. Cal. 2013) .24, 26

18

*Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) ...............................16, 17

19

*Pension Committee of Univ. of Montreal v. Banc of Am. Sec. LLC*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010) .....................................................................................................24

20

*Reinsdorf v. Skechers U.S.A.*, 296 F.R.D. 604 (C.D. Cal. 2013) .....................................24

21

*Residential Funding Corporation v. DeGeorge Financial Corporation*, 306 F.3d 99 (2d Cir. 2002) ...................................................................................................................25

22

*Swoboda v. Pala Mining, Inc.*, 844 F.2d 654 (9th Cir. 1988) ....................................12, 13

*Syed v. M-I, LLC*, 2014 U.S. Dist. LEXIS 104820 (E.D. Cal. July 30, 2014) ..................16

23

*Tedori v. United States*, 211 F.3d 488 (9th Cir. 2000)....................................................12

24

*United Factory Furn. Corp. v. Alterwitz*, 2012 WL 1155741 (D. Nev. Apr. 6, 2012) ........5

*United States v. San Francisco*, 748 F.Supp. 1416 (N.D. Cal. 1990) ..............................12

25

*Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051 (9th Cir. 1998)................................11

*White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876-78 (6th Cir. 2012) 16, 17

26

*Williams v. U.S. Bank Nat. Assn.*, 290 F.R.D. 600, 605 & n.5 (E.D. Cal. 2013) ..............16

*Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 467 (S.D. N.Y. 2011) ....................17

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Rules

Fed. R. Civ. P. 37(e)..........................................................................................................23

Other Authorities

Evan Koblentz, *Training of Predictive Coding Systems Fosters Debate*, L. TECH. NEWS
    (Mar. 27, 2012)..........................................................................................................11

Memorandum from the Honorable David G. Campbell, Chair of the Advisory Committee
    on Civil Rules of the Judicial Conference of the United States to the Honorable Jeffrey
    S. Sutton, Chair of the Committee on Rules of Practice and Procedure of the Judicial
    Conference of the United States (May 8, 2013)....................................................24, 25

Tonia Hap Murphy, Mandating Use of Predictive Coding in Electronic Discovery: An Ill-
    Advised Judicial Intrusion, 50 Am. Bus. L.J. 609, 657 n3 (Fall, 2013)........................11

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## POINTS AND AUTHORITIES

**I.    INTRODUCTION**

In misplaced efforts to avoid discussion of the fatal errors, both factual and legal, in Special Master Garrie's Report and Recommendation, and to avoid any discussion of the merits of their court case, Plaintiffs launch a smear campaign against UMC instead.  As an apparent attempt to distract the court from the fatal flaws in the R & R meticulously itemized by UMC in its Objections (and the further problems with the R & R set forth herein), Plaintiffs hurl insults at and attribute false motives to UMC to construct  a negative story about UMC out of whole cloth. The story spans the entirety of the case, tarring UMC with as wide a brush as possible, apparently without regard for the fact that UMC is objecting to Special Master Garrie's Report and Recommendation.  Despite Plaintiffs' considerable efforts to malign UMC, the noxious cloud of invective in Plaintiffs' non-responsive Response does not manage to conceal the enormous hole at the center of Plaintiffs' Response and of Special Master Garrie's Report and Recommendation – that Plaintiffs' claims are meritless and that Plaintiffs have all the evidence they would need to prove the claims in the pleadings if only those claims had any validity to them.  By staging a self-righteous and illusory sideshow about nearly two terabytes of ESI that UMC has dutifully produced, and reams of paper documents that UMC is continuing to produce, Plaintiffs try to mask the absence of even a single meritorious claim among their 600-plus opt-in participants.

The Court should not be distracted by the lacerating rhetoric permeating Plaintiffs' Response, but rather should keep its gaze firmly fixed on Plaintiffs' actual claims, on UMC's ESI that is potentially or actually relevant to said claims, and on Plaintiffs' complete failure to meet their burden to show how any lost ESI affects the merits of Plaintiffs' claims at all.  Among the other failings briefed by UMC, Mr. Garrie declined to perform the analysis requested of him by the Court that would have examined Plaintiffs' legal claims, would have identified potentially-relevant ESI to preserve and produce, and would have required Plaintiffs to affirmatively demonstrate prejudice from lost ESI before any sanctions against UMC could even

be considered.  Instead, Mr. Garrie bypassed the Court-mandated factual investigation and legal analysis and proceeded to recommend catastrophic sanctions without justification.  Perhaps it was easier and more exciting to just blow up the building than to conduct a methodical, focused investigation and analysis, strictly confined to the claims and the defenses of the parties. However, Special Master Garrie was in fact hired to conduct a highly-technical and meticulous assessment of UMC's various computer systems in relation to this particular lawsuit,[1] not to senselessly demolish the whole building housing those computer systems instead of examining them.

## II.    SUPPORT FOR OBJECTION

### A.    Regardless of Any Particular Reason or Motive, Special Master Garrie Senselessly Condemned UMC From the Start Instead of Performing His Court-Ordered Duties

Plaintiffs are correct that UMC cannot definitively "identify any reason or motive that the Special Master would have been 'biased' against it."[2]  UMC can only guess about what might have happened to cause Mr. Garrie to completely retract his ex parte statements that everything would be fine and reverse his thinking so dramatically and punitively to impose discovery sanctions never before seen in Ninth Circuit jurisprudence. The shock to UMC's counsel of this complete turnabout was as severe as if Special Master Garrie had launched a missile to kill a mouse.[3]  While Mr. Garrie said some strange, inaccurate, and dismissive things during the Special Master proceedings, he seemed much more focused, measured, and willing to problem-solve on the near-daily ex parte telephone calls.

Plaintiffs do not dispute in their Response that UMC counsel explained its reasonable wish to have the parties review and comment on a draft of the R&R before it was finalized, to

---

[1] Plaintiffs repeatedly raise a non-issue in their Response – that UMC evaluated and accepted Special Master Garrie as an appropriate choice to help the parties work through ESI issues. *See* Response at 1- 2..  UMC has already conceded this point in its Objections.  *See* Objections at 9. Plaintiffs' repeated mention of this uncontroverted fact is redundant filler, merely an example of the Response's ceaseless chatter intended to desperately steer the conversation away from the fundamental problem that Plaintiffs' legal claims are devoid of merit.

[2] Response at 2.

[3] *See Lucas v. S. Carolina Coastal Comm'n*, 505 U.S. 1003 (1992) (Blackmun. J., dissenting).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

work out any inaccuracies and other concerns ahead of time so Judge Leen would not have to. With that process, the parties would have been able to at least try to resolve the problems that rendered the R&R the absurdity it unfortunately is today.  At that point it would not have been final.[4]  However, in hindsight, Special Master Garrie's unwillingness to collaborate on a document that is so riddled with factual and legal errors is extremely unfortunate.  UMC counsel could have provided much-needed help to the process, had it only been given the opportunity.[5]

### B.  There Can Be No Doubt That UMC Paid for Special Master Garrie's Services and Did Not Receive the Services Intended

Plaintiffs offer a contrived and insubstantial argument that UMC may not be heard to complain that it did not get what it paid six figures to Special Master Garrie for in this matter. UMC readily acknowledges that Magistrate Judge Leen imposed financial consequences on UMC to remedy its missteps in processing and producing responsive ESI for five custodians. The Special Master was supposed to be the antidote to these prior technical problems, and UMC was optimistic in March that Mr. Garrie could and would get the job done.

That is not what happened, though.  The specific technical assistance and compliance with Magistrate Judge Leen's referral UMC reasonably believed would happen did not get accomplished.  If Judge Leen's referring order [Ct. Dkt. # 152] may be viewed as a contract for Mr. Garrie's services in this suit, then Mr. Garrie is most certainly in breach of that contract.  Had the work described in the referring order been performed, the results would have been helpful to all the parties to ascertain the actual facts underlying Plaintiffs' claims and UMC's defenses.  The

---

[4] Plaintiffs make much of another non-issue by their assertion that UMC should have objected to Mr. Garrie's intermediate orders filed before the R & R.  See Response at 3-4. The intermediate orders were not final findings of fact and conclusions of law, and none of them foreshadowed the extraordinary punitive findings, conclusions, or recommendations against UMC in the R & R.  Hence, UMC's counsel's shock when it saw the R & R.

[5] Speaking of inaccuracies, UMC believes Plaintiffs protest too much to Mr. Espinoza's statements during deposition that the claims in this lawsuit lack merit.  See Response at 3 n.2. Mr. Espinoza was correct, as corroborated by Plaintiffs' studied avoidance of any discussion of the merits of their claims in the Response.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  case might then have moved forward to a proper merits determination.  This has not yet happened

2  either.

