UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DANIEL SMALL, et al., | Case No. 2:13-cv-0298-APG-PAL |
| Plaintiffs, | **ORDER** |
| v. | |
| UNIVERSITY MEDICAL CENTER, et al., | (Report and Recommendation and Final Findings of Fact and Conclusions of Law – ECF No. 189) |
| Defendants. | |

This order resolves the parties' disputes concerning the Report and Recommendation and Findings of Fact and Conclusions of Law of Special Master Daniel B. Garrie (ECF No. 189.) Defendants filed an Objection to the Report of Findings and Recommendation (ECF No. 207), Plaintiffs filed a Response to Defendants' Objections (ECF No. 216), and Defendants file a Reply (ECF No. 222). The court heard oral argument on the parties' positions and took the matter under submission.

## TABLE OF CONTENTS

I.   INTRODUCTION......................................................................................................... 3

II.  PROCEDURAL HISTORY AND DISCOVERY PROCEEDINGS ........................... 5

   A.   The Pleadings.......................................................................................... 5

      1.  The Initial Complaint ................................................................... 5

      2.  Subsequent Amended Complaints ............................................... 6

      3.  The Operative Pleading – Fourth Amended Complaint (ECF No. 268)...................... 7

   B.   The Initial Case Management Conference.............................................. 8

   C.   Conditional Certification ....................................................................... 8

   D.   Plaintiffs' May 2013 Motion to Compel................................................ 9

      1.  The June 25, 2013 Hearing .......................................................... 9

      2.  The July 12, 2013 Hearing........................................................... 11

      3.  The August 15, 2013 Hearing: Agreement on Search Terms and Custodians .......... 14

      4.  The September 24, 2013 Hearing: Agreement on Production Timeline ................... 17

5. The November 12, 2013 Hearing: Requests Concerning Kronos and Mobile Phone Text Message Data ........................................... 21

6. The November 26, 2013 Hearing: Further Discussion Regarding Kronos and Mobile Phone Data ............................................. 22

7. The January 21, 2014 Hearing: UMC Ordered to Preserve Text Message Data, Discussion of Sanctions ........................................ 24

8. The February 11, 2014 Hearing .................................................. 27

9. The March 10, 2014 Meeting in Chambers ............................... 30

**III. THE SPECIAL MASTER'S ACTIVITIES AND REPORT AND RECOMMENDATION** .................. 31

**IV. THE PARTIES' RESPONSES TO THE SPECIAL MASTER'S R & R** ........................... 35

A. UMC's Objection ........................................................................ 35

B. Plaintiffs' Response to Defendants' Objection .......................... 36

C. UMC's Reply .............................................................................. 37

**V. DE NOVO REVIEW OF SPECIAL MASTER PROCEEDINGS** .................................. 38

A. Declaration of Nicholas M. Wieczorek ..................................... 39

B. Declaration of Craig Renard ...................................................... 40

C. Declaration of Brian Brannman .................................................. 41

D. Testimony of Lawrence Barnard ................................................ 42

E. Declaration of John Espinoza re: Preservation Notices .............. 43

F. Revised Declaration of Espinoza re: Preservation Notices ......... 44

G. Declaration of John Espinoza Regarding the DOL Investigation ..... 45

H. Testimony of John Espinoza ....................................................... 46

I. Declaration of Doug Spring ........................................................ 47

J. Testimony of Doug Spring .......................................................... 48

K. Testimony of Ernie McKinley .................................................... 50

L. Testimony of Jackie Panzeri ...................................................... 50

M. Testimony of Glen McIntire ....................................................... 52

N. Amended Declaration of Dean Schaibley .................................. 55

O. Amended Declaration of Joseph Edmondson ............................ 57

P. Declaration of Marilyn Sue Kisner ............................................ 59

Q. Declaration of David J. Williams ............................................... 60

R. Declaration of Ruben Gurrola .................................................... 61

S. Cayla Witty's June 25, 2014 Letter ............................................ 62

T. Cayla Witty's June 30, 2014 Letter ............................................ 63

**VI. THE COURT'S FINDINGS AND CONCLUSIONS** ........................................... 64

A. Special Master Garrie was Professional, Neutral, Possessed Specialized Knowledge and Expertise, and Remedied Much of UMC's ESI Deficiencies .................. 64

B. UMC Failed to Comply with the Court's Orders to Preserve and Produce ESI .......... 66

C. UMC Had No Preservation Policy or Litigation Hold Policy and Failed to Timely

2

Implement One ............................................................................................. 68

    D.    UMC Executives Failed to Accept Responsibility for Ensuring that ESI was Preserved and Failed to Notify Key Custodians and IT Staff to Preserve, and Prevent Loss, or Destruction of Relevant, Responsive ESI ..................................................... 75

    E.    UMC Failed to Disclose the Existence of Relevant ESI Repositories, Including Multiple Timekeeping Systems and the Q-Drive Until Late in the Special Master Proceedings ................................................................................................................................ 79

        1.    UMC's Burden Shifting Argument in Defense of Non-Disclosure ........................... 80

        2.    The Sixth Circuit's *White* Decision ................................................................. 82

        3.    The Sixth Circuit's *Craig* Decision ................................................................. 84

        4.    The Ninth Circuit's *Forrester* Decision ............................................................ 85

        5.    The *Lillehagen* Decision ............................................................................. 87

    F.    UMC Modified, Lost, Deleted and/or Destroyed ESI Responsive to Plaintiffs' Discovery Requests .................................................................................................. 89

    G.    UMC's Failure to Comply with its Legal Duty to Preserve, Failure to Put in Place a Timely Litigation Hold, Failure to Comply with Multiple Court Orders to Preserve and Produce Responsive ESI, and Loss and Destruction of Responsive ESI (1) Necessitated the Appointment of a Special Master, (2) Caused Substantial Delay of these Proceedings, and (3) Caused Plaintiffs to Incur Needless Monetary Expenses .......... 95

    H.    The Special Master Correctly Concluded UMC Repeatedly Misrepresented the Completeness of its Production of Documents Produced to DOL; However, UMC Was Not Ordered to Produce Kronos Payroll Data in Spreadsheet Format ........................ 96

**VII. ANALYSIS AND DECISION** ........................................................................................ **99**

    A.    Spoliation of Evidence ............................................................................... 100

    B.    The Duty to Preserve ................................................................................. 101

    C.    Scope of the Duty to Preserve ...................................................................... 102

    D.    Sanctions Under Rule 37(b) .......................................................................... 110

    E.    Rule 37(e) ............................................................................................... 112

## I. INTRODUCTION

This case involves a dispute over unpaid wages and overtime compensation. Three named plaintiffs filed the case on July 27, 2012 individually and on behalf of all other similarly situated employees of defendant University Medical Center ("UMC").[1] The case was filed as a collective

---

[1] This case was originally filed in the unofficial northern division for the District of Nevada and assigned to District Judge Howard D. McKibben and Magistrate Judge Valerie P. Cooke. The case was subsequently reassigned to District Judge Miranda M. Du and Magistrate Judge George W. Foley, Jr. on February 25, 2013 (ECF No. 65), and again reassigned on May 3, 2013, to District Judge Andrew P. Gordon for all further proceedings. (Min. Order in Chambers, ECF No. 91.) Judge Foley recused himself from the case on May 16, 2013 (Order of Recusal, ECF No. 94), and the case was reassigned to undersigned magistrate judge shortly thereafter. (*See* Min. Order, ECF No. 100.)

action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq*. ("FLSA"), and initially as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.[2]

This lawsuit followed a Department of Labor ("DOL") investigation that addressed substantially similar issues about uncompensated time for hourly employees related to uncompensated meal breaks. The DOL investigated a two-year period between April 1, 2010, and March 30, 2012. Prior to filing the lawsuit, plaintiffs' counsel made a Freedom of Information ("FOIA") request to DOL for information related to the investigation. The DOL concluded that the employer violated the record-keeping provisions of the FLSA "by not keeping accurate records of hours worked for all employees due to the fact that employees were not taking lunch breaks, but it was automatically deducted in the pay records."[3]

The court reluctantly appointed a special master only after a series of hearings over many months made it painfully apparent that UMC, its counsel, and consultants were failing in their efforts to produce electronically stored information ("ESI") responsive to plaintiffs' discovery requests. At the hearing before the appointment of the special master, the court warned UMC that if it did not resolve its ongoing problems with preserving, collecting, and producing responsive ESI, a special master would be appointed at UMC's expense. Not only did UMC fail to correct the problems outlined in the parties' joint status reports and addressed at length at eight case management and dispute resolution conferences the court conducted over nine months, but UMC's latest ESI production was largely unusable. ESI was produced to the plaintiffs that did not contain extracted text in pages of undecipherable codes complete with Japanese and Korean characters. The bulk of the production was unintelligible.

The court has now conducted a *de novo* review of the entire record preceding the appointment of the special master as well as the entire record of the special master's proceedings. The court has also considered the parties' responses to the special master's report. The special master's report and supporting exhibits consisted of nearly 1500 pages, which the court has personally reviewed in its entirety. For the reasons explained below, the court finds that UMC has

---

[2] Any reference to a "Rule" or "Rules" in this Order refers to the Federal Rules of Civil Procedure. All citations to materials in the record will be enclosed in parentheses.

[3] (DOL Letter to Pls.' Counsel re: FOIA Request, Small 000006, Pls.' Resp. Ex. H, ECF No. 216-8.)

repeatedly violated its discovery obligations and its duty to preserve. Its multiple failures to implement timely preservation procedures, and to identify and collect information from relevant responsive repositories, resulted in the destruction of ESI responsive to plaintiffs' discovery requests. It also resulted in considerable delay of discovery, consumed an extraordinary amount of judicial resources, and cost the parties enormous, unnecessary time and expense. Sanctions are warranted. However, the court will not adopt the special master's recommendation to impose case-dispositive sanctions. Instead, the court will sanction UMC by ordering a jury instruction that allows the jury to consider UMC's discovery failures and destruction of evidence as an alternative to the more severe sanctions recommended by the special master. The court will also impose monetary sanctions in the form of reasonable costs and attorneys' fees unnecessarily incurred by plaintiffs, including ESI consultant fees incurred in connection with filing plaintiffs' May 2013 motion to compel, attempts to identify and remedy UMC's deficient ESI productions, and the cost of participating in special master proceedings.

## II. PROCEDURAL HISTORY AND DISCOVERY PROCEEDINGS

### A. The Pleadings

#### 1. The Initial Complaint

The original Complaint (ECF No. 1) alleged that plaintiffs worked for UMC as hourly-paid, non-exempt employees during the statutory period. (*Id.* ¶ 14.) UMC violated federal and state wage laws by automatically deducting 30 minutes each day for meal break times regardless of whether a bona fide 30-minute meal break was actually taken. (*Id.* ¶ 17.) This uniform policy applied to the named plaintiffs and members of the collective classes (the "On-duty Meal Policy".) (*Id.*) UMC did not maintain proper time records reflecting whether plaintiffs took meal breaks or worked through meal breaks during the statutory period. (*Id.*) UMC was aware of the On-duty Meal Policy at all times, but allowed the practice to continue as it reduced UMC's labor and payroll costs. (*Id.* ¶¶ 19–20.) The proposed opt-in collective class and Rule 23 class were defined to include respiratory therapists as other similarly titled positions. (*Id.* ¶¶ 23, 33.) The complaint alleged claims of action for (1) violation of the FLSA, and (2) violation of NRS 608.016 and NRS 608.018.

## 2.  Subsequent Amended Complaints

An Amended Complaint (ECF No. 37) was filed in December 2012, adding three additional named plaintiffs.  The amended complaint repeated the allegations of FLSA and Nevada wage and hour law violations regarding the On-duty Meal Policy.  The proposed definition of the opt-in collective class and Rule 23 class was expanded to include respiratory therapists, registered nurses, admitting representatives, unit clerks, unit secretaries, environmental waste handlers, and any other similarly situated hourly employees.  (*Id.* ¶¶ 30, 40, 52.)  UMC filed an Answer (ECF No. 42) on January 2, 2013.

Plaintiffs filed a Second Amended Complaint (ECF No. 237) in February 2015, repeating allegations of the On-duty Meal Policy, but omitting any claim under NRS 608.016 and NRS 608.018.  This amendment alleged two claims for (1) FLSA violations, and (2) unjust enrichment and/or quantum meruit.

In July 2015, plaintiffs filed a Motion to Amend Complaint (ECF No. 249), seeking to name UMC's Chief Human Resources Officer, John Espinoza, as a defendant.  Plaintiffs asserted that Espinoza's addition was proper because the DOL determined that he fit the definition of an employer under the FLSA.  The court granted the motion.  (Min. Order, ECF No. 255.)

The Third Amended Complaint (ECF No. 256) was filed in February 2016.  Plaintiffs alleged that Mr. Espinoza is involved in the day to day business operations of UMC, exercises direct control over the hours and wages of the named plaintiffs and all similarly situated hourly employees employed, and is an employer within the meaning of the FLSA.  (*Id.* ¶ 21.)  The third amended complaint maintained allegations regarding the On-duty Meal Policy and asserted two claims for (1) FLSA violations, and (2) unjust enrichment and/or quantum meruit.

Defendants filed a Motion to Dismiss (ECF No. 259) the third amended complaint for failure to state a claim.  District Judge Andrew P. Gordon dismissed the FLSA claim with leave to amend because plaintiffs' allegations regarding overtime pay were threadbare recitals of the elements of a cause of action.  (Order, ECF No. 267.)  He also dismissed plaintiffs' minimum-wage claim with leave to amend because plaintiffs asserted an equitable theory of recovery that is not available to them because they have an adequate remedy at law.  *Id.*

### 3.   The Operative Pleading – Fourth Amended Complaint (ECF No. 268)

Plaintiffs filed a Fourth Amended Complaint (ECF No. 268) on August 25, 2016, alleging one FLSA claim against defendants UMC and Espinoza.  Plaintiffs allege the defendants regularly interrupted employees' meal breaks or caused employees to miss meal breaks.  (*Id*. at 8–11.)  However, UMC's timekeeping software automatically deducted 30 minutes from employees' time for meal breaks.  (*Id*. ¶ 51.)  As a result, hourly employees went uncompensated for missed or interrupted meal breaks.  (*Id.* ¶ 53.)  Each named plaintiff alleges that he or she often had meal breaks interrupted, and missed breaks all together, but was not compensated.  (*Id.* at 8–10.)  Each named plaintiff also identifies at least one week in which he or she worked over 40 hours, including time worked through at least one meal break, for which he or she was not compensated.  (*Id.*)

Plaintiffs further allege defendants violated the FLSA by failing to track employees' meal breaks to determine whether employees took their breaks, were interrupted, or missed them.  (*Id.* at 10–11.)  Defendants' policy and practice required employees to clock in at the beginning of their shift and clock out at the end of the work day.  (*Id*. ¶ 48.)  They were not permitted to clock in and out for lunch.  *Id*.  Instead, defendants simply assumed that each employee actually received a bona fide, uninterrupted 30-minute meal break and deducted 30 minutes each day from their time cards automatically—*i.e.*, the On-duty Meal Policy.  (*Id*. ¶¶ 48, 51.)

In addition, plaintiffs allege defendants knowingly and willingly violated the FLSA.  For example, defendants contracted with a consultant specializing in strategic planning and process improvement in 2011 to analyze and recommend ways to improve teamwork and morale in UMC's emergency department.  (*Id*. ¶ 57.)  One of findings the consultant presented to defendants involved substantial staff complaints of missed meal breaks.  (*Id.*)  A 2012 investigation by the DOL also determined that employees were frequently not taking their lunch breaks and were automatically deducted 30 minutes for lunch per shift.  (*Id*. ¶¶ 58–60.)  Plaintiffs further allege that, in the two years prior to the filing of the complaint, UMC's labor relations committee discussed and noted at least eight times that hourly employees missed meal breaks.  (*Id*. ¶ 62.)  However, defendants continued the On-duty Meal Policy and failed to record and compensate employees for missed meal breaks.  (*Id.*)

The fourth amended complaint alleges that Espinoza qualifies as an employer under the FLSA because he exercises direct control over UMC employees' hours and wages, is involved in UMC's day-to-day operations, has the authority to hire and fire employees, has the authority to direct and supervise employees' work, and has the authority to make decisions regarding employee compensation and capital expenditures. (*Id.* ¶ 32.) Espinoza purportedly devised, implemented, and supervised UMC's wage and hour practices and policies. (*Id.*) He was also an active participant on the UMC project leadership team that worked with the consultant. (*Id.* ¶ 57.)

Defendants filed a Motion to Dismiss (ECF No. 273) the fourth amended complaint in October 2016. Judge Gordon found that plaintiffs plausibly alleged the defendants knew or should have known that UMC employees were regularly missing meal breaks or having meal breaks interrupted but were still having 30 minutes deducted from their time automatically, without compensation. (Order at 5–6, ECF No. 276.) Additionally, Judge Gordon found the plaintiffs adequately alleged that Espinoza is an employer within the meaning of the FLSA. (*Id.* at 9.) Viewing the allegations and inferences in the light most favorable to plaintiffs, and considering that the definition of an employer is to be given an expansive interpretation, he found the fourth amended complaint states a plausible FLSA claim against Mr. Espinoza. (*Id.*) Judge Gordon, therefore, denied the motion to dismiss. (*Id.*)

## B. The Initial Case Management Conference

Judge Cooke conducted an initial case management conference on February 6, 2013, and approved the parties' proposed discovery plan and scheduling order as outlined in the parties' joint case management report. (Mins., ECF No. 53.) The initial discovery plan and scheduling order established a July 1, 2013 discovery cutoff. (Scheduling Order, ECF No. 55.)

## C. Conditional Certification

On June 7, 2013, Judge Gordon held a hearing on plaintiffs' Motion to Certify Class (ECF No. 46) and took the matter under submission. (Mins., ECF No. 103.) Judge Gordon granted plaintiffs' motion for conditional certification of an FLSA class. (Order, ECF No. 106.) His written order directed notice to "[a]ll individuals who were employed or are currently employed by [UMC] as hourly employees at any time during the relevant statute of limitations period." (*Id.*)

The order also directed UMC to provide counsel for plaintiffs with the name, last known mailing address, and last known email address of every non-exempt, hourly employee who has worked for UMC at any time during the three years preceding the date of the filing of the complaint; and to post the notification form in a conspicuous location at UMC's place of business where employment-related notices are routinely posted.  (*Id.*)

### D.  Plaintiffs' May 2013 Motion to Compel

On May 15, 2013, plaintiffs filed a Motion to Compel Production of Documents and Information in Response to Plaintiffs' First Set of Request for Production of Documents and First Set of Interrogatories, and to Compel Further Inspection of Defendants' Premises (ECF No. 92).[4] The motion to compel sought an order compelling the defendants to respond to plaintiffs' first set of written discovery including interrogatories and requests for production of documents and electronically stored information served on January 23, 2013.  The motion raised serious concerns from plaintiffs that spoliation was occurring.  Plaintiffs requested, *inter alia*, documents and data relating to timekeeping and payroll records, and job descriptions and other employment records.

#### 1.  The June 25, 2013 Hearing

After the case was reassigned, the court set plaintiffs' motion to compel for a hearing on June 25, 2013.  (Notice of Hr'g, ECF No. 107.)  Plaintiffs' counsel appeared at the hearing.  (Mins., ECF No. 112.)  Defense counsel did not, but were ultimately reached by telephone 23 minutes after the scheduled start time.  (Hr'g Tr. 3:24, ECF No. 113.)  The court intentionally set the hearing after Judge Gordon's hearing on the motion to conditionally certify an FLSA class because the outcome of that motion impacted the scope of discovery in this case and the disputes involved in plaintiffs' motion to compel.  (Tr. 4:1–4.)  This was because UMC had resisted responding to discovery prior to conditional certification.

At the hearing, UMC's counsel represented that it was now working on obtaining class contact information and working on producing employee files, timekeeping records, and payroll records for the opt-in plaintiffs "to the tune of 5600 documents already."  (Tr. 8:2–8.)  The court

---

[4]  On May 16, 2013, Judge Foley recused himself (ECF No. 94), and the case was reassigned to the undersigned magistrate judge on June 4, 2013.  (Min. Order, ECF No. 100.)

addressed UMC's counsel concerning its response to the motion to compel which indicated that UMC had retained an IT specialist to help collect responsive data and documents, and asked what scope issues it now had in light of Judge Gordon's order.  (Tr. 8:13–18.)  Counsel for UMC requested an opportunity to meet and confer to see if the parties could work out their scope of discovery disputes.  The court indicated it was prepared to rule on the motion to compel, and again inquired what if any scope of discovery issues UMC had in addition to its objection to producing DOL investigation materials.  (Tr. 8:18–24.)

Counsel for UMC indicated that, with respect to the opt-in plaintiffs, UMC would make rolling productions of documents and expected to have the first round ready within a couple of weeks "and on a continued basis thereafter."  (Tr. 12:24–13:9.)  Counsel for plaintiffs agreed it made sense to proceed first with opt-in plaintiff discovery.  With respect to the other categories of discovery addressed in the motion to compel, which included ESI and payroll records spreadsheets, plaintiffs suggested an August 1st deadline, five weeks after the hearing, for producing information responsive to discovery requests served five months earlier.  (Tr. 14:6–19.)  Plaintiffs' counsel specifically addressed discovery requests for DOL documents indicating that UMC had produced 19 pages of DOL documents and plaintiffs therefore believed it had waived any privilege claims.  (Tr. 14:20–15:3.)  Additionally, plaintiffs' counsel pointed out that John Espinoza, UMC's Chief Human Resources Officer, had already been deposed and testified at length about the DOL investigation and UMC's new timekeeping procedures.  (Tr. 15:4–11.)

Counsel for UMC objected to plaintiffs' proposed timeline for producing discovery suggesting 21 days to produce what counsel expected would be 25,000 pages was not reasonable.  (Tr. 17:2–9.)  She referred to Mr. Espinoza's testimony that the documents could be produced in that time frame but pointed out that he was not an attorney and did not appreciate the need for privilege and relevance review.  (Tr. 17:10–15.)

The court continued the motion hearing to July 12, 2013, directing counsel for UMC to provide an updated estimate of when UMC would be producing documents with respect to the opt-ins.  (Tr. 19:1–7.)  The court also advised the parties that it would set a definitive timeline for rolling productions "based on your ability to get some definitive information from your IT people."

(Tr. 19:7–10.)  Although the court was prepared to decide the disputes in the motion to compel at the June 25, 2013, hearing, because UMC's counsel was not prepared for the hearing, the court indicated it would resolve any remaining disputes concerning plaintiffs' motion to compel at the next hearing.  The court also gave counsel relief from the existing discovery plan and scheduling order deadlines indicating new deadlines would be established at the July 12, 2103 hearing once the court received UMC's updated report on its document production timeline.

### 2.  The July 12, 2013 Hearing

The court conducted a lengthy hearing on plaintiffs' motion to compel on July 12, 2013.  (Mins., ECF No. 115.)  Counsel for plaintiffs advised the court that no progress had been made since the last hearing, plaintiffs had not received any documents, either hard copy or ESI, and no privilege log had been produced.  (Hr'g Tr. 4:14–21, ECF No. 119.)  Additionally, UMC had not attempted to meet and confer between the two hearings with respect to issues raised in the motion to compel.  (Tr. 4:22–24.)  UMC had not yet provided the class list for notification although UMC had promised it the day of the hearing.  (Tr. 5:7–21.)

UMC's counsel indicated that he believed the class list and contact information for approximately 400 persons would be produced by July 29, 2013, in accordance with Judge Gordon's order.  (Tr. 6:6–13.)  Defense counsel indicated UMC had been working "tirelessly" since the last hearing and expected to have discovery for the 77 opt-in plaintiffs produced by August 9th.  (Tr. 6:25–7:2.)  With respect to the DOL investigation documents, counsel represented that he understood "from my clients that everything that we have that relates to the Department of Labor investigation has already been produced as part of the initial document production.  I think they were Bates stamped 1 through 19."  (Tr. 7:3–8.)  He represented there were no transcripts of DOL interviews with UMC employees.  (Tr. 7:9–24.)  He further represented that there was one document that he was aware of that had not been produced.  (Tr. 7:25–8:1.)  Counsel did not have the document but described it as a letter written by the district attorney who represented UMC in the investigation to the DOL in response to its inquiry.  (Tr. 8:1–7.)

The court then addressed UMC's failure to produce any ESI to date when it had committed to a rolling production.  The court pointed out that these discovery responses were long overdue.

(Tr. 8:12–14.) UMC's counsel argued that it was incredibly time intensive to produce and copy the hard copy documents from the opt-in plaintiffs' records. The court noted that UMC had represented in its response to plaintiffs' motion to compel that the client had retained a data collection company to coordinate completion of processing responsive ESI. (Tr. 9:2–5.) Counsel for UMC responded that prior counsel had retained a data collection agency and that his firm had tried to "recreate what they were doing." (Tr. 9:7–8.) Counsel for UMC represented the following:

> The client didn't have any real understanding of what that law firm was doing or the data collection service was doing. When we looked at what they collected, not only was it not usable, we didn't even know where it had come from. There was a lot of data collected. We don't know where it came from. It was—it turned out to be 3, 3 ½ million pages of documents. . . . that were not only responsive to anybody's discovery requests, but probably almost certainly included things that we could not produce, confidential patient information, confidential information about employees that are not part of the lawsuit, all kinds of the things so, we went back and started over and, when we started over and we ran a search of—just to see what we would get and how long it would take, we ran an email—a search on an email for the plaintiff Daniel Small. Daniel Small's e-mail account and search took 6 hours for the IT person to do and it—and it produced 45 pages of documents, none of which are relevant to the lawsuit. So I—in talking with the person at University Medical Center, I have a solution or a proposal for accommodating the searches for the electronic—at least for emails.

(Tr. 9:9–10:6.)

UMC's counsel acknowledged that there was a stipulated ESI protocol in place. However, he argued that UMC could not spend 6 hours per plaintiff conducting ESI searches with more than 70 opt-ins involved. The court pointed out that this was the reason counsel were supposed to discuss ESI problems at the beginning of the case. Counsel for UMC responded, "Well, I learned that this week." (Tr. 11:3.) In a nutshell, counsel for UMC advised the court that he thought ESI was being collected, but learned it had not been done, and so "I started over" on the Monday before the hearing. (Tr. 11:15–20.) He suggested that, because it was so burdensome for UMC to search each of the plaintiffs' emails for documents that might relate to their lawsuit, UMC could give the plaintiffs access to their archived email and require them to search UMC records for their own emails. (Tr. 12:1–25.)

Plaintiffs' counsel responded that much of what UMC had just reported was news to them. (Tr. 15:3–4.) Plaintiffs' counsel disputed UMC's representations about what had happened to date with respect to discovery, stating the "record is replete with what's happened here with prior

counsel." (Tr. 15:9–11.) Plaintiffs' counsel stated that another UMC lawyer submitted a declaration indicating she had met with IT people three times in the first week of June. (Tr. 15:23–25.) Plaintiffs' counsel had a letter dated mid-April from prior counsel indicating he was meeting with people at the hospital and with the IT people. (Tr. 16:1–3.) Plaintiffs' counsel argued, "I don't think it's difficult and time consuming to figure out what happened here, your Honor, I just think someone from the defense side needs to sit down and do it." (Tr. 16:3–6.) Counsel for plaintiffs also reported to the court that what UMC's counsel, Mr. Freeman, had just stated on the record was "wildly inconsistent" with the deposition testimony of Mr. Espinoza with respect to the DOL investigation, notes, calendars, and other documents exchanged with the DOL and about interviews that had been conducted. (Tr. 16:7–20.) Counsel for plaintiffs pointed out that the ESI protocol was put in place five months earlier. (Tr. 16:21–23.)

Plaintiffs' counsel clarified that plaintiffs did not expect that defendants would review every individual plaintiffs' electronic mail. Rather, plaintiffs wanted "the executives' e-mails to be searched. That's what we want." (Tr. 16:23–17:2.) Plaintiffs had not yet provided a list of custodians for an email search, but stated that ESI from at least some of the human resources ("HR") people, specifically Messrs. Espinoza, Spring, and Brannman, were needed immediately. (Tr. 17:3–11.)

The court urged the parties to communicate directly with each other and recessed the hearing to allow the parties to talk. The court granted plaintiffs' motion to compel indicating the question would be the timing of the disclosures. (Tr. 17:24–18:1.) The parties met and conferred for about an hour and the court resumed the hearing. Counsel for plaintiffs indicated that progress had been made. With respect to opt-in plaintiff information, the plaintiffs were willing to agree to an August 9th production date for information relating to the opt-ins. (Tr. 19:22–24.) The details of the agreement to produce opt-in plaintiff information on a rolling basis was described on the record. (Tr. 20:1–8.)

With respect to ESI, plaintiffs' counsel indicated that essentially the parties were "really back at stage I." (Tr. 20:9–12.) The parties had agreed that within a week of the hearing, UMC would engage an ESI vendor and counsel and their IT persons would:

> get our hands around the structure of UMCs IT department, we'll have a list of individuals' servers, mainframes, hardware, all that kind of stuff, personal digital assistant devices that need to be searched and will have search terms; that one week from that point—so that three weeks out from now, . . . we'll be in a position where . . . ESI searches have begun.

(Tr. 20:13–23.) Plaintiffs' counsel indicated that this was a cooperative effort where the plaintiffs would be involved in every step so that months later plaintiffs did not find out that the right ESI searches had not been conducted. (Tr. 20:24–21:3.) The parties indicated they were meeting and anticipated filing a stipulated scheduling order within a week if not sooner, and requested an August status conference. Counsel for UMC asked for 60 days to go back and "re-answer" discovery responses served by prior counsel indicating he did not "see any other way to do it." (Tr. 22:23–23:6.) He reiterated that he would have to start over with ESI searches and stated "it's going to take me 60 days to get it done so I'm going to ask for 60 days to provide those supplements." (Tr. 23:7:14.) With respect to the ESI plan that counsel for plaintiffs described on the record, counsel for UMC stated he did not have "any trouble" with it. (Tr. 23:15–16.)

The court indicated that it would set monthly status hearings to address issues as they arose to avoid formal motion practice on routine matters. (Tr. 25:13–17.) The court also indicated it was essential for both sides and their IT people to be involved in the ESI planning and production because "the vast majority of disputes that I have in ESI discovery matters are because of a lack of communication." (Tr. 25:18–22.) The court acknowledged that plaintiffs were frustrated because they had been engaged in litigation for a year, very little information had been produced, and what information had been produced seemed inconsistent with much of Mr. Espinoza's deposition testimony. (Tr. 26:14–18.) The court urged counsel to "start on a fresh page and see if we can keep things civil and moving forward." (Tr. 26:19–20.) The court gave UMC 45 days to serve supplemental discovery responses. (Tr. 27:23–28:2.)

The parties submitted a Stipulation (ECF No. 114) facilitating Judge Gordon's Order (ECF No. 106) to give notice to the collective class, which the court approved following the hearing. (July 23, 2013 Order, ECF No. 116.)

3.  The August 15, 2013 Hearing: Agreement on Search Terms and Custodians

The court conducted a follow up status and dispute resolution conference on August 15,

2013. (Mins., ECF No. 121.) The court heard counsel's representations concerning their progress on ESI protocols and the current status of the opt-in notices. UMC's counsel indicated that UMC was having difficulty responding to plaintiffs' discovery requests given the amount of information involved. Counsel for plaintiffs advised the court that UMC had not met its own August 2nd deadline to initiate ESI searches[5] and that plaintiffs received an email from UCM approximately two days before the hearing indicating that UMC wanted to negotiate the list of custodians who would be searched for ESI, the list of search terms for ESI, and that the letter made a "vague reference" to needing more time. (Hr'g Tr. 5:13–23, ECF No. 131.)