3  Oddly enough, UMC found it akin to pulling teeth to obtain any information at all

4  (beyond cursory statements and peculiar formulae for alleged damages that gave no underlying

5  figures to support them) from Plaintiffs about their claims.  This led UMC to believe that John

6  Espinoza was correct and the claims were meritless. Plaintiffs have offered nothing to date to

7  dispel this belief.  It should come as no surprise, then, that UMC did not wish to mediate claims

8  with no apparent value.  Plaintiffs may rest assured that UMC is deeply "concerned with the

9  financial ramifications of this case,"[6] along with the residents and taxpayers of Clark County.

10  Plaintiffs take UMC to task for a putative violation of Fed. R. Evid. 408 for referring very

11  obliquely and discreetly to a settlement demand letter.[7]  But UMC had no other inkling of how

12  many lunches the Plaintiffs were alleged to have missed and to have not been paid for, to

13  compare to Special Master Garrie's enormous number (every lunch for every putative Rule 23

14  class member) in the R & R. No Rule 408 violation has occurred because UMC did not refer to

15  that sole estimation provided  by Plaintiffs "to prove or disprove the validity or amount of a

16  disputed claim" as Rule 408 prohibits.  As made clear in the Opposition and the instant Reply,

17  UMC has received nothing from Plaintiffs to show any validity to their claims, either in a

18  settlement letter or elsewhere.[8]  UMC offered the number estimated by Plaintiffs to show that it

19  had no prior notice of the grossly-inflated number of missed lunches written down in the R & R

20  by Mr. Garrie.  UMC also disclosed the estimated number from the settlement letter to prove "a

21  witness's bias or prejudice," an expressly permitted purpose in Rule 408(b).  Mr. Garrie's bias

22  and prejudice against UMC apparently led him to recommend the establishment of this

23  ───────────────

24  [6] *See* Response at 5.

  [7] *See* Response at 5 n.14.

25  [8] Plaintiffs spuriously argue that it is a "fact" that "UMC has failed and refused to

26  compensate these hourly-paid individuals in accordance with its promises and with the law."
  Response at 6.  No evidence of any kind has been conveyed to UMC, either confidentially or not,

27  to support such a putative fact.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                    4

outrageously-inflated number.

**C. Special Master Garrie Was Specifically Directed by the Court to Determine the Scope of Potentially Relevant ESI By UMC, But He Did Not Do So**

In response to UMC's honest admissions that it has had difficulties with ESI in this case and did not know what was encompassed within the realm of potentially-relevant ESI it needed to preserve for this lawsuit, Plaintiffs set forth meaningless platitudes that do nothing to advance the discussion.[9]  Plaintiffs' Response offers more heat than light, suggesting to UMC that Plaintiffs do not know the scope of potentially-relevant ESI for their claims either.  Had Special Master Garrie fulfilled his specific mandate, all parties would likely have known the proper scope of ESI preservation for this case by now.[10]  No such luck, which is a pity in light of resources expended by all concerned to date.

Plaintiffs argue that their own generic litigation hold letters to UMC dictate the content of ESI to be held.[11]  This argument is circular and leads nowhere at all.  No guidance may be obtained either by combining this empty contention with a quote from Judge Leen on March 10, 2004, saying only that "UMC shall take all steps necessary to preserve ESI potentially relevant to the parties' claims and defenses in this matter in full compliance with the litigation hold/preservation letters sent by Plaintiffs' counsel shortly after this lawsuit was filed."[12]  A bit like Special Master Garrie's cross-references to nothing for the essential conclusion that Plaintiffs

---

[9] For example, Plaintiffs cite to a District of Nevada case that observes "the duty to preserve is 'uncompromising,'" without further elaboration.  Response at 6 n.15 (citing *United Factory Furn. Corp. v. Alterwitz*, 2012 WL 1155741 at *3 (D. Nev. Apr. 6, 2012).

[10] Certainly Kronos data was potentially relevant.  It was essential, as described below.  Kronos data was preserved and turned over to Plaintiffs' counsel wholesale before Special Master Garrie's appointment.

[11] *See* Response at 7.

[12] Response at 7, quoting March 10, 2014 minute order of proceedings before Magistrate Judge Leen.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

were prejudiced by UMC's loss of ESI,[13] Plaintiffs' arguments here do nothing to illuminate the reader.

It is readily apparent, then, that Judge Leen thought the Special Master should figure out the scope of potentially-relevant ESI to be preserved, as the parties did not seem have a handle on it.  To summarize the pertinent language in the order defining Mr. Garrie's role to isolate what needed to be preserved,

> 3.  The Special Master shall issue specific findings of fact concerning . . .("ESI") that [UMC] was legally obligated to maintain in connection with this lawsuit. . . . 4. . . . shall examine the adequacy of UMC's efforts to preserve and maintain information, documents , and ESI related to the claims at issue in this lawsuit . . . .  The Special Master shall make specific findings concerning, among other things . . . a finding as to whether the scope of UMC preservation efforts were reasonable and in good faith; and the extent to which UMC . . . took affirmative steps to ensure all relevant evidence was preserved. . . .  6.  The Special Master shall examine whether UMC's current preservation efforts are reasonable and comply with UMC on-going preservation obligations.

The "specific findings" Judge Leen ordered Mr. Garrie to make regarding the scope of ESI to be preserved and maintained were never made.  Indeed, it was logically impossible to make any such specific findings without carefully defining the scope of potentially-relevant evidence itself, upon which all related findings and conclusions needed to be premised.  Plaintiffs' conclusory statements in the Response arguing otherwise do nothing that could convince the Court to uphold Special Master Garrie's findings and conclusions in the R & R that flow from this pivotal question.

/ / /

/ / /

/ / /

---

[13] *See* Report and Recommendation at 65 (citing fruitlessly to prior sections of the R & R).  This point is detailed further in UMC's Objection at 30.  Plaintiffs' counsel and Special Master Garrie are both in the habit of making such empty arguments.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                                     6

**D.  <u>The R&R's Findings of Fact Are Rife With Erroneous Statements Lacking Record Support and Other Serious Errors That Undermine the Reliability of the Entire Report</u>**

As they do elsewhere in their Response , Plaintiffs also make superficial arguments that nothing is wrong with the R & R's Findings of Facts despite the pervasive errors of varying magnitude.  Critically, Plaintiffs dance around the issue but do not actually dispute that Special Master Garrie **never made** a prejudice finding that could support discovery sanctions.[14]  Of all the errors that one could grumble about in the R & R, this absence of a prejudice finding is perhaps the most significant and Plaintiffs do not challenge it in the "Citations Errors" section of their Response.  Interestingly, they do not challenge the absence of a prejudice finding supporting sanctions in their "Applicable Legal Standards" section either.  *See* Response at 20-23 (mentioning the word "prejudice" but never articulating any prejudice to their own case).

Dodging this critical issue, Plaintiffs instead make the conclusory and superficial argument that "ministerial" mistakes were made.  No authority is offered to show that someone involved in the case could make corrections to the R & R that could possibly salvage it.  Most tellingly, Plaintiffs offer no plan for fixing the R & R, implicitly acknowledging it cannot be saved.  Rather unhelpfully, Plaintiffs give no indication of what findings they agree with UMC are incorrectly referenced in the R & R or are themselves erroneous.  Such vagueness lends no support to Plaintiffs' bland assertion that a person with ministerial authority (perhaps Special Master Garrie? Judge Leen?) could make a few minor corrections to the R & R's citations to revive that document.  The R & R must be rejected in its entirety.

---

[14] *See* Response at 9, lines 4-9 (noting UMC's arguments, including on page 30 of the Objections, where the free-floating prejudice finding is shown to be based on "cross references that lead nowhere," much like the "phantom record cites" replete elsewhere in the R & R).  Plaintiffs then proceed to say "most . . .egregious citation mistakes cited by UMC are inconsequential" and "[o]ther examples of 'errors' offered by UMC are merely *wrong* or otherwise purposely misleading on UMC's part" and point to UMC's Exhibit 1, a table of carefully-cataloged errors.  Response at 9, lines 5-9.  However, Plaintiffs never even challenge the most important error in the whole R & R – no finding of prejudice to support discovery sanctions.  *See* Objections at 30.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**E.** **The R&R and Plaintiffs' Response Fail to Address How Specific Discovery Issues Prejudice Plaintiffs' Claims**

Plaintiffs' Response cannot stand on the merit of the Report and Recommendation as written, and in turn, take to demonizing this public county hospital. Recognizing that the appointment of the Special Master at the expense of UMC was a sanction from the Court based on UMC's fault in being unable to produce ESI for 5 custodians, UMC has engaged in the Special Master proceedings in good faith and diligently continues to produce responsive documents. However, Plaintiffs are not actually concerned about receiving information addressing their claims. Instead, Plaintiffs continue to rehash these past issues and refuse to engage in meet-and-confer to move forward with discovery activities. The parties all know the procedural history, but Plaintiffs continue to emphasize past actions because looking at the merits of the case does not tarnish UMC as well as mudslinging. While UMC has some fault in the loss of data from its systems, Plaintiffs fail to address why that information is relevant.