Among the issues that plaintiffs' counsel raised at the hearing was that timekeeping and payroll information was not produced in Excel spreadsheet format. (Tr. 6:17–18.) Plaintiffs received a disk they contended was "not usable." (Tr. 6:19–23.) Counsel for plaintiffs also asked the court to order that the defendants initiate ESI searches immediately with the list of custodians and list of "narrowly tailored and very reasonable" search terms plaintiffs provided. (Tr. 8:12–19.) Plaintiffs had provided a list of 22 custodians including the named plaintiffs, and most of the executives at UMC. (Tr. 8:22–23.) The plaintiffs had also provided a list of approximately 55 search terms. (Tr. 9:4–6.) The list of custodians and search terms were provided on July 24, 2013. (Tr. 9:22–25.) Pursuant to the deadline established at the July 12, 2013 hearing, the deadline for initiating those searches was August 2nd. (Tr. 9:25–10:2.) On August 13th, two days prior to the hearing, UMC indicated it was "disputing those terms." (Tr. 10:2–5.)

Plaintiffs had conducted a meet and confer with UMC's counsel, UMC's internal IT people, and UMC's outside ESI vendor to identify the sources of relevant ESI. (Tr. 10:8–12.) The parties had identified servers, PCs in individual offices, PDAs/cell phones which were "the three categories of IT that we want searched" instead of just some mainframe server. (Tr. 10:12–18.) The court inquired of counsel for UMC what he had done in the last 30 days to attempt to comply with the deadline to initiate ESI productions by August 2, 2013. (Tr. 11:22–24.) Counsel for UMC acknowledged that he received the list of custodians and search terms on July 24, 2013, and had not gotten back to the plaintiffs about ESI productions until August 13th. (Tr. 12:4–8.) UMC

---

[5] UMC Agreed to begin ESI searches within three weeks of the July 12, 2013 hearing.

"cut out those terms that we felt were duplicative of other terms." (Tr. 12:8–11.) The court inquired why it took until August 13th to respond to the plaintiffs' search terms. (Tr. 12:12–13.) Counsel for UMC responded "that was a function of the fact that our IT person only recently told us it would take two whole weeks of nothing but searches to comply with what the plaintiffs' request was. So as soon as we knew that, we made a counter-proposal." (Tr. 12:14–18.) Counsel for UMC addressed the cost and time estimates for it to comply with plaintiffs' ESI search for 22 custodians and for the plaintiffs' search terms. The court pointed out that UMC had yet to turn over "a single bit of ESI" in the entire case. (Tr. 14:1–3.) Counsel for UMC still had no idea what UMC's IT personnel were going to produce in terms of ESI. (Tr. 15:3–6.)

After an extended discussion on the record about UMC's difficulties in producing discovery, the court proposed an iterative process to prioritize the search of ESI by an agreement to identify the five top custodians and critical search terms and "tweak the process as we go." (Tr. 23:2–5.) Plaintiffs' counsel agreed to the proposal if the searches could be conducted immediately because the plaintiffs had waited so long. (Tr. 23:6–9.) The court required the parties to stay and identify the top five custodians and top ten search terms and a time parameter for the search "so that UMC can initiate the search for ESI for those five and those ten now." (Tr. 24:14–19.)

The court also inquired of plaintiffs' counsel what discovery it was most interested in seeing sooner rather than later. (Tr. 28:2–4.) Counsel for plaintiffs responded that the need to begin ESI searches was a priority to the plaintiffs. (Tr. 28:10–11.)

UMC's counsel indicated that because of the number of plaintiffs who had opted in, 113 at the time of the hearing, it was going to take UMC months and months to produce individual files for the opt-in plaintiffs. (Tr. 27:14–24.) Counsel for plaintiffs argued that plaintiffs needed the payroll information in an Excel spreadsheet format to begin their work. (Tr. 29:1–2.) Plaintiffs' counsel stated the data was received in TIFF format, but the ESI protocol called for documents to be produced in spreadsheet fashion if available. (Tr. 29:7–14.) The plaintiffs had been told by three different representatives of UMC, including Mr. Espinoza at his deposition, that the timekeeping and payroll data was available in spreadsheet format. (Tr. 29:19–24.) Counsel for plaintiffs indicated that the ESI protocol required the documents to be produced in TIFF image,

but there was an exception for spreadsheets.  (Tr. 31:1–3.)  Prior counsel indicated the data could be produced in spreadsheet format.  (Tr. 31:3–7.)  Mr. Espinoza also said UMC could do it.  (Tr. 31:7–8.)  According to plaintiffs, Espinoza testified that he reviewed payroll data all the time in spreadsheet format.  (Tr. 31:12–14.)  Plaintiffs' number one priority at that point was to obtain payroll and timekeeping information in Excel spreadsheet format.  (Tr. 31:20–21.)

Counsel for UMC insisted that it produced the payroll and timekeeping data in compliance with the ESI protocol.  (Tr. 32:6–8.)  UMC's counsel represented that "none of [UMC's] documents are kept in Excel spreadsheets;" rather, "it's kept in Kronos" and exported.  (Tr. 32:13–17.)  Plaintiffs wanted TIFF so UMC produced the data in TIFF format.  (Tr. 32:18–19.)  The court then inquired about what Espinoza had testified to at his deposition.  (Tr. 32:23–25.)  UMC's counsel responded that it was her understanding that "Mr. Espinoza said there is a report that can be run that he can review in Excel."  (Tr. 33:2–4.)  Espinoza said he could review the data that way, but it was not kept that way.  UMC's counsel argued that its obligation under the Rules was to provide information "the way that it's kept, rather than to run special reports."  (Tr. 33:7–11.)

The court directed UMC to initiate ESI search terms for five custodians of plaintiffs' choice and ten search terms the parties mutually agreed upon in the next day or two.  (Tr. 34:3–18.)  A follow-up status and dispute resolution conference was set for September 24, 2013, with a joint status report articulating the parties' respective positions with respect to any outstanding discovery disputes the Thursday before the hearing, August 19, 2013.

4.  The September 24, 2013 Hearing: Agreement on Production Timeline

At the September 24, 2013 status and dispute resolution conference, the court addressed each side's contested issues in the order in which they appeared in the joint status report.  (Mins., ECF No. 128; Hr'g Tr., ECF No. 130.)

Plaintiffs' counsel again requested that timekeeping and payroll information be produced in Excel spreadsheet format.  Plaintiffs' counsel indicated that a Kronos guide attached to the parties' joint status report showed how simply conversion into spreadsheet format could be accomplished.  Counsel for UMC again insisted that UMC did not keep this information in Excel spreadsheet format and that it was not required to produce documents in spreadsheet format

17

because it did not keep the data this way in the ordinary course of its business. Based on the representation of UMC's counsel, the court ordered UMC to produce its timekeeping and payroll information in the format kept in the ordinary course of its business.

By the September 24th hearing, nearly 500 plaintiffs had opted in to the conditionally certified class. Counsel for the parties addressed the time it was taking to prepare hard copy documents or "packets" for the opt-in plaintiffs. UMC's counsel reiterated what it had represented in prior hearings that it took UMC personnel about four hours per opt-in plaintiff to gather the data from their personnel files and timekeeping records. As UMC had only produced 60 packets to date, plaintiffs projected that it would take another two years for UMC to produce the documents for the additional opt-in plaintiffs. Plaintiffs had not received any additional individual opt-in plaintiff document packets since the last hearing.

The court then raised the issue of the proportionality of the discovery asking plaintiffs the amount they reasonably believed was in dispute for the damages involved for the entire opt-in class. Although plaintiffs' counsel had not finished their damages analysis, counsel represented that based on a very conservative estimate, each of the conditionally certified class members missed two meal breaks per week during the statutory period and damages would be "somewhere in the neighborhood of $10 million." (Hr'g Tr. 9:6–10, ECF No. 130.) The court advised counsel that it made this inquiry to determine "how hard to push" the parties and how much resources were reasonable for UMC to devote. (Tr. 11:17–19.) The court noted that although inconvenience or expense in and of itself is not generally a defense to having to produce legitimate discovery, the court must assess whether the inconvenience or expense was out of proportion to plaintiffs' damages. (Tr. 11:19–23.)

Counsel for UMC explained that UMC was working diligently, but also working on the ESI discovery issues. The court pointed out that UMC was preparing the individual opt-in plaintiff discovery packets through its in-house personnel, but had an ESI vendor assisting with the ESI production.

The court then turned to the unfortunate ESI debacle. UMC's counsel indicated that UMC had not discussed the custodians or limited search terms with its ESI contractor before agreeing to

them. (Tr. 13:23–14:9.) UMC had produced a lot of ESI and had information from its contractor that about 70 gigabytes of raw data, or in the neighborhood of 2,100 boxes of additional ESI had been printed out. (Tr. 14:21–24.) The court questioned why UMC would even consider making hard copies of an ESI collection. Counsel for UMC responded, "It makes perfect sense the way you say that." (Tr. 15:15–16.) The court questioned why the volume was a big issue for the five custodians and 10 search terms the court ordered at the last hearing. UMC's counsel responded that the size of the production was not the concern, but counsel's ability to go through it. (Tr. 15:20–21.) UMC acknowledged that a claw back agreement was in place. UMC's counsel also stated that UMC had recently received a report from its contractor giving subject headings of emails that would make it easier to weed out the irrelevant search terms. (Tr. 15:21–16:1.)

The court inquired what UMC's independent contractor indicated would be more reasonable search terms. (Tr. 16:14–16.) UMC's counsel responded that there were some ideas that would "take a bit more conversation with our contractor and opposing counsel … but … we think it's close to ready to go." (Tr. 16:17–25.)

The court inquired of plaintiffs' counsel whether they were willing to review a potential "document dump" of potentially irrelevant documents from key word searches for terms such as "lunch." (Tr. 17:18–24.) Counsel for plaintiffs responded that by de-duplicating documents "you're probably going to cut this in half anyway." (Tr. 18:1–6.) Plaintiffs' counsel offered to consider search terms and Boolean searches to further limit the production. (Tr. 18:6–8.) However, plaintiffs were willing to review 15 or 20 gigabytes of information if necessary. (Tr. 18:8–10.) Counsel for UMC estimated the cost of putting the ESI production of approximately 75 gigabytes on a flash drive was approximately $100. (Tr. 18:22–23.) UMC's counsel stated that its ESI vendor indicated he could not simply de-duplicate documents without changing metadata and without changing the content. (Tr. 19:2–7.)

Counsel for plaintiffs expressed concern that UMC was insisting it would not produce ESI for more than five custodians. The court indicated that it ordered the first five custodians with ten search terms in order to initiate ESI production, but that ESI production would continue in waves. (Tr. 20:13–21:14.) The court's intention was to allow plaintiffs to review the ESI production for

the first five custodians involving the first ten search terms to further evaluate what further ESI search and production was reasonable taking it a step at a time. (Tr. 21:9–22:11.) The court then inquired whether there was any reason UMC could not produce ESI in electronic format to plaintiffs' counsel to allow them to de-duplicate the documents for the five custodians and 10 search terms in two weeks. (Tr. 22:12–14.) UMC's counsel replied "I see no reason why not. We will do that." (Tr. 22:15–16.)

The court addressed the parties' disputes concerning UMC's supplemental discovery responses ordered as a result of granting plaintiffs' motion to compel. (Tr. 22:18–20.) UMC's counsel maintained that notwithstanding the court's order overruling UMC's objections to the discovery requests at issue in the motion to compel, its objections remained viable. (Tr. 22:20–25.) The court indicated that if UMC had withheld any documents on the basis of privilege, a privilege log fully compliant with Rule 26 would be required to be produced. (Tr. 23:8–10.) The court inquired whether UMC believed any objection other than privilege survived the court's order granting plaintiffs' motion to compel. (Tr. 23:14–20.) Counsel for UMC responded that the discovery requests were over-burdensome and irrelevant. (Tr. 23:21–25.) The court indicated that it would continue to oversee the scope of ESI custodian searches, but that as UMC had lost the motion to compel all of its objections were overruled except for privilege. (Tr. 24:2–9.) UMC's counsel responded that it had not withheld anything "except exceeding the scope of discovery," which would be revisited in a letter to opposing counsel clarifying the matter. (Tr. 24:14–17.)

The court reiterated that it did not have all of the parties' prior disputes in the motion to compel memorized, but that boilerplate objections had been overruled. (Tr. 25:16–22.) The court ordered UMC to review their supplemental responses to make sure that no documents had been withheld except on the basis of privilege. (Tr. 25:24–26:10.) However, the court specifically advised UMC that its other objections were overruled when the motion to compel was granted. (Tr. 26:12–13.) After additional discussion, the court pointed out that it had gone over each of the disputed discovery requests and ruled on an interrogatory-by-interrogatory and an individual response to request for production basis, and again reiterated "so with respect to all of the objections I compelled you to produce, all of your objections, save privilege, have been overruled."

(Tr. 27:1–3.)  The court resolved a number of other disputes and set the matter for a further status conference on November 12, 2013.

### 5. The November 12, 2013 Hearing: Requests Concerning Kronos and Mobile Phone Text Message Data

At the November 12, 2013 status conference, counsel for plaintiffs again indicated that plaintiffs had not received ESI promised by UMC, or in compliance with the ESI protocol.  (Mins., ECF No. 138; Hr'g Tr. 5:3–8, ECF No. 139.)  UMC's counsel had discussed the need to use a different ESI vendor.  (Hr'g Tr. 5:18–20, ECF No. 139.)  Plaintiffs' counsel proposed that both sides use plaintiffs' ESI vendor, International Litigation Services, Inc., which had a great deal of experience in e-discovery.  (Tr. 5:21–6:1.)

Plaintiffs' counsel also indicated that searches from executive "PDAs" (*i.e.*, personal digital assistants) issued to UMC custodians, such as cell phones, had still not been produced.  (Tr. 6:1–7:4.) Because of all of UMC's difficulties, plaintiffs had still not been able to begin review of ESI.  (Tr. 7:15–16.)  Plaintiffs' counsel again repeated their request for Kronos data in spreadsheet form, including Kronos spreadsheets related to the DOL investigation.  (Tr. 9:1–18.)  Plaintiffs' counsel represented that its own ESI vendor could not produce the payroll data in spreadsheet format because plaintiffs did not have native documents.  (Tr. 9:19–10:2.) The court inquired whether, if plaintiffs received raw data that contained the metadata and in the format that both sides agreed to, plaintiffs could generate spreadsheet reports with the Kronos software.  (Tr. 10:17–21.)  Counsel for plaintiffs responded that if UMC produced the Kronos data in its native format, plaintiffs could generate the report.  (Tr. 10:22–23.)

Counsel for UMC indicated UMC was amenable to plaintiffs' suggestion to jointly retain plaintiffs' ESI vendor which had been intimately involved in the process and prepared to comply with the ESI protocol.  (Tr. 14:14–20.)  However, counsel had to confer with the client.  (Tr. 14:20–21.)  The court expressed its frustration with hearing more problems with UMC's ESI production at every status conference.  (Tr. 16:5–6.)  Additionally, ESI problems were discussed with counsel for UMC who kept assuring the court that "next time, there won't be an issue with what is loaded and what is produced."  (Tr. 17:21–22.)  The court required UMC's IT vendor to speak directly

with plaintiffs' IT vendor to ensure both sides were on the same page about compliance with the ESI protocol. (Tr. 17:23–18:6.) UMC requested two weeks to consider plaintiffs' proposal that the parties jointly use the same ESI vendor. (Tr. 18:7–15.)

Counsel for UMC then addressed the electronic searches of the "personal digital systems" or PDAs and cellphones for UMC officials. (Tr. 19:21–24.) Counsel indicated that there were two issues—one regarding email or documents that would have been transmitted through those phones that would have gone through the exchange server with UMC. (Tr. 19:24–20:6.) UMC's counsel indicated that if there was other ESI such as text messages or metadata regarding calls that plaintiffs were seeking, it was not covered by the ESI protocol. (Tr. 20:7–10.) Counsel for UMC suggested that a stipulation would be needed to obtain information directly from the cell phone provider. (Tr. 20:10–15.)

The court pointed out that this was an issue that had been discussed many months ago in a status conference, and that UMC had agreed to provide this information. (Tr. 20:16–19.) Counsel for UMC expressly represented to the court that "what information UMC has control over was searched, and I just wanted to clarify that for the court." (Tr. 21:9–11.)

Counsel for UMC also represented that she did not believe that providing plaintiffs with the raw data from Kronos would enable the plaintiffs to create timekeeping spreadsheets because a manual entry from a separate program was required. (Tr. 22:6–19.) The court directed that this issue be discussed among the parties' respective IT experts. (Tr. 22:25–23:14.)

The court expressly addressed counsel for UMC about his comment that he was not technologically savvy about ESI issues stating:

> If you're going to practice law in this era, like it or not, you're going to have to have an understanding of that. If that means having your ESI tech talk to you like a sixth grader, . . . that means they talk to you like a sixth grader. I mean, you have to understand.

(Tr. 25:18–25.) The court continued the hearing for two weeks until Tuesday, November 26, 2013.

### 6. The November 26, 2013 Hearing: Further Discussion Regarding Kronos and Mobile Phone Data

At the November 26, 2013 status conference, the parties announced that they had resolved

some issues. (Mins., ECF No. 140; Hr'g Tr. 4:2–3, ECF No. 141.) The parties and their ESI vendors held a telephone conference on November 20, 2013. (Hr'g Tr. 4:23–5:6, ECF No. 141.) Defense counsel was on the phone with their new ESI expert, Joe Edmondson. (Tr. 5:2–6.) The primary discussion was how to produce prior discovery in conformance with the ESI order and make it compatible for review. (Tr. 5:7–9.) Plaintiffs' counsel believed that the discussion was fruitful and everything seemed to be on track on that issue. (Tr. 5:10–14.) The defense did not have a Kronos person on the phone to talk about the specifics of the Kronos database. (Tr. 5:15–18.) The parties discussed getting information from hospital-issued PDAs. (Tr. 5:19–20.)

The parties conducted another telephone call on November 25, 2013, and plaintiffs believed everything was on track with respect to the document production. (Tr. 5:23–25.) Defense counsel told plaintiffs that the search and subsequent processing of results would be completed by November 29th. (Tr. 6:1–3.) That process would include getting the documents properly formatted and de-duplicated. (Tr. 6:3–4.) Defense counsel also represented that ESI would be produced along with the privileged log on December 6th. (Tr. 6:5–6.)

Plaintiffs' counsel advised the court that with respect to the PDAs, two of the five custodians had hospital-issued Blackberries and emails that would have been generated from those would be part of the ESI production on December 6th. (Tr. 6:14–18.) With respect to the texts, there was some ambiguity about when they would be produced. (Tr. 6:19–21.) However, plaintiffs' counsel believed defendants represented that the texts would be produced sometime in December. (Tr. 6:21–23.) Defense counsel indicated that their Kronos expert would be available for discussions the following day. (Tr. 6:25–7:5.) Based on these discussions, plaintiffs' counsel hoped to begin reviewing ESI document production in the beginning of the new year. (Tr. 8:7–9.) However, with respect to additional ESI production for additional custodians, the parties had not yet come to an agreement. (Tr. 8:10–12.)

Counsel for UMC responded that, with respect to the progress that has been made, she was in agreement with plaintiffs' counsel. (Tr. 9:21–23.) The additional processing for the initial results was started the day after the last hearing. (Tr. 9:24–25.) UMC intended to have everything produced by December 6th. (Tr. 10:1–2.) With respect to the text messages for the smart phones

or the five custodians' PDAs, counsel represented "we did actually contact them directly. Only two of them have UMC issued phones." (Tr. 11:9–13.) These were upper-level management custodians. (Tr. 11:18.) Counsel represented that:

> To collect any text messages that might relate to the search terms, we have to go to the individual phones. And that requires a little bit of additional scheduling. And we also have to deal with a little bit of preparation, to make sure we know what data can actually be taken from the phone because unfortunately, it varies widely depending on the device and the carrier.

(Tr. 11:18–25.) The carriers varied because some people used Blackberries, "which are not used on all services, and it's conflicting." (Tr. 12:2–6.) The court specifically inquired whether the parties had discussions between their experts about making sure how to retrieve the data so that there was not a spoliation claim involving the manner in which data was retrieved. (Tr. 12:7–10.) Counsel for UMC responded that she did not think that had been discussed between the experts, but did not believe it would be a problem. (Tr. 12:11–13.) Counsel further represented to the court that because of the interaction between the ESI vendors and the experts, she did not believe there would be "anywhere near the delay in production from this point on, and it's just more a matter of making sure that we know what the scope is and the additional search terms that we can agree on." (Tr. 12:18–23.) The court directed the parties to submit a stipulation and proposed order extending the deadlines to memorialize all of the dates that had been discussed and agreed upon. (Tr. 14:13–16.) A further status conference was set for January 21, 2014.

7. The January 21, 2014 Hearing: UMC Ordered to Preserve Text Message Data, Discussion of Sanctions

The parties filed a Joint Status Report (ECF No. 142) before the January 21, 2014 hearing. In the report, UMC represented that it would produce text message data of the five identified UMC executive custodians by the end of January 2014. UMC represented that it has ascertained that three of the five custodians—Brian Brannman, current Chief Executive Officer ("CEO") of UMC, John Espinoza, Chief Human Resources Officer of UMC, and James Mumford, Human Resources Director of Labor Relations—had mobile phones issued by UMC. (*Id.* 4:15–18.) Defense counsel represented that three of these individuals had UMC-issued Blackberry devices that required lengthy data-pulls taking four hours each. (*Id.* 4:18–19.) "As these individuals with high-levels

of institutional responsibility are required to have access to these devices continually, UMC is very carefully scheduling time in January to pull what data can be obtained from these devices." (*Id.* 4:19–22.)

The hearing addressed ongoing issues with UMC's failure to produce ESI in accordance with the parties' ESI protocol. (Mins., ECF No. 143.) Among other things, counsel for plaintiffs indicated that UMC produced ESI in December that was given to plaintiffs' ESI expert. (Hr'g Tr. 6:5–6, ECF No. 144.) Plaintiffs' ESI expert tried to load the data, but there were complications, which he attempted to diagnose. (Tr. 6:6–8.) Plaintiffs subsequently advised the defendants that the data was useless and needed to be reproduced. (Tr. 6:8–11.) Plaintiffs disputed UMC's representation in the joint status report that plaintiffs' concerns had been addressed. (Tr. 6:12–14.) Rather, UMC's counsel indicated that counsel had reviewed the production and believed it was fine. (*Id.*) Plaintiffs' counsel therefore suggested that the ESI people get together to figure out who was right. (Tr. 6:15–17.)

A meeting was arranged with the respective ESI people. (Tr. 6:18–19.) On the morning of the conference call, defense counsel suddenly acknowledged that plaintiffs were correct that there were problems with the second production, which UMC agreed to fix. (Tr. 6:19–23.) UMC provided plaintiffs with samples of what it believed was a "corrected production." (Tr. 7:5–7.) Plaintiffs' ESI vendor reviewed the information and found it still had a problem. (Tr. 7:7–8.) Plaintiffs' counsel described the technical aspects of the problem. (Tr. 7:9–19.) Plaintiffs spent $15,000 trying to work with what UMC had produced, which UMC now admitted was unworkable, and plaintiffs' counsel questioned why plaintiffs should bear the cost of UMC's inability to produce discovery. (Tr. 8:7–12.) Plaintiffs asked the court to order reimbursement to plaintiffs for the additional costs incurred for their ESI vendor. (Tr. 8:13–16.) Plaintiffs' counsel also advised the court that the mobile text data that had still not been produced. (Tr. 10:22.)

The court addressed counsel for UMC about the representation in the Joint Status Report (ECF No. 142) that UMC had spent $100,000 over a year's period of time with two different vendors who gave UMC something described as worthless and did not comply with an ESI protocol that UMC itself proposed. (Tr. 16:4–17.) Counsel represented that UMC's production

was ready, but that part of the problem with the latest ESI production "was purely a miscommunication." (Tr. 16:18–20.) There was a coding issue with the second production. (Tr. 16:21–22.) Closer evaluation discovered the coding issues and UMC's ESI vendor began reprocessing it. (Tr. 17:1–3.) The January 14th conference call that was held "was another miscommunication." (Tr. 17:25–18:1.) However, counsel for UMC represented in open court that she had an ESI production ready to produce to plaintiffs and would continue meeting and conferring with regard to any additional metadata issues. (Tr. 19:10–14.)

The court directed UMC to turn the data over indicating it would give plaintiffs' expert two weeks to review the data and that:

> If there's a problem again, I'm going to appoint a special master who is going to be paid for at UMC's expense, and this will be a special master who is a lawyer, who will be entitled to hire an ESI specialist who will report to the court what the problem is, and recommend to the court how to resolve the problem, because I am not going through this every two weeks.

(Tr. 19:20–20:3.) The court directed UMC's counsel to produce the Kronos payroll data for all of its employees during the time period relevant to the litigation, not just the opt-in plaintiffs, because the court had confidence in the plaintiffs' representations. (Tr. 20:18–23.)

The court gave UMC until January 31st to produce the text data for the UMC executives to opposing counsel and told UMC's counsel that the court did not want to hear one more time about how the executives could not be without their Blackberries for the four hours it would take to dump the data. (Tr. 20:24–21:3.) The court warned UMC that it would permit plaintiffs to file whatever motions they intended to file if ESI production continued to be a problem including "the full panoply of Rule 37 sanctions that I have at my disposal up to and including case dispositive sanctions against UMC if we can't get this case ready for trial and discovery of routine information and ESI produced to plaintiffs' counsel." (Tr. 21:4–11.) The court pointed out to UMC's counsel that the date was then January 21, 2014, and UMC had yet to produce ESI according to a protocol its own counsel drafted. (Tr. 23:5–6.)

By the January 21, 2014 hearing and after seeing the latest round of UMC's problems with its production, the court had lost all confidence in UMC's ability to comply with its discovery obligations. By contrast, the court had a great deal of confidence in what plaintiffs and their ESI

consultants were reporting.

## 8. The February 11, 2014 Hearing

At the next status and dispute resolution conference on February 11, 2014, plaintiffs' ESI experts, Doug Forrest and Bruce Pixley, were available and participated telephonically. Defendants' ESI expert, Joseph Edmondson, was not present or available telephonically although he was expected to participate, given contact information to call in, and attempts were made to contact him during the hearing. (Mins., ECF No. 146; Hr'g Tr. 1:1–5:25, ECF No. 147.) The only explanation counsel for UMC could provide for why Edmondson was not available as anticipated was that he had recently taken a position with the Las Vegas Sands, which was having problems with its phone lines. (Hr'g Tr. 6:1–7, ECF No. 147.) The hearing therefore proceeded without him.[6]

Plaintiff's counsel indicated that plaintiffs had received the Kronos database, but it had not yet been loaded because plaintiffs were preoccupied with ESI and some text message issues. (Tr. 6:17–19.) Plaintiffs were in the process of loading the Kronos database. (Tr. 6:20.) UMC had also produced the final opt-in packets to plaintiffs for all 600 opt-in plaintiffs. (Tr. 6:24–7:5.) UMC had served these packets, but plaintiffs had not yet received it. (*Id*.) A privileged document log had also been produced. (Tr. 7:6–10.)

However, there were still significant problems with defendants' ESI production and issues about whether it complied with the parties' ESI protocol. (Tr. 7:15–21.) The parties outlined the problems with UMC's most recent ESI production in a Joint Status Report (ECF No. 145) filed before the hearing. Counsel for plaintiffs advised the court that there were technical issues with UMC's most recent ESI production. The manner in which it was delivered to the plaintiffs made the information not searchable or sortable. (Tr. 9:7–12.) The joint status report attached the declaration of plaintiffs' ESI expert, Mr. Pixley, explaining how the documents were not searchable, sortable, or readable. (Tr. 9:13–17.) The documents could not be loaded to a viewing platform like Summation or Concordance so they could be viewed in the same manner that UMC saw them. (Tr. 9:18–20.) Plaintiffs' experts spent a good deal of time loading the data and

---

[6] He eventually called in to participate more than 20 minutes after the hearing started.

attempting to diagnose the problem.  (Tr. 10:3–8.)  Plaintiffs were not surprised by what they found because of the problems with the sample data set UMC sent in mid-January, which was discussed at the last hearing.  (Tr. 10:10–20.)  Plaintiffs' counsel requested that the court appoint a special master at UMC's expense consistent with the court's suggestion at the last status conference.  (Tr. 10:24–11:1.)  Plaintiffs' ESI vendor had advised plaintiffs' counsel that 52,000 of the 76,000 documents in UMC's ESI production contained no subject line in the metadata.  (Tr. 11:2–5.)

Plaintiffs' counsel also addressed the text messages that the court ordered produced at the last hearing.  (Tr. 11:16–19.)  Although the court had given UMC a "drop-dead deadline" for the custodians, plaintiffs only received text messages from December 2013, through the date that the text messages were searched.  (Tr. 11:23–12:2.)  Defense counsel represented to plaintiffs' counsel the week before the hearing that it was highly unlikely that plaintiffs would receive any additional text messages.  (Tr. 12:10–13.)  These were the text messages of the UMC executives' Blackberries of Messrs. Brannman, Espinoza, and Mumford.  (Tr. 12:17–23.)

Counsel for plaintiffs pointed out that the lawsuit was filed in July 2012 and a preservation letter was sent to UMC on August 6, 2012, that covered ESI and text messages.  (Tr. 12:24–13:5.)  A second preservation letter was sent in the fall of 2012 when the complaint was amended to cover a broader group of employees.  (Tr. 13:5–7.)  At the July 2013 status conference, there was a detailed discussion about Blackberries and text messages.  (Tr. 13:10–13.)  Plaintiffs' counsel reminded the court that the parties went off the record for 45 minutes and reached a resolution of a number of discovery problems including preserving these text messages, and the spoliation issue was specifically raised.  (Tr. 13:13–24.)  However, when the text messages were produced in January, plaintiffs were told that the text messages produced included everything that was on them and the devices did not gather anything else.  (Tr. 13:24–14:2.)  Plaintiffs' expert, Mr. Pixley, prepared a declaration that Blackberry has a free software application that would preserve all of this data.  (Tr. 14:5–8.)  Plaintiffs therefore requested that if a special master was appointed, that he have authority over not just ESI, but also text messages that were not preserved and produced.  (Tr. 14:8–12.)

Counsel for UMC acknowledged "that this has been a very difficult process."  (Tr. 14:16–

18.)  UMC's counsel represented they had been engaged in discussion of ESI compliance with UMC for the past year and believed UMC's production was in compliance with the ESI protocol order.  (Tr. 14:18–21.)  She characterized the issue raised by plaintiffs at the status conference as "matters of form that were not addressed by the ESI protocol order that go back to the idea of preservation…which is not briefed at this point."  (Tr. 14:21–25.)  UMC attempted to address the most recent technical issues with its expert, Mr. Edmondson.  (Tr. 15:4–6.)  A lot of the documents were collected from a period before plaintiffs sent the preservation letter in August 2012.  (Tr. 15:6–9.)  As a result, the most recent document production involved documents that had to be recovered "that involves technical specifics that will lead to issues such as formatting information being included within the texts we're searching."  (Tr. 15:9–12.)  Counsel believed the information was searchable, but stated "it is not as clean as plaintiffs might like…."  (Tr. 15:13–15.)

The court pointed out that the data was produced with Japanese and Korean characters and imbedded data that makes nonsense of simple emails.  (Tr. 15:16–18.)  The court characterized the examples of UMC's ESI production attached to Mr. Pixley's declaration as "outrageous."  (Tr. 15:18–19.)  UMC's counsel stated UMC was trying to "problem solve, how this data can be best used."  (Tr. 16:2–4.)  However, UMC believed it was compliant with an oral agreement reached with plaintiffs and their ESI vendor to amend paragraph four of the stipulated ESI protocol entered in this case.  (Tr. 16:4–17:.25)

UMC's counsel noted that its first ESI vendor created a production that was "useless in terms of the ESI protocol."  (Tr. 16:22–17:1.)  UMC sent 78,000 emails to its first vendor who was not compliant with the ESI protocol order.  (Tr. 17:14–17.)  This is why UMC went to its current ESI vendor, Mr. Edmondson, so he could comply.  (Tr. 17:17–18.)  UMC's counsel reiterated that she believed UMC was fully compliant with the ESI order and the parties should focus on whether there was additional information UMC needed to provide to move forward.  (Tr. 18:1–8.)