1.    *UMC-issued Blackberry Devices*

In January 2014, UMC produced all texts messages that could be extracted from UMC-issued Blackberries to the three custodians with such devices (Brian Brannman, John Espinoza, and James Mumford from the five custodians initially considered).  Plaintiffs (and, to an extent, the Special Master Report & Recommendation) condemn UMC for the lack of messages available on those phones. In hindsight, it may be that there would be more text messages if every text for these custodians were copied, but this was not a retention policy that UMC had as texts were not business records. UMC did upgrade its Blackberry server in late 2013 through early 2014, and this process caused the custodians' devices to lose text histories unbeknownst to the three custodians who were notified in November 2013 to maintain all texts on their UMC-issued devices. This upgrade was not made aware to the three identified custodians or counsel for UMC until the Special Master proceedings began. There were no purposeful misrepresentations made as Plaintiffs allege. Neither Plaintiffs nor Special Master present an objective timeline of this information as it would not serve their purposes. Again, this is another factual fault that is grounds for modification of the Special Master's Report and Recommendation.

1    Regardless, it is known now the volume of texts for these custodians (and others whose

2 devices were not previously identified for collection) from November 2012 to May 2014.

3 Recognizing that texts for the three custodians were wiped during a system upgrade, UMC

4 provided all information it could regarding the three original text custodians and many others.

5 Still, Plaintiffs cannot show that the lost texts would assist their case. While the volume of texts

6 with content produced is limited, there is content that could be evaluated. From that content,

7 Plaintiffs should extrapolate what content might be applicable to their claims. Plaintiffs fail to

8 present this analysis because it is easily recognized that the content of these three custodians'

9 texts have nothing to do with the lawsuit and thus no prejudice can be shown from loss of this

10 data.

11              2.      *Pending Issues with Discovery*

12    Because UMC has produced a large amount of information, including the full Kronos

13 database that reflects the time worked by and paid to the Plaintiffs, Plaintiffs' complaints

14 regarding on-going production of ESI and hard copy document scanning is particularly

15 frustrating. Plaintiffs' emphasis is on an Order of the Special Master, filed August 13, not the

16 Report and Recommendation which is the basis of the Objection to which Plaintiffs should be

17 responding. As such, their concerns are improperly raised, and should be addressed to UMC to

18 allow for resolution without the Court.

19    Nonetheless, UMC points out that it is diligently working toward producing any and all

20 data that is responsive to the agreed-to ten (10) search terms, as well as reports from the Clarity,

21 Teletracking, CrimeStar, and GRASP systems as relate to opt-in plaintiffs and scanned and

22 searchable pdfs of hundreds of thousands of hard copy documents from UMC departments and

23 payroll. UMC does not "blame" the Special Master for any of these productions. UMC has

24 pointed out that there are issues with the timeline ordered by the Special Master and by the vague

25 and ambiguous terms of the order for indices and custodian of record declarations. These were

26 concerns of UMC since the production was ordered, but UMC worked attentively on the

27 production nonetheless. Plaintiffs refuse to engage in meet-and-confer to help resolve any issues,

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

and instead further denigrate UMC for its good faith attempts to coordinate with Plaintiffs. UMC has borne its weighty production obligations as best it's able. However, the volume and timetable demanded by Plaintiffs (and the Special Master) was not reasonable. UMC believes that further meet-and-confer would provide progress in this litigation where Plaintiffs' accusations only promote further discord.

The informality of the Special Master proceedings and overreach of the Special Master has added to the discord in the matter of hard copy document production. This is emphasized again by Plaintiffs in their complaints regarding indices and custodian of record declarations for hard copy document scans. Originally, as shown in Exhibit G to Plaintiffs' Response (4/22/14 hearing transcript), Plaintiffs proposed that UMC create an index of hard copy documents from which Plaintiffs could identify subsets of documents for inspection. From that initial inspection, Plaintiffs would identify documents for production. UMC agreed to this procedure because, while not specifically subject to the jurisdiction of the Special Master, the hard copy documents were identified and somewhat responsive to Plaintiffs' discovery requests. However, the protocol agreed to in April 2014 by the parties was never set out in an order by the Special Master, which certainly did not help when the parties later disagreed about moving forward with this discovery activity. The agreed-to protocol was later abandoned altogether as Plaintiffs demanded *production* of all documents prior to receiving any index (and realistically negating the need for an index). It was at that point that the parties became confused about production versus inspection, a matter hotly disputed on the record and off, another folly of the informality of these proceedings. It was not until August 13 that the Special Master issued a written order on the subject. UMC is producing wholesale the thousands upon thousands of scanned hard copy documents, on a schedule faster than seven (7) departments a week. UMC is committed to the production of indices and declarations, but where there exists dispute as to the form of such UMC requires the cooperation of Plaintiffs.

The technical difficulties of production, the impetus of the Special Master appointment, have been overcome. ESI results for 27 custodians have been produced, more than five times the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

custodians at issue in the productions that were contested by Plaintiffs in late 2013 and early 2014. Documents beyond those custodians have been searched and produced as well. These productions took time, but UMC was committed to the production. UMC is still committed to further production, and asks that the Report and Recommendation be the focus at this point and allow discovery to move forward.

## III.    R&R FACTUAL ISSUES

> There is no point to a lawsuit, if it merely applies law to lies.  True facts must be the foundation for any just result.

*Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998).

"Garbage in, garbage out," or GIGO, is a phrase with which Special Master Garrie likely is quite familiar, given his credentials and significant experience in computer science.  GIGO refers to a concept that even a person with no computer science background intuitively understands, however: bad inputs lead to bad outputs.  Such is the case with the R&R: it is so flawed, plagued with so many factual mistakes, that any conclusions drawn therein are just as flawed.  It is a phrase and concept that surfaces in cases where courts have rejected outcomes when premised on untruths and errors.[15]

For example, in *Blixseth v. Kirschner* (In re Yellowstone Mt. Club, LLC), 436 B.R. 598, 647 (Bankr. D. Mont. 2010), the court rejected expert reports and testimony which, on their face, appeared to show that Mr. Blixseth (the debtor) had made a $200,000,000 loan, not a distribution. The court carefully constructed the purview of each expert, and noted that Mr. Blixseth strategically divided the expert's topics so that neither opined on the sum total, and both relied on presumption they did not fact-check with the other expert. *Blixseth*, 436 B.R. at 647. As a result,

---

[15] "[P]redictive coding systems are inherently a garbage in, garbage out operation. Essentially what the software's doing is it's encoding the identity of the person training it. If that person is training with intelligence and has provided consistent input, well then the software will be coded with intelligence and consistency. If not, it'll be coded with ignorance and inconsistency." Tonia Hap Murphy, Mandating Use of Predictive Coding in Electronic Discovery: An Ill-Advised Judicial Intrusion, 50 Am. Bus. L.J. 609, 657 n3 (Fall, 2013) (quoting an executive from Equivio, a predictive coding company in Evan Koblentz, *Training of Predictive Coding Systems Fosters Debate*, L. TECH. NEWS (Mar. 27, 2012)).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

the court rejected their opinions as "garbage in/garbage out." *Id*. Similarly, in *Tedori v. United States*, 211 F.3d 488 (9th Cir. 2000), the court explained that by beginning with a false premise, one assures a false conclusion—"the equivalent of GIGO – "garbage in, garbage out." *Tedori*, 211 F.3d at 494. In *Tedori*, two taxpayers argued that the deduction for an interest charge they had claimed was valid because it was an "investment interest" that is an "indebtedness properly allocable to 'property held for investment.'" *Id*. However, the court explained that the interest charge was not an investment interest because it was not "the result of an 'investment activity,'" and thus the interest charge was not deductible. *Id*. A final example of why conclusions based on misinformation or an absence of good information is *United States v. San Francisco*, 748 F.Supp. 1416 (N.D. Cal. 1990), where the court had to determine whether proposed attorneys' fees were excessive in a Title VII action.  Specifically, at issue were hours classified as "file review." *United States v. San Francisco*, 748 F.Supp. at 1421-22. The court determined that the City's data entries for attorney time for any entry including the word "review" had been improperly categorized as "file review ," a non-billable activity. *Id*. However, the court then reviewed a second data source to determine the accuracy of those conclusions (the attorneys' own billing system entries) and agreed that this categorization failed to provide an accurate picture of how much file review was completed. *Id*. at 1422. As a result, the court noted:

> Therefore, the conclusions which the City reached based on the faulty data are themselves faulty (once again illustrating the computer adage: garbage in, garbage out). No hours will be deducted for excessive file review.