The court indicated it would appoint a special master at UMC's expense to solve the ongoing ESI problems to get the ESI in usable format to move the litigation forward.  (Tr. 20:14–20.)  The court stated for the record that having reviewed the declarations of the respective experts in connection with the joint status report, it was not satisfied that plaintiffs had received what they

29

were entitled to receive pursuant to the ESI protocol and the court's orders. (Tr. 20:21–25.) The court directed the parties to meet and confer to select a mutually agreeable special master so that each side would have confidence in a person with sufficient technical expertise to advise the court on how to solve the problem. (Tr. 21:2–6.) The court gave the parties two weeks to select a special master if they were able to agree, and if not, to submit their respective proposals, indicating the court would select one. (Tr. 21:6–12.) The court also indicated that it would hold a meeting in chambers with the special master, defense counsel, plaintiffs' counsel, and their respective IT folks to have a "calm, collected, problem-solving session to resolve this problem as efficiently and inexpensively as is humanly possible." (Tr. 21:12–17.) The court ordered the appointment of a special master. (Tr. 21:20–22.) The court found that UMC was responsible for the problem and therefore would be responsible for the cost of the special master. (Tr. 21:22–23.) The meeting in chambers was set for March 10, 2014.

### 9. The March 10, 2014 Meeting in Chambers

The meeting in chambers occurred as scheduled on March 10, 2014. (Mins., ECF No. 151.) Both sides agreed to appoint Daniel Garrie as Special Master. Counsel for plaintiffs, counsel for UMC, and Special Master Garrie appeared along with plaintiffs' ESI experts Douglas Forrest and Bruce Pixley. Ernie McKinley, and Doug Spring were present on behalf of UMC, along with UMC's ESI expert, Joe Edmonson. The court and special master had extensive discussions with counsel, the parties' representative and consultants regarding UMC's ESI collection and production issues, as well as UMC's efforts to preserve discoverable materials requested in plaintiffs' litigation hold/preservation letters. (*Id.*) The court advised the parties that it had serious concerns about UMC's compliance with its preservation duties, the manner in which it collected and produced discoverable ESI, and its compliance with the court-approved ESI protocol. (*Id.*) The conference lasted approximately 3½ hours. At the conclusion of the conference, the court ordered UMC to "take all steps necessary to preserve ESI potentially relevant to the parties' claims and defenses in this matter in full compliance with the litigation hold/preservation letters sent by plaintiffs' counsel shortly after this lawsuit was filed. Failure to comply will result in sanctions, up to and including a recommendation to the district judge of case dispositive sanctions." (*Id.*)

The court entered a written Order (ECF No. 152) on March 14, 2014, formally appointing Special Master Garrie and outlining his duties and responsibilities as special master.

## III.    THE SPECIAL MASTER'S ACTIVITIES AND REPORT AND RECOMMENDATION

Over the course of approximately five months, Special Master Garrie conducted at least five in-person, all-day hearings, and 14 telephonic hearings. He obtained at least 20 declarations from employees and agents of UMC, and various written submissions from counsel and ESI experts. At the conclusion of his investigation, Special Master Garrie filed a Report and Recommendation and Final Findings of Fact and Conclusions of Law (ECF No. 189) ("R & R").[7] He concluded that "UMC destroyed evidence by failing to identify, preserve, collect, process, and search multiple repositories." (R & R 1:17–2:1.) His findings, conclusions, and recommendation are summarized below:

A.  UMC's preservation efforts were insufficient.

1.  UMC had no policy for issuing litigation holds, and no such hold was issued for at least the first eight months of this litigation.

2.  UMC executives were unaware of their preservation duties, ignoring them altogether, or at best addressing them "in a hallway in passing."

3.  UMC's prior and current counsel failed to conduct timely custodian interviews. As a result, key custodians and repositories of ESI were left unidentified, and substantial data was lost, including:

a.  Shared Q-Drive files containing human resources, corporate compliance, employee grievance, payroll, and DOL investigation data.

b.  Laptop and desktop local drive data, with local drives not being preserved until some 18 months into this litigation.

c.  Intranet server containing policies and procedures regarding meal breaks

---

[7]  The special master's R & R refers to 50 exhibits. (ECF No. 189, Exs. 1–5; ECF No. 190, Ex. 6; ECF No. 191, Ex. 7–19; ECF No. 192, Ex. 20– 21 and 22, part 1 of 7; ECF No. 193, Ex. 22, part 2 of 7; ECF No. 194 Ex. 22, part 3 of 7; ECF No. 195, Ex. 22, part 4 of 7; ECF No. 196, Ex. 22, part 5 of 7; ECF No. 197, Ex. 22, part 6 of 7; ECF No. 198, Ex. 22, part 7 of 7, and Exs. 23–27; ECF No. 199, Exs. 28–50.) The exhibits themselves also provide attachments. For ease and consistency of reference, this Order will cite the ECF docket number entry.

and compensation.

    **d.** Much of the mobile device data (executive Blackberry data) was lost through deliberate wiping, beyond the simple failure to preserve.

    **e.** Alternate timekeeping systems specifically used for tracking lunch breaks, which were not disclosed until late in the special master's work.

**B.** UMC's collection and production was deeply flawed and was still incomplete at the time of his R & R.

    **1.** UMC failed to preserve and collect the data listed in the preceding section.

    **2.** UMC's first two collections used unreliable methodologies.

        **a.** Many discovery conferences were premised on these partial and incomplete productions.

        **b.** These issues could have been avoided using best practices and if chain-of-custody paperwork had been completed.

    **3.** All of UMC's multiple ESI vendors repeatedly failed to follow best practices or use appropriate forensic tools under the ESI protocol.

    **4.** UMC's counsel repeatedly failed to engage UMC stakeholders regarding their duties to preserve, including implementing litigation holds.

**C.** UMC repeatedly misrepresented the existence of relevant ESI repositories, UMC's ability to produce summary spreadsheets via Kronos, and the completeness of its production of DOL documents.

    **1.** Information regarding alternative timekeeping systems, intranet applications, mobile devices and a Blackberry server were "at best withheld" by UMC.

    **2.** UMC repeatedly asserted it could not produce Kronos timesheet data in Excel spreadsheet format, when it had previously and easily done so during the DOL investigation.

    **3.** UMC failed to produce all of the DOL documents until the special master elicited testimony that they had only partially been produced. These documents were largely stored on the unpreserved Q-Drive.

**D.** UMC's misrepresentations and serious and repeated failures to act in good faith imposed substantial costs in both money and time delays.

**E.** UMC lost or deleted ESI likely to be both relevant and responsive.

    **1.** Approximately 38,000 files were likely deleted or otherwise lost from the Q-Drive. These files dealt with human resources, corporate compliance, employee grievances, payroll, and the DOL investigation.

    **2.** Ultimately, only one month of text messages from the three UMC executives was produced. Further, **the Blackberries were wiped just prior to the court's order setting a January 31, 2014 deadline to produce data from the devices to plaintiffs**. Approximately 26,000 text messages over a two-year period were wiped.

    **3.** Unpreserved local drives were likely to have responsive data, as was the intranet server containing job descriptions and various UMC policies.

**F.** UMC spoliated responsive ESI.

    **1.** The duty to preserve likely attached as early as the DOL investigation, but at the latest upon filing of the suit.

    **2.** Plaintiffs served UMC's CEO with two preservation letters but UMC did not institute a litigation hold until after plaintiffs deposed John Espinoza more than 270 days after the complaint was served.

    **3.** UMC engaged in the conduct described above, disregarding its obligation by failing to preserve data and by actively destroying data.

    **4.** Sanctions are available under the court's inherent authority and Rule 37, and are appropriate where there has been willful or bad-faith spoliation.

**G.** Applying the five-factor standard for dispositive sanctions in the Ninth Circuit, the special master recommended that the court:

    **1.** Enter default judgment against UMC as to the 613 opt-in plaintiffs pursuant to Rule 37(b)(2)(A)(iii)–(vi) and the court's inherent powers.

    **2.** Certify a Rule 23(a) class pursuant to Rule 37(b)(2)(A)(i) and take certain facts

as established for purposes of the requirements of the class action certification.

**3.** Order that facts be established as a rebuttable presumption in plaintiffs' favor. Specifically, that:

    **a.** UMC failed to maintain, and still fails to maintain, proper time records reflecting when and if its hourly-paid employees actually take bona fide 30-minute meal breaks, or whether they work through some or all of their meal breaks, and as such, UMC failed to keep true and accurate time records for all hours worked by its hourly-paid employees.

    **b.** UMC has not paid its hourly-paid employees for the bona fide meal breaks its employees did not receive.

    **c.** UMC made deductions from its hourly-paid employees' pay for meal breaks not taken.

    **d.** UMC has known since before plaintiffs filed this lawsuit that its hourly-paid employees were in fact working during meal breaks while UMC was automatically deducting 30 minutes each day of work time its employees actually performed.

    **e.** UMC knew its hourly employees were performing work during the purported meal breaks, yet failed to pay them for such time in violation of the FLSA and Nevada state and wage hour laws and UMC's violations were willful.

    **f.** Despite this knowledge, UMC continued to automatically deduct 30 minutes of work time from each eight-hour shift, which resulted in depriving its hourly-paid employees of payment for work being performed.

    **g.** UMC had an "on-duty meal policy" as described in the amended complaint that automatically deducted 30 minutes per shift from each hourly employee's pay.

    **h.** UMC automatically deducted 30 minutes of pay for each eight-hour shift an hourly employee worked as a purported meal break, regardless of whether

a bona fide 30-minute meal break was actually taken.

    **i.** UMC's practice of automatically deducting 30 minutes from each eight-hour shift as a purported meal break was uniformly applied to all hourly employees and resulted in underpayment of wages to all hourly employees.

    **j.** UMC's hourly employees missed, on average, one meal break for every shift worked in each pay period during their employment.

**4.** Order UMC to reimburse plaintiffs' reasonable costs and fees, including costs for bringing the motion to compel, attending status conferences before the court, and time spent in proceedings before the special master.

## IV. THE PARTIES' RESPONSES TO THE SPECIAL MASTER'S R & R

### A. UMC's Objection

UMC filed an Objection (ECF No. 207) to the Special Master's R & R pursuant to Rule 53. UMC acknowledges that the special master identified ESI that should have been produced to plaintiffs as admittedly relevant to the parties' claims and defenses. UMC also acknowledges that some of the evidence presented to the special master showed that UMC "struggles itself to identify and fulfill its obligations with respect to determining the relevance of vast amounts of ESI." (Obj. 6:25–7:1.) However, it professes to be "shocked" by his findings and conclusions and asks the court "to substitute its own fully-supported findings of facts and conclusions of law" for those of the special master. (Obj. 7:13–14.) UMC argues that the special master's factual findings were incorrect or misrepresented, many others were strained inferences not supported by the record, and an entire section of his R & R is "riddled with inappropriate editorialization, much of it negative towards UMC." (Obj. 12:25–26.)

UMC acknowledges that the court "has shown great patience with UMC" in discovery and that the special master was appointed to determine whether UMC withheld, deleted, destroyed, or permitted to be destroyed, information it was legally obligated to maintain. (Obj. 13:22–14:3.) UMC also understood the special master was assigned to investigate whether any withheld or unproduced responsive ESI could be recovered for production. However, counsel for UMC argues that the special master's duties with respect to unproduced responsive ESI was limited to the

"scope of ESI connected to the custodians already identified by the parties." (Obj. 14:3–6.)

In a footnote, UMC states it "recognizes Special Master Garrie's technical expertise and impressive credentials and does not dispute that it agreed to put Mr. Garrie forward as one of the two special master candidates." (Obj. 15 n.8.) However, after seeing his R & R, counsel for UMC opines it was "frankly shoddy and unprofessional work product, full of unsubstantiated, immoderate, and conclusory findings and conclusions." (*Id.*) The objection claims that the record shows many instances where the special master is "blatantly wrong," makes dubious inferences premised on mistaken information, and "elevated opinion and speculation into so-called factual findings without the ballast of analysis to support them." (Obj. 15:7–10.)

UMC therefore urges the court to conduct a *de novo* review of the entire record in this case, including all of the special master proceedings, and to reject nearly all of his findings of fact and conclusions of law and recommended sanctions. Recognizing that "UMC's preservation efforts were not first-rate" and that the "record is replete with this lack of effort," UMC suggests that at most, the court should consider an adverse inference instruction as a sanction. UMC's objection also recognizes that plaintiffs have incurred additional technical expenses as a result of UMC's technical problems leading up to the appointment of the special master. Therefore, some portion of plaintiffs' ESI consultants' expenses during the ESI disputes before the court prior to Mr. Garrie's appointment should be reimbursed by UMC. However, because UMC has paid all of the special master's expenses, it argues that further fees and costs associated with the special master's activities should not be awarded to plaintiffs as a sanction.

During oral argument on its objections to the special master's R & R, counsel for UMC stated "I'm not even going to tell you that I don't think we shouldn't be sanctioned." (Hr'g Tr. 24:28–25:1, Oct. 21, 2014, ECF No. 229.) When asked what sanction he felt was appropriate based on the developed record, UMC's counsel suggested that an adverse inference jury instruction would be appropriate. (Tr. 25:4–10.)

### B. Plaintiffs' Response to Defendants' Objection

Plaintiffs' Response (ECF No. 216) argues that UMC's objection is rooted in factually unsupported claims that the special master was biased and/or failed to discharge his duties. The

response asserts that the special master's R & R is supported by both fact and law. Plaintiffs ask that the court overrule UMC's objections in their entirety and adopt the special master's R & R in its entirety.

Plaintiffs contend the record does not support UMC's claim the special master was biased and, in fact, shows that he was courteous, professional, fair, and accommodating to UMC's witnesses and counsel. Many of UMC's complaints with the record consist of "ministerial citation errors" that can be easily corrected and do not render the R & R unreliable.

Plaintiffs maintain that UMC has exhibited a pattern of failing to comply with court orders and its discovery obligations throughout the litigation. The special master's findings that UMC failed to comply with its discovery obligations and the court's orders are fully supported by the record. Specifically, UMC failed to identify key time tracking systems in bad faith, UMC misrepresented its ability to create Excel spreadsheets containing Kronos data, and has continued to misrepresent its capabilities regarding Kronos data in Excel format. UMC had a duty to preserve and disclose the use of personal mobile devices, including the devices of Mr. Spring and Mr. Espinoza, yet wiped them. Under these circumstances, plaintiffs maintain that the special master's R & R is fully supported by the law and that his recommendations should be affirmed in their entirety.

### C.  UMC's Reply

UMC filed a Reply (ECF No. 222), which argues that its objections are fully supported in the record. It accuses plaintiffs of engaging in a "smear campaign against UMC" instead of addressing the merits of their claims. (Reply 1:4–5.) UMC reiterates arguments that it was "shocked" by the special master's R & R. Its counsel can "only guess" what might have happened to cause the special master to "completely retract his ex parte statements that everything would be fine and reverse his thinking so dramatically and punitively to impose discovery sanctions never before seen in Ninth Circuit jurisprudence." (Reply 2:12–15.)

With respect to the timekeeping systems discovered late in the special master process, UMC argues there is nothing to show that any data was lost from these repositories. UMC produced vast amounts of discovery including all of the plaintiffs' payroll records and thousands

of email communications. UMC argues its failure to disclose additional timekeeping systems did not prejudice plaintiffs because Kronos is the only timekeeping system used to compensate employees. UMC argues that the courts of appeals have upheld automatic meal break deduction policies as well as policies shifting the burden to employees to report missed breaks to be compensated. In this case, there is no indication that employees notified UMC of lost time or unpaid overtime. Therefore, plaintiffs cannot show they were prejudiced by the failure to disclose and produce timekeeping data from other timekeeping systems.

UMC also maintains that it has never misrepresented its ability to generate spreadsheets from Kronos data. Rather, UMC represented that the reports generated from Kronos are in PDF format and it was not UMC's regular business practice to alter the report by converting the data to Excel spreadsheet format. The fact that Excel spreadsheet files were created for the DOL during its investigation "does not negate that UMC does not regularly generate the requested time detail reports in Excel format." (Reply 19:1–5.) UMC does not deny that the Excel spreadsheets provided to the DOL were discoverable, or that other spreadsheets exist. UMC's counsel promised that UMC would continue to produce discoverable documents when identified.

UMC's reply also accuses plaintiffs of damaging the integrity of the discovery process by engaging in "discovery shenanigans." (Reply 20:7–9.) UMC claims it has produced a terabyte of ESI, and tens of thousands (if not hundreds of thousands) of documents, which required UMC's IT staff and department staff to be pulled away from their critical mission. Yet plaintiffs cannot show that any relevant information was lost or destroyed. Plaintiffs have not met their burden of showing that data was destroyed with a culpable mental state, or that relevant data was lost. The severe sanctions recommended by the special master are not warranted, and the court should substitute its own findings of fact and conclusions of law for those of the special master following a de novo review.

## V.    DE NOVO REVIEW OF SPECIAL MASTER PROCEEDINGS

The court conducted a de novo review of the entire record of special master proceedings. The most significant portions of the record are summarized in this section.

/ / /

### A. Declaration of Nicholas M. Wieczorek

The special master requested and obtained the declaration of Nicholas M. Wieczorek, UMC's first counsel of record in this case. (Wieczorek Decl., R & R Ex. 23, ECF No. 198-1.) Mr. Wieczorek is a partner in the law firm of Morris Polich & Purdy LLP ("MPP"). (*Id.* ¶ 1.) He formerly served as UMC's counsel in this case. (*Id.*) He was involved in all aspects of the litigation with the assistance of his associate Jeremy Thompson. (*Id.* ¶ 3.) On November 7, 2012, Wieczorek received a preservation notice letter from plaintiffs' counsel dated November 6, which he forwarded by email to Doug Spring and John Espinoza the same day with a request to schedule a meeting. (*Id.* ¶ 5.) A meeting with Mr. Spring and Mr. Espinoza occurred on November 14, 2012. (*Id.* ¶ 6.) The preservation letter was discussed at the meeting. (*Id.*) As a result of the meeting, it was Mr. Wieczorek's understanding that "Mr. Espinoza contacted UMC's Human Resources staff and confirmed the obligation to preserve and maintain documents related to the litigation." (*Id.*)

On April 5, 2013, Jeremy Thompson contacted Ernie McKinley, UMC's Chief Information Officer ("CIO"), regarding collection of ESI at UMC with the assistance of Craig Renard of The Litigation Document Group. (*Id.* ¶ 7.) Mr. Wieczorek believed Mr. Renard collected ESI data at UMC from April 9–24, 2013. (*Id.*) Mr. Thompson instructed Renard was to halt all conduct with regard to ESI data collection on April 24, 2013. (*Id.*)

On April 8, 2013, Mr. Espinoza was deposed in this case. (*Id.* ¶ 8.) Plaintiffs' counsel provided Espinoza with a copy of a preservation notice letter addressed to Brian Brannman, UMC's then CEO, dated August 6, 2012. (*Id.*) MPP had no record of having received this correspondence prior to Mr. Espinoza's deposition. (*Id.*)

On April 9, 2013, MPP reviewed the August 2012 preservation notice letter with Mr. Espinoza. (*Id.* ¶ 9.) On April 15, Doug Spring notified MPP "that an email instructing UMC managers and directors regarding the obligation to preserve and maintain documents, including electronically-stored documents, relating to this litigation, was distributed to staff." (*Id.*) On April 24, 2013, Wieczorek was notified that UMC transferred its representation from MPP to Lewis Brisbois Bisgaard & Smith LLP ("LBBS") and his office ceased all activities for this case. (*Id.*)

## B. Declaration of Craig Renard

Craig Renard of The Litigation Document Group also submitted a declaration at the request of the special master. (Renard Decl., R & R Ex. 36, ECF No. 199-8.) In it, he avers that he is the CEO of The Litigation Document Group ("LDG"), a legal document service company in Las Vegas, Nevada. (*Id.* ¶ 1.) LDG had a vendor relationship with MPP and worked with Nick Wieczorek and Jeremy Thompson on the electronic discovery for litigation in this case. (*Id.* ¶ 2.) MPP provided Renard with an ESI protocol, and Renard discussed ESI data that Thompson needed LDG to collect. (*Id.* ¶ 3.) Renard exchanged emails with individuals from UMC's IT departments, including Ernie McKinley, Connie Sadler, and Dean Schaibley, to arrange for ESI data collection. (*Id.* ¶ 4.) On April 9, 2013, Renard notified Leon Mare of Expert Data Forensics ("EDF") about the UMC project and arranged for a meeting at UMC on April 10, 2013. (*Id.* ¶ 5.) Renard had used Mare as a subcontractor in previous ESI data collection efforts. (*Id.*)

On April 10, 2013, Mare and Renard met with Dean Schaibley, UMC's Network Security Administrator. (*Id.* ¶ 6.) Renard was not personally involved in the actual ESI data collection on April 10, 2014. (*Id.*) The forensic collection was performed on site. (*Id.* ¶ 7.) Renard understood that Mr. Mare brought his laptop that used a forensic collection tool, which copied the desired data into zip files onto external drives. (*Id.*) Mare was unable to finish collecting all of the information and returned on April 19th to complete the collection. (*Id.*)

To Renard's knowledge, Mare did not back up, *i.e.* make a copy of, the UMC ESI data collection. (*Id.* ¶ 8.) Mare handed the drive to Renard on April 19, 2013. (*Id.*) On April 15, 2013, Renard contacted MPP to obtain instruction as to how MPP needed the first batch of ESI to be processed. (*Id.* ¶ 9.) LDG filled out an e-data processing form pursuant to discussions with Jeremy Thompson at MPP, which was emailed to Mr. Thompson on April 18, 2013. (*Id.*)

On April 19, 2013, LDG began unpacking the second batch of data, initiated de-duplication efforts, and initiated ESI data processing according to the e-data processing form. (*Id.* ¶ 10.) On April 24, 2013, Thompson contacted Renard and notified him that MPP was no longer UMC's attorneys and LDG should cease its activities. (*Id.* ¶ 11.) LDG's normal practice is to hold onto ESI collection for 90 days after payment of services, and then destroy the data. (*Id.* ¶ 12.) To the

40

best of Renard's recollection, he received a call from an attorney at LBBS informing Renard that LBBS did not need the data. (*Id.* ¶ 13.) Because of the conversation with LBBS, Renard decided to hold onto the UMC ESI data for an additional 90 days, at which time LDG destroyed the ESI data. (*Id.* ¶ 14.) Renard could not recall having a discussion with anyone from MPP or UMC about preserving the UMC ESI data collection. (*Id.* ¶ 15.) To the best of Renard's recollection, his only interactions with UMC personnel included Ernie McKinley, Connie Sadler, and Dean Schaibley, who he met in person for about ten minutes on April 10, 2013 on the day of the first forensic collection. (*Id.* ¶ 16.)

## C. Declaration of Brian Brannman

The special master obtained the declaration of Brian Brannman. (Brannman Decl., R & R Ex. 20, ECF No. 192.) Brannman declared that he was the CEO at UMC from July 2011, to January 2014. (*Id.* ¶ 2.) From April 2008, to July 2011, he was the Chief Operating Officer at UMC. (*Id.*) He was asked to provide his understanding of the timeline of the lawsuit's initiation and related document preservation efforts. (*Id.* ¶ 3.) Plaintiffs filed their original complaint on July 27, 2012. (*Id.* ¶ 4.) He did not recall when or how he was provided notice of the lawsuit and was not involved in the appointment of counsel or preparing a responsive pleading. (*Id.*) He did not recall and had no record of receiving any notice to preserve documents in this case in August 2012. (*Id.* ¶ 5.) He did not recall and had no record of receiving any notice to preserve documents in this case in November 2012. (*Id.*)

To the best of Brannman's recollection, UMC preservation policies were handled by the Risk Management Office in consultation with the County, but he did not have a specific recollection of those policies. (*Id.* ¶ 8.) To the best of his recollection, he was not involved in any preservation procedures or efforts in this matter, nor did he recall being involved in preservation proceedings or efforts in other lawsuits against UMC. (*Id.* ¶ 9.) To the best of his knowledge, the Risk Management Office had responsibility for executing the preservation effort in this matter, but he did not recall the risk manager having reported to him directly or indirectly about any preservation efforts in this case. (*Id.* ¶ 10.)

To the best of Brannman's knowledge, UMC followed the County's records retention

policies. (*Id.* ¶ 11.) Brannman did not recall and had no record of making any relevancy determinations regarding document collection and preservation in this dispute. (*Id.* ¶ 12.) Brannman was approached by Espinoza in April 2013, about sending a notice to supervisors and director-level management within UMC to preserve information. (*Id.* ¶ 14.) He understood that the topic of document preservation had arisen in a deposition of Espinoza in early April. (*Id.*) He approved an email to be sent to a distribution list (PatientServiceLeaders) instructing all recipients of their obligation to preserve and maintain related information. (*Id.* ¶ 15.) The email was sent on his behalf by his executive assistant, Cindy Dwyer. A copy of the email is attached as Exhibit A to his declaration. (*Id.*) He knew of no UMC-group notices on preservation and maintenance besides Exhibit A. (*Id.*)

The email attached as Exhibit A refers to a discussion at a Patient Service Leader meeting. It states that UMC was continuing to respond to requests for information from the DOL and attorneys representing employees who had filed a complaint regarding meal and rest break claims and overtime claims. It reminded the distribution list "of our obligation to preserve documents that may relate to this issue. Please make sure that you do not destroy any emails, staffing schedules, correspondence, meeting minutes, or other related documents." The email directed any questions "regarding how relative [sic] a document might be" to contact Human Resources.

### D. Testimony of Lawrence Barnard

Lawrence Barnard testified at a special master hearing on April 22, 2014. (Hr'g Tr., R & R Ex. 4, ECF No. 189-4.[8]) Mr. Barnard joined UMC in August 2012 as the Chief Operating Officer. (Tr. 27:5–9.) At that time the CIO reported to him. (Tr. 27:11–13.) When asked if he had any meetings with the CEO about this litigation, Barnard responded "If anything, it was like minutes. It wasn't extensive meetings. It was just 'Hey, this is what's'–he's saying, 'This is what's going on.'" (Tr. 27:14–18.) Barnard testified that he had never spoken to UMC's former lawyers. (Tr. 28:23.) He was not sure whether he communicated with employees that they were to preserve evidence relevant to this lawsuit. (Tr. 30:1–6.) Based on this testimony the special master asked

---

[8] The transcript of the April 22, 2014 hearing includes testimony taken from multiple witnesses. Mr. Barnard's testimony begins at page 5 of the court reporter's transcript, which is page 4 of 44 of ECF No. 189-4. The citations to his testimony are taken from the court reporter's transcript.

counsel for UMC to identify every preservation notice circulated within UMC under the firm's auspices or prior to Barnard serving as a CEO or COO. (Tr. 30:7–13.) Barnard was asked by plaintiffs' counsel, "you don't recall when you communicated—" and before counsel could complete his question Barnard responded:

> Answer: No. This would have been in a hallway in passing, someone saying, "We need to preserve based on this case," and me saying, "Ok, preserve what we need to preserve." . . .
>
> Question by Mr. Tostrud: Yes, when did that happen.
>
> Answer: I said if it did happen, it would have been in the hallway conversation saying that—someone saying that, "We have to preserve it for the case," and I [*sic*] saying, "Okay, preserve what we need to preserve."

(Tr. 30:25–31:14.) The special master then asked Barnard whether UMC had any formal preservation policy. He responded that he was sure there was, "but I'm not aware of the exact …." (Tr. 31:16–19.) As a result of this answer, the special master directed UMC to educate Mr. Barnard on that topic. (Tr. 31:20–22.)

## E. Declaration of John Espinoza re: Preservation Notices

John Espinoza provided a declaration regarding preservation issues at the request of the special master. (Espinoza Decl. re: Preservation Notices, Apr. 30, 2014, R & R Ex. 24, ECF No. 198-2.) Mr. Espinoza is UMC's Chief Human Resources Officer. (*Id.* ¶ 1.) As part of the special master proceedings, Espinoza was required to determine when preservation notices were delivered to staff within UMC. (*Id.* ¶ 2.) In mid-November 2012, he received a preservation notice from UMC's Risk Management department. (*Id.* ¶ 4.) The letter was written by plaintiffs' counsel and referred to an earlier letter he had never seen. (*Id.*) As a normal practice, he "confirmed the obligation to preserve and maintain documents related to this litigation with the Human Resources (HR) staff that I supervise in-person." (*Id.* ¶ 5.) On April 8, 2013, he was deposed and provided with a copy of a preservation notice letter dated August 6, 2012. (*Id.* ¶ 6.) He had not seen this letter prior to his deposition, and could find no record of receipt of the letter at UMC prior to his deposition. (*Id.*)

After reviewing the preservation notice letter with UMC's then-counsel, MPP, UMC's then-CEO, Brian Brannman, sent an email instructing all UMC employees of their obligation to

43

preserve and maintain related information to an email distribution list that connects to each and every UMC employee. (*Id.* ¶ 7.) On April 5, 2013, UMC's former counsel, Jeremy Thompson of MPP, contacted Ernie McKinley, UMC's CIO, regarding collection of ESI at UMC. (*Id.* ¶ 8.) Network Security Analyst Dean Schaibley was contacted to assist MPP's ESI vendor in the collection effort. (*Id.*) There is no record that Messrs. McKinley or Schaibley received the preservation notice sent by plaintiffs' counsel. (*Id.* ¶ 9.) Espinoza found no record of any further UMC-wide notices on preservation and maintenance. (*Id.* ¶ 10.)

After Special Master Garrie was appointed and the parties conferred in chambers on March 10, 2014, Doug Spring, UMC's Director of Human Resources Operations, sent an email on March 12, 2014, to custodians whose ESI had been collected in April and August 2013. (*Id.* ¶ 11.[9]) Counsel for UMC, Kayla Witty, informed Espinoza that the language from this March 12, 2014 email was sent to plaintiffs' counsel to be delivered to six originally-named plaintiffs separately as the ESI profiles of these individuals were collected in April 2013. (*Id.* ¶ 12.) Espinoza found no other preservation notices disseminated within UMC. (*Id.* ¶ 13.)

### F. Revised Declaration of Espinoza re: Preservation Notices

The special master gave Mr. Espinoza an opportunity to revise his declaration regarding preservation notices after further proceedings called into question the accuracy of his initial declaration. (Revised Espinoza Decl. re: Preservation Notices, June 13, 2014, R & R Ex. 25, ECF No. 198-3.) In his revised declaration, Espinoza averred that in mid-November 2012, he received a preservation notice letter from UMC's Risk Management Department. (*Id.* ¶ 5.) The letter he received was written by plaintiffs' counsel and referred to an earlier letter that he had never seen. (*Id.*) He did not recall receiving an electronic copy of this document or any earlier preservation notice. (*Id.*) As normal practice, upon receipt of a preservation notice, Espinoza would confirm the obligation to preserve and maintain documents related to litigation with HR staff responsible for labor relations. (*Id.* ¶ 6.) He would coordinate with Doug Spring, Director of HR Operations, who would contact the appropriate department heads to preserve or isolate related documents. (*Id.*) The revised declaration reiterated that UMC's ESI review, which he confirmed with counsel,

---

[9] A copy of that email was attached as Exhibit A to Espinoza's declaration.

shows no record that Messrs. McKinley or Schaibley received the preservation notice letter from plaintiffs' counsel or from Mr. Espinoza's office. (*Id.* ¶ 10.) The declaration attests that the only preservation notices UMC sent to its employees regarding their obligation to preserve and maintain related information was in April 2013 following Espinoza's deposition. (*Id.* ¶ 8.) A March 12, 2014 email was sent to custodians whose ESI had been collected in April and August 2013. (*Id.* ¶ 11.) Espinoza found no record of any other UMC-issued notices on preservation and maintenance of documents related to this lawsuit prior to the commencement of the special master proceedings. (*Id.* ¶ 13.)