*Id.* Thus, in a variety of circumstances, regardless of the sophistication or intents of the parties, when facts are presumed to exist (but don't) or have been misconstrued for convenience, flawed conclusions invariably result.  The R&R merits rejection.

*Swoboda v. Pala Mining, Inc.*, 844 F.2d 654 (9th Cir. 1988), illustrates how a flawed factual finding should be remedied. In *Swoboda*, the dispute centered on "a relatively obscure area of the federal mining laws," to wit, whether a "pegmatite dike" which spread extralaterally under a reservation constituted a "vein" in the context of applying 30 U.S.C. § 26. *Swoboda*, 844 F.2d at 655-56. If the dike was a vein, then the owner of the mine that contained the bulk of the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                             12

pegmatite dike was entitled to damages caused by mining activities that occurred directly above the pegmatite vein. *Id*. at 656.

In preparing the factual findings, the Special Master relied on the correct definitions of "vein," as gleaned from case law, and even visited the mine, which provided the district court a sufficient basis to uphold these Special Master findings of fact as to whether the pegmatite dike was a "vein," but the district court lowered the amount of punitive damages by half. *Id*. The Ninth Circuit affirmed the district court's adoption of those specific factual findings, but it ultimately remanded the sole issue of damages back to the district court for a *de novo* examination upon determining that the record did not support the Special Master's factual findings regarding damages. *Id*. at 659. Specifically, the court stated that:

> Despite the seriousness of this determination, the Special Master has not supported this finding with any references to testimony, deposition transcripts, or material evidence. Similarly, several of the Special Master's findings in paragraphs 8-16 of his "Amended Findings of Fact" lack evidentiary support, especially paragraphs 9, 10, 13, 15 and 16. Due to the lack of support in the record, we find that the Special Master's findings of fact with respect to damages to be clearly erroneous.

*Id*. at 659. Additionally, the Court was persuaded by the fact that the defendants had offered "several pieces of evidence which call into question the accuracy of the Special Master's findings," and remanded. *Id*.

Plaintiffs' Response follows the same faulty logic as used in the Special Master Report and Recommendation with regard to the arguments presented in their Section III. Where UMC pointed to factual findings that are not warranted inferences from the record, UMC was highlighting the most egregious examples of overbroad inferences. There are plenty more: in the first 24 pages of the Report & Recommendation, there are at least 23 incorrect cites to the record and Exhibit 28 (the chain of custody documents) was not even filed. Pointing out stretched inferences is not difficult in this slipshod document. See the following:

- Pages 16-17: "The failure by UMC to preserve ESI on [local] workstations, means that UMC failed to preserve responsive ESI for more than 600 days after the filing of the Complaint."
  - While UMC may not have initially preserved information on local workstations, this does not necessarily mean that it was "responsive ESI" that was not preserved. In fact, Brannman, Espinoza, and Mumford, three of the high priority

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                    13

custodians, testified that while they used their desktop computers daily, only "some" information would have been saved to their local workstations. Mumford went so far as to state that likely only negotiation notes would have been stored on his local workstation which are not responsive documents to this litigation. Most of their information was electronically stored on the network.

- Pages 16-17: "The above custodian interviews [Brannman, Espinoza, and Mumford] demonstrate that key custodians stored documents on their local computer. Couple with the fact that there is no backup of the data of these computers, UMC's failure to preserve this responsive ESI likely resulted in its destruction."
    - o None of the information identified in the custodian interviews was necessarily "responsive." Furthermore, simply because information was not preserved initially, does not mean that it was "likely destroyed." Special Master failed to establish the forensic information to determine such conduct.
- Page 17: "But for Special Master Garrie's involvement, UMC would likely never have identified, preserved, or produced any documents from its Intranet."
    - o Special Master Garrie is touting himself here a fair amount. It is speculative and factually incorrect for him to make such a bold statement and include it in his Findings. As noted in the Special Master proceedings, the job descriptions included in the opt-in packets were directly pulled from the Intranet.
- Page 18: "UMC's failure to preserve the Siemens Policy and Procedure database therefore resulted in the loss of responsive ESI."
    - o There is no evidence to support the Special Master's conclusion that responsive ESI was lost. Plaintiffs have not produced an iota of evidence and SM Garrie did not find any document or information to support this conclusion/inference.
- Page 21: Stay with me here…" While UMC failed to identify [the BlackBerry] repository to LBBS, the failure to identify the BlackBerry server likely did not result in the loss of ESI…[h]owever, it is possible that, for the time period in question, the BlackBerry server had a different configuration that did not capture calendar and e-mail entries, meaning responsive ESI could have been lost."
    - o There is at least one fundamental problem with the Special Master's inference here that 'responsive ESI could have been lost.' It was never explored during the Special Master proceedings whether UMC had a different configuration; this is something that Special Master likely thought about while drafting the R&R. It is a fact that could have been determined with one or two questions to the IT staff at UMC and/or the ESI vendor. It seems that this sentence and inference was placed in the R&R simply for the Special Master's own edification and not to offer the Court any substantive information. It is nearly admitted as such in a footnote – "It is possible through forensic analysis to establish how the BlackBerry server was configured during this time period. This analysis has not been undertaken, and the mere possibility of a different configuration acknowledged herein was not considered in reaching the recommendation set forth in this Report." This begs the question as to the reason the unnecessary information and inference was placed in the Report at all.
- Page 24: "The nonchalant attitude to preservation evidenced in [Barnard's] testimony is reflective of UMC's widespread failure to take its duty to preserve seriously."
    - o First of all, the Special Master's value judgment is unnecessary and inappropriate as Barnard was not a custodian of information in this litigation. Second, any

failure of UMC to preserve information was not likely due to a "nonchalant attitude to preservation," but a communication breakdown between siloed individuals within this large bureaucratic public hospital, as evidenced in the overwhelming testimony offered by UMC personnel throughout the Special Master proceedings.

So in overlooking the assumptions required to establish certain findings, Plaintiffs, of course, accept the Special Master's logical fallacies to get to the holding they want: that UMC is maliciously hiding and/or destroying information. For the specific data mentioned (timekeeping systems, Excel spreadsheets, and personal mobile devices), Plaintiffs reiterate the same broad assumptions that the Special Master presented. The record as is cannot support the finding of the Special Master because it is riddled with problems, not the least of which Plaintiffs highlight by adding information to the court record in their Response. What is successful is the obfuscation of the record as to the timekeeping systems, Excel spreadsheets, and personal mobile devices. Even with the expanded record, there is no showing of prejudice to Plaintiffs or merit to the Plaintiffs' claims.

A. **Timekeeping systems**

With regard to the timekeeping systems, there is no record to show that any data was lost from these repositories. None of the UMC IT individuals responsible for maintaining the data repositories have any record of data loss from these systems. Forensic analysis was not pursued as the Special Master filed his Report and Recommendation prior to finishing any inquiry into these repositories (making his findings on this topic brashly premature, if not flat out wrong).

The most telling aspect of the Plaintiffs' Response regarding the timekeeping systems is their avoidance of discussing the Kronos database as the source of the timekeeping relevant to Plaintiffs' remuneration for all time worked. It is fact that all UMC employees are paid based on the timekeeping data within Kronos, and UMC turned over its entire Kronos database to Plaintiffs prior to the Special Master proceedings.[16] For the time period relevant to this lawsuit, July 2009

---

[16] This was in addition to the Kronos reports (as generated from Kronos in pdf format) for each opt-in packet.

to July 2012, a missed meal break to be compensated was recorded in Kronos as a cancellation of the automatic 30-minute meal break deductions for all hourly employees. As extensively discussed in UMC's Objection, such automatic meal break deduction policies have been found legal and shift the to the impacted hourly employees to report partial or missing meal breaks to management in order to be repaid for them.  See *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876-78 (6th Cir. 2012), in which the Sixth Circuit Court of Appeals held that when an employer has an honest and reasonable process in place for employees to follow for missing lunch breaks, the employee must use the process to assert entitlement to overtime pay.[17] This directly follows from the *Forrester* holding, *see Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981) (an employer must be notified of the alleged overtime worked in order to compensate the employee for it), and is followed in the district courts in the Ninth Circuit, *see Williams v. U.S. Bank Nat. Assn.*, 290 F.R.D. 600, 605 & n.5 (E.D. Cal. 2013) (applying *White's* two-step process for an FLSA wage and hour collective action class); *Benedict v. Hewlett-Packard Co.*, 2014 U.S. Dist. LEXIS 18594 (N.D. Cal. Feb. 13, 2014); *Syed v. M-I, LLC*, 2014 U.S. Dist. LEXIS 104820 (E.D. Cal. July 30, 2014); *Lillehagen v. Alorica, Inc.*, 2014 U.S. Dist. LEXIS 67963 (C.D. Cal. May 15, 2014); *McKeen-Chaplin v. Provident Sav. Bank*, 2013 U.S. Dist. LEXIS 113654 (E. D. Cal. Aug. 9, 2013).