Espinoza was asked about use of printed calendars from his electronic Outlook calendar at UMC. (*Id.* ¶ 14.) He did not as a practice write on those printed calendars. (*Id.*) If he made an adjustment to his calendar, he would record it electronically and have a new copy printed if necessary. (*Id.*) He no longer had his calendar printed out as of the date of his revised declaration on June 13, 2014. (*Id.*)

### G. Declaration of John Espinoza Regarding the DOL Investigation

John Espinoza and Doug Spring were involved in the DOL investigation preceding the filing of this lawsuit. At the request of the special master, Espinoza was requested to detail his involvement in the DOL investigation. (Espinoza Decl. re: DOL Investigation, Apr. 29, 2014, R & R Ex. 46, ECF No. 199-18.) His declaration outlined the contacts he had with DOL investigators beginning in February 2012. On February 29, 2012, DOL investigator Ybelka Hernandez called UMC to request information concerning admitting representatives in the main UMC cost center. (*Id.* ¶ 4.) Espinoza was unable to speak with Ms. Hernandez and asked Doug Spring to follow up with her. (*Id.*) On March 1, 2012, Hernandez sent a letter requesting specific information. (*Id.* ¶ 5.)

On March 2, 2012, Spring informed Espinoza that he had spoken with Hernandez who had requested certain timekeeping and payroll information for every employee in the admitting department in the main cost center. (*Id.* ¶ 6.) Spring memorialized this request in an email to Stephanie Merrill, UMC's Chief Financial Officer, James Mumford, Senior Human Resources Analyst, and Jackie Panzeri, UMC's Payroll Manager, "the individuals that would be coordinating

the collection of this information." (*Id.*)  Espinoza met with Hernandez on March 15, 2012, and arranged for a follow up meeting to go over information UMC collected at the DOL's request. (*Id.* ¶ 7.)  On April 4, 2012, Claudette Myers sent further documentation to Hernandez regarding requested financial documents. (*Id.* ¶ 9.)  Espinoza did not hear from Hernandez or the DOL again until August 2012. (*Id.* ¶ 10.)

On August 28, 2012, UMC met with Hernandez. (*Id.* ¶ 12.)  Doug Spring and Tiffanie Fleming from Admitting, and some of her subordinate supervisors were present. (*Id.*)  Hernandez informed UMC that DOL had received a formal complaint from several UMC employees in the Admitting Department alleging missed meal breaks. (*Id.* ¶ 13.)  Hernandez informed UMC that she had interviewed several UMC Admitting representatives in her investigation. (*Id.*)  UMC requested that Hernandez submit her findings to UMC in writing. (*Id.* ¶ 15.)  The declaration relates subsequent contacts between UMC and DOL between September 2012, and March 2013.

On March 26, 2013, Hernandez, Panzeri, and Espinoza met to discuss the process for calculating payment of the alleged missed lunch periods identified by the DOL, and to look at documents previously gathered. (*Id.* ¶ 26.)  After this conference, UMC officials engaged in internal discussions with counsel for Clark County and outside counsel regarding legal issues raised in the DOL investigation. (*Id.* ¶ 27.)  Because of the lack of communication from DOL, Espinoza sent a letter to DOL on May 1, 2013, stating that UMC would not be paying back wages to the employees identified by DOL. (*Id.*)  Espinoza had not heard anything further from DOL after May 1, 2013. (*Id.* ¶ 28.)

**H.  Testimony of John Espinoza**

John Espinoza testified at a special master hearing on April 22, 2014. (Hr'g Tr., R & R Ex. 4, ECF No. 189-4.[10])  Mr. Espinoza was questioned by the special master concerning whether he was aware of a litigation hold relating to this litigation.  He responded that he was. (Tr. 53:23–25.)  He was aware of a litigation hold sometime after November 2012. (Tr. 54:1–2.)  Espinoza testified that he was deposed in April 2013 and made aware of an August 2012 letter as well, but

---

[10]  The transcript of the April 22, 2014 hearing includes testimony taken from multiple witnesses.  Mr. Espinoza's testimony begins at page 50 of the court reporter's transcript, which is page 16 of 44 of ECF No. 189-4.  The citations to his testimony are from the court reporter's transcript.

testified "I never saw that August letter prior to deposition." (Tr. 54:3–9.) He was asked to walk the special master through what occurs when a preservation notice comes into UMC. He testified that he should receive a copy, but he did not always directly. (Tr. 54:13–18.) "We've had some problems before with regard to how information is communicated." (Tr. 54:18–19.) The earlier August letter should have come through the Risk Management department. (Tr. 54:21–25.)

## I. Declaration of Doug Spring

Doug Spring, the Director of Human Resources Operations at UMC, also provided a declaration to the special master concerning his involvement in the DOL investigation of missed meal breaks at UMC from 2012 to 2013. (Spring Decl., R & R Ex. 45, ECF No. 199-17.) Spring stated that on February 29, 2012, he received an email informing him that DOL investigator Hernandez called to notify UMC of an upcoming letter of investigation. (*Id.* ¶ 3.) On March 1, 2012, UMC received Ms. Hernandez's letter containing a document request and was informed of an impending visit by the DOL. (*Id.* ¶ 4.) Spring received a hard copy of the letter. (*Id.*) On March 2, 2012, Spring spoke with Hernandez on the phone to determine exactly what documents she needed for the DOL investigation. (*Id.*) Hernandez informed Spring that she wanted information relating to the hospital overall. (*Id.* ¶ 5.) She wanted payroll, timekeeping, and attendance records for Admitting employees. (*Id.*) Spring memorialized the information in an email to John Espinoza, Stephanie Merrill, UMC's Chief Financial Officer, James Mumford, Senior Human Resources Analyst, and Jackie Panzeri, UMC's Payroll Manager, the individuals who would be coordinating the collection of this information. (*Id.* ¶ 6.)

On March 15, 2012, Spring met with Hernandez with Espinoza. (*Id.* ¶ 7.) Due to the volume of requested information, Spring requested additional time to collect the information and another meeting was arranged. (*Id.*) As of March 30, 2012, UMC had boxes of documents prepared for Hernandez. (*Id.* ¶ 9.) Spring did not personally collect the documents, but understood that these were the payroll and timekeeping records for Admitting employees. (*Id.*)

Spring attended an August 28, 2012 meeting with Hernandez and other UMC employees including Espinoza. (*Id.* ¶ 10.) During the meeting, Ms. Hernandez described the results of her investigation and provided an estimate of how many lunches UMC should pay each employee

within Admitting. (*Id.* ¶ 11.) On September 20, 2012, Hernandez sent Espinoza a fax with a cover sheet, several copies of wage-and-hour statutes and regulations, and her request for how many lunches UMC should pay each employee within Admitting. (*Id.* ¶ 14.) Spring assisted Espinoza in drafting a response to Ms. Hernandez's letter. (*Id.* ¶ 15.) On September 26, 2012, Espinoza sent UMC's responsive letter to the DOL to acknowledge receipt of the September 20th letter and to offer a possible schedule for reasonable back wage payments. (*Id.*) Hernandez called UMC on December 19, 2012, for an update on the investigation. (*Id.* ¶ 18.) Spring attempted to follow up with Ms. Hernandez on December 26, 2012, but could not reach her. (*Id.*) On January 31, 2013, Spring met with Espinoza to discuss ongoing documentation requests from Ms. Hernandez, but Spring had no further substantive involvement in the DOL investigation after that. (*Id.* ¶¶ 19, 20.)

### J. Testimony of Doug Spring

Doug Spring testified at a special master hearing on May 6, 2014. (Hr'g Tr., R & R Ex. 5, ECF No. 189-5.[11]) Mr. Spring testified that he did not ever receive a preservation notice from anybody in 2012. (Tr. 67:14–16.) MPP was appointed by the district attorney's office and the county to represent UMC in this case. (Tr. 67:20–22.) Spring was involved with MPP once they were appointed. (Tr. 68:3–6.) Spring was the primary point of contact with the law firm. (Tr. 68:7–9.) MPP never provided Spring written notice of an obligation to preserve documents that relate to this matter. (Tr. 68:10–14.) Spring was asked to the best of his recollection whether MPP informed him of an obligation to preserve information. (Tr. 69:23–25.) Spring responded that he recalled John Espinoza being deposed. (Tr. 70:1–2.) This was the first time Spring knew about preservation of documents after Espinoza's deposition. (Tr. 70:5–7.) Spring drafted letters or memos relating to the DOL investigation. (Tr. 77:8–11.) At that time, UMC did not have counsel, but the letters or memos were subsequently provided to litigation counsel. (Tr. 77:12–19.) As of July 2012, the DOL investigation was running concurrently with this lawsuit. (Tr. 78:11–18.)

He was asked whether in 2013 he was ever given a preservation notice or instructions by prior counsel to preserve information. (Tr. 78:19–21.) He responded, "as I previously stated, I

---

[11] Several other witnesses testified at the same hearing. Mr. Spring's testimony is reported beginning at page 66 of the court reporter's transcript, which is page 44 of 91 of ECF No. 189-5.

did not even know there was such a thing." (Tr. 78:22–23.) No preservation notice or instructions were given in 2012. (Tr. 78:24–25.)

Spring did not recall providing MPP with DOL investigation data he collected, and he did not recall them asking for that information. (Tr. 79:5–10.) Additional copies of the payroll records were not made, so Spring did not believe they were provided to the DOL or to UMC's attorneys. (Tr. 79:13–16.) Counsel received the memorandum or letters that UMC was sending to the DOL. (Tr. 79:22–80:1.)

Spring testified that he collected information for MPP. (Tr. 110:5–9.) When asked whether he had any idea of what information was collected, he responded that "if they made a request . . . I don't really recall how we gave it to them. Probably just a hard copy to them of documents they may have requested." (Tr. 110:15–19.) Spring made no formal request to Mr. Schaibley to do a collection. (Tr. 110:20–24.)

When asked what he did after receiving a preservation letter form Mr. Espinoza following Espinoza's deposition in April 2013, Spring responded, "There was an email that I drafted that was sent out by Brian Brannman, who was the CEO at the time, indicating that it was important that we preserve all documents." (Tr. 113:21–114:12.) Spring could not recall if he consulted with MPP at that point. (Tr. 114:13–15.) Spring could not recall if MPP helped him in issuing the firm-wide preservation notice. (Tr. 115:15–19.) He recalled there was a discussion with MPP after Espinoza's deposition, but testified "I don't believe they drafted the preservation document." (Tr. 115:19–21.) Spring believed he drafted the preservation letter and gave it Mr. Espinoza. (Tr. 118:3–5.) No other UMC employees were involved in assisting in the drafting. (Tr. 118:6–8.)

Spring was asked whether prior to or the time of his testimony UMC had any formal process for preserving upon receipt of a litigation hold or litigation notice, and testified "not that I'm aware of." (Tr. 119:5–10.) Spring had no interaction with Mr. Schaibley in the process of collecting ESI. (Tr. 119:14–17.) When asked who within UMC to the best of Spring's knowledge was responsible for instructing Schaibley on collecting ESI, Spring responded, "my assumption would be our attorneys did that." (Tr. 119:18–25.) When asked whether it was normal "to just directly have the attorney reach out to the network admin within UMC as standard practices,"

Spring responded, "this has been a very unusual case. I don't know if that's a standard practice or not." (Tr. 120:1–6.)

Spring testified that he used his mobile device to conduct UMC-related business. (Tr. 120:19–21.) It was not a UMC device. (Tr. 120:22–24.) He did not provide his device to UMC's attorney to review for responsive potential communications before the date of his testimony. (Tr. 120:25–121:3.)

### K. Testimony of Ernie McKinley

Ernie McKinley is UMC's CIO. He participated and was present during testimony taken from other UMC witnesses. (Hr'g Tr. 156:15–17, R & R Ex. 4, ECF No. 189-4.[12]) He heard extensive testimony about preservation and litigation holds. (Tr. 156:22–24.) Mr. McKinley testified on April 22, 2014, and the special master asked him whether UMC had a protocol for preserving information and he testified it did not. (Tr. 156:24–157:2.) McKinley never spoke with UMC's prior lawyers in this case. (Tr. 157:12–17.) After having conversations with counsel, he understood he was required to preserve not only individual custodians' user profiles, but also the network file shares. (Tr. 157:22–158:2.) He agreed with the special master that UMC's executive team clearly had no idea of where the information they generate is stored. (Tr. 158:8–12.) He was asked when he first received a preservation notice from the group list, UMC post, or some similar thing, and testified it was after the first meeting with the special master. (Tr. 158:25–159:7.)

### L. Testimony of Jackie Panzeri

Ms. Panzeri is UMC's Payroll Manager. She testified at a special master hearing on May 6, 2014, and was asked by the special master when she first became aware of or received a notice letter or email telling her to preserve documents. (Hr'g Tr. 5:25–6:4, R & R Ex. 5, ECF No. 189-5.[13]) She received the preservation notice from Mr. Spring two or three weeks prior to her

---

[12] ECF No. 189-4 is an excerpt of a court reporter's transcript of the special master hearing held April 22, 2014. Testimony from a number of witnesses was taken on that date. Mr. McKinley's testimony begins at page 156 of the court reporter's transcript, which is page 30 of 44 in ECF No. 189-4. Citations to his testimony are from the court reporter's transcript.

[13] Ms. Panzeri was one of several witnesses providing testimony at a special master hearing on Tuesday, May 6, 2014. Her testimony begins at page 5 of the court reporter's transcript, which is page 5 of 91 in ECF No. 189-5. Citations to her testimony are from the court reporter's transcript.

testimony at the special master hearing.  (Tr. 6:5–12.)

Ms. Panzeri was involved in the DOL investigation.  (Tr. 6:20–22.)  She collected documents for the DOL investigation.  (Tr. 6:23–25.)  She did not work with former counsel in this effort.  (Tr. 7:1–3.)  She first learned about this lawsuit shortly after documents were provided to the DOL.  (Tr. 7:4–10.)  As the Payroll Manager, she is part of the Finance Department.  (Tr. 7:21–22.)  She collected documents for the DOL investigation towards the beginning of 2012.  (Tr. 9:2–5.)  She made paper copies of paystubs, and also had them online.  (Tr. 9:6–14.)  Paystubs that were sent to the DOL were printed out.  (Tr. 9:15–18.)  The timecard reports were provided in paper and Panzeri testified, "I believe it was an electronic file."  (Tr. 9:18–20.)

Spreadsheets were part of the process, but did not come until after UMC gave DOL documentation for time and pay.  (Tr. 9:23–10:1.)  She stored the documents electronically on her personal drive, the Q-Drive.  (Tr. 10:2–10.)  There was a shared folder with HR so that when the payroll department electronically saved information, she would put it in that folder for HR to have access.  (Tr. 10:11–18.)  This was for both the DOL investigation and this case.  (Tr. 10:19–23.)

Ms. Panzeri was not informed by UMC of any obligation to preserve emails at any point in 2012 or 2013.  (Tr. 10:24–11:13.)

Panzeri testified that she "keeps documents forever."  (Tr. 11:20–21.)  She had a lot of documents on her personal drive and several archives full of email because she did not delete information.  (Tr. 11:22–25.)

There are payroll correction forms on UMC's intranet that departments complete with a copy of the employee's paystub and the time report.  (Tr. 14:22–15:7.)  These reports come to payroll in various ways.  (Tr. 15:8–10.)  They are either faxed or scanned.  (Tr. 15:12–14.)  They have also been received by "interoffice," but for the most part they are faxed or scanned to payroll.  (Tr. 15:18–20.)  Interoffice refers to mail received from the mail room disbursed to the applicable department.  (Tr. 15:21–16:3.)  When payroll correction forms are received via fax, it goes to a specific machine in the payroll office.  (Tr. 16:3–17:2.)

Panzeri kept notes of requests for documentations for the DOL investigation such as requests for copies of paystubs and timecards.  (Tr. 19:3–10.)  She had her staff collect information

for the DOL investigation and sent it to HR. (Tr. 19:11–25.) The information was generally supplied to John Espinoza or his administrative assistant. (Tr. 20:13–19.) The information was generally in a box and would have been copies of paystubs. (Tr. 21:14–15.) The time details were on an electronic file. (Tr. 21:15–16.) Spreadsheets were also created. (Tr. 21:19–23.) With respect to the DOL investigation, payroll took time reports, converted them to Excel, and configured them so that they were legible. (Tr. 22:1–5.) Ms. Panzeri described the process in which the printed payroll stubs were converted to spreadsheets. (Tr. 22:22–24.) The spreadsheets that were created for the DOL investigation still exist. (Tr. 24:10–12.) The spreadsheets were readily accessible to her, "They're not in any archive file. They're right where I can get them." (Tr. 24:13–23.) She was never asked to search for those spreadsheets and produce them in this case. (Tr. 25:13–15.) She would not need to search for them because she knew exactly where they were, but was not asked to produce them. (Tr. 25:16–18.) She described again how the spreadsheets that were created for the DOL investigation were created from the Kronos system and converted to spreadsheet format. (Tr. 27:10–29:2.) Then Panzeri entered additional data into the spreadsheet based on the DOL inputs and dialogue. (Tr. 29:5–8.)

Counsel for plaintiffs made a formal request for the specific documents that were accessible to be produced within 48 hours stating that plaintiffs had been asking for the documents for months. (Tr. 29:18–23.) Counsel for UMC, Ms. Foley, responded that the documents had been produced. (Tr. 29:24–25.) The special master ordered UMC to produce within 48 hours the Bates stamp numbers for the spreadsheets Ms. Panzeri referenced, which counsel represented had been produced to plaintiffs. (Tr. 30:12–15.)

Panzeri was never asked to create spreadsheets in the *Small v. UMC* matter. (Tr. 36:6–24.) She personally did not know how to export data directly from Kronos into an Excel spreadsheet. (Tr. 47:25–48:3.)

### M. Testimony of Glen McIntire

Mr. McIntire was UMC's Director of Risk Management during time periods relevant in this case. His last day at UMC was February 28, 2014. (Hr'g Tr. 126:19–21, R & R Ex. 6, ECF

/ / /

52

No. 190.[14]) He was involved in litigation at UMC. (Tr. 121:19–22.) He was responsible for claims management, directing claims on all of the medical malpractice cases, personal injury, and property cases. (Tr. 121:23–122:3.) His duties included working with defense counsel and making a determination with the approval of the County Commissioners as to trying or settling the cases, and for how much. (Tr. 122:4–10.) He selected outside counsel for these types of cases. (Tr. 122:11–17.) Employment cases were the responsibility of the HR Department. (Tr. 122:23–24.)

For personal injury cases, Mr. McIntire was responsible for making sure that proper documents were being preserved. (Tr. 122:25–123:3.) He was asked whether he followed any protocols or processes to preserve and testified he would notify those people he knew to be involved in the care of the patient in the case, and notify them to hold all materials. (Tr. 123:4–11.) McIntire did not believe he ever communicated or relayed that information to the IT Department. (Tr. 123:12–15.) Each custodian was responsible for self-preserving and collecting the relevant documents. (Tr. 123:16–19.)

McIntire was asked how a preservation hold letter was handled when sent to UMC to the attention of Brian Brannman, "how that would work?" (Tr. 124:1–4.) He was not aware of any formal process within UMC for providing preservation notices that were not sent directly to his office. (Tr. 124:17–125:3.) He did not know if a preservation letter would or would not have been sent to him if it was not directed specifically to his office. (Tr. 124:5–16.) When asked with respect to labor employment disputes who at UMC was responsible for the preservation process, McIntire responded "that would have been either the Chief of HR or Doug Spring, who was the number two man." (Tr. 125:4–10.) Mr. Spring, would also have been responsible for selecting outside counsel and vendors. (Tr. 125:11–17.)

McIntire was involved in this case after it was filed, but did not recall when he first learned of it. (Tr. 126:3–18.) He was aware that there was an obligation to preserve, although he was not responsible for it. (Tr. 129:2–5.) When asked who was responsible, he testified that it would have been Doug Spring. (Tr. 129:6–9.) Mr. McIntire did not know if anyone in IT was initially

---

[14] Mr. McIntire was one of several witnesses who testified at a special master hearing on June 16, 2014. His testimony begins at page 121 of the court reporter's transcript, which is 15 of 34 in ECF No. 190. Citations to his testimony are from the court reporter's transcript.

contacted, but testified "down the road" they were. (Tr. 129:10–15.) He could not recall the exact dates. (Tr. 129:18–19.) However, it was by the time the defense attorney was doing electronic discovery. (Tr. 129:23–24.)

McIntire was not involved in the retention of the former ESI expert, but was aware of his existence. (Tr. 130:2–7.) He was asked by the special master who within the IT Department he recalled talking to or communicating with about their efforts to preserve or collect, and testified he could not recall. (Tr. 130:21–131:4.) He believed someone within the IT Department was on the telephone during one of the conversations. (Tr. 131:5–9.) He was aware of the initial collection that was performed by the prior vendor, Litigation Document Group. (Tr. 131:10–15.) UMC had received a very large bill, which was why McIntire was brought in. (Tr. 131:16–20.) His role was to determine whether or not defense counsel was acting appropriately. (Tr. 131:21–132:1.) His conclusion was to replace them. (Tr. 132:2–4.)

To the best of Mr. McIntire's knowledge, he did not remember ever seeing a litigation hold relating to this case. (Tr. 133:5–8.) When asked whether he ever received an email informing him of the obligation to preserve documents relating to this case, he responded that at some point in time he may have received something from Doug Spring in an email he was copied on. (Tr. 133:9–15.) It was not sent to him; he was just carbon copied on it. (Tr. 133:15–16.)

He was asked to describe the role of Patricia Kennedy as the legal analyst in the Risk Management Department. (Tr. 145:7–15.) He testified that when UMC received a summons and complaint, she would open the case file, and if the case involved HR, she would pass the information onto them. (Tr. 146:4–8.) She was responsible for initiating a file so that UMC would have a record of anything received. (Tr. 146:11–15.) At UMC, the file was a mix of paper and some of the things were scanned and put into the Q-Drive. (Tr. 146:19–21.) He was not aware of any formal process for opening a file at that time. (Tr. 146:22–25.) Ms. Kennedy would receive a complaint from the county, and then scan it and put it on the Q-Drive in the file. (Tr. 147:1–16.) The file was placed in Risk Management on the Q-Drive. (Tr. 147:17–20.)

Mr. McIntire had the opportunity to review Shaunda Phillips' declaration. (Tr. 150:15–17.) Shaunda Phillips was UMC's Director of Risk Management in June 2014 when McIntire

provided his testimony. (Tr. 148:3–8.) He was asked whether the procedures Ms. Phillips outlined in her declaration were followed while McIntire was at UMC in August 2012. (Tr. 150:25–151:3.) He testified that they were, and described how once the county was served the file would be transferred over from Stephanie Barker in the District Attorney's Office to McIntire or Patricia Kennedy in the Risk Management Office either in hard copy or email. (Tr. 151:4–17.) McIntire or Kennedy would then date-stamp it and letters would be forwarded to department heads if needed. (Tr. 151:18–20.) Then it would also go to whomever was responsible for preserving documentation. (Tr. 151:21–23.) In most cases, that would be the IM Department, the Medical Records Department, with the exception of the HR cases, which would go to the HR Department. (Tr. 151:23–152:1.) Mr. McIntire testified that he had never seen those policies and procedures in writing. (Tr. 152:2–6.) He became aware of these policies when he "first checked in there" and was told by Patricia Kennedy. (Tr. 152:7–12.)

## N. Amended Declaration of Dean Schaibley

Dean Schaibley has been the Network Security Administrator at UMC since June 2012. (Schaibley Am. Decl. ¶¶ 1–2, Aug. 1, 2014, R & R Ex. 17, ECF No. 191-10.) He was asked to describe his involvement in the data collection related to this litigation by the special master. (*Id.* ¶ 3.) He provided a timeline in his declaration showing the timing of his involvement in the litigation and the related collection. (*Id.* ¶ 4.) On April 19, 2013, he received an email from Craig Renard of LDG confirming an appointment for the following day to perform a forensic collection of email accounts and personal folders of 26 individuals.[15] (*Id.*)

On April 10, 2013, he began the network scan to locate all computers these 26 individuals had local profiles on. (*Id.*) He copied all data from each identified computer to a secure repository that Leon Mare, a forensic investigator from Expert Data Forensics, would use to make a forensic image. (*Id.*)

On April 18, 2013, he met with Craig Renard and Leon Mare to determine what data would

---

[15] These 26 individuals were J. Espinoza, D. Spring, C. Myers, L. Conedy, K. Crowley, R. Pfaff, S. Merrill, J. Panzeri, C. Dwyer, B. Brannman, J. Strasser, P. Greaux, D. Small, C. Small, B. Curtin, D. Cohen, L. Lawrence, L. Collard, A. Martin, A. Jones, T. Sutter, C. Jones, A. Robinson, T. Fleming, S. Ahmed, and O. Borbon.

be copied from his collection for the 26 individual users. (*Id.*) All data was copied, including all data from the individuals' local work station profiles and home folders. (*Id.*) It was determined that the active Outlook mailboxes of these 26 custodians should be collected and copied. (*Id.*) Total data collected was 583,714 files, 90,974 folders, and 173 gigabytes of uncompressed data. (*Id.*) He understood that Leon Mare made a forensic image of all of the data collected and then took the data for processing to LDG. (*Id.*)

On June 24, 2013, Schaibley received an email chain from HR Director Doug Spring, IT Director Lonnie Richardson, and IT Security Officer Connie Sadler, requesting that he pull a list of all email addresses for UMC users. (*Id.*)

On July 10, 2013, he received an email message from Tara Shiroff, a lawyer from UMC's counsel, LBBS. (*Id.*) This was Schaibley's first contact with LBBS attorneys. (*Id.*) On July 22, 2013, he set up a meeting with Ms. Shiroff and Leon Mare to discuss the new discovery request and process for complying. (*Id.*) This meeting occurred in person on the UMC campus. (*Id.*) Ms. Shiroff, Mr. Mare and Schaibley's supervisor, Connie Sadler, met in Ms. Sadler's office. (*Id.*) He did not have a specific recollection of the conversation, but knows it was the first time he met anyone from LBBS in person. (*Id.*) Schaibley believed the participants discussed how to identify parameters on a new collection with regard to size of data and number of custodians. (*Id.*)

On August 16, 2013, he received an email with a list of five names and ten search terms from Ms. Shiroff and Margaret Foley, also an LBBS lawyer. (*Id.*) He pulled the requested data. (*Id.*)

On August 26, 2013, Schaibley worked again with Leon Mare to complete the forensic imaging of the requested data. (*Id.*) From August 26 until November 25, 2013, his ESI data collection efforts in this case consisted of reviewing and responding to a few email messages. (*Id.*)

On November 25, 2013, Mr. Schaibley received an email from Kayla Witty, a lawyer with LBBS, indicating that UMC had been asked to provide data from Kronos, UMC's timekeeping system. (*Id.*) He forwarded this request through Connie Sadler, UMC's Information Security Officer, who is also Schaibley's supervisor; Ernie McKinley, UMC's CIO; and Lonnie Richardson, UMC's Director of Information Technology. (*Id.*)

On March 11, 2014, Schaibley received an email message from Ms. Witty requesting a list of custodians for data collected in April 2013. (*Id.*) On March 23, 2014, he received an email message from Ms. Witty requesting that he attend the special master proceedings on April 4 and 7, 2014, as he had been identified as the individual at UMC who had conducted the data collection in April and August 2013. (*Id.*)

During special master hearings on April 4 and 7, 2014, Mr. Schaibley offered to create new E01 files for UMC's ESI vendor, Joseph Edmondson, because Edmondson had not received the full data collected by UMC. (*Id.* ¶ 5.) It was only during these proceedings that Schaibley learned that Mare did not retain a copy of the data copied in April 2013, and all that could have been transferred to Mr. Edmondson was the data copied in August 2013. (*Id.*) Mare did not ask to copy the April 2013 data when he came back in August, and Schaibley had not met Edmondson prior to April 4, 2014. (*Id.*)

Error logs for both the April 2013 and August 2013 ESI collection were provided to the parties during special master proceedings. (*Id.* ¶ 7.) Mr. Schaibley explained the error log posts UMC previously provided to the special master. (*Id.* ¶ 8.)

To the best of Mr. Schaibley's knowledge and recollection, the list of custodians to pull came to Schaibley in an April 9, 2013 email from LDG's Renard, which copied individuals from MPP. (*Id.* ¶ 9.) The balance of the affidavit described reports he prepared and information he provided on behalf of UMC that were submitted during special master proceedings.

**O. Amended Declaration of Joseph Edmondson**

The special master obtained the declaration and amended declaration of Joseph Edmondson, the forensic computer examiner hired by LBBS to process and produce responsive electronic data from the search of ESI in this case. (Edmondson Am. Decl., Aug. 6, 2014, R & R Ex. 22, ECF No. 192-2; Edmondson Decl., June 11, 2014, Pls.' Resp. Ex. X, ECF No. 216-24.) Edmondson avers that he was ordered by the special master to provide a declaration detailing his involvement in the e-discovery in this case, outlining his responsibilities, documenting his e-discovery processes, and addressing any concerns that had arisen in the process. (Edmondson Am. Decl. ¶ 2, ECF No. 192-2.)

Mr. Edmondson was contacted in mid-September 2013, by Brando Eusebio from Legal Wings, the document processing vendor used by LBBS for consultation related to a report generated by ESI vendor Leon Mare. (*Id.* ¶ 3.) After reviewing the report, Edmondson requested more information regarding what data was being analyzed and what type of production was intended to be provided. (*Id.*) On October 3, 2013, Edmondson participated in a meeting with UMC's counsel and Mr. Eusebio to determine what specific processing needed to be accomplished "as it had been determined that the initial ESI vendor's report was insufficient under this lawsuit's standing ESI Protocol Order." (*Id.* ¶ 4.) Edmondson asked counsel to provide the responsive native files with their original folder structure maintained, and UMC's counsel indicated they would follow up with the initial vendor. (*Id.*)

On November 14, 2013, Edmondson met with UMC's counsel and Mr. Eusebio to receive a hard drive containing the original source data used by Leon Mare to create his report and clarify the processing that needed to be performed. (*Id.* ¶ 5.) UMC requested that Edmondson recreate the results from the original report provided by Leon Mare as closely as possible, but to provide native files, TIFF files, OCR text and load-files in compliance with the ESI protocol order. (*Id.*) Edmondson was retained that day and submitted a quote for his anticipated services. (*Id.*)

The hard drive that Edmondson was provided contained data for five identified custodians in a forensically sound file format. (*Id.* ¶ 6.) He understood that this was a collection of the full data source for those five custodians. (*Id.*) UMC counsel informed Edmondson that Leon Mare should have made a complete copy of all the custodians' collections. (*Id.*) Edmondson only communicated with counsel and did not verify this information directly with UMC's IT security, or the prior ESI vendor. (*Id.*)

At the special master's request, Edmondson determined the data he received in November 2013, was comprised of (1) the amalgamated local profile data of custodians Brian Brannman, John Espinoza, Doug Spring, James Mumford, and Jacquelyn Panzeri; (2) the then-current mailboxes for these five custodians as collected in August 2013; and (3) the then-current mailboxes of four custodians (Brannman, Espinoza, Spring, and Panzeri) as collected in April 2013. (*Id.* ¶ 15.) All of the data Edmondson received in November 2013 was preserved by UMC's Network

Security Analyst Dean Schaibley.  (*Id.*)  Paragraphs 8 through 17 describe the efforts he engaged in concerning UMC's ESI production in this case in technical detail.