Moreover, where an "employee fails to notify the employer . . . of the overtime work, the employer's failure to pay for the overtime hours is not a violation" of the FLSA. *See Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) (citing *Forrester*, *supra*). An employee can be estopped from claiming overtime if the employee cannot prove that "the employer knew or had reason to believe that the reported information was inaccurate." *Id.* at 749 (citing *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972). In *Newton*, the plaintiff, a municipal

---

[17] When the plaintiff used the system, she was compensated for the missed lunch break, but when she failed to use the system, she was not compensated.  *See White, supra*, at 877. Without any evidence that the employer prevented plaintiff from utilizing the notification process or otherwise impeded or ignored the notifications, the plaintiff could not recover damages from the employer under the FLSA. *See id.*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  police officer assigned to a DEA task force, was informed he would not be paid for unauthorized

2  overtime, and thus requested specific overtime allowances. *Id.* at 748. After resigning, the

3  plaintiff sought compensation for additional unauthorized overtime hours that he did not report

4  on the time reports for payroll purposes. *Id.* While separate timekeeping forms were submitted by

5  the plaintiff to the DEA with this additional overtime recorded and the Chief of Police could have

6  accessed that information, the court found that the possible access to the DEA timekeeping forms

7  was not sufficient knowledge to hold the employer liable under the FLSA. *Id.*

8      Even though UMC has produced vast amounts of discovery including all of the Plaintiffs'

9  payroll records and thousands of email communications, there is no indication that any

10  notification was provided to UMC of unpaid overtime. In fact, UMC routinely pays its employees

11  for overtime worked.  During fiscal years including the three-year time period relevant in this

12  case, UMC paid overtime compensation to its employees in the approximate amount of fifty-five

13  million, five hundred twenty-seven thousand, two hundred and nine dollars

14  ($55,527,209.00)[18].  UMC's habit of disbursing overtime pay as a matter of course demonstrates

15  that UMC employees were clearly able to recover compensation for overtime worked, "a fact

16  which 'strongly suggests' [UMC] honored plaintiffs' request" for meal break adjustments when

17  properly requested.  *See Desilva v. North Shore Long Island Jewish Health System*, 2014 U.S.

18  Dist. LEXIS 77669 (E.D. N.Y. June 5, 2014) (quoting *Zivali v. AT&T Mobility, LLC*, 784 F.

19  Supp. 2d 456, 467 (S.D. N.Y. 2011)); *see also White*, *supra*, at fn. 4.

20      As the very substance of Plaintiffs' claims of missed meal breaks under the FLSA is

21  properly shown through Kronos data already in Plaintiffs' hands, it is clear why Plaintiffs still

22  refuse to discuss how they are prejudiced by any purported data loss relating to other timekeeping

23  systems. Plaintiffs have the data on which their claims rely, and cannot show that their claims are

24

25

---

26      [18] The exact amount of total overtime paid is $55,527,209.16 for UMC fiscal years 2009
   ($13,436,464.16), 2010 ($8,668,399.18), 2011 ($9,548,328.62), 2012 ($11,050,726.80), and 2013

27  ($12,823,290.48).

28



1   harmed in any way by any data loss described in the Special Master's Report and

2   Recommendation.

3          In UMC's Objection, UMC discussed why Special Master's findings regarding how the

4   timekeeping systems were disclosed is improper. UMC focused on the holes in the fact-finding

5   proceedings that allowed discussion of additional systems to avoid disclosure. UMC did not deny

6   relevance; UMC merely argued that there was no bad faith in the recent disclosure. Plaintiffs

7   continually redirect attention to the recent disclosure of the timekeeping systems because they

8   cannot meet their burden to show prejudice from the late disclosure. Plaintiffs do not even begin

9   to discuss the content of these systems even though Plaintiffs have received samples of reports

10  for opt-in plaintiffs.[19] Where no data has been determined to be lost and reports are being sought

11  from these systems, the timing of the disclosure of these systems does not warrant the sanctions

12  which are recommended.

13      **B.  Excel Spreadsheets**

14          Plaintiffs' claims that UMC "grossly conflates and confuses" the Special Master's flawed

15  findings regarding Excel spreadsheets is in itself a gross obfuscation of the issue. First, UMC has

16  not misrepresented its ability to generate spreadsheets. When Plaintiffs made the request for

17  Kronos information in Excel spreadsheet format, UMC represented that the reports generated

18  from Kronos are in pdf format. Thus, it was not a regular business practice to alter the report by

19  converting it to Excel (something the Plaintiffs could do themselves after receiving the reports if

20  they chose although now they have the entire Kronos database and no longer have an argument

21  for requesting the information in Excel format). Regardless of how simple the technical process

22  may be, the testimony of Jacquelyn Panzeri shows that it was not simple for payroll to complete

23  Excel conversion, the capability does not change the fact that UMC does not maintain the reports

24

25          [19] It should also be noted for the record that the Teletracking and CrimeStar systems were
26  not used to track meal break periods until October 2012, after the filing of Plaintiffs' original
    Complaint, so the data within these systems would not support Plaintiffs claims for the time
27  period of July 2009 to July 2012.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  in Excel format. UMC payroll does not *regularly* generate spreadsheets from Kronos. Excel

2  conversion would have required additional work time and resources of this public hospital, as

3  evidenced by Ms. Panzeri's testimony regarding the Department of Labor investigation

4  documents. That Excel files were created for the Department of Labor does not negate that UMC

5  does not regularly generate the requested time detail reports in Excel format. In fact, Exhibits U

6  and V submitted by Plaintiffs do not show that any Kronos time detail reports were held in Excel

7  format; file folder names are not the same as file extensions and do not connote any practice as

8  asserted by Plaintiffs. Furthermore, UMC does not deny that the Department of Labor

9  spreadsheets were discoverable, or other spreadsheets that exits. And UMC will continue to

10  produce such discoverable documents when identified. But UMC does deny that the Special

11  Master's findings support the recommended sanctions.

    **C.  <u>Personal Mobile Devices</u>**

12           UMC has made significant arguments against the Special Master's findings regarding the

13

14  personal mobile devices of Mr. John Espinoza and Mr. Doug Smith. Plaintiff does not add

15  anything to this discussion, merely citing the flawed statements of the Special Master. Moreover,

16  the record has shown that UMC did identify individuals' personal devices and reviewed them.

17  Because there was no relevant data identified, the assertion that the devices should be preserved

18  is logically inconsistent and does not warrant the recommended sanctions.

19

20  **IV.   R&R LEGAL ISSUES**

    **A.  <u>The Only Party Threatening to Damage the Integrity of the Discovery
21      Process Is Plaintiffs</u>**

22    As the Ninth Circuit has stated:

23

     In deciding whether to impose case-dispositive sanctions, the most critical factor is
24     not merely delay or docket management concerns, but truth.

25  *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007).

26  That is, the determination of whether a party made it "impossible for a court to be confident that

27  the parties will ever have access to the true facts" is of absolute importance in the analysis of

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

whether to stop a case from proceeding to the merits. *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097. In *Connecticut General*, certain of the defendants perpetrated repeated frauds upon the court to evade litigation, including filing a fraud-laced bankruptcy petition, a doctored docket sheet intended to mislead the court about when these defendants had been in bankruptcy proceedings, and written discovery responses that "approached contumaciousness," including identifying persons with knowledge of a surgery clinic's operations by nicknames or first names, with no contact information for these employees. *Id.* at 1095. These are the types of discovery shenanigans that frustrate a court's assurance that before it is truth, not lies.

Nothing of this sort has happened at UMC—and the record shows this to be true: a terabyte of ESI produced, tens of thousands (if not hundreds of thousands) of documents produced, IT staff and departmental staff pulled away from UMC's critical mission to carry out a momentous document inspection.  There is simply no meaningful comparison to the *Connecticut General* defendants' obstructionist and intentional unresponsiveness to UMC's documented efforts to comply with ever-changing, ever-increasing discovery demands made by Special Master Garrie.