At the request of the special master, and with the cooperation of UMC, Edmondson conducted a search for possible preservation notice or litigation hold emails.  (*Id.* ¶ 25.)  He identified two emails.  (*Id.*)  The first email is the email message sent to a UMC distribution list, PatientServiceLeaders, on April 15, 2013, by Cindy Dwyer on behalf of Brian Brannman.  (*Id.*)  The second email is an email sent by Patricia Kennedy to Doug Spring on August 20, 2012, with three PDF attachments.  (*Id.*)  *One of those attachments is the August 6, 2012 preservation notice letter sent from plaintiffs' counsel.*  (*Id.*)

### P.  Declaration of Marilyn Sue Kisner

The special master obtained the declaration of Marilyn Sue Kisner, the Information Technology Customer Services Manager at UMC.  (Kisner Decl. ¶ 1, R & R Ex. 26, ECF No. 198-4.)  Her declaration was provided to clarify the use of and policies regarding Blackberry devices at UMC as ordered by the special master.  (*Id.* ¶ 2.)  Ms. Kisner served as the IT Customer Services Manager for the two years prior to her May 2, 2014 declaration.  *Id.* ¶ 3.)  She supervised the PBX and communications personnel that handled the day-to-day Blackberry service issues.  (*Id.*)

UMC did not have a policy to back up the Blackberry server or particular Blackberry devices.  (*Id.* ¶ 4.)  The system is used as a pass-through system, connecting the individual devices to information directly from Microsoft Exchange Server Environment.  (*Id.*)  Prior to this case, UMC has never had a request to preserve the Blackberry server or any Blackberry devices.  (*Id.* ¶ 5.)  "It is not normal practice for UMC to retain this information as text messages and other mobile content is not considered official records for UMC and all calendar and email entries from UMC-issued Blackberry devices would be captured on the Microsoft Exchange server."  (*Id.*)

Ms. Kisner personally learned of the need to preserve cellphone data for certain custodians' Blackberry devices on January 21, 2014.  (*Id.* ¶ 6.)  She was forwarded an email from Director of Information Technology, Lonnie Richardson, that included communications from UMC's counsel requesting time to forensically image the devices of John Espinoza, Brian Brannman, and James Mumford.  (*Id.*)  In January 2014, UMC migrated devices from its Blackberry server to a new

Blackberry server.  (*Id.* ¶ 7.)  "This process included wiping all devices to be migrated."  (*Id.*)  When addressing device issues, it is sometimes necessary to clear a device of all previous settings, *i.e.*, "the phone is wiped."  (*Id.* ¶ 12.)  UMC does not keep a separate log of when an individual device is wiped.  (*Id.*)  Pursuant to UMC practice, no data was preserved on the Blackberry exchange prior to beginning special master proceedings.  (*Id.* ¶ 13.)  To determine if other information regarding text messages on Blackberry devices was available, UMC contacted Sprint for additional information.  (*Id.* ¶ 14.)  UMC's monthly bill lists only a total number of text messages for each device and does not break down the text details such as when a message was sent or received, or between which contacts.  (*Id.*)  A court order is required to provide this information.  (*Id.*)

### Q. Declaration of David J. Williams

Mr. Williams is a System Administrator at the UMC Information Technology Department.  (Williams Decl. ¶ 1, R & R Ex. 40, ECF No. 199-12.)  He first learned about this case in July 2013 via an email from UMC HR.  (*Id.* ¶ 2.)  He was not contacted or notified to preserve any information related to this lawsuit.  (*Id.*)  Toward the end of March 2014, he was instructed by IT Management, Ernie McKinley, the CIO, with Susie Kisner present, to review Blackberry Enterprise server settings and begin retaining SMS messages sent by certain UMC employees.  (*Id.* ¶ 3.)  This was the first time he heard of data preservation for this lawsuit.  (*Id.*)  He later learned the reason for the change in policy that was requested was in response to this lawsuit.  (*Id.*)  The preservation efforts were later expanded to work stations and other data repositories in mid-April 2014.  (*Id.*)  His declaration went on to explain that UMC began backing up several hundred applications contained on numerous servers, including Clarity, TeleTracking, Crimestar, and GRASP.  (*Id.* ¶ 4.)

UMC began using Clarity project management software around May 2006.  (*Id.* ¶ 7.)  Clarity was meant to be a project management tool, but devolved into collecting data for analysis of time spent by UMC staff on projects versus working tickets generated in UMC's problem-tracking system.  (*Id.*)  Clarify was meant to manage projects and estimate workloads, and to Mr. Williams' knowledge, did not determine any employee pay.  (*Id.*)

60

IT staff entered time spent each day in particular areas such as break/fix or specific projects as line items. (*Id.* ¶ 8.) The IT staff entering time into Clarity were supposed to honestly track hours worked, however, data entered into Clarity did not affect pay. (*Id.* ¶ 9.) Only the hours in Kronos generated pay. (*Id.*) When an employee entered their time in Clarity, the entry was time and date-stamped. (*Id.* ¶ 10.) UMC management received reports from Clarity and an employee's timesheet entries were approved by the employee's supervisor. (*Id.* ¶ 11.) Data within Clarity was also archived, or marked inactive, on a periodic basis. (*Id.* ¶ 12.) To Mr. Williams' knowledge, no data was ever completely removed or deleted from the Clarity system. (*Id.* ¶ 13.) The data may not be viewed by a user, but the data was retained in the Clarity system as inactive or archived data. (*Id.*) The Clarity database was housed on a UMC server. (*Id.* ¶ 14.) This server was shut down on May 5, 2014, after Williams received an email from Mr. Oliveri indicating that UMC would no longer be using the product. (*Id.*) As a result, he turned the system off and data within Clarity is no longer being input or updated. (*Id.*) To his knowledge, it has not been moved, altered, lost, or deleted. (*Id.*) At the request of counsel, Williams restored the Clarity system to functionality in anticipation of remote-viewing by the special master on June 16, 2014. (*Id.* ¶ 16.) At the time of his July 2014 declaration, Clarity was up and running. (*Id.* ¶ 17.) He used the system at the request of counsel to verify and compare a list of complainants to the users he could find. (*Id.*) He provided a verification report to the special master. (*Id.*)

**R. Declaration of Ruben Gurrola**

Ruben Gurrola is the Director of Public Safety at UMC. (Gurrola Decl. ¶ 1, R & R Ex. 41, ECF No. 199-13.) As the director, he supervises all Public Safety Officers ("PSOs") at UMC. (*Id.* ¶ 2.) To the best of his knowledge, the CrimeStar was installed in 2005. (*Id.* ¶ 3.) It is a records management system originally intended to provide a tool to enhance the Public Safety department's system in relation to writing reports, dispatching, and call for service recording and analysis. (*Id.*) All PSOs have access to CrimeStar for incident reports. (*Id.* ¶ 4.) CrimeStar does not connect to Kronos or SAP for timekeeping or payroll purposes. (*Id.* ¶ 7.) Kronos is still the official timekeeping system for all PSOs. (*Id.*) PSOs clock into work through Kronos and clock out through Kronos. (*Id.*) In October 2012, when the Administrative Policy on Meal Breaks came

out, Public Safety had all PSO's read and sign acknowledging the policy on meal breaks. (*Id.* ¶ 8.) At that time, the PSOs tried to comply with the policy by clocking out for lunch and clocking back in when back on duty. (*Id.*) After a few weeks of working with the policy, Public Safety informed HR about the difficulty officers were having complying with the policies because PSOs must respond to emergencies and were being called back into service when off the clock. (*Id.*) This made it difficult to comply with the policy on documenting meal breaks. (*Id.*)

A proposal was made to, and approved by, Doug Spring to allow PSOs to track their meal breaks in Public Safety's computer aided dispatch (CAD), a part of CrimeStar RMS. (*Id.* ¶ 9.) When an officer goes to a meal break, he or she would call into dispatch on his or her portable radio, the dispatcher enters the time of the meal break into CAD where the data is captured and saved. (*Id.*) Thus, there is no need for PSOs to use the Kronos phone system for meals. (*Id.*) Sometime during the first two weeks of November 2012, Public Safety started allowing PSOs to notify dispatch when taking a meal break. (*Id.* ¶ 10.) At a monthly staff meeting on November 14, 2012, the PSOs reported that the new system of tracking meal times over the radio to dispatch was working well. (*Id.*) Gurrola's communications regarding the meal break data entry changes were exclusively with Doug Spring. (*Id.* ¶ 11.) Gurrola had not had any direct communication with any other HR employees regarding meal break data entry or this case. (*Id.*) He had not had any direct communications with David Williams regarding the meal break data entry into CrimeStar or this case. (*Id.* ¶ 12.)

**S. Cayla Witty's June 25, 2014 Letter**

When the special master was advised in June 2014 that there were other UMC time tracking systems besides Kronos, he asked UMC's counsel to provide a letter explaining those systems. Ms. Witty provided her first letter to the special master on June 25, 2014. (R & R Ex. 39, ECF No. 199-11.) The letter described UMC's TeleTracking and CrimeStar time tracking systems. Ms. Witty represented that UMC uses TeleTracking in two departments: the Environmental Services Department and the Transport Department. TeleTracking is used to track assignments, tasks, and locations for employees in these departments, including certain opt-in plaintiffs. "Because the employees in these departments do not maintain a central location during shifts, they

track their breaks (including meal periods) through the TeleTracking system." (*Id.*) This data is not captured in Kronos because these departments only use Kronos for clocking in and out for the workday.

The Public Safety Department uses CrimeStar RMS as their computer-assisted dispatch. PSOs at UMC, including certain opt-in plaintiffs, clock in and out for duty through Kronos, UMC's official timekeeping system. PSOs do not personally enter information into CrimeStar. The dispatcher is required to enter codes and assignments into CrimeStar sent via radio to the officers. One of the codes entered into CrimeStar includes a meal break code. This data is not captured in Kronos because the PSOs only use Kronos for clocking in and out for the workday.

The systems described in Ms. Witty's June 25 letter along with Kronos and Clarity systems "are the universe of time-tracking systems at UMC. These systems will be produced in full, and UMC will coordinate with plaintiffs with any continuing technical concerns relating to these systems." (*Id.*) These databases will be produced to plaintiffs pursuant to the Second Amended ESI Protocol Order and the confidentiality and protective order in place in this case.

**T. Cayla Witty's June 30, 2014 Letter**

The special master requested a letter from counsel for UMC explaining why Clarity was not identified in any of the earlier hearings before the special master or before the court. Her June 30, 2014 letter to the special master reiterated UMC's position that Kronos is the official timekeeping system at UMC. (R & R Ex. 38, ECF No. 199-10.) Even for departments that may track tasks or summarize time and other systems, Kronos is the official timekeeping system from which compensation is based. Thus, the Kronos timekeeping system is the best evidence from which plaintiffs would establish that they were not paid correctly for time worked.

Clarity is a time tracking system used in UMC's IT Department until 2012. IT management implemented the system in May 2006. The majority of UMC's IT users of Clarity are exempt employees. At no time has Clarity been used to determine compensation.

During a May 30, 2014 hearing, the special master asked counsel for more information about Clarity. (Hr'g Tr., R & R Ex. 10, ECF No. 191-3.) This was the first opportunity counsel for UMC had to investigate the Clarity software system at UMC. Counsel for UMC had not

discussed other timekeeping software systems other than Kronos that might have a time-related function because the Kronos database on which all hourly employees' compensation was generated had been disclosed in its entirety.

## VI.  THE COURT'S FINDINGS AND CONCLUSIONS

The court has personally conducted a thorough review of the record prior to the special master's appointment and the record of the proceedings conducted by the special master.  The record before the court and the record developed by the special master amply supports his findings that UMC destroyed evidence by failing to identify, preserve, collect, process, and search multiple repositories of information relevant to the parties' claims and defenses.

### A. Special Master Garrie was Professional, Neutral, Possessed Specialized Knowledge and Expertise, and Remedied Much of UMC's ESI Deficiencies

As an initial matter, the court emphatically rejects arguments advanced by UMC in its objection that the special master was unprofessional, biased, and produced a shoddy work product. UMC concedes the special master had technological expertise and that he resolved many of the problems with UMC's ESI collection and production.  Its Objection (ECF No. 207) acknowledges that "UMC and its counsel engaged in many open and productive discussions" with the special master.  (Obj. 25:10–11.)  The objection also acknowledges that "UMC and its counsel found that the special master expressed a more nuanced understanding of the lawsuit as a whole, assisted the parties in making more reasonable requests and/or objections, and attempted to apply more analysis to the respective technological situations and resource allegations being addressed in the hearings."  (Obj. 25:14–17.)  UMC and its counsel expected that many of the ESI issues were being resolved.  (Obj. 25:17–19.)  "It seemed like everything would work out—technical issues were dealt with and the parties could move forward to the merits of the case."  (Obj. 25:25–26:1.) However, now that UMC fully appreciates the special master's findings and conclusions, its response is to personally and professionally impugn the special master.  UMC now accuses the special master of being discourteous and biased.  UMC claims it was "shocked" by the special master's R & R stating the "actual result came as quite the shock."  (Obj. 16:1–3.)

The court has conducted a de novo review of all of the special master proceedings and finds

that he was professional and courteous, if occasionally frustrated by testimony displaying a lack of appreciation of UMC's legal duties to preserve and produce responsive ESI. He was repeatedly told by UMC executives and employees that they did not know about their duty to preserve, had not learned about their preservation obligations from counsel, did not know what a litigation hold was, and had not explored relevant repositories of information responsive to plaintiffs' discovery requests. The special master provided extensions to counsel. He considered alternatives recommended by both sides to his proposed orders. He offered to accommodate UMC employees, their schedules, and UMC's business needs on multiple occasions. In fact, during an April 22, 2014 hearing in which UMC COO Lawrence Barnard was called to testify, the special master addressed Mr. Barnard "to stress the importance and my serious concerns about UMC's ability to preserve information, communicate with their lawyers, effectively communicate what is going on to their counsel so that your counsel can effectively represent you." (Hr'g Tr. 7:8–15, ECF No. 189-4.) The special master heaped praise on UMC's Network Security Administrator, Dean Schaibley, for his assistance. The special master told Mr. Barnard that he had "had the honor" of working with Mr. Schaibley, "who is an exceptionally bright and intelligent individual . . . as well as informative." (Tr. 7:20–24.)

Counsel for UMC reported to the court in hearings prior to the appointment of the special master that the client had no real idea of what ESI had been collected at the request of prior counsel. However, at the request of the special master, Mr. Schaibley produced a detailed affidavit identifying exactly what he did to collect ESI at the request of prior counsel.

The fact that UMC now purports to be shocked by the special master's findings and conclusions only reinforces the court's conclusion that the special master did indeed do his job in a professional, courteous, and neutral manner. Otherwise, UMC would not be shocked with his findings and recommendations. The special master had extraordinary specialized expertise necessary to ask the right questions of the right personnel at UMC to uncover what occurred, and what additional sources of ESI had not been identified. Certainly, if he was as discourteous and biased as UMC now claims in its objection, UMC would have addressed its concerns with the court. It did not do so.

## B. UMC Failed to Comply with the Court's Orders to Preserve and Produce ESI

On July 12, 2013 the court compelled UMC to produce documents and ESI responsive to plaintiffs' written discovery requests at issue in plaintiffs' motion to compel. Plaintiffs' discovery requests were served on January 23, 2013. The parties' Stipulated Protective Order (ECF No. 67) governing confidentiality was entered on February 28, 2013. The court also entered an Order (ECF No. 79) approving the parties' stipulated ESI protocol on March 20, 2013. The Motion to Compel (ECF No. 92) was filed May 15, 2013, after the parties' efforts to resolve the disputes without the court's intervention were unsuccessful. The motion to compel sought answers to interrogatories, hard copy documents and ESI pertaining to the named plaintiffs and approximately 70 plaintiffs who had opted-in.

The discovery requests were initially directed to the entire FLSA class, but plaintiffs' counsel offered as a compromise to limit the requests to the named plaintiffs and opt-in plaintiffs. At the time the motion to compel was filed, plaintiffs' Motion to Facilitate Notice to Potential Opt-In Plaintiffs (ECF No. 46) of a collective FLSA action was under submission to the district judge. UMC had objected to a majority of plaintiffs' discovery requests on the grounds that a class had not yet been certified and no class representative had been appointed. Plaintiffs sought an order compelling discovery of HR/personnel files, all timekeeping/time clock records and payroll records, including methods for ascertaining time worked, and measures taken to ensure employees were paid for all hours worked. The motion asked for an order compelling production within 10 days. The motion also sought discovery of the interviews of UMC employees taken by DOL during its investigation.

With respect to ESI discovery, the motion pointed out that no ESI had yet been produced despite the fact that a preservation letter was sent to UMC CEO Brian Brannman on August 6, 2012, that included a demand to preserve ESI. The motion to compel also advised the court that although plaintiffs sent a preservation letter, John Espinoza testified at his deposition on April 8, 2013, that to his knowledge no directive had been sent to UMC employees or management to preserve documents in this matter. Portions of Mr. Espinoza's deposition testimony were quoted in the motion. Espinoza denied receiving any directive to preserve documents from Mr. Brannman

although Espinoza expected that if such a directive had been given he would have received it. Espinoza also testified that no kind of electronic search of his office or computer had been undertaken. The plaintiffs therefore asked for an order compelling UMC to search for and produce ESI responsive to plaintiffs' discovery requests.

The court granted the motion to compel on July 12, 2013, after hearing oral argument on June 25 and July 12, 2013. (Mins., ECF No. 115.) As detailed in the summary of status and dispute resolution conferences in Section II D of this Order, although UMC produced hard copy documents of individual opt-in plaintiffs' personnel files, *UMC had produced virtually no useable ESI to plaintiffs before the court appointed a special master more than a year after UMC's responses to plaintiffs' discovery requests were initially due.*

UMC repeatedly failed to comply with its own requested ESI production deadlines after the motion to compel was granted, even after the court granted UMC relief from its asserted burden by limiting the initial round of ESI productions to five key custodians and ten key search terms. UMC repeatedly failed to comply with the ESI protocol drafted by its former counsel. Additionally, as outlined in great detail in Section II D of this Order, UMC's current counsel blamed former counsel and their ESI consultants for the delay in producing responsive ESI. Counsel for UMC advised the court at the hearing on June 25, 2013, that the client did not have any real understanding of what MPP had done or what data had been collected. This representation turned out to be false. As the declarations and testimony obtained in special master proceedings make clear, MPP and its vendor met with UMC's IT staff to collect relevant ESI and memorialized the collection in an e-data processing form filled out April 15, 2013. (Renard Decl. with attached form, ECF No. 199-8.) UMC's Network Security Administrator Dean Schaibley was involved in the initial data collection in April 2013, and was able to describe his involvement during special master proceedings. Mr. Schaibley described exactly what he collected in his Amended Declaration (ECF No. 191-10). Thus, the representation UMC's current counsel made to the court that the client did not have any real idea of what prior counsel had done regarding ESI collection was patently false. In the light most favorable to current counsel, they did not ask the right questions of the individuals involved in the initial collection. The people involved in the process—

MPP, its vendors and consultants, and the IT personnel at UMC who did the collection of ESI from 26 custodians—were simply not asked until after the special master was appointed and made the appropriate inquiries.

### C. UMC Had No Preservation Policy or Litigation Hold Policy and Failed to Timely Implement One

Plaintiffs' initial complaint was filed July 27, 2012. The complaint was filed several months after the DOL initiated an investigation of uncompensated meal breaks for the two-year period between April 1, 2010, and March 30, 2012. Plaintiffs' counsel sent a preservation letter via certified mail to Brian Brannman, UMC's CEO on August 6, 2012. (R & R Ex. 22, part 7 of 7, p. 4 of 25, ECF No. 198.) The letter included the case caption, case number, and demanded preservation of evidence, including electronically stored evidence related to issues involved in the case. Specifically, plaintiffs requested that electronic data concerning timekeeping records, scheduling records, payroll data, and relevant information contained in emails, video, date books, word-processing files, spreadsheets, databases, HTML files, etc. be preserved as evidence in this case. The letter requested that UMC take affirmative measures to preserve potential evidence that might otherwise be destroyed in the course of normal business. The letter also requested that instructions be provided to directors, officers, employees, IT personnel, attorneys and anyone else acting on UMC's behalf to suspend destruction of documents, things, and other electronic data while the case is pending, or until UMC determined the material did not contain discoverable evidence.

The special master methodically traced what happened internally within UMC from the first notice of this lawsuit. The Clark County Board of Commissioners was served with this lawsuit on August 7, 2012. (Aug. 7, 2012 Memorandum, R & R Ex. 22, part 6 of 7, p. 7 of 38, ECF No. 197 (advising that the Commission Office was served with *Small*, *et al. v. UMC*, Case No. 3:12-cv-00395-HDM-VPC).) A copy of the memorandum was courtesy copied to the county manager. (*Id.*) A copy of the complaint and the notices of consent to join were attached to the memorandum. (*Id.* 8–38.) On August 14, 2012, the Clark County District Attorney's Office forwarded a copy of the complaint and notice of consent to Patricia Kennedy in UMC's Risk

Management.  (Letter from Emily Elzeftawy to Patricia Kennedy, *id*. 6 of 38.)  The letter was signed by the assistant to the Civil Division Chief Deputy District Attorney, Stephanie Barker.  (*Id*.)  On August 20, 2012, Patricia Kennedy, a Legal Specialist in UMC's Risk Management Department, sent an email to Doug Spring regarding this case, stating "Doug, here are the Small v. UMC documents."  (Kennedy email to Spring, *id*. 5 of 38.)  Three PDF attachments were forwarded to Mr. Spring with the email.  (*Id*. 6–38.)  One of those attachments was a copy of plaintiffs' August 6, 2012 preservation letter addressed to Mr. Brannman.  (*Id*.; *see also* Edmondson Am. Decl. ¶ 25, ECF No. 192-2; Edmondson Decl. ¶ 18, ECF No. 216-24.)

During the May 6, 2014 hearing, the special master disclosed to plaintiffs' counsel that he had directed UMC's prior counsel, MPP, to turn over their entire case file, including electronic communications to current counsel for UMC.  (Hr'g Tr. 65:9–11, ECF No. 189-5.)  The special master indicated he had instructed counsel for UMC to ask prior counsel for any and all preservation notices they may have sent to UMC.  (Tr. 65:11–14.)  He asked current counsel for UMC, Ms. Witty, to state what she had learned on the record.  She responded that "prior counsel represented they have turned over their entire file to current counsel, and that within the file there is no indication for preservation notice sent to UMC."  (Tr. 65:17–20.)  MPP was appointed shortly after service of the complaint.  (Tr. 66:2–7.)  The person responsible for interacting with MPP was Doug Spring.  (Tr. 66:8–11.)

These documents undisputedly establish that UMC's Risk Management, CEO, and Director of Human Resources all received actual notice of the lawsuit and plaintiffs' preservation letter in August 2012.  However, UMC's CEO Brian Brannman, Chief HR Officer John Espinoza, and Director of HR Operations Doug Spring all denied receiving the preservation letter under oath in testimony and declarations provided during special master proceedings.  Proof that the August 6, 2012 preservation letter was received by UMC executives was obtained only because the special master directed Joseph Edmondson, the forensic computer examiner hired by LBBS, to search for any preservation letters or litigation hold documents UMC sent or received.

Mr. Wieczorek, counsel for UMC until LBBS was substituted in May 2013, averred in his declaration that he first received a preservation notice from counsel for plaintiffs on November 6,

2012.  (Wieczorek Decl. ¶ 5, ECF No. 198-1.)  His sworn declaration attests that he sent a copy of the November 6, 2012 email to Mr. Espinoza and Mr. Spring on November 7, 2012, and met with both of them on November 14, 2012, to discuss preservation of relevant documents.   Mr. Wieczorek attests that after meeting with Messrs. Espinoza and Spring, he understood that Espinoza would contact UMC HR to confirm the obligation to preserve and maintain documents related to this litigation.

Mr. Espinoza provided a declaration as directed by the special master to address when preservation notices were delivered to UMC staff.  (Espinoza Decl. re: Preservation Notices ¶ 1, ECF No. 198-2.)  Espinoza averred that in mid-November 2012, he received a preservation notice from UMC's Risk Management Department.  (*Id.* ¶ 4.)  The letter was written by plaintiffs' counsel and referred to an earlier letter he had never seen.  (*Id.*)  As a normal practice, he "confirmed the obligation to preserve and maintain documents related to this litigation with the Human Resources (HR) staff that I supervise in-person."  (*Id.* ¶ 5.)

The special master gave Mr. Espinoza an opportunity to revise his declaration regarding preservation notices after further proceedings called into question the accuracy of his initial declaration.  In his revised declaration, Espinoza averred that in mid-November, he received a preservation notice letter from UMC's Risk Management Department.  (Espinoza Revised Decl. ¶ 5, ECF No. 198-3.)  The letter he received was written by plaintiffs' counsel and referred to an earlier letter that he had never seen.  (*Id.*)  He did not recall receiving an electronic copy of this document or any earlier preservation notice.  (*Id.*)  As a normal practice, upon receipt of a preservation notice, Espinoza would confirm the obligation to preserve and maintain documents related to litigation with HR staff responsible for labor relations.  (*Id.* ¶ 6.)  He would coordinate with Doug Spring, Director of HR Operations, who would contact the appropriate department heads to preserve or isolate related documents.  (*Id.*)

Espinoza confirmed with UMC's counsel that UMC's ESI review shows no record that Messrs. McKinley or Schaibley received the preservation notice letter from plaintiffs' counsel or from Espinoza's office.  (*Id.* ¶ 10.)  The only preservation notices UMC sent to UMC employees regarding their obligation to preserve and maintain related information was in April 2013

following Espinoza's deposition. (*Id.* ¶ 8.) Espinoza found no record of any other UMC-issued policies on preservation and maintenance of documents related to this lawsuit prior to the commencement of the special master proceedings. (*Id.* ¶ 13.)

Mr. Spring testified at a special master hearing on May 6, 2014. (Hr'g Tr., ECF No. 189-5.) Spring testified that he did not ever receive a preservation notice from anyone in 2012. (Tr. 67:14–16.) MPP was appointed by the district attorney's office and the county to represent UMC in this case. (Tr. 67:20–22.) Spring was involved with MPP once they were appointed. (Tr. 68:3–6.) Spring was the primary point of contact with the law firm. (Tr. 68:7–9.) Spring testified that MPP never provided him written notice of an obligation to preserve documents that relate to this matter. (Tr. 68:10–14.) The special master asked Spring to the best of his recollection whether MPP ever informed him of an obligation to preserve information, and Spring responded that he recalled John Espinoza being deposed. (Tr. 69:23–70:2.) After Espinoza's deposition was the first time Spring knew about preservation of documents. (Tr. 70:5–7.) The special master asked Spring whether in 2013 he was ever given a preservation notice or instructions by prior counsel to preserve information. (Tr. 78:19–21.) He responded, "as I previously stated, I did not even know there was such a thing." (Tr. 78:22–23.) Spring testified that no preservation notice or instructions were given to him in 2012. (Tr. 78:24–25.)

Shauna Phillips, UMC's Director of Risk Management beginning April 2014, provided a declaration indicating she first became aware of this case in April 2014. (Phillips Decl. ¶ 2, May 14, 2014, R & R Ex. 33, ECF No. 199-5.) She described how her department would be involved with document preservation during litigation. (*Id.* ¶¶ 2–5.) When litigation is initiated against UMC, once proper service is effectuated, her office would receive a hard-copy of the served complaint via interdepartmental messenger from Clark County. (*Id.* ¶ 3.) Copies of the served complaint are forwarded to the UMC member of management with oversight of the matter. (*Id.*) When a document preservation request is received, the letter would be date-stamped and then turned over to the addressee. (*Id.* ¶ 4.) Copies of the letter are forwarded to department heads of the areas with responsibility over the documentation to be preserved, and the UMC member of management with oversight of the underlying matter. (*Id.*) If Risk Management was not the

original recipient of the letter, Risk Management would also receive a copy of the letter. (*Id.*) The respective department heads take steps to ensure the documentation identified for preservation is separated and/or segregated from any document retention/destruction protocols until further notice. (*Id.* ¶ 5.) Department heads are also directed to advise Risk Management "of the UMC member of management with oversight of the underlying matter of the documents that are being preserved and the manner of that preservation." (*Id.*) She could not locate any document preservation letter in the records with Risk Management for this case. (*Id.* ¶ 6.) She reports directly to the CFO at UMC who does not manage any document preservation notice, except to the extent that a request for document preservation is copied to the CFO as a member of UMC management with oversight of the underlying matter. (*Id.* ¶ 7.) The department of Risk Management and the CFO do not oversee this litigation. (*Id.* ¶ 8.) The HR Department would be the coordinating office for litigation assistance in this matter. (*Id.*) The Chief HR Officer would be the member of UMC management with oversight of this matter. (*Id.*)

It is undisputed, and the court finds, that UMC did not provide preservation notices to appropriate custodians of relevant information of their duty to preserve and maintain documents until Cindy Dwyer sent her April 15, 2013 email to PatientServiceLeaders. This preservation notice was only sent out after Mr. Espinoza was deposed in this case on April 8, 2013, and was presented with a copy of plaintiffs' August 2, 2012 preservation letter, which he denied ever seeing. No litigation hold was in place, and no preservation instructions were issued for at least the first eight months of this litigation. Neither prior counsel, MPP, nor current counsel, LBBS, provided written guidance to UMC concerning its preservation obligations. Mr. Wieczorek attested he sent a copy of plaintiffs' November 6, 2012 preservation letter notice to Espinoza and Spring on November 7, 2012, and met with Espinoza and Spring on November 14, 2012, to discuss preservation and understood Espinoza would contact UMC HR to confirm the obligation to preserve and maintain documents relevant to the litigation. However, Spring, the member of UMC management who was the point of contact with MPP and responsible for oversight of this case, repeatedly testified he first learned about the need to preserve after Espinoza was deposed April 8, 2013, and "did not even know there was such a thing" as a preservation notice before then. (Hr'g

1    Tr. 78:22–23, ECF No. 189-5.)

2         Mr. McKinley, UMC's CIO, participated and was present during testimony taken from

3    other UMC witnesses during special master proceedings.  He was asked by the special master

4    whether UMC had a protocol for preserving information, and testified it did not.  (Hr'g Tr. 156:24–

5    157:2, ECF No. 189-4.)  He had never spoken with UMC's prior lawyers in this case.  (Tr. 157:12–

6    17.)  McKinley had a chance to converse with current counsel, and as a result, understood that he

7    was required to preserve not only individual custodians' user profiles, but also the network file

8    shares.  (Tr. 157:22–158:2.)  He was asked when he first received a preservation notice from the

9    group list, UMCPOST, or some similar thing, and testified that it was after the first meeting with

10   the special master.  (Tr. 158:25–159:7.)

11        Espinoza and Spring communicated with, and obtained documents from, key custodians

12   involved in the process of collecting payroll and timekeeping records at the request of DOL.  On

13   March 2, 2013, Doug Spring emailed John Espinoza, Stephanie Merrill, UMC's CFO, James

14   Mumford, UMC's Senior HR Analyst, and Jackie Panzeri, UMC's Payroll Manager—the

15   individuals who would be coordinating the information DOL was requesting in its investigation.

16   (Spring Decl. ¶¶ 4–6, ECF No. 199-17.)  Yet, these same custodians were not notified in August

17   2012 to preserve ESI requested by the plaintiffs.  Rather, at the earliest, Merrill, and Mumford

18   received the first preservation notice on April 15, 2013, after Espinoza was deposed.  Other key

19   custodians whose ESI was collected in April and August 2013 were not provided with any

20   preservation notice until *after the special master was appointed*, and the parties conferred with the

21   court and the special master in chambers on March 10, 2014.  (Espinoza Decl. ¶ 11, ECF No. 198-

22   2.)  Ms. Panzeri, the Payroll Manager who collected and participated in the preparation of the

23   payroll spreadsheets provided to the DOL, was not notified to preserve anything until two or three

24   weeks before she testified at a special master hearing on June 16, 2014, nearly three months after

25   the special master was appointed.  (Hr'g Tr. 5:25–6:12, ECF No. 189-5.)  She was the person who

26   revealed in testimony to the special master that payroll information collected and produced to DOL

27   was readily accessible on her Q-Drive in spreadsheet format.  (Tr. 24:10–25:18.)

28        Glen McIntire, UMC's former Director of Risk Management, provided testimony during

73

special master proceedings.[16] (Hr'g Tr., ECF No. 190.) He was responsible for claims management and directing claims and all of the medical malpractice, personal injury, and property cases. (Tr. 121:19–122:3.) He selected outside counsel for these types of cases. (Tr. 122:11–17.) Employment cases were the responsibility of the HR Department. (Tr. 122:23–24.) He was asked whether he followed any protocols or processes to preserve, and testified he would notify those people he knew to be involved in the care of the patient of the case and notify them to hold all materials. (Tr. 123:4–11.) He did not believe he ever communicated or relayed that information to the IT Department. (Tr. 123:12–15.) Each custodian was responsible for self-preserving and collecting relevant documents. (Tr. 123:16–19.) McIntire was asked what would happen if a preservation hold letter was sent to UMC to the attention of Brian Brannman rather than to himself. (Tr. 124:1–4.) He did not know if a preservation letter addressed to Brannman would or would not have been sent to him if it was not specifically directed to his office. (Tr. 124:5–17.)