Plaintiffs' reliance on *Henry v. Gill Industries, Inc.*, 983 F.2d 943 (9th Cir. 1993) merely underscores why case-ending sanctions are not appropriate here.  In *Henry*, the Ninth Circuit affirmed numerous case-dispositive and monetary sanctions against the plaintiff, Mr. Henry, a stockholder, who alleged that defendant Gill Industries, Inc. engaged in misconduct arising out of a 1985 securities transaction. *Henry*, 983 F.2d at 945. Mr. Henry:

    a)  refused to answer interrogatories (*Id.* at 949);

    b)  delayed for many months in answering the production requests Gill Industries had propounded, and never produced documents such as his 1986 tax return, and other "key" documents specifically identified by Gill Industries. (*Id.* at 947);

    c)  refused to attend and delayed his own deposition (*Id.* at 949); and,

    d)  deposited with the court clerk a non-negotiable certificate of deposit made out to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                                        20

1    his own attorney instead of depositing (as he was ordered to) a negotiable
     certificate of deposit (*Id*. at 947-48).

2    In *Henry*, the Ninth Circuit performed the type of thorough analysis of prejudice not present in

3    either the Special Master's R& R or Plaintiffs' Response.  During this uncooperative conduct

4    spanning almost two years, the key defendant, Allen T. Gilliland, became "no longer able to

5    assist in the defense," and passed away. *Id*. at 948. His diagnosis (brain tumor) occurred

6    approximately 17 months into the case, and he became incapacitated three months later. *Id*. Mr.

7    Gilliland was the "only participant in the conversations with [Mr.] Henry that formed the basis of

8

9    [Mr.] Henry's lawsuit," and thus:

10        [T]here is every reason to believe that this prejudice would in turn have threatened
          to interfere with the rightful decision of the case, since whatever it was that passed
11        between [Mr.] Henry and [Mr.] Gilliland in 1985 would apparently have been the
          key to the jury's decision.
12

13   *Id*. at 948. This reflects a simple cause-and-effect relationship: Mr. Henry's unwarranted delays

14   caused discovery to be delayed for months on end, during which time he produced very little,

15   answered no interrogatories, and refused to show up (twice!) for his own deposition, all of which

16   precluded completion of Mr. Gilliland's deposition. *Id*. Therefore, prejudice was irreparable and

17   profound—and, as examined thoroughly by the court, his unresponsiveness was completely

18   within Mr. Henry's control. *Id*. His willful and dilatory conduct caused the prejudice to Gill

19   Industries, who could not mount the necessary defense to Mr. Henry's claim of securities

20   misconduct because of Mr. Gilliland's singular importance to their defense. *Id*. at 948-49.

21   Contrary to Plaintiffs' Response (Doc. 216 at 34:3-7), the issue did not turn on the length of

22   delay, but rather what happened because of the delay: Mr. Gilliland, the defendants' only means

23   to defend against the gravamen of Mr. Henry's claims, had passed away.

24        Such is not the case here, as UMC has produced a tremendous amount of documents and

25   ESI over the course of months.  UMC has not engaged in the same willful unresponsiveness as

26

27   Mr. Henry did, and has expended likely close to a seven-figure amount in ESI production alone.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                    21

As this Court noted many months ago, UMC is just a county hospital. It is not a small sailboat capable of quick turns and instant steering commands.  It is more akin to a floating island where wayward travelers with no where else to go can find refuge, and whose movement through the waters is slow, and determined not by commands, but by deep currents and other such uncontrollable forces, like the weather.  Nonetheless, UMC's endeavors to comply with a never-ending list of discovery orders are lost on the Special Master and Plaintiffs.  Trying to make an island into a sailboat is a doomed quest, because no matter how much that island will try to accommodate the requests, it will not be as responsive as the captain desires.  Very simply, and callously shirked off as a consequence Special Master Garrie and Plaintiffs care not at all about, sinking the island at this juncture will have unfathomable consequences for an entire city.

Furthermore, unlike the defendants in *Henry*, who could not proceed with necessary discovery, Plaintiffs have not suffered any impediment to launch further discovery efforts into the actual merits of their case against UMC.  Like the short-circuited analysis in the R&R, Plaintiffs have jumped the gun and cried prejudice before undertaking the necessary analysis of the vast e-discovery provided or continuing any traditional substantive discovery.  This belies Plaintiffs' claim of prejudice. There is no hindrance to moving the litigation forward and to having a trial on the merits of this case.[20]  This is why the *Apple II* case is particularly on-point here.  As UMC argued in its Objection (Doc. No. 207 at 31:19 – 34:9), the court used a very tempered and well-reasoned approach to preservation issues: the court ordered rebuttable presumptions against these most tech-savvy parties for their ESI violations, thus allowing the case to move forward to where the actual merits could be adjudicated.

---

[20] Furthermore, UMC notes that Plaintiffs have not practiced what they preach: they have not turned over a single text, email, or any ESI about working through breaks.

Yes, a county hospital has struggled to meet its preservation duties and herculean production obligations; however, at no point have Plaintiffs carried their burden to show that any ESI that UMC may have lost *is relevant to the merits of their case, thus giving rise to prejudice*. As UMC argued in its Objection (Doc. No. 207 at 37:23 – 38:24), they must do so:

> The burden falls on the 'prejudiced party' to produce some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.

*Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001), *accord Cottle-Banks v. Cox Communs., Inc.*, 2013 U.S. Dist. LEXIS 72070, *44 (S.D. Cal. May 21, 2013) ("Because the Court concludes that Plaintiff has not shown that the deleted recordings would not have likely been relevant and supportive of her claim, the Court also concludes the Plaintiff was not prejudiced by Defendant's deletion of the call recordings.").

Changes to ESI discovery requirements are afoot, and imminently so, as UMC noted in its Objection (Doc. No. 207 at 18:12 – 20:17), yet Plaintiffs would have this Court ignore yet one more fact in its quest to win this case not on the merits, but by wearing down a public institution to the point of sanctioning it out of existence. To be sure, the Response correctly notes that the proposed amendments to Fed. R. Civ. P. 37(e) are just that: proposed. (Doc. No. 216 at 27:13-15). But once more, this misses the point. The proposed amendment simply, but unquestionably, shows that those with experience in ESI discovery in the judiciary see the need to retool the rule to reduce the use of ESI as a weapon to obfuscate the fact that a party's claims are unfounded.

Plaintiffs are incorrect when they assert that even under proposed Rule 37(e), UMC merits severe sanctions. With a nod to the R&R, but not to the correct facts, Plaintiffs quickly state that "serious prejudice resulted." (Doc. No. 216 at 27:22-23). The prejudice analysis, once again, is absent. That is, in what way has the instant FLSA litigation been seriously prejudiced? As the Honorable Judge Campbell explained, any prejudice finding must take into account the fact that

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

"substitute evidence is often available" because digital data often duplicate other data. (Doc. No. 207 at 19:13-14) (quoting Memorandum from the Honorable David G. Campbell, Chair of the Advisory Committee on Civil Rules of the Judicial Conference of the United States to the Honorable Jeffrey S. Sutton, Chair of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (May 8, 2013), attached to UMC's Objection as Ex. D, at 15). This is the reality here, as Plaintiff has had a full copy of UMC's timekeeping and payroll system, Kronos, the backbone of their case. *See* Section III.A, *supra*.

**B.   The R&R and Plaintiffs' Response's Arguments are Inadequate to Uphold the Recommended Sanctions Applicable a Putative Rule 23 Class of UMC Hourly Employees**

Plaintiffs claim that where the Special Master's recommendations are a de facto class certification with damages established as a rebuttable presumption is completely warranted and supported by the record. Even under *Apple II*, cited by Plaintiffs for a three-part test to determine whether to issue evidentiary sanctions, Plaintiffs' argument fails.

*Apple II* states that to find for evidentiary sanctions, the following needs to be established: 1)the party with control over the evidence had an obligation to preserve it at the time it was destroyed; 2) the records were destroyed with a culpable state of mind; and 3) the evidence must be relevant to a party's claim such that a reasonable trier of fact could find that it would support that claim or defense. *See Apple, Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. 2012) ("*Apple II*"); *see also Montoya v. Orange Cnty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 1010 (C.D. Cal. 2013). However, the party seeking spoliation sanctions bears the burden of establishing the elements of spoliation, *see Reinsdorf v. Skechers U.S.A.*, 296 F.R.D. 604, 627 (C.D. Cal. 2013), and indifferent or inept actions are not sufficient to show a culpable state of mind, *see Montoya*, 987 F. Supp. 2d at 1010. Moreover, the party seeking spoliation must "show that the evidence would have been helpful in proving its claims or defenses," not just that "the destroyed evidence would have been responsive to a document request." *Pension Committee of Univ. of Montreal v. Banc of Am. Sec. LLC*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010); *see also*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Cottle-Banks, supra*, at *15-16 (negligent destruction of documents did not warrant adverse inference instruction or evidence preclusion where non-spoliating party failed to show relevance and thus was not prejudiced).