McIntire was not aware of any formal process within UMC for providing preservation notices that were not sent directly to his office. (Tr. 124:17–125:3.) He testified that the Chief of HR, John Espinoza, or his number two man, Doug Spring, would have been responsible for the preservation process in labor employment disputes. (Tr. 125:4–17.) McIntire did not remember ever seeing a litigation hold related to this case. (Tr. 133:5–8.) When asked whether he ever received an email informing him of the obligation to preserve documents related to this case, Mr. McIntire responded that he may have received something from Doug Spring in an email he was copied on; however, it was not sent to him, he was just carbon copied on it. (Tr. 133:9–16.)

McIntire reviewed Ms. Phillips' declaration and testified that the procedures she outlined in her declaration were followed while he was at UMC in August 2012. (Tr. 150:15–151:11.) However, he testified that he had never seen those policies and procedures in writing. (Tr. 152:2–6.) He became aware of these policies when he "first checked in there" and was told about them by Patricia Kennedy. (Tr. 152:7–12.)

In short, there is ample support in the record for the special master's findings that (1) UMC had no policy for issuing litigation holds to appropriate personnel hospital wide, (2) UMC issued

---

[16] Mr. McIntire's last day at UMC was February 28, 2014.

74

no litigation hold until April 15, 2103, eight months after the complaint was filed, and (3) UMC executives were not aware of their preservation obligations.

### D. UMC Executives Failed to Accept Responsibility for Ensuring that ESI was Preserved and Failed to Notify Key Custodians and IT Staff to Preserve, and Prevent Loss, or Destruction of Relevant, Responsive ESI

The record amply supports the special master's findings that UMC had no policy for issuing a litigation hold, and that no such hold was issued for the first eight months of this litigation until after Mr. Espinoza was deposed on April 8, 2013, and was asked about UMC's response to plaintiff's August 6, 2012 preservation letter. The special master accurately found that UMC executives were unaware of their preservation duties, ignored them altogether, or at best addressed them "in the hallway in passing." This quote came directly from Lawrence Barnard, who joined UMC in August 2012 as its COO. (Hr'g Tr. 27:5–9, ECF No. 189-4.) As COO, the CIO reported to him. (Tr. 27:11–13.) Barnard was asked whether he had any meetings with the CEO about this litigation and he responded, "If anything, it was like minutes. It wasn't extensive meetings. It was just 'hey, this is what's'—he's saying, 'This is what's going on.'" (Tr. 27:14–18.) Barnard was asked, "you don't recall when you communicated—" and before plaintiffs' counsel could finish the question Barnard responded:

> Answer: No. This would have been in a hallway in passing, someone saying, "We need to preserve based on this case," and me saying, "Ok, preserve what we need to preserve." . . .
>
> Question by Mr. Tostrud: Yes, when did that happen.
>
> Answer: I said if it did happen, it would have been in the hallway conversation saying that—someone saying that, "We have to preserve it for the case," and I saying, "Okay, preserve what we need to preserve."

(Tr. 30:25–31:14.)

It is also undisputed that UMC's prior and current counsel failed to conduct timely custodian interviews. Custodian interviews were not conducted until well into the special master proceedings when it became apparent they had not been done. The special master required the interviews to be conducted a second time because the initial custodian interviews conducted by counsel were inadequate.

UMC's CEO received plaintiffs' August 6, 2012 preservation letter, but did nothing to

direct appropriate department heads at UMC to preserve relevant ESI. Mr. Brannman could not recall receiving the preservation letter and averred he had no record of receiving it. Mr. Espinoza testified he did not receive the preservation notice and first saw it at his April 2013 deposition in this case. Former counsel provided a declaration indicating the law firm did not receive the initial preservation letter sent to Brannman. On April 8, 2013, Mr. Espinoza was deposed and during his deposition, Espinoza and counsel for UMC were provided with a copy of the August 6, 2012 preservation notice addressed to Brannman. It was not until April 15, 2013, eight months later, that Doug Spring notified former counsel for UMC, MPP, that an email instructing UMC managers and directors regarding the obligation to preserve and maintain documents, including ESI related to this case was distributed to staff.

At the direction of the special master, UMC's forensic computer examiner, Mr. Edmondson, conducted a search of UMC's records and proved that this testimony was patently false. Mr. Spring received an email from Patricia Kennedy, legal specialist with the Risk Management Department on August 20, 2012. (Kennedy email to Spring, R & R Ex. 22, part 6 of 7, p. 5 of 38, ECF No. 197.) The email related to this case as the subject line is "Small" and Kennedy stated, "Doug, here are the Small v. UMC documents." (*Id*.) Attached to the email were three PDF documents, one of which was plaintiffs' August 6, 2012 preservation letter to Mr. Brannman. (*Id*.; *see also* Edmondson Am. Decl. ¶ 25, ECF No. 192-2; Edmondson Decl. ¶ 18, ECF No. 216-24.) Spring received but ignored plaintiffs' August 6, 2012 preservation letter.

The special master's finding that UMC executives failed to accept responsibility for their legal duty to preserve is amply supported in the record. UMC executives and counsel failed to communicate with and provide adequate instructions to the department heads and IT personnel of repositories containing discoverable ESI to prevent the loss or destruction of potentially relevant ESI. Espinoza and Spring collected information for the DOL investigation. (Espinoza Decl. re: DOL Investigation, ECF No. 199-18.) Jackie Panzeri, UMC's Payroll Manager was not notified to preserve anything until two or three weeks before she testified in special master proceedings on May 6, 2014, nearly three months <u>after</u> the special master was appointed. (Hr'g Tr. 5:25–6:12, ECF No. 189-5.)

UMC failed to comply with its duty to preserve and did not even attempt to notify employees responsible for the preservation of documents and relevant repositories until the April 15, 2013 email sent out by Cindy Dwyer on Mr. Brannman's request to PatientServiceLeaders. There was absolutely no follow up by UMC executives involved in the process or by UMC's counsel to see that department personnel complied with the instruction to preserve and maintain documents relevant to this lawsuit.

UMC executives uniformly testified in their declarations and testimony before the special master that someone else was responsible for seeing that UMC complied with its preservation obligations. Brannman testified that to the best of his recollection, UMC preservation policies were handled by the Risk Management office in consultation with "the County." However, he did not have a specific recollection of what those preservation policies were. (Brannman Decl. ¶ 8, ECF No. 192.) To the best of his knowledge, Risk Management had responsibility for executing the preservation effort in this matter, but he did not recall being involved in preservation proceedings or in efforts in other lawsuits against UMC. (*Id.* ¶ 9.) He did not recall the risk manager reporting to him directly or indirectly about any preservation letters in this case. (*Id.* ¶ 10.)

John Espinoza testified at a special master hearing on April 22, 2014, that he was aware of a litigation hold sometime after November 2012. (Hr'g Tr. 54:1–2, ECF No. 189-4.) He was asked to explain what occurs when a preservation notice comes to UMC and testified that he should receive a copy, but did not always directly, and "we've had some problems before with regard to how information is communicated." (Tr. 54:18–19.) He testified the August 2012 preservation letter should have come through the Risk Management Department. The special master proved the preservation letter was received by Risk Management, but Ms. Phillips, UMC's Risk Manager, testified she could not locate it, and the UMC executives who the special master proved received it did nothing at all to notify appropriate personnel to preserve information relevant to this case.

Mr. Spring testified that he did not ever receive a preservation notice from anyone in 2012. (Hr'g Tr. 67:14–16, ECF No. 189-5.) The special master proved this testimony was patently false. The August 6, 2012 preservation letter was sent to Mr. Spring by Ms. Kennedy in Risk

Management on August 20, 2012. (Kennedy email to Spring, R & R Ex. 22, part 6 of 7, p. 5 of 38, ECF No. 197; Edmondson Am. Decl. ¶ 25, ECF No. 192-2.) Spring was asked whether in 2012 he was given a preservation notice or instructions by prior counsel to preserve information and he responded, "As I previously stated, I did not even know there was such a thing," and no preservation notice or instructions were given in 2012. (Hr'g Tr. 78:19–25, ECF No. 189-5.) However, UMC's prior counsel, Mr. Wieczorek attested he provided plaintiffs' November 6, 2012 preservation notice to Messrs. Espinoza and Spring on November 7, 2012, and met with both of them on November 14, 2012, to discuss preservation. (Wieczorek Decl. ¶¶ 5–6, ECF No. 198-1.) When Spring was asked what he did after receiving a preservation letter from Mr. Espinoza following Espinoza's deposition in April 2013, Mr. Spring responded that he drafted an email indicating that it was important to preserve all documents. (Hr'g Tr. 113:21–114:12, ECF No. 189-5.) However, Spring could not recall if he consulted with MPP at that point, or whether MPP helped him issuing a UMC-wide preservation notice. (Tr. 114:13–115:19.) Spring was asked whether prior to the time of his testimony if UMC had any formal process for preserving upon receipt of a litigation hold or litigation notice and testified, "Not that I'm aware of." (Tr. 119:5–10.) When asked who within UMC to the best of his knowledge was responsible for instructing Mr. Schaibley for collecting ESI, Spring responded, "My assumption would be our attorneys did that." (Tr. 119:18–25.)

There is no evidence in the record, and UMC does not suggest there is any, that current or former counsel gave instructions to UMC to suspend business as usual to prevent the destruction, deletion or modification of ESI responsive to plaintiffs' discovery requests. Although the court ordered UMC to produce documents responsive to plaintiffs' discovery requests on July 12, 2013, UMC executives, including Doug Spring, who was identified as the point of contact with former and current counsel took no steps to notify IT personnel and other key custodians of the need to preserve key ESI.

In status reports and hearings, the court was repeatedly told that counsel was working on carefully scheduling a time to download data from executive mobile devices ordered to be produced. Yet no effort was made to communicate with IT staff to see that this data was preserved

and *data on the devices of Brannman, Espinoza, and Mumford was deliberately wiped six months after the motion to compel was granted.* Ms. Kisner, UMC's IT Customer Service Manager, who supervised the communications and PBX staff and handled the day-to-day customer service issues with the Blackberries was not told, and did not learn of the need to preserve this data until January 21, 2014. By then it was too late. The data was wiped on some unknown date in January 2014 before the devices were scheduled to be downloaded.

In short, it is crystal clear that UMC executives failed to accept responsibility for ensuring that discoverable ESI was preserved and failed to notify key custodians and IT staff to take appropriate steps to see that discoverable ESI was not lost, destroyed, or modified. There is ample support in the record that UMC executives displayed a cavalier attitude about their preservation obligations addressing them in passing, and that UMC executives repeatedly took the position in declarations and testimony that responsibility for preservation was someone else's job. UMC executives' lack of understanding of the legal duty to preserve and cavalier attitude towards preservation is perhaps best illustrated by the fact that the key custodians whose ESI was collected in April and August of 2013, and the key IT personnel who collected their information as well as IT personnel responsible for seeing data was preserved, were not notified to preserve information relevant to this case until after the special master was appointed.

**E. UMC Failed to Disclose the Existence of Relevant ESI Repositories, Including Multiple Timekeeping Systems and the Q-Drive Until Late in the Special Master Proceedings**

The special master correctly found that current and former counsel failed to conduct timely custodian interviews to identify individuals with discoverable information and key repositories of discoverable ESI. In an Order (ECF No. 154) entered March 18, 2014, the special master directed UMC to create chain-of-custody paperwork before the April 4, 2014 hearing. He attached chain-of-custody forms to his order. UMC submitted chain-of-custody forms that were inadequate because they failed to record such important information as: (1) what sources UMC collected data from for each of the 27 custodians; (2) how they identified the ESI; (3) how they collected the ESI; (4) how ESI was preserved; and (5) what criteria were used to identify the ESI that was collected. (R & R 37 n.72, ECF No. 189). As a result, UMC was ordered to redo the forms after the special

master gave additional instructions. UMC objects to the special master's characterization that he had to provide UMC with a "step by step picture book showing how to properly collect and process ESI." (R & R 37 n.73.) However, it does not dispute that no effort to document the chain of custody for the ESI collection was prepared until after special master proceedings were initiated. Similarly, UMC does not dispute that the chain-of-custody forms provided to the special master were redone because they lacked critical information noted in the special master's R & R.

It is undisputed that multiple UMC time tracking databases were not disclosed until near the end of the special master's hearing process in August 2014. UMC's explanation for why this was not disclosed during Mr. Espinoza's testimony and special hearing testimony was that Espinoza did not use the alternative time tracking databases and therefore was not familiar with them, and had no duty to disclose them. This explanation illustrates UMC's failure to appreciate its legal duties, and supports the finding that UMC executives repeatedly displayed a cavalier attitude concerning the legal duty to preserve discoverable information. Moreover, the explanation is not credible. UMC concedes in its objection that Mr. Spring, Mr. Espinoza's "number two man" and the person responsible for contact with former and current UMC counsel, approved the CrimeStar and TeleTracking databases. It is undisputed that both of these databases were used by opt-in plaintiffs to report meal breaks. Mr. Gurrola's Declaration (ECF No. 199-13) establishes that Spring authorized Public Safety employees to use CrimeStar to track meal breaks after Spring was advised that UMC's new policy to track meal breaks, which was implemented after the DOL investigation, was not working for that department. Spring not only knew about and approved use of the databases, but he approved CrimeStar specifically to track meal breaks. Gurrola's declaration also establishes that UMC received feedback from employees in November 2012 staff meetings that the new system of using CrimeStar to track meal breaks was working. The court simply does not believe that Mr. Spring was not familiar enough with CrimeStar, which he authorized to keep track of meal breaks, to understand that this timekeeping system should have been disclosed.

1. UMC's Burden Shifting Argument in Defense of Non-Disclosure

In hearings before the court and in its objection to the special master's R & R, UMC has

repeatedly argued that its Kronos timekeeping system is the only repository of timekeeping evidence relevant and discoverable to plaintiffs' claims. This argument is based on UMC's contention that because it implemented a policy requiring employees to report missed meal breaks and/or uncompensated overtime, that UMC cannot be liable for uncompensated time under the FLSA if employees failed to follow that policy.

The Supreme Court has established a burden-shifting approach for proving an FLSA violation. Plaintiffs have the burden of proving by a preponderance of the evidence that they performed work for which they were not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). If an employer keeps accurate records, the employees can easily meet this burden of proof by obtaining the employer's records. *Id.* at 687. However, if the employer does not keep accurate records, even if the failure is the result of a bona fide mistake about whether the time is compensable, "having received the benefit of such work," the employer "cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Id.* at 688. If the employer has not kept accurate records, the employees meet their burden of proof by proving they actually performed work for which they were not compensated. The employee must produce:

> sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed, or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687–88.

UMC's Objection (ECF No. 222) to the special master's R & R asserts that automatic meal break deduction policies are legal and shift the burden to employees to report any missed meal breaks in order to be compensated. (Obj. 16 (citing *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 876–78 (6th Cir. 2012).) UMC claims that *White* directly follows the Ninth Circuit's holding in *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981), and district courts in this circuit follow *White*. The court disagrees.

/ / /

## 2. The Sixth Circuit's *White* Decision

The issue on appeal in *White* was whether a hospital knew or had reason to know it was not compensating a nurse for working during her meal breaks. 699 F.3d at 873. There, White, the plaintiff nurse, received a handbook during orientation explaining that certain hospital employees such as nurses would have meal breaks automatically deducted from their paychecks. If a nurse's meal break was missed or interrupted because of a work related reason, the nurse would be compensated for the time she worked during the meal break. Nurses were instructed to record all such time in an "exception log." White used the exception log at first and was compensated for the time she reported. Sometimes she would tell her supervisors or HR that she missed a meal break, but she did not tell them she was not compensated. She eventually stopped reporting the times when her meal break was interrupted. White also knew the hospital's procedure to report and correct payroll errors. However, she did not use this procedure to correct uncompensated meal break times because she felt it would be "an uphill battle."

*White* cited an earlier Sixth Circuit decision, which held that an automatic meal-deduction system is lawful under the FLSA. 699 F.3d at 873 (citing *Hill v. United States*, 751 F.2d 810 (6th Cir. 1984)). However, *White* also cited 29 C.F.R. § 785.11, which provides that where an employer knows or has reason to believe that an employee is continuing to work the time counts as compensable working time. *White* held that an employer was not liable under the FLSA when it establishes a system to report missed meal breaks and the employee fails to follow the established process, *unless* the employer (1) prevents employees from reporting overtime, or (2) is otherwise notified of the employees' unreported work. *Id.* at 876–77 (collecting cases).[17] White's FLSA

[17] *See, e.g.*, *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 356–57 (2d Cir. 2011) (employer did not allow the employee to report overtime); *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 283–84, 287–91 (2d Cir. 2008) (employer had "full knowledge" that its employees were working overtime and failed to compensate them); *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (employer prevented the employee from reporting overtime hours); *Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1131 (10th Cir. 2000) (dispute revolved around whether all scheduled "on-call" time for technicians could constitute overtime or only time when they were called into work); *Reich v. Dep't of Conservation & Natural Res.*, 28 F.3d 1076, 1083–84 (11th Cir. 1994) (employer had constructive knowledge when supervisors were "specifically instructed" to "closely monitor" hours to ensure compliance with the no overtime policy and when the employer knew that the monitoring was not being done based on a previous study); *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975) (with the employer's knowledge, the employee was never relieved for a meal break and always had to eat her meal while she worked); *Brennan v. Gen. Motors Acceptance Corp.*,

claims failed because she did not use the hospital's reasonable, established procedure. *Id*. at 877. There was no evidence the hospital discouraged employees from reporting time worked during meal breaks, or that the hospital was "otherwise notified that their employees were failing to report time worked during meal breaks." *Id.* When White used hospital's reporting system she was compensated, and when she failed to use that system she was not compensated. Thus, she could not recover damages under the FLSA.

The dissent in *White* argued that the majority's decision was contradicted by the record, labor regulations, and the FLSA cases discussed by the majority, including *Forrester*. The dissent believed that labor regulations and *Forrester* did not suggest "that an employer *with actual knowledge* of overtime can defeat its obligations by pointing to incomplete time-sheets." *Id*. at 882–83 ("There are no cases, on summary judgment or otherwise, where an employee's failure to report hours *actually known to be worked* by the employer defeats a claim under the FLSA."). The dissent asserted the record contained evidence from which a jury could find that the hospital had actual knowledge that White was working without compensation; thus, summary judgment on this basis was inappropriate. *Id*. at 878.

*White* explicitly rejected UMC's argument that an employer may shift the burden to employees because "[w]ork not requested but suffered or permitted is work time," under the FLSA. *Id*. at 873 (quoting 29 C.F.R. § 785.11). Labor regulations do not allow an employer to enact a policy of automatic deductions for meal breaks and then shift the burden onto the employee to ensure accurate reporting of hours or alleviate the employer's obligation to pay for time actually worked under the FLSA. Rather,

> [I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13.[18]  *White*'s holding did not relieve employers who know or have reason to

---

482 F.2d 825, 827 (5th Cir. 1973) (employer discouraged employees from reporting overtime); *Burry v. National Trailer Convoy, Inc.*, 338 F.2d 422, 425–27 (6th Cir. 1964) (employer knew the employee's time sheets were inaccurate).

[18]  *See also* Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, FLSA2007–1NA, at *1 (May 14,

know employees are working during their meal breaks from liability under the FLSA for not compensating employees for missed meal breaks or overtime.

### 3.   The Sixth Circuit's *Craig* Decision

In *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382 (6th Cir. 2016), the Sixth Circuit recently discussed *White* reiterating that the decision carves out two exceptions to the rule barring an employee from recovering for uncompensated work time for employers who (1) prevent employees from reporting overtime, or (2) otherwise know of unreported work.  823 F.3d at 389. In both instances, employers "are still on the hook for unpaid overtime." *Id.*  The Sixth Circuit adopted the "reasonable diligence" standard for determining whether an employer has constructive knowledge of unpaid overtime.  An employer has "reason to believe" or constructive knowledge of uncompensated time when the employer should have discovered it in the exercise of due diligence.  *Id.* at 388–89.  *Craig* reversed the trial court's grant of summary judgment in favor of an employer finding disputed issues of material fact concerning whether the employer had actual or constructive knowledge that the employee was working uncompensated overtime.  *Craig* held it was for the jury to decide whether the employee miscalculated or misreported her pay rate, whether the employer had a procedure in place for properly compensating overtime, and whether the employee was aware of the procedure.  *Id.* at 390.  Additionally, the Sixth Circuit held that even if the employee knew of and failed to comply with an established procedure for reporting overtime, it was for the jury to decide whether the employer had actual or constructive knowledge, that is otherwise knew, Craig was working overtime and not being compensated.  *Id.*

Moreover, as the Sixth Circuit recognized in *Craig*, even if an employer establishes a reasonable time reporting procedure of which employees are aware, an employee cannot "voluntarily opt out of her rights under the FLSA." *Id*. at 388.  The Supreme Court has foreclosed

2007) (implementation of automatic pay deduction for lunch breaks "does not violate the FLSA *so long as the employer* accurately records actual hours worked, including any work performed during the lunch period" (emphasis added)); Wage & Hour Div., U.S. Dep't of Labor, Opinion Letter, FLSA2008–7NA, at *1–2 (May 15, 2008) (an employer "must compensate the employee for all hours worked including the time worked during the missed meal period," even if the "employee fails to take a meal break and does not notify the manager" in direct violation of company policy); Wage & Hour Div., U.S. Dep't of Labor, Fact Sheet # 53, at *3 (July 2009) ("When choosing to automatically deduct 30-minutes per shift, the employer must ensure that the employees are receiving the full meal break.").

waiver arguments and as *Craig* noted, "frequently emphasized the nonwaivable nature of an individual employee's right . . . to overtime pay under the Act." *Id.* (quoting *Barrentine v. Arkansas-Best Freight Sys.*, *Inc.*, 450 U.S. 728, 740 (1981)). " 'FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate'." *Id.* (quoting *Barrentine*, 450 U.S. at 740). Therefore, an auto-deduction policy cannot operate as a waiver of an employer's FLSA obligations to pay for time actually worked or to ensure accurate reporting of hours.

### 4. The Ninth Circuit's *Forrester* Decision

The *White* court discussed multiple FLSA cases by sister circuits, including the Ninth Circuit's *Forrester* decision.[19] *Forrester* held that where an employer does not know and has no reason to know that an employee is working overtime *and* the employee prevents the employer from acquiring knowledge of the overtime, an employer does not violate the FLSA by failing to pay that overtime. 646 F.2d at 414. *Forrester* recognized that when an employer has no knowledge that an employee is working overtime, and the employee fails to notify the employer or deliberately prevents an employer from learning of the overtime, the employer's failure to pay overtime is not a violation of the FLSA. *Id.* However, *Forrester* also recognized that an "employer who knows or should have known that an employee is or was working overtime must comply with the FLSA. *Id.* An employer who knows or should know an employee is working uncompensated overtime "cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Id.* The Ninth Circuit reasoned:

---

[19] *See, e.g.*, *Hertz v. Woodbury County*, 566 F.3d 775, 783 (8th Cir. 2009) (denying police officers' FLSA claim because it was unreasonable to require County to "weed through non-payroll CAD records" to determine whether its employees worked overtime, especially when plaintiffs regularly used the County's established procedure overtime claims); *Newton v. City of Henderson*, 47 F.3d 746, 749–50 (5th Cir. 1995) (holding that access to information about an officer's Task Force activities did not constitute constructive knowledge that he was working overtime since he was explicitly ordered not to work overtime and he ignored the city's "specific procedures" for overtime payments.) In an unpublished opinion cited by the *White* court, the Sixth Circuit also held that an "employee bears some responsibility for the proper implementation of the FLSA's overtime provisions." *Wood v. Mid-America Mgmt. Corp.*, 192 Fed. App'x 378, 381 (6th Cir. 2006). The court reasoned that an "employer cannot satisfy an obligation that it has no reason to think exists. And an employee cannot undermine his employer's efforts to comply with the FLSA by consciously omitting overtime hours for which he knew he could be paid." *Id.*

An employer must have an opportunity to comply with the provisions of the FLSA. This is not to say that an employer may escape responsibility by negligently maintaining records required by the FLSA, or by deliberately turning its back on a situation. However, *where the acts of an employee prevent an employer from acquiring knowledge*, here of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work in violation of § 207(a).

*Id*. at 414–15 (emphasis added).

The Ninth Circuit affirmed the district court's grant of summary judgment in that case because the employee, Forrester, knew that overtime was supposed to be reported on timesheets, and the employer regularly paid reported overtime. Forrester himself had been paid for all overtime work he reported and testified that if he had reported the additional ten hours per week he was seeking in the lawsuit, he would have been paid. Under those circumstances, the Ninth Circuit agreed with the district court that there was no genuine issue of material fact regarding whether the employer knew or should have known that Forrester was uncompensated for overtime work he performed. The Ninth Circuit found that an employer must have an opportunity to comply with the provisions of the FLSA adding that an employer may not "escape responsibility by negligently maintaining records required by the FLSA, or by deliberately turning its back on a situation." *Id.* at 414.

UMC asserts that *White* "directly follows" the Ninth Circuit's holding in *Forrester*. While UMC is correct that *White* cited *Forrester*, the Ninth Circuit has not shifted the burden to employees to report missed meal breaks where employers have automatic meal break deduction policies and corresponding policies for employees to report missed breaks. An employer who knows or has reason to know, *i.e.*, constructive knowledge, its employees are working and not being compensated for all time worked is "still on the hook" to compensate its employees for that time under the FLSA.

UMC cited a number of district court decisions in the Ninth Circuit asserting that they followed *White's* burden shifting approach. (Obj. 16, ECF No. 222.[20]) However, none of the cited

[20] *Williams v. U.S. Bank Nat. Assn.*, 290 F.R.D. 600, 605 & n.5 (E.D. Cal. 2013) (applying *White's* two-step process for certifying an FLSA collective action class); *Benedict v. Hewlett-Packard Co.*, 2014 U.S. Dist. LEXIS 18594 (N.D. Cal. Feb. 13, 2014); *Syed v. M-I, LLC*, 2014 U.S. Dist. LEXIS 104820 (E.D. Cal. July 30, 2014); *Lillehagen v. Alorica, Inc.*, 2014 U.S. Dist. LEXIS 67963 (C.D. Cal. May 15, 2014); *McKeen-Chaplin v. Provident Sav. Bank*, 2013 U.S. Dist. LEXIS 113654 (E.D. Cal. Aug. 9, 2013).

cases discuss *White*'s holding regarding an employer's actual or constructive knowledge of uncompensated overtime or an employee's failure to follow established, reasonable procedures for reporting hours worked. Rather, the district courts citing *White* have used the case as an example of a circuit adopting a two-step approach to FLSA class certification. One of the decisions UMC cites directly contradicts its position.

### 5. The *Lillehagen* Decision

In *Lillehagen v. Alorica, Inc.*, 2014 WL 6989230, at *17–20 (C.D. Cal. Dec. 10, 2014), District Judge David Carter agreed with the plaintiffs that requiring employers to conduct a reasonable inquiry and treating inquiry notice as constructive knowledge was more faithful to the spirit of the FLSA. Judge Carter discussed *White*, *Forrester*, and decisions in several other circuits at length. He observed that "the Fifth, Sixth, Eighth, and Eleventh Circuits have all built upon the Ninth Circuit's *Forrester* decision in determining when an employer has actual or constructive knowledge and what role an employee's failure to notify the employer plays in that inquiry." *Id*. at *19. But their standards diverge considerably. The Fifth and Sixth Circuit standards "protect the employer from liability when employees fail to use the employer's reasonable time reporting procedures and impose no duty on the employer to investigate whether employees are being compensated for all the time worked even if the employer has access to the information." *Id*. The Eleventh Circuit requires employers to conduct a reasonable inquiry and treats inquiry notice as constructive knowledge.

Not surprisingly, the plaintiffs in *Lillehagen* argued that the Eleventh Circuit's approach was more faithful to the spirit of FLSA, while the defendant employer urged Judge Carter to apply the Fifth and Sixth Circuit's standards. Judge Carter agreed with the plaintiffs. Applying *Forrester*, he found that the employee's failure to notify the employer only becomes an issue after it is established that the employer had no knowledge and no reason to know. *Id*. Citing *Forrester*, 646 F.2d at 414, Judge Carter held that an employer does not violate the FLSA if the employer had no knowledge or reason to know *and* the employee fails to notify the employer or otherwise prevents the employer from finding out about the uncompensated work. He also found that inquiry notice is constructive notice for FLSA purposes. He rejected the employer's argument that an

employee's failure to use the employer's time reporting procedures or otherwise notify the employer was dispositive evidence that the employer did not have knowledge. He reasoned that when the employer "suffers" or "permits" the employee to work, the employer cannot stand idly by when it knows or should know that employees are working without proper compensation, even if the employee does not make a claim for compensation. He found:

> Thus, employers who have some reason to believe that the employees are working without compensation must take action to ensure that employees are being properly compensated. The employer cannot "sit back" and assume that employees will bring each unaccounted-for hour to its attention, even if the employer has a general policy that employees should report all the hours they work. The prohibition against "sitting back" or "standing idly by" requires the employer to take reasonable steps to investigate the suspected non-compensation, to ensure that the employee is paid for the work that has already occurred, and to stop future non-payment for work or compensable breaks from occurring.

*Lillehagen*, 2014 WL 6989230, at *19. Applying this standard, Judge Carter held that the employer could be fairly charged with actual or at least constructive knowledge of unreported work time and that customer service representatives were not compensated for that time based on the employer's maintenance of its timekeeping and payroll records. *Id*. at *20.

The court agrees that the Eleventh Circuit's approach applied by *Lillehagen* is more consistent with the broad remedial policies of the FLSA. An automatic meal deduction policy coupled with corresponding policies for employees to report missed meal breaks of which employees are adequately informed may be lawful. However, the employee's failure to notify an employer of uncompensated time only becomes an issue if it is established that the employer had no knowledge or reason to know the employee was working and not being compensated. Therefore, the court rejects UMC's arguments that the Ninth Circuit and district court decisions in this circuit have found that employers who have established procedures to report uncompensated meal breaks may shift the entire burden for reporting missed time to the employee. The court also rejects UMC's arguments that it is not liable for violating the FLSA merely because it implemented a reasonable procedure for reporting missed time, and informed employees of the procedure. Finally, the court rejects UCM's arguments that because Kronos is the only timekeeping system used to compensate UMC employees, other timekeeping systems and timekeeping records were not required to be disclosed or produced in discovery. These records are clearly highly relevant

and discoverable on the issue of whether UMC had actual or constructive notice that employees were missing meal breaks and working overtime without being compensated.

**F. UMC Modified, Lost, Deleted and/or Destroyed ESI Responsive to Plaintiffs' Discovery Requests**

After the court granted plaintiffs' motion to compel UMC produced paper documents but struggled to produce ESI responsive to plaintiffs' discovery requests in compliance with the court's order and the stipulated ESI protocol drafted by MPP. At the August 15, 2013 status and dispute resolution hearing counsel for UMC advised the court that UMC had not met its own August 2, 2013 proposed deadline for initiating ESI searches and wanted to negotiate the list of relevant custodians and search terms with plaintiffs' counsel. (*See, supra*, Section II.D.3.) Leading up to the hearing plaintiffs' counsel had conducted a meet and confer with UMC's counsel, UMC's internal IT people and UMC's outside vendor to identify sources of relevant ESI. The parties had identified servers, PC's in individuals' offices, and PDAs/cell phones of relevant custodians whose ESI needed to be searched and collected. Plaintiffs wanted to make sure that UMC was not merely searching for ESI from "some mainframe server." Counsel for UMC acknowledged that although plaintiffs' counsel had provided plaintiffs' list of custodians and terms shortly after the July hearing, counsel for UMC did not respond until July 24, 2013. UMC's counsel argued to the court that plaintiffs' list would take too much time and expense to search, collect and produce. The court proposed an iterative process to prioritize the search of ESI by an agreement to identify five key custodians and ten key search terms. After an extended discussion the court directed UMC to initiate ESI searches for five custodians and ten search terms that the parties were to agree on within the next couple of days, and set a follow up status and dispute resolution conference for September 24, 2013.