> 1. *Plaintiffs Cannot Establish a Mental State or Data Relevance Argument to Support Recommended Sanctions*

Plaintiffs complete argument appears to be that because data was lost, it is obviously relevant. Citing *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006), Plaintiffs want to argue that relevance cannot be ascertained for the lost data and thus they do not have to carry their burden established in Ninth Circuit case law. In *Leon*, the plaintiff, who asserted an employment discrimination claim, intentionally deleted information from his work-issued laptop computer and then wrote a program to further writeover the deleted documents. *See Leon*, 464 F.3d at 959. His employer sought terminating sanctions against him for deleting the information because that information, including pornography, would have supported the employer's declaratory judgment seeking to establish the employer's right to legally fire Leon for violating the employee guide forbidding work access to sexually oriented materials. *Id.* The deleted files also included communications with health care providers relevant to the plaintiff's ADA claim and correspondence with financial institutions relevant to the timing of plaintiff's resignation. *Id.* at 959-60. The Court found that while identify and content of the deleted files would be impossible to establish, there was "obvious relevance." *Id.* at 960.

Citing case law that has been specifically been criticized by the Advisory Committee on Civil Rule of the Judicial Conference of the United States,[21] Plaintiffs claim that UMC's state of mind is sufficient to find both the second and third elements required to find for evidentiary

---

[21] See the Memorandum from the Honorable David G. Campbell, Chair of the Advisory Committee on Civil Rules of the Judicial Conference of the United States to the Honorable Jeffrey S. Sutton, Chair of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (May 8, 2013), attached to UMC's Objection as Exh. D, at 3, specifically rejecting *Residential Funding Corporation v. DeGeorge Financial Corporation*, 306 F.3d 99 (2d Cir. 2002), which stated that negligence is sufficient culpability to support sanctions.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   sanctions. This is a stretch even from the overbroad and conclusory recommendations of the

2   Special Master. As discussed in UMC's Objection, even the tech giants Apple and Samsung were

3   not subjected to this level of condemnation for failing to suspend email purging policies and other

4   inadvertent document destruction actions. *See also Montoya*, 987 F. Supp. 2d at 1010 (general

5   accusation that defendant's litigation hold policy was ineffective was insufficient mental state to

6   warrant spoliation instruction). UMC did not intentionally delete anything. Its institutional

7   upgrades and massive network file shares were subject to inadvertent loss from lack of

8   communication and failure to effect a massively intrusive hold on all data that UMC possesses.

9   This is not the double-deletion intent from *Leon*.

10       Moreover, unlike the employer in *Leon*, Plaintiffs here have failed to identify how they

11   could even use the data which UMC cannot retrieve. This is particularly damning, as unlike the

12   employer in *Leon*, here, Plaintiffs have some idea of what content was deleted from the limited

13   texts and the 6,000-plus documents identified from the Q: Drive analysis conducted. Of those,

14   6,000-plus documents, where is the vital evidence Plaintiffs would use? While Plaintiffs point

15   toward folder files again, they had a list of the deleted files from the Q: Drive and did not indicate

16   which of those files they even potentially believe are relevant. Because the recommended

17   sanctions are so strict, Plaintiffs must do more to show relevance of data lost. See *Apple II*, 888 F.

18   Supp. 2d at 994-95, where the Court found it difficult to conclude Apple's ability to go to trial

19   was significantly hampered where discovery in the case was voluminous.

20                    2.      _Class Certification Sanctions NOT Warranted_

21       At this point in the litigation, it is not surprising that Plaintiffs believe that class

22   certification is merited as a sanction. This would allow Plaintiffs to prevail without showing any

23   merit to their claims. The case illustrations that Special Master cited and Plaintiffs extrapolate

24   from do nothing to change this reality. And the procedural histories are significantly different.

25       For *Gaddis v. Abell*, No. 03-10773-PM, 2006 WL 4671850 (Bankr. D. Md. July 13,

26   2003), the defendant refused to answer interrogatories completely, refusing to provide any

27   information to the named plaintiffs. UMC has not stood so resolutely in opposition to discovery.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   A large amount of ESI and hard copy documents have been produced, UMC has answered

2   written discovery, and has not obstructed any further discovery that Plaintiffs might have sought

3   in pursuit of full class certification. Moreover, Plaintiffs have a significant number of opt-in

4   plaintiffs from the FLSA collective action from which they could garner information to assist in

5   filing a Rule 23 motion. UMC's behavior, even resulting in some data loss, does not rise to a

6   complete refusal to participate, and thus, de facto class certification sanctions are not warranted.

7       Similarly, in *Air West*,[22] it was a failure of the defendant to appear for deposition, a

8   complete refusal to participate (further complicated by the defendant representative's death), that

9   warranted the imputation of prior sanctions to the full class. Of course, it must be pointed out that

10   the class was certified not because of the discovery sanction; the class certification was merited

11   on meeting the requirements of Rule 23. Plaintiffs have not met that standard, and as UMC

12   argues that default judgment is not warranted for the FLSA opt-in class members, that standard

13   cannot be supposed on this case precedent.

14       And as for the law of the case referenced by Plaintiffs, the following paragraph from the

15   District Court's previous ruling undermines their argument for Rule 23 certification: the court

16   was applying the "lenient standards governing this first phase of the FLSA collection action,"

17   notice of similarly situated individuals not Rule 23 members.

18           *3.*       *Liability and Damages Sanctions NOT Warranted*

19       Plaintiffs argue in favor for of the unsupported findings for liability and damages by the

20   Special Master under two startling orders from a district court case – *Hester v. Vision Airlines*,

21   *Inc.*, Case No. 2:09-cv-00117-RLH-NJK (D. Nev.), (1) Order from November 3, 2010 and (2)

22   Order from March 11, 2013. However, the facts of *Hester* are substantially different from the

23   current situation.

24       In determining a measure for damages for the class of pilots requesting hazard play in

25   *Hester,* the court uncovered that the employer "deliberately misled the class and the Court into

---

[22] *In re Consol. Pretrial Proceedings in Air West Secs. Litig.*, 73 F.R.D. 12, 16 (N.D. Cal. 1976), *aff'd Anderson v. Air West, Inc.,* 542 F.2d 1090 (9th Cir. 1976).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                    27

believing the Air Bridge contract [on which damages would be determined] would end in nine weeks." *Hester March 2013 Order.* at 4:9-10. This lead the pilot class to drop its lawsuit. *Id.* The Court agreed with the pilot class that this misrepresentation of the contract length constituted a fraud on the court. *Id.* at 6:12-15.[23]

The most startling deviation here from *Hester* is that the employer in *Hester* withheld information that would allow Plaintiffs to determine damages. UMC has not engaged in such disgusting discovery tactics. With regard to data regarding damages, UMC has clearly provided the determinate discovery repository, the Kronos database system, clearly distinguishing UMC from the employer in *Hester* that lied about the information. With regard to the disclosure of the other timekeeping systems,[24] those systems were instituted for tracking meal breaks after litigation was initiated and Kronos would still determine failure to pay for time-worked. Moreover, while e-discovery has consumed a large amount of time in this litigation, UMC has been producing volumes of responsive data continuously, where the *Hester November 2010 Order* clearly outlines a much more obstructive discovery schedule. This is not the case where Plaintiffs are considering dropping their claims due to a lack of information; this is just a case of the Plaintiffs having a lack of information showing merit for their claims.

Specifically, however, the recommendation for a damage valuation of one (1) meal missed *per shift* is startlingly inappropriate. In direct contradiction to Plaintiffs' claims, the factual record does not support this holding. First, Plaintiffs' Amended Complaint does not mention anywhere that Plaintiffs missed "one meal per shift." The Amended Complaint very generally states "Defendant encouraged, suffered, and permitted the named Plaintiffs and collective classes to work more than forty (40) hours per week without the proper overtime compensation," "[Plaintiffs] were subjected to a policy of suffering work without pay and

---

[23] It should be noted that the Ninth Circuit did not review the damages valuation order from the district court. The Ninth Circuit review was of the default judgment order from November of 2010.