The parties' September 19, 2013 Joint Status Report (ECF No. 126) advised the court that plaintiffs had initially produced a list of 21 ESI custodians and 68 search terms for which they were requesting a search of ESI on UMC's servers, certain personal computers, and certain personal digital assistance devices. UMC objected to the number of custodians and search terms. However, the parties agreed UMC would conduct a preliminary search for five custodians and 10

89

search terms. The five custodians were Brian Brannman, John Espinoza, Doug Spring, Jackie Panzeri, and James Mumford. The 10 search terms were: (1) missed meal break!; (2) compensate!; (3) Department of Labor or DOL; (4) lunch!; (5) FLSA or "Fair Labor Standards Act"; (6) Kronos; (7) time report; (8) correction form; (9) interrupt!; and (10) meal/lunch policy. UMC advised the court in the joint status report that the search for these five custodians and ten search terms had been conducted by UMC's ESI contractor. The ESI contractor conducted a search of the five individuals' electronic profiles on the UMC servers, individual custodian's hard drives/personal computers, and PDAs or cellphones. The search resulted in 5,000,000 individual hits. Counsel for UMC estimated that if all of this electronic information was printed out, it would require between 500 and 2,000 banker's boxes of documents[21] and argued that the time and expense of producing these search results was overwhelming. UMC's ESI contractor recommended a number of alternatives to narrow the field.

Plaintiffs responded that UMC had provided virtually no ESI data to date, and that UMC's claim that the initial ESI search produced an overwhelming number of documents was misleading. Plaintiffs pointed out that after UMC's ESI vendor de-duplicated the emails and attachments to those emails, the volume of the initial search results would likely be substantially reduced, and that the resulting volume of data that UMC would be producing is not "overwhelming" relative to other class and collective action lawsuits of this size. However, plaintiffs agreed to meet and confer regarding the proposal to conduct Boolean searches. Plaintiffs urged the court to compel UMC to produce ESI documents on a rolling basis and to consider requiring UMC to conduct further custodian searches.

By the September 24, 2013 hearing UMC advised the court that counsel had not conferred with its ESI vendor before agreeing to the five custodians and ten search terms, and that the search had resulted in about 70 gigs of raw data which for some unknown reason UMC had printed out in hard copy form. Counsel for UMC told the court that the volume of ESI collected was not the problem preventing UMC from producing responsive ESI. (*See, supra*, Section II.D.4.) Rather,

---

[21] At the next hearing on September 24, 2013, UMC's counsel represented the volume of ESI would fill 2,100 bankers boxes if printed.

the problem was counsel's ability to review it for information responsive to plaintiffs' discovery requests. Plaintiffs' counsel agreed to review the entire collection, and to have their own consultants "de-dup" the ESI as counsel for UMC represented its own consultant could not do so without changing metadata and content. UMC agreed to produce the entire collection to plaintiffs' counsel in electronic format shifting the burden to plaintiffs to review the ESI for information responsive to their discovery requests. UMC estimated that the cost of transferring the data collected to a flash drive would be approximately $100.

Thus, long before the special master was appointed plaintiffs' counsel had agreed to review huge amounts of ESI collected from the various repositories and custodians without requiring UMC to incur the burden or expense of reviewing the data for information responsive to plaintiffs' discovery requests. Despite this, UMC still failed to disclose the existence of repositories of relevant ESI, and failed produce useable ESI from even the five initial key custodians using the ten search terms the parties agreed upon for the initial search and production.

UMC does not dispute the special master's finding that UMC did not preserve or collect ESI on the shared Q-Drive until April 2014. When the special master directed that UMC recover and restore a December 2013 Q-Drive snapshot, it was discovered that UMC did not have any backups going further back than December 2013 for the Q-Drive. The special master ordered UMC to produce a spreadsheet of all the folders and subfolders that seven key custodians could access as of April 14, 2014. Dean Schaibley prepared an August 1, 2014 amended declaration and spreadsheet listing the network file shares to which the seven high priority custodians had access. (R & R Ex. 17, ECF No. 191-10.) The spreadsheet was created on May 9, 2014, and reviewed by the special master who determined there was a substantial amount of ESI responsive to plaintiffs' discovery requests on the Q-Drive. The special master identified more than 50 folders with the words "DOL," "Small," "labor," and "payroll." This includes a file labeled "Q:\Department\Payroll\PAYWORK\Department of Labor Audits\Ready for Jackie\Completed ot entd & sim\Ready for DOL."

The special master then had Mr. Edmondson, UMC's forensic computer consultant, analyze the Q-Drive from December 14, 2013, against the Q-Drive from April 4, 2014. (Q-Drive

File Comparison Analysis, R & R 44, ECF No. 199-16.)  Mr. Edmondson created a report that contained the number of files that were modified or deleted between the oldest existing backup of the Q-Drive from December 14, 2013, and Mr. Schaibley's April 4, 2014 collection four months later.  Again, the report that was created was limited to the folders the seven key custodians were able to access on the Q-Drive.

UMC does not dispute that Mr. Edmondson's report showed that over the 116 days between the December 2013 Q-Drive backup and collection, there were a total of 8,969 Q-Drive files in the shared folders of the seven high priority custodians that were modified or deleted.  This included 6,614 files deleted, 1,425 files modified, and 930 files migrated or moved.  From the data obtained over this 116-day period, the special master extrapolated the numbers over the 450-day-plus period between service of plaintiffs' complaint, and the December 13, 2013 Q-Drive backup to estimate the number of files lost, modified, or moved.  By doing the math, he roughly estimated 37,731 files were lost, modified, migrated, or moved over this 450-day period.  This included 27,824 files deleted, 5,994 files modified, and 3,912 files moved or migrated.

A review of Mr. Edmondson's report, Mr. Schaibley's declaration, and supporting exhibits amply support the special master's finding that the Q-Drive was a key ESI repository.  As indicated, Ms. Panzeri disclosed its existence in testimony before the special master.  It was where she kept information she was directed to collect and produce to Mr. Espinoza and Mr. Spring responsive to the DOL investigation of uncompensated meal break time.  The special master concluded, and UMC does not dispute, that documents deleted or modified between August 7, 2012, when plaintiffs served their complaint, and the December 2013 backup, are likely irretrievably lost.  The special master found that the deleted files included human resources, corporate compliance, employee grievances, and payroll related files.  He listed three examples of deleted files: (1) "\\Department\HR\HRCOMMON\Labor\Grievance Logs\2013 Grievance Log\Grievance logs (active.)doc"; (2) "SAP PAYROLL PROCESSING new KRONOS jf.xlsx"; and (3) \\Department\HR\...\Labor\corporate compliance.amdcmt.xls. (R & R 51 (citing Q-Drive File Comparison Analysis, ECF No. 199-16).)

It is also undisputed that UMC deleted and destroyed text messages on the Blackberry

92

devices of UMC custodians Brannman, Espinoza, and Mumford after the court ordered the data produced, and after the court established a January 31, 2014 deadline for their production. The deadline was set at a status and dispute hearing on January 21, 2014 because although production of the texts was discussed at several prior hearings UMC had still not downloaded the data. Moreover, the court had detailed discussions with counsel for UMC in at least two prior hearings about making sure that the appropriate IT personnel were consulted to ensure the data was properly retrieved and not spoliated. (*See, e.g., supra*, Section II.D.5 & 6.)

Counsel for UMC, Cayla Witty, sent a letter to plaintiffs enclosing what purported to be UMC's production of text data from these Blackberry devices on January 31, 2014. The letter stated "Please find enclosed a CD-R disk production of Excel files containing the text message data extracted from UMC-issued Blackberry devices on custodians Brian Brannman, John Espinoza, and James Mumford. This constitutes all of the text message information contained on the devices." (Witty letter to Plaintiffs' Counsel, R & R Ex. 47, ECF No. 199-19.)

In the parties' February 7, 2014 Joint Status Report (ECF No. 145), counsel for plaintiffs pointed out that the Blackberry text data UMC produced contained only roughly one month of text message data. UMC told the court in the joint status report that it produced all the text message data that could be acquired from the UMC-issued devices of Brannman, Spring, and Mumford. (*Id.* 10:2–3.) Counsel for UMC claimed:

> the production was extremely limited due to the lack of storage space on the Blackberry devices each custodian possessed. Not ignoring the preservation notices from the past, UMC acted in accordance with their understanding to preserve relevant data . . . UMC officials understood they were not to delete text messages, and this data would be collected directly from their devices. It was the data directly from the devices that was produced.

(*Id.* 10:4–11.)

UMC's "storage space" explanation proved patently false. As indicated, the devices were intentionally wiped just prior to UMC's production of mobile phone data on January 31, 2014. The special master issued a subpoena for the phone records from UMC's mobile provider, Sprint. Sprint produced 914 pages of records in June 2014 related to twelve individuals, a number of whom were identified as custodians of relevant ESI in this case. Those relevant custodians

included Mumford, Brannman, Espinoza, Spring, and Stephanie Merrill. The Sprint report revealed that 26,374 text messages identified by Sprint had been sent or received since November 19, 2012. UMC had produced only 64 text messages to the plaintiffs. Thus, UMC destroyed 2,478 text messages of James Mumford, 687 text messages of Brian Brannman, 463 text messages of John Espinoza, 753 text messages of Doug Spring, and 2,079 text messages of Stephanie Merrill.

The special master correctly found that plaintiffs' counsel requested that UMC preserve ESI on local custodians' computers at a status conference on August 15, 2013. However, data from individual custodians' local computers was not collected from the work computers used by 24 of the 27 custodians from whom plaintiffs sought ESI for more than 600 days after plaintiffs' complaint was filed. Key custodians Brannman, Espinoza, and Mumford provided custodian interviews indicating that they each used desktop computers on a daily basis. All three of these individuals indicated they saved documents in personal folders on their desktops. The special master found, and again UMC does not dispute, that there is no backup of the data on the computers used by these key custodians.

UMC argues in its' reply that just because these executives used their computers for work does not mean they contained information relevant to this lawsuit or plaintiffs' discovery requests. However, Brannman, Espinoza and Mumford were three of the five key custodians identified for the first ESI search using the ten agreed upon search terms. UMC told the court in the September 19, 2013 joint status report and at the September 24, 2013 hearing that the search for all five custodians using the ten terms resulted 5,000,000 hits and the collection of 70 gigs of raw data, or 2,100 boxes of hard copies UMC had printed out. These are key players. The only logical conclusion from the vast amount of data collected by UMC during the first phase ESI collection using search terms unquestionably relevant to the parties claims and defenses is that they also had information relevant to this case on their personal computers and devices.

Key custodians did not even preserve the August 2012 preservation letters in this case the special master proved they received. Espinoza and Spring did not preserve the November 2012 preservation letter prior counsel for UMC, Mr. Wieczorek, attested he forwarded to them before meeting with Espinoza, Spring and UMC IT personnel regarding UMC's initial ESI collection in

this case. The court has no difficulty concluding evidence relevant to plaintiffs' discovery requests that the court compelled UMC to produce was lost from key custodians' personal computers when these key custodians who were in charge of this case did not even preserve the preservation letters they denied receiving, but undeniably received.

The special master correctly found that UMC's failure to preserve documents on the personal computers of key custodians identified by the plaintiffs likely resulted in the destruction of ESI responsive to plaintiffs' discovery requests.

**G. UMC's Failure to Comply with its Legal Duty to Preserve, Failure to Put in Place a Timely Litigation Hold, Failure to Comply with Multiple Court Orders to Preserve and Produce Responsive ESI, and Loss and Destruction of Responsive ESI (1) Necessitated the Appointment of a Special Master, (2) Caused Substantial Delay of these Proceedings, and (3) Caused Plaintiffs to Incur Needless Monetary Expenses**

None of status and dispute resolution conferences the court conducted between July 12, 2013 and the appointment of the special master in March 2014 resolved the multiple discovery and ESI production failures. The vast majority of the time spent in these hearings were devoted to UMC's ESI problems. Plaintiffs and their consultants expended unnecessary time and expense attempting to resolve, diagnose and remediate the problems that ultimately resulted in the appointment of the special master. UMC does not dispute this, but asks the court to limit sanctions to an adverse inference instruction and monetary sanctions in the form of any additional costs and fees plaintiffs incurred before appointment of the special master. UMC argues this would be fair because the special master resolved most of the problems, and UMC paid his costs and fees. The court agrees the special master resolved many problems, but disagrees that monetary sanctions should not be imposed for plaintiffs' costs and fees in participating in special master proceedings.

UMC did not object to the appointment of the special master, to any of his orders, or to his costs and fees. Plaintiffs would not have been required to participate in special master proceedings if UMC had simply taken reasonable steps to comply with its discovery obligations and legal duty to preserve ESI relevant to the parties' claims and defenses.

Special master proceedings outlined in this order make it clear that UMC's own IT personnel, and in particular, Mr. Schaibley had the knowledge and expertise needed to inform and

assist counsel in the preservation, collection, and production of responsive ESI. Former counsel consulted and worked with Mr. Schaibley in the collection of ESI from key custodians, yet no one informed Mr. Schaibley of the need to preserve until after the special master was appointed. Moreover, current counsel and their ESI consultants did not confer with prior counsel and their ESI consultants or even the UMC personnel involved in the collection. As a result, current counsel incorrectly represented to the court and opposing counsel at the July 12, 2013 hearing that the client "didn't really have any real understanding" of what the prior firm did or what the data collection they were involved in with UMC's own IT personnel entailed. Current counsel represented that the prior collection was "worthless", and as a result they had to start over. However,much, if not most of the confusion and technical problems could have and should have been resolved by UMC and its counsel by simply consulting their own highly specialized and knowledgeable IT staff, and prior counsel. When finally asked by the special master Mr. Schaibley was able to explain exactly what was collected and from what sources. Under the circumstances it would be inequitable to force plaintiffs to pay for costs and fees that would not have been incurred if UMC had taken reasonable steps to preserve and produce responsive ESI.

### H. The Special Master Correctly Concluded UMC Repeatedly Misrepresented the Completeness of its Production of Documents Produced to DOL; However, UMC Was Not Ordered to Produce Kronos Payroll Data in Spreadsheet Format

The special master found that UMC repeatedly misrepresented its ability to produce summary spreadsheets via Kronos documents and the completeness of its production of documents produced to the DOL. Specifically, the special master found UMC repeatedly asserted it could not produce Kronos timesheet data in Excel spreadsheet format, when it had previously and easily done so during the DOL investigation. The court agrees that there is ample support in the record for the special master's finding that UMC misrepresented the completeness of its production of documents produced to the DOL. However, UMC is correct that in hearings before the court prior to the appointment of the special master, the court did not compel UMC to produce Kronos payroll data is spreadsheet format.

UMC steadfastly represented that it had turned over all documents produced to the DOL during its investigation to the court, to plaintiffs' counsel and to the special master. These

representations were proven to be manifestly false during special master proceedings when the special master elicited testimony from UMC Payroll Manager Jackie Panzeri that she had payroll spreadsheets stored on her Q-Drive that were provided to the DOL and no one had ever asked her for them. The DOL timesheet issue was again raised during the May 29, 2014 special master hearing. (*See* Hr'g Tr., Pls.' Resp. Ex. T, ECF No. 216-20.) Ms. Witty referred to the late discovery of a spreadsheet of Kronos payroll information that was provided to the DOL as an unfortunate communication issue. (Tr. 69–70.) The plaintiffs were repeatedly told that UMC did not have any additional spreadsheets of payroll information relevant to the uncompensated time at issue in the DOL investigation. During the May 29, 2014 special master hearing, it was disclosed that UMC had gone back and collected the folder on the payroll Q-Drive which Ms. Panzeri had access to, and UMC had located spreadsheets that were produced earlier in the DOL investigation that had not yet been produced to the plaintiffs despite counsel's earlier representations. These spreadsheets were responsive to plaintiffs' discovery requests which the court compelled UMC to produce in July 2013. Almost two years later, they had still not been produced to the plaintiffs, and UMC's counsel had never even asked Ms. Panzeri, the person responsible for collecting the information, about them.

However, UMC is correct that in hearings before the court prior to the special master's appointment, the court did not compel UMC to produce Kronos payroll data in spreadsheet format. Plaintiffs' request to produce payroll data in spreadsheet format was addressed in at least two status and dispute resolution conferences before the appointment of the special master. In the September 19, 2014 Joint Status Report (ECF No. 126), plaintiffs argued that they had requested payroll data from Kronos and SAP in spreadsheet format beginning in early July 2013. Plaintiffs argued that it was possible to use the Kronos 6.0 timekeeping software used by UMC to generate a report in spreadsheet format for timekeeping of payroll data. Excerpts from the Kronos 6.0 reference guide were attached as Exhibit 1 to the joint status report. It outlined specific and detailed directions on generating reports, including in Excel spreadsheet format. Plaintiffs claimed the guide instructions showed a simple step-by-step process for producing information in the format plaintiffs had been requesting for months.

UMC stated its position in the joint status report that it had produced and continued to produce relevant timekeeping and payroll data responsive to plaintiffs' discovery requests. UMC's counsel represented that during his deposition, Mr. Espinoza referred to a spreadsheet that UMC generated by manually inputting information requested by the DOL. UMC offered to provide a witness to testify to the "actual functionality of" UMC's Kronos system and to discuss the possibility of cost-shifting for manual data entry and subsequent report generation if required. However, UMC insisted that it was providing Kronos timekeeping and payroll data in the form it was maintained in UMC's regular course of business. UMC did not regularly store this data in spreadsheet form, and UMC argued it would be unduly burdensome to require UMC to produce already-disclosed data and information in a format to accommodate plaintiffs' access without shifting the cost of that additional work to the plaintiffs.

The court accepted UMC's arguments that the data was not kept in spreadsheet format in UMC's ordinary course of business. (Hr'g Tr. 32:2–33:11, Aug. 15, 2013, ECF No. 131; *see also, supra*, Section II.D.3.) Counsel for UMC advised the court that Mr. Espinoza testified there was a report that could be run and reviewed in Excel. However, it was not kept that way in the ordinary course of business, and it would require UMC to run special reports to produce it in spreadsheet format. Based on these representations, the court did not compel UMC to create Kronos payroll data in spreadsheet format. It is clear Espinoza reviewed data collected for the DOL investigation in spreadsheet format, undoubtedly because it was more convenient, and more easily understood. The court is persuaded after reviewing the record of special master proceedings that UMC did not keep Kronos payroll data in spreadsheet format in its normal course of business. UMC and its counsel may have exaggerated the difficulty of converting the data to spreadsheet format, but did not misrepresent that the data was produced as it was kept in the ordinary course of business.

UMC made additional misrepresentations to the court and opposing counsel about its ESI capabilities that the special master did not catch. For example, UMC's counsel told the court at hearings prior to the special master's appointment that UMC was unable to de-duplicate its ESI collection. However, the declaration of Craig Renard of LDG, retained by UMC's prior counsel, indicates that LDG began unpacking and de-duplicating the ESI it collected on April 19, 2013.

(Renard Decl. ¶ 10, ECF No. 199-8.) These de-duplication efforts began just before LDG was terminated. (*Id.*) To the best of Mr. Renard's recollection, he received a call from an LBBS attorney, UMC's current counsel, informing Renard that LBBS did not need the data he collected. (*Id.* ¶ 13.) Because of this conversation with LBBS, Renard decided to hold onto the UMC ESI data for an additional 90 days, at which time the data was destroyed. (*Id.* ¶ 14.)

As pointed out elsewhere in this order current counsel for UMC also told the court that the client had no real understanding of what ESI was collected by prior counsel and their consultants. This representation was patently false. Mr. Schaibley provided a declaration that identified precisely what was collected. While LBBS and upper level UMC executives may not have had a detailed understanding of what LDG collected at the request of MPP, UMC personnel involved in the process certainly were. It was LDG who initially worked with UMC's McKinley, Schaibley, and Connie Sadler to collect data from the initial 26 custodians. Thus, the court simply does not accept current counsel for UMC's representations that "the client" had no real understanding of the ESI collection efforts made on its behalf by prior counsel and their consultants.

## VII. ANALYSIS AND DECISION

There is no question UMC failed to implement a timely litigation hold, and failed to communicate its legal preservation duties to key custodians of discoverable evidence. There is no question that UMC failed to preserve discoverable ESI. There is no question data was lost or destroyed as a result. There is no question sanctions are warranted. UMC concedes they are. The only question is what sanctions are appropriate and proportional for the violations. The special master found UMC spoliated ESI responsive to plaintiffs' discovery requests. The court agrees. The special master recommended a wide range of dispositive, evidentiary, and monetary sanctions. Plaintiffs urge the court to adopt his recommendations in their entirety. UMC urges the court to impose lesser sanctions in the form of an adverse inference instruction and monetary sanctions for the increased cost plaintiffs and their consultants incurred before the special master was appointed.

For the reasons explained below, the court finds the sanctions recommended by the special master are too harsh, and inconsistent with evolving federal law on spoliation of ESI. The court finds lesser sanctions are appropriate and proportional for UMC's multiple violations of its legal

duties, and the court's orders. The court finds UMC should be sanctioned in the form of an instruction to the jury that the court has found UMC failed to comply with its legal duty to preserve discoverable information, failed to comply with its discovery obligations, and failed to comply with a number of the court's orders. The instruction will provide that these failures resulted in the loss or destruction of some ESI relevant to the parties' claims and defenses and responsive to plaintiffs' discovery requests, and that the jury may consider these findings with all other evidence in the case for whatever value it deems appropriate.

The court will also impose substantial monetary sanctions against UMC in the form of reasonable costs and attorneys' fees unnecessarily incurred by plaintiffs, including costs incurred for plaintiffs' ESI consultants in connection with (1) filing the May 2013 motion to compel; (2) efforts to obtain compliance with the order compelling UMC to produce information responsive to the discovery requests in dispute; (3) attempts to identify and remedy UMC's deficient ESI productions; and (4) cost of participating in special master proceedings.

**A. Spoliation of Evidence**

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech.*, *Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320 (9th Cir. 2011).

The Ninth Circuit has held that a party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business. *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009) (no indication that evidence destroyed with knowledge that it was relevant to litigation) (citing *Kitsap Physicians Serv.*, 314 F.3d at 1001–02 (no spoliation where evidence destroyed in normal course of business and no indication that relevant to anticipated litigation)); *Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 720 (9th Cir. 2005) (same).

/ / /

### B. The Duty to Preserve

A party's duty to preserve evidence begins when litigation is "pending or reasonably foreseeable." *Micron Tech.*, 645 F.3d at 1320. The mere existence of a potential claim or the distant possibility of litigation is not sufficient to trigger a duty to preserve. *Id.* Once a party is on notice of a potential claim, it is under a duty to preserve evidence which it knows, or reasonably should know, is relevant to the claim or potential litigation. *In re Napster*, *Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) (citing *Nat'l Assoc. of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556–57 (N.D. Cal. 1987) (stating "[a]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action")). Litigation need not be "imminent or probable" to be reasonably foreseeable and "the proper standard for determining when the duty to preserve documents attaches is the flexible one of reasonably foreseeable litigation." *Micron Tech.*, 645 F.3d at 1320. The duty to preserve also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation. *In re Napster*, 462 F. Supp. 2d at 1068 (duty to preserve begins when a party should have known the evidence may be relevant to future litigation).

A party must preserve evidence it knows or should know is relevant to a claim or defense of any party. 7-37 *Moore's Federal Practice–Civil* § 37.120. Courts apply an objective standard to determine whether a party's duty to preserve is "reasonably foreseeable." *Apple Inc. v. Samsung Electronics Co.*, *Ltd.*, 881 F. Supp. 2d 1132, 1145 (N.D. Cal. 2012) (citing *Micron Tech.*, 645 F.3d at 1320). The Ninth Circuit reviews the district court's factual finding of when litigation was reasonably foreseeable for clear error. *Micron Tech.*, 645 F.3d at 1321.

The court finds UMC was on notice and had a legal duty to preserve documents and ESI relevant to this litigation no later than August 6, 2012, when plaintiffs' counsel sent UMC's CEO Brannman the preservation letter putting UMC on notice of its "duty to preserve all electronic data that is relevant to this litigation matter" and duty to "take affirmative measures to preserve potential evidence that might otherwise be destroyed in the course of normal business." (R & R Ex. 22, part 7 of 7, p. 4–7 of 25, ECF No. 198.) Arguably, UMC was on notice of the potential for litigation months earlier when the DOL initiated its investigation in April 2012 into claims made by hourly

employees in the admitting department that UMC was not compensating them for missed meal breaks, and was not keeping records documenting actual time worked by employees as required by the FLSA.

The DOL investigation of uncompensated meal breaks covered the period between April 1, 2010 and March 30, 2012. (*See* DOL Letter to Pls.' Counsel re: FOIA Request, Small000003–4, ECF No. 216-8.) The DOL found UMC "violated the recordkeeping section by not keeping accurate records of hours worked for all employees due to the fact that employees were not taking lunch breaks but it was automatically deducted in the pay records." (*Id.* Small000006.) On September 26, 2012 John Espinoza, UMC's Chief HR Officer, sent a letter to the DOL investigator acknowledging, among other things:

> It is true that the timekeeping system for UMC employees requires them to clock in at the beginning of their shift and clock out at the conclusion of their shift. Employees have not been required to clock out and back during their lunch; therefore, as you discovered, documentation to support an uninterrupted lunch period does not exist in most cases. Based on your input, we are developing a policy that will require employees to clock out and in for their lunch period.

(*Id.*)

The 2010–2012 period investigated by DOL is within the statutory period covered by plaintiffs' FLSA claims in this case. Espinoza advised the DOL that based on its input UMC was "developing a policy that will require employees to clock out and in for their lunch period." (*Id.*) This letter was sent more than a month after UMC was served with plaintiffs' complaint, and UMC's CEO received plaintiffs' counsel's August 6, 2012 preservation letter. UMC clearly understood that its timekeeping records and policies, and inability to document that employees were being compensated for actual time worked was under investigation by the DOL, and at issue in plaintiffs' complaint. UMC's Chief Human Resources Officer also clearly understood that "documentation to support an uninterrupted lunch period does not exist in most cases." (*Id.*)

## C. Scope of the Duty to Preserve

The duty to preserve evidence arises when the party has notice that the evidence is relevant to litigation, for example, "when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *MOSAID Techs.*,

*Inc. v. Samsung Elecs. Co.*, *Ltd.*, 348 F. Supp. 2d 332, 336 (D.N.J. 2004) (stating that a litigant "is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation"). "The duty to preserve evidence also includes an obligation to identify, locate and maintain, information that is relevant to specific, predictable, and identifiable litigation." *Apple*, 881 F. Supp. 2d at 1136 (internal quotation and citation omitted). A party's duty to preserve relevant documents includes documents or tangible things made by individuals that are likely to have discoverable information that the disclosing party may use to support its claims or defenses. *Id.* It also includes documents prepared for those individuals, information that is relevant to the claims or defenses of any party, or the subject matter of the action. *Id.* The duty to preserve also includes information in the possession of "those employees likely to have relevant information—the 'key players' in the case." *Id.* (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)).

Once a duty to preserve is triggered, a party has a duty to suspend any existing policies relating to deleting or destroying files and preserve all relevant documents related to litigation. *In re Napster*, 262 F. Supp. 2d at 1070 (citing *Zubulake*, 220 F.R.D. at 218 ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.")). The duty to preserve discoverable materials is an affirmative one. *Turnage*, 115 F.R.D. at 557–58. This affirmative duty requires agents or corporate officers having notice of discovery obligations to communicate those obligations to employees in possession of discoverable materials. *Id.* In *Apple*, the court found Samsung violated its duty to preserve when it did not suspend its automatic bi-weekly destruction policy for a software system, failed to distribute litigation hold notices to a sufficient number of employees after litigation was reasonably foreseeable, failed to follow up with its affected employees for seven months, and failed to monitor its employees' preservation efforts to ensure its employees were all compliant. 881 F. Supp. 2d at 1150.

One of the most astonishing assertions UMC made in its objection to the special master's R & R is that UMC did not know what to preserve. UMC and its counsel had a legal duty to figure this out. Collection and preservation of ESI is often an iterative process between the attorney and

the client. The lawyer's obligation is to explain to the client what the lawsuit is about, what plaintiffs' claims are, and what the lawyer's analysis of potential defenses are to educate the client. The lawyer should provide discovery requested by the opposing party, and explain what evidence counsel believes is needed to present claims and defenses. An inquiry must be made concerning the people who have discoverable information, and where relevant information is likely to be stored. Steps must be taken to suspend business as usual so that discoverable information is not lost, modified or destroyed. The lawyer has an obligation to educate himself or herself about what data the client has, who has it, how it is stored, what document retention and destruction policies the client has, who has access to the data, and how it is preserved, or how it may be modified or destroyed. As the advisory committee notes to the 2015 amendment to Rule 37(e) instruct, counsel for parties "must become familiar with their clients' information systems and digital data—including social media—to address these issues." Fed. R. Civ. P. 37(e) advisory committee note.

It is simply not an option to fail to learn how to address the technical issues related to preservation, collection, and production of ESI. Even the old dogs of the federal judiciary must learn new tricks. We no longer communicate with quill pens and paper. We no longer store most information on paper. We file lawsuits electronically. We do research electronically. We keep track of what is going on in the world electronically. Parties to lawsuits and their lawyers may not avoid their legal duties to preserve and produce discoverable information because no one devotes sufficient time to find out what the party has, stores, and preserves.

In this case, witnesses in corporate capacities charged with knowing profess to know little or nothing about the legal duty to preserve and produce relevant information in a lawsuit. Prior to the appointment of the special master the search for truth was repeatedly frustrated by the obstinate refusal of UMC executives and counsel to spend the time to investigate and find out where relevant or potentially relevant ESI was stored, and to take reasonable steps to see it was preserved, collected, and where responsive to plaintiffs' discovery requests, produced.

UMC and its counsel took no steps to put a litigation hold in place until April 15, 2013. The email Cindy Dwyer sent out on April 15, 2013, at the request of Mr. Brannman was inadequate. It provided little or no guidance to key custodians about what the case was about and

what evidence should be preserved. UMC failed to distribute litigation hold notices to a sufficient number of employees from the beginning. UMC's counsel and executives failed to notify key custodians and IT staff responsible for maintaining data of the need to preserve and prevent destruction until months after the special master was appointed. After a litigation hold was finally distributed, UMC and its counsel failed to follow up with key custodians to see that discoverable information was preserved and failed to coordinate preservation with the IT staff who had the technical expertise to see discoverable information was preserved.

UMC and its counsel failed to conduct an adequate investigation to determine which employees were likely to have discoverable information, and where that information was stored. UMC executives and its counsel failed to instruct any UMC employees to suspend any automatic data destruction policies. UMC did not notify the 26 custodians whose ESI was collected in April and August 2013 to preserve until after the special master was appointed and met with the court and parties in chambers on March 10, 2014.

Jackie Panzeri, the Payroll Manager at UMC who collected payroll data requested by the DOL at the direction of Espinoza and Spring was not notified to preserve data she was involved in collecting until two or three weeks before she provided testimony at a special master hearing in May 2014. During her testimony on May 6, 2014, Ms. Panzeri disclosed she had readily accessible data collected for the DOL investigation and had provided it to Espinoza and Spring to respond to DOL's request for information. Yet no one ever asked her if she had relevant information before the hearing. Follow up by the special master revealed she had payroll data produced to the DOL in spreadsheet format that UMC's counsel insisted had been produced to plaintiffs that had not in fact been produced. Counsel for UMC later conceded some spreadsheets had not been produced. When UMC's counsel investigated further and found that all the spreadsheets of payroll data provided to the DOL had not been produced to plaintiffs, counsel claimed during special master proceedings that this was the result of a "miscommunication." This was one of many, many "miscommunications" uncovered during special master proceedings.

UMC was on notice that its timekeeping, time systems, payroll policies, and procedures were relevant to this litigation. UMC also knew it was unable to document that employees were

being compensated for actual time worked. Both UMC and its former and current counsel failed to comply with UMC's legal duty to suspend routine document retention/destruction policies to ensure the preservation of relevant documents. UMC failed to communicate the need to preserve relevant documents and ESI to employees in possession or likely to be in possession of discoverable information, or for that matter to communicate this duty even to "key players." UMC and its counsel failed to identify, locate, and maintain information relevant to specific, predictable, and identifiable claims involved in this litigation.

Despite acknowledging to the DOL after plaintiffs filed their complaint that its Kronos system was not capturing actual time worked, UMC failed to identify and produce timekeeping data on at least four other timekeeping systems used by UMC employees to keep track of their time. Doug Spring, the UMC executive responsible for this litigation, authorized use of one of those timekeeping systems, CrimeStar, to track meal breaks because employees in UMC's Public Safety Office informed him that UMC's new system for reporting meal breaks was not working for that department. (Gurrola Decl., ECF No. 199-13.) In staff meetings in November 2012 after Spring authorized use of CrimeStar to report meal breaks, employees using CrimeStar to track meal breaks stated the new system was working. Yet the CrimeStar timekeeping system was not disclosed or preserved until late in special master proceedings. Counsel for UMC explained to the special master that they did not investigate or disclose the four other timekeeping systems because Kronos was the only system used to pay employees. However, as Espinoza told the DOL, employees did not clock in and out on Kronos for meal breaks, and UMC had no ability to document uninterrupted meal breaks. UMC told the DOL it was working on implementing a policy to correct this problem. Timekeeping systems that UMC did not disclose until special master proceedings were used by some opt-in plaintiffs. They contain evidence of time worked.

UMC's objection claims the four other systems are not timekeeping systems and, although Mr. Spring may have approved the use of CrimeStar and Teletracking, he did not use those applications himself and therefore had no obligation to disclose these systems in custodian interviews ordered by the special master because a "custodian interview is aimed at uncovering the applications, systems, programs, data with which the actual custodian interfaces." (Obj. 21,

ECF No. 207.) This excuse couched as an explanation exemplifies the failure of UMC executives and its counsel to appreciate, let alone comply with, the legal obligation to identify, locate, maintain, and produce information relevant to specific, predictable, and identifiable claims and defenses.

UMC's lawyers told the court UMC has since implemented a policy to correct the problem and informed employees of policy for getting compensated for missed meals breaks.[22] It defends its failure to identify and produce other time tracking data arguing that its auto deduction policy is legal and its policy implemented after the DOL investigation uncovered its inability to document actual time taken for meal breaks now shifts the burden on employees to report and remedy uncompensated time. For the reasons the court discussed at length in this order, the court rejects UMC's burden shifting argument. (*See, supra*, Section VI.E.) The existence of these timekeeping systems and data stored on them is highly relevant to the issue of whether UMC had actual or constructive knowledge that employees were not being compensated for missed meal breaks.

UMC executives and its counsel clearly violated the court's order to produce data on key executive mobile devices, and failed to notify appropriate personnel of the need to preserve the data until January 21, 2014, the day before the data was to be downloaded. By then it was too late. UMC also attributes the fact that the Blackberries used by Brannman, Espinoza, and Mumford were wiped to a "communication failure." Counsel represented to the court that these executives were informed they needed to preserve data on the devices. Although the court ordered production of responsive texts from these executives' devices in granting the motion to compel in July 2013, UMC's reply states that the custodians were not notified to preserve their text messages until November 2013. (Reply 8:20–24, ECF No. 222.) UMC's counsel represented to the court before the January 21, 2014 hearing that "[a]s these individuals with high-levels of institutional responsibility are required to have access to these devices continually, UMC is very carefully scheduling time in January to pull the data that can be obtained from these devices." (Joint Status Report at 4, ECF No. 142.)

---

[22] Plaintiffs' Response (ECF No. 216) to UMC's Objections claims UMC had not produced the policy UMC claims it implemented after the DOL investigation.

UMC's counsel told the court these executives could not part with their devices long enough to download the data until January 22, 2014, yet the Blackberries were given to IT staff for an upgrade that wiped them. At oral argument on the objections to the special master's R & R, counsel for UMC conceded that IT staff was not informed of the need to preserve this data. "The IT person obviously did not know that this data on those phones needed to be preserved and so they performed the upgrade and that resulted in wiping out what text messages there were." (Hr'g Tr. 26: 12–22, Oct. 21, 2014, ECF No. 229.) UMC was forced to concede the point because of the efforts of the special master to uncover what actually occurred.

The data was wiped after the court gave UMC a final January 31, 2014 deadline for producing the text data warning UMC that if ESI production continued to be a problem the court would consider the full panoply of Rule 37 sanctions up to and including case dispositive sanctions. Despite all the hearings and all the representations and all the warnings, no one in the IT department responsible for preserving the data was notified of the need to preserve until January 21, 2014. (*See* Kisner Decl., ECF No. 198-4.)

Ms. Kisner is the Information Technology Customer Services Manager at UMC. Her declaration states:

> I personally learned of the of the need to preserve cell phone data for certain custodians' Blackberry devices on January 21, 2014. I was forwarded an email from the Director of Information Technology, Lonnie Richardson, that included communications from counsel for UMC requesting time to forensically image the devices of John Espinoza, Brian Brannman, and James Mumford.

(*Id*. ¶ 6.) She then relates that on an unspecified date in January 2014, UMC "migrated devices from our old Blackberry server to a new Blackberry server … which process "included wiping all devices to be migrated." (*Id*. ¶ 7; *see also* Hr'g Tr. 86–188, ECF No. 189-5 (testimony of Trina Burage Simon, the UMC PBX supervisor who managed the Blackberry account).) Ms. Simon testified she did not receive any preservation notice until she received an email "from Susie that said not to wipe any more Blackberries" around the end of January 2014. (Tr. 187:4–6.)

As a result, the special master determined that 26,000 text messages were deleted from the mobile devices of UMC users including key custodians who used them so continuously UMC was "carefully scheduling" data collection. UMC has the audacity to defend the destruction of data the

108

court ordered produced from these devices in its objection arguing UMC did not take steps to preserve the data until it was too late because UMC does not consider the data to be UMC business records. This is a preposterous *post-hac* rationalization. The argument is inconsistent with multiple representations made to the court that use of these devices was vital to executives' work. It also completely ignores the fact that the court *ordered* the data produced. The data was wiped more than six months after the July 12, 2013 hearing in which the court overruled UMC's objections to plaintiffs' discovery requests, granted plaintiffs' motion to compel, and required UMC to produce data from executive mobile devices responsive to plaintiffs' discovery requests.

When the text data was produced it was forwarded by a letter from UMC counsel stating the disk contained all the texts for the three custodians. Sixty-four texts were produced from December 2013. When questioned about the scant production UMC's counsel initially told plaintiffs' counsel and the court that the reason there were so few texts produced was because of a storage problem. Special master proceedings established that this representation was patently false. However, even if the explanation was true it would only further illustrate UMC's failure to appreciate the need to suspend routine data deletion of repositories of relevant discoverable information.

Significantly, UMC has never argued that ESI responsive to plaintiffs' discovery requests was not reasonably accessible. Rather, UMC's current counsel has argued the ESI protocol its former counsel drafted was too onerous and difficult to comply with. After months of hearings during which UMC's counsel explained its inability to produce responsive ESI, the court granted UMC relief from producing ESI responsive to the plaintiffs' discovery requests by narrowing the list of custodians and search terms for conducting a first round of ESI production. The court directed plaintiffs to identify five key custodians, and for the parties to agree on 10 search terms to initiate the ESI production.

When the first search using the 10 agreed-upon search terms for the first five custodians was done in September 2013, it resulted in 5,000,000 "hits" and what UMC's counsel represented was 70 gigs of data, which would fill 2,100 boxes in paper form. Counsel for UMC told the court that the volume of the material collected using these custodians and search terms was not the

problem. Rather, the problem was the time and expense it would take counsel to review the data for information responsive to plaintiffs' discovery requests. Plaintiffs agreed to review the entire collection to relieve UMC of the burden and expense of reviewing the data for information responsive to their requests. UMC agreed to produce to produce the collection to plaintiffs' counsel by transferring the data to a flash drive at an estimated cost of $100. Yet, as explained in great detail in this order, UMC was unable to produce very little usable ESI until after the special master was appointed, more than eight months after the court compelled UMC to respond to plaintiffs' discovery requests and after months and months of hearings trying to address the problems as they were described. UMC's conduct warrants sanctions.

### D. Sanctions Under Rule 37(b)

Rule 37(b) authorizes a wide range of sanctions for a party's failure to comply with a discovery order, including litigation-ending sanctions. Fed. R. Civ. P. 37(b)(2)(A).

The special master found that UMC's failure to issue a timely litigation hold/preservation notice after the court entered an order requiring preservation of ESI amounted to willful, bad faith conduct. He also found that UMC acted with "conscious disregard" of its legal duty to preserve by failing to institute a litigation hold until April 2013. He concluded that UMC's failure to effectively implement ESI preservation, and failure to inform and educate key custodians about their preservation duties constituted willful spoliation. Applying the Ninth Circuit's test for case dispositive sanctions, he determined that in light of the multiple preservation orders entered by the court and by the special master, UMC's conduct was willful and in bad faith and warranted dispositive sanctions. The special master recommended that default judgment be entered against UMC in favor of the 613 opt-in plaintiffs. The special master also recommended a wide array of preclusion and evidentiary sanctions that would effectively dispose of claims and defenses.

The Ninth Circuit has established a five-part test, with three subparts to the fifth part "to determine whether a case dispositive sanction under Rule 37(b)(2) is just." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). Before dismissing a case or declaring a default the court must consider: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the

other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id*. The three subparts for evaluating the fifth factor are (1) whether the court has considered lesser sanctions, (2) whether it tried them, and (3) whether it warned the recalcitrant party about the possibility of case-dispositive sanctions. *Id*. The five factor test is not a mechanical test. *Id*. It merely provides the "court with a way to think about what to do, not a set of conditions precedent for sanctions or a script the district court must follow." *Id.* When preclusion sanctions amount to dismissal of a claim, the district court is required to make a finding of willfulness, fault, or bad faith, and to consider the availability of lesser sanctions. *R&R Sales*, *Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012).

Here, the first three of the five factors clearly weigh in favor of imposing case-dispositive sanctions. Little progress was made in moving the case forward and discovery was delayed for many months as the court tried to sort out and remedy UMC's failure to produce usable ESI responsive to plaintiffs' discovery requests in lengthy discovery and dispute resolution hearings conducted between August 15, 2013, and February 11, 2014. The court appointed a special master at UMC's expense as a last resort and only after warning UMC it would do so if UMC was unable to remedy its ongoing problems with preserving, collecting and producing ESI in compliance with the stipulated ESI protocol. UMC's last ESI production before the appointment of the special master was largely unusable. By the time the special master was appointed, the court had lost all confidence in the accurateness of the representations made by UMC, its counsel, and its consultants. The court simply did not believe UMC was able and/or willing to identify and remedy the problems.

Plaintiffs have been prejudiced by the delay and additional expense involved in attempting to resolve the numerous problems both before and after the appointment of the special master. The court originally set a 90-day timeline for the special master to identify and, if possible remediate UMC's ESI discovery failures. It took nearly twice as long for the special master to complete his work because of the magnitude of the problems, the multiple "miscommunications" and patently false representations made by UMC and its counsel, and the sheer number of people the special master needed to obtain information from to complete his work.

The last two factors weigh in favor of lesser sanctions. Public policy favors disposition of cases on their merits. After conducting an exhaustive de novo review of the record, the court cannot conclude that UMC's multiple discovery failures and failure to comply with the court's orders threatens to interfere with the rightful decision of this case on the merits. The court tried and imposed lesser sanctions by appointing the special master, and warned UMC that it would consider the full panoply of sanctions available under Rule 37, including case dipositive sanctions before the special master was appointed. However, lesser sanctions are still available. The court cannot adequately remedy the substantial delay plaintiffs have suffered in getting the case resolved on the merits. The court can, however, remedy the additional expense plaintiffs have unnecessarily incurred.

The court finds lesser sanctions are more appropriate and proportional for UMC's disobedience of court orders and discovery obligations primarily because the special master's extraordinary expertise and persistence successfully remediated the majority of the problems. He uncovered repositories of relevant responsive ESI, identified the key custodians and found out all of the devices and sources of ESI they had. He was able to identify and remedy the technical glitches that resulted in ESI productions that were not searchable or in compliance with the ESI protocol. He assisted in amending the ESI protocol to address other problems. He was able to direct restoration of lost data with the notable exceptions of data wiped from executive Blackberries and data stored on the Q Drive earlier than December 2013.

**E. Rule 37(e)**

Rule 37(e) was adopted in 2006 to address sanctions for a party's failure "to provide electronically stored information lost as a result of routine, good faith operation of an electronic information system." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. It provided:

> Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.

The 2006 version of Rule 37(e) was criticized for "not adequately addressing the serious problems resulting from continued exponential growth and the volume" of ESI. *Id.* The advisory committee

pointed out that "aggressive preservation efforts can be extremely costly" and that parties "may have limited staff and resources to devote" to preservation efforts. *Id.* The advisory committee also observed that the federal circuits had "established significantly different standards for imposing sanctions or curative measures on parties who failed to preserve electronically stored information." *Id.* The combination of these developments "caused litigants to expend excessive effort and money on preservation in order to avoid the risk of severe sanctions if a court finds they did not do enough." *Id.*

Rule 37(e) was amended effective December 1, 2015. It now provides:

> **(e) Failure to Preserve Electronically Stored Information**. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> **(A)** presume that the lost information was unfavorable to the party;
>
> **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> **(C)** dismiss the action or enter a default judgment.

Under the current version of Rule 37(e), the court may impose sanctions for a party's failure to preserve ESI if it finds: (1) the party failed to preserve ESI "that should have been preserved" in anticipation or conduct of litigation; (2) the ESI was lost because the party failed to take reasonable steps to preserve it; (3) the ESI cannot be restored or replaced through additional discovery; and (4) another party was prejudiced by the loss. Fed. R. Civ. P. 37(e)(1). If the court finds all four prerequisites, it may issue sanctions "no greater than necessary" to cure the prejudice. *Id.*

If the party that lost the ESI "acted with the intent to deprive another party of the information's use in the litigation," Rule 37(e)(2) authorizes more severe sanctions, including a presumption that the lost information was unfavorable to the party losing it, a permissive or mandatory jury instruction that the information was unfavorable to the party, or the dispositive sanctions of dismissal or default. Fed. R. Civ. P. 27(e)(2)(A)–(C).

The current version of Rule 37(e) gives the court authority to impose curative and other sanctions "if information that should have been preserved is lost, and specifies the findings

necessary to justify these measures." *Id.* The 2015 amendment to Rule 37(e) now "forecloses reliance on inherent authority or state law" to determine whether and what sanctions are appropriate for a party's loss of discoverable ESI. *Id.* The advisory committee made clear that the 2015 amendment to Rule 37(e) "does not attempt to create a new duty to preserve." *Id.* Rather, the federal common law "duty to preserve relevant information when litigation is reasonably foreseeable remains." *Id.* ("Rule 37(e) is based on this common-law duty; and it does not attempt to create a new duty to preserve.").

Sanctions under Rule 37(e) are authorized only when ESI lost is because a party failed to take reasonable steps to preserve. *Id.* The advisory committee explained that because of the "ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible." *Id.* The current version of Rule 37(e) therefore preserved the provision of the 2006 version of the rule that provided that "the routine, good-faith operation of an electronic information system" is a "factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information." *Id.* Because "reasonable steps" to preserve discoverable ESI rather than perfection is the standard, the amended rule "is inapplicable when loss of information occurs despite a party's reasonable steps to preserve."

The advisory committee note instructs the courts that proportionality is a factor that should be used to evaluate the reasonableness of preservation efforts. The amendments to the Federal Rules of Civil Procedure in 2015 also made significant changes to Rule 26(b)(1). Parties are now only entitled to discover information relevant to claims and defenses *and* proportional to the needs of the case. The 2015 amendments to Rule 37(e) reinforce the necessity that a trial court evaluate proportionality in allowing discovery and considering sanctions for the loss of relevant or potentially relevant ESI.

This case was filed in 2012. The special master was appointed in early-2014 and entered his findings and recommendations in August 2014. The court must therefore decide whether to apply the 2006 version or the current version of Rule 37(e). The Supreme Court approved the amendment to Rule 37 in April 2014, but the new rule did not go into effect until December 1,

2015.  In the April 29, 2014 order transmitting the rule changes to Congress, the Supreme Court ordered that they "shall take effect on December 1, 2015, and shall govern . . . insofar as just and practicable, all proceedings then pending."  2015 U.S. Order 0017; *see also* 28 U.S.C. § 2074(a).[23]

The court finds it is "just and practicable" to apply the amended version of Rule 37(e) for several reasons.  The amended rule is based on the federal common law duty to preserve relevant ESI when litigation is reasonably foreseeable.  It does not create a new duty to preserve.  Rather, the current version of Rule 37(e) specifies findings the court must make before determining whether sanctions are appropriate and the sanctions that may be imposed in the exercise of the court's broad discretion based on those findings.  Fed. R. Civ. P. 37(e) advisory committee note ("It authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures.").  It is not unjust to apply the 2015 version of Rule 37(e) because it "does not govern conduct; a party has the same legal duty to preserve evidence for use in litigation today as before the amendments."  *Security Alarm Fin. Enter. L.P. v. Alarm Protection*, 2016 WL 7115911 (D. Ala. 2016).[24]  The new rule "merely limits the court's discretion to impose particular sanctions."  *Id.*

Finally, the advisory committee's reasons for the amendment recognize the enormous time and expense parties incur to preserve relevant ESI to avoid potentially devastating sanctions caused

---

[23]  It provides in part: "The Supreme Court may fix the extent to which such rule shall apply to proceedings then pending, except that the Supreme Court shall not require that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies."

[24]  *See also, e.g.*, *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 695 (N.D. Ga. 2016) (concluding that application of the new rule would be just and practicable because the amended rule "does not create a new duty to preserve evidence"); *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 618 n.6 (E.D. Pa. 2016) (applying the revised rule to motions filed before the amendment went into effect, and noting that the rule change did not substantively alter the moving party's burden, in the Third Circuit, of showing that ESI was destroyed in "bad faith"); *Konica Minolta Bus. Sols., U.S.A. Inc. v. Lowery Corp.*, 2016 WL 4537847, at *2–4 (E.D. Mich. Aug. 31, 2016) ("While the language of the rules changed, the spirit and principles underlying them have not materially changed in a manner adverse to" the moving party); *GN Netcom, Inc. v. Plantronics, Inc.*, 2016 WL 3792833, at *5 n.6 (D. Del. July 12, 2016); *Matthew Enter., Inc. v. Chrysler Group LLC*, 2016 WL 2957133, at *1 (N.D. Cal. May 23, 2016); *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *3 n.1 (S.D. Fla. Mar. 22, 2016); *but see Learning Care Grp., Inc. v. Armetta*, 315 F.R.D. 433, 439–40 (D. Conn. 2016) (declining to apply Rule 37(e)'s new, more stringent culpability standard when evaluating spoliation sanctions in form of a default or an adverse inference instruction because plaintiff raised the issue prior to the rule change and doing so would not have been just or practicable; nevertheless, finding that an award of reasonable costs and attorneys' fees was appropriate).

by the ever-increasing volume of electronically stored information.  The advisory committee notes emphasize the need to focus on whether lost ESI can be restored or replaced by other discovery, as well as the need to address proportionately.  Its focus on reasonable measures rather than perfection.  Restoration or replacement and proportionality is simply a more reasonable approach to evaluating whether and how to sanction a party for losing discoverable ESI.

Since the late 1970s, the Supreme Court and the advisory committee on the Civil Rules have encouraged trial courts to exercise their broad discretion to limit and tailor discovery to avoid abuse and overuse.  The trial courts have been urged to actively manage discovery to accomplish the goal of Rule 1—"to secure the just, speedy, and inexpensive determination of every action and proceeding."

Chief Justice John Roberts issued his Year-End Report on the Federal Judiciary in which he addressed at length the 2015 amendments to the Federal Rules of Civil Procedure.[25]  The Chief Justice traced the "elaborate and time-consuming" procedure for promulgating and amending the rules which began in 2010 when the advisory committee on the Civil Rules sponsored a symposium on civil litigation attended by federal and state judges, law professors, plaintiff and defense lawyers, and representatives from business, government, and public interest organizations. The symposium identified the need for procedural reforms to: (1) encourage greater cooperation; (2) focus discovery on what is truly needed to resolve cases; (3) engage judges in early and active case management; and (4) address serious problems associated with vast amounts of electronically stored information.  *Id*. at 4–5.

The Chief Justice's Report wrote that the changes that went into effect on December 1, 2015, "may not look like a big deal at first glance, but they are."  *Id*. at 5.  It was the reason he decided to highlight them in his report.  Rule 1 was expanded to add eight words to emphasize "the obligation of judges and lawyers to work cooperatively in controlling the expense and time demands of litigation."  *Id*. at 5–6. Rule 1 now directs that the Federal Rules "should be construed, administered, *and employed by the court and the parties* to secure the just, speedy, and inexpensive

---

[25]  Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary (Dec. 31, 2015), *available at* http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf.

determination of every action and proceeding." *Id*. at 6 (emphasis in original). Chief Justice Roberts stated that lawyers representing adverse parties "have an affirmative duty to work together, and with the court, to achieve prompt and efficient resolutions of disputes." *Id*.

The 2015 amendments to Rule 26(b)(1) emphasize the need to impose "reasonable limits on discovery through increased reliance on the common-sense concept of proportionality." *Id*. The fundamental principle of amended Rule 26(b)(1) is "that lawyers must size and shape their discovery requests to the requisites of a case." *Id*. at 7. The pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery. This requires active involvement of federal judges to make decisions regarding the scope of discovery.

Chief Justice Roberts observed that the 2015 amendments to the civil rules "are a major stride towards a better federal court system," but accomplishing the goal of Rule 1 will only occur "if the entire legal community, including the bench, bar, and legal academy, step up to the challenge of making real change." *Id*. at 9. He appealed to judges "to take on a stewardship role, managing their cases from the onset rather than allowing parties alone to dictate the scope of discovery" and to actively engage in early case management to "identify the critical issues, determine the appropriate breadth of discovery, and curtail dilatory tactics, gamesmanship, and procedural posturing." *Id*. at 10–11. He beseeched judges and lawyers to "engineer a change in our legal culture that places a premium on the public's interest in speedy, fair, and efficient justice." *Id*. at 11.

The amendment to Rule 37(e) was intended to address the serious problems faced by litigants associated with vast amounts of ESI, to accomplish the goal of Rule 1, and the need to tailor discovery, and introduce proportionality into the equation to avoid discovery abuse and overuse. The days of imposing severe, punitive sanctions for loss of ESI that can be restored or replaced by other discovery, especially ESI that is marginally relevant or duplicative of information from other sources should be over.

Rule 37(e) now provides that if ESI should have been preserved but is lost because a party failed to take reasonable steps to preserve it, and the ESI cannot be restored or replaced, and the

court finds prejudice to the other party from the loss of the information, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The court may impose the harshest or most severe sanctions "only upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). These severe sanctions include a presumption that the lost information was unfavorable to the party that lost it, permissive or mandatory instruction to the jury that the information was unfavorable to the party, or the dispositive sanctions of dismissal or default. Fed. R. Civ. P. 37(e)(2)(A)–(C).

If the court finds that spoliation of ESI has occurred, the court's determination of the appropriate sanction "necessarily includes an evaluation of the [lost] information's importance in the litigation." Fed. R. Civ. P. 37(e) advisory committee note. Importantly, the current version of Rule 37(e)(1) "does not place the burden of proving or disproving prejudice on one party or the other." *Id*. As the advisory committee recognized:

> Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear to be sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations.

Courts are vested with great discretion in determining what sanctions are appropriate once a finding of prejudice is made. However, "the severity of given measures must be calibrated in terms of their effect on the particular case." *Id*. The authority to order measures "no greater than necessary to cure prejudice does not require the court to adopt measures to cure every possible prejudicial effect." *Id.*

Rule 37(e)(1) still authorizes severe sanctions for loss of ESI "such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies." *Id.* The advisory committee cautioned the court to use care "to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are

permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation." Impermissible sanctions would include striking pleadings related to, or precluding a party from offering evidence in support of, the central or only claim or defense in the case. *Id.*

In limiting the most severe sanctions to cases in which the court finds that the party who lost information acted with the intention to deprive another party of the information's use in litigation, the amendment to Rule 37(e)(2) was "designed to provide a uniform standard in federal court for use of these serious measures when addressing failure to preserve electronically stored information." Fed. R. Civ. P. 37 (e)(2) advisory committee note. The amendment to the rule "rejects such cases as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d. 99 (2nd Cir. 2002), that authorized the giving of adverse-inference instructions on a finding of negligence or gross negligence." *Id.* The advisory committee reasoned that adverse inference instructions were based on the premise that intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was available to the party responsible for the loss or destruction of the evidence. *Id.* However, "[n]egligent or even grossly negligent behavior does not logically support that inference." Because the lost information may have been favorable or unfavorable to the party who lost it "inferring that is was unfavorable to the party may tip the balance at trial in ways the lost information never would have." Therefore, "[t]he better rule for the negligent or grossly negligent loss of electronically stored information is to preserve a broad range of measures to cure prejudice caused by its loss, but to limit the most severe sanctions to instances of intentional loss or destruction." *Id.*

To summarize, the court may impose sanctions against UMC under the current version of Rule 37(e) only if it finds: (1) UMC failed to preserve ESI "that should have been preserved" in anticipation or conduct of litigation; (2) the information was lost because UMC failed to take reasonable steps to preserve it; (3) the ESI cannot be restored or replaced; and (4) the plaintiffs were prejudiced by the loss. If all of these prerequisites are met, the court may issue sanctions no greater than necessary to cure the prejudice caused by the loss. Only if the court finds UMC acted with intent to deprive may the court impose the most severe sanctions.

The court has found that UMC failed to preserve ESI that should have been preserved in anticipation of litigation, and throughout the course of this litigation. The court has also found that the information was lost because UMC failed to take reasonable steps to preserve it. Thousands of text messages on UMC Blackberry devices were lost and cannot be restored. Tens of thousands of files from the Q-Drive were lost and cannot be restored prior to December 2013.

UMC's own forensic computer expert, Mr. Edmondson, created the report at the request of the special master which established the number of files on the Q-drive accessible to seven key custodians that were modified or deleted from December 14, 2013, through April 4, 2014. December 14, 2013 was the oldest existing date on which files were backed up. Mr. Edmondson's report covered deleted or modified folders of seven of twenty-six key custodians identified by the plaintiffs in this case. Many of these custodians were the same custodians identified by prior counsel for UMC. UMC does not dispute the accuracy of Mr. Edmondson's report or the special master's extrapolation of the amount of data lost or modified based on Mr. Edmondson's report over the more than 450-day period between service of plaintiffs' complaint and UMC's December 14, 2013 backup. UMC does not dispute that more than 50 folders with the words "DOL," "Small," "labor," and "payroll," to which these seven key custodian had access, were lost or modified. UMC does not dispute the special master's finding that this large amount of data lost or modified between August 7, 2012, and December 14, 2013, when the Q-Drive backup was done, was likely irretrievably lost.

There is no dispute that all but one month of text data for December 2013 from executive Blackberries was intentionally deleted. There is also no dispute that the key custodians involved and responsible for this case failed to preserve even the preservation letters they denied receiving, but undeniably received.

The content of the lost data on the Q-drive and on key custodians' individual computers is fairly evident. However, the special master's extraordinary expertise and persistence resulted in restoration, remediation, and production of a great deal of relevant and discoverable ESI. The special master was able to direct restoration of the time tracking systems UMC failed to disclose until near the end of special master proceedings. Fortunately, Jackie Panzeri, UMC's payroll

manager who described herself as a "pack rat" that "keeps documents forever" had a lot of documents on her personal drive and several archives full of emails she did not delete or modify. She was involved in the DOL investigation from the beginning and saved both documents collected and produced to the DOL and for this case. The court is also mindful that ESI is stored in multiple locations and that modified or lost data from the seven key custodians is likely to be found in other locations.

Finally, the Supreme Court's burden shifting approach for proving an FLSA violation shifts the burden to employers who do not keep accurate records. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). Where the employer does not keep accurate records employees need only produce sufficient evidence to show the amount and extent of the hours they worked but were not compensated. *Id*. "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed, or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Id.* If the employer fails to meet this burden "the court may then award damages to the employee, even though the result may be only approximate." *Id*. Informing the jury of the court's findings and allowing it to consider UMC's failure to comply with the court's orders, duty to preserve, and loss of relevant and discoverable ESI, for whatever value it deems appropriate is a significant sanction in light this burden shifting approach for proving an FLSA violation.

Although the court finds plaintiffs have been prejudiced by the loss of data from key repositories and custodians, the loss has not threatened to interfere with the rightful decision of the case on its merits given the large volume of ESI the special master was able to ensure that UMC produced. For these reasons, the court finds that lesser sanctions are appropriate, proportional, and no greater than necessary to cure the prejudice caused by the loss of ESI uncovered by the special master.

**IT IS ORDERED**:

1. The Special Master's Report and Recommendation and Final Findings of Fact and Conclusions of Law (ECF No. 189) is **ACCEPTED and ADOPTED in part and OVERRULED in part** consistent with this order. The Special Master's

1    recommendation of case dispositive sanctions are **OVERRULED**.

2    2.   UMC is sanctioned in the form of an instruction to the jury that the court has found

3         UMC failed to comply with its legal duty to preserve discoverable information, failed

4         to comply with its discovery obligations, and failed to comply with a number of the

5         court's orders.  The instruction will provide that these failures resulted in the loss or

6         destruction of some ESI relevant to the parties' claims and defenses and responsive to

7         plaintiffs' discovery requests, and that the jury may consider these findings with all

8         other evidence in the case for whatever value it deems appropriate.

9    3.   Monetary sanctions are also imposed against UMC in the form of reasonable costs and

10        attorneys' fees unnecessarily incurred by plaintiffs, including costs incurred for

11        plaintiffs' ESI consultants in connection with (1) filing the May 2013 motion to

12        compel; (2) efforts to obtain compliance with the order compelling UMC to produce

13        information responsive to the discovery requests in dispute; (3) attempts to identify and

14        remedy UMC's deficient ESI productions; and (4) cost of participating in special

15        master proceedings.

16   4.   Plaintiffs shall have until **August 14, 2018,** to file an application for an award of

17        attorneys' fees in compliance with the requirements of LR 54-14.  The motion must

18        include:

19        (A)   A reasonable itemization and description of the work performed;

20        (B)   An itemization of all costs sought to be charged as part of the fee award and not

21              otherwise taxable under LR 54-1 through 54-13;

22        (C)   A brief summary of:

23              (i)     The results obtained and the amount involved;

24              (ii)    The time and labor required;

25              (iii)   The novelty and difficulty of the questions involved;

26              (iv)    The skill requisite to perform the legal service properly;

27              (v)     The preclusion of other employment by the attorney due to acceptance

28                      of the case;

1   (vi) The customary fee;

2   (vii) Whether the fee is fixed or contingent;

3   (viii) The time limitations imposed by the client or the circumstances;

4   (ix) The experience, reputation, and ability of the attorney(s);

5   (x) The undesirability of the case, if any;

6   (xi) The nature and length of the professional relationship with the client;

7   (xii) Awards in similar cases; and

8   (xiii) Any other information the court may request.

9  (D) The motion must be accompanied by an affidavit from the attorney responsible

10   for the billings in the case authenticating the information contained in the

11   motion and confirming that the bill was reviewed and edited and that the fees

12   and costs charged are reasonable.

13  (E) Failure to provide the information required by subsections (B) and (C) in a

14   motion for attorney's fees may be deemed a consent to the denial of the motion.

15  (F) If no opposition is filed, the court may grant the motion after independent

16   review of the record.  If an opposition is filed, it must set forth the specific

17   charges that are disputed and state with reasonable particularity the basis for the

18   opposition.  The opposition must include affidavits to support any contested

19   fact.

20  (G) If either party wishes to examine the affidavit, the party must specifically make

21   that request in writing.  Absent such a request, the court may decide the motion

22   on the papers or set the matter for evidentiary hearing.

23 5.  Defendants shall have until **August 29, 2018**, to file a response to plaintiffs' motion.

24 DATED this 31st day of July, 2018.

25

26          PEGGY A. LEEN

27          UNITED STATES MAGISTRATE JUDGE

28