[24] Plaintiffs also mention a "failure to turn over all relevant DOL investigation documents" but UMC is not aware of what documents to which Plaintiffs are referring.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                    28

1   improper deductions," "Plaintiffs' worked in excess of forty (40) hours per week for the

2   Defendant, but were not properly paid overtime wages in violation of the FLSA," and "Defendant

3   violated the NRS by regularly and repeatedly failing to properly compensate Plaintiffs and class

4   members for the actual time they worked each week." The Amended Complaint also states that

5   the value of the individual Plaintiffs' claims are or may be "relatively small." A lunch per shift

6   award to every single possible claimant would not comport with these averments.

7         Plaintiffs' responses to written discovery do not support this valuation either. See the

8   Responses and Objections to Defendant's First Set of Interrogatories from the six named

9   plaintiffs, attached hereto as Exhibit A. Although the Interrogatories to Plaintiffs are structured in

10   such a way to draw an Answer alleging that the Plaintiffs were not compensated for "one meal

11   per shift," none of them answered in such a way.   Plaintiffs' individual Answers were form-like

12   and consisted of the following:

> I am/was an hourly-paid non-exempt employee of Defendant.  I regularly worked
13   overtime for Defendant, but Defendant did not properly pay overtime wages at the
     rate of 1.5 times to me for all overtime hours (or fractions thereof)
14   worked…Defendant repeatedly failed to compensate me for all actual regular time
     and overtime worked.
15

16         When asked specifically to identify by date and type of damage or injury the individual

17   Plaintiff claimed to have suffered because of any wrongful act or omission by Defendant,

18   Plaintiffs responded: "general categories of damages in this case include:  unpaid regular and

19   overtime compensation for missed or interrupted meal periods; interest on all unpaid and regular

20   overtime compensation due accruing for the date such amounts were due until it is paid; statutory

21   penalties, liquidated damages; and attorneys' fees and costs/expenses." When asked to describe

22   every document which supports the claim for individual Plaintiff's alleged damages, Plaintiffs

23   merely identified documents produced by Defendants and "Plaintiff's Responses to Defendant's

24   Document Requests."  Once again, nothing specific or to the effect that meal breaks at the rate of

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  one per shift was mentioned.  Many of Plaintiffs' Responses expressed that they may have missed

2  a break due to staffing issues on isolated occasions.[25]

3         With regard to the Department of Labor investigation on which Plaintiffs rely supporting

4  this over-generous damage valuation, it should be noted that the report is (1) restricted to a single

5  classification of employees at UMC and (2) does not actually find that UMC violated the FLSA

6  regarding minimum wage or overtime. Where the DOL report indicated that "it was determined

7  that employees were not taking their lunch breaks while policy allowed an automatic deduction, it

8  still was not asserted that this was on average one (1) lunch per shift was missed.

9         Plaintiffs have also produced interview statements they received from the DOL for the

10  employees the DOL interviewed and that are involved in the lawsuit.  Again, all of the employees

11  the DOL interviewed were of a single job classification (Admitting Representatives) at

12  UMC.  None of the other numerous departments with hourly employees at UMC were involved

13  in the DOL investigation.  It is difficult to extrapolate and would be inaccurate to do so to apply

14  the information obtained during the interviews of admitting staff to other staff from various

15  departments that are involved in the lawsuit.

16         Moreover, from the interview notes provided for seven total plaintiffs (who are not

17  identified by name), two (2) of them indicated that they **never** get their lunch breaks, and they

18  were deducted the time for their lunches anyway; two (2) admitting staff employees indicated that

19  "most of the time" and on certain days of the week, they would not take their lunches, or they

20  would be interrupted during their lunches, and their time would be deducted for lunches anyway;

21  and three (3) admitting employees indicated that they always take their lunches.  So even within

22  Admitting Representatives, it appears that circumstances differed.

23         As the DOL's investigation consisted of a single department out of dozens at UMC, and

24  the information provided by the DOL to Plaintiffs was even a smaller sampling of that small

25  sampling, to use that representation to find that all UMC hourly employees failed to receive an

26  _____

27  [25] However, none of them specifically indicated that they were not compensated for their missed meal periods when reported.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                          30

1  unpaid lunch for any amount of time would be an abuse of discretion. Even just the conclusion

2  that all admitting department employees were not being compensated for lunches on every shift

3  worked at UMC is inaccurate. Therefore, the Special Master and Plaintiffs are remiss to even try

4  to rely on the DOL's conclusions, let alone extend the DOL's conclusions to all of the employees

5  of several departments at UMC involved in this litigation, to assert that all possible hourly

6  employees subject to the possible class in this litigation are entitled to compensation at a rate of

7  one lunch per shift.

8        **C.  Plaintiffs' Response Regarding Monetary Sanctions Fails to Address the Issues at Hand**

9        Plaintiffs also summarily claim that because the Court can award fees and costs under

10  Rule 37 that they are entitled to such as recommended by the Special Master. However, as noted

11  with regard to the more-substantive sanctions, in order to comport with due process, any sanction

12  imposed under Rule 37 must be specifically related to the particular claim which was at issue in

13  the order to provide discovery. *Adriana Intl. Corp. v. Lewis & Co.*, 913 F.2d 1406, 1413 (9th Cir.

14  1990). UMC contends that the faulty record on which the Report and Recommendation is

15  founded is sufficient circumstance to undermine the justness of an award of expenses as

16  comprehensive as recommended by the Special Master. As UMC requests that the Court reject

17  the Report and Recommendation in its entirety and enter an order of its own, UMC notes that, as

18  a matter of basic fairness, it has already paid the monetary sanction warranted for the initial issue

19  (i.e., the faulty productions from late 2013 and early 2014) in paying the Special Master fees.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1

**V.      CONCLUSION**

   For the foregoing reasons as well as those set forth in UMC's Objections [Ct. Dkt. No. 207], UMC respectfully requests that the court reject Mr. Garrie's R & R [Ct. Dkt. No. 189] in its entirety.  UMC further requests the Court to substitute its own Findings of Fact and Conclusions of Law for Special Master Garrie's,  following the Court's own de novo review.


   DATED this 26th day of September, 2014.

                                    LEWIS BRISBOIS BISGAARD & SMITH LLP


                        By      /s/ *Margaret G. Foley*
                                Robert W. Freeman, Esq.
                                Nevada Bar No. 3062
                                Margaret G. Foley, Esq.
                                Nevada Bar No. 7703
                                Cayla Witty, Esq.
                                Nevada Bar No. 12897
                                6385 S. Rainbow Boulevard, Suite 600
                                Las Vegas, Nevada 89118
                                *Attorneys for Defendant*
                                *University Medical Center of Southern Nevada*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-9773-6478.1                                   32

1
2
3
4
5
6
7
8

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b), I HEREBY CERTIFY that on this 26th day of September, 2014, I served a true and correct copy of the foregoing **DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S OBJECTION TO THE REPORT AND RECOMMENDATION AND FINAL FINDINGS OF FACT AND CONCLUSION OF LAW OF SPECIAL MASTER DANIEL B. GARRIE** via the Court's CM/ECF electronic filing and service system to all parties on the current service list:

| | |
|---|---|
| DAVID C. O'MARA, ESQ.<br>WILLIAM M. O'MARA, ESQ.<br>THE O'MARA LAW FIRM. P.C.<br>311 East Liberty Street<br>Reno, Nevada 89501<br>Phone: 775-323-1321<br>Fax: 775-323-4082<br>Email: david@omaralaw.net<br>Email: bill@omaralaw.net<br>*Counsel for Plaintiffs* | MARC L. GODINO. ESQ. (pro hac vice)<br>KEVIN F. RUF, ESQ. (pro hac vice)<br>KARA M. WOLKE, ESQ. (pro hac vice)<br>1925 Century Park East, Suite 2100<br>Los Angeles, California 90067<br>Phone: 310-201-9105<br>Fax: 310-201-9160<br>Email: mgodino@glancylaw.com<br>Email: kevinuff@glancylaw.com<br>Email: kwolke@glancylaw.com<br>*Counsel for Plaintiffs* |
| JON A. TOSTRUD, ESQ. (pro hac vice)<br>ANTHONY CARTER, ESQ. (pro hac vice)<br>TOSTURD LAW GROUP<br>1925 Century Parkway East, Suite 2125<br>Los Angeles, California 90067<br>Phone: 310-278-2600<br>Fax: 310-278-2640<br>Email: jtostrud@tostrudlaw.com<br>Email: acarter@tostrudlaw.com<br>*Counsel for Plaintiffs* | |

By     /s/ *Cayla Witty*

An employee of

LEWIS BRISBOIS BISGAARD & SMITH LLP

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW